# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, *et al.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>JAMES R. MCHENRY III, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br><br>Defendants. | Civil Docket No. 1:25-cv-286 |

# DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

A.    BOP's Inmate Designation Authority and Process ................................................ 4

B.    The Prison Rape Elimination Act ........................................................................... 5

C.    The Executive Order and BOP's Implementation ................................................. 6

D.    Procedural History .................................................................................................. 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

I.     THIS COURT LACKS AUTHORITY TO REVIEW THIS CASE
       UNDER THE PLRA ................................................................................................ 8

II.    PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF
       SUCCESS ON THE MERITS ............................................................................... 10

       A.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection
             Claim ......................................................................................................... 10

       B.    Plaintiffs Are Unlikely to Succeed on Their Eighth Amendment
             Claim ......................................................................................................... 16

       C.    Plaintiffs Are Unlikely to Succeed on Their APA Claim ....................... 19

III.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ....... 21

IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
       DEFENDANTS ..................................................................................................... 22

V.     ANY INJUNCTIVE RELIEF MUST COMPLY WITH THE PLRA ............... 22

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) .................................................................................. 15

*Bell v. Wolfish,*
   441 U.S. 520 (1979) .................................................................................. 11

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................. 19

*Bernier v. Allen,*
   38 F.4th 1145 (D.C. Cir. 2022) ........................................................... 16, 18

*Bolling v. Sharpe,*
   347 U.S. 497 (1954) .................................................................................. 10

*Booth v. Churner,*
   532 U.S. 731 (2001) .................................................................................... 9

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ................................................................. 21

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
   473 U.S. 432 (1985) .................................................................................. 10

*ConverDyn v. Moniz,*
   68 F. Supp. 3d 34 (D.D.C. 2014) .............................................................. 21

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   603 U.S. 799 (2024) .................................................................................. 18

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) .................................................................................. 20

*Erickson v. Pardus,*
   551 U.S. 89 (2007) .................................................................................... 18

*Estelle v. Gamble,*
   429 U.S. 97 (1976) .................................................................................... 16

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................................. 16

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................. 20

*Foy v. United States,*
    285 F.R.D. 407 (N.D. Iowa 2012) ........................................................ 8

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ........................................................... 8

*Harrison v. Kernan,*
    971 F.3d 1069 (9th Cir. 2020) ............................................................ 14

*Hatim v. Obama,*
    760 F.3d 54 (D.C. Cir. 2014) ............................................... 11, 12, 21

*Inmates of Occoquan v. Barry,*
    844 F.2d 828 (D.C. Cir. 1988) ....................................................... 4, 16

*Johnson v. California,*
    543 U.S. 499 (2005) ........................................................................ 2, 14

*Jones v. Bock,*
    549 U.S. 199 (2007) .................................................................. 1, 9, 10

*Jones v. North Carolina Prisoners' Union,*
    433 U.S. 119 (1977) ............................................................................ 11

*Keohane v. Fla. Dep't of Corr. Sec'y,*
    952 F.3d 1257 (11th Cir. 2020) ...................................................... 3, 17

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014).................................................................. 17

*Lamb v. Norwood,*
    899 F.3d 1159 (10th Cir. 2018) ......................................................... 17

*McCarthy v. Madigan,*
    503 U.S. 140 (1992) ............................................................................. 9

*Michael M. v. Superior Court,*
    450 U.S. 464 (1981) ................................................................................................ 10

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) .............................................................................. 20

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ......................................................................... 21

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................................. 8

*O'Lone v. Estate of Shabazz,*
    482 U.S. 342 (1987) ................................................................................................ 14

*Overton v. Bazzetta,*
    539 U.S. 126 (2003) ................................................................................................ 14

*Pitts v. Thornburgh,*
    866 F.2d 1450 (D.C. Cir. 1989) ................................................................... 13, 14, 15

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................................................................................ 10

*Porche v. Salazar,*
    No. 3:19-CV-00077, 2019 WL 1373683 (D. Or. Mar. 5, 2019) ................................ 8

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) ................................................................................................ 11

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) ...................................................................................... 3, 11, 16

*Ross v. Blake,*
    578 U.S. 632 (2016) .................................................................................................. 9

*Saline Parents v. Garland,*
    88 F.4th 298 (D.C. Cir. 2023) ................................................................................. 15

*Stoddard v. District of Columbia,*
    764 F. Supp. 2d 213 (D.D.C. 2011) ....................................................................... 16

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ................................................................................................ 13

*Turner v. Safley,*
   482 U.S. 78 (1987) ................................................................................. 2, 11, 21

*United States v. Vang,*
   No. CR 16-277, 2020 WL 4704875 (D. Minn. Aug. 13, 2020) ................................... 8

*Veney v. Wyche,*
   293 F.3d 726 (4th Cir. 2002) .................................................................... 11

*Wills v. Barnhardt,*
   No. 21-1383, 2022 WL 4481492 (10th Cir. Sept. 27, 2022) .................................. 8

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................... 7, 8

*Wis. Gas. Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) .................................................................. 21

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia,*
   93 F.3d 910 (D.C. Cir. 1996) ............................................................ *passim*

*Woodford v. Ngo,*
   548 U.S. 81 (2006) .............................................................................. 9

**Statutes**

5 U.S.C. § 704 ....................................................................................... 3, 18

18 U.S.C. § 3621 ............................................................................... *passim*

18 U.S.C. § 3625 ...................................................................................... 3, 18

18 U.S.C. § 3626 ......................................................................................... 22

42 U.S.C. § 1997e ....................................................................................... 9

**Regulations**

28 C.F.R. § 115.41 ................................................................................ 5, 19, 20

28 C.F.R. § 115.42 ................................................................................ 6, 19, 20

28 C.F.R. §§ 542.13 .................................................................................... 10

28 C.F.R. § 542.14 ...................................................................................... 10

28 C.F.R. § 542.15 ...................................................................................... 10

Executive Order 14168,
   90 Fed. Reg. 8615, 2025 WL 327882 (Jan. 20, 2025) ..................................... *passim*

**INTRODUCTION**

Plaintiffs, three transgender individuals imprisoned in women's federal correctional facilities, have moved for a temporary restraining order and preliminary injunction to prevent the Federal Bureau of Prisons ("BOP") from transferring them to men's facilities and from stopping their hormone treatment for gender dysphoria. An Executive Order issued by the President on the day he took office requires BOP to ensure that "males are not detained in women's prisons." Exec. Order 14168, § 4(a), 90 Fed. Reg. 8615, 2025 WL 327882 (Jan. 20, 2025). The Executive Order also requires BOP to revise its policies concerning medical care so that no Federal funds are expended "for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.*, § 4(c).

This Court should dismiss this case because it has no authority to review Plaintiffs' challenge to their upcoming transfers. The Court's authority is limited by the Prison Litigation Reform Act ("PLRA"), which provides that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621(b). The subsection grants BOP broad discretion to designate a prisoner's place of imprisonment "in any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau." *Id.*

As for Plaintiffs' challenge to BOP's upcoming application of the yet-to-be formulated policy concerning medical care for transgender inmates, it is also subject to PLRA's restrictions, including most significantly, the "mandatory" requirement to exhaust available administrative remedies. *Jones v. Bock*, 549 U.S. 199, 211 (2007). Plaintiffs do not allege that they have satisfied this requirement. That is unsurprising because BOP has yet to revise its policy on medical care for transgender inmates. The requested relief to enjoin BOP from stopping Plaintiffs' hormone

treatment is therefore premature (and in any event, precluded by the PLRA for failure to exhaust). Indeed, the Executive Order explicitly requires that it "be implemented consistent with applicable law," which would include the Constitution. Exec. Order, § 8(b). Any suggestion that BOP would act in a contrary manner is unwarranted and insufficient to support the extraordinary relief of a TRO or preliminary injunction.

Beyond these significant threshold hurdles, Plaintiffs are unlikely to succeed on the merits of their claims. As for their equal protection claim, Plaintiffs' claim about placement is not likely to succeed. As an initial matter, BOP's implementation of the Executive Order is not subject to heightened scrutiny because, in the prison context, even a restriction affecting fundamental rights or protected classes is permissible if the asserted right is "inconsistent with proper incarceration," *Johnson v. California*, 543 U.S. 499, 500 (2005), and the restriction is "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987). The D.C. Circuit has long recognized that "the segregation of inmates by sex is unquestionably constitutional." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996). Under *Turner's* deferential standard, the asserted interest in protecting female inmates' safety, dignity, well-being, and privacy in intimate spaces withstands scrutiny.

Plaintiffs likewise are not likely to succeed on their Eighth Amendment claim. The prospect of placement in a men's facility does not constitute "cruel and unusual" punishment because, as Congress has authorized, BOP may designate any facility that meets "minimum standards of health and habitability." 18 U.S.C. § 3621. Indeed, the vast majority of the male-to-female transgender inmates (1,490 out of a total of 1,506, or 98.9%) are housed in men's facilities. BOP also has not acted with deliberate indifference to the risk of assault against Plaintiffs. As explained in the declaration of Mr. Rick Stover, BOP's Senior Deputy Assistant Director of the

2

Designation and Sentence Computation Center (attached as Exhibit 1), BOP has found that that low-security facilities will be the primary options because each houses a large number of non-violent offenders. BOP believes that placing Plaintiffs at low security institutions with non-violent offenders will minimize the likelihood that they would be victimized.

Plaintiffs' Eighth Amendment claim concerning the potential termination of hormone therapy is not likely to succeed either, even assuming it is ripe. Because "medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020), "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb," *id*. It is speculative that Plaintiffs would be able to meet this standard, considering that the Executive Order requires that its provisions be implemented consistent with applicable law, which would include the Eighth Amendment. Exec. Order, § 8(b).

Finally, Plaintiffs' claim under the Administrative Procedure Act ("APA") is unlikely to succeed because the APA may not be used to challenge BOP's designations of inmate placement. *See* 18 U.S.C. § 3625. Even if it could, BOP has not taken any "final agency action"—a prerequisite to judicial review under the APA, *see* 5 U.S.C. § 704—with respect to either Plaintiffs' final placement or their future medical care. Nor are BOP's actions arbitrary and capricious or contrary to law. BOP's implementation of the Executive Order as to placement is consistent with applicable regulations, and the Court cannot assume that BOP's future medical care policy will be unlawful.

The Supreme Court has repeatedly emphasized that "[c]ourts must and do recognize the primacy of the legislative and executive authorities in the administration of prisons." *Rhodes v. Chapman*, 452 U.S. 337, 362 (1981); *see also*

*Inmates of Occoquan v. Barry*, 844 F.2d 828, 835–36 (D.C. Cir. 1988) (noting the "recurring theme of judicial caution in the area of institutional conditions litigation"). Not only is judicial restraint appropriate in these circumstances, but there is a significant government and public interest in deferring to the Executive's determination about prison administration, consistent with U.S. policy. These interests outweigh Plaintiffs' speculative harm.

For these reasons and those stated below, the Court should dismiss the case, or, at a minimum, deny Plaintiffs' request for emergency injunctive relief.

## BACKGROUND

### A.    BOP's Inmate Designation Authority and Process

Decisions regarding classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b). As noted above, in making inmate designation decisions, BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau." *Id.*

There are currently approximately 2,230 transgender inmates housed in BOP facilities and halfway houses. Stover Decl. ¶ 6. Of those, 1,506 are male-to-female, and 724 are female-to-male. *Id.* Of the 1,506 male-to-female transgender inmates, 16 are housed in female institutions. *Id.*

BOP's current Transgender Offender Manual, found in Program Statement 5200.04, has provided guidance on many aspects of managing transgender inmates, including staff training, initial designations, intake screening, and housing and programming assignments. This guidance has been revised at various times over the past several years. From May 2018 to January 2022, the guidance provided that in deciding the facility assignment for a transgender inmate, BOP would "use biological sex as the initial determination for designation." 2018 Guidance § 5 (attached as Exhibit 2). The guidance further provided that "designation to a facility of the

4

inmate's identified gender would be appropriate only in rare cases after consideration of all of the [identified] factors." *Id.*

In January 2022, BOP revised the Transgender Offender Manual to state that in deciding the facility assignment for a transgender inmate, BOP would consider, among other things, the inmate's "current gender expression." 2022 Guidance § 5 (attached as Exhibit 3). That policy has remained in effect since 2022. Pursuant to the President's recent Executive Order, however, BOP will soon be revising the Manual.

Under both the current and prior versions of the Transgender Offender Manual, the Transgender Executive Council, a multidisciplinary team, was the BOP decision-making body on issues affecting the transgender population, including the assessment of facility designation for transgender inmates. It met periodically to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with gender dysphoria.

**B.    The Prison Rape Elimination Act**

Congress enacted the Prison Rape Elimination Act ("PREA") in 2003 to establish national standards for the prevention of sexual assault in prisons and detention facilities in the United States. *See* 34 U.S.C. §§ 30301-30309. The statute does not contain any substantive requirements, nor does it reference transgender inmates or promote gender ideology. Instead, it established a commission to study the issue and directed the Attorney General to promulgate regulations based on that study, which the Attorney General did in 2012. 28 C.F.R. part. 115. The resulting regulations require that prisons assess all inmates during an "intake screening" and upon transfer to another facility for their risk of being sexually abused by other inmates, 28 C.F.R. § 115.41(a), and that such screening consider a range of factors, *see id.* § 115.41(d), including whether the inmate "is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." *Id.* § 115.41(d)(7). The

agency then must use that the screening information to inform housing and other assignments with "the goal of keeping separate those inmates at high risk of being sexually victimized and from those at high risk of being sexually abusive." *Id.* § 115.42(a).

As to transgender or intersex inmates, the regulations provide that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c). The regulations also require prison officials to give "serious consideration" to "[a] transgender or intersex inmate's own views with respect to his or her own safety." *Id.* § 115.42(e). There is no requirement that a transgender inmate be placed in a facility that is inconsistent with the inmate's biological sex.

## C.    The Executive Order and BOP's Implementation

On January 20, 2025, the President issued an Executive Order titled, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Executive Order provides that "[i]t is the policy of the United States to recognize two sexes, male and female," Exec. Order, § 2, and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a). Section 4(a) of the Executive Order, titled "Privacy in Intimate Spaces," provides:

> The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

Section 4(c) of the Executive Order further provides:

6

> The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

The Executive Order also requires that "it shall be implemented consistent with applicable law and subject to the availability of appropriations." Exec. Order § 8(b).

Plaintiffs allege that on January 24, 2025, BOP officials removed Plaintiffs Jane and Mary Doe from the general population and placed them in separate housing with other transgender individuals in anticipation of transfer to men's facilities. Compl. ¶ 26. They further allege that on January 25, BOP officials similarly removed Plaintiff Sara Doe from the general population and placed Doe in the Special Housing Unit ("SHU"). *Id.* ¶ 29. All Plaintiffs have since been returned to the general population following reassessment. Stover Decl. ¶¶ 7–9; *see also* Compl. ¶¶ 28, 33.

After the President issued the Executive Order, members of the Transgender Executive Council reviewed the progress and current housing placement of several of BOP's transgender inmates. Stover Dec. ¶ 10. The members of the Council found that low-security facilities will be the primary options because such facilities house "a large number of non-violent offenders." *Id.* ¶ 12. "Based on the [members of the Council's] experience and range of expertise, placing [Plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." *Id.*

## D.    Procedural History

Plaintiffs filed this suit on January 30, 2025, raising claims under (i) the Equal Protection Clause of the Fifth Amendment, (ii) the Eighth Amendment, (iii) the Rehabilitation Act, and (iv) the Administrative Procedure Act ("APA"). Plaintiffs simultaneously moved for a temporary restraining order ("TRO") and a preliminary injunction, relying on the Equal Protection, Eighth Amendment, and APA claims.

## LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20). Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I. THIS COURT LACKS AUTHORITY TO REVIEW THIS CASE UNDER THE PLRA

The restrictions imposed by PLRA bar this Court's review of both Plaintiffs' challenges to placement and medical care.

*First*, Congress has vested in BOP the discretion to "designate the place of the prisoner's imprisonment" and to "direct the transfer of a prisoner from one penal or correctional facility to another." 18 U.S.C. § 3621(b) *see also Foy v. United States*, 285 F.R.D. 407, 410 (N.D. Iowa 2012) (collecting cases). To be sure, BOP must consider a number of factors when making the designation or transfer decision, and the selected penal or correctional facility must also meet "minimum standards of health and habitability established by the Bureau." 18 U.S.C. § 3621(b). But Congress could not be clearer that BOP's designations are not subject to judicial review: "Notwithstanding any other provision of law, a designation of a place of imprisonment under [18 U.S.C. § 3621(b)] is not reviewable by any court." *Id.*; *see United States v. Vang*, No. CR 16-277, 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020) (collecting

8

cases); *see also Porche v. Salazar*, No. 3:19-CV-00077, 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019) (construing § 3621(b) to preclude court review of BOP's denial of inmate's transfer request).  This includes challenges to denials of transfer requests on constitutional grounds.  *See Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *2 (10th Cir. Sept. 27, 2022) (rejecting argument that § 3621(b) did not apply to due process and equal protection challenges because "§ 3621(b) contains no such limiting language").

*Second*, Plaintiffs have failed to exhaust available administrative remedies. The PLRA provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as available are exhausted.

42 U.S.C. § 1997e(a).  The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).  So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take [special] circumstances into account."  *Ross v. Blake*, 578 U.S. 632, 638–39 (2016).  A procedure is "available" even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take some action in response to a complaint."  *Booth v. Churner*, 532 U.S. 731, 736 (2001).

Exhaustion of administrative remedies "serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  "First, exhaustion protects 'administrative agency authority,' giving an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  "Second, exhaustion promotes efficiency."  *Id.*  "Even where a controversy survives administrative review,

9

exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.*

Here, BOP's administrative process is "available" to Plaintiffs. BOP's Administrative Remedy Program has four levels: (i) aggrieved individuals must first attempt an informal resolution with unit staff, then (ii) submit an administrative remedy request to the Warden, then (iii) appeal to BOP's Regional Director, and then, (iv) if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. Plaintiffs do not claim to have "complete[d] the administrative review process in accordance with the applicable procedural rules." *Jones*, 549 U.S. at 218. At a minimum, requiring exhaustion here would "produce a useful record for subsequent judicial consideration," *Woodford*, 548 U.S. at 89, as the record is currently undeveloped as to which facilities Plaintiffs will be transferred (including the risk of harm in those facilities) or what, if any, medical care will be terminated because BOP is still revising its medical care policy. As noted, it is not yet clear what, if any, medical care will be terminated because BOP is still revising its medical care policy. Under the PLRA, BOP is entitled to have the first opportunity to assess any challenge to its ultimate determinations and to take appropriate actions. Proceeding with this case now would frustrate the important purposes of PLRA's exhaustion requirement. Judicial review therefore is improper.

## II.  PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim

Plaintiffs are also unlikely to succeed on the merits of their claims. Plaintiffs first argue that BOP's implementation of Sections 4(a) and 4(c) of the Executive Order violates the Equal Protection Clause. *See* Pls.' Mem. at 7–14. The Fourteenth Amendment's Equal Protection guarantee, as applied to the Federal Government through the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S.

10

497, 499 (1954), "requires the government to treat similarly situated persons alike," *Women Prisoners*, 93 F.3d at 924 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985)).

"The Constitution, however, 'does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Id.* (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)); *accord Michael M. v. Superior Court,* 450 U.S. 464, 469 (1981). "Thus, the dissimilar treatment of dissimilarly situated persons does not violate equal protection." *Women Prisoners*, 93 F.3d at 924 (citation omitted). The D.C. Circuit in *Women Prisoners* held that prison administrators' failure to provide women inmates the same programs as those available in men's facilities did not violate equal protection because the female and male inmates in the D.C. prison system were not similarly situated for a variety of reasons. Citing *Turner v. Safley*, 482 U.S. 78, 85–85, 89 (1987), which generally governs the standard for analyzing alleged unconstitutional prison practices, the D.C. Circuit observed that to require prison officials to do otherwise would "completely eviscerate[] the deference that federal courts are obliged to give prison administrators." *Women Prisoners*, 93 F.3d at 926–27.

Under *Turner*, courts "are to uphold prison regulations that 'impinge on inmates' constitutional rights' as long as those regulations are 'reasonably related to legitimate penological interests'—a stark departure from the 'inflexible strict scrutiny' analysis that normally applies when the government infringes on constitutional rights." *Hatim v. Obama*, 760 F.3d 54, 58 (D.C. Cir. 2014) (quoting *Turner*, 482 U.S. at 84–85, 89); *see also Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) ("In a prison context, . . . we must determine whether the disparate treatment is reasonably related to any legitimate penological interests." (cleaned up)).

In *Turner*, the Court held that prison regulations restricting inmate marriages and inmate-to-inmate correspondence were not subject to strict scrutiny despite the

11

implication of fundamental rights. As the Court recognized, a "deferential" standard is "necessary if 'prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 88 (alterations omitted) (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977)); *see also Rhodes*, 452 U.S. at 351 n.16 (1981) (prison administration is "peculiarly within the province of the legislative and executive branches of government"); *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) ("It is difficult to imagine an activity in which [the government] has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."). Thus, courts "must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim*, 760 F.3d at 59 (cleaned up).

### 1. Section 4(a) does not violate equal protection

Applying the above principles here, Plaintiffs are unlikely to succeed in establishing an equal protection violation. As to BOP's application of Section 4(a) ("Privacy in Intimate Spaces") of the Executive Order, Plaintiffs cannot demonstrate that they are entitled to the same housing as biologically female inmates. As the D.C. Circuit has recognized, "the segregation of inmates by sex is unquestionably constitutional." *Women Prisoners*, 93 F.3d at 926. Housing individuals separately according to their sex furthers the government's undisputedly legitimate interests in prisoner safety, security, and privacy. Section 4(a), which requires that all individuals of the same biological sex be housed separately from those of the opposite sex, thus plainly comports with equal protection principles. The Fifth Amendment does not require BOP to recognize exceptions to a plainly constitutional classification

12

system based on other considerations, such as an inmate's view of their gender identity.

Even if Plaintiffs were considered similarly situated to biological women inmates, their equal protection challenge would still fail. The policy withstands scrutiny under *Turner*'s deferential standard because the Executive has a legitimate penological interest in protecting the safety, well-being, and dignity of women inmates, who could have privacy and security concerns about being housed with individuals of the opposite biological sex. The Executive has determined that it is better for prison management and security to treat all biological male inmates similarly by housing them in men's facilities, *see Hatim*, 760 F.3d at 59 ("Prison security . . . is beyond cavil a legitimate governmental interest."), and to protect women inmates' safety and privacy concerns in intimate spaces for prison operation and administration. BOP's implementation of Section 4(a) has a rational connection to furthering these interests. The Court according should defer to the Executive's judgment. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.").

Plaintiffs contend that Section 4(a) "fail[s] even rational basis review" because it is "based on animus toward transgender people." Pls.' Mem. at 14. However, unlike in the "few occasions" where the Court has struck down a policy on animus grounds, here "it cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus," *Trump v. Hawaii*, 585 U.S. 667, 706 (2018), as demonstrated above.

Citing *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989), Plaintiffs argue that instead of *Turner*'s deferential standard, "heightened scrutiny applies to sex

discrimination claims brought by incarcerated people" and that the policy discriminates on the basis of sex. Pls.' Mem. at 7. Plaintiffs' reliance on *Pitts* is misplaced. There the court applied heightened scrutiny in rejecting an equal protection challenge to the District of Columbia's policy of housing long-term women offenders considerably farther from the District than long-term male offenders—thus causing the women offenders to "suffer a substantial burden." 866 F.2d at 1453. The court reasoned that *Turner* did not apply "in th[at] particular case," in part because the plaintiffs were challenging "general budgetary and policy choices made over decades" rather than "regulations that govern the day-to-day operation of prisons"; that is, the challenged policy did not implicate "either prison security or control of inmate behavior." *Id.* at 1543. Here, by contrast, BOP's implementation of Section 4(c) directly concerns the "day-to-day operation of prisons" and "the security [and] control of inmate behaviors." *Id.* at 1453. In such a circumstance, *Turner* applies and the court must give due deference to the Executive's judgment.

Plaintiffs' reliance on *Johnson v. California*, 543 U.S. 499 (2005), involving race discrimination, is similarly misplaced. As the Court explained, it has never applied *Turner* to racial classifications because the right not to be discriminated on the basis of race "is not a right that need necessarily be compromised for the sake of proper prison administration." *Id.* at 510. "*Turner*'s reasonable-relationship test" instead applies to rights that are 'inconsistent with proper incarceration.'" *Id.* (quoting *Overton v. Bazzetta,* 539 U.S. 126, 131 (2003)). "This is because certain privileges and rights must necessarily be limited in the prison context." *Id.*; *see O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) ("[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Accordingly, *Turner* has been applied to assess restrictions on a variety of constitutional rights, such as the right to marry, to attend religious services, to access

courts, to associate with others, and some due process rights. *See* 543 U.S. at 510. Here, Plaintiffs' asserted right to be housed with inmates who have a different biological sex from them is "inconsistent with proper incarceration" for the reasons discussed above.

Even if heightened scrutiny applies, BOP's application of Section 4(a) would survive that standard as well. "Heightened scrutiny does not eliminate appreciation of both the difficulties confronting prison administrators and the considerable limits of judicial competency, informed by basic principles of separation of powers." *Pitts*, 866 F.2d at 1455 (rejecting equal protection sex-discrimination challenge under heightened scrutiny). Heightened scrutiny "must not substitute the court's presumed expertise for that of prison administrators as the court evaluates administrator's choices of one course over others." *Id.*; *see also Harrison v. Kernan*, 971 F.3d 1069, 1079 (9th Cir. 2020) ("Under heightened scrutiny, the deference owed to judgments made by prison officials is factored into the importance of the government's asserted interest.").

Here, the government has "specifically asserted the governmental interest that supports the contested policies," *Pitts*, 866 F.2d at 1456—*i.e.*, the safety, well-being, and privacy of inmates in intimate spaces. And Section 4(a) of the Executive order is "directly and substantially related" to that important government interest. *Id.* Accordingly, Section 4(a) would survive even heightened scrutiny.

### 2. Section 4(c) does not violate equal protection

As for Section 4(c), Plaintiffs' equal protection challenge to its implementation is simply premature. Section 4(c) requires BOP to "revise[] its policies concerning medical care to be consistent with this order." Although it further provides that BOP shall ensure that "no Federal Funds are expended for any medical procedures, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," Section 8(b) of the Executive Order directs that it "shall be

15

implemented consistent with applicable law." At this point, BOP has not revised its policies nor made any determination to stop Plaintiffs' hormone treatment. Thus, Plaintiffs' claims challenging the revision of medical care policies in light of Section 4(c) are unripe. "[A] case is unripe for review when any prediction how the Government might eventually implement a policy is no more than conjecture." *Saline Parents v. Garland*, 88 F.4th 298, 308 (D.C. Cir. 2023) (alterations and quotation marks omitted), *cert. denied*, No. 23-1135, 2024 WL 4426566 (U.S. Oct. 7, 2024). "Absent a concrete factual context, determination of the scope and constitutionality of a purported government policy in advance of its immediate adverse effect involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Id.* at 307 (alteration and quotation marks omitted). Because the policy at issue has not yet been developed or applied, Plaintiffs' challenge to that policy "rests on hypotheticals that are too remote, speculative, and abstract for judicial review." *Id.* at 308. The Court therefore should not offer an advisory opinion. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (courts should not "entangl[e] themselves in abstract disagreements" by engaging in "premature adjudication"). Instead, this court should presume, in accordance with the Executive Order's text, that the yet-to-be formulated policy will be implemented in a manner consistent with the Constitution, including the provision of constitutionally minimum adequate medical care under the Eighth Amendment. Much more is needed for Plaintiffs to show a likelihood of success on this equal protection challenge as to warrant emergency injunctive relief.

### B. Plaintiffs Are Unlikely to Succeed on Their Eighth Amendment Claim

Plaintiffs likewise are unlikely to succeed on their Eighth Amendment claim. Plaintiffs contend that BOP has acted with deliberate indifference to their safety and medical needs in two ways: (1) by "failing to protect [Plaintiffs] from a serious risk of

16

bodily harm" because Plaintiffs will be transferred to men's facilities, and (2) by adopting a "blanket ban on gender dysphoria treatment." Pls.' Mem. at 15–16. Neither argument justifies the issuance of emergency relief.

*First*, Plaintiffs are unlikely to establish that BOP has "recklessly disregarded" an "excessive risk" to their safety by transferring to men's facilities. *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). The Eighth Amendment's prohibition against "cruel and unusual punishments" is meant to prohibit "unnecessary and wanton infliction of pain," which is "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). As the D.C. Circuit has recognized, "the 'deprivations' that trigger Eighth Amendment scrutiny are deprivations of essential human needs." *Inmates of Occoquan,* 844 F.2d at 836 (citing *Rhodes*, 452 U.S. at 348); *accord Women Prisoners*, 93 F.3d at 928. An inmate thus can establish an Eighth Amendment claim only if he can show "a prison official knew that he faced a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures." *Stoddard v. District of Columbia*, 764 F. Supp. 2d 213, 218 (D.D.C. 2011) (citing *Farmer v. Brennan,* 511 U.S. 825, 847 (1994)). The "wanton disregard" to a prisoner's needs "must be akin to criminal recklessness." *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) (en banc)).

Here, Plaintiffs are unlikely to make the requisite showing because in making the housing determinations, BOP will take into account Plaintiffs' medical and psychology record, as well as the potential risk of sexual assault and the characteristics of the male facilities to which Plaintiffs may be transferred. *See* Stover Decl. ¶¶ 11–12. While BOP is aware of studies suggesting that transgender inmates may have an increased risk of victimization, that by no means suggests that all transgender male-to-female inmates must be housed in women's prisons. Rather, it has always been the practical reality—under both the current and prior versions of the Transgender Offender Manual—that almost all transgender inmates are housed

17

in a facility corresponding to their biological sex.  Of the 1,506 male-to-female transgender inmates, only 16 are housed in women's facilities.  A decision to transfer Plaintiffs to women's facilities by itself thus does not demonstrate deliberate indifference.  Importantly, BOP intends to minimize the risk of harm to Plaintiffs by placing Plaintiffs in low security institutions with a large number of non-violent offenders.  *Id.* ¶ 12.

*Second*, as to Plaintiffs' alleged deprivation of hormone therapy, the challenge is premature because as discussed above, BOP is still to revise its policy in a manner consistent with the Constitution.  *See* Exec. Order, §§ 4(c), 8(b).  Notably, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency," *Kosilek*, 774 F.3d at 96, and does not "require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good,'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020); *see also Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants").  Only "[d]eliberate indifference to serious medical needs of prisoners" can constitute an Eighth Amendment violation.  *Erickson v. Pardus*, 551 U.S. 89, 90 (2007).  Specifically, a prisoner must satisfy both: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need.  *Bernier*, 38 F.4th at 1151.

The Court cannot assume that BOP's application of yet-to-be formulated policies to Plaintiffs will violate the Eighth Amendment or that Plaintiffs are likely to meet the above stringent standard as to warrant the extraordinary relief of a TRO or preliminary injunction now.  *Cf. Keohane v. Dixon*, 4:24-cv-00434, Docket No. 55 (N.D. Fla, Dec. 27, 2024) (a copy is attached as Exhibit 4) (suit challenging state correctional department's reevaluation of policies concerning hormone treatment for

biologically male inmates where new state law prohibits "expending any state funds to purchase cross-sex hormones for the treatment of Gender Dysphoria"; preliminary injunction motion denied because the correctional department indicated that it would provide "constitutionally adequate care").

### C.    Plaintiffs Are Unlikely to Succeed on Their APA Claim

Plaintiffs' APA claim is unlikely to succeed because, as a threshold matter, the PLRA prohibits a prisoner from challenging his or her "place of imprisonment" under the APA.  The PLRA provides that the APA "do[es] not apply to the making of any determination, decision, or order under [Title 18, Part II, Chapter 229, Subchapter C]."  18 U.S.C. § 3625.  Subchapter C includes 18 U.S.C. § 3621(b), which governs the "place of imprisonment."

BOP also has not taken any "final agency action" either as to Plaintiffs' transfer or medical care; yet, under the APA, "judicial review is available only for 'final agency action.'"  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,* 603 U.S. 799, 808 (2024) (citing 5 U.S.C. § 704).  Plaintiffs acknowledge that "Executive orders issued by the President are not subject to the APA," but suggest that "an agency's action implementing such an order may be the basis of an APA claim."  Pls.' Mem. at 19.  But Plaintiffs have not identified an action that "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)  (internal quotation marks omitted).  As noted, BOP has not made any "final" decision as to which facilities to transfer Plaintiffs, nor has BOP revised its policies concerning medical care.

Even assuming Plaintiffs can overcome these significant threshold hurdles, their APA claim is not likely to succeed.  Plaintiffs first contend that BOP's transfer decision was made "without observance of procedure required by law" because BOP "did not amend 28 C.F.R. §§ 115.41–42 through notice-and-comment rulemaking

19

before deciding to transfer." Pls.' Mem. at 19–20.  The cited PREA regulations, however, merely require BOP to take into account Plaintiffs' identification as transgender individuals when deciding on the particular facility in which plaintiffs are housed.  Plaintiffs' argument thus rests on their mistaken belief that their upcoming transfers violate the PREA regulations.  *See id.* at 21.

As discussed above, the PREA regulations are designed to achieve "the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a).  To that end, § 115.42(c) provides:

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

The regulations also require prison officials to give "serious consideration" to "[a] transgender or intersex inmate's own views with respect to his or her own safety." *Id.* § 115.42(e).  But there is no requirement that a transgender inmate be placed in a facility that is consistent with the inmate's gender identity.  While BOP has permitted that option in the past, the regulation merely requires BOP to conduct a case-by-case assessment as to the proper placement of transgender individuals, *id.* § 115.42(c), taking into account a range of factors identified in the regulations, *id.* § 115.41(d), which BOP has done or will do.

Finally, Plaintiffs contend that BOP's action is arbitrary and capricious because it "fails to consider important aspects of the problem," "depart[s] from agency precedent without explanation," and "relies on pretextual or contrived reasons." Pls' Mem. at 20.  But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*,

20

579 U.S. 211, 221–22 (2016).  As noted, BOP has changed its policies concerning transgender individuals before, in 2018 and 2022.  The Supreme Court has made clear that agency action is not subject to a heightened or more searching standard of review simply because it represents a change in policy.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).  Rather, the core requirement is simply that the agency "display awareness that it *is* changing position."  *Id.* at 515; *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) ("[A]n agency's view of what is in the public interest may change, either with or without a change in circumstances.").  The Executive Order has articulated why the United States has changed its policy.  Plaintiffs' disagreement with the new policy is insufficient to show that the policy is arbitrary and capricious, let alone warranting emergency injunctive relief.

## III.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Because Plaintiffs are unlikely to succeed on the merits of their claims, the Court need not proceed further and should deny the motion for emergency relief.  In any event, Plaintiffs have also failed to "demonstrate irreparable harm," which is "grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief."  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury."  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  Plaintiffs must demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical."  *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Here, Plaintiffs have not demonstrated a likelihood of irreparable harm, largely for reasons already discussed.  Plaintiffs have not shown that Section 4(c) of

the Order will result in irreparable harm because BOP has not yet revised its policies concerning medical care, and so it is not yet clear how, if it all, the revised policies will affect Plaintiffs' medical care.  Nor have Plaintiffs demonstrated that the upcoming transfer to men's facilities will result in physical harm, given that the vast majority of male-to-female transgender inmates are currently housed in male facilities and BOP intends to minimize any risk to Plaintiffs by transferring them to low security institutions with non-violent offenders.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DEFENDANTS

"Prison administrators, and not the courts, are to make difficult judgments concerning institutional operations," *Turner*, 482 U.S. at 89, and courts "must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Hatim*, 760 F.3d at 59.  As discussed above, the President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody.  Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons, particularly given that the Executive Order is to be implemented in a manner "consistent with applicable law."  Exec. Order § 8(b).

## V.    ANY INJUNCTIVE RELIEF MUST COMPLY WITH THE PLRA

Although the Court should not issue any injunctive relief for the reasons explained above, if it is inclined to do so, it should adhere to PLRA's restrictions.  Under the PLRA, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  As to

preliminary injunctive relief specifically, such relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct the harm." *Id.* § 3626(a)(2). The court "shall give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief." *Id.* Moreover, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under [18 U.S.C. § 3626(a)(1)] for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.* Any order granting prospective or preliminary relief would need to comply with these provisions of the PLRA.

## CONCLUSION

The Court should dismiss the case under the PLRA. At a minimum, the Court should deny Plaintiffs' request for emergency relief.

Dated: February 3, 2025          Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

/s/ *Jean Lin*
JEAN LIN  (NY #4074530)
Special Litigation Counsel
JOHN ROBINSON
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-3716
jean.lin@usdoj.gov