# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>JAMES R. McHENRY III, *in his official capacity as* Acting Attorney General of the United States; and WILLIAM LOTHROP, *in his official capacity as* Acting Director of the Federal Bureau of Prisons,<br><br>               Defendants. | Case No.: 1:25-cv-00286<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Ernest Galvan *
Kara J. Janssen *
Adrienne Spiegel *
Ben Hattem *
**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738

Christopher Stoll *
Amy Whelan *
**NATIONAL CENTER FOR LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, California 94102

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

Jennifer L. Levi *
Sarah Austin *
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

*Pro Bono Counsel for Plaintiffs*
*\* Pro Hac Vice To Be Submitted*

## INTRODUCTION

On January ▮▮▮▮, 2025, Plaintiffs, who are incarcerated transgender woman, were removed from the general population of a women's Bureau of Prisons ("BOP") facility and placed into separate housing with other transgender women, pending transfer to men's facilities.

Plaintiffs have been housed in women's units for months or years until this abrupt transfer. Despite the BOP having recognized Plaintiffs as women during their incarceration, they face imminent transfer to men's facilities.

The sole reason for this imminent transfer is Plaintiffs' status as transgender women, pursuant to President Trump's issuance of Executive Order 14166, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" on January 20, 2025 ("the Order"). Based on the Order, the BOP has decided to transfer Plaintiffs to men's facilities and plans to do so in the coming days. If they are transferred, Plaintiffs fear for their safety. In addition, the Order instructs the BOP to terminate the administration of medications Plaintiffs have taken ███████ to treat their gender dysphoria. Without hormone therapy, Plaintiffs' bodies will undergo significant changes that will put them at risk of physical harms and exacerbate their gender dysphoria, causing the kind of disabling depression, anxiety, lack of self-esteem, and suicidality that characterize untreated gender dysphoria. They will lose the benefits of medications they have taken ███████, causing them severe and irreparable physical and psychological harm.

Plaintiffs seek emergency relief to enjoin Sections 4(a) and 4(c) of the Executive Order and Defendants' implementation thereof, which change BOP's housing and medical care policies, as violations of the Fifth Amendment's equal protection guarantee, the Eighth Amendment, and Administrative Procedure Act. The Order discriminates against transgender people and knowingly puts them at high risk of serious harm without constitutional justification. As a result of the Order, Plaintiffs will be exposed to a substantial risk of sexual assault in a men's prison and severe physical and psychological harm caused by terminating their hormone

therapy. Emergency relief is needed to preserve the status quo by ensuring that Plaintiffs are not transferred to men's facilities and maintaining their medication access while this case proceeds.

## STATEMENT OF FACTS

### I.    PLAINTIFFS HAVE RESIDED IN WOMEN'S FACILITIES FOR MONTHS OR YEARS

Plaintiffs are all housed in women's facilities. Plaintiff Jane Doe has been housed in a women's facility since ██████. (Jane Doe Decl. ¶ 6.) Plaintiff Mary Doe has been housed in women's facilities for ████████████. (*Id.* ¶ 7.) Plaintiff Sara Doe has been housed in a women's facility for ██████. (██ Decl. ¶ 8.)

While housed in women's facilities, Plaintiffs have received hormone medications necessary to ensure their health and safety. Jane Doe and Sara Doe have taken hormones for ██████████, and Mary Doe has taken hormones for even longer. (Jane Doe Decl. ¶ 3; ██ Decl. ¶ 5; Compl. ¶ 7.)

### II.    PLAINTIFFS AND THEIR MEDICAL CARE

Plaintiffs are adult transgender women who have been diagnosed with gender dysphoria and have maintained medically necessary hormone treatment for their gender dysphoria ██ ██. Prior to her incarceration, Plaintiff Sara Doe ████████████████████████ ████████████████████████████████████. (██ Decl. ¶ 6.) Gender dysphoria is a serious medical condition that requires treatment through gender transition, including hormone therapy in appropriate cases. (Ettner Decl. ¶¶ 7–9.) Forcing Plaintiffs to stop hormone therapy would trigger severe physical and psychological consequences. Medical professionals warn that termination of hormone therapy can cause permanent physical and emotional harm, including "serious and potentially life-threatening symptoms from their gender dysphoria." (*Id.* ¶¶ 10–16.)

III. **DAYS AFTER PRESIDENT TRUMP'S ISSUANCE OF EXECUTIVE ORDER 14166, PLAINTIFFS WERE REMOVED FROM GENERAL POPULATION AND PLACED IN A SEGREGATED UNIT PENDING TRANSFER TO MEN'S FACILITIES**

On January 20, 2025, President Trump issued Executive Order 14166. In relevant part, the Order: (1) categorically bars transgender women from women's prisons, mandating their transfer to men's facilities regardless of individual safety considerations (EO 14166 ¶ 4(a)); and (2) categorically prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." (EO 14166 ¶ 4(c).)

On January ████, 2025, as a result of the Order's issuance, BOP officials removed Plaintiffs from the general population of their women's facilities and placed them into segregated units. (Jane Doe Decl. ¶ 9; ███ Decl. ¶ 12; Compl. ¶ 25.) BOP officials told Plaintiffs that the reason they were removed from general population was because of the Order, and that they would be imminently moved to men's facilities. (Jane Doe Decl. ¶¶ 9–10; ███ Decl. ¶ 14; Compl. ¶¶ 26–27.) Plaintiffs Mary and Jane Doe were also told ████████████ ████████████████████████████████████████████. (Jane Doe Decl. ¶ 10; Compl. ¶ 27.) Plaintiffs will be imminently transferred to all-male facilities and will be housed there as females among all-male populations.

IV. **PLAINTIFFS FACE SERIOUS RISKS OF VIOLENCE AND IRREVERSIBLE PHYSICAL CHANGES IF THEY ARE TRANSFERRED TO MEN'S FACILITIES**

Transferring Plaintiffs to men's facilities and terminating their hormone therapy will place them in immediate physical and psychological danger.

Courts, researchers, and corrections professionals recognize that transgender women housed in men's prisons face extremely high levels of violence and sexual assault, as well as

pervasive sexual harassment. This reality is uncontroverted. A 2013 study by the Department of Justice estimated that nearly 35% of transgender inmates in state and federal prisons were sexually assaulted between 2007 and 2012. U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, NCJ No. 241399, Supplemental Table 1 (2013).[1] From 2011 to 2012, transgender people were sexually assaulted at nearly ten times the rate for the general incarcerated population.[2] ███████████
███████████████████████████████████████

If transferred to men's prisons, Plaintiffs will be at extremely high risk of rape and sexual and physical assault. They may be subjected to humiliating and dangerous circumstances, such as being forced to be unclothed and shower among male prisoners, causing them to be exposed and vulnerable to sexual violence. The Order's termination of gender dysphoria treatment will also cause psychological distress and irreversible physical changes. Removing gender dysphoria treatment "constitutes a serious medical risk that can severely impact both physical and mental health" and will cause "serious and potentially life-threatening symptoms." (Ettner Decl. ¶¶ 10, 16.)

## LEGAL STANDARD

In order to obtain a preliminary injunction, a moving party must "make a 'clear showing' that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm

---

[1] Available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

[2] *Compare id.* (noting a 39.9% sexual victimization rate for transgender people from 2011 to 2012), *with* U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 6 (2013) (reflecting a 4.0% rate of sexual victimization in the general prison population from 2011 to 2012), available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf.

before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95

(D.C. Cir. 2022); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,

897 F.3d 314, 321 (D.C. Cir. 2018) (stating preliminary injunction standard); *Chef Time 1520

LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to

award a TRO is 'analyzed using the same "factors applicable to preliminary injunctive relief,"'"

(quoting *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020)). All four factors

overwhelmingly support granting temporary restraints and a preliminary injunction in this

matter.

  The purpose of preliminary relief is to preserve the status quo pending resolution of the

underlying litigation. *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers

of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969); *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C.

2013). The same is true of temporary restraining orders. *Granny Goose Foods, Inc. v. Bhd. of

Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)

(TRO's "are no doubt necessary in certain circumstances," to "serv[e] their underlying purpose

of preserving the status quo and preventing irreparable harm"). The relevant status quo is the

"last uncontested status which preceded the pending controversy." *Dist. 50, United Mine

Workers of Am.*, 412 F.2d at 168; *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir.

2022) (finding that "status quo" was the "last regime in place" before imposition of the

government agency's order from which plaintiff sought injunctive relief).

  Here, the last uncontested status is that which existed prior to the President issuing the

Executive Order on January 20, 2025.

<u>**ARGUMENT**</u>

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

    A.    **Plaintiffs Are Likely to Succeed On Count One of Their Complaint Because Sections 4(a) and 4(c) Violate the Fifth Amendment's Equal Protection Guarantee**

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). "The approach to Fifth Amendment equal protection claims is 'precisely the same' as the approach to Fourteenth Amendment equal protection claims." *Azam v. D.C. Taxicab Comm'n*, 46 F. Supp. 3d 38, 49 (D.D.C. 2014) (quoting *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n.2 (1975)).

Sex-based laws trigger heightened scrutiny, requiring the government to show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (quotations omitted) (modifications in original). The justification must be "exceedingly persuasive" and "genuine," not "hypothesized" or "invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. The "burden of justification is demanding, and it rests entirely on the [government]." *Id*. Heightened scrutiny applies to sex discrimination claims brought by incarcerated people. *Pitts v. Thornburgh*, 866 F.2d 1450, 1453–54 (D.C. Cir. 1989); *see also Johnson v. California*, 543 U.S. 499, 510 (2005) ("The right not to be discriminated against . . . . is not a right that need necessarily be compromised for the sake of proper prison administration.").

Laws that discriminate on other quasi-suspect bases are also subject to heightened scrutiny. When determining whether a particular group qualifies as a quasi-suspect class, courts

consider: (1) whether the group has historically faced discrimination; (2) whether the group exhibits an obvious, immutable, or distinguishing characteristic that defines them as a discrete group; (3) whether those characteristics relate to the group's ability to perform or contribute to society; and (4) whether the group is a minority or politically powerless. *See generally Frontiero v. Richardson*, 411 U.S. 677, 684–87 (1973); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

In addition, the Supreme Court has long held that laws violate the requirement of equal protection when based on "a bare desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or "mere negative attitudes" and "fear," *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985). Here, in addition to failing heightened scrutiny, Sections 4(a) and 4(c) fail even this basic test. As the record demonstrates, these measures are so sweeping, cause such severe harms, and are so disconnected from any asserted justification that they are inexplicable by anything other than animus toward transgender people.

## 1. Section 4(a)'s Sex-Based Classification Triggers Heightened Scrutiny

Section 4(a) creates an explicit sex-based classification by mandating that the BOP assign housing based solely on birth sex and by categorically prohibiting transgender women from being housed in women's facilities. This classification triggers heightened scrutiny in two independent ways. First, Section 4(a) discriminates based on sex on its face by using birth sex as the sole criterion for housing assignments. Second, by targeting transgender people for different treatment, it necessarily creates a sex-based classification, because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). This District has previously concluded that transgender classifications are sex-based classifications, which require heightened scrutiny under the Equal Protection Clause. *Doe 1 v. Trump*, 275 F.

Supp. 3d 167, 209 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F.

App'x 19 (D.C. Cir. 2019); *cf. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum.*

*Servs.*, 485 F. Supp. 3d 1, 39–40 (D.D.C. 2020) (holding that "[t]here is no apparent reason why

[*Bostock*'s] conclusion—that it is 'impossible' to discriminate based on transgender status

without discriminating based on sex, *see* 140 S. Ct. at 1741—would remain cabined to Title

VII"). Multiple circuit courts concur. *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024);

*Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox v. Little*, 104 F.4th 1061,

1079–80 (9th Cir. 2024); *see also Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051

(7th Cir. 2017).

      Additionally, transgender people constitute a quasi-suspect class because they meet all

four criteria established by the Supreme Court. *See Doe 1*, 275 F. Supp. 3d at 208–09.

Transgender people have suffered pervasive discrimination throughout history, including laws

and policies that: (i) criminalized their ability to dress and appear as who they are; (ii) banned

them from federal employment and military service; (iii) excluded them from marriage; (iv)

terminated their parental rights; and (v) restricted their ability to obtain healthcare. Transgender

people share the immutable and distinguishing characteristic of having a sex different than the

sex assigned to them at birth. While this characteristic bears no relation to their ability to

contribute to society, transgender people have been unable to secure basic rights through the

political process. For all these reasons, federal courts throughout the country have held that

transgender-status discrimination triggers heightened scrutiny.[3] As one district court put it,

---

[3] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–11 (4th Cir. 2020) (collecting authorities); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035-, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286

courts "would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018).

That Section 4(a) classifies based on sex and transgender status does not resolve the inquiry; rather, it establishes that heightened scrutiny applies. Under this standard, the burden shifts to the government to demonstrate an exceedingly persuasive justification for the classification, showing that it serves important governmental objectives and is substantially related to achieving those objectives. The government cannot meet that burden here.

### 2.    Section 4(a) Fails Heightened Scrutiny

Under heightened scrutiny, Section 4(a) fails because it serves no important or even legitimate governmental purpose. Rather than advancing a legitimate penological interest, Section 4(a)'s categorical rule puts transgender women at severe risk of harm and prevents prison officials from exercising their discretion to make housing placements based on individualized safety and security considerations. The provision undermines rather than advances safety.

Section (4)(a) creates severe, documented risks of physical and sexual assault against transgender women by forcing them into men's facilities with no consideration of individualized circumstances, their individual safety and security, or the impact on the overall safety and security of the institution. The severe risks to transgender women are well-known. *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016) (the vulnerability of transgender

---

F. Supp. 3d 704, 718–19 (D. Md. 2018); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

incarcerated women to sexual abuse is "no secret"). Defendants' intentional decision to

endanger the lives and wellbeing of transgender women is unspeakably cruel. The gulf between

any plausibly legitimate government interest and the actual effect of the policy raises a strong

inference that Section 4(a) is motivated by little more than a "bare . . . desire to harm a politically

unpopular group." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (alteration in original).

In addition, Section 4(a)'s blanket ban conflicts with BOP's policy of individualized

housing placement assessments for incarcerated transgender people, which BOP determined best

serves safety and penological interests. U.S. DOJ, *Transgender Offender Manual §§ 5–6* (2022),

available at https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf. A blanket ban also conflicts

with a regulation promulgated pursuant to PREA that identifies transgender women as a group at

high risk of sexual victimization and requires individualized housing determinations. 28 C.F.R.

§ 115.42(c). The Order provides no legitimate security or penological justification for replacing

this established approach with a categorical ban.

The Order relies on "overbroad generalizations," *VMI*, 518 U.S. at 533, by claiming

without evidence that transgender women inherently threaten safety in women's facilities. By

suggesting transgender individuals seek access to single-sex spaces for improper purposes, the

Order impermissibly depends on stereotypes rather than individual assessments or facts. These

broad assumptions fail heightened scrutiny, which requires government actions be based on

concrete evidence rather than overgeneralized or hypothetical concerns.

Transgender women pose no unique safety threats to other women, as multiple federal

courts have recognized. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020) (finding

that such unsupported generalizations "are the precise kind of generalized concerns for prison

security that courts routinely object"); *Hampton v. Baldwin*, No. 18-CV-550, 2018 WL 5830730,

at *11 (S.D. Ill. Nov. 7, 2018) (rejecting the claim that a blanket "policy of placing transgender inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security"); *Doe v. Mass. Dep't of Corr.*, No. 17-12255, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (holding that "generalized concerns for prison security are insufficient").

Plaintiffs have been incarcerated in women's facilities for months or years; Plaintiff Mary Doe, for instance, has been incarcerated in women's facilities for ███████████████

██. (Compl., ¶ 7.) To determine these housing assignments, BOP officials weighed Plaintiffs' individual circumstances, as required by the Prison Rape Elimination Act (PREA), and determined that the safest and most appropriate placement for them is in women's facilities in part because they would be at extremely high risk for physical and sexual assault in men's prisons. *See* 28 C.F.R. § 115.42(c). The Order's categorical transfer policy is not substantially related to advancing any safety objective or other legitimate government interest; instead, it rests entirely on "overbroad generalizations" and hostility toward transgender people. *VMI*, 518 U.S. at 533

### 3. Section 4(c)'s Categorical Ban on Medical Care Triggers Heightened Scrutiny

Like Section 4(a), Section 4(c) discriminates based on sex in two ways. First, it creates an explicit sex-based classification by using birth sex as the sole criterion to prohibit certain medical treatments. Second, it discriminates specifically against transgender individuals by denying them essential healthcare while continuing to provide such care—including, in some cases, the same medications and procedures—to non-transgender people. Because Section 4(c) establishes these sex-based classifications, it only passes constitutional muster if it can survive heightened scrutiny.

### 4.    Section 4(c) Fails Heightened Scrutiny

Section 4(c)'s blanket ban on gender transition treatments for incarcerated transgender people fails heightened scrutiny because it lacks a substantial relationship to important governmental interests. The ban categorically overrides medical judgment to deny medically necessary and prescribed care based solely on transgender status. No legitimate medical or penological interest justifies this sweeping prohibition. *See Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wis. 2010), *aff'd on other grounds*, 653 F.3d 550 (7th Cir. 2011) (finding "no reasonably conceivable state of facts provides a rational tie" between "prison safety and security" and banning gender transition care for incarcerated transgender people). This categorical denial constitutes the type of "broad and undifferentiated disability" that heightened scrutiny prohibits. *See Romer*, 517 U.S. at 632.

The provision's complete lack of tailoring fails heightened scrutiny, a standard that requires precision rather than "broad and undifferentiated disability." *Id.* Courts have consistently held that categorical bans on gender transition care lack any rational relationship to legitimate penological interests. *See Fields*, 712 F. Supp. 2d at 868; *Cordellioné v. Comm'r*, No. 23-cv-00135, 2024 WL 4333152, at *17 (S.D. Ind. Sept. 17, 2024).

Section 4(c) would strip Plaintiffs of medically necessary hormone therapy that BOP doctors have prescribed to them ███████, based solely on their transgender status, with no consideration of their individual circumstances or medical needs. The government's arbitrary discontinuation of established medical care fails to serve any legitimate government interest, much less survive the demanding justification required under heightened scrutiny.

13

5.    **Sections 4(a) and 4(c) Fail Even Rational Basis Review Because They Are Based on Animus Toward Transgender People**

The challenged provisions of the Order also violate the requirement of equal protection because they are rooted in animus and thus cannot survive even rational basis review. State action motivated by "animus toward the class it affects" is unconstitutional under any level of scrutiny. *Romer*, 517 U.S. at 632. Like the amendment in *Romer*, the Order singles out a specific group of people and denies them basic protections—here, access to safe housing and medical care—while preserving those protections for others. *Id.* at 631–33.

The President's campaign statements made clear that the Order was motivated by animus toward transgender Americans. The President's statements calling transgender Americans "insan[e]" and "deranged" only underscore that the discriminatory Order stems from hostility toward transgender people rather than a legitimate purpose. (Compl., ¶ 50.) During the campaign, the President vowed that "with a stroke of [his] pen on day one" he would "stop the transgender lunacy." (*Id.*, ¶ 53.) The Order is the result of the animus expressed in that promise.

Just as *Moreno* rejected "a bare desire to harm a politically unpopular group" and *Cleburne* invalidated restrictions based on "mere negative attitudes" and "fear," the Order's withdrawal of established protections, the severe harms it imposes, and the absence of any rational connection to legitimate governmental interests show that it is based on animus and, as such, violates the Equal Protection Clause. *Moreno*, 413 U.S. at 534; *City of Cleburne*, 473 U.S. at 448.

B.    **Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Eighth Amendment Claims**

Prison officials violate the Eighth Amendment when they are deliberately indifferent to prisoners' serious medical needs or fail to protect incarcerated individuals from a substantial risk of violence at the hands of other prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976);

*Farmer v. Brennan,* 511 U.S. 825, 833 (1994). The Order violates the Eighth Amendment by imposing a blanket medical treatment ban that denies necessary care and by mandating that all transgender women must be housed with men, both of which expose Plaintiffs to severe harm.

**1.    The Executive Order Subjects Plaintiffs to Cruel and Unusual Punishment by Failing to Protect Them From a Serious Risk of Bodily Harm**

Plaintiffs have a strong likelihood of success on the merits of their Eighth Amendment claim that Defendants are failing to protect them from a serious risk of bodily harm by transferring them to men's facilities pursuant to the Order. "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer,* 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Plaintiffs' failure-to-protect claim requires them to establish both an objective and a subjective element.

The objective element requires showing incarceration "under conditions posing a substantial risk of serious harm." *Id.* at 833. The threatened harm must be "objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Without question, physical and sexual violence constitute objectively serious deprivations. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Rhodes v. Chapman*. 452 U.S. 337, 347 (1981)).

Here, Plaintiffs face clear risks of violence, rape, and sexual assault if they are housed with men. A plaintiff can prove exposure to serious harm by demonstrating membership in "an identifiable group of prisoners who are frequently singled out for violent attack." *Id.* at 843. Federal regulations recognize transgender status as increasing "risk of sexual victimization"; accordingly, they require individualized risk assessment for housing decisions. 28 C.F.R. § 115.41(d)(7); *id.* § 115.42(c)–(d). Plaintiffs' long-term hormone therapy and previous placement in women's facilities further demonstrate their heightened risk. ██████████████

████████████████████████████████████████

████████████████████████████

The subjective element requires showing officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Courts have consistently found this element satisfied when officials knowingly house transgender women in men's prisons. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) ("[A] jury could infer that [prison officials] knew Doe faced a substantial risk of rape because of her status as a transgender woman."); *Stover v. Corr. Corp. of Am.*, No. 12-cv-00393, 2015 WL 874288, at *9–10 (D. Idaho Feb. 27, 2015); *Lojan v. Crumbsie*, No. 12-CV-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *see also Zollicoffer*, 169 F. Supp. 3d at 691 (noting that the "vulnerability of transgender prisoners to sexual abuse is no secret").

The Order's directive to amend 28 C.F.R. § 115.41 to enable blanket transfers of transgender women to men's facilities, regardless of individual risk, demonstrates Defendants' awareness and disregard of known dangers. This deliberate indifference is further evidenced by Defendants' implementation of the Order despite previously acknowledging these risks by placing Plaintiffs in women's facilities. These facts establish the subjective element of Plaintiffs' failure-to-protect claim.  Plaintiffs have demonstrated a strong likelihood of success on the merits of their Eighth Amendment claim.

### 2.  The Executive Order Mandates Deliberate Indifference to Plaintiffs Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle*, 429 U.S. at 104. This analysis requires both objective and subjective components. *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). The objective component requires a "a known, serious medical condition." *Id*. The subjective component requires that

officials possessed "'subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk.'" *Id.* (quoting *Anderson v. District of Columbia,* 810 F. Appx. 4, 6 (D.C. Cir. 2020); *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Plaintiffs easily satisfy the objective component. Gender dysphoria is a serious, medically recognized disorder. *See Farmer v. Hawk*, 991 F. Supp. 19, 21 (D.D.C. 1998), *rev'd in part on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998). Multiple federal courts of appeals have determined that gender dysphoria is "a serious medical condition." *Id.* at 25 (citing *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995); *Phillips v. Michigan Dep't of Corr.*, 731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991); *White v. Farrier,* 849 F.2d 322 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987); *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986)); *see also Edmo v. Corizon, Inc*., 935 F.3d 757, 769 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The Order's categorical ban on federally funded medical care for gender dysphoria denies all treatment for this serious condition, including Plaintiffs' prescribed hormone therapy and other care.

For the subjective component, "refusal to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety [constitutes] deliberate indifference in violation of the Eighth Amendment." *Bernier,* 38 F. 4th at 1151. This includes when treatment decisions are "based exclusively on nonmedical considerations . . . rather than any medical justification." *Id.* The imposition of a blanket ban on medical treatment for gender dysphoria satisfies this component. *See*, *e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citing *Fields v. Smith*, 653 F.3d 550, 559

(7th Cir. 2011); *Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 250 (D. Mass. 2012)). "[R]esponding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane*, 952 F.3d at 1266–67.

Defendants have provided Plaintiffs with hormone therapy throughout their incarceration, acknowledging their gender dysphoria diagnoses. The Order now mandates denial of this medically necessary care, which will cause severe harm as each of the Plaintiffs' conditions worsen. This deliberate termination of treatment for a recognized serious condition meets the objective and subjective requirements for deliberate indifference. *See Fields*, 653 F.3d at 556 ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). Plaintiffs thus demonstrate a strong likelihood of success on this claim.

### C.    Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Administrative Procedure Claim

The Administrative Procedure Act ("APA") permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For an agency action to be considered "final," "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted). In addition, the action must either determine "rights and obligations" or be one "from which legal consequences will flow." *Id.* at 178 (internal citations omitted). In other words, the action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin v.*

*Massachusetts*, 505 U.S. 788, 796-97 (1992) (quoting *Abbot Lab'ys. v. Gardner*, 387 U.S. 136, 152 (1967)).

Executive orders issued by the President are not subject to the APA; however, an agency's actions implementing such an order are subject to the APA. *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019), *rev'd on other grounds*, 961 F.3d 635 (4th Cir. 2020); *see also Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018) (explaining that once an agency has "consummated" its implementation of a presidential directive such that "legal consequences will flow," the agency's action is final and reviewable under the APA).

The actions taken against Plaintiffs here reflect a final agency action. BOP has made a final decision to transfer Plaintiffs to men's facilities and ███████████████████████████ ████████████████████████. (Jane Doe Decl. ¶¶ 9–10; ███ Decl. ¶¶ 12–14; Compl., ¶¶ 25–33.) This decision "mark[s] the 'consummation' of the agency's decisionmaking process," and Plaintiffs' "rights . . . have been determined" by that decision. *Bennett*, 520 U.S. at 178. Because of BOP's decision, Plaintiffs will imminently be transferred to men's facilities and will be denied necessary medical care for their gender dysphoria, depriving Plaintiffs of their right to safe housing and placing them at risk of significant physical and psychological harm. Their APA claims are thus ripe, and a court must set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "without observance of procedure required by law." 5 U.S.C. § 706.

The APA was violated on all these grounds. BOP's decision to transfer Plaintiffs to men's facilities was made "without observance of procedure required by law" because BOP did

not amend 28 C.F.R. §§ 115.41–42 through notice-and-comment rulemaking before replacing the individualized assessment of housing placements required by those regulations with a blanket transfer policy. BOP's decision to transfer Plaintiffs to men's facilities and deny them medical care solely because of their birth sex are unconstitutional and thus also violate 5 U.S.C. § 706 (2)(B). The agency action is also arbitrary and capricious because it fails to consider important aspects of the problem or offers an explanation so implausible it cannot be attributed to agency expertise or differing viewpoints. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, departing from agency precedent without explanation constitutes arbitrary and capricious action. *Lemoyne-Owen College v. NLRB*, 357 F.3d 55, 60–61 (D.C. Cir. 2004). Courts also find agency action arbitrary and capricious when it relies on pretextual or contrived reasons. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The government's actions are "arbitrary and capricious" for each of those reasons. First, the Executive Order mandates housing based on birth sex without considering transgender women like Plaintiffs who have ████████████████████████████████████ ███████████████. Given the well-documented high rates of harassment, violence, and sexual assault transgender women face in men's prisons, requiring their placement in men's facilities without addressing these safety risks ignores a crucial policy impact. This failure to consider basic facts and provide any rationale violates the *State Farm* standard. 463 U.S. at 43. Second, this unexplained 180-degree reversal from previous BOP policy that allowed Plaintiffs to reside in women's facilities after receiving individualized determinations violates *Lemoyne-Owen College*. 357 F.3d at 60–61. Third, under *New York*, the policy's devastating impact on incarcerated persons without demonstrable benefits suggests anti-transgender animus as the true motivation. 588 U.S. at 785.

Finally, BOP's decision to transfer Plaintiffs solely based on their transgender status also directly conflicts with PREA regulations requiring case-by-case consideration of inmate health, safety, and facility management concerns. 28 C.F.R. § 115.42(c). The Order instructs the Attorney General to "amend[], as necessary," the PREA regulations to allow this blanket transfer policy. The Attorney General has not done so; instead, BOP has "simply disregard[ed] rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Because Defendants McHenry and Lothrop have not followed the necessary procedures to rescind the PREA regulations and instead are simply violating those regulations, the blanket transfer policy violates the APA. 5 U.S.C. § 706(2)(A), (D).

Together, these factors strongly support success on the merits of the APA claim.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION

The harms Plaintiffs will suffer under the challenged Order and Defendants' implementation thereof are irreparable and require urgent judicial intervention. Plaintiffs face imminent transfer to all-male facilities, where they will experience an extremely high risk of sexual assault and physical violence. They also face the abrupt discontinuation of their medically necessary hormone therapy. Denying them this critical treatment for gender dysphoria will inflict severe emotional distress—including a high risk of suicidality—and irreversible physical changes. These imminent injuries, both physical and psychological, cannot be remedied through monetary compensation. Moreover, as set forth above, Plaintiffs' constitutional rights will be directly infringed by these actions, compounding the severity of the harm.

Courts recognize that immediate threats to safety, health, and constitutional rights constitute irreparable harm warranting urgent relief. *See Al-Joudi v. Bush,* 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm in connection with constitutional violation); *Wilson*

*v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (finding irreparable

harm in connection with threats to health). Moreover, courts in this Circuit routinely find

irreparable harm where there is an alleged loss of constitutional freedoms—even if temporary.

*Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding irreparable harm in connection with

alleged Fourth Amendment violation and explaining that "it has long been established that the

loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury") (citation and internal quotations omitted)). Ultimately, irreparable harm

exists when a plaintiff shows she will likely suffer harm that is "beyond remediation." *Davis v.

Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014).

Here, Plaintiffs face an imminent risk of sexual violence, psychological harm, and

termination of medical care if transferred—injuries that no monetary damages can remedy.

Without appropriate medical treatment, gender dysphoria can impact "the brain and the

autonomic nervous system" as well as "hormonal functions, including corticosteroids and insulin

regulation." (Ettner Decl. ¶ 7.) Gender dysphoria can also cause "suppression of white and red

blood cells," "digestive disorders," and "hypertension." (*Id.*) The termination of Plaintiffs'

medical treatment "constitutes a serious medical risk that can severely impact both physical and

mental health." (*Id.* ¶ 10.) These harms will only become more severe once Plaintiffs are

transferred to men's facilities, necessitating immediate judicial intervention to prevent that

outcome.

A.    **Plaintiffs Face Irreparable Harm by Being Subjected to an Extremely High Risk of Violence and Sexual Abuse**

Courts nationwide have recognized that housing transgender women in men's facilities

dramatically increases the danger of harassment and violence. *See, e.g.*, *Greene v. Bowles*, 361

F.3d 290, 292 (6th Cir. 2004) (describing a severe physical attack against a transgender woman

by another prisoner); *Hampton v. Baldwin*, No. 18-CV-550, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (describing incidents of severe sexual misconduct against a transgender woman by prison staff and physical attack by a male prisoner); *Tay v. Dennison*, 457 F. Supp. 3d 657, 664–68 (S.D. Ill. 2020) (same).

Establishing irreparable harm does not require proof that Plaintiffs have personally suffered physical violence or sexual abuse, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██ Courts have consistently held that the serious and foreseeable threat of harm to transgender women housed in all-male facilities constitutes irreparable harm. *See, e.g.*, *Tay*, 457 F. Supp. 3d at 685–87 (finding irreparable harm where plaintiff was physically endangered due to risk of sexual assault and threats); *Becker v. Sherman*, No. 16-cv-0828, 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (finding reasonable fear of future harm for transgender inmate based on past assaults and vulnerability in a male prison, despite experiencing periods without assault); *Lojan v. Crumbsie*, No. 12-CV-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (holding that knowledge of an inmate's transgender status was sufficient to alert defendants of vulnerability and need for protection). Here, the risk of sexual violence is heightened because ████████████ ████████████████████████████████████████

### B.    Plaintiffs Face Irreparable Harm by Being Denied Essential Medical Care

The Order threatens to halt Plaintiffs' ███████ hormone therapy for gender dysphoria, risking immediate and irreversible physical harm. When faced with "requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi*, 406 F. Supp. 2d at 20 (finding irreparable harm and granting preliminary injunction where plaintiffs alleged that lack of precautionary measures at department of correction's facility increased their risk of serious health consequences from COVID-19);

*Wilson*, 791 F.Supp. at 314 (finding irreparable harm and granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt" and insurance carrier refused to pay for life-saving treatment).

As other courts have recognized, the denial of medical care for gender dysphoria can lead to severe psychological harm—including risk of self-harm and suicide. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (explaining that it is "a disorder that can be extremely dangerous," including leading to "self-mutilation"); *Adams*, 716 F.Supp. 2d at 109 (discussing the "risk of serious harm including depression, anxiety, self-mutilation, and suicide"); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) (recognizing gender dysphoria as a "serious condition recognized by the medical community that frequently requires treatment," and can lead to suicidality); *see also, e.g.*, *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) *vacated and remanded on other grounds*, 122 F.4th 688 (7th Cir. 2024) ("there is no doubt that Plaintiffs face irreparable harm that cannot be compensated by monetary damages" where deprivation of treatment for gender dysphoria resulted in depression and suicidal ideation).

Terminating Plaintiffs' hormone treatment will cause immediate health deterioration, establishing irreparable injury. *MH v. Adams*, No. 22-cv-00409, 2024 WL 3237006, at *7 (D. Idaho June 29, 2024) (holding that halting treatment for gender dysphoria constitutes irreparable harm). Termination of Plaintiffs' hormone treatment may cause "[r]apid hormonal changes trigger[ing] severe mood swings, anxiety, and depression," "[i]ncreased risk of suicidal ideation," "[r]eturn of masculine secondary sex characteristics causing psychological distress," and other serious harms. (Ettner Decl. ¶ 10.)

### C.    Deprivation of Constitutional Rights Also Constitutes Irreparable Harm

Finally, relief is warranted because constitutional violations constitute irreparable harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[A] prospective violation

of a constitutional right constitutes irreparable injury."); *Costa v. Bazron*, 464 F. Supp. 3d 132,

156 (D.D.C. 2020) (finding that harm imposed by alleged Fifth Amendment violation was "itself

irreparable" and granting preliminary injunction); *Pursuing Am.'s Greatness v. Fed. Election

Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (finding that harm imposed by alleged First

Amendment violation was "irreparable" and remanding district court's denial of a preliminary

injunction).

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF

The balance of equities strongly favors Plaintiffs. "'The final two factors the Court must

consider when deciding whether to grant a [temporary restraining order] are the balance of harms

and the public interest.'" *Pushkar v. Blinken,* No. CV-21-2297, 2021 WL 4318116, at *12

(D.D.C. Sept. 23, 2021) (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d

9, 41 (D.D.C. 2013)). When "the government is a party to the litigation, these two factors merge

and are 'one and the same, because the government's interest is the public interest.'" *Id.* (quoting

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Here, the Government does not have any bona fide interest at issue.  Rather, it is "always

in the public interest to prevent the violation of a party's constitutional rights." *Banks v. Booth*,

468 F. Supp. 3d 101, 124 (D.D.C. 2020) (internal citations omitted). It is also in the public

interest to ensure Plaintiffs' health and safety and ensure that prison policies reflect careful,

reasoned judgment, not bias or abrupt change with no consideration of penological interests.

Further, Plaintiffs' interest in avoiding the potential harms posed by the Order is strong.

Until January ███████, 2025, Plaintiffs were safely housed in women's facilities while

receiving essential hormone therapy. Their transfer to men's facilities would expose them to

serious risks of violence, sexual assault, and emotional trauma. In contrast, Defendants face no

hardship in reverting to their longstanding practices before the imposition of the Order, which align with federal law and constitutional requirements. Ultimately, Plaintiffs seek no more than to maintain the status quo that existed before January 20, 2025, and avoid the risks posed by their transfer.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs seek the immediate relief requested.

Dated:  January 30, 2025

Eve L. Hill (Bar No. 424896)
ehill@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

Christopher Stoll (*pro hac vice* to be submitted)
Amy Whelan (*pro hac vice* to be submitted)
CStoll@nclrights.org
AWhelan@nclrights.org
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel: (415) 365-1338
Fax: (415) 392-8442

Ernest Galvan (*pro hac vice* to be submitted)
Kara J. Janssen (*pro hac vice* to be submitted)
Adrienne Spiegel (*pro hac vice* to be submitted)
Ben Hattem (*pro hac vice* to be submitted)
EGalvan@rbgg.com
KJanssen@rbgg.com
ASpiegel@rbgg.com
BHattem@rbgg.com
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830

26

Jennifer L. Levi
Sarah Austin
**GLBTQ Legal Advocates & Defenders**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

*Attorneys for Plaintiffs*