UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, *et al.*, *Plaintiffs*, v. JAMES R. MCHENRY, III, in his official capacity as Acting Attorney General of the United States, *et al.*, *Defendants*. | Case No. 1:25-cv-286-RCL |

## ORDER

### I. Background

The plaintiffs are three male-to-female transgender women in the custody of the Bureau of Prisons ("BOP") and housed in female penitentiary facilities. Compl. ¶¶ 3, 7, 10, ECF No. 1. Plaintiffs allege that they each suffer from gender dysphoria, a condition marked by significant distress and a host of physiological and psychological symptoms when a person lives in a manner conforming to their biological sex. *Id.* at ¶ 35. For several years before and including their time in BOP custody, the plaintiffs have been prescribed and have generally received hormone therapy to treat their gender dysphoria. *Id.* ¶¶ 3, 7, 10.

On January 20, 2025, President Donald Trump signed an Executive Order which provides, in pertinent part:

> Sec. 4(a) (the "Transfer Provision"): "The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

> Sec. 4(c) (the "Medication Provision"): "The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical

1

procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

Exec. Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order"). Shortly after the Executive Order was signed, all three plaintiffs were alerted of BOP's intention to transfer them to a male penitentiary. Compl. ¶¶ 25, 27, 29–30. All three have since been returned to the general population at their respective facilities, but the BOP continues to represent that they will soon be transferred. *Id.* ¶¶ 28, 33. It is not alleged that the BOP has withheld the plaintiffs' hormone therapy medications.

Plaintiffs bring this suit, alleging that the Executive Order and its enforcement against the plaintiffs violate the Eighth Amendment, the equal protection principles embodied within the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act ("APA"). *Id.* ¶¶ 56–98. The plaintiffs have moved for a temporary restraining order ("TRO") or preliminary injunction to prevent the defendants from enforcing the Executive Order against them during the pendency of their claim. *See* Unredacted Mot. for Temporary Restraining Order, ECF No. 13. The defendants have filed an opposition to that Motion. *See* Gov'ts Opp'n, ECF No. 11. On February 4, 2025, the Court held a hearing, during which both parties voiced their arguments for and against the issuance of a TRO. The Motion is now ripe for the Court's review. For the reasons that follow, the request for a temporary restraining order is **GRANTED** on the narrow grounds of the plaintiffs' Eighth Amendment claims. Because the plaintiffs' Eighth Amendment claims are sufficient unto themselves to sustain a TRO, the Court will take no position on the merits of the plaintiffs' equal protection or APA claims at this time.

## II. Legal Standard

A TRO or preliminary injunction should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) that a TRO or preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the TRO analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the Government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III. The Court Has Jurisdiction to Entertain the TRO Request

The defendants raise two jurisdictional defenses. First, the defendants argue that any legal objection to the Transfer Provision and all APA claims are statutorily foreclosed. Specifically, the Prison Litigation Reform Act provides that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment" and that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621. Moreover, 18 U.S.C. § 3625 dictates that the APA "do[es] not apply to the making of any determination, decision, or order under this subchapter . . . ."

The defendants may be correct that these statutory provisions foreclose any APA challenges to facility designations and transfer decisions. *See Brown v. Holder*, 770 F. Supp. 2d 363, 365–66 (D.D.C. 2011) (collecting cases from this and other districts for the proposition that federal courts lack jurisdiction to hear APA challenges to BOP facility designations). The Court

need not reach that issue conclusively, because the Court holds, in any event, that these provisions do not divest the Court of jurisdiction to entertain constitutional claims arising from BOP facility designations. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear . . . to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975)). Indeed, this Court has held before that 18 U.S.C. §§ 3621 and 3625 preclude judicial review of "BOP 'determination[s], decision[s], or order[s]' as to a prisoner's place of imprisonment," but do not "explicitly preclude[] review of *constitutional* claims based on these or similar decisions." *Royer v. Federal Bureau of Prisons*, 933 F. Supp. 2d 170, 181–82 (D.D.C. 2013) (Lamberth, C.J.). *Webster* compels that this Court adopt a narrow reading of these statutory provisions. Without prejudice to the question of whether they strip the Court of jurisdiction to entertain statutory challenges arising from BOP facility designations, they are not sufficiently explicit to bar consideration of constitutional claims.[1]

The defendants' second jurisdictional argument is that the plaintiffs have not exhausted their administrative remedies with the BOP. To exhaust administrative remedies as to any given complaint, an inmate must follow a four-step process: First; an inmate must attempt to resolve the problem informally with prison officials; second, if unsuccessful, the inmate may initiate a request to the warden of their penitentiary facility; third, if unsatisfied by the warden's response, the inmate may appeal to the regional BOP director within 20 calendar days; and finally, if the regional

---

[1] The defendants argued at the TRO hearing that the statute was amended to add the nonreviewability clause of 18 U.S.C. § 3621(b) after this Court's decision in *Royer*. However, the addition of this language does not alter the Court's conclusion with respect to its jurisdiction to entertain constitutional challenges arising from BOP facility designations. It would be extraordinary to impute to Congress the intent to completely bar courts from considering claims related to prison facility designations with a constitutional valence. The text of the statute is not sufficiently clear on this point to justify such an extreme conclusion.

director does not provide the relief sought, the inmate may escalate the complaint to the BOP's general counsel office. *DeBrew v. Atwood*, 847 F. Supp. 2d 95, 107 (D.D.C. 2012). Undoubtedly, a statutorily-prescribed exhaustion provision such as the PLRA's is "mandatory," and therefore not "amenable to judge-made exceptions." *Ross v. Blake*, 578 U.S. 632, 639 (2016). Indeed, courts refuse to entertain the argument that "special circumstances" may justify an inmate's failure to exhaust, *id.* at 640; not even facially meritorious constitutional claims are exempt, nor are claims that the inmate believes—rightly or wrongly—to be futile. *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006) (rejecting an exception for constitutional claims); *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (Sentelle, C.J.) ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process.").

There is, however, a narrow exception to the administrative exhaustion requirement embedded within the text of the PLRA itself: exhaustion is required so long as administrative remedies are "available." *Ross*, 578 U.S. at 642. The Supreme Court has noted three archetypical circumstances where administrative remedies can be considered "unavailable" and may therefore be bypassed: 1) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; 2) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"; and 3) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643–44. The "dead end" exception is narrowly construed. If the BOP is capable of providing *some* relief, even if it is not the relief that the plaintiff requests, administrative exhaustion is required. *See Booth v. Churner*, 532 U.S. 731, 735–36 (2001) (holding that an inmate seeking money damages for alleged Eighth Amendment violations must

5

exhaust administrative remedies, even though the Pennsylvania Department of Corrections could not award the monetary relief sought, because it could award other forms of relief).

The plaintiffs have set forth the rare sort of case that fits into the "dead end" exception to the PLRA's administrative exhaustion requirement. As detailed below, the plaintiffs claim that their imminent transfer to a male penitentiary and deprival of their hormone therapy would inherently work an Eighth Amendment injury. The text of the Executive Order plainly requires the BOP to perform the allegedly unlawful facility transfer and to withhold the prescribed hormone therapy drugs. Thus, there is no form of relief that is within the BOP's discretion to provide and that would remedy the plaintiffs' supposed constitutional violations. In that sense, their allegations are less like *Booth*, where exhaustion was required because the defendant could offer injunctive relief in lieu of damages, and more like *Kaemmerling*. In that case, the plaintiff sought an order restraining the BOP from collecting DNA samples from him on First, Fourth, and Fifth Amendment grounds. 553 F.3d at 673. The D.C. Circuit distinguished *Booth*, writing:

> Even under questioning from this court, counsel for the BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kaemmerling's claim that collecting his DNA would violate his statutory and constitutional rights. . . . This is not a situation like that in *Booth*, where the prison grievance process cannot grant the exact type of relief the inmate seeks or where the inmate believes pursuing the process would be futile because it is unlikely to resolve his complaint. Although the administrative process in *Booth* could not offer money damages—the exclusive form of redress the inmate sought—it did authorize at least some responsive action on the inmate's complaint of abuse, such as reassigning the abusive guard. Here, the prison grievance process cannot authorize any action on the subject of Kaemmerling's complaint because he challenges the statute's command that BOP collect his DNA sample. Kaemmerling does not complain about the method or timing of collecting the sample, which counsel for the BOP suggested the prison might have authority to change; he complains only about the fact that the BOP will collect his DNA at all, a complaint for which the BOP can offer no possible relief.

*Id.* at 675–676 (internal citations omitted). Just so in the case at hand: the alleged constitutional violation arises from the forthcoming transfer to a male penitentiary and withdrawal of hormone therapy, actions which the BOP has no discretion not to take. Under these rare circumstances, administrative exhaustion is excused; "'where the relevant administrative procedure lacks authority to provide *any* relief,' the inmate has 'nothing to exhaust.'" *Ross*, 578 U.S. at 643 (quoting *Booth*, 532 U.S. at 736 & n.4).

Satisfied that the Court has jurisdiction to hear the plaintiffs' TRO request, the Court now turns to the plaintiffs' likelihood of success on the merits.

## IV. The Plaintiffs Have Established a Likelihood of Success on the Merits of Their Eighth Amendment Claim

The parties dispute what level of scrutiny applies to the plaintiffs' equal protection and Eighth Amendment claims. The defendants, relying on *Turner v. Safley*, argue that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," a standard of review that is deferential to the Government as compared to the elevated scrutiny that ordinarily attaches to complaints alleging discrimination based on a suspect classification or the burdening of a fundamental right. 482 U.S. 78, 89 (1987). The plaintiffs retort that later cases, such as *Johnson v. California*, have applied heightened scrutiny even to suspect classifications arising in the prison context. 543 U.S. 499, 510 (2005) (holding that *Turner* is inapplicable in a challenge to the California Department of Corrections' "unwritten policy of racially segregating prisoners").

There is good reason to doubt that *Johnson*'s cabining of *Turner* applies to laws that discriminate among inmates on the basis of sex: *Johnson* stressed that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*" because that right need not "be compromised for the sake of proper prison administration." *Id.* By contrast,

7

"the segregation of inmates by sex is unquestionably constitutional" because it is reasonably related to legitimate prison management concerns. *Women Prisoners of Dist. of Columbia Dep't of Corrections v. Dist. of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996). Indeed, the sole case that the plaintiffs cite where heightened scrutiny was applied to a law discriminating among inmates by sex is *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989). The *Pitts* Court was careful to distinguish *Turner*, noting that *Turner* "applies to cases involving regulations that govern the day-to-day operation of prisons and that restrict the exercise of prisoners' individual rights within prisons," whereas heightened scrutiny was appropriate in cases "challeng[ing] general budgetary and policy choices made over decades in the give and take of city politics." *Id.* at 1453–54. The case at hand appears to more nearly resemble *Turner* than *Pitts*.

However, the Court need not reach any firm conclusion about *Turner*'s effects on the plaintiffs' equal protection claims, because it is beyond peradventure that the Supreme Court "[has] not used *Turner* to evaluate Eighth Amendment claims," which are adjudicated "under the 'deliberate indifference' standard, rather than *Turner*'s 'reasonably related' standard." *Johnson*, 543 U.S. at 511. Under this standard, as the Court will now explain, the plaintiffs have demonstrated a sufficient likelihood of success to justify a TRO at this stage.

To prove an Eighth Amendment violation based on theories such as failure-to-protect or deliberate indifference, a plaintiff must show that both an objective and subjective element are met: the plaintiff must be confronted with an "objectively intolerable risk of harm," and prison officials must knowingly or recklessly subject the plaintiff to such a known risk. *Farmer v. Brennan*, 511 U.S. 825, 839–40, 846 (1994). With respect to the transfer provision, the plaintiffs cited to various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed

in a facility corresponding to their biological sex—which the defendants do not dispute. *See* Compl. ¶ 44. The plaintiffs further claim that placement in a male penitentiary *by itself* will exacerbate the symptoms of their gender dysphoria, *even if* they are not subject to physical or sexual violence in their new facility—whether because they will be subject to searches by male correctional officers, made to shower in the company of men, referred to as men, forced to dress as men, or simply because the mere homogenous presence of men will cause uncomfortable dissonance. *See* Compl. ¶¶ 5, 44. And with respect to the medication provision, the plaintiffs have also provided an affidavit from a physician explaining the numerous and severe symptoms that may arise from failure to treat gender dysmorphia, effects which the defendants likewise do not contest. *See generally* Aff. of Dr. Frederic Ettner, ¶¶ 7–8, 10, 14–15, Mot. for TRO Ex. 6, ECF No. 13-6. Nor do the defendants dispute the plaintiffs' allegations that the BOP is subjectively aware that transferring the plaintiffs to a male penitentiary would substantially increase the likelihood of them experiencing this parade of harms; indeed, the government resources and regulations to which the plaintiffs gesture in their complaint strongly suggest the requisite awareness on the part of the BOP.

The defendants' only substantial retort to these arguments is that the matter is not yet ripe for the Court's review because the BOP has neither stated which type of facility the plaintiffs will be transferred to, nor formulated its new policy on hormone therapy pursuant to the Executive Order. Neither of these arguments is persuasive. The plain text of the Executive Order affords the BOP no discretion to keep the plaintiffs in a female penitentiary, nor to continue providing hormonal therapy to help them conform physically to their non-birth sex. To reiterate, the plaintiffs' alleged constitutional harms would arise entirely and narrowly out of their placement in a male penitentiary and the denial of their hormone therapeutics. Though the BOP may have some

9

discretion in formulating new policies with respect to transgender inmates—e.g., whether they should be housed in high- or low-security facilities or in segregated housing—the Executive Order plainly leaves the agency with no discretion with respect to these actions. The Court is therefore satisfied that the plaintiffs' Eighth Amendment claims are sufficiently "fit . . . for judicial decision" at this time, and that the plaintiffs have adequately demonstrated that "hardship" will flow from "withholding court consideration," as to justify pre-enforcement review. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967).

It is, of course, possible that further briefing of the constitutional issues at the center of this dispute, or factual discovery, will eventually yield a different outcome. But the plaintiffs, through their largely undisputed factual allegations and proffered affidavits, have met their burden to show a likelihood of success on the merits. Therefore, the first TRO factor is satisfied.

## V.     The Remaining TRO Factors Favor the Plaintiffs

Plaintiffs have straightforwardly demonstrated that irreparable harm will follow if their TRO request is denied. This is so because "a prospective violation of a constitutional right constitutes irreparable injury . . . ." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). And this is to say nothing of the substantial harms that plaintiffs have plausibly stated, through affidavit, will follow if the plaintiffs are denied their hormone therapy. *See generally* Ettner Aff.

Moreover, the balance of the equities and the public interest favor the plaintiffs. Even if the Court credits the Executive Order's representation that housing biological males in female penitentiaries has some deleterious effect on privacy and security, by the defendants' own admission, there are only about sixteen male-to-female transgender women housed in female penitentiaries, including the plaintiffs. Stover Decl. ¶ 6, Gov's Opp'n Ex. 1, ECF No. 11-1. And the defendants have not so much as alleged that the plaintiffs in this particular suit present any

threat to the female inmates housed with them, or that this threat cannot be managed locally by prison staff. Thus, the public interest in seeing the plaintiffs relocated *immediately* to male facilities is slight at best. And it is hard to cognize of *any* public interest in the immediate cessation of their hormone therapy—aside, perhaps, from whatever small sum of money the BOP may save by ceasing administration of these drugs, or the abstract interest in the enforcement of Executive Branch policy decisions. The plaintiffs' interests, on the other hand, are not abstract at all, as discussed above. The balance of the equities therefore favors a TRO so that the litigation may run its course.

Therefore, upon consideration of the plaintiffs' Motion [ECF No. 13] for a Temporary Restraining Order, the defendant's Opposition [ECF No. 11] thereto, and the entire record herein, it is hereby

**ORDERED** that the plaintiffs' Motion for a Temporary Restraining Order is **GRANTED**; and it is further

**ORDERED** that the defendants are temporarily enjoined and restrained from implementing Sections 4(a) and 4(c) of Executive Order 14168, pending further Order of this Court; and it is further

**ORDERED** that, pending further Order of this Court, defendants shall maintain and continue the plaintiffs' housing status and medical care as they existed immediately prior to January 20, 2025.

Date: February 4, 2025
7:00 p.m.

Royce C. Lamberth
United States District Judge