1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    * * * * * * * * * * * * * * *    )
     JANE DOE, et al.,                )     Civil Action
4                                     )     No. 25-00286
                    Plaintiffs,       )
5                                     )
       vs.                            )
6                                     )
     JAMES R. McHENRY, III, et al.,   )     Washington, D.C.
7                                     )     February 4, 2025
                    Defendants.       )     11:35 a.m.
8                                     )
     * * * * * * * * * * * * * * *    )
9

10

                    TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE ROYCE C. LAMBERTH
               UNITED STATES SENIOR DISTRICT JUDGE
12

13

     APPEARANCES:
14

     FOR THE PLAINTIFFS:      JENNIFER LEVI, ESQ.
15                            EVE L. HILL, ESQ.
                              SARAH AUSTIN, ESQ.
16                            GLBTQ LEGAL ADVOCATES & DEFENDERS
                              18 Tremont Street
17                            Suite 950
                              Boston, Massachusetts 02108
18

     FOR THE DEFENDANTS:      JOHN ROBINSON, ESQ.
19                            JEAN LINN, ESQ.
                              U.S. DEPARTMENT OF JUSTICE
20                            1100 L Street, Northwest
                              Washington, D.C. 20005
21

     REPORTED BY:             LISA EDWARDS, RDR, CRR
22                            Official Court Reporter
                              United States District Court for the
23                             District of Columbia
                              333 Constitution Avenue, Northwest
24                            Room 6706
                              Washington, D.C. 20001
25                            (202) 354-3269

```
1              THE COURTROOM DEPUTY:  This is Civil Action

2    25-286, Jane Doe, et al., versus James R. McHenry, III,

3    et al.

4              Starting with the Plaintiffs' counsel, please

5    approach the podium and state your appearance for the

6    record.

7              MS. LEVI:  Good morning, your Honor.  Jennifer

8    Levi for the Plaintiffs.

9              MS. HILL:  Eve Hill for the Plaintiffs.

10             MS. AUSTIN:  Sarah Austin for the Plaintiffs.

11             MR. ROBINSON:  Good afternoon, your Honor.  John

12   Robinson from the Department of Justice representing the

13   Defendants.  With me at counsel table is Jean Lin.

14             THE COURT:  Okay.  I apologize to counsel.  I had

15   a medical emergency this morning.  And I wanted to make it

16   here by hook or crook, so I made it.  But I apologize to

17   counsel for the delay.

18             We're here on the Plaintiffs' motion for a

19   temporary restraining order.  So we'll start with Ms. Levi.

20             MS. LEVI:  Thank you, your Honor.  I certainly

21   appreciate your incredible efforts to be here this morning.

22             There's a -- before I start, I just want to take

23   up a matter relating to the protective order.  We filed a

24   motion for a protective order along with the motion to seal.

25   And I know your Honor addressed --
```

1           THE COURT:  Yes.  That's granted.  And so the

2     redacted version should be filed on the record, deleting the

3     names.  But otherwise, the full discussion can go on here.

4           MS. LEVI:  Thank you, your Honor.

5           Your Honor, I represent three transgender women

6     who are currently residing in the women's facilities at the

7     Bureau of Prisons.  They've been there for an extended

8     period of time, some of them for years.

9           On January 20th, the president issued an executive

10    order establishing the policy of the United States to

11    prevent transgender people from functioning in society.  And

12    it's predicated on the premise that -- a premise that

13    rejects that transgender people exist.

14          I'm going to address two specific provisions of

15    that executive order this morning.  But the context for the

16    change in federal BOP policy stems from that broader

17    executive order that was issued on January 20th.

18          Following the issuance of that order, each of the

19    transgender women that I represent were transferred to a

20    special housing unit and told that they would be transferred

21    to a men's facility.

22          They were terrified at the prospect of these

23    transfers, given the serious risk of violence and sexual

24    assault that they'll face in men's facilities.  The

25    Government's owns document, their own research, shows that

1    transgender women experience ten times the rates of violence

2    as compared to others in the general population.  The known

3    risks of violence to transgender women in men's facilities

4    is well-established.

5         These Plaintiffs bring this case to challenge the

6    Bureau of Prisons' implementation of that executive order;

7    and they bring their claims under the Equal Protection

8    Clause of the Fifth Amendment, the Eighth Amendment and the

9    Administrative Procedures Act.  And I'd like to address

10   those arguments in turn.

11        Before I do, I want to address the Defendants'

12   argument that Section 36 -- 18 USC Section 3621 bars the

13   review of this Court -- this Court's review.  Those statutes

14   are inapposite to this case.  This case is not challenging

15   an individualized housing determination, which is what 18

16   USC 3621 refers to; it's challenging a categorical rule by

17   the Bureau of Prisons as being unconstitutional and contrary

18   to binding established regulations under the Prison Rape

19   Elimination Act.

20        This Court has previously concluded that 18 USC

21   Section 3621 does not preclude judicial review of these

22   types of claims in the housing context.  And I would cite to

23   *Royer versus Federal Bureau of Prisons*, 933 F.Supp.2d 170.

24   I know your Honor's familiar with that.  To quote from the

25   decision --

```
 1              THE COURT:  To quote from myself?

 2              MS. LEVI:  Yes.  Exactly.  I can spare you that,

 3      if you wish.

 4              But for the record, this Court has said that

 5      Congress has precluded review of BOP determinations,

 6      decisions or orders as to a prisoner's place of

 7      imprisonment.

 8              However, Congress has not explicitly precluded

 9      review of constitutional claims based on these or similar

10      decisions.  And so that statute doesn't preclude this

11      Court's review here.

12              THE COURT:  It used to alarm me when I first came

13      on the bench when people would quote me from myself and I

14      would say, "Don't you have something better?"  Now I say,

15      "Oh, that was pretty good."

16              [Laughter.]

17              MS. LEVI:  I look forward to that, your Honor.

18              If I may, I'll start by addressing the equal

19      protection claim here.

20              The Bureau of Prisons' implementation -- well,

21      first of all, I'm addressing two specific provisions in the

22      executive order.  And those are Sections 4(a) and 4(c).

23      Section 4(a) sets forth that transgender women may not be

24      housed in women's detention centers.  And Section 4(c)

25      prevents transgender incarcerated individuals from receiving
```

1  any medical procedure, treatment or drug for the purpose of

2  conforming an inmate's appearance to that of the opposite

3  sex; in other words, to receive any medication for purposes

4  of gender transition and to be transgender.

5          So Section 4(a) mandates that transgender women be

6  housed in men's facilities based on their birth sex.  And

7  those were the steps that BOP took in removing these women

8  from the general population, putting them in special housing

9  pending the transfer, and they were told that they would be

10  transferred to men's facilities.

11          And the Bureau of Prisons in its response doesn't

12  dispute that that's the only facilities that they would be

13  able to be placed in, consistent with the executive order.

14          This provision conflicts with existing PREA

15  regulations that require individualized safety assessments

16  for transgender people, and Section 4(c) singles out

17  transgender people by prohibiting medical care that they

18  need precisely because they are transgender.

19          There's no ambiguity about the classifications.

20  The order explicitly requires BOP to identify transgender

21  individuals by their birth sex, to make housing

22  determinations based on that birth sex classification and to

23  terminate medical care specifically because it's for gender

24  transition.

25          By its focus facially on both sex and transgender

1    status, the Plaintiffs argue that heightened scrutiny

2    applies.  That's true consistent with district court

3    decisions in this circuit.  Both the *Whitman Walker* case and

4    *Doe v. Trump* say that.  And it's consistent with decisions

5    from across the country.  I've cited those in our brief, but

6    including *Folwell* and *Kadel* and *Hecox* and *Whitaker* and many

7    others.

8          The Defendants can't satisfy that heavy burden

9    here.  I want to address the -- your Honor is completely

10   familiar with that standard of scrutiny.  It's a very heavy

11   burden.  The Government has to advance an important

12   justification and demonstrate that the rule is substantially

13   related to it, which we argue it cannot do here.

14         The justifications that the Bureau of Prisons

15   offers are three:  safety, security and privacy.  And I want

16   to first address the safety and security justifications.

17         Plaintiffs agree, of course, that safety and

18   security are important government interests in the abstract.

19   But the facts here show that this policy undermines --

20   actively undermines, rather than advances, the interests of

21   safety or security.  As I mentioned, the Government's own

22   data shows that transgender women face violence in men's

23   facilities at ten times the rate of other inmates.

24         And here, there's zero evidence, none, that

25   transgender women pose any safety or security risks to other

1   women prisoners because they are transgender.  And

2   tellingly, these Plaintiffs have been safely housed in

3   women's facilities, some of them for years, without

4   incidents.

5          So there are no facts to support the safety and

6   security justifications here.  And certainly the rule

7   transferring them -- excuse me, your Honor.  If I might get

8   a little water.  Thank you, your Honor.

9          There have been no facts -- there's no facts here

10   to demonstrate that transferring these women who have been

11   in the women's facilities to a men's facility would advance

12   any safety and security interest.

13          And perhaps most tellingly, this policy overturns

14   the regulations under the Prison Rape Elimination Act, which

15   have been focused on addressing the safety concerns that

16   women, including transgender women, face when they're

17   incarcerated.  And the PREA regulations are specifically

18   designed to protect safety through required individualized

19   assessments in order to make housing placement decisions for

20   transgender individuals.

21          Turning to the Government's privacy arguments,

22   they fare no better here.  First, the categorical --

23   shifting to a categorical rule ignores that the Bureau of

24   Prisons already has effective, less restrictive measures in

25   place under PREA to protect everyone's privacy, including,

1    for example, specifically addressing the ways in which

2    access to showers can be maintained, authorizing scheduled

3    bathroom times and other accommodations.  And these are the

4    kinds of individualized accommodations that have worked

5    successfully during the years these -- my clients, these

6    Plaintiffs and others, have been housed in BOP, women's

7    facilities.  And again, there's no suggestion in the record

8    and certainly not in the executive order that these

9    accommodations haven't addressed any privacy issues that

10   have arisen.

11        Second, the pretextual nature of the privacy

12   justifications is really exposed by how the order operates.

13   It eliminates BOP's discretion to make case-by-case

14   determinations about appropriate placement, even for

15   transgender women who have had genital surgery.  The notion

16   that privacy requires housing transgender women with breasts

17   and female genitals in men's facilities strains credibility

18   here.  And in fact, these are just the kinds of overbroad

19   generalizations that the *Virginia Military Institute* case

20   just simply doesn't permit.

21        Also I want to address, your Honor, the

22   Defendants' reliance on *Turner versus Safley*.  So Defendants

23   argue that a heightened scrutiny shouldn't apply because of

24   a need for deference to the prison's assessment about

25   received and security risks.  The Plaintiffs have cited in

1     our briefs the case of *California versus Johnson,* in which

2     the Supreme Court established that strict scrutiny applies

3     in the context of a race-based classification for housing

4     and placement in prison settings.

5              And *California versus Johnson* itself explains that

6     *Turner* -- *Turner*'s deferential standard only applies to

7     rights that are not inherent in incarceration.

8              The existence of separate men's and women's

9     facilities does not mean that sex discrimination is inherent

10    to incarceration in the way that *Johnson* meant.  That kind

11    of facility separation serves a specific, documented safety

12    interest in protecting women from the high rates of assault

13    they face when housed with men.  And we don't challenge that

14    separation here, your Honor.

15             Every sex classification has to stand on its own

16    merit.  That's what the analysis in *Pitts versus Thornburgh*

17    demonstrates.  There is a sex-based classification in that

18    case relating to the geographical placement of incarcerated

19    women relative to men.

20             Now, whether that satisfies heightened scrutiny is

21    a different issue.  But it doesn't apply the deferential

22    standard in *Turner*.  Prisons don't get a free pass from

23    heightened scrutiny where there is a sex-based

24    classification.

25             And, your Honor, I would submit that if that were

1    true, a prison could impose additional restrictions on, for

2    example, programming for lesbians who are incarcerated or

3    exercise time or even impose restrictions on medical care

4    for gay men.

5         The point here is that heightened scrutiny

6    applies; and then there is a secondary question as to

7    whether the Defendants can meet it in any particular case.

8         The proper analysis, clearly, under *California*

9    *versus Johnson* is whether the specific sex-based

10   classification at issue -- and here, that's the categorical

11   exclusion of transgender women from women's facilities,

12   regardless of individual circumstances -- must -- and I'm

13   quoting from *California versus Johnson* -- "necessarily be

14   compromised for the sake of proper prison administration."

15        It does not.  In fact, the evidence shows just the

16   opposite, which is that the Federal Bureau of Prisons has

17   successfully housed these Plaintiffs and other transgender

18   women in women's facilities for years using the existing

19   PREA protocols that are being overturned by the

20   implementation of this order.

21        I'd like to shift to address the Eighth Amendment

22   arguments.  The executive order also violates the Eighth

23   Amendment in two distinct ways.  One is by knowingly

24   exposing transgender women to a grave risk of assault and by

25   categorically denying necessary medical care.

1    So let me first address safety.  And I've

2    specifically talked about that in terms of the demonstrated

3    evidence.  But the Supreme Court has also been clear on this

4    in the case of *Farmer versus Brennan,* and that is that

5    prison officials have a duty to protect prisoners from

6    violence at the hands of other prisoners.  *Farmer versus*

7    *Brennan* recognizes that being violently assaulted in prison

8    is simply not part of the penalty that criminal offenders

9    pay for their offenses against society.

10    As I said, the Government's own data shows the

11    risk -- the astronomic risk that transgender women face in

12    men's facilities.  And the Bureau of Prisons clearly knows

13    this.  It's why they housed these individuals in the women's

14    facility in the first place.

15    The Defendants go on at length about the small

16    number of transgender women who are in women's facilities;

17    and rather than suggesting that that means they would be

18    safe in a men's facility, to the contrary, first of all, the

19    evidence shows that those transgender women who are

20    currently housed in men's facilities are subject to

21    astronomical rates of harm.  But the fact that on an

22    individualized assessment these women were placed in women's

23    facilities just underscores both the objective and the

24    subjective deliberate indifference to transferring them to a

25    men's facility.

1          The Government offers two responses, and each of

2     these fail.  First, they say that they'll try to choose

3     safer men's facilities.  But in admitting this, it

4     underscores the fundamental problem; and that is that all

5     men's facilities present this elevated risk.  Again, it's

6     why these women needed to be in the women's facilities to

7     begin with.

8          And as I said, the fact that there are a very

9     small number of women in the women's facilities also shows

10    that there is no safe option, certainly not even a safer

11    option in the men's facilities.

12         If I may, I want to address the Eighth Amendment

13    violation associated with the medical care.  And there are

14    cases, including *Fields*, including the *Keohane* case from the

15    Eleventh Circuit, that have found that a categorical

16    exclusion of provision of medical care for a known medical

17    need violates the Eighth Amendment.

18         This isn't an issue of whether or not someone can

19    receive a form, a particular form of medical care for gender

20    transition or associated with the distress that a

21    transgender person would experience if they couldn't live in

22    a sex different than their birth sex.  This is about a

23    categorical denial of the provision of any medical treatment

24    that is known to treat the condition.

25         And the Government offers --

```
1              THE COURT:  Tell me more about the -- what is the
2    routine medical care that goes on as it exists now in BOP?
3    And it's doctor-prescribed, I take it?
4              MS. LEVI:  Yes, your Honor.
5              THE COURT:  And under the president's order now,
6    the Bureau of Prisons, wherever they're transferred, could
7    not comply with that prescription.
8              MS. LEVI:  Yes, your Honor.
9              THE COURT:  Is that your understanding?
10             MS. LEVI:  That's correct, your Honor.
11             And if I may, to explain a little bit further --
12             THE COURT:  Explain what it is that goes on now,
13   and then we'll talk about your understanding of what the
14   Bureau of Prisons would do with that.
15             MS. LEVI:  Your Honor, my understanding -- so
16   there is an underlying medical condition, which is gender
17   dysphoria, which is the very serious distress that a
18   transgender person experiences --
19             THE COURT:  And that's diagnosed by a medical
20   doctor --
21             MS. LEVI:  It's --
22             THE COURT:  -- not just some quack?
23             MS. LEVI:  Yes, your Honor.  It's --
24             THE COURT:  A licensed medical professional has
25   made that diagnosis and the person is on some medication --
```

```
 1                    MS. LEVI:  Yes, your Honor.

 2                    THE COURT:  -- as well as other regimens, I

 3       presume, but some medication that goes with it?

 4                    MS. LEVI:  Yes, your Honor.

 5                    THE COURT:  And right now, BOP is consistently

 6       filling those prescriptions?

 7                    MS. LEVI:  I don't want to admit too much here,

 8       because transgender people have tremendous difficulties in

 9       getting both accurate diagnosis and treatment.

10                    But yes.  The underlying condition is gender

11       dysphoria.  It's a well-established medical condition that

12       the Defendants don't dispute.  It's recognized by every

13       major medical association.  And there's an

14       established course of treatment --

15                    THE COURT:  And under the current BOP policies, if

16       you have a prescription, they would be honoring it and

17       following these prescriptions?

18                    MS. LEVI:  Yes, your Honor.  The basic medication

19       is hormone therapy, which is available to non-transgender

20       people who are incarcerated for numerous other conditions.

21       These women are prescribed by a medical doctor hormones,

22       estrogen, in order to treat gender dysphoria.

23                    And this Section 4(c) of the executive order --

24       and I just want to read it both for you and for the record.

25       It says that "No federal funds are expended for any medical
```

1    procedure, treatment or drug for the purpose of conforming

2    an inmate's appearance to that of the opposite sex," which

3    is the medical treatment for a transgender person who

4    experiences gender dysphoria.  So this would prohibit the

5    Bureau of Prisons from providing the hormones that my

6    clients have been prescribed based on a medical diagnosis

7    from a doctor.

8            The Government says that it's speculative that

9    that will happen.  But I just read to you the clarity in the

10   executive order.  It doesn't admit any of exception or

11   discretion.  The fact that the Bureau of Prisons took such

12   action to enforce the executive order reflects why we're

13   here on a temporary restraining order.

14           And I do want to say the medications -- I mean, my

15   clients have been receiving hormone therapy for years.

16   They've been on hormones for ten years.  The sudden

17   cessation of medications that they've been receiving for

18   years would be devastating physically in terms of the

19   immediate impacts to them, to their bodies.

20           A number of them don't produce any alternative

21   hormones, and so the physical effects of that would be

22   devastating; and the psychological impacts as well.  There's

23   a known risk of suicidality.  And we have -- there are cases

24   across the country where transgender individuals have not

25   been prescribed medication where the suicide risks and the

1    incidence of grievous harm are well-established.  And so

2    this is a very present risk for each of my clients.

3         I'm going to turn to the Administrative Procedures

4    Act, unless you have any questions on any of that.

5         The Government also violates the Administrative

6    Procedures Act by contravening express PREA regulations.

7    PREA regulation 115.42(c) states specifically that in

8    deciding whether to assign a transgender individual who is

9    incarcerated to a facility for male or female inmates, and

10   in making other housing and programming assignments, the

11   agency shall consider on a case-by-case basis whether a

12   placement would ensure the inmate's health and safety and

13   whether the placement would present management or security

14   problems.

15        The implementation of this executive order

16   directly conflicts with a PREA rule and in doing so is -- in

17   an unconstitutional way violates the notice and comment and

18   rulemaking requirements of the Administrative Procedures

19   Act, and also for the reasons that I've said is arbitrary

20   and capricious.

21        The Government tries to evade this clear language

22   in Section 115.42(c) by claiming that they can categorically

23   exclude transgender women from women's facilities as long as

24   they individually assess which men's facility to use.

25        But that contradicts the plain text of 115.42(c).

```
 1     And it is -- it would make no sense to construe 115.42(c) in

 2     a way that only allows for that individual assessment to

 3     result in placement to a men's facility rather than a

 4     women's facility, particularly in light of the fact that the

 5     prior two sections of 115.42 require individualized

 6     determinations about how to ensure the safety of all

 7     inmates.

 8          And so to read Section 115.42, Subsection (c),

 9     which expressly addresses transgender individuals, to limit

10     the exercise of that discretion exclusively to one or the

11     other facility would both defy the language of 115.42,

12     Subsection (c), and also the principle that we should

13     presume that regulations, like statutes, are not mere

14     surplusage.

15          Your Honor, I'm happy to go -- address any

16     questions you have about irreparable harm.  I think by my

17     comments already I've made, I hope, clear the extreme risk

18     of rape, sexual assault, violence that these women would

19     experience if transferred.

20          And to the point of the irreparable harm that

21     would result if the medications that they've been provided

22     ceased, I just detailed for you what could happen

23     immediately.  And there would be no way to repair the injury

24     because of the extensive ways in which people's medical and

25     psychological status would be impacted.
```

 1          And there is no way to keep these individuals safe

 2     outside of a women's facility.  And so we think we have

 3     clearly demonstrated irreparable harm here.

 4          And the only last thing I would say before I'm

 5     happy to answer any additional questions you have is, we

 6     also think the balance of equities and the public interest

 7     are very clear here.  We are just asking for this Court to

 8     maintain the status quo.  These women have been in the

 9     women's facilities.  They've been provided medical care for

10     the time that they have been housed in the Bureau of

11     Prisons.  And there's no public interest in ceasing their

12     appropriate medical care or in transferring them, placing

13     them at serious risk.

14          And there will be time in the merits phase of this

15     case to address any of either the legal or factual issues.

16     And we do ask for a temporary restraining order here.  There

17     have been -- as I said, I mean, they have been

18     transferred -- had been transferred to a special housing

19     unit.

20          And there are actually other reports across the

21     country, including the case in Massachusetts, where --

22          THE COURT:  What have your clients been told about

23     their particular status?

24          MS. LEVI:  I'm sorry, your Honor?

25          THE COURT:  What have your clients been told about

1    their particular status, though?

2         MS. LEVI:  They were told that they were being

3    transferred to the men's facilities.  My understanding --

4    and the Defendants can address this -- is that they have

5    been put back into general population since the filing of

6    this lawsuit.  And I am not aware that they have had their

7    medical treatment terminated.

8         But they were told that -- when they were removed

9    from general population and they were placed in special

10   housing, they were told that they were going to be

11   transferred.  And beyond that, I haven't been able to get a

12   current status from them since the filing of the TRO.

13        THE COURT:  What's their medical regimen right

14   now?  Are they still on their medicine right now?

15        MS. LEVI:  They're on their medicine as far as I

16   know right now, yes.  And they are prescribed to receive

17   regular hormone treatments.  And my understanding is that

18   they have been -- that has continued to be provided to them.

19        THE COURT:  Okay.  But under the president's

20   order, they would not be entitled to continue that absent a

21   court order?

22        MS. LEVI:  That's correct, your Honor.

23        THE COURT:  All right.  Now, I take it that the

24   law seems pretty clear that I wouldn't have justification on

25   your APA claims that have not been exhausted.  I've got to

1    deal with the constitutional claims.  Don't you think?  Or

2    not?

3             MS. LEVI:  No, your Honor.  There is no

4    availability of exhaustion here.  There is no possibility

5    for them to grieve the housing transfer denial based on the

6    enforcement of the executive order.  So we would argue

7    because of the unavailability of that that this Court could

8    also address the order under all three of our claims:  equal

9    protection, Eighth Amendment and the --

10             THE COURT:  What's your best constitutional claim,

11    then, that you're making?

12             MS. LEVI:  Your Honor, I think that both the equal

13    protection and the Eighth Amendment claims are exceedingly

14    strong.  It would be hard for me to rank them because I

15    don't see the justification and I see the deliberate

16    indifference in the Eighth Amendment.

17             THE COURT:  Thank you very much.

18             MS. LEVI:  I just wanted to make one other point,

19    if I may, about the exhaustion question.  So exhaustion in

20    any case is an affirmative defense, and the Defendants would

21    have to prove the absence of exhaustion.  And we would ask

22    for the opportunity to brief that issue if you -- if your

23    Honor saw that as a bar to any of our claims.

24             Thank you, your Honor.

25             THE COURT:  I'm not throwing anything out today;

1    I'm just deciding a TRO.  But likelihood of success is a

2    question in TRO.

3              MS. LEVI:  I do think that both the Eighth

4    Amendment claim and the Equal Protection Claim under

5    well-established in and the courts in this district and

6    throughout the country are strong.

7              THE COURT:  Okay.

8              MS. LEVI:  Thank you, your Honor.

9              THE COURT:  Okay, Mr. Robinson.

10             MR. ROBINSON:  Thank you, your Honor.  Good

11   morning.

12             So I do want to address each of the points that

13   Plaintiffs' counsel made, but I do want to start with our

14   two threshold defenses under the Prison Litigation Reform

15   Act.  The first is a nonreviewability provision in Section

16   3621(b), which applies specifically to their transfer claim.

17             So as your Honor saw in our papers, 18 USC 3621(b)

18   is the statute that gives the Bureau of Prisons the

19   authority and the responsibility to designate the place of

20   imprisonment.  And that statute gives BOP broad discretion

21   in deciding the appropriate place of imprisonment.

22             So I'll just read from the statute.  It says that

23   BOP may designate, quote, "any available facility that meets

24   minimum standards of health" -- and it goes on -- "that the

25   Bureau determines to be appropriate."  And so broad

1      discretion.

2              So even before this amendment in 2018 that I'm

3      going to talk about in a second, courts held that that

4      provision rendered unreviewable placement decisions such as

5      the placement decision that Plaintiff challenges here.

6              In 2018, Congress made that language even clearer.

7      And at the end of this subsection, Subsection 3621(b), it

8      added the following language:  Notwithstanding any other

9      provision of law, a designation of a place of imprisonment

10     under this subsection is not reviewable by any court.  So

11     fairly clear language.

12             And I understand on -- during counsel's argument,

13     she cited the *Reuter* case.  But that case was from 2013, so

14     it predated the 2018 amendment that specifically said these

15     placement decisions are unreviewable.  So we think that is a

16     bar to at least their transfer claim.

17             Now, there's also this separate bar under the

18     Prison Litigation Reform Act that your Honor alluded to.

19     That's the exhaustion bar.  The Supreme Court has made very

20     clear in cases such as *Jones* and *Booth* that exhaustion under

21     the Prison Litigation Reform Act is mandatory.  It is not

22     waivable.  And it is mandatory even if the Plaintiff

23     believes -- and the D.C. Circuit has said this -- even if

24     the Plaintiff believes that exhaustion may be futile.

25             It applies to constitutional claims; it applies to

1    APA claims.  In fact, APA claims are unreviewable under the

2    Prison Litigation Reform Act.  That's a third bar.

3            But exhaustion is a bar to all of Plaintiffs'

4    claims here.

5            It's available even if the specific remedy that

6    the Plaintiff is seeking is something that a BOP official

7    cannot provide.  So long as BOP can take some action in

8    response to the request, exhaustion is required.

9            Now, there is no dispute here -- I didn't hear any

10    dispute from Plaintiffs -- that their clients have not

11    attempted to exhaust their administrative remedies.  Right?

12    It's a four-step process.  First, you have to do an informal

13    grievance with the unit staff; then you bring it to the

14    warden; then you bring it to the regional director; and then

15    you bring it to BOP's general counsel.  None of that has

16    been done here.

17            The Supreme Court in the *Woodford* case explained

18    the important reasons why we have the exhaustion

19    requirement.  And one of those reasons is to establish a

20    record so that this Court can review precisely what

21    Plaintiffs are grieving and what BOP's response was to that

22    grievance so that the Court can evaluate BOP's decision.

23            That has not been done here.  And I think that

24    concern is all the more important in this context, where the

25    president has just issued the executive order.  BOP is still

1    in the process of revising its policies.  And no action has

2    been taken yet to transfer Plaintiffs to facilities or to

3    deny them medical care.  So BOP is still in the process of

4    revising its policies in that regard.

5              And I believe Plaintiffs' counsel represented and

6    my best information at the moment is that no medical care

7    has been denied yet and that claim would be premature.

8              So we do think that there are two strong threshold

9    bars to Plaintiffs' claims here.  That would mean they do

10    not have -- they have not shown a likelihood of success on

11    the merits and that therefore any interim relief,

12    preliminary injunction, temporary restraining order, would

13    have to be denied until they comply with those requirements.

14              But I will turn then to the three merits claims

15    that Plaintiffs bring:  the Equal Protection Claim, the

16    Eighth Amendment claim and the Administrative Procedure Act

17    claim.

18              On equal protection, we do believe that the

19    deferential standard of review of the *Turner v. Safley* case

20    applies.  And under the *Turner* standard, a restriction --

21    BOP regulation will be upheld so long as it reasonably

22    relates to a legitimate penological interest.  Our brief has

23    explained what those legitimate interests are here.  They're

24    interest in safety, security, well-being and privacy in

25    intimate spaces.  And we've explained how the executive

1    order relates to those legitimate penological interests.

2            Now, counsel in their brief and at argument have

3    argued that heightened scrutiny applies here, relying

4    primarily on the case *California v. Johnson*, a Supreme Court

5    case.

6            But *California v. Johnson* concerns racial

7    discrimination, not sex-based discrimination.

8            And the Court there held that racial

9    discrimination in this context triggers strict scrutiny

10   because the right not to be discriminated against on the

11   basis of one's race is not inconsistent with proper

12   incarceration.

13           But of course in the prison system, prisons have

14   always been segregated by biological sex.  And in fact, the

15   D.C. Circuit in the *Brennan* prisoners case held, quote, "The

16   segregation of inmates by sex is unquestionably

17   constitutional."

18           So the Supreme Court -- so the D.C. Circuit has

19   specifically allowed sex-based discrimination in this

20   context.  And sex is therefore very different from race in

21   this context.  And we think that the logic of *California v.*

22   *Johnson* would not require heightened scrutiny in these

23   circumstances.

24           Counsel also referenced a D.C. Circuit case, *Pitts*

25   *v. Thornburgh*, which did apply heightened scrutiny to a sex

1    discrimination claim involving prisons.  But the Court was

2    clear in that case that it was only applying heightened

3    scrutiny in that particular case.  The D.C. Circuit was not

4    laying out a blanket rule that heightened scrutiny always

5    applies in the prison context.

6            And the reason it applied heightened scrutiny in

7    that case was because the Plaintiff was not challenging

8    prison regulations that went to safety or security or

9    day-to-day operations of prisons.  They were challenging a

10   budgetary policy choice that resulted in a women's facility

11   being located farther from individuals' residences than

12   men's facilities.

13           So as a policy budgetary challenge, it did not

14   implicate the concerns of the Supreme Court's case in

15   *Turner*.  And so we do not think that *Pitts* requires

16   heightened scrutiny in this context.

17           And then on the Equal Protection Claim and the

18   Eighth Amendment claim, just specifically with respect to

19   their challenge to the denial of medical care, we think that

20   challenge is premature, especially if you look to the

21   language of the executive order.

22           So as I said, no medical care has been denied yet.

23   And the executive order requires the Attorney General to

24   ensure that the Bureau of Prisons revises its policies

25   concerning medical care to be consistent with the order and

1    that no federal funds will be expended for any medical

2    procedure, treatment or drug for the purpose of conforming

3    an inmate's appearance to that of the opposite sex.

4        BOP has not yet revised its policies.  We don't

5    know what BOP's going to say about hormone therapy, for

6    example.  It is simply premature.  BOP has not come out with

7    a policy saying they will not provide hormone therapy in all

8    cases.  And we think that it would be appropriate to wait

9    for BOP to revise its policy before addressing the merits of

10    an equal protection or Eighth Amendment claim.

11        Turning, then, to --

12        THE COURT:  I don't understand that.  You think

13    there's some way that BOP can do something contrary to what

14    the president said?

15        MR. ROBINSON:  Not necessarily contrary to what

16    the president said.  But if you just read the plain text of

17    the order, it doesn't address hormone therapy, for example.

18    It uses different terminology.  So I don't want to get out

19    ahead of interpreting this executive order for BOP.  BOP

20    will have to do that for itself.

21        But I don't think it's clear as to each specific

22    possible treatment for gender dysphoria what the executive

23    order requires.

24        So, for example, there are a number of surgical

25    interventions for -- that have been used for gender

1   dysphoria:  facial feminization, gender confirmation

2   surgery, vaginoplasty.  Right?  BOP is going to need to look

3   at the executive order and each of these medical requests

4   and decide which are consistent with the executive order and

5   which are not.  Until BOP has an opportunity to do that, we

6   think the claim is premature.

7          And that's -- if I could just go back to the

8   exhaustion requirement, that's why exhaustion is so

9   important here, because they will have an opportunity if BOP

10  tells them -- which it hasn't done -- if BOP tells them,

11  "Your hormone therapy is going to be stopped," they'll have

12  an opportunity to grieve that with the unit staff, with

13  every level of the BOP grievance process; and then if that's

14  denied, this Court can review that denial, assuming it's

15  not -- yeah.  This Court can review that denial.

16         And it will have a record at that point.  We won't

17  be speculating.  We'll be able to say:  Okay.  BOP has

18  issued this policy.  It is now not providing hormone

19  therapy, hypothetically.  And we're going to assess that now

20  under equal protection and Eighth Amendment jurisprudence.

21         But BOP hasn't issued that policy yet, so we are

22  dealing with uncertainty.  And I think that's why exhaustion

23  is required and why it would be unripe to address the equal

24  protection or Eighth Amendment challenge.

25         Just turning to the Eighth Amendment challenge,

1    then, at the outset I want to note the legal standard here,

2    because it is quite a high bar.  As your Honor knows, the

3    Eighth Amendment prohibits cruel and unusual punishment.

4          The Supreme Court has said -- has equated that

5    standard with unnecessary and wanton infliction of pain

6    repugnant to the conscience of mankind.

7          So this is obviously not a question of which is

8    the preferred policy choice here.  The policy on these

9    difficult issues has changed from administration to

10   administration, as I'm sure your Honor is aware.

11         The administration is free to change that policy

12   to rebalance the privacy concerns versus other security

13   concerns.

14         But the Eighth Amendment analysis is focused on,

15   is this cruel and unusual looking to the -- you know, is it

16   imposing unnecessary and wanton infliction of pain?

17         And on this point, I would just emphasize again

18   the point from our papers that for the entire history of our

19   nation, including the past administration, close to 99

20   percent of transgender individuals are housed in the

21   facility of their biological sex.  That is the practical

22   reality of what the Bureau of Prisons has always done.

23         And so if Plaintiff is correct, then there is a

24   potential Eighth Amendment violation for every single one of

25   those transgender individuals who are housed in the facility

1    that corresponds to their biological sex.

2           Now, as part of their Eighth Amendment claim, they

3    also have to show deliberate indifference, which means they

4    have to show that BOP was aware of a substantial risk of

5    harm to Plaintiffs and disregarded that substantial risk of

6    harm.

7           But the record does not support that in this case.

8    We have provided a declaration from BOP that talks about the

9    considerations that BOP will take into account in

10   designating the appropriate facility for these individuals.

11   They will take into account the individual's medical,

12   psychiatric, security history and will designate a facility

13   that can best accommodate their needs.

14          That's not deliberate indifference.  That is being

15   aware of the risk and doing everything it can consistent

16   with the executive order to comply -- to accommodate their

17   needs.

18          I would also just note a point that I should have

19   mentioned earlier in response to the executive order's

20   provision regarding medical care, which is that Section 8(b)

21   of the executive order makes clear that the order should be

22   implemented consistent with law, which includes the

23   Constitution of the United States.  Right?

24          So when BOP is interpreting this order and

25   determining what medical care it can and should provide, it

1    will need to take the Eighth Amendment into account and will

2    take the Eighth Amendment into account.

3         So again, we would have a better sense of these

4    issues if these claims had been properly exhausted because

5    we would have BOP's description of what it is doing and what

6    it believes is required under the Eighth Amendment

7    specifically as to these individuals.  But we don't have

8    that yet because the claims haven't been administratively

9    exhausted.

10         And again -- so on the Eighth Amendment, they

11    challenge both the transfer decision and the medical care

12    determination.  We think the medical care question

13    especially is unripe.

14         And then just briefly on the APA claim, your

15    Honor, because I think your Honor recognized that there are

16    some significant threshold hurdles to reach in an APA claim:

17    The first is that the Prison Litigation Reform Act

18    specifically says the Administrative Procedure Act is not

19    available to challenge prison conditions.  So I think that

20    just flatly bars their APA challenge.  Even if they can get

21    past that hurdle, they need to identify final agency action,

22    culmination of the agency's procedures.

23         They haven't done that here.  They haven't done

24    that in the context of their medical care claim for the

25    reasons we've said many times.  No decision has been made

1    yet to deny medical care and they haven't grieved that

2    denial.

3         But then also with the transfer decision, I mean,

4    no decision has been made yet as to which particular

5    facilities these Plaintiffs will be transferred to.  So we

6    think that, too, there hasn't been final agency action.

7         In terms of the merits or substance of their

8    Administrative Procedure Act claim, I heard counsel to

9    primarily rely on the Prison Rape Elimination Act

10   regulations, which they say requires BOP to do a

11   case-by-case assessment and place individuals in facilities

12   corresponding to their expressed gender identity.

13        That is not what the regulation says.  The

14   regulation does call for a case-by-case assessment, which

15   BOP will do.  But there's nothing in the regulation -- this

16   is 28 CFR 115.42(c) -- that requires that Plaintiffs, for

17   example, be housed in women's facilities.  The regulation

18   leaves that to BOP's discretion.  And if the regulation

19   wanted to require that outcome, it could have done so.  But

20   it doesn't.

21        It gives BOP that discretion so long as it does a

22   case-by-case assessment, which it will do in determining the

23   appropriate place of designation.

24        Just one more point, your Honor, unless you have

25   questions:  On the non-reviewability provision, to go back

1    to the non-reviewability bar, I think they said they can get

2    around it by asserting a facial challenge to the executive

3    order as opposed to, like, an individual designation

4    decision.

5            But I don't think that works because, one, BOP is

6    implementing the executive order by making individual

7    designation decisions.  That's exactly what the statute

8    gives BOP discretion to do and bars reviewability of.

9            But then second, if they are bringing a facial

10   challenge, that is an extraordinarily high bar.  And facial

11   challenges are disfavored.  They have to show there's no

12   legitimate set of circumstances that -- and the statute has

13   no plainly legitimate sweep.  They haven't even attempted to

14   make that showing here.

15           So the only type of claim they could bring is an

16   as-applied challenge.  But if they're bringing an as-applied

17   challenge, then that's barred by the statute.

18           So with that, your Honor, unless there are further

19   questions -- let me just check -- nothing further.

20           THE COURT:  Thank you.

21           The Plaintiff has the burden.  I'll give you the

22   last word.

23           MS. LEVI:  Thank you, your Honor.

24           Something I want to say at the outset is that

25   opposing counsel here suggests that they've retained some

1    kind of ability to make individualized assessments.

2           But within their own reply opposition, they make

3    it clear that there is no possibility of a consideration of

4    placement in a women's facility.  So it defies the idea of

5    an individual assessment if there is a limit that we argue

6    creates a constitutional threshold for consideration of that

7    rule, which creates a categorical bar to an individualized

8    assessment.

9           And that really makes clear our point that this is

10   a challenge to a categorical rule that BOP admits that it's

11   applying, which limits its discretion to make an

12   individualized placement decision.  So there's nothing in

13   what they have included in their opposition to suggest that

14   they could defy the executive order by considering, for

15   example, continuing to house these women in the facility

16   that they've been in, some of them for years.

17          Similarly, with respect to Section 4(c), I want to

18   make it clear that there is no discretion built into the

19   second half of Section 4(c), which is the provision that

20   prohibits the expenditure of federal funds for any medical

21   procedure, treatment or drug for the purpose of conforming

22   an inmate's appearance to that of the opposite sex, which is

23   the defining treatment that a transgender individual would

24   need for treatment of gender dysphoria.

25          I would say that to the extent -- as I argued, we

1    don't believe there's any available exhaustion here.  It is

2    an affirmative defense.  We think we should have at least

3    the opportunity to demonstrate what these Plaintiffs may

4    have done to exhaust, although we don't think that's the

5    threshold here because of the unavailability of that.

6           And I think if your Honor has no additional

7    questions, I think we've addressed all of our arguments.

8           THE COURT:  All right.  I'll take a short recess.

9           MS. LEVI:  Thank you, your Honor.

10          (Thereupon a recess was taken, after which the

11    following proceedings were had:)

12          THE COURT:  I have one other question I wanted to

13    ask the Plaintiff, if you could help me with it.

14          In terms of the requirement for exhaustion of

15    remedies, even in a constitutional question, I think in

16    *Woodford versus Ngo*, 548 U.S. 81 at 91, the Supreme Court

17    said I cannot grant an exception even for a constitutional

18    case, that the Court may not excuse exhaustion of

19    administration remedies.  You have to go through them.

20          Isn't that right?  And if you can explain how I'd

21    get around the exhaustion requirement, even for a

22    constitutional question.

23          MS. LEVI:  Well, first of all, exhaustion is an

24    affirmative defense.  And the burden is on the Defendants to

25    demonstrate it.  It's not typically decided.

1          THE COURT:  Well, but they have remedies you can

2     go through to file a complaint.

3          MS. LEVI:  There's no -- well, first of all, my

4     understanding is -- and we've been moving on a TRO, but that

5     some of these individuals have initiated some of those

6     processes.  I can't confirm that.  I'd like the opportunity

7     to confirm that.

8          THE COURT:  But your clients haven't?

9          MS. LEVI:  I'm sorry?

10          THE COURT:  You're talking about your clients.

11     Your clients have not shown any exhaustion.

12          MS. LEVI:  They have -- I'm not -- they have

13     initiated grievances.

14          THE COURT:  Right.

15          MS. LEVI:  The burden is on the Defendants to show

16     that they haven't exhausted.  And they can't show that here.

17          But more than that, there's no available remedy

18     here.  There's nothing to --

19          THE COURT:  Well, there are remedies.  They can go

20     to the Bureau of Prisons and say -- and then they have an

21     exhaustion of those remedies in BOP that I take it the

22     courts enforce standardly.

23          MS. LEVI:  But there is nothing to exhaust here.

24     So in other words, BOP has said that they will not consider

25     any placement in the female facility.  So there's nothing to

1    exhaust.  That decision has been made finally.  They've

2    represented it in the papers before this Court.

3              And so --

4              THE COURT:  That's saying exhaustion is futile.

5              MS. LEVI:  Exactly.  It is futile, absolutely.

6    And it's both unavailable here and --

7              THE COURT:  So then I have to figure out if there

8    is any case law that supports that.

9              MS. LEVI:  So we would cite for your Honor to the

10    point that exhaustion is an affirmative defense *Jones versus*

11    *Bock*, 549 U.S. 199, 212.

12              We would also say exhaustion is not a bar here.

13    It only applies, as you mentioned, when administrative

14    remedies are available.  And under *Ross versus Blake*, 578

15    U.S. 632, where there is -- my point is there's no remedy

16    available because BOP has represented in front of this Court

17    that it will not and cannot consider a placement in the

18    female facilities.

19              And so where the relevant administrative procedure

20    lacks authority to provide any relief, which they've

21    admitted in the opposition filed here, that there's nothing

22    to exhaust.

23              I have additional case law I would cite relating

24    to where the law uses mandatory language, BOP lacks

25    discretion.  They've admitted that they have no discretion.

1    And so there's no authority to provide the relief here,

2    which is for them to have it within the consideration of

3    them being in a female facility.

4            THE COURT:  Right.  That's helpful.

5            MS. LEVI:  Okay.

6            THE COURT:  Mr. Johnson?

7            MR. ROBINSON:  Briefly.

8            Just briefly, your Honor, a couple case cites.  So

9    the D.C. Circuit was clear in a case called *Kaemmerling v.*

10   *Lappin*, 553 F.3d 669, from 2008, that futility, if they

11   think it's futile, that is not an excuse to fail to exhaust.

12   You need to do it.

13           And then in terms of it's an affirmative defense,

14   I just now pulled up a preliminary injunction case.

15   Hopefully, I can open my phone to read the citation to you.

16   It's *ABA, Inc., versus District of Columbia*.  That's 40

17   F.Supp.3d 153, DDC 2014.

18           Judge Collyer held that preliminary injunction was

19   denied because you're not likely to succeed on the merits

20   because you haven't exhausted.  So I think it's irrelevant

21   that it's an affirmative defense.  We've raised the defense.

22   They admit they haven't exhausted.

23           That's all.

24           THE COURT:  I've got it.  Okay.  I'll rule as

25   promptly as I can.  I'll issue a written order this

```
 1    afternoon.  We won't try to reconvene in court, but I will
 2    issue something in writing this afternoon.
 3               MS. LEVI:  Can I say something in a final
 4    response?
 5               THE COURT:  Go ahead.
 6               MS. LEVI:  Just to the *Kaemmerling* point, I want
 7    to make it clear that our argument here is that even if
 8    it's -- even if there is a futility argument to be made, it
 9    is still unavailable and that they have admitted that it's
10    unavailable by the fact that they won't consider the
11    placement in a women's facility.
12               THE COURT:  Thank you all very much.
13               MS. LEVI:  Thank you, your Honor.
14               THE COURT:  Both counsel were very helpful to the
15    Court.  I appreciate it.
16               Again, I apologize for being so late in starting.
17    It was beyond my control.
18               MS. LEVI:  I appreciate it, your Honor.
19               (Proceedings concluded.)
20
21
22
23
24
25
```

1                        **<u>CERTIFICATE</u>**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10               Dated this 6th day of February, 2025.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25