# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE et al., | |
| Plaintiffs, | Case No.: 1:25-cv-00286 |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND EXPANDED PRELIMINARY INJUNCTION** |
| PAMELA BONDI, *in her official capacity* as Attorney General of the United States; and WILLIAM LOTHROP, *in his official capacity* as Acting Director of the Federal Bureau of Prisons, | |
| Defendants. | |

Ernest Galvan *
Kara J. Janssen *
Adrienne Spiegel *
Ben Hattem *
**ROSEN BIEN
GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

Christopher Stoll *
Amy Whelan *
**NATIONAL CENTER FOR
LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, California  94102

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland  21202

Jennifer L. Levi *
Sarah Austin *
**GLBTQ LEGAL ADVOCATES &
DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

*Counsel for Plaintiffs*
* Admitted Pro Hac Vice*

## INTRODUCTION

Plaintiffs Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, and Wendy Doe are all transgender women incarcerated in women's Bureau of Prison's ("BOP") facilities. President Trump's Executive Order 14168 directs BOP to cut off medically necessary healthcare for Plaintiffs' gender dysphoria and to transfer them to men's prisons.

This Court entered a temporary restraining order and preliminary injunction to prevent Defendants from implementing Executive Order 14168 with regard to Jane Doe, Mary Doe, and Sara Doe while this case proceeds. Dkts. 23, 44. On February 20 and 21, 2025, days after the Court's preliminary injunction order, the additional Plaintiffs and other transgender women at their facilities who were not previously named as Plaintiffs in this case were rounded up by BOP officials and informed that they would be immediately transferred to men's prisons and would have their healthcare terminated pursuant to the Executive Order.

Plaintiffs Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, and Wendy Doe hereby seek the same relief this Court has already entered as to Jane, Mary, and Sara Doe. Each of these additional Plaintiffs is similarly situated to Jane, Mary, and Sara Doe for purposes of the claims in this case, including the Eighth Amendment claims on which this Court previously granted preliminary relief. All of the newly added Plaintiffs have confirmed diagnoses of gender dysphoria and have long ago transitioned and live as women, including being on hormones and, for many, having surgeries. All of the Plaintiffs face serious, immediate, and irreparable harm if they are transferred to men's prisons or if their vital medical care is stopped. Plaintiffs Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, and Wendy Doe therefore seek immediate and preliminary relief to

enjoin Defendants' application to them of Sections 4(a) and 4(c) of the Order and to maintain their housing, medication, and treatment access while this case proceeds.

## STATEMENT OF FACTS

Plaintiffs have previously detailed the facts giving rise to their claims in this case. *See* Dkt. 13-1 at 3–5 (Mem. P. & A. in Supp. Mot. for TRO & Prelim. Inj.). Plaintiffs incorporate their previous statement of facts and present additional information here regarding the new Plaintiffs in the First Amended Complaint and the developments since the Court's prior orders.

Plaintiffs are all housed in women's facilities. Each of the Plaintiffs has been housed in a women's facility for months or years. (FAC ¶¶ 2–40.) While housed in women's facilities, Plaintiffs have received hormone medications necessary to ensure their health and safety—most of them for over a decade. (E.g., FAC ¶¶ 17, 20, 23.)

Plaintiffs have all been diagnosed with gender dysphoria and have maintained medically necessary hormone treatment for their gender dysphoria for years. Many have had surgeries to live as women. (FAC ¶¶ 10, 17, 20, 38.) All have had their medical care overseen by BOP doctors. The Plaintiffs who have had genital surgery no longer produce sex hormones endogenously, which means that they need hormone medication to maintain their overall health and wellbeing. (E.g., FAC ¶¶ 17, 20.)

Transferring Plaintiffs to men's facilities will place them in immediate physical and psychological danger. Transgender women housed in men's prisons face extremely high levels of violence and sexual assault, as well as pervasive sexual harassment. Many of the Plaintiffs have been raped and survived attempted rapes when previously housed in men's facilities. (E.g., FAC ¶¶ 5, 8, 21, 24.)

On January 20, 2025, President Trump issued Executive Order 14168. In relevant part, the Order: (1) bars transgender women from women's prisons, mandating their transfer to men's

facilities regardless of individual safety considerations, Exec. Order No. 14168 § 4(a); and (2) prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.* § 4(c). On January 24 and 25, 2025, BOP officials removed Plaintiffs from the general population of their women's facilities, placed them into segregated units, and told them they would be imminently moved to men's facilities because of the Executive Order. (FAC ¶¶ 62–72.) Jane Doe, Mary Doe, and Sara Doe filed suit on January 30, 2025, to prevent their transfer and to stop the threatened termination of their necessary medical care. The Court entered a preliminary injunction with regard to those three Plaintiffs on February 18, 2025. Dkt. 44.

On February 20 and 21, 2025, BOP officials informed all of the Plaintiffs except Jane Doe, Mary Doe, and Sara Doe that they will be transferred to men's prisons in the coming days, and that their medical treatment for gender dysphoria will stop when they arrive at male facilities. (FAC ¶¶ 74–75.) Plaintiffs seek immediate relief to prevent these transfers and ensure Plaintiffs' medical treatment continues. Plaintiffs thus seek to expand the coverage of the Court's preliminary injunction to cover all Plaintiffs in the First Amended Complaint.[1] Plaintiffs also provide an additional legal basis for an expanded injunction based on the claim in Count

---

[1] Plaintiffs' counsel continues to learn about additional women who are similarly situated to the Plaintiffs. Those women are also at imminent risk of harm and could be imminently transferred to men's prisons or cut off from necessary medical care. BOP has been recalcitrant in following this Court's earlier TRO which broadly prevented BOP from enforcing the challenged provisions of the Executive Order. Plaintiffs ask this Court to issue a facial injunction to ensure that BOP does not enforce the Executive Order as to other women in the same circumstances as the Plaintiffs herein. This Court's failure to do so risks BOP personnel again rounding up even these women to rehouse them.

VII: that Section 4(a) of the Executive Order is unconstitutional as an ultra vires act in violation of the separation of powers.

## LEGAL STANDARD

In order to obtain a temporary restraining order or preliminary injunction, a moving party must "make a 'clear showing' that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (stating preliminary injunction standard); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to award a TRO is 'analyzed using the same "factors applicable to preliminary injunctive relief,"'" (quoting *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020)). All four factors support granting temporary restraints and a preliminary injunction in this matter.

The purpose of preliminary relief is to preserve the status quo pending resolution of the underlying litigation. *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). The same is true of temporary restraining orders. *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). The relevant status quo is the "last uncontested status which preceded the pending controversy." *Dist. 50, United Mine Workers of Am.*, 412 F.2d at 168; *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). Here, the last uncontested status is that which existed prior to January 20, 2025.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Are Likely to Succeed on the Merits of Their Eighth Amendment Claims

This Court has already concluded that Jane Doe, Mary Doe, and Sara Doe are likely to succeed on the merits of their Eighth Amendment claims.  Dkt. 23 at 8–10; Dkt. 44 at 1–2.  The other Plaintiffs are all similarly situated to Jane, Mary, and Sara Doe for purposes of their Eighth Amendment claims because they all have diagnosed gender dysphoria, medically prescribed and necessary treatment plans that will be cut off by Defendants' actions implementing the Executive Order, and serious risks of sexual violence and other harms if they are transferred to men's prisons.

As this Court previously noted, "various government reports and regulations recogniz[e] that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility" based on their sex assigned at birth.  Dkt. 23 at 8–9.  Moreover, "placement in a male penitentiary *by itself* will exacerbate the symptoms of [Plaintiffs'] gender dysphoria, *even if* they are not subject to physical or sexual violence in their new facility—whether because they will be subject to searches by male correctional officers, made to shower in the company of men, referred to as men, forced to dress as men, or simply because the mere homogenous presence of men will cause uncomfortable dissonance."  *Id.* at 9.  Defendants' actions to end Plaintiffs' gender dysphoria treatment will place them at risk of "numerous and severe symptoms," and "BOP is subjectively aware that transferring the plaintiffs to a male penitentiary would substantially increase the likelihood of them experiencing this parade of harms."  *Id.*  These findings apply to each of the newly added Plaintiffs in the First Amended Complaint, just as the Court found with regard to Jane, Mary, and Sara Doe.

As Plaintiffs have previously argued, Prison officials violate the Eighth Amendment when they are deliberately indifferent to prisoners' serious medical needs or fail to protect incarcerated individuals from a substantial risk of violence at the hands of other prisoners.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). The Order violates the Eighth Amendment by imposing a blanket medical treatment ban that denies necessary care and by mandating that all transgender women must be housed with men, both of which expose Plaintiffs to severe harm.

### 1. The Executive Order Subjects Plaintiffs to Cruel and Unusual Punishment by Failing to Protect Them From a Serious Risk of Bodily Harm

As this Court has found, Plaintiffs have a strong likelihood of success on the merits of their Eighth Amendment claim that Defendants are failing to protect them from a serious risk of bodily harm by transferring them to men's facilities pursuant to the Order.  "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Plaintiffs' failure-to-protect claim requires them to establish both incarceration "under conditions posing a substantial risk of serious harm" and that the threatened harm is "objectively, 'sufficiently serious.'"  *Id.* at 833–34 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Without question, physical and sexual violence constitute objectively serious deprivations.  Here, Plaintiffs face clear risks of violence, rape, and sexual assault if they are housed with men.  Federal regulations recognize transgender status as increasing "risk of sexual victimization"; accordingly, the regulations require individualized risk assessment for housing decisions.  28 C.F.R. § 115.41(d)(7); *id*. § 115.42(c)–(d).  Plaintiffs' long-term hormone therapy and previous placement in women's facilities further demonstrate their heightened risk.  Indeed,

multiple Plaintiffs have been sexually assaulted while housed in BOP men's facilities.  (E.g., FAC ¶¶ 5, 8, 21, 24.)

The subjective element requires showing officials "know[] of and disregard[] an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  Courts have consistently found this element satisfied when officials knowingly house transgender women in men's prisons. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) ("[A] jury could infer that [prison officials] knew Doe faced a substantial risk of rape because of her status as a transgender woman."); *Stover v. Corr. Corp. of Am.*, No. 12-cv-00393, 2015 WL 874288, at *9– 10 (D. Idaho Feb. 27, 2015); *Lojan v. Crumbsie*, No. 12-CV-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *see also Zollicoffer*, 169 F. Supp. 3d at 691 (noting that the "vulnerability of transgender prisoners to sexual abuse is no secret").

The Order's directive to amend 28 C.F.R. § 115.41 to enable blanket transfers of transgender women to men's facilities, regardless of individual risk, demonstrates Defendants' awareness and disregard of known dangers.  This deliberate indifference is further evidenced by Defendants' implementation of the Order despite previously acknowledging these risks by placing Plaintiffs in women's facilities.  These facts establish the subjective element of Plaintiffs' failure-to-protect claim.  Plaintiffs have demonstrated a strong likelihood of success on the merits of their Eighth Amendment claim.

### 2.    The Executive Order Mandates Deliberate Indifference to Plaintiffs' Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment.  *Estelle*, 429 U.S. at 104.  This requires both "a known, serious medical condition" and that officials possessed "subjective knowledge of the serious medical need and recklessly

disregarded the excessive risk to inmate health or safety from that risk." *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022).

Plaintiffs easily satisfy the objective component. Gender dysphoria is a serious, medically recognized disorder. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The Order's categorical ban on federally funded medical care for gender dysphoria denies all treatment for this serious condition, including Plaintiffs' prescribed hormone medication and other care.

For the subjective component, "refusal to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety [constitutes] deliberate indifference in violation of the Eighth Amendment." *Bernier,* 38 F. 4th at 1151. This includes when treatment decisions are "based exclusively on nonmedical considerations . . . rather than any medical justification." *Id.* The imposition of a blanket ban on medical treatment for gender dysphoria satisfies this component. *See*, *e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citing *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011). "[R]esponding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Id.* at 1266–67.

Defendants have provided Plaintiffs with hormone medication and treatment for months or years to treat Plaintiffs' gender dysphoria diagnoses. The Order now mandates denial of this medically necessary care, which will cause severe harm as each of the Plaintiffs' conditions worsens. This deliberate termination of treatment for a recognized serious condition meets the

objective and subjective requirements for deliberate indifference. *See Fields*, 653 F.3d at 556.

Plaintiffs thus demonstrate a strong likelihood of success on this claim.

> **B.     Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim**

As the Court has recognized, Plaintiffs' Eighth Amendment claims are sufficient to

sustain temporary restraints and a preliminary injunction to prevent Defendants from

implementing the Executive Order with regard to Plaintiffs. However, Defendants'

implementation also violates Plaintiffs' Equal Protection rights and may be enjoined on that

basis as well. Plaintiffs ask this Court to extend the protections in the Preliminary Injunction

under the Eighth Amendment grounds already decided to ensure that the additional women

named in the amended complaint are protected. Plaintiffs make the Equal Protection argument

as an alternative ground to support immediate relief herein largely to preserve the argument as

this case moves forward.

As Plaintiffs have argued, sex-based laws trigger heightened scrutiny, requiring the

government to show "at least that the [challenged] classification serves important governmental

objectives and that the discriminatory means employed are substantially related to the

achievement of those objectives." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996).

Defendants have claimed that the deferential standard of *Turner v. Safley*, 482 U.S. 78

(1987), should apply to Plaintiffs' equal protection claims instead of heightened scrutiny.

Defendants rest this argument on *Women Prisoners of District of Columbia Department of

Corrections v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996), which held that the D.C.

Department of Corrections could constitutionally offer different and fewer programs at a

women's prison than at a vastly larger men's prison, *id.* at 925–27.

*Women Prisoners* does not support Defendants' claim.  *Women Prisoners* did not apply the *Turner* standard; the circuit instead concluded that its decision was "altogether consistent with the Supreme Court's most recent articulation of equal protection principles in *United States v. Virginia*."  *Id.* at 926.  The circuit held that the plaintiffs' claim failed because the plaintiffs were not similarly situated to male prisoners due to the size of their respective facilities.  *Id.*  The circuit further held that the programs offered at the women's prison were appropriately tailored to the facility's size.  *Id.*  Contrary to Defendants' characterization, the court did not hold that the programmatic differences between the prisons were constitutional because they were "reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.

Defendants rely on *Women Prisoners* primarily for its citation to *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989), which held that the separation of prisoners into men's and women's facilities was constitutional.  *Id.* at 1456; *see Women Prisoners*, 93 F.3d at 926.  But *Pitts* itself shows why Defendants' argument is wrong.  The circuit applied heightened scrutiny to the equal protection challenge in *Pitts*, rejecting the *Turner* standard.  *Pitts*, 866 F.2d at 1453–55.  It did so for two reasons: *first*, because *Pitts* (like this case) involved "general budgetary and policy choices" rather than "regulations that govern the day-to-day operation of prisons and that restrict the exercise of prisoners' individual rights within prisons"; and *second*, because *Pitts* (like this case) "touche[d] upon important concerns that the Supreme Court has clearly held call for stepped-up scrutiny."  *Id.* at 1453–54.

Just like Plaintiffs' claims in this case, the claim in *Pitts* called for heightened scrutiny because "Plaintiffs allege facial gender discrimination, a classification that traditionally summons heightened scrutiny."  *Id.* at 1454.  As *Pitts* explained, sex discrimination claims brought by incarcerated people should receive heightened scrutiny because such claims "differ in

kind from challenges to limitations upon personal rights that *Turner* subjects to" less searching review. *Id.* at 1455. The Supreme Court confirmed the reasoning of *Pitts* in the context of race discrimination in *Johnson v. California*, 543 U.S. 499 (2005), holding that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*." *Id.* at 510.

It makes no difference to Plaintiffs' claims that after applying heightened scrutiny, *Pitts* ultimately affirmed the separation of men's and women's prisons. Plaintiffs do not challenge the existence of separate men's and women's facilities; they challenge Defendants' policy of categorically moving transgender women to men's prisons based solely on their sex assigned at birth. The threshold dispute in this case is whether heightened scrutiny applies to Defendants' facial sex classification, and *Pitts* and *Johnson* make clear that it does. *Pitts*, 866 F.2d at 1454–55 (holding that the "dangers of gender discrimination . . . emphasize[] the need for heightened scrutiny in this case"); *Johnson*, 543 U.S. at 515 (holding that heightened scrutiny applied and leaving for remand whether the policy was unconstitutional when subject to such scrutiny).

Moreover, laws that discriminate on other quasi-suspect bases are also subject to heightened scrutiny. Even under rational basis review, laws also violate the requirement of equal protection when based on "a bare [governmental] desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or "mere negative attitudes, or fear," *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985). Here, in addition to failing heightened scrutiny, Sections 4(a) and 4(c) fail even this basic test.

### 1.     Sections 4(a) and 4(c) Trigger Heightened Scrutiny

As Plaintiffs have argued, Section 4(a) creates an explicit sex-based classification by mandating that BOP assign housing based solely on birth sex and by categorically prohibiting transgender women from being housed in women's facilities. Section 4(c) similarly relies on an explicit sex-based classification because it uses birth sex as the sole criterion to prohibit certain

12

medical treatments.  Section 4(c) also discriminates specifically against transgender individuals by denying them essential healthcare while continuing to provide such care—including, in some cases, the same medications and procedures—to non-transgender people.  These classifications trigger heightened scrutiny in three independent ways.

First, Sections 4(a) and 4(c) make a facial sex-based classification by using birth sex as the sole criterion for housing assignments and for the prohibition of necessary medical care.  Second, by targeting *transgender* people for different treatment, Sections 4(a) and 4(c) necessarily create sex-based classifications.  This District has previously concluded that transgender classifications are sex-based classifications, requiring heightened scrutiny under the Equal Protection Clause.  *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 209 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).  Multiple circuit courts concur.  *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153-54 (4th Cir. 2024) (en banc); *Hecox v. Little*, 104 F.4th 1061, 1079–80 (9th Cir. 2024); *see also Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

Third, transgender people constitute a quasi-suspect class because they meet all four criteria established by the Supreme Court.  *See Doe 1*, 275 F. Supp. 3d at 208–09.  Transgender people have suffered pervasive discrimination throughout history, including laws and policies that: (i) criminalized their ability to dress and appear as who they are; (ii) banned them from federal employment and military service; (iii) excluded them from marriage; (iv) terminated their parental rights; and (v) restricted their ability to obtain healthcare.  Transgender people share the immutable and distinguishing characteristic of having a sex different than the sex assigned to them at birth, and they have been unable to secure basic rights through the political process.  For all these reasons, federal courts throughout the country have held that transgender-status

discrimination triggers heightened scrutiny. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–11 (4th Cir. 2020) (collecting authorities).

**2.    Section 4(a) Fails Heightened Scrutiny**

Under heightened scrutiny, Section 4(a) fails because it serves no important or even legitimate governmental purpose. Rather than advancing a legitimate penological interest, Section 4(a)'s categorical rule puts transgender women at severe risk of harm and prevents prison officials from exercising their discretion to make housing placements based on individualized safety and security considerations. The provision undermines rather than advances safety.

As the Court has found with regard to Plaintiffs' Eighth Amendment claims, Section (4)(a) creates severe risks of physical and sexual assault for Plaintiffs by forcing them into men's facilities with no consideration of individualized circumstances, their individual safety and security, or the impact on the overall safety and security of the institution. Dkt. 23 at 8–9; *accord Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016) ("[T]he vulnerability of transgender prisoners to sexual abuse is no secret.").

In addition, Section 4(a)'s categorical mandate conflicts with PREA regulations that identify transgender women as a group at high risk of sexual victimization and require individualized housing determinations. 28 C.F.R. § 115.42. The Order provides no legitimate security or penological justification for replacing this established individualized approach with a categorical ban on placement in women's facilities. For that reason, the Order plainly fails heightened scrutiny and would fail even the deferential *Turner* standard.

The Order also relies on "overbroad generalizations," *VMI*, 518 U.S. at 533, by claiming without evidence that transgender women inherently threaten safety in women's facilities. By suggesting transgender individuals seek access to single-sex spaces for improper purposes, the

14

Order impermissibly depends on stereotypes rather than individual assessments or facts. Transgender women pose no unique safety threats to other women, as multiple federal courts have recognized. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020) (finding that such generalizations "are the precise kind of generalized concerns for prison security that courts routinely object"); *Hampton v. Baldwin*, No. 18-CV-550, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018) (rejecting the claim that a blanket "policy of placing transgender inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security"); *Doe v. Mass. Dep't of Corr.*, No. 17-12255, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) ("Generalized concerns for prison security are insufficient to meet the 'demanding burden' placed on the [government] to justify sex-based classifications").

Plaintiffs have been incarcerated in women's facilities for months or years; Plaintiff Wendy Doe, for instance, has been incarcerated in women's facilities for ███████████ ██████. (FAC ¶ 38.)  To determine these housing assignments, BOP officials weighed Plaintiffs' individual circumstances, as required by the Prison Rape Elimination Act (PREA), and determined that the safest and most appropriate placement for Plaintiffs is in women's facilities, in part because they would be at extremely high risk for physical and sexual assault in men's prisons. *See* 28 C.F.R. §§ 115.42(b)–(c).  The Order's categorical transfer policy is not substantially related to advancing any safety objective or other legitimate government interest; instead, it rests entirely on "overbroad generalizations" and hostility toward transgender people. *VMI*, 518 U.S. at 533.

### 3.    Section 4(c) Fails Heightened Scrutiny

Section 4(c)'s blanket ban on gender dysphoria treatment for incarcerated transgender people also fails heightened scrutiny because it lacks a substantial relationship to important governmental interests.  The ban categorically overrides medical judgment to deny medically

necessary and prescribed care based solely on transgender status.  No legitimate medical or penological interest justifies this sweeping prohibition.  *See Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wis. 2010), *aff'd on other grounds*, 653 F.3d 550 (7th Cir. 2011) (finding "no reasonably conceivable state of facts provides a rational tie" between "prison safety and security" and banning gender transition care for incarcerated transgender people).

As a result, Section 4(c) could not survive even *Turner* review, much less heightened scrutiny.  Courts have consistently held that categorical bans on gender transition care lack any rational relationship to legitimate penological interests.  *See id.* at 868; *Cordellioné v. Comm'r, Ind. Dep't of Corr.*, No. 23-cv-00135, 2024 WL 4333152, at *17 (S.D. Ind. Sept. 17, 2024).  The government's arbitrary discontinuation of established medical care fails to serve any legitimate government interest, much less survive the demanding requirements of heightened scrutiny.

### 4.    Sections 4(a) and 4(c) Fail Even Rational Basis Review Because They Are Based on Animus Toward Transgender People

The challenged provisions of the Order also violate equal protection because they are rooted in animus and thus cannot survive even rational basis review.  State action motivated by "animus toward the class it affects" is unconstitutional under any level of scrutiny.  *Romer*, 517 U.S. at 632.  Like the amendment in *Romer*, the Order singles out a specific group of people and denies them basic protections—here, access to safe housing and medical care—while preserving those protections for others.  *Id.* at 631–33.

The President's campaign statements made clear that the Order was motivated by animus toward transgender Americans.  The President's statements calling transgender Americans "insan[e]" and "deranged" only underscore that the discriminatory Order stems from hostility toward transgender people rather than a legitimate purpose.  (FAC ¶ 92.)  During the campaign,

the President vowed that "with a stroke of [his] pen on day one" he would "stop the transgender lunacy." (*Id.* ¶ 95.) The Order is the result of the animus expressed in that promise.

The Order's withdrawal of established protections, the severe harms it affirmatively imposes, and the absence of any rational connection to legitimate governmental interests show that it is based on animus and, as such, violates the Equal Protection Clause. *Moreno*, 413 U.S. at 534; *City of Cleburne*, 473 U.S. at 448.

### C.    Plaintiffs Are Likely to Succeed on the Merits of Their Separation of Powers Claim

In the First Amended Complaint, Plaintiffs add a further challenge to the implementation of Section 4(c) because that Section of the Executive Order violates the constitutional separation of powers, encroaches on Congress's Spending and Appropriations powers, and violates the Bicameralism and Presentment requirements for repealing statutes. Plaintiffs have a strong likelihood of success on this claim. As set forth above, Plaintiffs urge the expansion of the Preliminary Injunction on the Eighth Amendment ground already decided by this Court and make the Separation of Powers argument here because of its strength and to preserve it in the case going forward.

It is foundational to the structure of our federal government that "[t]he legislature . . . commands the purse." The Federalist, No. 78 (Alexander Hamilton). This bedrock principle is expressed in the Spending and Appropriations Clauses of the Constitution, which together grant Congress the exclusive power to authorize the distribution of federal money. U.S. Const. art. I, § 8, cl. 1; *id.*, art. I, § 9, cl. 7.

Because the power to appropriate funds is granted to Congress alone, "the President does not have unilateral authority to refuse to spend the funds" appropriated by Congress. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see also City & County of San*

17

*Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("[T]he President is without authority to thwart congressional will by canceling appropriations passed by Congress.").  Congress has not delegated to the President the power to withhold funds appropriated to BOP for necessary medical care, regardless of the President's policy disagreement with providing that care.  In the absence of such delegation, in this case "the President's 'power is at its lowest ebb,'" and he "has none of 'his own constitutional powers' to 'rely' upon."  *City & County of San Francisco*, 897 F.3d at 1233–34 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Congress has put in place a procedure the President must follow to rescind the appropriation of federal funds.  When the President does not want appropriated funds to be spent "for fiscal policy or other reasons," the President is required by statute to propose this rescission to Congress; Congress then determines whether to introduce and vote on a "rescission bill" effectuating the requested withholding.  2 U.S.C. § 683; *Aiken County*, 725 F.3d at 261 n.1 ("[T]he President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.")  Such funds must remain available while Congress considers the President's request.  2 U.S.C. § 683(b).  Section 4(c) of the Executive Order ignores that procedure and arrogates to the President and subordinate executive officials the power to determine whether appropriated funds should be spent.  Exec. Order No. 14168 § 4(c) (directing the Attorney General to "ensure that no Federal funds are expended" for the purpose of treating gender dysphoria).

For similar reasons, Section 4(c) violates the Bicameralism and Presentment requirements of the Constitution, the "single, finely wrought and exhaustively considered, procedure" for enacting and repealing federal statutes.  *I.N.S. v. Chadha*, 462 U.S. 919, 951

(1983). Because Congress's statutory appropriations can be repealed only through this constitutional process, the Supreme Court has rejected the claim that the President may rescind individual spending items by "relying on his own policy judgment." *Clinton v. City of New York*, 524 U.S. 417, 444 (1998). As the Court held in *Clinton v. City of New York*, the President may not unilaterally rescind appropriations "even when Congress specifically authorized the President's action." *City & County of San Francisco*, 897 F.3d at 1232 (citing *Clinton*, 524 U.S. at 439). The President has even less power to do so here because Congress has not granted the President any authority to withhold funding for medically necessary treatment for transgender people incarcerated in BOP facilities.

For those reasons, Plaintiffs have a high likelihood of success on their separation of powers claim.

### D.    Plaintiffs Are Likely to Succeed on the Merits of Their Administrative Procedure Act Claim

Plaintiffs have also challenged the implementation of both Section 4(a) and 4(c) under the Administrative Procedure Act ("APA"). As set forth above with respect to the Equal Protection and Separation of Powers arguments, Plaintiffs do not believe the Court needs to address this claim to expand the Preliminary Injunction in this case, and Plaintiffs make the argument here to preserve it for the case. An agency's actions implementing an executive order are generally subject to the APA. *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019), *rev'd on other grounds*, 961 F.3d 635 (4th Cir. 2020); *see also Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018). Defendants have argued that their blanket transfer and medication-denial policies are nonetheless unreviewable under the APA because of 18 U.S.C. §§ 3621(b) and 3625. Defendants are wrong.

Section 3621(b) states that "a designation of a place of imprisonment *under this subsection* is not reviewable by any court."  18 U.S.C. § 3621(b) (emphasis added).  That subsection addresses individualized designations and transfers based on BOP's discretionary determinations of the "appropriate and suitable" housing for incarcerated people.  *Id.*  Plaintiffs' imminent transfers to men's facilities are not the result of individualized determinations made under § 3621(b); they are instead the result of BOP's blanket, unconstitutional transfer policy implementing Executive Order 14168.  By its terms, the non-reviewability provision of § 3621(b) is inapplicable to Plaintiffs' claims.

That is not the only textual problem with Defendants' argument.  The statute also makes clear that the initial "designation of a place of imprisonment" differs from the subsequent transfer of an incarcerated person to new housing.  *Id.* (discussing requirements when "designating the place of imprisonment *or making transfers under this subsection*").  "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).  Under the plain language of § 3621(b), the bar to judicial review in that subsection applies only to challenges to BOP's initial "designation of a place of imprisonment," not subsequent transfers.  18 U.S.C. § 3621(b).  Courts begin from a "strong presumption favoring judicial review of agency action," and the absence of any language in § 3621(b) precluding review of transfers does not rebut that presumption.  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)).  Moreover, no part of § 3621(b) pertains to the denial of medical care under Section 4(c) of the Order that Plaintiffs also challenge in this suit.

Defendants argue that 18 U.S.C. § 3625 also bars APA review of their blanket transfer and medication denial policies implementing the Executive Order. Again, § 3625 has nothing to do with BOP's medical care denials under Section 4(c). Furthermore, Defendants' claim about § 3625 fails for the same reason as their claim about § 3621(b): § 3625 bars APA review only of a "determination, decision, or order *under this subchapter*." 18 U.S.C. § 3625 (emphasis added). As this Court has previously concluded, § 3625 "applies only to decisions made under 18 U.S.C. §§ 3621–3626, and thus, by its terms, not to decisions made under" other provisions of law. *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181 (D.D.C. 2013) (Lamberth, C.J.). 18 U.S.C. § 3625 does not bar Plaintiffs' APA claims because the BOP action challenged in this case is an unlawful policy created to implement the Executive Order, not an individualized "determination, decision, or order" under §§ 3621–3626. 18 U.S.C. § 3625.

Other language in § 3625 confirms that the provision does not bar review of BOP policies like the blanket transfer policy here. As other courts considering that statute have noted, "[t]he specific provisions of the APA excluded" by § 3625 "apply to *individual* adjudications and their judicial review." *Iacaboni v. United States*, 251 F. Supp. 2d 1015, 1036 (D. Mass. 2003) (emphasis in original). The statute does not include 5 U.S.C. § 553, the section of the APA that governs rulemaking. *See* 18 U.S.C. § 3625 (exempting BOP decisions under that subchapter from "sections 554 and 555 and 701 through 706 of title 5, United States Code"). For that reason, courts have routinely interpreted § 3625 to "provide[] that rule-making activities are reviewable under the APA, while 'adjudication[s] of specific cases are not.'" *Iacaboni*, 251 F. Supp. 2d at 1036–37 (collecting cases); *see also Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 83–84 (D.D.C. 2006) (concluding that "challenges to rulemaking are not precluded by the statute").

BOP's blanket transfer policy is a (procedurally improper) rulemaking activity for which § 3625 does not preclude review, not an individual adjudication covered by that statute.  BOP's policy runs directly contrary to Prison Rape Elimination Act ("PREA") regulations that require individualized determinations of "health and safety" risks to transgender incarcerated people before making housing assignments.  28 C.F.R. § 115.42(c).  Those regulations were enacted through notice-and-comment rulemaking under 5 U.S.C. § 553.  *See* 77 Fed. Reg. 37106, 37204 (2012).  BOP's blanket housing policy implementing the Executive Order prohibits the "case-by-case" determinations required by PREA, 28 C.F.R. § 115.42(c), and it effectively rescinds PREA regulations without following the procedures required by 5 U.S.C. § 553.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (holding that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

The Order instructs the Attorney General to "amend[], as necessary," the PREA regulations to allow this blanket transfer policy.  Exec. Order No. 14,168 § 4(a).  The Attorney General has not done so; instead, Defendants have "simply disregard[ed] rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Because Defendants have not followed the necessary procedures to rescind the PREA regulations and instead are simply disregarding those regulations, the blanket transfer policy violates the APA.

Defendants' implementation of Sections 4(a) and 4(c) of the Order is also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706.  BOP's decision to transfer Plaintiffs to men's facilities and to deny them medical care solely because of their birth sex is unconstitutional and thus also violates 5 U.S.C. § 706(2)(B).  The agency's action is also

arbitrary and capricious because it fails to consider important aspects of the problem or offers an explanation so implausible it cannot be attributed to agency expertise or differing viewpoints. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, departing from agency precedent without explanation, as Defendants have done, constitutes arbitrary and capricious action. *Lemoyne-Owen College v. NLRB*, 357 F.3d 55, 60–61 (D.C. Cir. 2004). Defendants' actions are also arbitrary and capricious because they rely on pretextual and contrived reasoning. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION

This Court has previously found that Jane Doe, Mary Doe, and Sara Doe would suffer irreparable harm without temporary restraints and a preliminary injunction to prevent Defendants from enforcing the Sections 4(a) and 4(c). Dkt. 23 at 10. The additional Plaintiffs face the same immediate, irreparable harms if the Court does not grant temporary and preliminary relief.

Without a preliminary injunction, Plaintiffs face imminent transfer to all-male facilities where they will experience an extremely high risk of sexual assault and physical violence. *See, e.g.*, *Greene v. Bowles*, 361 F.3d 290, 292 (6th Cir. 2004) (describing a severe physical attack against a transgender woman by another prisoner); *Tay v. Dennison*, 457 F. Supp. 3d 657, 664–68 (S.D. Ill. 2020) (describing severe sexual misconduct against a transgender woman by prison staff and physical attack by a male prisoner). Several of the Plaintiffs have previously suffered sexual assaults while housed in men's facilities. (E.g., FAC ¶¶ 5, 8, 21, 24.) Plaintiffs also face the abrupt discontinuation of their medically necessary hormone medications and care. Denying them this critical treatment for gender dysphoria will inflict severe emotional distress—including a high risk of suicidality—and irreversible physical changes. (*See* Ettner Decl. ECF 013-6 ¶¶ 7,

10.) These imminent injuries, both physical and psychological, cannot be remedied through monetary compensation.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF

The balance of equities strongly favors Plaintiffs.  As this Court has found, "the public interest in seeing the plaintiffs relocated *immediately* to male facilities is slight at best," even crediting the Executive Order's false and discriminatory claims.  Dkt. 23 at 11.  Moreover, "it is hard to cognize of *any* public interest in the immediate cessation of [Plaintiffs'] hormone therapy."  *Id.*  Rather, it is "always in the public interest to prevent the violation of a party's constitutional rights."  *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (internal citations omitted).  It is also in the public interest to ensure Plaintiffs' health and safety and ensure that prison policies reflect careful, reasoned judgment, not bias or abrupt change with no consideration of penological interests.  Further, Plaintiffs' interest in avoiding the potential harms posed by the Order is strong because their transfer to men's facilities would expose them to serious risks of violence, sexual assault, and emotional trauma.

## IV. PLAINTIFFS' PROPOSED ORDER COMPLIES WITH THE PLRA

Under the PLRA, a district court must find that a preliminary injunction regarding prison conditions is "narrowly drawn," extends "no further than necessary to correct the harm the court finds requires preliminary relief," and is "the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).  Sections 4(a) and 4(c) of the Executive Order instruct BOP to transfer Plaintiffs to men's facilities and to cut off their necessary medical care.  Any application of those sections of the Executive Order to Plaintiffs, or prisoners who are similarly situated to Plaintiffs, would cause them the immediate, irreparable harm detailed above.  For that reason, a preliminary injunction preventing Defendants from applying those sections of the Order to

Plaintiffs and to prisoners similarly situated to Plaintiffs is the narrowest injunction that will still provide the necessary relief. It is also the least intrusive means necessary to correct the imminent harm Plaintiffs face since these provisions, if allowed to go into effect, would remove all discretion from BOP staff to provide safer housing and medically necessary care to these women.

A more limited injunction would be inconsistent with a finding that Plaintiffs have shown a substantial likelihood of success on the merits of their challenges to Sections 4(a) and 4(c). And because the preliminary injunction sought by Plaintiffs only bars the application of those sections to Plaintiffs and to people who are similarly situated to Plaintiffs while this case proceeds, it extends no further than necessary to correct the harm threatened by those sections.

The PLRA also requires district courts to give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* Maintaining the status quo of Plaintiffs' housing and medical care while this suit proceeds causes no adverse impact to the operation of the criminal justice system. Entering this preliminary relief would also have no adverse effect on public safety. To the contrary, this preliminary relief would benefit public safety by preventing the violence that Plaintiffs will face if transferred to men's prisons. For all of those reasons, Plaintiffs' requested temporary restraining order and preliminary relief complies with the PLRA.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs seek the temporary restraining order and preliminary relief requested.

Dated: February 21, 2025                          _____/s/ Eve L. Hill_____

Eve L. Hill (Bar No. 424896)
ehill@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

Christopher Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
CStoll@nclrights.org
AWhelan@nclrights.org
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel: (415) 365-1338
Fax: (415) 392-8442

Ernest Galvan (admitted *pro hac vice*)
Kara J. Janssen (admitted *pro hac vice*)
Adrienne Spiegel (admitted *pro hac vice*)
Ben Hattem (admitted *pro hac vice*)
EGalvan@rbgg.com
KJanssen@rbgg.com
ASpiegel@rbgg.com
BHattem@rbgg.com
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830

Jennifer L. Levi (admitted *pro hac vice*)
Sarah Austin (admitted *pro hac vice*)
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

*Attorneys for Plaintiffs*