# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, et al.,<br><br>            Plaintiffs,<br><br>v.<br><br>PAMELA BONDI, *in her official capacity as* Attorney General of the United States; and WILLIAM LOTHROP, *in his official capacity as* Acting Director of the Federal Bureau of Prisons,<br><br>            Defendants. | Case No.:  1:25-cv-00286-RCL |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This case challenges the Bureau of Prisons' ("BOP") imminent action, pursuant to Executive Order 14168, that requires all transgender women to be housed with men and terminates all medical treatments for gender dysphoria.  Unable to defend this policy on the merits, Defendants rehash the arguments they unsuccessfully put forth in response to Plaintiffs' original Motion for a Temporary Restraining Order; they argue that Plaintiffs' claims are barred, unripe, and that this Court should defer to the executive's decision to transfer Plaintiffs to men's facilities.  Not only do these arguments once again fail, but Defendants' opposition underscores why relief is needed to address the significant and irreparable harm all Plaintiffs would face due to transfer to *any* men's facility.  The risk of serious violence Plaintiffs face if transferred to men's facilities is known to BOP and is why these individuals were permitted to live in female facilities in the first place.  Forcing Plaintiffs to live as men is cruel, harmful, and will cause Plaintiffs to suffer severe physical and psychological distress for no reason beyond the fact they fall within a group that is disliked by the current administration.

Defendants' actions in implementing the Order's mandates demonstrate both the ripeness of Plaintiffs' claims and the urgent need to prevent further irreparable harm. Defendants' declaration describing housing reassessments and general rates of violence in BOP facilities is inadmissible, as it violates of numerous rules of evidence. Even if this Court considers the declaration, it fails to support Defendants' argument that they are acting within the bounds of the Eighth Amendment. That, in response to this litigation, BOP conducted post hoc assessments to justify a conclusion predetermined by the Executive Order, does not diminish Defendants' subjective and objective deliberate indifference to the harms Plaintiffs will face. To maintain their safety Plaintiffs must be allowed to stay in their current facilities and receive continued access to medically necessary care and female commissary items pending resolution of this case.

## I.    This Court Can Review Plaintiffs' Claims

### A.    Judicial Review Is Not Barred by 18 U.S.C. § 3621.

Defendants argue that all of Plaintiffs' challenges to section 4(a) are barred because 18 U.S.C. § 3621 strips federal courts' jurisdiction to hear any claim related to housing placements or transfers. Opp. at 12–13. This Court has rightly rejected that argument with regard to Plaintiffs' constitutional claims. Dkt. 23 at 3–4. Defendants are wrong about Plaintiffs' APA claims as well.

Defendants' argument fails under the plain text of § 3621(b), which bars judicial review only of the "designation of a place of imprisonment *under this subsection*." 18 U.S.C. § 3621(b) (emphasis added). As this Court has previously concluded, housing determinations resulting from other laws are not decisions "made pursuant to 18 U.S.C. § 3621." *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181 (D.D.C. 2013). BOP's decision to transfer Plaintiffs to men's prisons was made pursuant to the Executive Order's mandates, not § 3621. Indeed, Defendants' own Stover declaration makes clear that BOP did not follow the § 3621 process to determine

2

Plaintiffs' new housing placements.  The factors considered by BOP were not the considerations required by § 3621 (nor those required by PREA regulations).  *Compare* Stover Decl., ¶¶ 10–11 *with* 18 U.S.C. § 3621(b)(1)–(5) *and* 28 C.F.R. § 115.42(c), (e).  And Defendants' briefing leaves no doubt that BOP eliminated all women's prisons from consideration when determining these placements.  Opp. at 16 (acknowledging that BOP "lack[s] discretion to transfer Plaintiffs" to any women's facility under the Executive Order).  BOP's categorical determination that Plaintiffs can no longer be housed in women's prisons is the action challenged in this lawsuit, it is mandated by the Executive Order, and it has nothing to do with BOP's discretion to make individualized housing designations under § 3621(b).

The amendment to § 3621(b) in the First Step Act does not change this result.  The provision added by the First Step Act confirms that the restriction on judicial review is limited to claims challenging "a designation of a place of imprisonment *under this subsection*."  First Step Act of 2018, P.L. 115-391, 132 Stat 5194, 5237 (2018) (emphasis added).  All of the cases Defendants cite involved challenges to individual housing designations made pursuant to § 3621, not blanket housing policy decisions resulting from other laws.  *See Foy v. United States*, 285 F.R.D. 407, 410 (N.D. Iowa 2012); *Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *4 (10th Cir. Sept. 27, 2022); *United States v. Vang*, No. 16-cr-277, 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020); *Porche v. Salazar*, No. 19-cv-77, 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019).

As this Court has noted, "[w]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  Dkt. 23 at 4 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)).  Similarly, the availability of APA review is precluded "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent."  *Abbott*

*Laboratories v. Gardner*, 387 U.S. 136, 141 (1967) (abrogated on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977)).  In § 3621, Congress did not clearly preclude review of constitutional or APA challenges to categorical housing policies like the policy BOP has enacted here—to the contrary, Congress expressly stated that the restriction on judicial review in § 3621(b) applies only to the "designation of a place of imprisonment *under this subsection*."  18 U.S.C. § 3621(b).  Accordingly, none of Plaintiffs' claims are barred by that statute.

**B.    Plaintiffs Are Not Required to Exhaust Administrative Remedies Because No Administrative Remedies Are Available**

Defendants argue that Plaintiffs failed to exhaust administrative remedies before bringing this suit.  Defs.' Opp. at 14–17.  As this Court has already found, Plaintiffs are not required to exhaust administrative remedies because no administrative remedy is available to them.  Dkt. 23 at 4–7; *Ross v. Blake*, 578 U.S. 632, 642 (2016).

Prisoners are only required to exhaust "grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  *Ross*, 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).  "Where the relevant administrative procedure lacks authority to provide any relief," there is "nothing to exhaust."  *Id.* at 643.  The D.C. Circuit has held that this is true when a law uses mandatory language that deprives the BOP of discretion to provide any relief.  *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008).  Administrative remedies are therefore unavailable when a plaintiff "is challenging . . . the enforceability of a statute rather than the prison's method of enforcement."  *Id.* at 676.

That is the case here.  Plaintiffs challenge their imminent transfers to men's prisons and the termination of medically necessary care for their gender dysphoria under Executive Order 14168.  BOP has no authority to provide relief to Plaintiffs because Sections 4(a) and 4(c) of the Order use "mandatory language" that leaves BOP no discretion.  *Id.* at 675.  Section 4(a)

instructs that the Attorney General "*shall ensure*" that transgender women "are not detained in women's prisons."  Exec. Order No. 14,168 § 4(a).  Section 4(c) orders that the Attorney General "*shall ensure* that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and *shall ensure* that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."  *Id.* § 4(c).  These mandates allow BOP no discretion to continue housing Plaintiffs in women's prisons or to continue providing them necessary medical care.

Defendants argue that Plaintiffs' claims are nonetheless barred because exhaustion is required if the agency could hypothetically provide some relief, even though it cannot provide the exact remedy the plaintiff seeks.  Opp. at 15–16.  But as the Supreme Court has held, exhaustion is not required "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint."  *Booth v. Churner*, 532 U.S. 731, 736 (2001).  BOP has no authority to take any action in response to Plaintiffs' complaint because the Order requires BOP to transfer Plaintiffs to men's prisons and to cut off their necessary medical care.  *See* Exec. Order No. 14168 §§ 4(a), 4(c).

BOP cannot provide "alternative treatment" through its administrative process that would prevent the harm to Plaintiffs, as Defendants claim.  Opp. at 16.  The Order requires BOP to cut off Plaintiffs' hormone treatments and other medical care for their gender dysphoria, which will necessarily put Plaintiffs at serious risk of immediate and irreparable harm.  *See* Ettner Decl., Dkt. 13-6 ¶¶ 10, 13–17; Ex. 1, Declaration of Lauren Meade., ¶¶ 3-14 ("Meade Decl.").  As this Court has found, Plaintiffs will also be placed at serious risk of sexual assault and other violence if transferred to men's prisons.  Dkt. 23 at 8–9.  Moreover, "placement in a male penitentiary *by itself* will exacerbate the symptoms of their gender dysphoria, *even if* they are not subject to

physical or sexual violence." *Id.* at 9. Defendants acknowledge that the Order requires BOP to transfer Plaintiffs to men's prisons. Opp. at 16 ("[P]rison officials would lack discretion to transfer Plaintiffs back to a women's facility . . . ."). Yet those transfers are the very cause of the harms Plaintiffs will undoubtedly suffer. Because BOP's administrative process cannot provide Plaintiffs any relief, exhaustion is not required. *Ross*, 578 U.S. at 643.

Moreover, administrative remedies are also unavailable in this case because such remedies cannot be finalized in time to prevent Plaintiffs' imminent transfer to men's prisons and the denial of their medical care, and because the harms caused by those actions cannot be repaired after the fact. For that reason, administrative remedies "cannot address the subject of [plaintiffs'] complaint" and "would serve none of the purposes of exhaustion." *Kaemmerling*, 553 F.3d at 676. Courts have found that remedies are unavailable where plaintiffs were at imminent risk of harm and where the administrative process could not respond quickly enough to avert that harm. *See, e.g.*, *McPherson v. Lamont*, 457 F. Supp. 3d 67, 81 (D. Conn. 2020).

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. The Declaration of Rick Stover Should be Stricken, Or Afforded Little Weight in Assessing Plaintiffs' Motion

Defendants rely almost exclusively on a declaration from Rick Stover ("Stover Decl.") as evidence to support their argument against Plaintiffs' Eighth Amendment claims. Mr. Stover's declaration does not support Defendants' argument that Plaintiffs have failed to show a substantial risk of serious harm as a result of the Executive Order. *See* Defs' Opp. at 17. Plaintiffs are currently housed in female facilities pursuant to prior BOP assessments that female facilities are the appropriate placement for each of them. Despite that determination, Defendants now claim that moving Plaintiffs to male facilities would not constitute deliberate indifference to a serious risk of bodily harm. Defs' Opp. at 17-22. In support, they point to Mr. Stover's

statement that reassessments were conducted. But the facts make clear that the assessments were conducted solely in response to the Executive Order, which no longer allows BOP to reach any conclusion other than that these individuals must be housed in male institutions. Prior to the issuance of the Executive Order, BOP reached the opposite conclusion, finding that these specific individuals did need to be housed in female institutions for their safety. The only fact that has changed is the issuance of the Executive Order. *See* Stover Decl. ¶ 17 ("In response to the preliminary injunction that was entered on February 18, 2025, the review of placements for Mary Doe, and Sara Doe have been placed on hold."). BOP reassessed the other named Plaintiffs within a single day of knowing their identities, not out of some genuine concern for their wellbeing and safety, but because they have now been ordered to house them in male facilities *regardless* of their safety there. If further proof were needed, Defendants notably allege *no* new facts that would justify this rushed reassessment or that justifies a completely different conclusion about the most suitable placement. To the extent BOP conducted individualized reassessments at all, they were sham, post hoc rationalizations for a predetermined conclusion.[1] As such, they do nothing to undermine this Court's prior finding that Plaintiffs are likely to succeed on their 8th Amendment claims.

Regardless, Mr. Stover's declaration (1) fails to lay a foundation of personal knowledge for the facts to which he purports to attest, *See* Fed. R. Evid. 602; (2) relies on business records that he fails to produce, *see id.* 1002; (3) indicates a lack of trustworthiness because of the "method or circumstances of preparation," *see id.* 803; and (4) makes impermissible legal conclusions as a lay witness. *See id.* 602.

---

[1] The records of them, accordingly, do not satisfy any exceptions to the hearsay rule. *See* Fed. R. Evid. 803(6)(E); *id.* 803(8)(B).

Lay declarants may only offer facts or opinions based on their own personal knowledge. Fed. R. Evid. 602; *United States v. Davis*, 596 F.3d 852, 856 (D.C. Cir. 2010) ("If the testimony on its face purports to be based on direct perception of the facts described but is actually based on an out-of-court statement about [or record demonstrating] those facts, the objection should be lack of personal knowledge."). Mr. Stover states that for the past eight months he has held the position of Senior Deputy Assistant Director of the Designation and Sentence Computation Center within BOP and prior to that was a warden at FCI Danbury, a female institution. Stover Decl. ¶¶ 1-2. Mr. Stover does not identify specific records he accessed or reviewed to prepare his declaration, and he does not attach any records to his declaration. Nor does Mr. Stover testify that he was personally involved in the alleged reevaluations of Plaintiffs' housing determinations. Mr. Stover lays no foundation whatsoever for his knowledge about reevaluations or rates of violence or sexual assaults at a variety of institutions where he has never worked and his statements as to these issues should be stricken for lack of personal knowledge.

Given the lack of substantiated personal knowledge, or any attached evidence in support, Mr. Stover's statements should also be stricken as hearsay under Rules 801 and 802 of the Federal Rules of Evidence. "The elementary wisdom of the best evidence rule rests on the fact that the [recording itself] is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description [of it]." *United States v. Holton*, 116 F.3d 1536, 1545 (D.C. Cir. 1997) (quoting *Gordon v. United States*, 344 U.S. 414 (1953)). If Defendants wish to rely on the contents of reassessments, they must produce the records themselves, not second-hand, hearsay descriptions.

Mr. Stover's declaration also contains the impermissible legal conclusion that BOP "follows the requirements of the Prison Rape Elimination Act of 2003's (PREA) implementing

regulations." Such self-serving legal conclusions are not proper evidence especially where, as here, it is unclear whether these regulations, or BOP's other relevant policies, even remain in effect.[2]

### B. Plaintiffs' Eighth Amendment Claim Challenging Section 4(a) is Likely to Succeed on the Merits

Defendants acknowledge that where a party ignores a "*particularized* risk of harm to an inmate who identifie[s] with the opposite biological sex" that disregard can constitute subjective deliberate indifference. Defs' Opp. at 18. Each Plaintiff faces a particularized risk of harm here, as evidenced by their existing housing determinations. Specifically, Plaintiffs claim that transferring transgender women who are *currently housed in women's facilities*—as all Plaintiffs are—to men's facilities, based on spurious "reassessments," constitutes subjective deliberate indifference to a serious risk of harm. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016).

Data about the risks of sexual abuse in prisons and the risks borne specifically by transgender women supports Plaintiffs' likelihood of success on the merits of their Eighth Amendment claim. The statistics Defendants cite about general rates of assault in the men's and women's facilities at issue do not capture the particular risks Plaintiffs, all of whom are transgender women, face. *See* Defs' Opp. at 21; Stover Decl. ¶¶ 19-24. A 2019 literature review

---

[2] *See* "National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act (PREA): Prison and Jail Standards," formerly available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/PREA-Prison-Jail-Standards.pdf ("The requested page could not be found."). Mr. Stover also references BOP Program Statement 5324.12 ("Sexually Abusive Behavior Prevention and Intervention Program), yet this policy, like *all* of BOP's policies, has been removed from circulation as the BOP "implement[s] the Executive Order on 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.'" *See* https://www.bop.gov/policy/policy_forms_unavailable.jsp.

and study found that "more than one third of transgender prisoners were sexually assaulted in the past year [2012], whereas approximately 4 percent of all prisoners experienced sexual victimization. . . . In California, [another study] found that sexual assault was *13 times more prevalent* among transgender women in prisons for men than for men in the same facilities." Jenness V, Sexton L, & Sumner J, "Sexual victimization against transgender women in prison: Consent and coercion in context," Criminology, 57(4), 604 (2019) (emphasis added) (internal citations omitted); *see generally id.* at 625 ("The victimization of incarcerated transgender women is, in the first instance, violence perpetrated by men and experienced by women in an institutional environment in which masculinity is valorized and femininity is regularly subordinated.").[3]

Defendants' reported plans to mitigate the harm Plaintiffs will face are insufficient to escape an Eighth Amendment violation. Plaintiffs' placement in male facilities, in addition to putting them at dramatically elevated risk of violence, also brings a serious risk of exacerbating their gender dysphoria, which, "left untreated, can result in debilitating psychological harms, including anxiety, depression, suicidality, and other mental health issues." *See* Meade Decl. ¶ 3. Defendants offer that they will mitigate the risks to Plaintiffs' safety by "hous[ing] them in more restrictive conditions as a protective custody case in the Special Housing Unit." Defs' Opp. at 8; Stover Decl. ¶ 30. Defendants offer to reduce one type of harm (violence and sexual assault) by risking a different type of harm (solitary confinement). It is well-established that "[a]lthough single cell and/or segregated units may shield [transgender] people from physical or sexual assault, isolated units can also present increased risk of mental health problems; thus, concerns

---

[3] Available at
https://www.researchgate.net/publication/335350919_Sexual_victimization_against_transgender_women_in_prison_Consent_and_coercion_in_context.

regarding physical safety must be balanced against threats to poor mental health due to isolation." Hughto J, Clark K, Daken K, "Victimization Within and Beyond the Prison Walls: A Latent Profile Analysis of Transgender and Gender Diverse Adults," J Interpers Violence, 37(23-24) (2022).[4] Defendants' reliance on BOP's own records of the prevalence of assault is entitled to little deference. Third party auditors have found, as recently as last summer, that BOP's assessment of the prevalence of sexual assault in its facilities is unreliable and predicated on incomplete information. The court-appointed Special Master in *California Coalition of Women Prisoners v. Bureau of Prisons,* Case No. 4:23-cv-04155-YGR (ND Cal) described the findings of the Permanent Subcommittee on Investigations of the U.S. Senate Hearing, December 13, 2022, thus: "The Subcommittee found the BOP failed to systematically analyze PREA data and relied upon misleading PREA audits that didn't indicate the sexual abuse that occurred at certain facilities. . . . The Subcommittee found that the BOP does not use key indicators of sexual abuse in its facilities."[5] Finally, the mechanisms available for reporting sexual assault do not reduce the risk that Plaintiffs will *be* assaulted. The knowledge that if they are sexually assaulted they will "have numerous ways to report" that assault, Defs' Opp. at 8-9, is cold comfort to Plaintiffs who will be thrown into a setting where assault is likely to occur.

**C.    Plaintiffs' Eighth Amendment Claim Challenging Section 4(c) is Likely to Succeed on the Merits**

Plaintiff's claims regarding Section 4(c) are ripe. BOP has already begun implementing the Executive Order, including initiating facility transfers and re-classifying sex designations. *See, e.g.*, Compl. ¶¶ 25–33. Section 4(c) demands that the BOP "ensure that no Federal funds

---

[4] Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC10281010/.

[5] First Report of the Special Master Pursuant to Court's Order of March 26, 2024, available at 89-90, available at https://rbgg.com/wp-content/uploads/Special-Master-Report-without-Attachments-Unsealed-08-02-24-1.pdf

are expended for any medical procedure, treatment, or drug for the purpose of conforming an

inmate's appearance to that of the opposite sex."  Exec. Order No. 14,168 § 4(c).  Section 4(c)

does not merely ask BOP to make policy changes; it requires BOP to cut off all funding for

Plaintiffs' necessary medical care.  Such an unequivocal directive from the President is sufficient

to establish jurisdiction and justiciability, even if it is yet to be fully implemented.  *Doe v.

Trump*, 275 F. Supp. 3d 167, 176 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v.

Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

     Plaintiffs have demonstrated a strong likelihood of success on their Eighth Amendment

claims based on the Executive Order's imposition of a blanket ban on medical treatment for

gender dysphoria.  Defendants argue that BOP's medical policies with regard to Plaintiffs are not

yet formulated.  That argument is at odds with the plain text of the Order.  On its face, the Order

prohibits all government-provided medical treatment for gender dysphoria, including medically

necessary hormone therapy that Plaintiffs have received for years both before and during their

confinement.  It contains no exceptions and makes no allowance for individual consideration of

medical necessity.  Hormone therapy and surgeries, when needed, to allow a person to live in a

different sex are the only known, effective treatments for gender dysphoria. Meade Decl. ¶ 6.

Any purported treatment to allow Plaintiffs to survive without the treatment they need to live as

women is conversion therapy, known to be harmful and to have long lasting traumatic impact on

its subjects. Meade Decl. ¶ 10.

     Section 8(b)'s boilerplate language requiring implementation of the Order "consistent

with applicable law" makes no reference to medical necessity, and Defendants offer no proof

that medically necessary care will be provided notwithstanding the clear language of the Order.

Here, unlike in *Keohane v. Dixon*, 4:24-cv-00434, Docket No. 55 (N.D. Fla, Dec. 27, 2024),

Defendants have offered no evidence that under the Order, they "will individually evaluate every inmate" to determine medical necessity or that BOP's policies in following the Order will be anything other than the blanket ban the Order demands. Such a blanket ban on care for gender dysphoria is prohibited by the Eighth Amendment. *See, e.g., Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266-67 (11th Cir. 2020); *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 249-50 (D. Mass. 2012).

   **D.    Plaintiffs' Equal Protection Claims Are Likely to Succeed on the Merits**

   Defendants do not dispute that Plaintiffs' equal protection claims are likely to succeed if heightened scrutiny applies. Instead, Defendants reiterate their incorrect claim that BOP's actions are subject only to the deferential standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987). Defendants' argument ignores the significance of *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989), which concluded that *Turner* did not apply to a facial sex discrimination claim like the claims brought here. *Id.* at 1455. As the D.C. Circuit explained, "equal protection claims . . . differ in kind from challenges to limitations upon personal rights that *Turner* subjects to review to ensure that they are 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89). "The claim charges invidiousness, rather than an unwarranted interference with constitutionally secured liberties." *Id*.

   The Supreme Court reached much the same conclusion in *Johnson v. California*, 543 U.S. 499 (2005), holding that *Turner* does not apply to facial classifications on a constitutionally suspect basis. To the contrary, the Court held that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*." *Id*. at 510. In response, Defendants do little more than reassert their mischaracterization of *Women Prisoners of District of Columbia Department of Corrections v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996), which did not apply *Turner* and instead concluded that its decision was "consistent with the

Supreme Court's most recent articulation of equal protection principles in *United States v. Virginia*." *Id.* at 926.

Defendants are also wrong that BOP's implementation of the Executive Order survives rational basis review. Unlike *Trump v. Hawaii*, 585 U.S. 667 (2018), there is no "persuasive evidence that the" Executive Order "has a legitimate grounding" in anything other than hostility toward transgender people, and transgender women in particular. *Id.* at 706. Nor is the Executive Order "expressly premised on legitimate purposes." *Id.* Multiple factors demonstrate that discriminatory animus motivated the Order. First, the animus is evident on the face of the Order itself: Section 2's declaration that "the sexes are not changeable" and that it is a "false claim{" that a male can identify as and become a woman explicitly deny the existence of transgender individuals. There is no evidence whatsoever in the Executive Order or in the record of this case that Plaintiffs or other transgender women present risks to privacy or safety in women's facilities and the Executive Order entirely disregards extensive documentation of disproportionate rates of sexual assault and violence against incarcerated transgender people. No urgent safety or security concerns precipitated this dramatic policy shift . Second, the Order is part of a systematic effort to eliminate protections for transgender individuals across all domains of federal policy. Beginning on January 20, this Administration has issued a series of executive orders specifically reversing protections for transgender people in schools, healthcare, military service, federal funding, shelters, and more. Beyond formal policy changes, federal agencies have systematically removed research, data, and information about transgender individuals from government websites. See, e.g., Nico Lang, "Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far," Them, (Feb. 7, 2025) (documenting systematic removal of LGBTQ+

content across federal websites);[6] Judd Legum and Rebecca Crosby, "The NSA's 'Big Delete'" Popular Information (Feb 10, 2025) (revealing directive to eliminate references to "transgender" and "gender identity" from federal websites).[7]

The proximity and pattern of these actions - multiple executive orders stripping transgender protections without justification or demonstrated need - clearly evidences discriminatory intent.  See *Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1274 (N.D. Fla. June 11, 2024) (finding animus where multiple policies targeting transgender individuals were enacted in close succession); *Hecox v. Little*, 479 F. Supp. 3d 930, 984 (D. Idaho Aug. 17, 2020) (similar pattern of coordinated anti-transgender policies supported finding of animus); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) (considering broader context and pattern of actions in determining discriminatory intent).  Defendants have not even attempted to propose a basis other than animus for the Executive Order's denial of necessary medical care to transgender people.  For these reasons, Defendants actions would violate the equal protection guarantee of the Fifth Amendment even if considered under rational basis review.

E.    **Plaintiffs' APA Claims Are Likely to Succeed on the Merits**

Defendants' response to Plaintiffs' APA claims is also unavailing.  First, Defendants cursorily claim that 18 U.S.C. § 3625 bars review of Plaintiffs' APA claims.  Opp. at 34.  But as Plaintiffs explained in their motion, § 3625 "applies only to decisions made under 18 U.S.C. §§ 3621–3626, and thus, by its terms, not to decisions made under" other provisions of law such as the Executive Order in this case.  Dkt. 50-1 at 21 (quoting *Royer*, 933 F. Supp. 2d at 181).  Moreover, courts have consistently recognized that rulemaking decisions like the housing policy

---

[6] Available at https://www.them.us/story/trump-administration-federal-websites-lgbtq-content-deleted-cdc-doe-usaid.

[7] Available at https://popular.info/p/the-nsas-big-delete.

in this case are excluded from § 3625. *Iacaboni v. United States*, 251 F. Supp. 2d 1015, 1036–37 (D. Mass. 2003) (collecting cases); *see also Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D. C. 2006) ("challenges to rulemaking are not precluded by [§ 3625]"). The restriction in § 3625 also has no bearing whatsoever on Plaintiffs' challenge to the medical care provisions of Section 4(c). Defendants have no answer to these arguments.

In addition to wrongly claiming that § 3625 bars Plaintiffs' claims, Defendants argue that Plaintiffs' challenge to Section 4(c) of the Executive Order is not yet reviewable because BOP has not taken any "final agency action." Opp. at 35. But Section 4(c) of the Order mandates that "no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." Exec. Order No. 14168 § 4(c). BOP cannot comply with that mandate and continue to provide medically necessary treatment for Plaintiffs' gender dysphoria. BOP's decision to comply with the Order is not "merely tentative or interlocutory nature," and that decision has determined Plaintiffs' "rights or obligations"—making it a final agency action. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

Plaintiffs have also demonstrated their likelihood of success on the merits of their APA claim. The Executive Order directly contradicts PREA regulations that require BOP to "consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems" when "deciding whether to assign a transgender . . . inmate to a facility for male or female inmates." 28 C.F.R. § 115.42(c). The Executive Order requires BOP to disregard that regulation and replace PREA's "case-by-case" determination with a blanket policy requiring all transgender women to be

housed in men's prisons, regardless of the threat to their "health and safety." *Id.* The Executive

Order acknowledged that PREA regulations would need to be amended through notice-and-

comment rulemaking for the Order's categorial bans to be implemented, but Defendants did not

undertake those procedures before effectively rescinding the PREA regulations. *Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 101 (2015) (holding that agencies must "use the same procedures

when they amend or repeal a rule as they used to issue the rule in the first instance"). For the

reasons stated in Plaintiffs' motion, Plaintiffs can also show that this agency action was

unconstitutional and arbitrary and capricious.

### F.     Plaintiffs' Separation of Powers Claim is Likely to Succeed on the Merits

Defendants argue that Plaintiffs' Separation of Powers claim is unlikely to succeed

because "§ 4(c) simply provides direction as to *how* the Attorney General should use funds that

Congress has appropriated to BOP." Opp. at 38. That is incorrect. Congress appropriated a

specific amount of funding to BOP with the intent that all of the funding be used. Pub. L. No.

118-42, § 5, 138 Stat 25, 26 (2024). BOP reported to Congress its budgetary needs prior to the

passage of this appropriation, including its need for funds to provide necessary medical care and

to meet the needs of transgender incarcerated people. *See, e.g.*, Bureau of Prisons, Congressional

Budget Justification for FY 2023 at 8, 24 (2023). Courts have rightly considered congressional

appropriations responding to such budget justifications to indicate that money was appropriated

to the agency for the purposes requested. *In re Aiken County*, 725 F.3d 255, 267 (D.C. Cir.

2013) (Randolph, J., concurring). The Executive Order mandates the withholding of those duly

appropriated funds and thereby trenches on Congress's Spending and Appropriations powers.

*See* Exec. Order No. 14168 § 4(c).

### III.    Plaintiffs Will Suffer Irreparable Harm Absent Temporary and Preliminary Relief

As Plaintiffs previously demonstrated, the harms they will suffer from enforcement of the

Order are both severe and irreparable.  As this Court has already found, if transferred to a men's

facility, Plaintiffs face a very high risk of physical violence and sexual assault.  Dkt. 23 at 8-9

("[P]lacement in a male penitentiary *by itself* will exacerbate the symptoms of their gender

dysphoria, *even if* they are not subject to physical or sexual violence.").  If denied continuation of

their medically necessary hormone therapy, their gender dysphoria will worsen, with severe

negative consequences for their physical and mental health.  *See* Ettner Decl., Dkt. 13-6 ¶¶ 10,

13–17; Ex. 1, Declaration of Lauren Meade.,  ¶¶ 3-14 ("Meade Decl.").

Defendants barely try to show that Plaintiffs do not face these serious harms.  Instead,

they fall back on their flawed arguments that the Order does not establish a blanket ban on

medical care and that transferring Plaintiffs to men's prisons will not expose them to sexual

assault, other violence, and psychological harm.  Opp. at 39–40.  Those arguments fail for the

reasons discussed above.  The severe threats that enforcement of the Order would pose to

Plaintiffs' physical and mental health and safety are more than sufficient to demonstrate

irreparable harm warranting preliminary relief.

### IV.    The Balance of Harms and Public Interest Weigh in Favor of Granting Relief

Defendants do not attempt to show that they or the public would suffer any meaningful

harm if the Court grants Plaintiffs interim relief from implementation of the Order.  Instead,

without citation to authority, they claim that "there is a public interest in deferring to the

Executive Branch's determination as to the operations of the federal prisons."  Opp. at 40.  But

there is no public interest in deferring to a government policy that violates constitutional rights.

It is "always in the public interest to prevent the violation of a party's constitutional rights."

*Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting Meledres v. Arpaio, 695 F.3d

990, 1002 (9th Cir. 2012).  The severe harms to health and safety that Plaintiffs face outweigh Defendants' appeal to deference.

**V.      Plaintiffs' Proposed Order Complies with the PLRA**

Defendants implicitly recognize that preliminary relief for Plaintiffs would comply with the PLRA, arguing only that "any TRO or preliminary injunction should apply to the named Plaintiffs only."  Opp. at 41.  Defendants are correct that relief for Plaintiffs would comply with the PLRA.  But this Court would also be within its power to enjoin all implementation of Sections 4(a) and 4(c) of the Order while this case moves forward.

Defendants' contrary argument relies on the PLRA's requirement for *permanent* relief that the injunction must "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  But that section of the PLRA is inapplicable to Plaintiffs' request for temporary restraints and preliminary relief.  Instead, the statute permits the Court to enter a preliminary injunction if it finds that the remedy "extend[s] no further than necessary to correct the harm the court finds requires preliminary relief."  *Id.* § 3626(a)(2).

BOP's actions in this case show why an injunction extending beyond the Plaintiffs may be "necessary to correct the harm" this Court has already found.  *Id.*  Immediately after this Court limited the Preliminary Injunction to the Plaintiffs who brought the original Complaint, BOP officials rounded up other transgender women currently housed in women's facilities and informed them that they would be moved to men's prisons and would have their medically necessary healthcare terminated.  *See* FAC, Dkt. 47 ¶¶ 74–75.  But nothing differentiates these women for purposes of the Eighth Amendment harm the Court has found.  Each of these women has diagnosed gender dysphoria, each has a prescribed and medically necessary treatment plan that will be cut off under the Executive Order, and each would be at substantial risk of sexual

19

assault, other violence, and serious psychological damage if transferred to men's prisons. *See id.* ¶¶ 2–40.

Defendants claim that only a small number of transgender women are currently housed in women's BOP facilities. Stover Decl. ¶ 5. The BOP has specifically determined that each of these women require placement in a women's facility to ensure their health and safety under the "case-by-case" assessment required by PREA. *See* 28 C.F.R. § 115.42(c); *see also* Valerie Jenness et al., *Sexual Victimization Against Transgender Women in Prison*, 57 Criminology 603, 604 (2019) ("[I]t is beyond dispute that transgender women incarcerated in men's prisons are at heightened risk for sexual assault and other forms of sexual victimization.").[8] Instead of addressing each woman's similar circumstances in seriatim lawsuits or pleading amendments, this Court can conclude that temporarily prohibiting Defendants from transferring any of these women[9] to men's prisons or cutting off any of their critical healthcare is "necessary to correct the harm the court [found] requires preliminary relief." 18 U.S.C. § 3626(a)(2).

## CONCLUSION

For the foregoing reasons, this Court should grant the temporary restraining order and preliminary injunction Plaintiffs request.

Dated: February 24, 2025                    Respectfully submitted,

                                            _____*/s/ Eve L. Hill*_____
                                            Eve L. Hill (Bar No. 424896)
                                            ehill@browngold.com
                                            BROWN GOLDSTEIN & LEVY, LLP

---

[8] Available at:
https://www.researchgate.net/publication/335350919_Sexual_victimization_against_transgender
_women_in_prison_Consent_and_coercion_in_context.

[9] Defendants estimate there are only 22 such women housed throughout the BOP. Stover Decl. at ¶ 5.

120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

Christopher Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
CStoll@nclrights.org
AWhelan@nclrights.org
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel: (415) 365-1338
Fax: (415) 392-8442

Ernest Galvan (admitted *pro hac vice*)
Kara J. Janssen (admitted *pro hac vice*)
Adrienne Spiegel (admitted *pro hac vice*)
Ben Hattem (admitted *pro hac vice*)
EGalvan@rbgg.com
KJanssen@rbgg.com
ASpiegel@rbgg.com
BHattem@rbgg.com
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830

Jennifer L. Levi (admitted *pro hac vice*)
Sarah Austin (admitted *pro hac vice*)
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

*Attorneys for Plaintiffs*