**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jennifer L. Levi
Sarah Austin (admitted *pro hac vice*)
**GLBTQ Legal Advocates**
**& Defenders**
18 Tremont, Suite 950
Boston, MA 02108

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR**
**LGBTQ RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102

Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom  (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020

Eve L. Hill (Bar No. 424896)
ehill@browngold.com
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

*Pro Bono Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................................................3

LEGAL STANDARD ..........................................................................................................8

ARGUMENT.....................................................................................................................9

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EIGHTH AMENDMENT CLAIM. ....................................................................9

         A.    Risk of Harm from Conditions of Confinement and Transfer. ....................9

         B.    Denial of Adequate Medical Care.............................................................10

         C.    The Executive Order Violates the Eighth Amendment by Forcing Plaintiffs' Transfer to Men's Facilities and Denying Necessary Medical Care. ....................................................................................11

              i.     Emily Doe. ...................................................................13

              ii.    Mary Doe. ....................................................................16

              iii.    Wendy Doe.....................................................................19

              iv.    Donna Jones. ................................................................23

              v.     Olivia Doe.....................................................................25

              vi.    Amy Jones.....................................................................27

              vii.    Maria Moe......................................................................31

              viii.   Jane Jones......................................................................34

              ix.    Carla Jones. ...................................................................38

              x.     Rachel Doe.....................................................................42

              xi.    Zoe Doe.........................................................................45

              xii.    Sara Doe........................................................................50

              xiii.   Sally Doe........................................................................53

              xiv.   Lois Doe........................................................................55

              xv.    Barbara Jones. ...............................................................58

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION. ..............................................................................60

    III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENT RELIEF..............................................63

-i-

IV.    THE    REQUESTED    INJUNCTION    MEETS    THE    PLRA'S
       REQUIREMENTS..............................................................................................64

CONCLUSION..........................................................................................................................64

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Fed. Bureau of Prisons*,
   716 F. Supp. 2d 107 (D. Mass. 2010) ........................................................................62

*Al-Joudi v. Bush*,
   406 F. Supp. 2d 13 (D.D.C. 2005) ............................................................................62

*Anderson v. District of Columbia*,
   810 F. App'x 4 (D.C. Cir. 2020) ..............................................................................11

*Banks v. Booth*,
   459 F. Supp. 3d 143 (D.D.C. 2020) ............................................................................8

*Baker v. District of Columbia*,
   326 F.3d 1302 (D.C. Cir. 2003) ...............................................................................11

*Barrett v. Coplan*,
   292 F. Supp. 2d 281 (D.N.H. 2003) ..........................................................................62

*Battista v. Clarke*,
   645 F.3d 449 (1st Cir. 2011) ....................................................................................62

*Becker v. Sherman*,
   No. 16-0828, 2017 WL 6316836 (E.D. Cal. Dec. 11, 2017) ....................................61

*Benjamin v. Oliver*,
   800 F. Supp. 3d 1314 (N.D. Ga. 2025), *appeal docketed*, No. 25-14263 (11th
   Cir. Dec. 5, 2025)......................................................................................................11

*Bernier v. Allen*,
   38 F.4th 1145 (D.C. Cir. 2022)...........................................................................10, 11

*Est. of Miller ex rel. Bertram v. Tobiasz*,
   680 F.3d 984 (7th Cir. 2012) ....................................................................................10

*Brown v. Plata*,
   563 U.S. 493 (2011).................................................................................................10

*Brown v. Zavaras*,
   63 F.3d 967 (10th Cir. 1995) ....................................................................................10

*Comstock v. McCrary*,
   273 F.3d 693 (6th Cir. 2001) ...........................................................................................10

*Cope v. Cogdill*,
   3 F.4th 198 (5th Cir. 2021) ..............................................................................................10

*Costa v. Bazron*,
   464 F. Supp. 3d 132 (D.D.C. 2020)................................................................................62

*Cuoco v. Moritsugu*,
   222 F.3d 99 (2d Cir. 2000)..............................................................................................11

*Davis v. District of Columbia*,
   158 F.3d 1342 (D.C. Cir. 1998)................................................................................62, 63

*De'Lonta v. Angelone*,
   330 F.3d 630 (4th Cir. 2003) ..........................................................................................11

*Disability Rts. Mont., Inc. v. Batista*,
   930 F.3d 1090 (9th Cir. 2019) ........................................................................................10

*Doe v. Blanche*,
   172 F.4th 901 (D.C. Cir. 2026)........................................................................... *passim*

*Doe v. District of Columbia*,
   215 F. Supp. 3d 62 (D.D.C. 2016) ...................................................................................9

*Doe v. McHenry*,
   763 F. Supp. 3d 81 (D.D.C. 2025)........................................................................4, 5, 7, 13

*Doe v. Wash. State Dep't of Corrs.*,
   No. 4:21-CV-5059-TOR, 2021 WL 2453099 (E.D. Wash. May 17, 2021) .............................9

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ..........................................................................................11

*Estelle v. Gamble*,
   429 U.S. 97 (1976)..........................................................................................................10

*Farmer v. Brennan*,
   511 U.S. 825 (1994)....................................................................................................9, 10

*Farmer v. Hawk*,
   991 F. Supp. 19 (D.D.C. 1998)........................................................................................10

*Farmer v. Moritsugu*,
   163 F.3d 610 (D.C. Cir. 1998)........................................................................................10

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) ...............................................................................11

*Finnegan v. Kink*,
No. 3:20-cv-00218-GCS, 2024 WL 1345632 (S.D. Ill. Mar. 29, 2024)....................................9

*Gilliam v. Dep't of Pub. Safety & Corr. Servs.*,
No. MJM-23-1047, 2024 WL 5186706 (D. Md. Dec. 20, 2024)................................................9

*Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016)...............................................................................63

*Jones v. Bondi*,
No. 1:25-cv-401, 2025 WL 1607095 (D.D.C. May 22, 2025) ..................................................5

*Jones v. Bondi*,
No. 1:25-cv-401-RCL, 2025 WL 923117 (D.D.C. Feb. 24, 2025)................................4, 5, 13

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ...............................................................................62

*Keohane v. Fla. Dep't of Corrs. Sec'y*,
952 F.3d 1257 (11th Cir. 2020) ...............................................................................11

*Kingdom v. Trump*,
Docket No. 1:25-cv-00691 (D.D.C. Feb 19, 2026) .............................................................5, 12

*Lojan v. Crumbsie*,
No. 12-CV-0320 (LAP), 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) ................................9, 62

*Meriwether v. Faulkner*,
821 F.2d 408 (7th Cir. 1987) ...............................................................................11

*Moe v. Trump*,
No. 1:25-cv-00653 (D.D.C. Mar. 10, 2025) ..................................................................4, 5, 13

*Monroe v. Baldwin*,
424 F. Supp. 3d 526 (S.D. Ill. 2019), *vacated and remanded on other grounds*,
122 F.4th 688 (7th Cir. 2024) ...............................................................................62

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................................63

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999)...............................................................................9

*S.D. v. Rees*,
No. 6:25-cv-01726-CL, (D. Or. Apr. 28, 2026)...............................................................9

*Supre v. Ricketts*,
    792 F.2d 958 (10th Cir. 1986) ......................................................................................11

*Tay v. Dennison*,
    457 F. Supp. 3d 657 (S.D. Ill. 2020) ..........................................................................9, 61

*White v. Farrier*,
    849 F.2d 322 (8th Cir. 1988) ......................................................................................10

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ........................................................................................9

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
    791 F. Supp. 309 (D.D.C. 1992) ..................................................................................62

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................6, 8

*Zollicoffer v. Livingston*,
    169 F. Supp. 3d 687 (S.D. Tex. 2016) ............................................................................9

*Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*,
    30 F.4th 1181 (10th Cir. 2022) ....................................................................................10

**Statutes**

5 U.S.C. §§ 551–559, 701–706 (Administrative Procedure Act) ......................................................4

18 U.S.C. § 3621(b) ..............................................................................................................5

18 U.S.C. § 3625 ..................................................................................................................5

18 U.S.C. § 3626(a)(2) (Prison Litigation Reform Act) ........................................................5, 64

29 U.S.C. §§ 701 *et seq.* (Rehabilitation Act of 1973) .................................................................4

34 U.S.C. §§ 30301–30309 (Prison Rape Elimination Act of 2003) .................................. *passim*

**Other Authorities**

28 C.F.R. § 115.41(d)(7) ........................................................................................................2

28 C.F.R. §§ 115.42(a)–(d) ....................................................................................................2

U.S. Const. amend. I ............................................................................................................62

U.S. Const. amend. V ........................................................................................................4, 62

U.S. Const. amend. VIII ................................................................................................. *passim*

Executive Order 14168 ............................................................................................................. *passim*

U.S. Dep't. of Just. Office of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* ...................................................................................2

**INTRODUCTION**

This case returns to the Court on remand with a singular directive: to determine whether the individualized facts of each Plaintiff's circumstances establish that their transfer from the women's prisons where they have been housed to men's prisons would violate the Eighth Amendment. The record before the Court—in support of Plaintiffs' initial motions for preliminary injunction and now further developed following the Court of Appeals' decision—answers that question unequivocally. It demonstrates that transferring this discrete, small population of transgender women from women's to men's prisons would expose each of them to a substantial, imminent, and intolerable risk of serious harm.

Plaintiffs are transgender women who have lived as women for many years and, in many cases, decades. Each has been medically diagnosed with gender dysphoria and has undergone a sustained course of medically necessary treatment, including continuous hormone therapy that has produced significant and irreversible physical feminization and, for several Plaintiffs, includes transition-related surgeries such as vaginoplasty, breast augmentation, and facial feminization. Plaintiffs are also part of a small, distinctive group: among the thousands of transgender women in custody of the Bureau of Prisons (the "BOP" or "Bureau"), they are the few whom BOP itself has repeatedly determined should be housed in women's facilities. Several Plaintiffs have never been housed in men's facilities.

Plaintiffs' submissions provide the individualized proofs the Court of Appeals required to enter the judicial relief essential to protecting their lives and safety. Their declarations and supporting evidence establish, in granular detail, the distinct and compounding characteristics that make each Plaintiff acutely vulnerable to serious and known harms in a men's facility— pronounced and irreversible physical feminization surgeries; documented histories of sexual victimization in men's facilities for those previously housed there; and the unique risks they face

because they have been housed in women's prisons and would be known by the men in men's prisons as being among this unique group. These are not generalized concerns applicable to all transgender women in BOP custody; they are plaintiff-specific risks grounded in the record. Further, BOP has repeatedly recognized specific characteristics of each individual plaintiff that would put them at serious risk of harm in men's facilities, including through regular assessments of their vulnerability to sexual abuse as required by regulations under the Prison Rape Elimination Act ("PREA"). *See* 28 C.F.R. §§ 115.41(d)(7), 115.42(a)–(d).

Defendants seek to enforce a categorical policy that disregards these individualized risks. In doing so, they ask this Court to permit what the Eighth Amendment forbids: the knowing exposure of uniquely vulnerable individuals to a substantial risk of sexual assault, physical violence, and profound psychological harm. That is not a close constitutional question. It is a paradigmatic case of deliberate indifference. The consequences of transferring Plaintiffs from the women's prisons where they are housed to men's prisons are immediate and severe. If transferred, they will be at unacceptably high risk of sexual violence and physical assault, based on their individual characteristics and histories.[1] Their gender dysphoria and overall mental health will also predictably worsen, exposing them to serious health and safety risks including an increased risk of self-harm and suicidality.

In addition, Plaintiffs seek the Court's protection to ensure that they continue to receive appropriate medical treatment for their gender dysphoria. The Court of Appeals' decision did not address Plaintiffs' claims related to their access to necessary medical care because the Government did not challenge that portion of this Court's preliminary injunctions on appeal. But Plaintiffs

---

[1] *See* U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, NCJ No. 241399, Suppl. Table 1 (2013), available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf (estimating nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2012).

remain at risk of imminent and irreparable harm if they are deprived of hormone therapy and medical care that they have been receiving for years—and for some, decades—to treat their diagnosed gender dysphoria. Plaintiffs submit evidence from medical experts establishing that, for each of them, hormone therapy is the only effective medication to treat their gender dysphoria, and that ongoing treatment is medically necessary based on their individual medical histories. The Government's policies seeking to deny Plaintiffs access to this well-established and necessary medical care demonstrate their deliberate indifference to Plaintiffs' serious medical needs, in violation of the Eighth Amendment.

Accordingly, Plaintiffs respectfully request that this Court issue a Temporary Restraining Order ("TRO") and, upon full briefing, a Preliminary Injunction, enjoining Defendants from (1) enforcing the Executive Order or its implementing policies against Plaintiffs, (2) transferring Plaintiffs to men's facilities, and (3) denying or tapering Plaintiffs' hormone therapy or other ongoing medical treatment for gender dysphoria while this litigation proceeds.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs are fifteen[2] transgender women who are currently housed in either a women's prison or a women's halfway house.[3] For many years, Plaintiffs have lived as women. All were classified as women by BOP prior to the events giving rise to this case. Each Plaintiff has been clinically diagnosed with gender dysphoria and has received a sustained course of medical treatment for that condition, including continuous hormone therapy. Several Plaintiffs have also

---

[2] Five original Plaintiffs, Susan Doe, Sophia Doe, Jane Doe, Ellen Doe, and Tori Doe, have been dismissed from these actions, released from custody, or died, and thus, are no longer part of the case.

[3] On September 5, 2025, during oral argument before the Court of Appeals, the Government represented that it would not transfer Plaintiffs currently housed in halfway houses. *See* Transcript of Oral Argument at 6:15–16. The Government has since retreated from that representation on the record and has declined to provide any comparable assurance in this proceeding.

undergone transition-related surgeries such as vaginoplasty, breast augmentation, and facial feminization.

On January 20, 2025, the President issued Executive Order 14168 (the "EO"), directing BOP to transfer transgender women in women's prisons to men's prisons without regard to individual health and safety risks, and further directing the Bureau not to provide "any medical procedure, treatment, or drug" to transgender women for treatment of gender dysphoria. EO 14168 § 4(c). The BOP immediately began implementing these directives and notified Plaintiffs that they would be transferred to men's facilities and cut off from hormones they had been prescribed for care. *Doe v. Blanche*, 172 F.4th 901, 908 (D.C. Cir. 2026). The BOP willfully disregarded the severe harms that Plaintiffs would suffer if transferred to men's facilities and denied medically necessary healthcare.

To prevent such harm, Plaintiffs filed the underlying complaints, Docket Nos. 1:25-cv-00286, 1:25-cv-00401, and 1:25-cv-00653, and sought temporary and permanent injunctive relief against implementation of the EO. The Complaints allege that the EO violates the Eighth Amendment, the equal protection component of the Due Process Clause of the Fifth Amendment, the Rehabilitation Act of 1973, and the Administrative Procedure Act. Contemporaneously with filing the Complaints, Plaintiffs moved for a TRO and a preliminary injunction.

This Court granted injunctive relief, finding that Plaintiffs had established a likelihood of success on the merits of their Eighth Amendment claims. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Bondi*, No. 1:25-cv-401-RCL, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 1:25-cv-00653, ECF No. 62 at 1–2 (D.D.C. Mar. 10, 2025). On the housing claim, the Court relied on undisputed evidence proffered by Plaintiffs that they would face a significantly elevated risk of physical and sexual violence in men's facilities, and that

-4-

"placement in a [men's facility] *by itself* [would] exacerbate the symptoms of their gender dysphoria." *Doe*, 763 F. Supp. 3d at 88; *see also Jones*, 2025 WL 923117, at *1; *Moe*, ECF No. 62 at 1–2. On the medical care claim, the Court relied on the uncontested evidence of the "numerous and severe symptoms" that arise from the failure to treat gender dysphoria in finding that an immediate cessation in hormone treatment would likely violate the Eighth Amendment. *Doe*, 763 F. Supp. 3d at 88–89; *see also Jones*, 2025 WL 923117, at *1; *Moe*, ECF No. 62 at 1–2.[4]

After analyzing the preliminary injunction factors, the Court enjoined Defendants from implementing the EO against Plaintiffs and ordered Defendants to (1) maintain Plaintiffs' housing status in women's facilities and (2) continue their gender dysphoria treatment as it existed immediately prior to January 20, 2025. The Court determined this relief was narrowly drawn, extended no further than necessary to correct the harm, was the least intrusive means necessary to correct the harm, and would have no adverse impact on public safety or the operation of the criminal justice system, as required by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(2). *See, e.g.*, *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 1607095, at *1 (D.D.C. May 22, 2025).

Defendants appealed only the housing placement decisions, not the injunctive relief regarding medical treatment.[5] The Court of Appeals vacated the preliminary injunctions and remanded for individualized findings. *Doe v. Blanche*, 172 F.4th at 918–19.

---

[4] The *Doe* Court also rejected Defendants' procedural arguments, finding that the Prison Litigation Reform Act ("PLRA"), specifically 18 U.S.C. § 3621(b) and § 3625, does not divest the Court of subject matter jurisdiction to review Plaintiffs' constitutional claims arising from the BOP's facility designations; Plaintiffs had adequately demonstrated that "hardship" would result from enforcement of the EO sufficient to warrant pre-enforcement review; and administrative exhaustion was not required by the PLRA because administrative remedies were unavailable. *Doe*, 763 F. Supp. 3d at 85–87, 89.

[5] BOP's implementation of the EO's ban on transgender healthcare in federal prisons is the subject of ongoing litigation in the class action *Kingdom v. Trump*, Docket No. 1:25-cv-00691 (D.D.C.). Plaintiffs have repeatedly obtained

The Court of Appeals recognized that Plaintiffs are a "small, unique group of transgender women whom BOP placed in women's facilities" and that their Eighth Amendment claims turn on individualized proof of the distinctive characteristics that make them uniquely vulnerable to harm in men's facilities. *Id.* at 916–17. The court acknowledged that Plaintiffs do not advance a categorical Eighth Amendment claim. *Id.* at 916. Instead, Plaintiffs rely on "particular vulnerabilities" distinguishing them from transgender women in BOP custody more broadly— including "long-term hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors." *Id.*

The court further observed that, "[g]iven the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Id.* at 918.

These statements confirm that Plaintiffs' vulnerability is concrete and well-supported in the record. The remand did not reject Plaintiffs' core Eighth Amendment theory or dispute the serious risks they face. The court identified only a narrow procedural gap: the absence of express, plaintiff-specific findings linking each individual's characteristics to a "significantly elevated risk" of harm. *Id.* at 917. The court's conclusion that Plaintiffs had not yet demonstrated irreparable harm likewise rested on this lack of individualized findings—not on any determination that such harm is unlikely or unsupported.[6] *Id.* at 918–19.

In sum, the Court of Appeals' decision leaves intact the substantial, undisputed evidence that Plaintiffs face acute risks of physical and sexual violence and exacerbated gender dysphoria

---

independent injunctive relief against the EO and BOP's medical care policies and have ongoing, individual medical care claims, including those intertwined with their housing claims.

[6] The court did not independently analyze whether the balance of equities favors Plaintiffs or whether an injunction serves the public interest, stating its holding regarding irreparable harm "obviates the need for us to consider the other *Winter* factors." *Doe*, 172 F.4th at 918.

in men's facilities, while directing the Court to make individualized factual findings consistent with its prior recognition of those dangers. *See id.* at 906, 917; *Doe*, 763 F. Supp. 3d at 84. Notably, while the Court of Appeals issued its decision on April 17, 2026, the final mandate does not issue and the decision does not go into effect until June 8, 2026. Nor does the decision address the timing or manner in which the District Court should consider the more-fully developed record on remand. The Court of Appeals left the proceedings on remand to the discretion of the District Court, and the Plaintiffs seek a TRO to maintain the status quo while the Court reviews the evidence and makes the required individualized factual determinations.[7] On remand, consistent with the Court of Appeals' directives, Plaintiffs submit extensive, well-documented evidence that each Plaintiff would be acutely vulnerable to serious harm if transferred from a women's prison to a men's prison or denied medical treatment for gender dysphoria. Plaintiffs submit this Motion on an expedited basis to secure immediate relief and, accordingly, have prepared this submission based on the records presently available to them. The Government has indicated that it will provide a complete set of each of the fifteen Plaintiffs' medical and correctional records (which are voluminous) by May 22, 2026. Given that the current preliminary injunction expires on May 20, Plaintiffs are moving forward without the benefit of complete records. While Plaintiffs have gathered and presented sufficient evidence to support their application for a temporary restraining order ("TRO") and preliminary injunction, they respectfully reserve the right to supplement the record as additional materials become available.

---

[7] Within days of the Court of Appeals decision, Plaintiffs' counsel contacted Defendants' counsel in an effort to negotiate a schedule for the production of the Plaintiffs' medical and correctional files and briefing on their motion for a preliminary injunction that would provide all parties with sufficient time to develop and review the record and prepare their submissions to the Court. Any such schedule, however, would require assurances that the Plaintiffs' status quo would be maintained until the District Court issues its decision. The Government declined and, accordingly, Plaintiffs file the current motion for a TRO on an expedited basis based on the record that currently exists, along with a request that the Court permit the parties to fully develop the record on remand while the Plaintiffs are protected from irreparable harm. A TRO is necessary to protect the Plaintiffs from the severe harms documented in this motion prior to the expiration of the applicable preliminary injunctions on May 20, 2026.

Since the Court of Appeals' decision, Plaintiffs have moved quickly to develop the current record. Plaintiffs only received the Government's 35,000-page document production (which is still incomplete) on May 8th and have diligently reviewed as many records as possible. Plaintiffs' counsel have flown out of state to meet with some Plaintiffs in person, but were unable to arrange in-person meetings with all Plaintiffs, who are located at different facilities around the country. Due to varied prison rules and restrictions, communicating with these incarcerated clients requires substantial time and effort from Plaintiffs' counsel, who must schedule multiple meetings to work through the large volume of records and declarations involved. For example, the Plaintiffs residing at ███████ are only available for attorney calls one day per week, and those calls are generally limited to thirty minutes. Plaintiffs will endeavor to make any supplemental submissions as quickly as possible and will update the Court on the timing of those submissions. As set forth in the Plaintiffs' proposed Order, Plaintiffs respectfully request that the Court order the Government to produce the complete Plaintiff files by May 22, 2026. Plaintiffs also respectfully request that the Government be barred from relying in their Opposition on any records relating to the Plaintiffs that were not produced to Plaintiffs by May 22.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, a movant "must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (alteration added); *see also Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020) (explaining that an application for a temporary restraining order is analyzed using the same factors applicable to a preliminary injunction). All four factors strongly support granting temporary restraints and a preliminary injunction here.

**ARGUMENT**

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EIGHTH AMENDMENT CLAIM.**

The Eighth Amendment's prohibition on cruel and unusual punishment imposes limits on both the conditions under which a prisoner is confined and the medical care she receives while incarcerated. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment when that official acts with deliberate indifference to a substantial risk of serious harm to an incarcerated person. *Id.* at 828. This standard contains both an objective component—whether the individual faces a sufficiently serious risk of harm—and a subjective component—whether officials knew of and disregarded that risk. *Id.* at 834, 837.

A.    **Risk of Harm from Conditions of Confinement and Transfer.**

In the context of conditions of confinement, including housing and transfer decisions, the Eighth Amendment requires prison officials to protect incarcerated people from violence and other serious harms. *See Doe*, 172 F.4th at 906. The objective prong is satisfied where an individual is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. As the Supreme Court has made clear, for example, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."[8] *Id.* (internal quotation marks omitted).

---

[8] The Supreme Court, federal courts of appeals, and district courts throughout the country have also recognized that transgender women face a high risk of sexual assault and abuse in men's correctional facilities. *See*, *e.g.*, *Farmer*, 511 U.S. at 848–49; *Williams v. Kincaid*, 45 F.4th 759, 778–79 & n.11 (4th Cir. 2022); *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999); *S.D. v. Rees*, No. 6:25-cv-01726-CL, ECF No. 45 at 16–17 (D. Or. Apr. 28, 2026); *Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020); *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691, 696 (S.D. Tex. 2016); *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, No. MJM-23-1047, 2024 WL 5186706, at *12–13 (D. Md. Dec. 20, 2024); *Finnegan v. Kink*, No. 3:20-cv-00218-GCS, 2024 WL 1345632, at *11 (S.D. Ill. Mar. 29, 2024); *Doe v. Wash. State Dep't of Corrs.*, No. 4:21-CV-5059-TOR, 2021 WL 2453099, at *5 (E.D. Wash. May 17, 2021); *Lojan v. Crumbsie*, No. 12-CV-0320 (LAP), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013).

This protection extends beyond physical violence to encompass known risks of serious psychological harm, including suicide and self-harm. Federal courts of appeals have repeatedly recognized that the risk of suicide and self-harm, and the failure to prevent it, constitutes a sufficiently serious harm to implicate the Eighth Amendment. *See, e.g.*, *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021); *Comstock v. McCrary*, 273 F.3d 693, 703–04 (6th Cir. 2001); *Est. of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012); *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019); *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1186 (10th Cir. 2022).

The subjective prong is met where prison officials know of and disregard an excessive risk to health or safety. *Farmer*, 511 U.S. at 837. This includes circumstances in which officials are aware of an incarcerated person's particular vulnerability to harm yet fail to take reasonable measures to protect her. *Id.* at 842–44. Accordingly, where officials knowingly place an incarcerated person in conditions that expose her to a substantial risk of assault, abuse, or self-harm, the Eighth Amendment is violated.

### B.      Denial of Adequate Medical Care.

Separately, the Eighth Amendment prohibits deliberate indifference to an incarcerated person's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Brown v. Plata*, 563 U.S. 493, 510–11 (2011) ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care."). In this context, the objective prong is satisfied where an incarcerated person suffers from a "known, serious medical condition." *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). Courts have consistently recognized gender dysphoria as such a condition. *See, e.g.*, *Farmer v. Hawk*, 991 F. Supp. 19, 25 (D.D.C. 1998), rev'd in part on other grounds sub nom. *Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998) (citing *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995); *White v. Farrier*, 849 F.2d 322 (8th Cir. 1988);

*Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987); *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986)); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

The subjective prong requires that officials had "knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety." *Bernier*, 38 F.4th at 1145 (quoting *Anderson v. District of Columbia*, 810 F. App'x 4, 6 (D.C. Cir. 2020); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)). Relevant here, courts have concluded that blanket bans on transgender health care for incarcerated persons are "the very definition of 'deliberate indifference.'" *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1266–67 (11th Cir. 2020) (holding in the context of blanket bans on transgender health care for incarcerated people that "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'"); *accord Benjamin v. Oliver*, 800 F. Supp. 3d 1314, 1339 (N.D. Ga. 2025), *appeal docketed*, No. 25-14263 (11th Cir. Dec. 5, 2025); *see also Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (holding that a state law that barred hormone therapy and sex reassignment surgery as possible treatments for incarcerated people with gender dysphoria facially violated the Eighth Amendment). The reasoning behind these decisions is self-evident: where the Government acknowledges a medical condition, acknowledges that treatment exists, and nonetheless refuses even to *consider* providing that treatment, its indifference to the incarcerated person's suffering is purposeful.

**C.     The Executive Order Violates the Eighth Amendment by Forcing Plaintiffs' Transfer to Men's Facilities and Denying Necessary Medical Care.**

As the Court of Appeals recognized, the record contains "ample, uncontested evidence" bearing on the risks Plaintiffs face. *Doe*, 172 F.4th at 917. That record—together with the

additional evidence submitted here—demonstrates that each Plaintiff presents distinct, individualized risk factors that render her acutely vulnerable to physical and sexual violence, as well as severe psychological harm, if transferred to a men's facility. These risks are not speculative. They are grounded in Plaintiffs' documented histories, medical conditions, and prior experiences, and are further exacerbated by the very fact of transfer itself. As former senior BOP executive Dr. Alix McLearen explains, transfers from women's to men's facilities would quickly become known within receiving institutions, and incarcerated men would predictably identify and exploit the vulnerabilities of transferees based on their appearance, mannerisms, and institutional history—characteristics that mark Plaintiffs as targets in men's settings. *See* (McLearen Decl. ¶¶ 21–25). And involuntary transfers from women's to men's facilities are likely to cause significant psychological distress and increased risk of self-harm or suicidality, especially for Plaintiffs who have been previously sexually assaulted in men's facilities or who have no prior experience in men's facilities. (*Id.* ¶¶ 38–42).

The EO's mandate to deny Plaintiffs medically necessary treatment independently violates the Eighth Amendment.[9] Each Plaintiff has been diagnosed with gender dysphoria, a serious medical condition for which she currently receives treatment. Without continued care, each faces a substantially heightened risk of severe psychological deterioration, including depression, anxiety, self-harm, and suicidality. The Government is fully aware of these diagnoses and the consequences of untreated gender dysphoria, as reflected in Plaintiffs' medical records. Yet it seeks to withdraw that care pursuant to a categorical policy that forecloses individualized medical judgment and targets the very condition requiring treatment. Abruptly terminating necessary care

---

[9] The Bureau issued a medical care policy on February 19, 2026, implementing the EO and requiring discontinuation of hormone therapy for all transgender people in BOP custody. *See Kingdom v. Trump*, No. 1:25-cv-691, ECF 125 (Feb. 19, 2026); *Id.* ECF 179-1 at 10-12 (Plaintiffs memorandum in support of motion for preliminary injunction, explaining how the February 19 medical policy is functionally identical to the EO).

under these circumstances—where the need is known and the consequences are severe and foreseeable—is the essence of deliberate indifference, as this Court has recognized in its previous decisions. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Bondi*, No. 25-401, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 25-00653 (D.D.C. March 10, 2025). The combination of the EO's transfer and medical care directives will "predictably cause grave harm" if implemented as to Plaintiffs. (McLearen Decl. ¶ 41).

The record developed on remand provides precisely the individualized, plaintiff-specific showing the Court of Appeals required. As set forth below, each Plaintiff presents a distinct constellation of risk factors—including documented histories of sexual assault, pronounced physical feminization, unique safety risks associated with being known to have been housed in a women's prison, and severe mental health vulnerabilities that are or will be exacerbated in men's facilities—and each has been diagnosed with gender dysphoria requiring medically necessary treatment including hormone therapy. Each Plaintiff faces a grave and particularized risk of serious harm from both forced transfer and the denial of medical care. The Eighth Amendment does not permit the Government to knowingly subject individuals in its custody to such preventable suffering. The record not only supports relief, it compels it.

### i.    Emily Doe.

The record contains overwhelming evidence that Emily Doe will be at substantial risk of serious harm if she is transferred to a men's facility. Emily is a transgender woman who has been on hormone therapy for ▮▮▮▮▮▮▮▮, (Declaration of Emily Doe ("Emily Doe Decl.") ¶ 14), a treatment that has fundamentally and irreversibly altered her physical appearance, (*id.* ¶ 15). She has developed female breasts, her body fat has redistributed to her hips and buttocks, her muscle mass has decreased significantly, and her skin and overall appearance have become markedly feminine. (*Id.* ¶ 15). These physical changes make her an immediate target for sexual violence in

a men's facility. (McLearen Decl. ¶¶ 12, 19, 23). Even before many of these physical changes, Emily was sexually assaulted by a male prisoner while in a ▆▆▆▆▆, (Emily Doe Decl. ¶ 6), and also sexually assaulted in ▆▆▆▆▆▆▆▆▆▆▆ prisons when she was housed there (*id.* ¶ 7). She was subjected to coercive sexual propositions when in men's prison on a weekly basis, sometimes multiple times per week. (*Id.* ¶ 30). This history of sexual abuse and harassment demonstrates that Emily faces a substantial risk of revictimization if transferred to a men's facility. (McLearen Decl. ¶¶ 15–16). Emily's psychiatric and physical vulnerabilities compound the dangers. She carries diagnoses of ▆▆▆▆▆▆▆▆▆▆▆▆ gender dysphoria. (Emily Doe Decl. ¶ 11; Dr. Ettner Decl. ¶ 40). "As a result of [Emily's] treatment, her circulating sex hormone levels are consistent with those of non-transgender women." (Dr. Ettner Decl. ¶ 41). She has attempted suicide twice driven by the unbearable distress of being prevented from living as female. (Emily Doe Decl.¶¶ 9, 10). While BOP has cycled Emily through medication after medication, no psychiatric medication has been able to treat her gender dysphoria or prevent her mental health from deteriorating while she was housed with men and prevented from presenting and living as a woman. (*Id.* ¶ 33). The only treatment that has proven effective is hormone therapy, combined with placement in a women's facility, which brought her rapid and measurable relief from ▆▆▆▆▆▆, and thoughts of self-harm. (*Id.* ¶¶ 21, 24, 33). Indeed, Dr. Ettner explained that Emily's ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ The BOP has long identified Emily as at risk of victimization in men's facilities given her prior sexual assaults and being a transgender woman, (Emily Doe Decl. ¶ 29; Dr. Ettner Decl. ¶ 45), but BOP was unable to prevent any of her victimization in men's facilities, (Emily Doe Decl. ¶ 24). Since her transfer to a women's facility

in ███████████, Emily's mental health has vastly improved. (*Id.* ¶ 20). She has re-engaged in programming, (*id.*), her gender dysphoria symptoms have diminished, (*id.* ¶ 21), and she has not been sexually abused or assaulted, (*id.* ¶ 25).

Forcing Emily back into a men's facility would strip away every gain she has made and plunge her back into an environment where she has already been victimized and attempted suicide multiple times. The psychological impact of removing her from a women's facility, where she has been safe, and returning her to a men's facility, where she has experienced severe trauma, will predictably have devastating mental health consequences and could trigger suicidality or self-harm. (McLearen Decl. ¶¶ 37–42). In fact, Dr. Ettner cautioned that the transfer would ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Transfer would also place an even larger target on her back because, as Emily has explained, it is common in prison to ask where a transferee came from, and learning she was housed in a women's facility, along with her physical changes from years of hormone therapy, would make her a magnet for predatory violence. (Emily Doe Decl. ¶ 34; *see also* McLearen Decl. ¶ 26). Her ████████ of adjusting to life in a women's facility will also make her particularly vulnerable to sexual violence if she is transferred to a men's facility. Presentation, mannerisms, and characteristics consistent with functioning in a women's facility will mark her as a target in a men's facility. (McLearen Decl. ¶ 25).

Emily's record provides exactly the kind of individualized showing the Court of Appeals required. The evidence does not present abstract or generalized risk; it reflects a concrete, experience-based understanding—confirmed by Emily's own history and the BOP's assessments—of the harm she faces. Emily's repeated sexual assaults in men's facilities, her pronounced and irreversible physical feminization, and her well-documented psychiatric

conditions together establish that she would be immediately identifiable and uniquely vulnerable if returned to a men's prison. Critically, many of these risk factors are drawn from BOP's own records and determinations, underscoring that Defendants are not merely on notice of the danger—they have already recognized it.

The record also clearly establishes that Emily has been diagnosed with gender dysphoria, the only effective treatment has been hormone therapy, which she has been on for ▮▮▮ and that absent treatment, she faces an increased substantial risk of a resurgence of her ▮▮▮ ▮▮▮. (Dr. Ettner Decl. ¶¶ 40–41). ▮▮▮

▮▮▮

▮▮▮

▮▮▮

▮▮▮

▮▮▮ Hence, any reduction or discontinuance in her hormone therapy would constitute deliberate indifference to Emily's vital medical needs.

### ii.    Mary Doe.

Mary Doe's record provides an equally compelling individualized showing. Mary is a transgender woman who has been on hormone therapy for ▮▮▮ treatment that has produced significant feminization of her body. (Declaration of Mary Doe ("Mary Doe Decl.") ¶¶ 24, 48). ▮▮▮

▮▮▮ Her physical changes make her an obvious and easy target for sexual violence in a men's facility, (McLearen Decl. ¶ 12), and the record confirms this with devastating clarity. Mary has been raped twice and has been

-16-

sexually assaulted many times in men's federal prisons, (Mary Doe Decl. ¶ 26), ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Under these circumstances, if Mary is transferred back to a men's facility, she will be at an especially high risk of sexual abuse and self-harm. (McLearen Decl. ¶ 20 ("A transgender woman who has been raped or sexually assaulted in men's correctional facilities would likely be at an especially high risk of revictimization in men's facilities, especially if the individual was assaulted on multiple occasions, by multiple perpetrators, or in multiple men's facilities.")).

Mary's psychiatric vulnerabilities reinforce the severity of the objective risk. She has been diagnosed with gender dysphoria, (Mary Doe Decl. ¶ 24), ████████████████, (id. ¶ 20), and ████████████████ so severe that she became hypervigilant, paranoid, and avoidant, could not sleep without arranging furniture to alert her to intruders, and suffered recurring nightmares reliving her assaults (id. ¶¶ 36–37). (See Dr. Gorton Decl. ¶ 12████████████ ████████████████████████████████████ She has attempted suicide five times—once ████████████ driven by hopelessness about never being able to express her true self, (Mary Doe Decl. ¶ 15), and four more times while in ████████████ ████████ for similar reasons, (id. ¶¶ 16–17).

On the deliberate-indifference prong, BOP has acknowledged Mary's particular risks in its many assessments of her as being at elevated risk for sexual victimization due to her history of prior sexual assaults, her transgender status, and her mental health conditions. (Id. at ¶ 27).

Since her transfer to a women's facility in ████████ Mary's ████ symptoms have become less severe and less frequent; she sleeps better, is less jumpy and afraid, and has fewer nightmares. (Id. ¶ 40). She has not been sexually abused or assaulted in a women's facility. (Id. ¶

-17-

41). Forcing her back into a men's facility would return her to the very environment in which she was raped, assaulted, and harassed for years—an environment in which the Bureau's own psychologists acknowledged she faced an elevated risk and from which they could not adequately protect her. (*Id.* ¶ 27; *see also* McLearen Decl. ¶¶ 43-50 (explaining why available protective measures are not sufficient to mitigate the risks of transferring transgender women from women's to men's facilities)). The danger would be even greater now, because Mary has been housed in women's facilities for ▉▉▉▉▉▉ and many people in the prison system already know it. (Mary Doe Decl. ¶ 55). Both Mary's widely known transfer history and her pronounced physical feminization would mark her as a target for predatory men who are skilled at identifying and exploiting vulnerable individuals. (*See* McLearen Decl. ¶¶ 21–24). As Mary herself has stated: it would feel like "a lamb being thrown back into the lion's den," (Mary Doe Decl. ¶ 45). Given her history of traumatizing sexual assaults in men's facilities, transfer would also subject Mary to severe mental health risks (McLearen Decl. ¶¶ 37–42), which is especially dangerous given her history of suicide attempts while incarcerated in men's facilities.

The record likewise establishes BOP's deliberate indifference to Mary's serious medical needs. ▉▉▉▉▉▉ have not alleviated the symptoms of her gender dysphoria. (Mary Doe Decl. ¶ 20). The only treatment that has proven effective is hormone therapy, which caused a significant reduction in her ▉▉▉▉▉▉, and thoughts of self-harm, and allowed her for the first time in her life to look in the mirror and feel acceptance of herself. (*Id.* ¶ 49). When her hormones were reduced or discontinued for medical reasons, the impact on her mental health was immediate and severe, including numbness, sadness, isolative behavior, and hopelessness. (*Id.* ¶ 50). No mental health care provider has ever informed her that psychiatric treatments could replace hormone therapy or fully treat her gender dysphoria without it. (*Id.* ¶ 52). ▉▉▉▉▉▉

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

### iii.    Wendy Doe.

Wendy Doe has been in BOP custody since late ████ and has only ever been housed in women's facilities. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████. She has never been housed in men's general population. When BOP briefly transferred her to a men's facility SHU in ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ reflects BOP's direct, specific knowledge of what transferring Wendy to a men's facility would do to her.

Wendy is ████████ years old. She has known since early childhood that she was female and began living as a woman in ████ at age nineteen. (Declaration of Wendy Doe ("Wendy Doe Decl.") ¶¶ 5, 7). She has been on hormone therapy and received a diagnosis of gender dysphoria in the early ████. (*Id.* ¶ 7; *see also* ████████████████ In 2012, she legally changed her name and sex marker to female on her driver's license, birth certificate, social security card, and passport. (Wendy Doe Decl. ¶ 9). In ████ she underwent ████████████████████████ (*Id.* ¶ 10). As a result of the ████████████████████████████████ ████████████████████████ (*Id.*). As Dr. Karasic noted, ██████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ (Dr. Karasic Decl. ¶¶ 68, 70). Wendy has lived as a woman for ████ years and has been on hormone therapy for nearly as long. Her physical

appearance reflects that history fully: ██████████████████████████ ██████████████, and during her first year and a half in BOP custody, the other women housed with her did not know she was transgender. (Wendy Doe Decl. ¶ 13).

Wendy's psychiatric vulnerabilities are significant and well-documented. She was diagnosed with ████████████████ around ████████, conditions she attributes to her then-undiagnosed gender dysphoria, and began cutting herself around the same time. (*Id.* ¶ 6). She was physically, sexually, and emotionally abused throughout her childhood and was later diagnosed with ████. (*Id.*; ██████████████████ Hormone therapy has been central to managing these conditions: during periods when she has been without it—including a six-month gap before sentencing and a four-month gap at her first BOP facility—her physical and mental health deteriorated significantly. She experienced fatigue, intense bone pain, emotional dysregulation, cognitive impairment, and worsening anxiety and depression. (Wendy Doe Decl. ¶ 13). Mental health medications alone were not sufficient to address these effects. (*Id.*). No mental health provider has ever told her that counseling or medication could replace hormone therapy or fully treat her gender dysphoria without it. (*Id.* ¶ 28).

Wendy has never been housed in a men's general population facility. (*Id.* ¶ 2). She has no familiarity with the social dynamics, dominance hierarchies, and threat patterns that characterize men's prisons, and would be less able to recognize or respond to emerging dangers in that environment. (McLearen Decl. ¶ 27). She would arrive visibly and unmistakably female, the product of more than ██████ of hormone therapy ████████████ in an environment where those characteristics make a person a target. (*Id.* ¶¶ 19, 23). The circumstances of her transfer—including her prior housing in women's facilities—would become known within the receiving

-20-

institution, further increasing her vulnerability before she even arrived in general population. (*Id.* ¶ 25).

The five days Wendy spent at a men's facility in ████████ as a result of the policy challenged by this case, provide direct evidence of the harm transfer would cause, even before she ever reached general population. BOP placed her in segregation for the entirety of her stay because staff did not know what else to do with her. (Wendy Doe Decl. ¶ 19). ████████

████████████████████████████████████

████████████████████ (Dr. Karasic Decl. ¶ 63; Wendy Doe Decl. ¶ 20). She was unable to participate in her programming. (Wendy Doe Decl. ¶ 21). The prospect of being housed with men was, in her words, terrifying. (*Id.*). These consequences followed from five days in a SHU, in isolation from the general male population. The physical safety and mental health risks she would face in general population are even greater. (McLearen Decl. ¶¶ 19, 23, 25–28, 38, 40, 42).

Wendy's current situation ████████ illustrates those risks with particular clarity.

████████████████████████████████████

████████████████████████████████ (Wendy Doe Decl. ¶ 29). She finds ████████ unsafe and uncomfortable. (*Id.*). If she were transferred to ████████, she fears the harassment would escalate to assault. (*Id.*; *see also* McLearen Decl. ¶ 21 (explaining how verbal sexual harassment frequently precedes sexual assault and rape in male correctional environments)). That fear is well-founded: ███

████████████████████████ potentially including men with histories of violent and predatory behavior, and ████████████████

████████████████████████████████████

Transgender women with the vulnerabilities present here predictably face an increased risk of victimization if ███████████████████████████████████████████, as well as serious mental health risks. (*Id.* ███████).

BOP's own clinicians, upon transferring Wendy to a men's facility, immediately recognized that the transfer and hormone disruption posed a serious risk of psychological harm that had the ██████████████████████████████████ (Dr. Karasic Decl. ¶ 63). ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ That clinical determination reflects institutional knowledge of her vulnerability at the most concrete level possible: not an inference from her history or characteristics, but ████████████████████████████████████ ██████ as a direct consequence of their own action. BOP then returned her to the women's facility, upgraded her mental health care level from █████████████████ in response to the ongoing threat of transfer, and subsequently told her twice more that transfer was imminent. (Wendy Doe Decl. ¶¶ 22, 24, 26). Each of those communications occurred against the backdrop of ██████████ ██████████████ what transfer would do to her. Proceeding with transfer regardless is deliberate indifference prohibited by the Eighth Amendment.

Since returning to women's facilities, Wendy has not been sexually abused or assaulted. (*Id.* ¶ 30). She has engaged productively in programming, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ (*Id.* ¶ 15). Her

gender dysphoria symptoms have not been present when she has been in a women's facility with access to her hormone therapy. (*Id.* ¶ 32; ████████████████)

The record likewise establishes BOP's deliberate indifference to Wendy's serious medical needs. Since beginning hormone therapy, her gender dysphoria symptoms have vastly improved, as established in BOP records. Dr. Karasic opined that ████████████████████ ████████████████████████████████████████ According to Dr. Karasic, ████████████████████████████████████

████████████████████████████████████████

████████████████████████ (Dr. Karasic Decl. ¶¶ 67, 71). ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (*Id.* ¶ 64).

### iv.    Donna Jones.

Donna is a transgender woman who has been on hormone therapy since ████████ treatment that has produced significant feminization of her body. (Declaration of Donna Jones ("Donna Jones Decl.") ¶ 6–7). Her overall appearance is now fully feminine. (*Id.* ¶¶ 36–38). On the substantial risk prong, her physical changes make her an easy and visible target for sexual violence in a men's facility, (*id.* ¶ 33; McLearen Decl. ¶19), and the record confirms this is far more than speculation. In ████ while housed at a men's prison, Donna was brutally raped ████ ████ by an incarcerated man. (Donna Jones Decl. ¶ 11). Beyond the rape, sexual assault and harassment were constant fixtures of her experience in men's facilities as she was frequently groped, received dozens of threatening notes, and was regularly told things like "if you want to be a woman, you can be a woman with me." (*Id.* ¶ 18; *see also* McLearen Decl. ¶¶ 20–21 (explaining

that past sexual assaults and sexual harassment are predictors for revictimization in men's facilities)).

Donna's mental health vulnerabilities are equally severe and exacerbate her vulnerability to harm. Donna has been diagnosed with ▮▮▮▮▮▮▮▮▮▮▮ and gender dysphoria, (Donna Jones Decl. ¶ 15), conditions rooted in an extensive history of childhood trauma, including sexual abuse ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (*Id.* ¶ 9). She has attempted suicide approximately ▮▮ times. (*Id.* ¶ 42). The constant fear and harassment she experienced at the men's facility contributes to ▮▮▮▮▮▮ including ▮▮▮▮▮▮▮▮ (*Id.* ¶ 13).

Since Donna's transfer to a women's facility in ▮▮▮▮, her gender dysphoria symptoms have improved significantly. (*Id.* ¶ 22). ▮▮▮▮▮▮▮▮▮▮ She has not been sexually abused or assaulted in a women's facility. (*Id.* ¶ 24). On the deliberate-indifference prong, forcing her back into a men's facility would return her to the very environment where she was raped, groped, and harassed for over ▮▮▮▮ (*Id.* ¶ 10, 11, 18). This would likely trigger severe mental health consequences and could lead to another suicide attempt (McLearen Decl. ¶¶ 37–42; ▮▮▮▮▮▮▮. If transferred, Donna will also face increased risks of violence, including sexual assault. The danger would be even greater now as Donna presents as more female than she did when previously housed with men. (Donna Jones Decl. ¶ 51). Donna's transfer from a women's facility would itself amplify her risk: in men's facilities, the fact of transfer from a women's facility routinely becomes known—through intake procedures, staff communication, and routine inquiries among the incarcerated population—and predatory men would be skilled at identifying and exploiting individuals so identified, particularly those whose physical feminization and presentation mark them as vulnerable. (McLearen Decl. ¶¶ 23–26). ▮

-24-

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

This record compels the conclusion that returning Donna to a men's facility would put her at substantial risk of serious harm, given her documented history of rape and pervasive sexual harassment in men's facilities, her pronounced physical feminization, and her severe, ██████ ██████████████████████ that are exacerbated in such environments. It also demonstrates Defendants' deliberate indifference. BOP is aware of her vulnerability, has acknowledged it is unable to protect her from sustained abuse in a men's facility, and has observed her significant improvement in a women's facility.

Likewise, the record establishes BOP's deliberate indifference to Donna's serious medical needs. Psychiatric medication alone has never been adequate to treat Donna's gender dysphoria. (Donna Jones Decl. ¶¶ 48–49). The only treatment that has proven effective is hormone therapy, which significantly reduced her ██████, distress, and anger, and allowed her to feel comfortable in her own body. (*Id.* ¶¶ 48–50). ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

v.    **Olivia Doe.**

Olivia is a transgender woman who has been on hormone therapy for ████ years without interruption, (Declaration of Olivia Doe ("Olivia Doe Decl.") ¶ 9), and, ████████████████ ████████████████████████████████████████ She began transitioning when she was ██████ years old. (Olivia Doe Decl. ¶ 6). Hormone treatments have

caused physical changes, including increased breast growth and softer skin. (*Id.* ¶ 10). Her female appearance makes her an easy and visible target for sexual violence in a men's facility. (McLearen Decl. ¶ 19). Indeed, Olivia was raped in ▋▋ while housed at a men's prison, and ▋▋▋▋ ▋▋▋▋▋▋▋▋. (Olivia Doe Decl. ¶ 13). After filing a PREA report documenting the rape, Olivia was placed in the SHU for several months, which was isolating and worsened her mental health. (*Id.* ¶ 14). ▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋

▋▋▋

Olivia's mental health vulnerabilities are equally severe and exacerbate her vulnerability to harm. Olivia has been diagnosed with ▋▋▋▋▋▋, and gender dysphoria, (Olivia Doe Decl. ¶¶ 5–6; ▋▋▋▋), conditions rooted in an extensive history of childhood trauma, including sexual and physical abuse, (Olivia Doe Decl. ¶ 5). She has been placed on suicide watch approximately ▋ times. (*Id.* ¶ 12, 14–15, 17–18, 24). The constant fear and harassment she experienced at the men's facility contributes to her ▋▋▋ and even caused her to attempt suicide ▋▋▋▋. (*Id.* ¶ 18).

Since Olivia's transfer to a women's facility in ▋▋, her gender dysphoria symptoms have improved significantly. (*Id.* ¶ 20). She has been involved in programming consistently since arriving at a women's facility. (*Id.* ¶ 21). She has not been sexually abused or assaulted in a women's facility. (*Id.* ¶ 22). Forcing Olivia back into a men's facility would return her to the environment where she was raped and harassed, creating severe mental health risks and putting her in serious danger of further sexual abuse. (McLearen Decl. ¶¶ 20–21, 38–39, 42.) The danger would be even greater now as Olivia presents as even more female than she did when

previously housed with men. (Olivia Doe Decl. ¶¶ 32). Olivia also suffers from other serious medical conditions such as ██████████████████████████████████████████████████ ██████████████████████████████████████████. (*Id.* ¶ 33). Olivia's ██ ████████████████████████████████████████████████████████████ ██████ puts her in an even more vulnerable position. (*Id.*; ████████████████ And Olivia's transfer from a women's facility would itself amplify her risk: in men's facilities, the news of a transfer from a women's facility would spread through intake procedures, staff communication, and routine inquiries among the incarcerated population. Upon learning she came from a women's facility, predatory men would likely single her out as a target for sexual abuse. (McLearen Decl. ¶¶ 21–24).

The record likewise establishes BOP's deliberate indifference to Olivia's serious medical needs. Hormone therapy significantly reduced Olivia's symptoms of ████████████ ██████ and allowed her to feel comfortable in her own body. (Olivia Doe Decl. ¶ 28). ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████

   vi.  **Amy Jones.**

The record contains overwhelming evidence that Amy Jones will be at substantial risk of serious harm if she is transferred to a men's facility. Amy is a transgender woman who has identified as female since early childhood. (Declaration of Amy Jones ("Amy Jones Decl.") ¶ 3). She was diagnosed with gender dysphoria while incarcerated and has been on continuous hormone therapy for nearly ████ years. (*Id.* ¶¶ 6, 8, 39 ████████████████████████████████ ████████████████████████████████████ That therapy has produced significant physical feminization: she has developed breasts, her hips and thighs have become fuller, and she

has lost muscle mass. (Amy Jones Decl. ¶ 39). ███████████████████

████████████████████████████████████████████████████████

████████████████. (*Id.*). Because of how she looks, other incarcerated women tell Amy she looks indistinguishable from a non-transgender woman. (*Id.* ¶ 40). She presents, in appearance and manner, as a woman, and she would be recognized as such by men with whom she would be housed.

Since entering incarceration in ██████, Amy has been sexually assaulted in every men's facility in which she has been housed, (*id.* ¶ 27), and has suffered damaging psychiatric consequences. The record of sexual and physical abuse that Amy experienced in men's facilities is extensive and devastating. In ████████████████████████████ assaulted and raped her ████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (*Id.* ¶¶ 10–11). Amy initially reported her injuries as ████████ out of fear of ending up in the SHU, (*id.* ¶ 12); she later disclosed the assault and received a sexual assault examination. (*Id.* ¶¶ 12–13).

The cumulative toll of these assaults on Amy's mental health was severe: she attempted suicide in ████████████████████████████████████████████ ████████ hospitalized, and returned to the facility on suicide watch. (*Id.* ¶ 17). Following prolonged sexual abuse by another incarcerated man, (*id.* ¶ 19), Amy repeatedly engaged in dangerous self-harm. ██████████████████████████ and was placed on suicide watch, (*id.* ¶ 20); ██████████████████████ (*id.* ¶ 21); ████████████

████████████████████████████████████████████████████

████████████████████████████ (*Id.* ¶ 25). Each of these episodes of self-harm

occurred while Amy was housed in men's facilities, where her mental health deteriorated; she experienced nightmares, startle reactions, and hypervigilance directly in response to the violence and harassment in those placements. (*Id.* ¶ 28).

Since being transferred to a women's facility, Amy is less depressed, less anxious, and has fewer thoughts of self-harm. (*Id.* ¶ 29). She has not been sexually abused or assaulted, she is building a stable life, (*id.* ¶¶ 29, 30, 35, 36), and her gender dysphoria symptoms, which remained severe even with hormone therapy while she was housed with men, have diminished substantially, (*id.* ¶¶ 28–29). This vast improvement in her psychiatric distress is relevant to her classification and housing assignment; transferring her to a male facility has a high and foreseeable likelihood of causing significant psychological distress and increased risk of self-harm and suicidality. (McLearen Decl. ¶¶ 38–39, 42).

Based on her documented history of abuse and increasingly visible female physical characteristics, there is nothing speculative about the substantial risks of transferring Amy to a men's facility; the consequences are foreseeable and predictable. (*Id.* ¶¶ 19–22, 24–25). The record of her abuse while in BOP custody is staggering: Amy was sexually assaulted in every men's facility in which she was housed since ██████ (Amy Jones Decl. ¶ 27). She was in danger every day in men's facilities, regardless of the security level, and even when BOP took steps to comply with PREA, BOP officers could not protect her. (*Id.*). Amy would be returning as someone with a personal history of severe and prolonged prior abuse in men's facilities, making the risk of revictimization especially high. (McLearen Decl. ¶ 24). Amy's ████████████████ ████████████████ only compound the risk of further abuse. (*Id.* ¶ 19). Amy now presents as even more visibly female than she did during the years she was being sexually assaulted in men's facilities, which makes her more likely to be approached, pressured, and exploited. (*Id.*) Amy has

been living among women; she carries the behavioral patterns, social presentation, and absence of defensive adaptation that predatory men in male prisons are practiced at recognizing and exploiting. (*Id.* ¶ 25).

On the deliberate indifference prong, BOP's decision to place Amy in a men's facility is a knowing and deliberate decision to subject her to further sexual abuse. Transgender women who have been raped or assaulted in men's facilities are at a high risk of physical and sexual violence if transferred back to men's facilities, in addition to facing significant mental health risks. (*Id.* ¶¶ 24, 39). BOP has known about Amy's vulnerability to sexual violence in men's facilities for years, dating back to at least ▉▉▉ when BOP gave Amy a PREA evaluation. (Amy Jones Decl. ¶ 14). BOP has allowed her to be raped, assaulted, and driven to repeated self-harm across multiple institutions. (*Id.* ¶¶ 17, 20, 21, 25, 27; *see also* McLearen Decl. ¶¶ 43–49 (explaining why protective measures in men's facilities are not sufficient to prevent violence against the most vulnerable transgender women)). BOP officials knew and disregarded excessive risks to Amy's health and safety for years before finally moving her to a women's facility, where she has finally been safe. Sending her back to a men's facility is a choice made with full awareness of the devastating consequences, which is what the Eighth Amendment forbids.

Likewise, the record establishes that Amy was diagnosed with gender dysphoria, which is being treated with hormone therapy. Since beginning hormone therapy, her gender dysphoria symptoms have significantly improved, as established in BOP records. ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉ These facts satisfy both prongs of the Eighth Amendment inquiry and the individualized showing the Court of Appeals required on remand.

### vii.    Maria Moe.

Maria Moe is ███████████. She has lived as a woman since █████████, has been on continuous hormone therapy for ████████████████████ ███ (Declaration of Maria Moe ("Maria Moe Decl.") ¶¶ 5, 6), and Maria has spent the entirety of her ███ years in BOP custody housed exclusively in women's facilities. (*Id.* ¶ 24). She was ████████████████████████████████████ (*Id.* ¶ 10). She has never been housed in a men's facility. (*Id.* ¶¶ 11, 30–31). The record establishes that transferring Maria to a men's facility would expose her to a substantial and imminent risk of serious harm, risks grounded in her specific medical history, her documented psychiatric vulnerabilities, and her history of childhood sexual abuse.

Maria was diagnosed with gender dysphoria and began hormone therapy ████████ ████████████████████ under the care of a physician specializing in transgender healthcare, and has remained on continuous hormone therapy since that time. (Maria Moe Decl. ¶¶ 5, 6). That therapy has produced significant and lasting physical feminization: breast growth, decreased muscle mass and strength, softening of skin, and voice changes. (*Id.* ¶ 23). As a result, Maria appears female and is recognized as a woman by others. (*Id.* ¶ 10). Her BOP records have always listed her sex as female. (*Id.* ¶ 23). ████████████████████████ ████████████████████████████████ (*Id.* ¶ 10). ████ ████████████████████████████████████ ████████████████████████████████████ ████ (*Id.*). Accordingly, since she entered BOP custody in ████████, BOP has housed Maria in women's facilities with access to hormone therapy. (*Id.* ¶ 12). She has never been sexually abused or assaulted in a women's facility. (*Id.* ¶ 24).

-31-

The substantial risk of sexual violence Maria would face in a men's facility is acute and specific. First, for all the reasons that justified Maria's placement in women's facilities—her female appearance, feminine mannerisms, and life experience as a woman—she is especially vulnerable to sexual violence in men's facilities. (McLearen Decl. ¶ 23). She would arrive visibly and unmistakably female, having been on hormone therapy since ██████████████. (Maria Moe Decl. ¶ 23). Second, Maria has never navigated the particular environment of a men's prison: its culture of dominance, its predatory dynamics, and the ways in which vulnerability is identified and exploited by those inclined to do so. (McLearen Decl. ¶ 27). That combination—a woman who is ████████████████████████ and has exclusively been housed in women's facilities, arriving in men's facility for the first time—presents precisely the profile that predatory men are most likely to target. (Id. ¶¶ 19, 23, 27). Third, male prisoners and staff will know that Maria came from a women's facility, which will increase the likelihood that she is targeted for exploitation. (Id. ¶ 26). Maria would be as vulnerable as any woman would be in a men's prison.

Maria's psychiatric vulnerabilities only exacerbate the already substantial risks. Maria was sexually abused ████████████████████████████████████████ (Maria Moe Decl. ¶ 9). She carries a diagnosis of ██████████████ and a history of ████████ ████████ including suicidal ideation stemming from her gender dysphoria. (Id. ¶ 5). Her prior episodes of self-harm occurred specifically in the context of acute gender dysphoria distress— before she was able to live fully as a woman and before her hormone therapy was stabilized. (Id. ¶ 8). Hormone therapy is the only treatment that has effectively addressed her gender dysphoria and the depressive symptoms it produces; no mental health care provider has ever told her that counseling or psychotherapy could replace hormone therapy or effectively treat her gender dysphoria without it. (Id. ¶ 23). The results of transferring Maria to a men's facility are predictably

dangerous to her mental health. (McLearen Decl. ¶¶ 38, 40, 42). If denied her ███████████

medical treatment, BOP will likely exacerbate Maria's gender dysphoria, exposing her to the

known psychiatric state that led her to suicidal ideation and self-harm in the past. Maria also fears

that the violence or threat of violence she would face in a men's facility could push her to harm

herself again. (Maria Moe Decl. ¶ 24; *see also* McLearen Decl. ¶ 41 (explaining how the

combination of transfer and denial of medical care carries grave mental health risks)).

On the deliberate indifference prong, BOP has had direct and specific knowledge of

Maria's vulnerability from the outset of her incarceration. Her health screening at BOP intake in

███████ documented her status as a transgender female who had been on hormone therapy since

██████████. (Maria Moe Decl. ¶ 6). BOP continued her hormone therapy, housed her

exclusively with women, and was aware of ████████████████████

████████████████████████████ (*Id.* ¶ 10).

Notwithstanding BOP's knowledge of Maria's individual circumstances, and bypassing the

individualized assessment of Maria's mental health and suicide risk that should have accompanied

any classification or housing decision, (McLearen Decl. ¶ 37), BOP moved immediately to transfer

Maria to a men's prison upon issuance of the EO.

The record well documents what BOP knew and what BOP chose to do with that

knowledge: BOP decided to move to a men's facility a ██-year old woman who has never been

housed with men, has lived as a woman her entire adult life, appears to others as indistinguishable

from other women, carries a documented history of childhood sexual abuse, is at risk of serious

depressive episodes related to gender dysphoria, and whose vulnerability was recognized ███████

████████████████ BOP made this transfer decision willingly and urgently, without any

individualized consideration of Maria's relevant, personal characteristics, all of which strongly counsel against placement in a men's facility. This is deliberate indifference in the clearest sense.

The record likewise establishes BOP's deliberate indifference to Maria's serious medical needs. Since beginning hormone therapy, her gender dysphoria symptoms have vastly improved, as established in BOP records. █████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████

### viii.    Jane Jones.

Jane Jones has spent her entire period of federal incarceration in women's facilities, with the exception of one temporary, but traumatic, assignment resulting from the policy challenged by this case. She has undergone ████████████████████████ ████████████████████████████████ and, like other women ████████████████ physically vulnerable to sexual assault by men with predatory behaviors. She is currently housed in ███████████████████, and the record establishes that transferring her to a men's facility would expose her to a substantial and imminent risk of serious harm—a conclusion confirmed not by inference or generalization, but because of her physical appearance, history in women's facilities, and by the direct evidence of what occurred during her brief, involuntary transfer to a men's SHU in ████████.

Jane is a transgender woman who has been on continuous hormone therapy for ████ ████ a course of treatment that has produced profound and irreversible physical feminization: she has developed female breasts, lost significant muscle mass, experienced a redistribution of body fat to a feminine shape, and her skin and body hair have transformed from ████████████ of estrogen therapy. (Declaration of Jane Jones ("Jane Jones Decl.") ¶¶ 6, 7, 31). She is, by her own

account and by the account of BOP itself, female in every respect that would be visible to other residents and staff. (*Id.* ¶¶ 16, 30.)



(Dr. Karasic Decl. ¶ 34). As Dr. Karasic explained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*). Without it, she also faces ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in addition to the severe psychiatric effects of hormone deprivation. (Jane Jones Decl. ¶ 31; McLearen Decl. ¶¶ 40–41; Dr. Karasic Decl. ¶ 35).

The risk of sexual violence and abuse that Jane would face in a men's facility is not speculative. A woman with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ housed in a men's facility presents an obvious and severe target for sexual predation. (McLearen Decl. ¶ 19). Jane would enter a men's facility as a visibly female woman ▮▮▮▮▮▮▮▮—characteristics that predatory individuals are skilled at identifying and exploiting. (*Id.*).

Jane's brief, involuntary transfer to a men's SHU in ▮▮▮▮▮▮ provides direct evidence of the harm she would face even in an isolated, controlled setting. During that week, Jane was placed in solitary confinement under 24-hour video surveillance by male corrections officers. (Jane Jones Decl. ¶¶ 18–21). Because those officers would have been able to observe her ▮▮▮▮▮▮▮▮

████████████████████████ she was unable to use the shower for the duration of her confinement. (*Id.* ¶ 21). She was provided with only men's toiletries and men's undergarments. (*Id.* ¶ 18). Her mental health deteriorated rapidly and foreseeably: she experienced hopelessness, fear, severe anxiety, and a profound sense of dehumanization, describing the experience as a forced de-transition. (*Id.* ¶¶ 24–25; McLearen Decl. ¶¶ 38, 40, 47). Even after returning to a women's facility, Jane continued to show signs of trauma from her short assignment to a men's SHU. (Jane Jones Decl. ¶ 29). Even in the isolation of the SHU—separated from the general male population entirely—Jane experienced physical and psychological harms. The risks of violence and exploitation she would face living, sleeping, and showering in a men's facility, ████████ ████████████████████████████████████ are both predictable and significant. ████████████████

The danger Jane faces is further compounded by her exclusive history of placement in women's facilities. Jane has never been housed in a men's facility outside of her brief, involuntary SHU placement. (Jane Jones Decl. ¶ 18.) She has no experience of the social dynamics, informal hierarchies, and threat patterns that characterize men's facilities, rendering her less able to recognize or respond to emerging dangers and more likely to be perceived as an easy target. (McLearen Decl. ¶ 24). Moreover, the circumstances of Jane's case—including her prior housing in women's facilities—would become known within a receiving men's facility, marking her a target upon arrival. (*Id.* at ¶¶ 26–27).

On the deliberate indifference prong, BOP was on specific, repeated notice of Jane's personal circumstances. When legislation was introduced that could have affected her housing, Jane ████████████████████████████████████ ████████ (Jane Jones Decl. ¶ 16). When the EO was signed, she ██████████████████

██████████ (*Id.* ¶ 17). Hours later, BOP transferred her to a men's facility regardless. (*Id.* ¶ 18). Without explanation or warning, Jane was handcuffed—████████████████

████████████████████████████████████████and

transferred. (*Id.* ¶ 18). She was denied her possessions and warned that her hormone prescription might not be renewed. (*Id.* ¶ 19). When she asked why she had been transferred, a BOP officer would only say that they had been told to bring her to the men's unit. (*Id.*). Even within BOP, the transfer was recognized as anomalous: a senior BOP official told Jane he was surprised she had been placed in a men's SHU at all, having expected her to be transferred to a different women's facility. (*Id.* ¶ 23). BOP thus had actual, specific knowledge of Jane's legal status, her ████████, her consistent assignment to women's facilities, and the representations BOP officials had made and upon which Jane relied—and BOP transferred her in deliberate disregard of all of it. (*Id.* ¶¶ 18–19). That BOP proceeded regardless of Jane's known, individual circumstances, notwithstanding its own prior representations and the misgivings of its own staff, is deliberate indifference.

After returning to the ████████, Jane continued to experience severe anxiety symptoms directly attributable to the trauma of her transfer into a men's unit. Any time the intercom sounded, Jane experienced elevated heart rate, sweating, and nausea from fear of being transferred again. (*Id.* ¶ 29). On one occasion, hearing her name over the intercom caused her to begin crying uncontrollably—symptoms she had never experienced before. (*Id.*)

The threat of transfer to a men's facility continues to cause measurable, ongoing psychological harm even in her current placement. Transfer to ████████████ would expose her to dangers she never faced in the women's population—████████████

████████████████████, and she has no prior experience

-37-

navigating those threats. Should her ███████████████████ transfer to a men's prison would present the same risks in an even more dangerous and violent setting.

The record likewise establishes BOP's deliberate indifference to Jane's serious medical needs. ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

### ix.    Carla Jones.

Carla Jones is ████ old and has been in BOP custody since ████ (Declaration of Carla Jones ("Carla Jones Decl.") ¶¶ 2, 7). She has known since early childhood that she was a girl (*id.* ¶ 2), has lived as a woman for most of her life (*id.* ¶¶ 2, 3), and has a long history of physical and sexual assaults and sexual harassment across the men's facilities in which she has been housed (*id.* ¶ 10). She has been in women's facilities since ████████, where she has not been sexually victimized for the first time in ████. (*Id.* ¶¶ 20, 23.) The record of what she has experienced in men's facilities, and of what BOP has long known about the risks she faces there, establishes that returning her to one would violate the Eighth Amendment.

Carla has presented as female since childhood, wearing women's clothing whenever she could and minimizing masculine traits throughout her life. (*Id.* ¶ 2). As a teenager ████████ ████████, she presented as a woman and used a female name. (*Id.* ¶ 3). Before entering BOP custody, she self-administered estrogen for years, which caused the development of female breasts. (*Id.* ¶ 6). She was formally diagnosed with gender dysphoria by BOP clinicians in ████ ████ and began hormone therapy in ████████ (*Id.* ¶ 13; Dr. Karasic Decl. ¶ 77). She has been

-38-

on continuous hormone therapy for more than ▓▓ years. (Carla Jones Decl. ¶ 13). That therapy has produced substantial and irreversible physical changes: her breasts have developed fully, her figure has become more feminine, her body hair has decreased significantly, and her muscle mass has declined. (*Id.* ¶ 14). She presents as a woman in every respect, and since her transfer to women's facilities, the women she lives with have acknowledged her as a woman and address her by her female name. (*Id.* ¶ 24).

Carla's psychiatric vulnerabilities are severe and directly tied to her housing conditions, her gender dysphoria, and the care BOP has withheld. She carries a diagnosis of recurrent ▓▓▓▓ ▓▓▓▓▓▓▓▓ and is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, reflecting the ongoing severity of her medical and mental health needs. (*Id.* ¶ 32.) She has experienced suicidal ideation and been placed on suicide watch at multiple points during her incarceration. (*Id.* ¶¶ 18–19.) ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ In ▓▓▓▓▓▓▓ after years of requests for surgical care that BOP repeatedly deferred without medical explanation, she ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ (*Id.*). That act was a direct consequence of BOP's prolonged failure to provide care she had sought for years.

Hormone therapy is the only treatment that has effectively addressed her gender dysphoria; the ▓▓▓ she receives treats her ▓▓▓▓ not her gender dysphoria, and no mental health provider has ever told her that counseling or medication could replace hormone therapy or fully treat her gender dysphoria without it. (*Id.* ¶¶ 34–36; Dr. Karasic Decl. ¶ 81). ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████████████████████████████████████████████████████

█████████████████████████████ (Dr. Karasic Decl. ¶ 88).

The record of what Carla experienced in men's facilities is extensive and unambiguous. Her developed breasts were visible enough that BOP staff eventually directed her not to remove her shirt in front of other incarcerated men, the Bureau's own acknowledgment that her female appearance made her a target in men's prison. (Carla Jones Decl. ¶ 10). She was harassed for years because of her feminine appearance and was physically assaulted by ███████████ in ██████ suffering multiple wounds to her ███████████████. (Id. ¶ 9). The following month, while in protective custody after that brutal attack, she was placed in a two-person cell with a man who she knew was dangerous, over her explicit objection, and ████████████████████████ ███████████████████████ (Id.). She was sexually harassed at subsequent facilities, leading to repeated transfers. (Id. ¶ 10). As recently as █████, Carla was reporting to BOP that men were exposing their genitals to her and propositioning her for sexual favors, resulting in additional PREA reports and medical attention. (Id.). She was in danger at every men's facility she was sent to, including ████████ facilities. (Id. ¶ 22). Past sexual abuse is a strong predictor of future victimization in prison, and a transgender woman who has been raped, sexually assaulted, and sexually harassed in men's correctional facilities faces a high risk of revictimization there— particularly when assaulted on multiple occasions, by multiple perpetrators, or across multiple facilities. (McLearen Decl. ¶¶ 20–21). Carla's history satisfies all of those factors.

On the deliberate indifference prong, BOP has known about Carla's vulnerability in granular detail for more than ████████. It recognized her physical vulnerability early enough to instruct her not to remove her shirt in front of other incarcerated men, documented her PREA reports, and transferred her repeatedly in response to sexual victimization and harassment—yet

BOP failed to protect her from sustained sexual and physical abuse across multiple facilities. It now seeks to transfer her back to the environment where she was assaulted, harassed, and driven to ███████████ based on a categorical policy that takes no account of any of this.

Since her transfer to women's facilities in ██████████, Carla has experienced "incredible relief"—her gender dysphoria symptoms have improved, her distress and anxiety have lessened, and she has not been sexually abused or assaulted. (Carla Jones Decl. ¶¶ 22–23). For the first time in decades, she can live without fear of being sexually victimized. (*Id.* ¶ 24).

Returning her to a men's facility would undo all of that. She would arrive visibly and unmistakably female, having been on hormone therapy continuously for more than ████ years and ████ of feminization, in an environment where those characteristics mark a person as a target. (McLearen Decl. ¶ 23). The fact of her transfer from a women's facility would become known quickly within the receiving institution, adding a further layer of vulnerability. (*Id.* ¶ 26). Behaviors and patterns of interaction consistent with ███ years of life in a women's facility would be read as indicators of vulnerability in a men's setting. (*Id.* ¶¶ 25–26). And being forced to return to an environment where she was previously sexually assaulted would likely reactivate trauma symptoms, intensify anxiety, and cause the kind of functional collapse that, in Carla's case, has previously led to self-harm. (*Id.* ¶ 28). According to Dr. Karasic, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ (Dr. Karasic Decl. ¶ 89). Returning Ms. Jones to a men's prison "████████████████████████████████████████

██████████████" (*Id.* ¶ 90).

The record likewise establishes BOP's deliberate indifference to Carla's serious medical needs. ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████

        x.     **Rachel Doe.**

Rachel is a transgender woman who has lived as a woman for over ████████████

████████████████████████████

████████████. (Declaration of Rachel Doe ("Rachel Doe Decl.") ¶ 9). She has been on hormone therapy since approximately ██████ (*Id.* ¶ 6). Her physical changes make her an obvious target for sexual abuse in a men's facility. (McLearen Decl. ¶¶ 19, 23). BOP psychology staff themselves assessed Rachel as being at elevated risk for sexual victimization because of her female anatomy and because she is transgender. (Rachel Doe Decl.¶ 12). Prior to the EO, she had only been housed in women's facilities. (*Id.* ¶ 11). But when transferred to men's units after the EO, Rachel was subjected to constant sexual harassment: a BOP guard disclosed ██████████ ██████ to an incarcerated male, after which men began sexually harassing her; one man passed a note under her door asking if she wanted to see his genitals and telling her ████████████ ████████████████████████████ another made sexual comments about her body; and several men approached her with harassing comments ███████████, (*id.* ¶ 15). At one men's prison, men would stare, whistle, clap, and knock on their windows when she walked to meals; she was propositioned for sex; and a man threw a note into her lap directing her to meet him for sex. (*Id.* ¶ 19). Rachel constantly felt she would be attacked. (*Id.* ¶ 18.) Her fears were not speculative. As Dr. McLearen explained, in male facilities, "verbal sexual harassment often serves

to identify individuals as potential targets and frequently precedes more serious forms of sexual abuse or rape." (McLearen Decl. ¶ 21).

Rachel was formally diagnosed with gender dysphoria in ███ (Rachel Doe Decl. ¶ 6; Dr. Karasic Decl. ¶ 40). She began experiencing symptoms of ██████████████ when she was a teenager, which stemmed in part from her untreated gender dysphoria. (Rachel Doe Decl. ¶ 5; Dr. Karasic Decl. ¶ 43). Being transferred to men's facilities under the EO amplified her ██████ ███████; she was unable to sleep and was kept in a state of constant fear and high alert that took a significant toll on her well-being. (Rachel Doe Decl. ¶ 21). She has been prescribed ████████ since ████ but they do not alleviate the symptoms of her gender dysphoria. (*Id.* ¶ 7). The only medication that has proven effective for her gender dysphoria is hormone therapy. (*Id.* ¶ 25). Hormone therapy helped her ████████████ subside and allowed her to feel like she was "able to be who I was meant to be." (*Id.* ¶ 6). No clinician has ever told her that mental health medication or counseling could replace her hormone treatments or fully treat her gender dysphoria. (*Id.* ¶ 26). As Dr. Karasic explained, ██████████████████ ███████████████████████ ██████ (Dr. Karasic Decl. ¶ 53). Moreover, because of her ██████████████ ████████████████████ making continued hormone medication medically essential. (Rachel Doe Decl. ¶ 9). In fact, Dr. Karasic concluded that ██████████████ ███████████████████████ ████████████. (Dr. Karasic Decl. ¶¶ 50–51).

BOP has direct knowledge and appreciation of Rachel's elevated risks. At both ███ ████████████████████, BOP psychology staff assessed Rachel as being at elevated risk for sexual victimization due to her female anatomy and transgender status. (Rachel Doe Decl. ¶¶

12, 17). At ▮▮▮▮▮▮, the BOP increased her mental health care level and required weekly psychology contacts. (*Id.* ¶ 12). BOP staff also took steps to try to protect her, including ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but these measures did not stop the sexual harassment and propositions. (*Id.* ¶¶ 14, 19). Rachel reported incidents to staff yet the harassment continued unabated. (*Id.* ¶ 19). ▮▮▮▮▮▮▮▮▮▮ BOP denied Rachel access to a bra, rendering her even more vulnerable to harassment. (*Id.* ¶ 19). Since her transfer to ▮▮▮▮▮ a women's facility, ▮▮▮▮▮▮ Rachel's experience was "life-changing." (*Id.* ¶ 22). Once in a women's facility, Rachel was no longer afraid, her nervous system could finally relax, she felt safe, and her medications made her feel much better. (*Id.*).

Forcing Rachel back into a men's facility would return her to the very environment where Rachel has already reported experiencing sexual harassment and the constant threat of sexual violence. (*Id.* ¶¶ 15, 16, 18). The danger would be even greater now, because Rachel has been housed exclusively with women since ▮▮▮▮▮ and her transfer history is known within the prison system. (*Id.* ¶¶ 23–25, 28). Being transferred from a women's facility to a men's facility would again mark her as a target for sexual violence and exploitation. (*See* McLearen Decl. ¶¶ 25–26). In addition, her female physical appearance ▮▮▮▮▮ make her extraordinarily vulnerable to sexual violence if transferred. (*Id.* ¶¶ 11-12, 19, 23). Transfer would also have serious mental health consequences, putting Rachel at an increased risk of self-harm and suicidality. (*Id.* ¶¶ 38, 42).

The record likewise establishes BOP's deliberate indifference to Rachel's serious medical needs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████ (Dr. Karasic Decl. ¶ 52). According to Dr. Karasic,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ *Id.* ¶ 55).

### xi.    Zoe Doe.

Zoe Doe is ████████ years old. (Declaration of Zoe Doe ("Zoe Doe Decl.") ¶¶ 2, 50). She has been in BOP custody since ████ and spent ████████ years in BOP men's facilities where she was repeatedly targeted for sexual violence. (*Id.* ¶¶ 11–27). She has lived in a women's facility since ████████████. (*Id.* ¶¶ 28–29). ███████████████████████

████████████████████████████

██████████████████████████████████████ (*Id.* ¶ 34). A senior official with BOP's Transgender Executive Council told her, just days before the EO was issued, that they ████████████████████████████████████████████████. (*Id.* ¶ 35). The record of what Zoe has already survived in men's facilities, and of what BOP itself has long known about the risks she faces there, compels the conclusion that returning her to one would violate the Eighth Amendment.

Zoe has known since early childhood that she was a girl. (*Id.* ¶ 2). She was first diagnosed with gender dysphoria, what then was called gender identity disorder, by a psychiatrist in ██████

████████████████████████████████████████

███████████████████████████████████████. (*Id.* ¶¶ 8–9; ████████████

████████ BOP refused to treat her at that time, and she spent years filing administrative remedies and petitioning medical staff for hormone therapy before finally beginning treatment in ████. (Zoe Doe Decl. ¶¶ 9, 16, 18). She has now been on continuous hormone therapy for approximately

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

Hormone therapy produced significant and lasting physical feminization. Zoe developed breasts, her features became more feminine, and her body changed in ways that are now permanent and irreversible. (Zoe Doe Decl. ¶ 19). ███████████████████████

████████████████████ (*Id.* ¶ 48). People she meets typically do not know she was not born a woman unless someone tells them. (*Id.* ¶ 29). The risk Zoe would face in a men's facility is not hypothetical. It is the subject of a documented record spanning ████████. She was raped and experienced multiple attempted sexual assaults while incarcerated in ████████████. (*Id.* ¶ 5). From the beginning of her BOP incarceration, BOP recognized her vulnerability: she was classified as at high risk for sexual assault as far back as █████ and referred to a ███████ program because staff viewed her as █████████████████████████████████████ ████████████████████████████ *Id.* ¶ 13). And this was before she had ███████████. ████████████████████████████████████

████████████████████████████████████████████

████████████ (Dr. Gorton Decl. ¶ 67; *see also* McLearen Decl. ¶¶ 19, 23).

After a ████████████████████████████████, word spread through her facility and harassment and threats became constant; she had to remain hypervigilant at all times.

-46-

(Zoe Doe Decl. ¶ 14). Zoe told a BOP mental health provider that each day in a men's facility felt like one giant battle to not be raped. (*Id.* ¶ 15). When she reported being stalked and pressured for sexual favors at one facility, BOP's own investigation concluded that her safety would be in jeopardy if she returned to general population and transferred her. (*Id.* ¶ 21). Notwithstanding numerous transfers and protective custody placements, the sexual abuse and harassment continued at men's facilities and Zoe was "in danger every day." (*Id.* ¶ 26). As Dr. McLearen noted, "[p]ast sexual abuse is [ ] a strong predictor of future sexual victimization in prison," and "[a] transgender woman who has been raped or sexually assaulted in men's correctional facilities would likely be at an especially high risk of revictimization in men's facilities, especially if the individual, was assaulted on multiple occasions, by multiple perpetrators, or in multiple men's facilities." (McLearen Decl. ¶ 20). BOP attempted to protect Zoe through repeated transfers and placements in protective custody across medium, high, and low-security facilities. None of those efforts were sufficient. (Zoe Doe Decl. ¶ 26). At every security level, she remained a target. She spent her days and nights hypervigilant, actively avoiding threats of sexual violence and harm. (*Id.*). Upon each transfer, PREA assessments consistently found her to be at serious risk of sexual victimization based on her history of assault, her LGBTQI status, her small stature, and her feminine appearance. (*Id.* ¶ 27).

When she was transferred to a women's facility in ▮▮▮▮ BOP conducted a new PREA assessment and reduced her risk rating to low. (*Id.* ¶ 28). BOP's own risk assessments thus directly confirm what the record otherwise establishes: that Zoe's vulnerability is a function of her placement in a men's facility, and that a women's facility is the only environment in which she can be safe. Protective measures in men's facilities, including staff monitoring, PREA compliance efforts, and protective custody, are inherently reactive and cannot adequately prevent harm to

-47-

transgender women who face the severe individual risk factors present here. (McLearen Decl. ¶¶ 39–46).

Since her transfer to a women's facility in ▮▮▮ Zoe has not been sexually abused or harassed. (Zoe Doe Decl. ¶ 29). She has been able to shower and move through the facility without constantly scanning for threats. (*Id.* ¶ 30). Her mental health improved immediately and substantially: she became less depressed, less anxious, and stopped experiencing thoughts of self-harm. (*Id.*). She was able, for the first time, to begin processing the sexual trauma she had accumulated over ▮▮▮ years in men's facilities, completing treatment through a ▮▮▮▮▮▮ ▮▮▮▮▮. (*Id.* ¶ 31). Both hormone therapy and living in a female role (in women's housing) are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ (Dr. Gorton Decl. ¶¶ 62, 63).

The risk that transfer would now pose to Zoe is compounded by nearly ▮▮▮ of life in a women's facility. Behaviors and presentation consistent with functioning in a women's correctional environment are often interpreted as indicators of vulnerability in a men's facility, and transgender women transferred from women's to men's facilities face heightened risk precisely because of the adjustment they have made to the female correctional environment. (McLearen Decl. ¶ 21). Zoe has spent almost ▮▮▮ living as a woman in a women's facility. She carries herself as a woman, and her behavior and presentation are consistent with the social norms and typical patterns of interaction in a women's facility. Those characteristics would mark her as vulnerable in a men's facility. (*Id.* ¶¶ 21–22). The fact of transfer from a women's facility would become known within the receiving institution through intake procedures, staff

-48-

communication, and routine inquiries among incarcerated people, which further increases the likelihood that she will be targeted for sexual abuse and exploitation. (*Id.* ¶ 26).

The mental health consequences of transfer would also be severe and foreseeable. ███

██████████████████████████████████████████████████████

████████████████████████████████████████ (Dr. Gorton Decl. ¶ 66). Individuals who have previously experienced rape or sexual assault in male facilities are particularly vulnerable being returned to the environment associated with that harm, and such exposure can reactivate trauma symptoms, increase anxiety, and cause hypervigilance and other functional impairments. (McLearen Decl. ¶ 39). For Zoe, those consequences are not speculative:

██████████████████████████████████████████████████████

████████████. (Gorton Decl. ¶ 68). Since BOP began treating her as male under the EO, she is anxious, depressed, unable to sleep, and hyperalert—symptoms she had not experienced since

████████████. (Zoe Doe Decl. ¶ 47). The combination of involuntary transfer to a men's facility and deprivation of hormone therapy will predictably cause grave harm. (McLearen Decl. ¶ 41; ████████████)

When Zoe learned in ████████ that she would be transferred to a men's facility, she told her healthcare provider: "I can't be safe at any male institution ██████████████

██████████████████." (Zoe Doe Decl. ¶¶ 37–39). That provider, noting Zoe's

████ diagnosis, recommended that she be removed from restrictive housing because placement there "results in increased risk for death by suicide and can contribute to decompensation in overall mental health." (*Id.* ¶ 39). Her care level was subsequently elevated and a psychology alert was added to her file. (*Id.* ¶ 41). She has had recurring nightmares of being sent to a men's prison. (*Id.*). She does not think she can survive it again. (*Id.* ¶ 50).

On the deliberate indifference prong, BOP's knowledge of Zoe's vulnerability is extensively documented in this record. BOP classified her as high risk for sexual victimization repeatedly across multiple facilities and multiple ███. Its own investigations concluded she could not safely be returned to general population in male facilities. It transferred her through ███ men's facilities over ███ years without ever finding one that could be made safe for her. It finally transferred her to a women's facility in ███, reduced her PREA risk rating to low, watched her mental health stabilize, and supported her through a ███████████ ████████████. A BOP senior official told her ███████ ██████ And it now seeks to undo all of that—to return a ███ year-old woman with ██ ██████, nearly ███ of life in a women's facility, and ███ years of documented victimization in men's prisons to a men's institution—based on a categorical policy that makes no individualized inquiry whatsoever. That is straightforward deliberate indifference.

The record likewise establishes BOP's deliberate indifference to Zoe's serious medical needs. Since beginning hormone therapy, her gender dysphoria symptoms have vastly improved, as established in BOP records. Dr. Gorton opined that █████████████ ███████████████ █████████

### xii. Sara Doe.

Sara Doe's record provides an equally compelling individualized showing. Sara is a transgender woman who has been on hormone therapy since she was ███████ ███████ ████ (Declaration of Sara Doe ("Sara Doe Decl.") ¶¶ 7, 8). As a result of her long-term hormone therapy ███████████ ████████. (Id. ¶ 9). Dr. Gorton explained ███████

███████████████████████████████████████████████ (Dr.
Gorton Decl. ¶ 52). These physical characteristics make her an obvious and easy target for sexual violence in a men's facility. (McLearen Decl. ¶ 12). Sara has an extensive history of sexual abuse by men and is extremely fearful of being physically and sexually assaulted in a men's facility. (Sara Doe Decl. ¶¶ 4, 14). BOP staff themselves have acknowledged this danger. Indeed, when Sara was first moved out of the SHU after being told she was being transferred, staff told her that she ███████████████ a men's prison. (*Id.* ¶ 14). Dr. Gorton noted that ███████████

███████████████████████████████████

███████████████████████████ (Dr. Gorton Decl. ¶ 52).

Sara's psychiatric vulnerabilities reinforce the severity of these risks. She endured a childhood marked by severe and repeated abuse—████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

(Sara Doe Decl. ¶ 4). Since learning in January 2025 that the BOP intended to transfer her to a men's facility, Sara has struggled with increasing anxiety, night terrors, and depression. (*Id.* ¶ 15). She has nightmares that she is being raped by groups of men and is afraid when she hears keys coming down the hallway that guards are coming to take her to a men's facility. (*Id.*). The ████ and stress became so severe that she required psychiatric intervention and was prescribed medication for ██████ (*Id.* ¶¶ 16, 25). BOP has direct knowledge and appreciation of these elevated risks. When Sara entered BOP custody in █████ she was immediately treated as female and has always been housed in female facilities. (*Id.* ¶ 11). Her female appearance, history of sexual abuse, years living as a woman both before and during her incarceration, and lack of

experience in men's facilities make her extraordinarily vulnerable to sexual victimization, self-harm, and suicidality if transferred under the EO. (McLearen Decl. ¶¶ 12, 19–20, 23–28, 37–38, 40–42).

The record likewise establishes BOP's deliberate indifference to Sara's serious medical needs. Hormone therapy is the only treatment that helps her gender dysphoria, and no mental health care provider has ever informed her that other treatments could replace hormone therapy or fully treat her gender dysphoria without it. (Sara Doe Decl. ¶ 23). ███████████████████ ███████████████████████████ (Dr. Gorton ¶ 50), discontinuation of treatment would not only precipitate a return of her psychiatric symptoms—including the ███████ night terrors, ███████, and nightmares she has already begun experiencing, (Sara Doe Decl. ¶¶ 15, 16)—but would also place her at risk of ████████████████████████████, (*id.* ¶ 18). BOP's recent attempt to taper her hormones, and the significant emotional distress it caused even during the brief period it was in effect, (*id.* ¶¶ 19, 20), strongly indicates, ██████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████

xiii.    **Sally Doe.**

Sally is a transgender woman who has been on hormone therapy since ▮ treatment that has produced significant feminization of her body, including breast development and a feminized physique. (Declaration of Sally Doe ("Sally Doe Decl.") ¶¶ 9, 11). According to Dr. Gorton, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (Dr. Gorton Decl. ¶ 34). These physical changes are visible and would make her an obvious and easy target for physical and sexual violence in a men's facility. (*See* McLearen Decl. ¶ 19). While housed in men's facilities, she was subjected to persistent hostility and harassment from other incarcerated people as well as BOP staff because of her transgender status, which destabilized her mental health and cause her to fear for her safety. (Sally Doe Decl. ¶¶ 8, 10).

Sally's psychiatric vulnerabilities reinforce the severity of the objective risk. She endured a childhood marked by physical and emotional abuse ▮▮▮▮▮▮▮▮ (*Id.* ¶ 4). When she was ▮ years old, an older boy attempted to rape her—a traumatic experience that has stayed with her throughout her life. (*Id.* ¶ 5). She has a documented history of suicidal ideation dating back to ▮, when she suffered a nervous breakdown; felt hopeless and saw no reason to continue living; and was hospitalized. (*Id.* ¶ 6). In ▮ she attempted to take her own life. (*Id.* ¶ 7). She experiences ▮▮▮▮▮▮▮▮▮▮ stemming from her then-undiagnosed gender dysphoria. (*Id.* ¶¶ 5, 7, 14; ▮▮▮▮▮▮▮ Since transitioning, presenting as a woman, and beginning hormone therapy, these symptoms have subsided. (Sally Doe Decl. ¶ 11). ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. (Dr. Gorton Decl. ¶ 37).

BOP has direct knowledge and appreciation of these elevated risks. The BOP itself prescribed Sally with hormone therapy and formally diagnosed her with gender dysphoria in ▮ ▮ respectively. (Sally Doe Decl. ¶ 9). Its own psychologists documented that being

targeted for discrimination is a destabilizer for her mental health. (*Id.* ¶ 17). In recognition of her needs, the BOP granted her request for transfer and moved her to a women's facility in ███████ ███. (*Id.* ¶ 12). The results were transformative: Sally built friendships, began participating in programming, and felt comfortable for the first time. (*Id.* ¶ 13). Her ███████████████ improved markedly, (*id.* ¶ 14), and she █████████████████████████ ██████████████. Yet in ███████████, she was informed she would be transferred to a men's facility and was removed from general population and placed in segregation with other transgender women pending transfer. (Sally Doe Decl. ¶ 15). Following this news, BOP increased her mental health care level, placed her on ████████████████, (*id.*), and ███████████ ███████████████, (Dr. Gorton Decl. ¶ 38). From the time she was removed from general population in ████████ until she transferred to ██████████████████, Sally lived in constant fear and stress, overcome with severe anxiety every time she was called by BOP staff for any reason, believing it would be the day she was transferred to a men's facility (Sally Doe Decl. ¶ 16). ████████████████████████████

████████████████████████████████████

████████████████████████████ (Dr. Gorton Decl. ¶ 38).

Forcing Sally back into a men's facility would return her to the very environment in which she was harassed, mocked, and ostracized for years—an environment in which the Bureau's own psychologists recognized she was vulnerable to discrimination-based destabilization and from which they could not adequately protect her. (Sally Doe Decl. ¶ 17). The danger would be even greater now, because Sally has been housed in women's facilities ██████████████████ where she has been fully accepted as a woman, (*id.* ¶ 18), and after nearly ████████ of hormone therapy, her body has undergone pronounced physical feminization that would make her an even

bigger target than she was before, (*id.* ¶ 11). Both her widely known transfer history and her visible feminization would mark her as a target for predatory men skilled at identifying and exploiting transgender women transferred from women's facilities for sexual abuse. *See* (McLearen Decl. ¶¶ 23–28, ███. In addition, transferring Sally to a men's facility would expose her to increased harassment and discrimination in the community and creates serious mental health risks, including increased anxiety, depression, and gender dysphoria that could trigger suicidal ideation or self-harm. (*Id.* ███

The record likewise establishes BOP's deliberate indifference to Sally's serious medical needs. Hormone therapy is the only treatment that has meaningfully addressed her gender dysphoria, and no mental health care provider has ever informed her that other treatments could replace hormone therapy or fully treat her gender dysphoria without it. (Sally Doe Decl. ¶¶ 20, 22). Before her treatment, Sally experienced suicidal ideation, panic attacks, and hopelessness; since beginning hormone therapy, she has achieved stability, happiness, and positivity. (*Id.* ¶¶ 6, 14, 21). If the BOP were to move her to a men's facility and discontinue her hormone medication, the devastating consequences she describes—the loss of the only effective treatment for her gender dysphoria, and the reversal of years of psychiatric progress—strongly indicate, ███████

████████

████████ (*Id.* ¶¶ 6, 23–24; Dr. Gorton Decl. ¶¶ 41, 44). Indeed, Dr. Gorton opined ████████████

████████████

████████ (Dr. Gorton Decl. ¶ 44).

### xiv.    Lois Doe.

Lois is a transgender woman who has been on hormone therapy for years, which has resulted in significant feminization of her body, including breast development, softer skin, hair

growth, loss of muscle mass, and a different distribution of body fat. (Declaration of Lois Doe ("Lois Doe Decl.") ¶¶ 7, 10). Her physical changes make her an obvious and easy target for sexual violence in a men's facility. (McLearen Decl. ¶¶ 11–12, 19, 23). She was raped ███████ ███████████████████████████████████████████████ (Lois Doe Decl. ¶ 8). Following these assaults, she felt fearful and constantly checked her surroundings. (*Id.*). While housed in BOP men's facilities, she was also sexually harassed, catcalled, and threatened with violence. (*Id.* ¶ 14). These experiences of rape and sexual harassment further increase her risk of victimization if transferred to a male facility. (McLearen Decl. ¶¶ 19–21, 24).

Lois has been diagnosed with ██████████████████████████, (*id.* ¶ 11; Dr. Ettner Decl. ¶ 521), and with ██████ stemming from her sexual assaults, (Lois Doe Decl. ¶ 12). When she was housed in a men's facility, she told BOP psychologists that she was anxious all the time. (*Id.* ¶ 15). As Lois herself has stated, when she is pushed past her breaking point and becomes overwhelmed, she thinks about hurting herself. (*Id.* ¶ 22). If Lois loses her hormones and is sent to a men's prison, that will push her "far beyond that point." (*Id.*).

BOP has direct knowledge and appreciation of these elevated risks. A BOP doctor diagnosed Lois with gender dysphoria in ██████ and prescribed hormone medication, which she has taken continuously since that time. (*Id.* ¶ 9; ██████████████ BOP doctors also diagnosed her with ██████████████ upon her entry into custody. (Lois Doe Decl. ¶ 11). BOP psychologists have documented in her records that with her ██████████████, stressful situations make things much worse. (*Id.* ¶ 18). They are aware of her history of sexual assault and her elevated ██████ and fear in male housing. (*Id.* ¶ 21). In recognition of her vulnerability, the BOP granted her request for transfer and moved her to ██████████, a women's facility, in ██████████ (*Id.* ¶ 17). The results were transformative: Lois became more open and more

comfortable being herself, she is less fearful, and she had not experienced any sexual assaults or harassment. (*Id.* ¶ 18).

Yet after the EO was issued in January 2025, BOP told Lois she would lose her medical care and be moved to a men's prison. (*Id.* ¶ 19). She panicked and became extremely upset, (*id.*). Staff removed her from general population and placed her in the SHU for a weekend, telling her she would stay there until she was moved to a men's facility. (*Id.*). She paced the entire weekend in fear of going back to a men's facility. (*Id.*). She was referred for a suicide risk evaluation on ████████████, and BOP staff increased her mental health care level ███████ and placed her on a ███████████████ (*id.* ¶ 21), which was the very deterioration that BOP's own psychologists had predicted would result from transfers and SHU placement, (*id.*).

Forcing Lois back into a men's facility would return her to the very environment in which she was sexually harassed, catcalled, threatened with violence, and lived in constant "survival mode"—an environment in which she always felt like she had eyes on her and feared someone would attack her for being transgender. (*Id.* ¶ 14). It would return her to the type of setting where she was previously raped ██████ (*id.* ¶ 8), which puts her at high risk of revictimization as well as severe mental health deterioration, (McLearen Decl. ¶¶ 20, 24, 37–39, 42). The danger would be even greater now, because Lois has been housed in a women's facility since ████████████ and many people in the prison system already know it. (*Id.* ¶¶ 25–26). Further, after years of hormone therapy, her pronounced physical feminization—including her developed breasts—would make her what she herself describes as "a plaything" in the eyes of incarcerated men. (Lois Doe Decl. ¶ 20; McLearen Decl. ¶¶ 19, 23).

The record likewise establishes BOP's deliberate indifference to Lois's serious medical needs. The medications she takes for her ██████████████████ only treat those illnesses, (Lois

Doe Decl. ¶ 24; ███████████████; the only medication that helps her gender dysphoria is hormone therapy. (*Id.*). Hormone therapy has helped her feel much better and has changed both her body and her mood. (Lois Doe Decl. ¶ 25). Lois has stated that she is "not sure [she] could live without these medications," (*id.* ¶ 23), and is concerned that if her hormone therapy is abruptly stopped, her male characteristics will return, her mood will change, and it will impact the positive relationships she has built since starting hormone therapy. (*Id.* ¶ 25). Indeed, according to Dr. Ettner, ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ (Dr. Ettner Decl. ¶ 56).

The BOP's own actions confirm the seriousness of this risk: the mere announcement of potential transfer and loss of medical care triggered a suicide risk evaluation and an increase in her mental health care level. (Lois Doe Decl. ¶ 21). BOP staff noted this was done ███████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████ (Dr. Ettner Decl. ¶ 55). This strongly indicates, as opined by Dr. Ettner that ███████████████████████

███████████████ (*Id.* ¶ 57). As Dr. Ettner explained, ███████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████ (*Id.* ¶ 59; *see also* McLearen Decl. ¶ 41).

### xv.   Barbara Jones.

Barbara is a transgender woman who has lived as a woman for approximately ███ years and has been on hormone therapy since ███ treatment that has produced significant feminization

of her body, including breast development, reduced facial and body hair, softened skin, and feminine fat redistribution around her hips and thighs. (Declaration of Barbara Jones ("Barbara Jones Decl.") ¶ 8). Her physical changes make her an obvious and easy target for sexual violence in a men's facility. (McLearen Decl. ¶ 19). Barbara fears she "will be an easy target for harassment, abuse, and violence, including sexual assault" if transferred to a men's ████████ (Barbara Jones Decl. ¶ 19). She has been housed exclusively in women's facilities since ███. (*Id.* ¶ 14). Being transferred from ████████████████████████████ would expose her to increased risks of physical violence and sexual abuse, as well as worsening mental health and elevated risk of self-harm and suicidality. (*See* McLearen Decl. ¶¶ ████.)

Barbara has experienced gender dysphoria since childhood, describing the disconnect between who she was and how she presented to the world as causing "significant pain, frustration, and ████" (Barbara Jones Decl. ¶ 4). She has attempted to cut herself and attempted suicide on several occasions, and has had thoughts of castrating herself. (*Id.*). The ████ caused by her gender dysphoria has led to sleeplessness, hypervigilance, and panic attacks. (*Id.*). She was formally diagnosed with gender dysphoria by a psychiatrist in ████ (*id.* ¶ 7; ████████ ████ and her ████████ and self-harm continued when she was housed in men's prisons beginning in ████ (Barbara Jones Decl. ¶ 5). Psychotherapy and counseling to treat ████████ are not enough to treat her gender dysphoria; she also needs hormone therapy. (*Id.* ¶ 17). No mental health care provider has ever informed her that the psychiatric treatments she received could serve as a replacement for hormone treatments, nor that they could fully treat her gender dysphoria without further hormone treatment. (*Id.* ¶ 18). The only treatment that has proven effective is hormone therapy, which caused her mental health to improve significantly and eliminated her thoughts of castrating herself. (*Id.* ¶ 8).

BOP has direct knowledge of these elevated risks. Since being housed in women's facilities beginning in ▮▮▮ Barbara's self-esteem and mental well-being have improved, and she has not had any incidents of self-harm. (*Id.* ¶¶ 14–15). She feels safe in her current women's facility. (*Id.* ¶ 13). Barbara has stated that the prospect of being transferred to a men's facility has left her feeling hopeless, and that all of the progress she has made with her mental health in the last ▮▮▮ years would be ruined. (*Id.* ¶ 16; *see also* McLearen Decl. ¶¶ 38, 40, 42, 53).

The record likewise establishes BOP's deliberate indifference to Barbara's serious medical needs. Her record shows marked and sustained improvement of her gender dysphoria symptoms while receiving hormone therapy and living in women's facilities, and strongly indicates, as opined by Dr. Ettner, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dr. Ettner Decl. ¶ 67; *see also* McLearen Decl. ¶¶ 41, 53). Indeed, Dr. Ettner determined ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 68).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION.

On the irreparable harm prong, the Court of Appeals did not reject Plaintiffs' showing. It declined to affirm this Court's prior finding only because that finding lacked individualized factual findings for each Plaintiff. *Doe*, 172 F.4th at 918–19. Without plaintiff-specific findings linking each Plaintiff's characteristics to a heightened risk of harm, the court explained, it could not conclude that Plaintiffs would likely suffer irreparable harm. *Id.* The court nonetheless

acknowledged Plaintiffs' individualized theories and left the door open to relief on remand with proper factual development. *Id.* at 919. Plaintiffs have now supplied the evidence required by the Court of Appeals. This Court's prior conclusion—that the harms flowing from the Eighth Amendment violation are irreparable—therefore remains fully applicable and again supports a finding of irreparable harm.

Courts have consistently held that the serious and foreseeable threat of harm to transgender women housed in all-male facilities constitutes irreparable harm. *See, e.g.*, *Dennison*, 457 F. Supp. 3d at 686–88 (finding irreparable harm where plaintiff was physically endangered due to risk of sexual assault and threats); *Becker v. Sherman*, No. 16-0828, 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (finding reasonable fear of future harm for transgender woman based on past assaults and vulnerability in a male prison, despite experiencing periods without assault); *Lojan v. Crumbsie*, No. 12-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (holding that knowledge of an individual's transgender status was sufficient to alert defendants of vulnerability and need for protection).

Foreclosing medical access to hormone therapy constitutes a separate irreparable harm. Plaintiffs have been on hormone therapy for years, if not decades. As Drs. Ettner, Gorton, and Karasic opine, stopping hormone therapy would have severe detrimental effects on these Plaintiffs' physical and mental health. Courts have also found that denying medical treatment for gender dysphoria can lead to grave irreparable harms, including suicidal ideation, attempts, and self-harm. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (explaining that gender identity disorder, now known as gender dysphoria, is "a disorder that can be extremely dangerous," including leading to "self-mutilation"); *Adams v. Fed. Bureau of Prisons,* 716 F. Supp. 2d 107, 109 (D. Mass. 2010) (discussing the "risk of serious harm including depression, anxiety, self-

-61-

mutilation, and suicide"); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) (recognizing gender identity disorder, now known as gender dysphoria, as a "serious condition recognized by the medical community that frequently requires treatment," and can lead to suicidality); *see also, e.g.*, *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) ("there is no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages" where deprivation of treatment for gender dysphoria resulted in depression, suicidal ideation, and self-harm), *vacated and remanded on other grounds*, 122 F.4th 688 (7th Cir. 2024). Courts have, too, recognized irreparable harm where the plaintiff's health was in danger. *See Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm and granting preliminary injunction where plaintiffs alleged that they were "vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantanamo and weakened physical condition"); *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (finding irreparable harm and granting preliminary injunction cancer patient's "health and future remain[ed] in serious doubt" and insurance carrier refused to pay for life-saving treatment).

Finally, constitutional violations themselves constitute irreparable harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[A] prospective violation of a constitutional right constitutes irreparable injury."); *Costa v. Bazron*, 464 F. Supp. 3d 132, 156 (D.D.C. 2020) (finding that harm imposed by alleged Fifth Amendment violation was "itself irreparable" and granting preliminary injunction); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (finding that harm imposed by alleged First Amendment violation was "irreparable" and remanding district court's denial of a preliminary injunction).

### III. THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENT RELIEF.

The balance of equities and the public interest strongly favor Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (when the party opposing a preliminary injunction is the federal government, the final two factors merge). Simply put, enforcement of an unconstitutional policy is never in the public interest, *see Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020), when Plaintiffs face grave and irreparable harm—including a heightened risk of sexual violence, as well as self-harm and suicide—if they are transferred from women's to men's facilities or if their medical treatment is disturbed. This Court has previously concluded that:

> Plaintiffs have straightforwardly demonstrated that irreparable harm will follow if their TRO request is denied. This is so because "a prospective violation of a constitutional right constitutes irreparable injury . . . ." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). And this is to say nothing of the substantial harms that plaintiffs have plausibly stated, through affidavit, will follow if the plaintiffs are denied their hormone therapy.

> Moreover, the balance of the equities and the public interest favor the plaintiffs. Even if the Court credits the Executive Order's representation that housing biological males in female penitentiaries has some deleterious effect on privacy and security, by the defendants' own admission, there are only about sixteen male-to-female transgender women housed in female penitentiaries, including the plaintiffs. And the defendants have not so much as alleged that the plaintiffs in this particular suit present any threat to the female inmates housed with them, or that this threat cannot be managed locally by prison staff. Thus, the public interest in seeing the plaintiffs relocated *immediately* to male facilities is slight at best. And it is hard to cognize of *any* public interest in the immediate cessation of their hormone therapy—aside, perhaps, from whatever small sum of money the BOP may save by ceasing administration of these drugs, or the abstract interest in the enforcement of Executive Branch policy decisions. The plaintiffs' interests, on the other hand, are not abstract at all, as discussed above. The balance of the equities therefore favors a TRO so that the litigation may run its course.

*Doe*, 763 F. Supp. 3d at 89–90 (citations to the record omitted). The Court of Appeals did not disturb this Court's finding as to the balance of the equities and the public interest. And, in light of Plaintiffs' updated declarations and supporting evidence, the Court's prior conclusion is even more compelling.

## IV.    THE REQUESTED INJUNCTION MEETS THE PLRA'S REQUIREMENTS.

The requested injunction is narrowly drawn and extends no further than necessary to correct and prevent the harm to Plaintiffs that would result from implementation of the EO. 18 U.S.C. § 3626(a)(2). It prohibits Defendants from applying only the challenged sections of the EO and BOP's implementing memoranda, and it prohibits Defendants from doing so only as to Plaintiffs. It is also the least intrusive means necessary to correct this harm. BOP has no discretion under the EO to maintain Plaintiffs' housing in women's facilities, nor to continue Plaintiffs' necessary medical care. Thus, enjoining Defendants is the least intrusive action the Court could take that will ensure Plaintiffs are not deprived of their rights. Finally, the issuance of a preliminary injunction will have no adverse impact on public safety or the operation of the criminal justice system because the order will simply maintain the status of Plaintiffs' medical care and housing while the litigation proceeds.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an immediate Temporary Restraining Order enjoining Defendants from enforcing the EO and from transferring Plaintiffs to men's prison or halfway house facilities or depriving them of access to their current medical treatment for their gender dysphoria, pending full briefing and the Court's resolution of Plaintiffs' Motion for a Preliminary Injunction.

-65-

Dated: May 13, 2026

Respectfully submitted,

/s/ *Jennifer Fiorica Delgado*

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES &
DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ
RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com

*Pro Bono Counsel for Plaintiffs*