## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | Civ. A. No. 25-286 (RCL)<br><br>Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

BACKGROUND ............................................................................................................................4

I.      Executive Order 14,168 ............................................................................................4

II.     BOP's Designation Authority and Management of Trans-Identifying Inmates ........................4

III.    Factual Background ............................................................................................7

IV.     Prior Proceedings ............................................................................................8

LEGAL STANDARD ............................................................................................................................9

ARGUMENT ............................................................................................................................10

I.      Plaintiffs Have Not Shown a Likelihood of Success on the Merits. .......................................10

        A.      Plaintiffs Have Not Exhausted Their Administrative Remedies. .................................10

        B.      The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who
                Are Male Inmates, in Female Prisons. ............................................................12

                1.      *Plaintiffs fail the objective prong of the deliberate indifference test* ................................13

                2.      *Plaintiffs also fail the subjective prong of the deliberate indifference test* ..........................16

                3.      *Plaintiffs, individually, fail to establish deliberate indifference* ........................................21

II.     Plaintiffs Have Not Satisfied the Remaining Preliminary-Injunction Factors. .........................32

III.    The Relief Sought by Plaintiffs Would Violate the PLRA. .........................................35

CONCLUSION ............................................................................................................................36

**TABLE OF AUTHORITIES**

**CASES**

*Abdullah v. Obama*,
   753 F.3d 193 (D.C. Cir. 2014) ................................................................................9

*Alpine Sec. Corp. v. Fin. Indust. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (June 2, 2025)................................33

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ................................................................................25

*Bernier v. Allen*,
   38 F.4th 1145 (D.C. Cir. 2022) ................................................................................13

*Booth v. Churner*,
   532 U.S. 731 (2001) ................................................................................11

*Calhoun v. DeTella*,
   319 F.3d 936 (7th Cir. 2003) ................................................................................20

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ................................................................................32

*Citizens for Resp. & Ethics in Wash. v. FEC*,
   904 F.3d 1014 (D.C. Cir. 2018) ................................................................................32

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................33

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ................................................................................9

*\*Doe v. Blanche*,
   172 F.4th 901 (D.C. Cir. 2026) ................................................................................passim

*Does 1-26 v. Musk*,
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025)................................33

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................passim

*Finstuen v. Crutcher*,
   496 F.3d 1139 (10th Cir. 2007) ................................................................................33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................33

*Hange v. City of Mansfield*,
257 F. App'x 887 (6th Cir. 2007) ................................................................................................33

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .................................................................................................32

*Hatim v. Obama*,
760 F.3d 54 (D.C. Cir. 2014) ....................................................................................................34

*Irving v. Dormire*,
519 F.3d 441 (8th Cir. 2008) .....................................................................................................16

*Jones v. Bock*,
549 U.S. 199 (2007) .............................................................................................................. 10, 12

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) ..................................................................................................11

*Lakin v. Barnhart*,
758 F.3d 66 (1st Cir. 2014).......................................................................................................13

*McKune v. Lile*,
536 U.S. 24 (2002) ................................................................................................................ 20, 34

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) ............................................................................................ 32, 34

*Murphy v. United States*,
653 F.2d 637 (D.C. Cir. 1981) ..................................................................................................13

*Nken v. Holder*,
556 418, 434 (2009)), *cert. denied*, 145 S. Ct. 2778 (June 6, 2025) ........................................33

*Ross v. Blake*,
578 U.S. 632 (2016) ........................................................................................................... 1, 10, 11

*Samma v. Dep't of Def.*,
136 F.4th 1108 (D.C. Cir. 2025)...............................................................................................25

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ....................................................................................................9

*Shrader v. White*,
761 F.2d 975 (4th Cir. 1985).....................................................................................................13

*Turner v. Safley*,
482 U.S. 78 (1987) .....................................................................................................................34

*Vandevender v. Sass*,
   970 F.3d 972 (8th Cir. 2020) .................................................................................................13

*Wilson v. Seiter*,
   501 U.S. 294 (1991) ........................................................................................ 13, 16, 21, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................................9

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
   93 F.3d 910 (D.C. Cir. 1996) ..............................................................................................12

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) .............................................................................................32

## STATUTES

18 U.S.C. § 3621 .............................................................................................................. 4, 5, 20

18 U.S.C. § 3626 .....................................................................................................................35

42 U.S.C. § 1997e .............................................................................................................. 6, 10

## REGULATIONS

28 C.F.R. § 115.41 ...................................................................................................................5

28 C.F.R. § 115.42 ...............................................................................................5, 12, 18, 36

28 C.F.R. § 542.13 ...................................................................................................................6

28 C.F.R. § 542.14 ...................................................................................................................6

28 C.F.R. § 542.15 ...................................................................................................................6

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
   Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ........................................*passim*

## OTHER AUTHORITIES

BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, (Mar. 6, 2025),
   https://perma.cc/G43K-8BD8 ................................................................................................6

Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, & S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* at 2 (Feb. 21, 2025),
   https://perma.cc/J5K2-3NU5................................................................................................6

U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, (May 2013), https://perma.cc/RLB3-CY8Q.............................................................................................................13

**INTRODUCTION**

On January 20, 2025, President Trump issued Executive Order 14,168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO 14,168). Among other things, EO 14,168 directs the Federal Bureau of Prisons (BOP) to ensure that male inmates are not housed in women's prisons to protect female inmates' safety, privacy, and dignity.

Plaintiffs, who are 14 male trans-identifying inmates housed in women's facilities, sued and sought preliminary injunctions to block their transfer to men's prisons.[1] This Court preliminarily enjoined such transfers on the sole basis that Plaintiffs were likely to succeed in showing that their transfers to men's prisons would constitute cruel and unusual punishment in violation of the Eighth Amendment. On appeal, the D.C. Circuit vacated the preliminary injunctions because this Court's categorical finding as to Plaintiffs' potential harm was not sufficient to sustain the preliminary injunctions as to the particular Plaintiffs. *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026). Plaintiffs now seek another bite at the apple, mischaracterizing the fatal deficiency identified by the Court of Appeals as a "narrow procedural gap." Pls.' Mem. at 6 (ECF No. 117-1). This Court should deny their motion for a temporary restraining order or preliminary injunction.

*First*, Plaintiffs have failed to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA). The Supreme Court has made clear that exhaustion is mandatory, and Plaintiffs "do not deny that they sought no administrative relief before filing suit," *Doe*, 172 F.4th at 913–14. In *Doe*, the D.C. Circuit held that Plaintiffs' suit should be dismissed if Defendants can show that remedies were "available" to Plaintiffs to obtain "some relief." *Id.* at 914 (quoting *Ross v. Blake*, 578

---

[1]     After Plaintiffs filed their brief on May 13, 2026, Plaintiff Donna Jones was released from BOP custody (on May 15, 2026) and thus is no longer a proper Plaintiff and will not be discussed further.

U.S. 632, 642 (2016).   Defendants have made that showing now.   As explained by BOP's Administrator for the Correctional Services Branch, if Plaintiffs had grieved their transfers to a men's prison because of concerns about assault or harassment, BOP could have sought to lessen the risk of harm by transferring the inmate to a different men's facility with different risk factors, changing the inmate's cell assignment if the risk of harm involved his cellmate, or placing the inmate in a separate housing unit to keep potential threats away from the potential victim, among other remedial measures. BOP is entitled to have the first opportunity to assess any challenge to its ultimate determinations and to take appropriate actions.   Accordingly, Plaintiffs' failure to exhaust the available administrative remedies violates the PLRA.

*Second*, even if Plaintiffs could meet the threshold exhaustion requirement, they are unlikely to succeed on their Eighth Amendment housing transfer claim.  The Eighth Amendment's bar on cruel and unusual punishment prohibits the wanton infliction of pain caused by deliberate indifference to inmates' safety or serious medical needs.  Defendants plan to transfer all Plaintiffs not in half-way houses to either Federal Medical Center ("FMC") Rochester or Medical Center for Federal Prisoners ("MCFP") Springfield, both of which have a large number of nonviolent offenders with only minor infractions in their disciplinary histories.  Plaintiffs cannot show that their transfer to these medical centers would expose them to a significantly elevated risk of assault and meet the Eighth Amendment's high bar.  Ninety-nine percent of male trans-identifying inmates are currently housed in male prisons, including about 600 of them on cross-sex hormones, a fact that undermines Plaintiffs' claim that BOP cannot adequately protect trans-identifying inmates housed in male prisons.  Moreover, many male prison facilities in the federal system have very low rates of sexual assault; indeed, FMC Rochester has lower rates (0.014% assault rate [12 assaults in 2025] and zero substantiated sexual assaults in 2025) than almost all of the female facilities where Plaintiffs are currently housed, and MCFP Springfield similarly has very low assault rate (0.025%, 28 assaults in 2025) and only one substantial sexual assault

in 2025.  And Plaintiffs fail to account for measures BOP would undertake to ensure their safety in such facilities—as BOP has done with other trans-identifying inmates and even some Plaintiffs here. For these reasons, Plaintiffs cannot show that merely housing them in male prisons would expose them to objectively intolerable levels of risk or that BOP will not take reasonable measures to abate any such risks.

Fundamentally, Plaintiffs' theory proves too much.  Many male inmates face risks of sexual and other assault based on characteristics unrelated to trans-identifying status, such as their conviction offense, their sexual orientation, their status as government informants, their mental health, and even their physical stature and strength.  Under Plaintiffs' reasoning, BOP would violate the Eighth Amendment any time it assigns such individuals to a men's prison rather than a theoretically lower-risk female prison.  But the Eighth Amendment imposes no such requirement; nor does the Constitution require BOP to ignore female inmates' safety, privacy, or distress—especially for female inmates who have experienced domestic abuse and sexual assault from men.  The Court may not substitute its policy judgment for that of the Executive Branch in balancing the competing interests when making housing decisions.

*Third*, in addition to being unlikely to succeed on the merits, Plaintiffs have not demonstrated that the remaining preliminary injunction factors are satisfied.  The D.C. Circuit held that irreparable harm must be proven on an individual (not categorical) basis and each Plaintiff fails on this front.  *Doe*, 172 F.4th at 918.  Although Plaintiffs fear becoming possible victims of violence in male facilities, the record does not establish that any such victimization is certain or imminent at the Medical Referral Centers to which each Plaintiff will be transferred.  Moreover, preliminary relief would disrupt important Executive Branch policy judgments, disregard BOP's exercise of its expertise in the difficult and sensitive task of managing the federal prison system, and ignore the harm to female inmates' safety, privacy, and dignity from being housed with male inmates.

## BACKGROUND

### I.      Executive Order 14,168

On January 20, 2025, President Trump issued EO 14,168.  The Order declares that, as a result of "deny[ing] the biological reality of sex," "legal and other socially coercive means" have increasingly been used "to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women." *Id.* § 1. "Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being." *Id.*  The EO's purpose is thus to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.*  The Order directs that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2.  Further, "the Executive Branch will enforce all sex-protective laws to promote this reality." *Id.*  The Order also directs that it "shall be implemented consistent with applicable law." *Id.* § 8(b).

As to "[p]rivacy in [i]ntimate [s]paces" in particular, Section 4(a) of the Order requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act." *Id.* § 4(a).

### II.     BOP's Designation Authority and Management of Trans-Identifying Inmates

Decisions on classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b).  In making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau . . . that the Bureau determines to be

4

appropriate and suitable." *Id.* Additionally, "[t]he Bureau may at any time . . . direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

In designating inmates to a facility, BOP follows the applicable regulations under the Prison Rape Elimination Act (PREA). During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the assignment of trans-identifying inmates in particular, BOP "considers on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." Stover Decl. ¶ 21 (Ex. #1); *see* 28 C.F.R. § 115.42(c).

Previously, BOP used a specialized decisionmaking body to handle the placements of the trans-identifying inmate population. As BOP has explained in former guidance documents, this body—called the Transgender Executive Council—oversaw the initial facility designations of trans-identifying inmates, and "review[ed] all transfers" of trans-identifying inmates "for approval." Jan. 13, 2022, *Transgender Offender Manual*, at 4–6 (ECF No. 11-3). From May 2018 to January 2022, the guidance provided that in deciding the facility assignment for a trans-identifying inmate, BOP would "use biological sex as the initial determination for designation." May 11, 2018, *Transgender Offender Manual*, at 2 (ECF No. 11-2). The guidance further provided that "designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the [identified] factors." *Id.* In January 2022, BOP revised the guidance to state that in deciding the facility assignment for a trans-identifying inmate, the Transgender Executive Council would also consider the inmate's "current gender expression." ECF No. 11-3, at 6. Pursuant to EO 14,168, BOP has

rescinded this guidance and disbanded the Transgender Executive Council.[2]  Now, the Designation

and Sentence Computation Center makes the initial placement and transfer decisions for all trans-

identifying inmates, just as it does for the rest of BOP's inmate population.  BOP, Program Statement

5100.08, *Inmate Security Designation and Custody Classification*, ch. 1, at 1-3 (Mar. 6, 2025),

https://perma.cc/G43K-8BD8.

When trans-identifying inmates wish to raise concerns about their treatment in BOP custody,

like all other inmates, they must exhaust the administrative remedy available under BOP's

Administrative Remedy Program before bringing any legal action.  *See* 42 U.S.C. § 1997e(a) (PLRA

exhaustion requirement).  The program has four levels: aggrieved inmates must first attempt an

informal resolution with unit staff, then submit an administrative remedy request to the Warden, then

appeal to BOP's Regional Director, and then, if necessary, appeal to BOP's General Counsel.  *See* 28

C.F.R. §§ 542.13-.15.  An inmate must fully exhaust this multi-layer process.

For complaints regarding sexual assault and harassment, in particular, there are numerous ways

for inmates to report incidents.  "An inmate can write directly to the Warden, Regional Director or

Director" of BOP; file a Request for Administrative Remedy; or contact the U.S. Department of

Justice Office of Inspector General directly."  Roman Decl. ¶ 8 (Ex. #2).

BOP, however, does not merely wait to react to any such complaints.  Rather, staff are trained

to "identify predatory behavior indicators, and act swiftly to minimize the risk of harm to other

inmates."  *Id.* ¶ 10.  "BOP has a zero tolerance policy toward sexual abuse and sexual harassment,

and provides routine training to all staff to help detect incidents, perpetrators, and inmate victims of

---

[2]    The responsibility for trans-identifying inmate housing decisions was then briefly taken over by the Special Populations Oversight Committee, which has also since disbanded.  *See* Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, & S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* at 2 (Feb. 21, 2025), https://perma.cc/J5K2-3NU5.

sexually abusive behavior as well as instruction on how to properly and timely intervene." *Id.* ¶ 9. If staff ever have reason to believe that an inmate's safety may be jeopardized by placement in the general population, staff can issue separation orders, temporarily move the inmate to protective custody or restrictive housing to ensure inmate safety while determining how to properly protect the inmate going forward. *Id.* ¶¶ 10, 12. "Staff at each institution also regularly review the files of certain inmates, including those who present a threat to staff or institutional security, or pose a significant threat to inmate safety." *Id.* ¶ 14. "Staff review the file for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses, for the purpose of keeping the institution safe and secure." *Id.*

## III.    Factual Background

There were approximately 2,198 trans-identifying inmates housed in BOP facilities and halfway houses at the time of this suit. Stover Decl. ¶ 5 (ECF No. 24) (describing trans-identifying inmate population as of February 20, 2025). Of those, 1,488 were male inmates who trans-identify as female, and 710 were female inmates trans-identifying as male. *Id.* Of the 1,488 male trans-identifying inmates, 22 were housed in female institutions as of February 20, 2025. *Id.* That number is now down to 14 inmates (all of them are Plaintiffs here), five of whom are currently on the women's side of a halfway house, eight in women's prisons, and one in home confinement. Plaintiffs allege that, although their "birth sex" is male, they identify as female, take cross-sex hormones, and five of them (including the one in home confinement) have had cross-sex surgeries (*e.g.*, vaginoplasties and breast augmentation). *See Doe* 2d Am. Compl. (ECF No. 58-2); *Jones* Compl. (ECF No. 35); *Moe* Compl. (ECF No. 1).

Following the issuance of EO 14,168, BOP officials informed Plaintiffs that they would be transferred to men's facilities. This Court preliminary enjoined such transfers. Following the D.C. Circuit's reversal of this Court's decision, BOP again reviewed the housing placements for each

Plaintiff, taking into consideration the inmates' "unique medical record, psychology record, disciplinary record, and security level." Stover Decl.¶ 21.

Through that review, BOP determined that Plaintiffs should be assigned to either FMC Rochester or MCFP Springfield because "the inmate population at these medical centers are largely non-violent and tend to have only minor infractions in their disciplinary history." *Id.* ¶ 22. Specifically, BOP observed that the rates of sexual assault at the chosen facilities were low (in 2025, zero substantiated sexual assaults at FMC Rochester and one at MCFP Springfield). *See id.* ¶¶ 24, 26. And BOP noted that the selected facilities already housed other inmates who identify as female (including some receiving cross-sex hormones), thereby ensuring that the staff members at the facilities are experienced in managing and providing care to this population. *Id.* ¶¶ 25, 27. Moreover, these two medical centers "are able to provide appropriate treatment to these inmates." *Id.* ¶ 22; *see* Weidow Decl. ¶ 4 (Ex. #3). Specifically, "FMC Rochester is medical center for inmates requiring specialized or long-term medical or mental health care, while MCFP Springfield houses inmates requiring comprehensive medical or mental health care." Stover Decl. ¶ 22.

## IV.    Prior Proceedings

Plaintiffs brought three lawsuits against the Attorney General and the BOP Director, among others, challenging any transfer to male facilities and the alleged imminent cessation of certain medical treatment for their gender dysphoria.[3] Plaintiffs collectively assert that the relevant transfer provision of EO 14,168, BOP's implementation of that provision, and the anticipated transfer of Plaintiffs to male facilities would violate Equal Protection principles, the Eighth Amendment, the Rehabilitation Act, the Administrative Procedure Act (APA), and the separation of powers. *See Doe* Sec. Am. Compl. (ECF No. 58-2); *Jones* Compl. (ECF No. 35); *Moe* Compl. (ECF No. 1). Plaintiffs seek a declaratory

---

[3]    On May 21, 2026, the Court stayed Plaintiffs' challenge to the medical treatment provided to them because Plaintiffs are part of the *Kingdom* class, which is the subject of ongoing litigation. ECF No. 127; *see Kingdom v. Trump*, Civ. A. No. 25-691 (D.D.C.).

judgment that Section 4(a) of EO 14,168 violates Plaintiffs' legal and constitutional rights, damages and costs, and injunctive relief prohibiting the government from implementing Section 4(a) and requiring Defendants to maintain Plaintiffs' housing consistent with the status quo before January 20, 2025. *See Doe* 2d Am. Compl. (ECF No. 58-2); *Jones* Compl. (ECF No. 35); *Moe* Compl. (ECF No. 1).

Plaintiffs also moved for temporary restraining orders and preliminary injunctions, which this Court granted in February and March 2025, concluding that Plaintiffs were likely to succeed on their Eighth Amendment claims. *See Doe*, 172 F.4th at 909. The government appealed the preliminary injunctions, and because the PLRA limits any injunction to 90 days, the Court subsequently issued several new preliminary junctions while the appeal was pending. The D.C. Circuit recently vacated them and remanded for further proceedings. *Id.* at 901. Plaintiffs now again move for preliminary injunctive relief.

## LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (alterations in original) (citation omitted). "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.* (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)); *Winter*, 555 U.S. at 32. Plaintiffs have not done so here.

**ARGUMENT**

Plaintiffs are not entitled to preliminary injunctive relief on their Eighth Amendment housing transfer claims.

## I.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on criminal inmates in federal custody. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). Plaintiffs contend that transferring them to male prison facilities and housing them with other male inmates would violate that prohibition by subjecting them to threat of harm from their fellow inmates. This challenge is unlikely to succeed on the merits both because it is barred by the PLRA for failure to exhaust administrative remedies and because it fails to establish the substantive elements of an Eighth Amendment claim.

### A.    Plaintiffs Have Not Exhausted Their Administrative Remedies.

Plaintiffs have not satisfied the PLRA's mandatory exhaustion requirement by pursuing complaints regarding their transfer to male facilities through BOP's Administrative Remedy Program before bringing suit. The PLRA requires plaintiffs to exhaust their claims within prison remedial schemes before seeking judicial relief. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take [special] circumstances into account." *Ross*, 578 U.S. at 638–39 (2016).

"An administrative remedy is 'available' if it is 'capable of use to obtain some relief for the action complained of.'" *Doe*, 172 F.4th at 914 (quoting *Ross*, 578 U.S. at 642). A procedure is "available" even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take some action in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001). "Conversely, an administrative remedy is not available 'where the relevant administrative procedure lacks authority to provide any relief' such that it operates as 'a simple dead end.'" *Doe*, 172 F.4th at 914 (quoting *Ross*, 578 U.S. at 63).

The question therefore is not whether BOP's administrative scheme can give Plaintiffs the precise relief they seek in this litigation—to keep them in female prisons—but whether it provides no remedy at all. *Booth*, 532 U.S. at 736 n.4; *cf. Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (holding that exhaustion was not required where "BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to" the inmate's complaint). The exhaustion exception only covers circumstances where there is truly "no . . . potential" for "'any relief.'" *Ross*, 578 U.S. at 642–43 (contemplating circumstances where the office at issue "disclaims the capacity to consider" grievances and "'lacks authority to provide any relief,'" or as a factual matter "decline[s] ever to exercise" its authority). For example, in *Kaemmerling*, 553 F.3d at 675, an inmate challenged BOP's statutorily mandated collection of his DNA on religious grounds. The D.C. Circuit held that the inmate was relieved of the exhaustion requirement because the inmate could not obtain any relief from filing a grievance; BOP had "no discretion not to collect [his] DNA." *Id.* In other words, BOP could either collect the DNA and cause religious injury or not collect the DNA and cause no injury; there were no measures that BOP could take to offer "some relief" for plaintiff because of the nature of his claims.

Although the D.C. Circuit held that Defendants had not previously shown that administrative remedies were "available" to Plaintiffs, *Doe*, 172 F.4th at 914, Defendants make that showing now.

11

EO 14,168 directs BOP to ensure that male inmates are not housed in women's prisons to the extent consistent with law, but there are any number of actions that BOP can take to protect their safety in a male facility, including changes to housing and programming assignments, and protective custody. *See* 28 C.F.R. § 115.42.  In particular,  if Plaintiffs had grieved their transfers to men's prisons because of concerns about assault or harassment, BOP could seek to lessen the risk of harm by transferring them to a different men's facility with different risk factors, changing the inmate's cell assignment if the risk of harm involves his cellmate, or placing the inmate in a separate housing unit to keep potential threats away from the potential victim.  *See* Roman Decl. ¶ 6.  In light of BOP's ability to provide some relief that would alleviate the constitutional injury, this case is distinguishable from *Kaemmerling* and Plaintiffs are required to exhaust the administrative remedies.  And because exhaustion is "mandatory under the PLRA," Plaintiffs' housing transfer claims cannot proceed.  *Jones*, 549 U.S. at 211.

The Court should therefore dismiss Plaintiffs' suit on this basis.  At a minimum, the Court cannot preliminarily enjoin BOP from effectuating the transfers because Plaintiffs cannot overcome the threshold hurdle of exhaustion.

B.  <u>The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who Are Male Inmates, in Female Prisons.</u>

"[T]he segregation of inmates by sex is unquestionably constitutional." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996).  Under the Eighth Amendment's prohibition of "cruel and unusual punishments," prison officials must "take reasonable measures to guarantee the safety of the inmates," which includes "protect[ing] prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832–33 (citations omitted).  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828.  "To prove an Eighth Amendment violation based on deliberate indifference, a prisoner must

establish that (1) the conditions in which the prisoner is incarcerated pos[ed] a substantial risk of serious harm; and (2) prison officials knew of and disregarded an excessive risk to the prisoner's health or safety." *Doe*, 172 F.4th at 906 (citation modified). Thus, deliberate indifference "includes subjective and objective components," *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022); neither prong of that inquiry has been satisfied here.

### 1.    *Plaintiffs fail the objective prong of the deliberate indifference test.*

Plaintiffs have not demonstrated that merely being placed in either of the two medical centers housing male inmates that BOP has selected will subject them to an objectively substantial risk of serious harm.  For the level of risk to satisfy the first prong of this inquiry, it must be "'sufficiently serious'" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "[N]ot every risk carries an inherent threat at a substantial level, or of severity beyond the norms[.]" *Lakin v. Barnhart*, 758 F.3d 66, 72 (1st Cir. 2014) (Souter, J.); *see Murphy v. United States*, 653 F.2d 637, 644 (D.C. Cir. 1981) ("[A] prisoner has no right to demand the level of protection necessary to render an institution assault-free[.]").  To qualify as "substantial," the risk must be "pervasive": "violence and sexual assaults [must] occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020) (citation omitted); *see Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985) (similar); *Murphy*, 653 F.2d at 644-45 (similar).

Except for this Court's prior preliminary injunction ruling, Defendants are not aware of any federal court holding that the Eighth Amendment requires BOP to house trans-identifying inmates in opposite-sex facilities as a means of protecting them from the risk of assault.  This is not surprising because historically, the rate of sexual victimization is almost two-and-a-half times higher at federal female prisons (8.5%) than at federal male prisons (3.7%).  U.S. Dep't of Justice, Bureau of Justice

13

Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, at 15 (May 2013) (Table 5), https://perma.cc/RLB3-CY8Q (BJS Report); *see id.* at 54 (Appendix Table 2) (showing overall lower rates at federal facilities, with similar disparity between male and female facilities). Indeed, many male facilities in the federal prison system have very low rates of sexual victimization, *id.* at 48 (Appendix Table 1), including a number that "had no reported incidents of sexual victimization of any kind" when surveyed, *id.* at 15. It therefore does not matter that the statistics do not separate assaults against transgender inmates from overall assault rates. And the rates of assault at the two medical centers for male inmates to which Plaintiffs will be transferred are generally lower than the rates in the facilities where Plaintiffs are currently housed—sometimes by a substantial margin. Stover Decl. ¶¶ 24, 26, 28, 39, 43, 54, 58. The overall rates of assaults in these male facilities are so low (0.014% for Rochester [12 assaults in 2025] and 0.025% for Springfield [28 assaults in 2025]) that merely being housed there cannot reasonably give rise to an inference Plaintiffs would face a substantial risk of serious harm, not to mention that Rochester had zero sexual assault in 2025 and Springfield had only one.

Plaintiffs also cannot show that they have such "distinctive characteristics," *Doe*, 172 F.4th at 917, such that each Plaintiff faces an "objectively intolerable" risk of harm if placed in Rochester or Springfield, where there are other trans-identifying inmates, including some on cross-sex hormones, *Farmer*, 511 U.S. at 846. First, each Plaintiff argues that cross-sex hormones has feminized their appearance and it is this feminized appearance that subjects them to a significantly elevated risk of harm in men's facilities. According to Plaintiffs experts, "[t]he more a person is perceived as authentically female"—for example, based on physical appearance—"the greater the risk of sexual assault and violence." Ettner Decl. ¶ 33 (ECF No. 117-25). But Plaintiffs' argument assumes that Plaintiffs mere presence in men's facilities will prompt generally non-violent offenders to commit sexual assault against them. And it assumes that, despite already being able to manage some 1,500

14

trans-identifying inmates in men's prisons (including about 600 of whom are on cross-sex hormones just like Plaintiffs, Stover Decl. ¶ 5), BOP cannot adequately account for any potential increased risk to Plaintiffs.  Such speculations cannot meet the high bar for showing an Eighth Amendment violation.

Moreover, any residual risk Plaintiffs may face likely will be addressed by the application of BOP's new policy on treatment of inmates with gender dysphoria, Program Statement 5260.01, *Management of Inmates with Gender Dysphoria* (2026 Policy), under which Plaintiffs will receive an individualized hormone tapering plan that will eventually lessen Plaintiffs' feminine characteristics. 2026 Policy at 7–8 (discussing tapering plans that consider a variety of individual factors including duration the inmate has been receiving hormones).  According to Plaintiffs' own expert, Dr. Ettner, "individuals who have been feminized with female hormones and the suppression of testosterone will experience the reversal of physical changes, such as the loss of breast tissue, and a return of testosterone driven male features."  Ettner Decl. ¶ 25; *see also* Meade Decl. ¶ 5 (ECF No. 54-1) (discontinuing hormones will cause loss of breast tissue and feminine fat distribution).  In other words, the very characteristics that Plaintiffs say put them at risk in men's prisons will largely resolve once they are tapered off cross-sex hormones.

Plaintiffs heavily rely on their purportedly individual "vulnerabilities" (*e.g.*, small stature, depression, and old age), but these attributes do not suffice to show that moving them to male facilities would subject to them to an intolerable risk of harm.  Under Plaintiffs' reasoning, BOP would violate the Constitution any time it assigned to a male prison a male inmate who, statistically speaking, faces an elevated risk of sexual assault.  But many male inmates face risks of sexual or other assault in men's prisons based on their individual characteristics, such as their offense of conviction, sexual orientation, mental health, status as a government informant, age, and stature, among other characteristics.  *See* BJS Report at 18 (higher rates of inmate-on-inmate sexual victimization among non-heterosexual

15

inmates than heterosexual inmates); *id.* at 19–20 (higher rates of sexual assault among violent sex offenders than other offenders); *id.* at 24–26 (higher rates of sexual assault against inmates with severe psychological distress than inmates without mental health problems); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (observing that "an inmate who is considered to be a snitch is in danger of being assaulted or killed by other inmates" and collecting similar Eighth Amendment cases).  But none of these attributes would justify transferring a male inmate to a women's facility on the assumption that he is less likely to be sexually assaulted in such a facility.  The same is true for the male inmates at issue here: the Constitution does not require BOP to defer to their preferences when balancing competing interests of safety and security, including the safety and privacy interests of female inmates.  Plaintiffs' sweeping understanding of the Eighth Amendment is thus plainly incorrect.

Plaintiffs also contend that transfers to men's facilities will exacerbate their gender dysphoria because their social transition to becoming women will be hampered.  But, again, even assuming that this was medically true, this risk is no different from that faced by the approximately 600 male inmates who have been taking cross-sex hormones and are housed in men's facilities.  Such a risk is thus not "'sufficiently serious'" and "objectively intolerable."  *See Farmer*, 511 U.S. at 834, 846 (quoting *Wilson*, 501 U.S. at 298).  Additionally, as discussed below, BOP's placement decisions account for the possibility of the exacerbation of mental health symptoms as a result of the transfers and has taken measures to abate any harm.  *Infra* at 17–18.

### 2. *Plaintiffs also fail the subjective prong of the deliberate indifference test.*

Nor have Plaintiffs shown that BOP officials believe Plaintiffs will face a substantial, intolerable risk of harm if transferred to men's prisons such as FMC Rochester and MCFP Springfield.  This prong of the inquiry requires that prison officials "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Prison officials are not deliberately indifferent "if they responded reasonably to the risk,

even if the harm ultimately was not averted." *Id.* at 844. The requirement that officials ensure "reasonable safety" for inmates "incorporates due regard for prison officials' unenviable task of keeping dangerous men [or women] in safe custody under humane conditions." *Id.* at 844–45 (citation omitted).

Here, BOP specifically considered the risks to Plaintiffs of being housed in male facilities. *See* Stover Decl. In determining the most appropriate placement for Plaintiffs, BOP took into consideration the inmates' assigned security level, disciplinary record, medical record, and psychology record. Stover Decl. ¶ 21. Through that review, BOP determined that Plaintiffs should be assigned to FMC Rochester and MCFP Springfield because "the inmate population at these medical centers are largely non-violent and tend to have only minor infractions in their disciplinary history." *Id.* ¶ 22. Specifically, BOP observed that the rates of sexual assault at the chosen facilities were low (in 2025, zero substantiated sexual assaults at FMC Rochester and one at MCFP Springfield), *see id.* ¶¶ 24, 26, and that the overall rates of assault are often lower than at the female facilities where Plaintiffs are currently housed, *id.* ¶¶ 24, 26, 28, 39, 43, 54, 58. And BOP noted that the selected facilities already housed other inmates who identify as female (including some receiving cross-sex hormones), thereby ensuring that the staff members at the facilities are experienced in managing and providing care to this special population. *Id.* ¶¶ 25, 27.

Finally, to the extent Plaintiffs argue that the transfer will exacerbate their gender dysphoria symptoms, the two medical centers where Plaintiffs will be placed "are able to provide appropriate treatment to these inmates." *Id.* ¶ 22. Both facilities selected for Plaintiffs can meet their medical needs: "FMC Rochester is a medical center for inmates requiring specialized or long-term medical or mental health care, while MCFP Springfield houses inmates requiring comprehensive medical or mental health care." *Id.* As Dr. Weidow explained, FMC Rochester is able to provide "more psychological treatment options" compared to other facilities and the treatment available at MCFP

17

Springfield was "appropriate" too. Weidow Decl. ¶ 4. Dr. Weidow assessed each Plaintiffs' individual medical needs and determined that the selected facilities could adequately treat any worsening of symptoms, therapeutically and with psychotropic medications. *E.g.*, *id.* ¶¶ 14, 18, 20.

Not only have Plaintiffs failed to establish that BOP "kn[ew] that [Plaintiffs would] face a substantial risk of serious harm" if housed in a men's prison, *Farmer*, 511 U.S. at 847, once Plaintiffs are in particular male facilities, BOP will further consider safety concerns and how to minimize the risk of victimization "in making . . . housing and programming assignments." 28 C.F.R. § 115.42(c). BOP explained the many options it has if an inmate experiences unwanted sexual advance or threats to safety. Roman Decl. ¶ 7. "At the institutional level, once staff are notified of the threat, they can begin monitoring predatory inmates and issuing separation orders that notify staff to keep certain inmates away from one another, including not placing them in the same programs." *Id.* ¶ 10. BOP also "utilizes both protective custody and restrictive housing when a credible threat is identified but understands how to use these tools in manner that does not create a punitive condition for the potential victim." *Id.* ¶ 12. Indeed, the record already contains an example of how BOP reasonably responds to concerns raised by trans-identifying inmates in male facilities. Plaintiffs Rachel and Ellen Doe were transferred to a male facility before being added to this litigation. *See* 3/19/25 Order at 1– 2, ECF No. 68. While there, "Rachel Doe reported receiving a note that was sexual in nature from an unknown inmate." Associate Warden Decl. ¶ 10 (ECF No. 63-2). As a result, BOP Special Investigative Services began an investigation into the incident. *Id.* The investigation found "that Rachel did not feel threatened or concerned," and subsequently was "living in general population and attending recreation without issue." *Id.* ¶¶ 11–12. However, if the investigation had revealed a serious threat, BOP would have taken appropriate steps to protect Doe from harm, such as by separating Doe from the aggressor or otherwise initiating protective custody.

18

BOP officials thus have responded reasonably to the asserted risk at issue (even assuming it is an objectively substantial one), and Plaintiffs provide no reason to believe that BOP officials will not continue to do so.  Moreover, the requirement to ensure "reasonable safety" for male trans-identifying inmates—reflecting "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody,'" *Farmer*, 511 U.S. at 844-45 (citation omitted)—does not require BOP to eliminate the risks to such inmates entirely by ignoring other important institutional concerns, including protecting the security, dignity, and well-being of female inmates.  Accordingly, Plaintiffs cannot establish that BOP officials were subjectively aware of a substantial risk of harm to Plaintiffs and failed to take reasonable steps to abate that risk.

The fact that BOP have placed Plaintiffs in women's facilities does not prove that BOP is being deliberately indifferent by transferring them to men's facilities.  As the D.C. Circuit held, the record on appeal does not establish "whether safety concerns motivated each plaintiff's [previous] placement" in a women's facilities.  *Doe*, 172 F.4th at 918.  In fact, safety concerns did not motivate these placements.  BOP's prior decisions to house Plaintiffs in female facilities were not made because Plaintiffs were uniquely vulnerable and incapable of being safely housed in any male facilities.  BOP's prior policy allowed male inmates to be housed in female prisons if certain conditions are met, but such accommodation is to facilitate the inmates' being able to live as the opposite sex, not any safety concerns.  And, in granting requests to transfer to a women's facility, BOP considered a number of factors, including: "an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse," as well as "facility-specific factors, including inmate populations, staffing patterns, and physical layouts."  Jan. 13, 2022, Transgender Offender Manual § 5.  In some circumstances, Plaintiffs were placed in a women's facility because of BOP's previous practice of placing individuals in facilities consistent with their housing prior to

19

coming into BOP custody. Stover Decl. ¶¶ 43, 58. And some Plaintiffs were transferred to a female facility because they had requested cross-sex surgery and BOP's prior policy required them to be housed in a female facility for at least a year before being eligible for such surgery. *Id.* ¶¶ 29, 33, 38, 46, 49, 55, 65, 69. And others entered BOP post-vaginoplasty and were placed in women's facilities pursuant to BOP's prior policy that such inmates be processed as women. *Id.* ¶¶ 66, 67. BOP's previous determinations to house Plaintiffs in female facilities therefore do not reflect a judgment on the part of BOP that it would be unconstitutionally unsafe to house Plaintiffs in any male facility.

In any event, even if Plaintiffs had been housed in female facilities based purely on safety concerns, the Eighth Amendment does not bar BOP from revisiting those assignments and determining that different housing designations are appropriate. Plaintiffs' argument boils down to the extraordinary assertion that once BOP decides to house a male inmate in a female facility (for however long or for whatever reasons), it can never move that person to a male facility. But housing placements are not a one-way ratchet; BOP has substantial discretion over such determinations. *See* 18 U.S.C. § 3621(b). "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). In making such decisions, the Constitution does not require prison administrators to prioritize the safety of an individual prisoner over all other considerations. *See, e.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (no Eighth Amendment violation where the action challenged was taken for "a legitimate penological purpose."). BOP has a legitimate penological interest in the privacy, well-being, and security of female inmates. That BOP is now placing more weight on those interests when making housing assignments than it did in the recent past does not violate the Constitution.

###### 3.  *Plaintiffs, individually, fail to establish deliberate indifference*

Plaintiffs cannot show on an individual basis that they have "distinctive characteristics," *Doe*, 172 F.4th at 917, such that each Plaintiff faces an "objectively intolerable" risk of harm if placed in FMC Rochester or MCFP Springfield.  *Farmer*, 511 U.S. at 846.

#### Emily Doe

Emily Doe's history of assaults and suicidal behavior in men's prisons is insufficient to support his arguments of potential exposure to "sufficiently serious" and "objectively intolerable" harm if ED is transferred back to a men's prison, let alone that BOP drew the inference that he would be subject to such harm.  *Farmer*, 511 U.S. at 834, 846, 847 (quoting *Wilson* 501 U.S. at 298).  ED alleges assaults in men's facilities in 2009 and 2010—before he began "liv[ing] as a woman" and many years before he began cross-sex hormones in 2016.  Emily Doe Decl. ¶¶ 6, 7, 13, 15, 32.  ED lived in a men's prison for eight years after he began hormones but did not allege any assaults during that span.  *Id.* ¶¶ 13–19; Stover Decl. ¶ 47 (no substantiated reports of being victimized).  Also, while living in a men's prison for about 14 years, he had only one suicide risk assessment.  Weidow Decl. ¶ 30.

According to Plaintiffs' expert Dr. Ryan Nicholas Gorton, who did not examine ED, ED's use of hormones has diminished his "muscle mass and bone density."  Gorton Decl. ¶ 22 (ECF No. 117-18).  Dr. Gorton then speculates that such usage of cross-sex hormones "mak[e] [Doe] less able to physically protect [himself] and more vulnerable to coercion and abuse."  *Id.*  But this risk is no different from that faced by the approximately 600 male inmates who have been taking cross-sex hormones and are housed in men's facilities.  Indeed, after ED began taking cross-sex hormones, he was not assaulted, sexually or otherwise, despite being housed in a men's facility for another eight years.  Emily Doe Decl. ¶¶ 13–19; Stover Decl. ¶ 47.

Moreover, ED will be transferred to either FMC Rochester or MCFP Springfield, facilities with very low assault rates—lower rates than even the women's prison where ED is currently housed,

FMC Carswell.  Stover Decl. ¶ 24 (0.014% at FMC Rochester), ¶ 26 (0.025% at MCFP Springfield), ¶ 28 (0.026% at FMC Carswell).  And in 2025 FMC Rochester had zero substantiated allegations of sexual assault while MCFP Springfield had only one, *id.* ¶¶ 24, 26, just like FMC Carswell, *id.* ¶ 28. Importantly, BOP previously placed ED in a female facility because the now-rescinded Transgender Offender Manual required that an inmate seeking cross-sex surgery be housed with women for at least one year before being considered for surgery, and thus BOP's reason for placing him in a female facility was unrelated to any concern about keeping him safe in a male facility.  *Id.* ¶ 46.  It is therefore pure speculation that ED will face an objectively intolerable risk of harm.

Finally, under the 2026 Policy, ED will receive an individualized tapering plan to wean him off cross-sex hormones, and according to Plaintiffs' experts Drs. Ettner and Meade, ED will regain muscle mass and his feminine features will reverse.  Ettner Decl. ¶ 25; Meade Decl. ¶ 5.  ED's purported "distinctive characteristics" that he states will expose him to a great risk of harm in a men's prison will dissipate.  Tellingly, Plaintiffs' brief states that ED's declaration states that hormones have "irreversibly altered her physical appearance." Pls.' Mem. at 13 (citing Emily Doe Decl. ¶ 15).  ED's declaration does not say that.  *See* Emily Doe Decl. ¶ 15.  And Plaintiffs' expert says just the opposite—once tapering begins, ED "will experience the reversal of physical changes."  Ettner Decl. ¶ 25.

### Lois Doe

Lois Doe asserts that since he began taking cross-sex hormones, he has "developed breasts," his "skin has become softer" and "hair has grown," and he has "lost muscle mass and noticed a different distribution of body fat."  Lois Doe Decl. ¶ 10.  LD fears being sexually assaulted in male facilities because of these features.  *Id.* ¶ 14.  LD alleges being raped by a male cellmate after taking sleeping medication while in a state prison in 2015, *id.* ¶ 8, but as an inmate in BOP men's prisons from ▮▮▮▮▮▮▮▮▮, he does not allege any sexual assault, only that "sexual things" were said to him and that he was called "derogatory names."  *Id.* ¶ 14; *see also* Stover Decl. ¶ 56.  The risk LD asserts is

22

no different from the hundreds of male inmates taking cross-sex hormones and housed in male facilities, which risk will be adequately mitigated by BOP's placing him in either FMC Rochester or MCFP Springfield, both of which have largely non-violent offenders. As discussed above, the assault rates at FMC Rochester and MCFP Springfield are very low, including sexual assault. Stover Decl. ¶¶ 24, 26. And like ED, BOP previously placed LD in a female facility because of the former cross-sex surgery policy, not for safety reasons. *Id.* ¶ 55.

Moreover, LD acknowledges—consistent with Plaintiffs' experts—that if hormones are stopped, his "male characteristics will return." Lois Doe Decl. ¶ 25. Under the 2026 Policy, LD will receive an individualized tapering plan so the very characteristics LD asserts will expose him to a purportedly unreasonable level of risk will dissipate.

LD thus has not met his burden of making a clear showing of "'sufficiently serious'" and "objectively intolerable" harm if transferred to a men's prison, let alone that BOP knew about such a substantial risk. *Farmer*, 511 U.S. at 834, 846, 847 (quoting *Wilson*, 501 U.S. at 298).

**<u>Mary Doe</u>**

Mary Doe claims that cross-sex hormones "have resulted in [ ] significant breast development . . . , fat redistribution to [his] hips, increased hair growth on top of [his] head, decreased body and facial hair, decreased muscle mass, and softer facial features." Mary Doe Decl. ¶ 48. MD alleges rapes and sexual assaults in men's prison's—both before and after he began cross-sex hormones in 2015, *id.* ¶¶ 24, 28–33, but according to BOP records, these allegations were determined to be unsubstantiated following an investigation, Stover Decl. ¶ 50. And in any event, because the alleged assaults occurred both before and after MD began hormones, the claim that he is vulnerable to assault because of the "distinctive characteristics" relating to his use of cross-sex hormones is speculative. Importantly, BOP previously placed MD in a female facility because of the prior cross-sex surgery policy that required a showing that the male inmate could live among women successfully,

23

not for safety reasons. *Id.* ¶ 49. Of MD's ▮ suicide risk assessments while in BOP custody, half of them were after his transfer to a female facility, Weidow Decl. ¶ 42, so his claim that he will decompensate in a men's prison is also speculative. Also at female facilities, MD has been the subject of seven sexual abuse interventions as a perpetrator, with the last one being in ▮▮▮▮▮ Stover Decl. ¶ 51. BOP is concerned about "the continued safety of females housed with the inmate." *Id.* ¶ 53.

MD will be transferred to either FMC Rochester or MCFP Springfield, facilities with very low assault rates—lower rates than even the women's prison where he is currently housed, FMC Carswell. *Id.* ¶ 24 (0.014% at FMC Rochester), ¶ 26 (0.025% at MCFP Springfield), ¶ 28 (0.026% at FMC Carswell). Again, the risks MD faces at a men's prison is similar to other male inmates taking cross-sex hormones and any risk to him once transferred back to a male prison will be adequately mitigated by BOP. Moreover, as with other inmates on cross-sex hormones, MD will receive an individualized tapering plan pursuant to the 2026 Policy and his feminization will dissipate. Ettner Decl. ¶ 25; Meade Decl. ¶ 5.

### Olivia Doe

Olivia Doe similarly asserts physical changes from taking cross-sex hormones, including developing breasts, softer skin, and increased hair growth on the head, decreased muscle mass and changes in body fat distribution. Olivia Doe Decl. ¶ 30. Like other Plaintiffs, OD asserts that as a result of these changes to his physical appearances, he would be "an easy target for harassment, abuse, and violence, including sexual assault," if transferred to a men's prison. *Id.* ¶ 32. But again, the risk is similar to the 600 or so male inmates taking cross-sex hormones in male prisons. BOP's previous approval for OD to be housed in a women's facility was purely to facilitate his request for cross-sex surgery, not because of safety reasons in a men's prison. *Id.* ¶ 61. While OD does allege rape while in a male prison, *id.* ¶ 13, those allegations were investigated and determined to be unsubstantiated,

Stover Decl. ¶ 62.  Additionally, any elevated risk can be adequately mitigated by BOP through placement in an appropriate facility, as BOP is planning to do.  BOP determined that both FMC Rochester and MCFP Springfield would be appropriate placements because they are very safe, with low assault and sexual assault rates, and will be able to address OD's medical needs.  Stover Decl. ¶¶ 24, 26, 63.  Moreover, as explained above, under the 2026 Policy, OD will be tapered off cross-sex hormones, reversing the feminine characteristics.

OD also states that ██████████████████████████ (related to an experience in state custody many years ago before he began taking cross-sex hormones) makes him particularly vulnerable in a men's prison because he is "far less prepared to be aware of potentially dangerous situations." Gorton Decl. ¶ 31.  But such "vulnerabilities" surely do not require housing a male inmate in a women's prison under the Eighth Amendment because these disabilities are shared by some male inmates in male prisons.  Indeed, BOP's Medical Director has noted that the prison population has a much higher rate of comorbidities.  *See* Stahl Decl. ¶ 7 (*Kingdom v. Trump*, Civ. A. No. 25-691, ECF No. 187-3).

### Rachel Doe

Rachel Doe, who has received breast implants and undergone vaginoplasty and facial feminization surgeries, is on home confinement.  Rachel Doe Decl. ¶¶ 2, 9.  Because RD is out of prison and on home confinement, RD's claims about being transferred to a men's prison are moot as he "lack[s] a legally cognizable interest in the outcome" of the case.  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted); *see also Samma v. Dep't of Def.*, 136 F.4th 1108, 1113 (D.C. Cir. 2025).  Thus, there is no irreparable injury that preliminary injunctive relief would remedy.  In any event, during RD's incarceration in two different BOP men's prisons, RD alleges no assaults despite having had surgical interventions.  RD does allege sexual harassment via a note passed under the door,

"crude comments," and being whistled and stared at, Rachel Doe Decl. ¶¶ 14, 15, 18, but that is far from the type of serious and intolerably high risk of harm the Eighth Amendment protects against.

**Sally Doe**

Sally Doe entered BOP custody in ▮▮▮ and began receiving hormones at that time. Sally Doe Decl. ¶¶ 8, 9. SD was placed in a female facility "as part of the progression towards surgical intervention" and is "unrelated to any concern about keeping him safe in a male facility." Stover Decl. ¶ 65. SD has been living in a women's halfway house since ▮▮▮▮▮ *Id.* ¶¶ 16, 18.

SD claims to have breasts and a body that "looks more like a woman's body" after being on cross-sex hormones for merely four years. *Id.* ¶¶ 11, 24. While SD claims to be a possible target for sexual assault if returned to men's prison, he alleges no sexual assaults in the two years he was in two different men's prison in ▮▮▮▮ only that other inmates did not want him to sit in certain areas of the common room and that he was allegedly "misgender[ed]." *Id.* ¶¶ 8–10. Again, this is not the type of risk warranting Court intervention into BOP's placement decisions.

BOP will move SD from the female side to the male side of the ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ field office where he currently resides. *Id.* ¶ 64. BOP does not believe that this will expose SD to an intolerable risk of harm because the facility reported zero guilty findings for assault on inmates in 2024 and 2025. *Id.* Additionally, SD is already mixed with the males in the common areas of the facility and alleges no incidents of sexual assault. Finally, once the 2026 Policy is applied to SD to wean him off cross-sex hormones, "the reversal of physical changes," Ettner Decl. ¶ 25, will alleviate the very characteristics that he believes makes him a target in men's prison.

**Sara Doe**

After starting hormones and having cross-sex surgery in 2019, Sara Doe entered BOP custody in ▮▮▮ and has been housed in a women's prison due to BOP's previous practice of placing individuals in facilities consistent with their housing prior to coming into BOP custody. Sara Doe

26

Decl. ¶ 11; Stover Decl. ¶ 58.  He has presented no evidence of a risk of harm in a men's prison; being "frightened" of being assaulted and speculating that he will not be safe is not sufficient.  Sara Doe Decl. at ¶¶ 12, 14.  BOP has assessed that he will not be subjected to an unreasonable risk of harm at either FMC Rochester or MCFP Springfield because they are medical centers with a large population of nonviolent offenders and accordingly, very low assault rates.  Stover Decl. ¶¶ 24, 26.

**Wendy Doe**

Wendy Doe entered BOP custody after already having a vaginoplasty and was placed in a women's facility "pursuant to BOP's prior policy that such inmates be processed as women."  Stover Decl. ¶ 66.  WD currently resides in a halfway house that houses both men and women on separate sides with a common facility area.  Wendy Doe Decl. ¶¶ 10, 29.  WD is housed on the women's side but when in the common areas of the facility, he alleges experiencing nothing more than "inappropriate comments."  Wendy Doe Decl. ¶ 29.  BOP will place WD on the male side of the halfway house where he currently resides (███████████████████████████████ field office) and that halfway house reported zero substantiated sexual assault allegations in 2025 and two guilty findings for assaults on inmates over the last three years.  Stover Decl. ¶ 66.  It is purely speculative that WD would face an intolerably high risk of harm if transferred to the men's side of the halfway house or that BOP knew of any such risk.

**Zoe Doe**

Zoe Doe alleges being raped at age 16 in an adult men's state prison—almost 30 years before ZD began receiving cross-sex hormones.  Zoe Doe Decl. ¶¶ 5, 18, 19.  ZD entered BOP custody in ████ and remained in men's prisons for the next ██ years.  Although ZD alleges harassment and threats, he does not allege any sexual assaults.  *Id.* ¶¶ 11–28; *see also* Stover Decl. ¶ 31 (no substantiated reports of rapes or assaults during time in men's prisons).  BOP placed ZD in a female facility because the now-rescinded Transgender Offender Manual required that an inmate seeking cross-sex surgery

27

be housed with women for at least one year prior before being considered for surgery and because of a lawsuit related to that surgery, not for safety reasons in a male facility. Stover Decl. ¶ 29. ZD had vaginoplasty and breast augmentation surgery in 2023 and notes being particularly vulnerable because of his ███████████ and ███████████████████ Zoe Doe Decl. ¶¶ 13, 39.

BOP has determined that ZD can be appropriately housed in FMC Rochester, which has a lower assault rate (0.014%) compared to FMC Carswell (0.026%), where he is currently housed. *Id.* ¶¶ 24, 28. BOP determined that FMC Rochester is a particularly good fit for ZD because it is a Medical Referral Center that can serve his medical and mental health needs, including providing him with any required post-vaginoplasty care. *Id.* ¶ 30.

ZD thus cannot show that he faces an intolerable risk of harm if BOP transfers him to FMC Rochester or establish that BOP knew of such a risk by transferring him.

### Amy Jones

As with other Plaintiffs, Amy Jones alleges feminine features—breasts, bigger hips and thighs, lower muscle mass. *Id.* ¶ 39. AJ alleges being raped once while in a men's prison, but the ███████████ incident occurred either before he began taking cross-sex hormones seven years ago or very soon thereafter. Amy Jones Decl. ¶¶ 10, 39. Additionally, the alleged rape was unsubstantiated. Stover Decl. ¶ 41. AJ was placed in a female facility in ██████ as part of the process required for inmates seeking cross-sex surgery under an old policy. *Id.* ¶ 38. AJ was transferred to a women's halfway house in ██████ when he apparently underwent facial feminization and breast augmentation surgeries but not a vaginoplasty, but was returned to prison because of a "community programing violation." Amy Jones Decl. ¶¶ 31, 32, 39. AJ has been persistently suicidal in both men's and women's facilities, including ███ suicide risk assessments during a five-month period when housed in a women's facility. Weidow Decl. ¶ 33. Dr. Weidow opined that AJ's "mood instability and suicidal thinking and threats will continue regardless of [his] housing." *Id.* ¶ 36. BOP has determined that FMC Rochester is an

28

appropriate placement for AJ because it would serve his mental health needs and because of FMC Rochester's safety record, as explained above. Stover Decl. ¶¶ 24, 40. Moreover, pursuant to the 2026 Policy, AJ will be subject to a tapering plan, and he "will experience the reversal of physical changes," Ettner Decl. ¶ 25.

### Barbara Jones

Barbara Jones alleges having similar feminine characteristic as other Plaintiffs as a result of cross-sex hormones and fears becoming a target in male prisons because of those features. Barbara Jones Decl. ¶¶ 8, 19. But despite being housed in men's prisons from ▮▮▮▮▮▮▮▮▮▮ "openly identifying as a transgender woman [beginning] in ▮▮▮▮," and beginning cross-sex hormones in ▮▮▮ id. ¶¶ 6, 7, BJ alleges no sexual assaults against him in men's prisons. In contrast, BJ's records reflect four sexual abuse interventions in women's prison where he was the perpetrator, and as such, there are "significant concerns for continuing to house him with females." Stover Decl. ¶ 70.

BJ was placed in a female facility as part of the progression towards surgical intervention, per the now rescinded Transgender Offender Manual, not for safety reasons in a men's facility. *Id.* ¶ 69. BOP will place BJ on the male side of the halfway house where he currently resides (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ field office) and that halfway house reported only two guilty findings for assaults on inmates in 2025. Stover Decl. ¶ 68. BJ "expect[s] to be transferred to home confinement soon." Barbara Jones Decl. ¶ 2. BJ cannot plausibly claim an intolerably high risk of harm, let alone that BOP knew that he would be subject to such harm.

### Carla Jones

Carla Jones is ▮▮ years old and alleges the same feminine characteristics as other Plaintiffs as a result of receiving cross-sex hormones. Carla Jones Decl. ¶¶ 2, 14. CJ presents allegations of assaults in men's prisons before receiving hormones (last time 16 years ago); yet after he began hormones, he does not mention any more assaults despite remaining in men's prisons for another six years. *Id.* ¶¶ 7–

20.  BOP's record search did not reveal any investigations concerning sexual abuse in which CJ was the victim.  Stover Decl. ¶ 36.  BOP placed CJ in a female facility because of the cross-sex surgery housing requirement under the rescinded policy and because of a lawsuit about his surgery, not for safety reasons.  *Id.* ¶ 33.  As Dr. Weidow discussed, however, since entering a female facility in ██████ ████ CJ's mental health complaints have not resolved and indeed his suicide risk assessments have increased.  Weidow Decl. ¶¶ 11, 12.

BOP has determined that CJ can be appropriately housed at FMC Rochester, which has a lower assault rate than FMC Carswell, the women's prison where CJ is currently housed.  Stover Decl. ¶¶ 24, 28.  BOP determined that FMC Rochester is an appropriate placement because it is a Medical Referral Center that provides enhanced medical and/or mental health treatment for inmates and can serve CJ's medical and mental health needs (CJis classified at ████████████████████████ he has more intensive needs).  *Id.* ¶¶ 34, 35.  CJ accordingly cannot establish that he faces an intolerably high risk of harm if transferred to FMC Rochester, and that BOP knew of such harm.  Moreover, CJ "will experience the reversal of physical changes" once the hormone tapering pursuant to the 2026 Policy begins.  Ettner Decl. ¶ 25.

### Jane Jones

Like Wendy Doe, Jane Jones entered BOP custody after already having a vaginoplasty and was placed in a women's facility "pursuant to BOP's prior policy that such inmates be processed as women."  Stover Decl. ¶ 67.   JJ is currently in a women's halfway house, and besides five days in a Special Housing Unit, JJ has never been in a men's prison.  Jane Jones Decl. ¶¶ 9, 12, 13, 20, 27, 28. BOP will place JJ on the male side of the halfway house where he currently resides (████████████ ████████████████████████████ field office) and that halfway house reported one substantiated sexual assault allegation in 2025 and no guilty findings for assaults on inmates in either 2024 or 2025. Stover Decl. ¶ 67.  JJ nevertheless alleges that he is concerned for his safety if moved to a men's

facility, Jane Jones Decl. ¶¶ 26, 29, but that speculation is insufficient to show an intolerable risk of harm, let alone that BOP knew about any such risk.

### Maria Moe

Maria Moe alleges to have "the same characteristics as other women: breasts, lower muscle mass and strength, soft skin and a feminine voice." Maria Moe Decl. ¶ 23. Although MM claims to face potential sexual assault and harassment if moved to a men's prison, *id.* ¶ 24, that speculation again is insufficient to show an intolerable risk of harm. Importantly, MM has been housed in a female facility due to BOP's previous practice of placing individuals in facilities consistent with their housing prior to coming into BOP custody; that is, the placement was unrelated to any concern about keeping him safe in a male facility. *Id.* ¶ 43. While in female prison, there have been two sexual abuse interventions with MM as the perpetrator in both—the most recent in ███ *Id.* ¶ 44. In ███ MM, while in women's prison, was found to have ███████████████████████████ The charge was substantiated. *Id.*

BOP does not believe that MM will be subject to an intolerable risk of harm if housed at either FMC Rochester or MCFP Springfield because both facilities have low assault rates. Stover Decl. ¶¶ 24, 26, 45. Also, under the 2026 Policy, MM will receive an individualized tapering plan that will eventually "revers[e] physical changes" from the cross-sex hormones. Ettner Decl. ¶ 25.

\*       \*       \*

Thus, Plaintiffs have not clearly shown that placing them in a male facility will subject them to an objectively substantial risk of serious harm and that BOP is aware of any such risk, yet fails to protect Plaintiffs. *Farmer*, 511 U.S. at 834, 846. For this reason, Plaintiffs are unlikely to succeed on the merits of their claim, and their preliminary injunction motion should be denied on this basis alone.

31

**II.    Plaintiffs Have Not Satisfied the Remaining Preliminary-Injunction Factors.**

In seeking a preliminary injunction, Plaintiffs also have "the burden to show … that they are likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities, including the public interest, tips in their favor." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (citation modified); *see MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) ("If the government is the party sought to be enjoined, the public interest and balance of equities factors merge."). Plaintiffs have failed to establish those factors here.

Plaintiffs have not demonstrated that they will likely suffer irreparable harm from the transfer to male facilities. The D.C. Circuit has "set a high standard for irreparable injury": to qualify, an injury must be "both certain and great," "actual and not theoretical," "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (citation modified) (holding that the asserted injury was too "hypothetical" where challenged practice merely "reduce[d the] Appellants' *opportunities* for promotion"). As with the likelihood of success prong, Plaintiffs must make a clear showing of irreparable harm on an individual (not a categorical) basis. *Doe*, 172 F4th at 918.

Here, Plaintiffs fear that they will be the victims of violence and sexual abuse if transferred to male facilities. But they have not shown that any such physical harm is likely, much less certain, given that the vast majority of male trans-identifying inmates are currently housed in male facilities and BOP will take steps to minimize any risk to Plaintiffs by, among other things, transferring them to low-security institutions with non-violent offenders. The possibility that these specific Plaintiffs will be victimized in the low-security facilities that BOP has identified for their housing thus "fail[s] to rise beyond the speculative level." *Citizens for Resp. & Ethics in Wash. v. FEC,* 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Hanson v. District of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (per curiam) ("'[S]imply showing some *possibility* of irreparable injury' is not sufficient to make the

32

irreparable harm showing needed to obtain preliminary relief." (quoting *Nken v. Holder*, 556 418, 434 (2009)), *cert. denied*, 145 S. Ct. 2778 (June 6, 2025).

Although Plaintiffs seem to suggest that experiencing fear of potential victimization alone is an irreparable injury, such intangible and subjective allegations of harm are insufficient, *see Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *5 (4th Cir. Mar. 28, 2025) ("[S]ubjective fear that is remote and speculative is insufficient to show the required actual and imminent harm to establish irreparability."). As the Supreme Court has explained with respect to the analogous standing inquiry, "[i]t is the *reality* of the threat of repeated injury that is relevant . . . not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) ("'subjective apprehensions' that … recurrence [of feared conduct] would even *take place* were not enough to support standing" in *Lyons*); *see also Hange v. City of Mansfield*, 257 F. App'x 887, 893 (6th Cir. 2007); *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007). Plaintiffs' subjective, asserted fear of violence thus does not constitute irreparable injury.

Plaintiffs' failure to adequately establish that they will likely suffer irreparable injury is sufficient to deny preliminary relief. *See Alpine Sec. Corp. v. Fin. Indust. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) ("A movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction." (citation omitted)), *cert. denied*, 145 S. Ct. 2751 (June 2, 2025).

Additionally, as to the merged third and fourth factors, the Executive Branch interests at stake in ensuring the safety, privacy, and dignity of prisoners in federal custody outweigh Plaintiffs' speculative assertions regarding the possible risks of being housed in low-security male facilities. The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in

33

intimate spaces when they are in federal custody.  EO 14,168, §§ 1, 4.  And that determination is consistent with BOP's expert policy judgment.  Stover Decl. ¶ 23 ("It is BOP's correctional judgment that housing inmates according to their biological sex ensures bodily privacy and safety for all inmates and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships.").  Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons.  By contrast, forcing BOP to effectively "keep in place a [former housing policy] that no longer reflects its current . . . thinking . . . is not in the public interest."  *MediNatura*, 998 F.3d at 945.

A preliminary injunction would also impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy.  "Prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations."  *Turner v. Safley*, 482 U.S. 78, 89 (1987) (citation modified).  And "[i]t is well settled that the decision where to house inmates," in particular, "is at the core of prison administrators' expertise."  *McKune*, 536 U.S. at 39.  The D.C. Circuit has accordingly recognized the need to "accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (citation omitted).  It is not the prerogative of this Court to dictate the management of federal prisons or countermand the President's express judgment that the implementation of this housing policy is necessary to serve the public interest in protecting female inmates.

The harms incurred by BOP when courts meddle in prison administration are well illustrated here.  At the same time that BOP is defending the instant suit brought by male inmates who are seeking to enjoin BOP from transferring them to men's facilities, at least seven women from one of the women's facilities where some Plaintiffs are currently housed are seeking to have these males

34

moved elsewhere because they violate the women's bodily integrity and they are being subjected to cruel and unusual punishment by being housed with men. *Fleming v. Rule*, Civ. A. No. 25-157 (N.D. Tex.). On May 26, 2026, five plaintiffs sought a preliminary injunction to have the male inmates housed "in a segregated area." ECF No. 197. The court granted the preliminary injunction motion and ordered BOP and these plaintiffs to confer about the appropriate relief. *Id.* The threat of conflicting injunctions telling BOP where it can house certain trans-identifying inmates—and the difficulties that BOP has now experienced in managing that prison—highlights the harms when courts impermissibly interfere with prison administration.

The Executive Branch interests at stake thus clearly outweigh Plaintiffs' speculative assertions regarding the possible risks of harm from being housed in low-security male facilities such as FMC Rochester or MCFP Springfield.

## III.    The Relief Sought By Plaintiffs Would Violate the PLRA.

At a minimum, this Court should alter the preliminary injunction requested by Plaintiffs to comply with the requirements of the PLRA. The PLRA contains specific restrictions on the grant of "preliminary injunctive relief" "with respect to prison conditions." 18 U.S.C. § 3626(a)(2). Any such relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.*

Here, Plaintiffs seek an order enjoining BOP "from implementing Section[] 4(a) . . . of Executive Order 14168" against Plaintiffs and requiring BOP to "maintain and continue [Plaintiffs'] housing status in women's facilities." Proposed Order (ECF No. 117-29). To the extent the Court finds that Plaintiffs have demonstrated a sufficient threat of harm from fellow inmates in men's facilities, and that such harm "requires preliminary relief," there are "le[ss] intrusive means" of addressing that harm than ordering BOP to keep Plaintiffs in female institutions. *Id.* For instance, the Court could order BOP to undertake additional safety measures to protect Plaintiffs in men's

35

facilities, such as housing Plaintiffs "in a dedicated facility, unit, or wing." 28 C.F.R. § 115.42(g) (observing that BOP can "place . . . transgender . . . inmates in dedicated facilities" when such facilities are "established in connection with a . . . legal judgment for the purpose of protecting such inmates"). Where, as here, such less intrusive options are available, the PLRA requires the Court to narrow the scope of the relief requested.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order and preliminary injunctions on the housing transfer claims.

Dated: May 29, 2026                    Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General

                                       JEAN LIN
                                       Special Litigation Counsel

                                       /s/ *M. Jared Littman*
                                       M. JARED LITTMAN
                                       ELIZABETH B. LAYENDECKER
                                       Trial Attorneys
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington D.C. 20005
                                       Jared.littman2@usdoj.gov