**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................... ii

ARGUMENT ......................................................................................................................1

I.    THE GOVERNMENT MISREADS THE D.C. CIRCUIT'S STANDARD AND
      CANNOT INSULATE ITS DELIBERATE INDIFFERENCE FROM
      CONSTITUTIONAL REVIEW..............................................................................1

II.   THE GOVERNMENT'S ARGUMENT THAT BOP'S PRIOR PLACEMENTS
      WERE NOT MOTIVATED BY SAFETY CONCERNS DOES NOT DEFEAT
      THE EIGHTH AMENDMENT CLAIM. ...................................................................5

III.  PLAINTIFFS SATISFY THE EIGHTH AMENDMENT'S OBJECTIVE
      PRONG ON AN INDIVIDUALIZED BASIS. ..............................................................6

      A.   The Government's Statistical Arguments Are Analytically Flawed in
           Multiple Respects...............................................................................6

      B.   Plaintiffs' Individual Characteristics Satisfy the Objective Prong Across the
           Categories the D.C. Circuit Identified. ...................................................9

      C.   The Absence of a "Substantiated" Sexual Assault in a Men's Facility Does
           Not Mean There Is No Substantial Risk of Harm. ...................................12

IV.   PLAINTIFFS SATISFY THE EIGHTH AMENDMENT'S SUBJECTIVE
      PRONG.........................................................................................................13

      A.   The Executive Order-Mandated Nature of the Transfers Defeats the
           Government's "Reasonable Response" Defense........................................13

      B.   The Government's Psychiatric Evidence Confirms Awareness of the Risk. .........15

V.    THE GOVERNMENT'S EXHAUSTION ARGUMENT FAILS BECAUSE
      ADMINISTRATIVE REMEDIES ARE UNAVAILABLE TO REMEDIATE
      THE CONSTITUTIONAL VIOLATION PLAINTIFFS ALLEGE. ..............................15

VI.   MAINTAINING PLAINTIFFS' CURRENT HOUSING PLACEMENTS IS THE
      LEAST INTRUSIVE MEANS OF PREVENTING THE THREATENED
      CONSTITUTIONAL INJURY. ..............................................................................17

VII.  THE REMAINING PRELIMINARY INJUNCTION FACTORS STRONGLY
      FAVOR PLAINTIFFS. .......................................................................................18

      A.   Irreparable Harm..............................................................................18

      B.   Balance of Equities and Public Interest. ...............................................19

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comstock v. McCrary*,
273 F.3d 693 (6th Cir. 2001) ..................................................................................12

*Cope v. Cogdill*,
3 F.4th 198 (5th Cir. 2021) ....................................................................................12

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) .............................................................................19

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) .................................................................1, 2, 16, 18

*Doe v. Blanche*,
No. 1:25-cv-00286-RCL (Feb. 3, 2025) ................................................................14

*Doe v. Blanche*,
No. 1:25-cv-00286-RCL (Feb. 23, 2025) ..............................................................14

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ...................................................................10, 20

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) .................................................................................12

*Farmer v. Brennan*,
511 U.S. 825 (1994) ...................................................................................... *passim*

*Fleming v. Rule*,
Civ. A. No. 25-157 (N.D. Tex.) ..............................................................................20

*Fletcher v. Menard Corr. Ctr.*,
623 F.3d 1171 (7th Cir. 2010) ...............................................................................17

*Hampton v. Baldwin*,
No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) .............14

*Johnson v. California*,
543 U.S. 499 (2005) ...............................................................................................19

*Jones v. Blanche*,
No. 1:25-cv-00401-RCL (Feb. 22, 2025) ..............................................................14

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)........................................................................................15

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020).........................................................................................19

*Kingdom v. Trump*,
    No. 25-cv-691 ...................................................................................................................3

*Moe v. Trump*,
    No. 1:25-cv-00653-RCL (Feb. 5, 2025) ......................................................................5, 14

*Poe v. Dep't of Justice*,
    No. 1:26-cv-01552 (D.D.C. 2026).....................................................................................16

*Ross v. Blake*,
    578 U.S. 632 (2016).........................................................................................................16

*S.D. v. Rees*,
    No. 6:25-cv-01726-CL, 2026 WL 1146591 (D. Or. Apr. 28, 2026) .......................................14

*Talbott v. United States*,
    775 F. Supp. 3d 283 (D.D.C. 2025).........................................................................................19

*Talbott v. United States*,
    No. 25-5087, 2026 WL 1532205 (D.C. Cir. June 1, 2026) ................................................19–20

*Turner v. Safley*,
    482 U.S. 78 (1987).........................................................................................................19

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ...........................................................................................14

**Statutes**

18 U.S.C. § 3626(a)(2).................................................................................................................20

**Other Authorities**

28 C.F.R. § 115.42(c)...............................................................................................................5, 14

28 C.F.R. § 115.42(c)–(g)................................................................................................................16

28 C.F.R. § 115.42(d) ....................................................................................................................6

77 Fed. Reg. 37106 .......................................................................................................................18

U.S. Const. amend. VIII................................................................................................ *passim*

iii

BOP, Program Statement 5333.01, Sexually Abusive Behavior Prevention and
    Intervention Manual (Mar. 19, 2026) ...............................................................................11, 16

U.S. Gov't Accountability Off., GAO-26-107343, *FEDERAL PRISONS:*
    *Improvements Needed to Prevent, Detect, and Address Sexual Abuse* 35 (May
    2026) ...............................................................................................................................7, 16–17

The Government's opposition misreads the D.C. Circuit's remand instructions, mischaracterizes the record, and repackages the same categorical arguments the Circuit found insufficient and inapplicable in *Doe v. Blanche*. The Circuit did not require Plaintiffs to show risks unique to them alone; it required evidence of individualized vulnerabilities that expose each Plaintiff to a substantially elevated risk of harm. Plaintiffs have met that burden through plaintiff-specific medical records, documented histories, and expert testimony. Plaintiffs have also established irreparable harm, and the balance of equities and public interest overwhelmingly favor relief.

Defendants' exhaustion defense likewise fails because the Bureau of Prisons (BOP) cannot provide meaningful relief from the challenged transfers themselves. The Eighth Amendment[1] is not subject to executive override. Exhaustion is unavailable here because Defendants have conceded that no administrative grievance could result in BOP considering continued placement in a women's facility. Accordingly, the administrative remedy process cannot redress the constitutional injuries Plaintiffs allege from the transfer itself.

## ARGUMENT

**I.    THE GOVERNMENT MISREADS THE D.C. CIRCUIT'S STANDARD AND CANNOT INSULATE ITS DELIBERATE INDIFFERENCE FROM CONSTITUTIONAL REVIEW.**

Defendants' arguments fail for multiple reasons. First, Defendants ask this Court to misapply the law. The D.C. Circuit held that Plaintiffs' Eighth Amendment claims turn on their "particular vulnerabilities" to sexual violence and other serious harms in men's prisons. *Doe v.*

---

[1] In the event the Court finds the Eighth Amendment does not support the issuance of a preliminary injunction, Plaintiffs ask the Court to maintain the status quo for long enough to allow Plaintiffs to fully develop their alternate and independent legal grounds for relief under the equal protection component of the Fifth Amendment's Due Process Clause, the Rehabilitation Act, and the Administrative Procedure Act.

*Blanche*, 172 F.4th 901, 916–17 (D.C. Cir. 2026). Defendants largely ignore that instruction, repeatedly arguing that Plaintiffs face risks "no different from" the approximately 600 transgender women on hormone therapy currently housed in men's prisons. (Defendants' Opposition Brief ("Opp. Br.") at 16.) However, the relevant inquiry on remand is not whether some risks are shared by others; it is whether these Plaintiffs' individualized vulnerabilities expose them to a substantial risk of serious harm. *See Doe*, 172 F.4th at 906, 910, 918; *see also Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (a plaintiff can establish deliberate indifference based on risks "personal to him" as well as risks shared by "all prisoners in his situation").

Second, the Government ignores the record. Plaintiffs rely not merely on evidence that transgender women as a group face elevated risks in men's prisons, but also on individualized evidence of their own histories of sexual violence, suicidality, self-harm, and other vulnerabilities. Defendants have not established—and cannot establish—that these vulnerabilities are uniform among transgender women housed in men's BOP facilities. The Government's effort to treat Plaintiffs as indistinguishable from other incarcerated transgender women disregards both the record and the D.C. Circuit's instruction to focus on Plaintiffs' particular vulnerabilities.

Multiple Plaintiffs have also submitted evidence establishing that they have undergone long-term hormone therapy as well as surgical procedures, including vaginal, breast, and facial feminizing reconstructive surgeries. Yet, the Government repeatedly suggests that Plaintiffs' female characteristics, including breasts and female genitalia, are irrelevant to their risk of victimization in men's prisons. (*See, e.g.*, Opp. Br. at 15 (arguing that terminating hormone therapy will reduce Plaintiffs' risk); *id.* at 19–20 (asserting that BOP's prior practice of housing transgender women who have had genital surgeries in women's facilities was unrelated to safety).) That position is contradicted by both the record and common sense. Long-term hormone therapy,

vaginoplasty, and other feminizing surgeries place individuals at a "severe risk of harm in men's facilities." (McLearen Decl. ¶ 19.) Indeed, the Government concedes that feminine physical characteristics put transgender women at substantial risk of serious harm in men's prisons. *See* Opp. Br. at 15.[2] They offer no coherent explanation why that principle would cease to apply to Plaintiffs who, because of surgery and long-term hormone therapy, will continue to appear female even if they are subjected to an unconstitutional denial of continued medical treatment. *See infra* at 9–10.

The Government similarly ignores evidence of the distinct harms that flow specifically from transferring Plaintiffs *from* women's *to* men's prisons, a harm categorically different from the baseline experience of transgender women who have never left men's prisons. As Dr. McLearen explains, such transfers dramatically increase vulnerability to sexual victimization and will reactivate trauma and cause severe disorientation as individuals accustomed to the norms of women's facilities are thrust into the predatory environment of men's prisons. (McLearen Decl. ¶¶ 25–28, 37–42.) The fact of transfer from a women's facility itself would mark Plaintiffs as targets: that history would likely become known within receiving institutions through intake procedures and routine inquiries, and predatory men are likely to exploit individuals so identified. (*See id.* ¶¶ 25–26.) The Government's repeated comparisons to the transgender women in men's prisons miss the point entirely. Those individuals have spent their incarceration navigating men's prison culture and dynamics. Plaintiffs have spent years living as women among women, and some have never been housed in men's facilities. That difference is not incidental. It renders Plaintiffs uniquely vulnerable.

---

[2] *See also Kingdom v. Trump*, No. 25-cv-691, ECF No. 160-2, at 7 (Apr. 1, 2026) (BOP memorandum stating that individuals receiving feminizing hormone therapy "would inevitably become a target for abuse in the male facility").

Defendants also failed to counter, or even address, Dr. McLearen's key points. Dr. McLearen explained that the institutional culture of men's facilities is more violent than women's facilities and that the "severely elevated risks of sexual abuse" that transgender women face in men's prisons is "well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or PREA compliance." (McLearen Decl. ¶¶ 11–13.) Dr. McLearen also identified characteristics that would predictably make individual transgender women like Plaintiffs especially susceptible to violent victimization if transferred from women's to men's facilities. (*Id.* ¶¶ 19–28.) And she explained why the most vulnerable transgender women cannot be adequately protected in men's facilities. (*Id.* ¶¶ 43–50.) Serious risks of harm to transgender women exist in a prison setting as well as halfway houses, where residents are required to share bedrooms and other spaces in close quarters while receiving less oversight and monitoring from staff for threatening, violent, or abusive conduct. (*Id.* ¶¶ 51–53.)

Finally, Defendants conflate population-level statistics with the individualized constitutional analysis this Court is required to conduct. That some transgender women housed in men's prisons do not have documented sexual assaults says nothing about whether these Plaintiffs, with their specific histories, physical characteristics, and vulnerabilities, face a substantial risk of serious harm upon transfer. Nor is the Government's reliance on only official "guilty findings" a reliable proxy for actual victimization in prison settings. Under the Government's logic, no incarcerated person could ever establish an Eighth Amendment violation as long as someone else with at least some shared characteristics avoided documented harm. That approach is inconsistent with what the D.C. Circuit directed on remand.

II.     **THE GOVERNMENT'S ARGUMENT THAT BOP'S PRIOR PLACEMENTS WERE NOT MOTIVATED BY SAFETY CONCERNS DOES NOT DEFEAT THE EIGHTH AMENDMENT CLAIM.**

The Government's principal argument is that BOP placed Plaintiffs in women's facilities for reasons unrelated to safety—citing prior housing and medical care policies and ▮▮▮▮ ▮▮▮▮—and that those placements therefore say nothing about the risks Plaintiffs face in men's facilities. That argument fails for two independent reasons.

First, the policies referenced by Defendants make clear that BOP staff were *always* obligated to consider safety when determining the housing placements of transgender prisoners. *See, e.g.*, *Moe v. Trump*, No. 1:25-cv-00653-RCL, ECF No. 37-2 (Feb. 5, 2025) (BOP 2022 Transgender Offender Manual), at 6 (mandating that when determining the housing of transgender prisoners, the Transgender Executive Council ("TEC") must consider "factors including, but not limited to, an inmate's security level . . . medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse" and must also consider "the wellbeing of all inmates while exploring appropriate options available to assist with mitigating risk to the inmate"); *see also id.* (mandating that BOP staff must "consider on a case-by-case basis that the inmate [housing] placement does not jeopardize the inmate's wellbeing and does not present management or security concerns"); 28 C.F.R. § 115.42(c) (mandating that BOP "consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems" when determining whether to assign a transgender inmate to a facility for male or female inmates). Indeed, the Government concedes that BOP considered health and safety, including vulnerability to sexual victimization, as part of the determination. (Opp. Br. at 19 (admitting "vulnerability to sexual victimization" was a factor in granting requests for transfer to women's facilities).) At a minimum,

5

BOP was on notice of Plaintiffs' substantial risks of serious harm in men's facilities when it decided to place them in women's facilities.

Second, BOP's motivation for initially placing Plaintiffs in women's prisons is legally distinct from the constitutional consequences of each of their proposed transfers. The relevant question is not why BOP originally placed Plaintiffs in women's facilities, but BOP's awareness of the risks of transfer now. BOP has extensively documented Plaintiffs' substantial risks of serious harm in men's facilities, including through frequent mandatory PREA assessments, medical and psychological evaluations, investigations of past incidents, and other records. (*See* 28 C.F.R. § 115.42(d) (requiring twice-yearly reassessments of placements); *see also, e.g.*, Gorton Decl. ¶¶ 22, 58, 67; Karasic Decl. ¶ 46.) Proceeding with transferring Plaintiffs to men's facilities despite that knowledge satisfies the subjective-awareness component of deliberate indifference. In addition, Plaintiffs now face even higher risks if transferred to men's facilities based on their years of additional hormone therapy, years of adjustment to life in a women's facility, and for many, an irreversibly changed body due to surgery. (*See* Ettner Decl. ¶¶ 25–27, 37; McLearen Decl. ¶¶ 19, 23, 25–27, 38, 40.) Simply put, the constitutional analysis concerns the risk created by the transfer, not the reason for the prior placement.[3]

## III.    PLAINTIFFS SATISFY THE EIGHTH AMENDMENT'S OBJECTIVE PRONG ON AN INDIVIDUALIZED BASIS.

### A.    The Government's Statistical Arguments Are Analytically Flawed in Multiple Respects.

---

[3] The Government also mistakes the existence of a policy for its justification. Even if Plaintiffs were placed in women's facilities pursuant to preexisting BOP policies, that does not establish that safety concerns played no role. The relevant question is why BOP adopted a policy of housing post-surgical transgender women, and transgender women who had years of established medical care, with other women in the first place. The most obvious answer is that BOP recognized that housing individuals with female anatomy and secondary sex characteristics in men's prisons poses serious safety risks. The Government offers no answer to that question.

The Government now contends for the first time that two particular men's prisons are uniquely situated to safely house currently incarcerated Plaintiffs based on evidence of overall assault rates at those two facilities. (Opp. Br. at 2, 8.) The Government's assault-rate evidence is the load-bearing pillar of its opposition on the objective prong, (*see* Opp. Br. at 14), and it is unsound in multiple respects.

*The denominator problem.* These figures are calculated across the entire population of the destination facilities. The constitutionally relevant question under *Farmer* is not the mean risk across a facility but the specific, individualized risk to Plaintiffs given their distinctive characteristics. A facility-wide assault rate measures average risk to an average incarcerated man, which Plaintiffs decidedly are not, and says nothing about the risk to a small group of visibly feminized transgender women known to the existing population as transfers from a women's prison.

*The numerator problem.* The Government relies only on "substantiated" sexual assault figures—zero at FMC Rochester and one at MCFP Springfield in 2025. (*See* Opp. Br. at 8, 17.) But as Dr. McLearen explains, sexual assault in men's prisons is significantly underreported, and official substantiation rates do not capture the universe of abusive and violent conduct that actually occurs. (*See* McLearen Decl. ¶¶ 29, 33; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.)[4]

*The comparison problem.* The Government compares assault rates at the destination facilities to rates at the women's facilities where Plaintiffs currently reside, arguing men's prisons are safer. But this ignores the significant and uncontroverted differences in institutional culture

---

[4] *See also* U.S. Gov't Accountability Off., GAO-26-107343, *FEDERAL PRISONS: Improvements Needed to Prevent, Detect, and Address Sexual Abuse* 35 (May 2026), https://www.gao.gov/assets/gao-26-107343.pdf (detailing challenges with reporting and investigations); *id.* at 44 (noting inadequate staffing coverage and "shortage of investigators").

and dynamics that bear directly on how reports are made and how investigations are conducted in men's and women's facilities, as well as on Plaintiffs' specific risks. (McLearen Decl. ¶¶ 33–34.) More fundamentally, the relevant question is not the baseline rate at the destination facility but the dramatically elevated risk that each Plaintiff—as a newly arrived, visibly feminized transgender woman coming from a women's prison—would face there. That the Government advances this comparison at all underscores how far its analysis strays from reality.

*The representation problem.* The Government points to people with gender dysphoria already housed at the two destination facilities as evidence that staff are experienced in protecting this population. (Opp. Br. at 8.) But the Government's own numbers expose how hollow that claim is. FMC Rochester and MCFP Springfield each house four people *diagnosed with gender dysphoria*—and across both facilities combined, only one of those eight is even on hormones. (Stover Decl. ¶¶ 25, 27.) A diagnosis of gender dysphoria encompasses a wide range of presentations and says nothing about whether those individuals present similarly to Plaintiffs, who have undergone years of hormone therapy and, in several cases, extensive feminizing surgeries. Overall assault statistics from two facilities that together house one transgender woman on hormones cannot establish that Plaintiffs will be adequately protected in these facilities if they are transferred from women's facilities.

*The transfer problem.* The Government's statistics also ignore that the transfer itself is an independent source of risk. The fact of arriving from a women's facility would become known quickly within any receiving institution, (McLearen Decl. ¶ 26), especially given BOP's plan to transfer Plaintiffs in groups to just two facilities. This information would mark Plaintiffs as targets. (*Id.*) This dynamic is independent of any physical characteristic and operates regardless of Defendants' plan to unconstitutionally withdraw Plaintiffs' medical care.

Plaintiffs do not contend, as the Government suggests, that transferring a transgender woman from a women's to a men's facility can never be consistent with the Eighth Amendment. What the Eighth Amendment requires is an individualized assessment of the full risks attendant to any such transfer, including those unique to arriving at a men's prison from a women's facility. A transfer is not inherently unconstitutional; whether it is depends on the individual's particular vulnerabilities and whether officials have adequately accounted for the full constellation of risks.[5] The categorical policy challenged here, by which BOP refuses to even consider continued placement at a women's prison, does none of that. The precautions BOP has identified—facility selection, PREA policies, and reactive protective custody or other reactive measures if threats materialize—do not provide constitutionally adequate protection for the reasons Dr. McLearen establishes. (*See* McLearen Decl. ¶¶ 43–50.)

### B. Plaintiffs' Individual Characteristics Satisfy the Objective Prong Across the Categories the D.C. Circuit Identified.

In their individual declarations, and through the declarations of medical experts and Dr. McLearen, Plaintiffs have supplied the individualized showing the D.C. Circuit required. Unable to rebut those particularized risk factors, Defendants' opposition largely ignores critical characteristics common across Plaintiffs.

**Surgeries.** Several Plaintiffs have undergone vaginoplasty, breast augmentation, and/or facial surgeries. (*See, e.g.,* ███████████████████████████████████

---

[5] The Stover Declaration notes that ███████████████████, two individuals previously associated with this litigation, voluntarily requested transfers to men's prisons and have not reported sexual assaults. This evidence is not relevant to the constitutional analysis for the remaining Plaintiffs because the constitutional question is individualized. The experience of two individuals who voluntarily chose men's housing does not speak to the risk to others with different physical characteristics, different histories, different risk factors, and different profiles. The Government's evidence in this regard actually underscores the individualized inquiries required by the Constitution.

██████████████████████████████████████████████████.) Those surgeries create distinctive female physical characteristics that cannot be concealed in institutional settings involving searches, medical examinations, shared sleeping areas, and communal showering. As such, even an unconstitutional tapering or termination of hormone therapy will not reduce their risk of sexual victimization, and will compound the other serious risks of mental health decompensation, self-harm, and suicidality they will face after transfer. (*See* Ettner Decl. ¶¶ 24–27; McLearen Decl. ¶¶ 19, 23, 41–42.)

**Long-term hormone therapy producing pronounced and irreversible feminization.** For Plaintiffs who have not had surgery, years or decades of hormone therapy have produced significant physical feminization including breast development, redistribution of body fat, softening of skin, and reduction of muscle mass. The Government incorrectly argues these characteristics will reverse with withdrawal of hormone treatment. Plaintiffs will continue to retain female physical characteristics during the tapering process and after termination of medical care. (*See* Supplemental Declaration of Randi Ettner ("Ettner Supp. Decl.") ¶¶ 12–13.) In addition, Plaintiffs would be maximally vulnerable during any transition period—precisely when the Government proposes their transfers. Further, even if termination of medical care could reduce Plaintiffs' risk of victimization in custody, that simply compounds the constitutional harms. This Court has repeatedly held that withdrawing Plaintiffs' hormones would likely violate the Eighth Amendment. *See, e.g.*, *Doe v. McHenry*, 763 F. Supp. 3d 81, 89–90 (D.D.C. 2025). The Eighth Amendment does not permit prison officials to respond to one constitutional injury by imposing another.

**Documented histories of sexual assault and serious harassment in male facilities.** Several Plaintiffs have reported sexual assaults, violence, or serious harassment in men's prisons.

10

(*See, e.g.,*

) The Government ignores pervasive sexual harassment and threats of harm, but Dr. McLearen explained that prior experiences of sexual harassment in male correctional facilities "indicate[s] a high risk of victimization." (McLearen Decl. ¶ 21.) Moreover, the Government's classification of these reports as "unsubstantiated" does not mean they did not occur.[6] These documented histories are relevant to the objective prong as evidence of prior exposure to institutional predation and as indicators of the type of targeted vulnerability these Plaintiffs will experience if transferred to men's prisons.

**Severe mental health vulnerabilities linked to housing conditions and treatment status.** Several Plaintiffs have documented histories of suicidality and self-harm that are specifically connected to housing conditions and the status of their gender dysphoria treatment. (*See, e.g.,*

---

[6] "Unsubstantiated" allegations mean the investigation was inconclusive. *See* BOP, Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, at 9 (Mar. 19, 2026), https://perma.cc/SZ62-WKGR. The government conflates "unsubstantiated" with "false" throughout its brief and declarations, artificially deflating reported assault figures at proposed destination facilities and systematically undercounting actual sexual violence against Plaintiffs. (*See generally* McLearen Decl. ¶¶ 29–36.) At the same time, without even acknowledging that they were unsubstantiated, Mr. Stover refers to numerous PREA investigations and "sexual abuse interventions" regarding Plaintiffs as either victims or alleged perpetrators. (*See, e.g.*, Stover Decl. ¶¶ 41–42, 44, 47, 50–51, 62, 70.) Regarding allegations about Plaintiffs as alleged perpetrators, Mr. Stover does not claim that *any* such investigations were substantiated by the BOP, and no document has been produced by Defendants that even remotely suggests that. Mr. Stover nevertheless claims the BOP is either "concerned" or has "significant concerns" continuing to house ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in women's prisons. (*Id.* at ¶¶ 53, 70.) The Court should disregard these statements by Mr. Stover, which are wholly unsupported. Indeed, even after Plaintiffs' counsel asked for the specific documents purportedly supporting some concern about ▮▮▮▮▮▮▮▮▮▮, Defendants failed to produce any such documents.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ ) The risk of serious self-harm and suicide constitutes a sufficiently serious harm to implicate the Eighth Amendment. *See, e.g.*, *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797–98 (9th Cir. 2019); *Comstock v. McCrary*, 273 F.3d 693, 703–04 (6th Cir. 2001). The Government's own psychiatric expert, Dr. Weidow, acknowledges that worsening of psychological symptoms following transfer is foreseeable for multiple Plaintiffs and that increased interventions would be required. (*See* Weidow Decl. ¶¶ 18, 20, 23–24, 26, 31, 38–40.) Indeed, Defendants' choice of two medical facilities demonstrates their knowledge that these transfers will create medical and mental health crises that are avoidable. These acknowledgments are not rebuttals to the Eighth Amendment claims; they are concessions that foreseeable and serious harm will occur. This is the definition of deliberate indifference.[7]

### C.    The Absence of a "Substantiated" Sexual Assault in a Men's Facility Does Not Mean There Is No Substantial Risk of Harm.

The Government argues repeatedly that certain Plaintiffs were housed in men's prisons for extended periods without documented assault, implying they can safely be housed there again. This argument is fatally flawed because the Government conflates the absence of prior documented harm with the absence of substantial risk. The Eighth Amendment is violated by exposure to a

---

[7] The connection between hormone deprivation and housing risk is directly relevant to the housing-based Eighth Amendment claim even setting aside the independently viable medical care theory. Multiple expert declarations establish that discontinuation of hormone therapy in a men's prison setting would worsen gender dysphoria symptoms, increase psychological distress, heighten the risk of self-harm and suicidality, and worsen the mental health vulnerabilities that themselves constitute part of the objective harm the housing claim addresses. (*See, e.g.*, Ettner Decl. ¶¶ 48, 56, 65, 75; Karasic Decl. ¶¶ 33, 49, 67; Gorton Decl. ¶¶ 20, 23, 30, 43–44, 48, 63, 76, 79, 87.) The Government's plan to simultaneously transfer Plaintiffs to men's prisons and initiate hormone termination is not two separate policy decisions with separate constitutional implications. It is a compounded constitutional violation whose combined effects Drs. McLearen, Ettner, Gorton, and Karasic identify as predictably causing grave harm.

12

substantial risk of harm, not only by the occurrence of actual harm. *Farmer*, 511 U.S. at 845. Thus, the absence of a prior assault establishes only that the risk did not materialize at that time—not that the risk was constitutionally acceptable.

In addition, Plaintiffs' current circumstances are materially different from those during any prior period of incarceration in men's facilities. They have adjusted to life in women's facilities. (*See* McLearen Decl. ¶¶ 25, 27, 38, 40.) Many have undergone additional years—or decades—of hormone therapy and, in several cases, feminizing surgeries that postdate their prior confinement in men's prisons. (*See* Ettner Supp. Dec. ¶ 12 ("Transgender women who have been on longstanding hormone therapy will not present as typically male upon transfer to a male facility if their hormones have been discontinued. They will retain visible feminizing characteristics, including breast tissue, that will be immediately apparent to other inmates and that will mark them as targets for sexual harassment, exploitation, and assault.").) And Plaintiffs now carry the unique vulnerability associated with being transferred from women's facilities, a risk that did not exist during their prior incarceration in men's prisons. (*See* McLearen Decl. ¶¶ 25–26, 28.) The constitutional question concerns the risks Plaintiffs face *today*, not past risks.

## IV.    PLAINTIFFS SATISFY THE EIGHTH AMENDMENT'S SUBJECTIVE PRONG.

### A.    The Executive Order-Mandated Nature of the Transfers Defeats the Government's "Reasonable Response" Defense.

The Government argues that BOP responded reasonably by selecting FMC Rochester and MCFP Springfield because they each have comparatively low assault rates and house a handful of individuals with gender dysphoria. Even if that were true, it mistakes the inquiry required under *Farmer*. The question is not whether BOP selected the safest available *men's* prison. It is whether transferring Plaintiffs to any men's prison, despite documented knowledge of their individualized vulnerabilities, is a reasonable response to a known substantial risk of harm. The Stover

Declaration confirms that BOP's remand review was limited to selecting among men's facilities, not determining whether placement in a men's facility is constitutionally appropriate. That is not a reasonable response to a known risk; instead, it is compliance with a categorical mandate that forecloses the individualized judgment *Farmer* requires.[8]

The Government's claim that the categorical exclusion of transgender women from women's facilities reflects "BOP's expert policy judgment" is unsupported by the record. (Opp. Br. at 34.) The first four declarations submitted by Stover in these cases never identified any independent correctional judgment requiring housing based solely on "biological sex." *See Moe*, No. 1:25-cv-00653-RCL, ECF No. 37 (Feb. 5, 2025); *Jones v. Blanche*, No. 1:25-cv-00401-RCL, ECF No. 24 (Feb. 22, 2025); *Doe v. Blanche*, No. 1:25-cv-00286-RCL, ECF Nos. 11 (Feb. 3, 2025), 52 (Feb. 23, 2025). That is because BOP's categorical policy derives entirely from Executive Order 14168, notwithstanding its direct conflict with PREA's requirement of individualized placement decisions, 28 C.F.R. § 115.42(c), and BOP's own prior policy. Further, the Government offers no evidence supporting its purported correctional judgment and no evidence that Plaintiffs—simply because they are transgender—threaten the safety, privacy, or dignity of other women. And it cannot do so. As Dr. McLearen explains, transgender status alone "does not indicate that an individual presents a risk to others and does not raise management or security concerns." (McLearen Decl. ¶ 18.)

---

[8] *See, e.g.*, *S.D. v. Rees*, No. 6:25-cv-01726-CL, 2026 WL 1146591, at *14–15 (D. Or. Apr. 28, 2026) (enjoining a "a categorical default placement of transgender women in men's prisons" on Eighth Amendment grounds); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *17 (S.D. Ill. Nov. 7, 2018) (enjoining categorical housing policy based on birth sex, requiring prison to consider placement in a women's facility based on individualized assessment, and reserving ruling on whether transfer to women's facility was constitutionally required); *see also Williams v. Kincaid*, 45 F.4th 759, 779 n. 11 (4th Cir. 2022) (stating that categorically housing transgender people "based solely on their genitalia *affirmatively subjects them to increased risks of harm*" (emphasis in original)).

### B.    The Government's Psychiatric Evidence Confirms Awareness of the Risk.

The Government's psychiatric evidence confirms, rather than refutes, BOP's awareness of the risk to Plaintiffs. Dr. Weidow does not dispute that transfer may worsen Plaintiffs' gender dysphoria, increase psychological distress, or trigger self-harm and suicidal ideation. And Stover admits that BOP reviewed Plaintiffs' psychological records before selecting FMC Rochester and MCFP Springfield. (Stover Decl. ¶ 21.) Instead, Defendants argue that those facilities are equipped to manage the resulting and known deterioration. That argument concedes the critical point: BOP's response did not determine whether transfer would expose Plaintiffs to a substantial risk of serious harm, but merely identified facilities purportedly capable of treating the foreseeable and avoidable consequences of that harm after it occurs. A prison official does not respond reasonably to a known substantial risk by deliberately creating the risk and then promising treatment afterward. The Government's evidence therefore establishes subjective awareness of the risk, not the absence of it. (*See* Ettner Supp. Dec. ¶ 11 ("A male facility with access to a psychiatrist does not resolve the physiological consequences of hormone withdrawal, the re-emergence of gender dysphoria, the trauma-related harm of placement among male inmates, or the substantially elevated risk of victimization that feminized transgender women face in male facilities.").)

### V.    THE GOVERNMENT'S EXHAUSTION ARGUMENT FAILS BECAUSE ADMINISTRATIVE REMEDIES ARE UNAVAILABLE TO REMEDIATE THE CONSTITUTIONAL VIOLATION PLAINTIFFS ALLEGE.

The Government still cannot establish an available administrative remedy. As to the exacerbation of gender dysphoria and related mental health harms that will result from transfer, this case "is on all fours with *Kaemmerling*," as the D.C. Circuit already held. *Doe*, 172 F.4th at 914 (citing *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008)). The Government's reliance on mental health services at FMC Rochester and MCFP Springfield merely repackages

the argument the Circuit rejected. The constitutional injury is the transfer itself and the resulting exacerbation of Plaintiffs' gender dysphoria, not the absence of treatment after the fact.

Nor do Defendants identify any remedy capable of preventing the substantial risks of physical and sexual violence attendant to transfer. (*See* McLearen Decl. ¶¶ 49–50.) Instead, they rely on general safety policies already rejected as inadequate by the D.C. Circuit. *See Doe*, 172 F.4th at 914. Defendants also point to possible housing adjustments, separation orders, and protective custody—measures available only after Plaintiffs have already been transferred and subjected to substantial risks of serious harm. (*See* McLearen Decl. ¶¶ 45–48.) But the Prison Litigation Reform Act ("PLRA") requires a remedy capable of providing "some relief for the action complained of." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Here, the challenged action is the transfer itself, and BOP lacks authority to prevent or reverse it. *Doe*, 172 F.4th at 914.

The Government's reliance on PREA regulations as an available remedy is doubly misplaced because the Department of Justice has directed facilities not to follow PREA provisions that conflict with Executive Order 14168. (*Compare* Opp. Br. at 5, 12, 18 (citing 28 C.F.R. § 115.42(c)-(g)), Roman Decl. ¶¶ 8, 10, *and* Stover Decl. ¶ 21 (suggesting BOP has complied with 28 C.F.R. § 115.42(c) in conducting its most recent assessments), *with* Ex. 1 to Complaint at 5, *Poe v. Dep't of Justice*, No. 1:26-cv-01552 (D.D.C. 2026), ECF No. 1-1 (Department of Justice memorandum stating that facilities should "disregard" PREA regulations that refer to transgender people), *and* BOP Program Statement 5333.01, *supra* note 6 (sexual abuse policy revision removing references to 28 C.F.R. § 115.42(c)-(g))). Thus, the protections Defendants invoke as evidence of available relief have been rendered unavailable by their own policy choices.[9]

---

[9] In addition, a recent GAO report highlighted concerns about ongoing sexual abuse even at PREA-compliant BOP facilities, noted significant challenges with reporting and investigating sexual abuse, emphasized that "inadequate staffing coverage" impedes BOP's efforts to prevent and

16

Finally, Plaintiffs' vulnerability will be greatest immediately upon transfer, when they lose established support systems, are thrust into an unfamiliar environment, and face heightened risks of victimization and psychological decompensation. (McLearen Decl. ¶¶ 23–28, 38, 40.) Measures implemented only after threats materialize, assaults occur, or mental-health crises emerge cannot meaningfully prevent those harms. *See Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173–74 (7th Cir. 2010); (McLearen Decl. ¶¶ 45–50.) Because Defendants identify no process capable of providing meaningful relief before the challenged injuries occur, they again fail to establish an available remedy under the PLRA.

## VI. MAINTAINING PLAINTIFFS' CURRENT HOUSING PLACEMENTS IS THE LEAST INTRUSIVE MEANS OF PREVENTING THE THREATENED CONSTITUTIONAL INJURY.

Defendants contend that maintaining Plaintiffs' current housing assignments is not the least intrusive remedy because the Court could instead require BOP to house Plaintiffs in segregated units within men's facilities. That argument turns the PLRA on its head. The least intrusive relief is to preserve the housing placements BOP itself established and has maintained for years.

Defendants' proposed alternative is far more intrusive than maintaining the status quo. It would require removing Plaintiffs from their current placements, transferring them to men's facilities, creating segregated units—which could require new construction, substantial renovations, and operational restructuring—and marshaling additional medical and mental health staff to address the foreseeable and dire consequences of these transfers. Nor is there any evidence that segregation would remedy Plaintiffs' injuries. Defendants identify no basis to conclude that a segregated unit in a men's facility would ensure Plaintiffs' safety or eliminate the substantial risk of serious psychological harm and exacerbated gender dysphoria that Plaintiffs face upon

respond to sexual abuse, and concluded that "not all correctional facilities are meeting the intent of PREA." U.S. Gov't Accountability Off., GAO-26-107343, *supra* note 4, at 20–22, 35–44, 48,

17

transfer.[10] To the contrary, the Government's proposal would impose additional restrictions while exposing Plaintiffs to ongoing harms that necessitate relief.

In addition, denying the injunction would not end this Court's involvement. Nothing restricts BOP from transferring Plaintiffs among men's facilities in the future (*see* Opp. at 4–5), meaning the Court could face recurring litigation over each new placement. And to the extent Plaintiffs are housed in long-term protective custody in men's facilities, that could generate independent Eighth Amendment litigation. Maintaining the status quo is less intrusive than the ongoing judicial supervision that denying relief invites.

## VII.    THE REMAINING PRELIMINARY INJUNCTION FACTORS STRONGLY FAVOR PLAINTIFFS.

### A.    Irreparable Harm

The D.C. Circuit declined to affirm this Court's irreparable harm finding solely because of the absence of individualized plaintiff-specific findings, not because the underlying threatened harm is legally insufficient or speculative. *Doe*, 172 F.4th at 918–19. With individualized findings now supplied, this Court's prior conclusions apply with full force.

The Government argues that Plaintiffs' fear of harm is subjective and therefore insufficient. Under *Farmer*, the Eighth Amendment is violated by exposure to a substantial risk of harm. 511 U.S. at 845–47. The fact that harm has not yet occurred does not make the risk speculative where it is grounded in documented individual characteristics and expert testimony about institutional dynamics. *See id.* Threatened sexual assault, physical violence, serious psychological deterioration, and suicidality are paradigmatic irreparable injuries that cannot be compensated by damages after the fact. In addition, constitutional violations themselves constitute irreparable

---

[10] *See* 77 Fed. Reg. 37106, 37152–53 (creating a segregated unit for transgender people may not be effective as a protective measure and "carries its own risk" of imposing unduly punitive conditions based on transgender status).

harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *see, e.g.*, *Talbott v. United States*, No. 25-5087, 2026 WL 1532205, at *18 (D.C. Cir. June 1, 2026).

The irreversibility of transfer-related harm deserves particular emphasis. The harm the injunction prevents cannot be meaningfully remedied after the fact, which is precisely why maintaining the status quo pending individualized findings is the only constitutionally adequate response to the D.C. Circuit's remand.[11]

### B.      Balance of Equities and Public Interest.

The balance of equities and public interest overwhelmingly favor Plaintiffs. Absent relief, Plaintiffs face grave and irreparable harm, including heightened risks of sexual violence, psychological decompensation, self-harm, suicide, and disruption of medically necessary treatment. By contrast, Defendants seek to enforce a policy that, as applied to Plaintiffs, violates the Eighth Amendment.

The Government is not entitled to deference. *Turner v. Safley* does not govern Eighth Amendment claims, which are evaluated under the deliberate-indifference standard. *Johnson v. California*, 543 U.S. 499, 511 (2005). (*Contra* Opp. Br. at 34 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987).) And it is well settled that enforcement of an unconstitutional policy is never in the public interest. *See Talbott v. United States*, 775 F. Supp. 3d 283, 333 (D.D.C. 2025); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *see, e.g.*, *Talbott*, 2026 WL 1532205, at *18–20

---

[11] ███████ claims relating to housing are not mooted by the fact that she is currently on home confinement. *See* Opp. Br. at 25. Rachel and any other Plaintiff placed on home confinement, including ███████, remain in BOP's legal custody and subject to its determinations regarding their housing. Absent an order from this Court, any revocation of their home confinement would automatically result in placement in men's facilities pursuant to the Executive Order and current BOP policies. ███████ therefore face the same irreparable transfer-related harm as all the Plaintiffs.

(declining to defer to military policy where the purported policy judgment was unsupported by the record and the policy was the product of animus).

Defendants cite *Fleming v. Rule*, Civ. A. No. 25-157 (N.D. Tex.) to argue that this Court should not "meddle in prison administration." (Opp. Br. at 34–35.) But the *Fleming* Court's actions raise concerns about "impermissibl[e] interfere[nce]" (*id.* at 35) with prison administration that are not present here. In *Fleming*, the court has issued a TRO and two injunctions, none of which was supported by written findings of fact, written conclusions of law, or the need-narrowness-intrusiveness findings required by 18 U.S.C. § 3626(a)(2). *See Fleming*, Civ. A. No. 25-157, ECF Nos. 80, 83, 137, 138, 140, 197, 199. And, tellingly, the Government has not opposed injunctive relief on the merits or raised any objections to judicial oversight of prison administration in that action. *See id.*, ECF Nos. 72, 129, 133, 140, 147, 165, 166. This Court should not reward Defendants' selective invocation of prison-deference principles here.

The Government's generalized concerns regarding the safety, privacy, and dignity of other incarcerated women do not alter that conclusion. Defendants do not show Plaintiffs pose a threat to others or that any concerns cannot be managed by staff. As this Court previously observed, "the public interest in seeing the plaintiffs relocated immediately to male facilities is slight at best." *McHenry*, 763 F. Supp. 3d at 89–90.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

Dated: June 3, 2026

Respectfully submitted,

/s/ *Jennifer Fiorica Delgado*
Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES &
DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ
RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com

*Pro Bono Counsel for Plaintiffs*

21