**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, *in his official capacity* as President of the United States, et al., | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF RANDI ETTNER, PH.D.**

I, Randi Ettner, Ph.D., state as follows;

1.  I submit this declaration to supplement the opinions provided in my original declaration dated May 11, 2026.

2.  I have reviewed the declarations of Dr. Edward Weidow and Rick Stover submitted by the defendants. Neither declaration meaningfully engages with the substantial body of evidence demonstrating that forced hormone withdrawal and transfer to male facilities will cause serious and foreseeable harm to the plaintiffs.

3.  Dr. Weidow is employed by the Bureau of Prisons (BOP) as Chief of Psychiatry, a position he has held since April 5, 2026. His experience with transgender clinical care is described as primarily involving treatment of "co-morbid psychiatric and psychological conditions," not gender dysphoria itself. He does not demonstrate specialized expertise in the diagnosis and treatment of gender dysphoria as a primary clinical focus. Dr. Weidow's declaration reflects neither familiarity with the current peer-reviewed literature on gender dysphoria treatment nor adherence to the medical standard of care.

4.  Mr. Stover is not a medical or mental health clinician, yet his declaration addresses the clinical appropriateness of hormone withdrawal and the medical adequacy of proposed alternatives. He holds no medical degree or clinical license and has no documented training in the diagnosis or treatment of gender dysphoria, psychiatric disorders, or endocrinology. He indicates no professional qualifications to opine on those matters.

5.  Although Dr. Weidow stops short of asserting that any Plaintiff's gender dysphoria diagnosis is incorrect, he questions the documentation or adequacy of the diagnosis of gender dysphoria for a small number of plaintiffs. There is no indication that his assertions regarding the insufficiency of those diagnoses are based on his own clinical evaluation of any inmate. Further, he disregards the clinical reality that BOP itself has diagnosed and treated plaintiffs for gender

dysphoria, some for nearly a decade or more, and has consistently prescribed hormone therapy and monitored those individuals for clinical response throughout that timeframe. In other words, Dr. Weidow fails to account for the ongoing clinical work of BOP clinicians. The adequacy of initial documentation is irrelevant to the medical necessity of continuing established, effective treatment.

6. There is no basis for Dr. Weidow to question whether a person's gender dysphoria diagnosis is valid if that person has no reported current dysphoria and/or has undergone surgery. The criteria for gender dysphoria in the Diagnostic and Statistical Manual of Mental Disorders (Section 302.85) address this very issue. The diagnostic criteria contain a "post-transition specifier" which provides that a person who has transitioned and lives full-time in their gender and has undergone medical treatment for gender transition still has a valid diagnosis of gender dysphoria. The purpose of the specifier is to reflect that the person has fully transitioned and they are no longer symptomatic. This provision nevertheless recognizes the appropriateness and necessity of on-going medical care for gender dysphoria, such as hormone therapy, for individuals who have completed gender transition.

7. As I explained in my first declaration, Dr. Weidow relies on a model of care that lacks any support in clinical research or experience and that the major professional medical organizations have rejected. His suggestion that increased "therapeutic contacts" and new or adjusted psychiatric medications can substitute for hormone therapy is directly contradicted by the current evidence base. There is no support in the guidelines of major medical organizations or the peer-reviewed medical literature for the proposition that withdrawal of hormones can be clinically managed with psychotherapy and medication adjustments. And Dr. Weidow cites none.

8. Dr. Weidow's assertion that worsening dysphoric symptoms following the discontinuation of hormones can be managed with psychological or medical interventions fails to

3

grapple with the specific mechanisms of harm. The degree of physiological feminization that results from long-standing hormone therapy is substantial. The consequences of withdrawal under such circumstances would be severe. Estrogen withdrawal in long-term hormone users produces rapid physiological destabilization: declining bone density, cardiovascular risk changes, metabolic disruption, mood dysregulation mediated by hormonal fluctuation, and re-emergence of testosterone-driven physical characteristics that are directly distressing to a person with gender dysphoria. None of these sequelae are addressable by psychotherapy or psychotropic medication. These severe risks are even greater for individuals with co-morbidities such as type 2 diabetes mellitus, hypertension, or diabetic retinopathy. Dr. Weidow is silent as to these risks.

9.  Dr. Weidow's suggestion that co-occurring mental health diagnoses might rule out gender dysphoria treatment has no basis in clinical practice or even common sense. This is like saying that someone who has both diabetes and cancer should be treated for one serious medical condition, but not the other. While clinicians should be aware of co-occurring mental health conditions for a variety of reasons related to patient care, those conditions would only warrant the denial or even delay of care for gender dysphoria if they were so severe or uncontrolled that they interfered with a person's ability to consent to treatment, such as the presence of acute psychosis.

10.  Mr. Stover's statements regarding the absence of documented, substantiated sexual assault during prior periods of incarceration in a male facility do not address the current risk of assault if the plaintiffs are transferred to a male facility. First, the absence of documented reports of sexual assault do not indicate the absence of victimization. Research consistently demonstrates the profound underreporting of sexual violence in prison settings, particularly by transgender women who may fear retaliation, may distrust institutional reporting mechanisms, or may have been coerced into silence. Second, as I explained in my first declaration, if an inmate

4

has been housed in a female correctional setting and has substantial physiological feminization, her risk profile has changed. The absence of documented victimization in a male facility prior to transition is not probative of current risk.

11. Both Dr. Weidow and Mr. Stover assert that FMC Rochester and MCFP Springfield are capable of providing "appropriate" care to the plaintiffs following transfer. This assertion does not address the central clinical question in this matter. The issue is not whether a federal medical center can provide psychiatric services generally. The issue is whether a forced discontinuation of hormone therapy and transfer to a male facility causes serious and foreseeable harm to these women. A male facility with access to a psychiatrist does not resolve the physiological consequences of hormone withdrawal, the re-emergence of gender dysphoria, the trauma-related harm of placement among male inmates, or the substantially elevated risk of victimization that feminized transgender women face in male facilities. These harms are not amendable to mitigation by increased therapeutic contacts or psychotropic medication, and neither Dr. Weider nor Mr. Stover provides any evidence-based support for the proposition that they are.

12. The defendants' brief incorrectly states that the forced termination of hormone therapy will "lessen Plaintiffs' feminine characteristics" and that accordingly, "the very characteristics that Plaintiffs say put them at risk in men's prisons will largely resolve once they are tapered off cross-sex hormones." ECF No. 129 at 2. Defendants appear to assume that once hormone therapy is stopped, transgender women will revert to a typical male body, eliminating the physical characteristics that place them at elevated risk of sexual victimization in a male facility. This assumption is incorrect. Feminizing hormone therapy produces a spectrum of physical changes, some of which are reversible and others of which reverse only slowly over a period of months to years, if at all. Changes that persist or reverse slowly after hormone

5

withdrawal include: breast tissue development and changes in nipple morphology, which do not fully resolve upon estrogen withdrawal and may be permanent; redistribution of subcutaneous adipose tissue to the hips, thighs and buttocks, which reverses gradually over an extended period; decreased skeletal muscle mass and upper body strength, which returns only slowly; changes in skin texture and decreased body hair density, which recover incompletely. The degree of residual feminization following hormone therapy is directly proportional to the duration and completeness of prior treatment. Transgender women who have been on longstanding hormone therapy will not present as typically male upon transfer to a male facility if their hormones have been discontinued. They will retain visible feminizing characteristics, including breast tissue, that will be immediately apparent to other inmates and that will mark them as targets for sexual harassment, exploitation, and assault.

13.   Defendants' brief (ECF No. 129 at 21) cites and misunderstands my statement at paragraph 25 of my first declaration regarding the physical changes that transgender women will experience with the termination of hormone therapy. My point was that any physical changes or diminution of feminization, processes that are partial or occur over time, will have devastating psychological consequences. A transgender woman's sense of bodily integrity depends on the maintenance of gender congruence. The harm is not contingent on full physical reversion, which will not occur. Rather, the harm comes from any erosion of the feminized body that these plaintiffs have lived in, in some cases for years or decades. As explained above, I did not state that transgender women will return to male appearing after the termination of hormone therapy. As explained above, that is not true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __2__ day of June, 2026.

_Randi Ettner PhD_
Randi Ettner, PhD