**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOE**, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>**TODD BLANCHE**, in his official capacity as Acting Attorney General of the United States, *et. al.*,<br><br>*Defendants*. | **Case No. 1:25-cv-286-RCL**<br>**Case No. 1:25-cv-401-RCL (consolidated)**<br>**Case No. 1:25-cv-653-RCL (consolidated)** |

## MEMORANDUM OPINION

In these consolidated cases, fourteen Plaintiffs challenge the Bureau of Prison's implementation of the President's Executive Order 14168, directing the Attorney General to ensure that transgender women are not detained in women's prisons or detention facilities. These Plaintiffs, transgender women who the Bureau itself had previously determined should be housed in women's facilities, have previously sought and received injunctive relief on Eighth Amendment grounds against the Bureau's implementation of the Executive Order to prevent their transfer to men's facilities.

These cases now return from the Circuit on remand for the Court to make individualized findings to assess whether each Plaintiff possesses certain characteristics (such as the effects of gender-affirming care or history of surviving assault or self-harm in men's prisons) that make them likely to face a substantial risk of serious harm rising to the level of an Eighth Amendment violation if they are transferred to a men's facility. For the reasons stated below, the Court finds that each Plaintiff has provided evidence demonstrating that they are likely to prevail on their Eighth Amendment claim.

## I. BACKGROUND

The Court presumes familiarity with the underlying facts of this case, which are detailed in several opinions. On January 20, 2025, the President issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." In relevant part, the Executive Order directed the Attorney General to "ensure that males"—defined as "person[s] belonging, at conception, to the sex that produces the small reproductive cell"—"are not detained in women's prisons or housed in women's detention centers." Exec. Order 14168, § 4(a), 90 Fed. Reg. 8615, 8615–16 (Jan. 30, 2025).

To effectuate this Order, the Bureau of Prisons began transferring to men's facilities the small minority of transgender women it had previously decided should be housed in women's facilities. These women, the plaintiffs in the consolidated cases before the Court, sought and received preliminary injunctive relief against the Bureau's enforcement of the Executive Order.[1] *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Blanche*, No. 1:25-cv-401-RCL, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 1:25-cv-653, ECF No. 62 at 1–2 (D.D.C. Mar. 10, 2025).

The government appealed the Court's housing placement decision. *Doe v. Blanche*, 172 F.4th 901, 905–06 (D.C. Cir. 2026). In its opinion, issued April 17, 2026, the Circuit recognized that Plaintiffs are a "are a very small subset of the thousands of transgender women in the Bureau's

[1] The Executive Order also directed the Bureau to cease providing any medical procedure, treatment, or drug to transgender women for treatment of gender dysphoria, Exec. Order 14168, § 4(c), 90 Fed. Reg. 8615, 8617 (Jan. 30, 2025), and the plaintiffs likewise sought injunctive relief to prevent the implementation of this section, which this Court preliminarily granted. However, the Bureau's implementation of the Executive Order's ban on transgender healthcare in federal prisons has subsequently become the subject of ongoing class action litigation in *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.), ECF No. 67, in which this Court has enjoined the Bureau's implementation of § 4(c) as to "a class consisting of all persons who are currently or will be incarcerated in BOP facilities with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future." Because the *Doe* plaintiffs' status as transgender women in the custody of the Bureau places them within the *Kingdom* class, this Court recently stayed their challenge to § 4(c), pending final adjudication of the *Kingdom* class claims. ECF No. 127.

custody" and posited that, "[g]iven the rarity of such placements within the federal system, it is reasonable to infer that [the Bureau's] decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Id.* at 918. On appeal, Plaintiffs argued that they had "particular vulnerabilities" that distinguish them from other transgender women in the Bureau's custody—including "long-term hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors." *Id.* at 916.

While acknowledging that the record "contains ample, uncontested evidence" of characteristics that could make Plaintiffs "distinctively vulnerable to harm in men's facilities," the Circuit held that it could not conclude that the Bureau had been deliberately indifferent to such harm without individualized findings as to each Plaintiffs' particular vulnerabilities. *Id.* at 917. Although this Court had "generally identified" certain "distinctive characteristics" that could cause a transgender woman to face "substantial risks of serious harm" upon transfer to a men's prison, the Circuit directed the Court on remand to make factual determinations as to the features of the *Doe* Plaintiffs "in particular" that "render their transfer to men's facilities unconstitutional under the Eighth Amendment." *Id.* at 910, 917.

On May 13, 2026, Plaintiffs moved again for a temporary restraining order and preliminary injunction, this time submitting individualized evidence of the substantial risk transfer would pose to each plaintiff. ECF Nos. 117-1 to 117-28. This motion became ripe on June 6, 2026, *see* Opp'n, ECF No. 129, Reply, ECF No. 135, and the Circuit's mandate will issue June 8, 2026.[2]

[2] The injunction on appeal was renewed on February 19, 2026, and was set to automatically expire on May 20, 2026. ECF No. 101; *see* 18 U.S.C. § 3626(a)(2). Although the Circuit released its opinion on April 17, 2026, the mandate will not issue until June 8, 2026, per Rule 40(d)(1) and Rule 41(b) of the Federal Rules of Appellate Procedure. That meant that the operative preliminary injunction would have expired by its own terms before it was formally vacated by the Circuit. The Court therefore renewed the existing preliminary injunction for the limited period of May 21, 2026, to June 8, 2026. ECF No. 125.

## II. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a preliminary injunction; and 4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the preliminary injunction analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B. Eighth Amendment

The Eighth Amendment prohibits cruel and unusual punishment—limiting the conditions under which a prisoner can be confined. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment by acting with "deliberate indifference to a substantial risk of serious harm" to an incarcerated person. *Id.* at 836; *see also Doe*, 172 F.4th at 906, 910, 918. This standard contains both an objective component as to whether the individual faces a sufficiently serious risk of harm and a subjective component as to whether the official knew of and disregarded that risk. *Farmer*, 511 U.S. at 834, 837. A plaintiff can establish deliberate indifference based on risks "personal to him" as well as risks shared by "all prisoners in his situation." *Id.* at 843.

In the context of conditions of confinement, the Eighth Amendment requires that prison officials protect incarcerated people from violence and other serious harms. *Doe*, 172 F.4th at 906; *see also Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (cleaned up)); *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021) (recognizing that the risk of suicide and self-harm, and the failure to prevent it, constitutes a serious harm to implicate the Eighth Amendment); *Est. of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (same); *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019) (same); *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1186 (10th Cir. 2022) (same).

## III. DISCUSSION

The Court begins with the government's threshold arguments regarding whether administrative exhaustion precludes review. The Court then provides an overview of the parties' arguments as to the merits, framing the principal disputes and relief sought. Finally, the Court turns to the Circuit's assignment—making individualized factual findings as to each Plaintiff.

### A. Administrative Exhaustion

In arguing that Plaintiffs' suit should be dismissed for failure to exhaust administrative remedies, the government spends much of its brief rehashing an argument it squarely lost on at the Circuit. As the Circuit held, "Defendants have failed to carry their burden to show that administrative remedies were available to plaintiffs." *Doe*, 172 F.4th at 914.

The PLRA requires the exhaustion of only "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is "available" if it is capable of providing some relief for the action complained of, and it is conversely not available "where the relevant administrative procedure lacks authority to provide any relief" such that it operates as "a simple dead end." *Ross v. Blake*,

578 U.S. 632, 642–43 (2016) (quotation omitted). While acknowledging that "[n]o one disputes that [the Bureau] has a grievance procedure open to [all] inmates," the Circuit held that the government had failed to show that, for Plaintiffs, any relief was available. *Doe*, 172 F.4th at 914.

The Circuit recognized that Plaintiffs assert two distinct theories of Eighth Amendment violations: (1) "the mere fact of their transfer to a men's facility would subject them to an intolerable risk of harm by exacerbating their gender dysphoria"; and (2) "the substantially elevated risk of physical or sexual violence they would face in men's facilities." *Id.* The Circuit then pointed out that, as to the first asserted injury, the government acknowledges that the Bureau's "grievance procedure cannot stop or reverse the challenged transfers because they are mandated by the Executive Order"—meaning the government essentially concedes that the Bureau has no discretion to remedy "the concrete action the [P]laintiffs challenge." *Id.* On remand, the government provides no explanation as to why this holding no longer stands. At most, it simply denies this theory of injury, but that puts the cart before the horse by conflating a merits argument with a threshold objection.

Regarding the second asserted injury, Plaintiff's "failure-to-protect claim," the Circuit held that Defendants "have failed to carry their burden to identify an administrative remedy 'capable' of providing plaintiffs 'some relief.'" *Id.* at 914–15 (quoting *Ross*, 578 U.S. at 642 (internal quotation marks omitted)). The Circuit expressly rejected the government's proposal to take "additional safety measures" for Plaintiffs who complain of physical and sexual violence by placing them "in the Special Housing Unit (SHU)"—a short-term segregated housing option in which inmates are unable to leave their cell for most of the day. *Id.* at 914–15. In the Circuit's view, this is a "temporary, stop-gap measure that lacks any capacity to relieve [P]laintiffs from the ongoing risk of harm in men's prisons." *Id.* at 915.

On remand, the government asserts for the first time that *other* "additional safety measures"—beyond those described in the record on appeal—exist and that Plaintiffs have failed to exhaust these available administrative remedies. Specifically, the government suggests the Bureau can "lessen the risk of harm" to an aggrieved Plaintiff by "transferring the inmate to a different men's facility with different risk factors, changing the inmate's cell assignment if the risk of harm involved his cellmate, or placing the inmate in a [SHU] to keep potential threats away from the potential victim, among other remedial measures." Opp'n at 2. But the Court will not assess what, if anything, the government has added to the list of remedial possibilities since they had every opportunity to present these options previously to this Court and the Circuit but failed to do so.[3]

The government reads the Circuit's opinion as inviting it to relitigate the issue of exhaustion. On the contrary, the Circuit squarely decided that the government had failed to prove that administrative remedies were available. *Doe*, 172 F.4th at 914. The government now puts forward new reasons as to why such remedies are meaningfully available to Plaintiffs, but the Court will not consider such arguments as they are forfeited. *See, e.g.*, *Keepseagle v. Perdue*, 856 F.3d 1039, 1054 (D.C. Cir. 2017) ("[U]nder well-established law, a party forfeits a claim by failing to raise it [previously] when the party 'knew, or should have known,' that the claim could be raised." (quoting *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1091 (D.C. Cir. 1984))); *Harmon v. Thornburgh*, 878 F.2d 484, 496 n.23 (D.C. Cir. 1989) ("If DOJ seeks on remand to attack the

[3] Even if the Court were to consider the waived arguments, the government's newfound asserted reliance on regulations promulgated under the Prison Rape Elimination Act as an available remedy is especially unpersuasive given that the Department of Justice has directed facilities not to follow PREA provisions that conflict with Executive Order 14168. *Compare* Opp. Br. at 5, 12, 18, 35–36 (citing 28 C.F.R. § 115.42(c)-(g)), *with Poe v. Dep't of Justice*, No. 1:26-cv-1552 (D.D.C. 2026), ECF No. 1-1 (Department of Justice memorandum stating that facilities should "disregard" PREA regulations that refer to transgender people), and BOP Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, 33–34 (Mar. 19, 2026) (sexual abuse policy revision removing references to 28 C.F.R. § 115.42(c)-(g))) [https://perma.cc/2BAB-FD9T].

injunction on this basis, it must rebut the presumption that an argument not raised on an initial appeal will thereafter be deemed waived.").

**B. Overview of Eighth Amendment Merits**

Having resolved the government's threshold objection, the Court turns to the merits of Plaintiffs' Eighth Amendment claim. But before making individualized findings as to each Plaintiff, the Court begins by laying out the foundation of their Eighth Amendment claim and Defendants' overarching arguments against it.

**1. Objective Prong**

Plaintiffs assert that their transfer to men's facilities would create two objectively intolerable risks: (1) the risk of physical and sexual violence from fellow inmates, and (2) the risk of severely exacerbated gender dysphoria. In response to the former, the government on remand assures the Court that it intends to transfer all Plaintiffs who are not in half-way houses to either Federal Medical Center (FMC) Rochester or Medical Center for Federal Prisoners (MCFP) Springfield—two prisons where the rates of assault are generally lower than those at the facilities where Plaintiffs are currently housed. Opp'n at 8. Specifically, the government states, and Plaintiffs do not contest, that FMC Rochester has an assault rate of 0.014%, with 12 assaults in 2025 and zero substantiated sexual assaults in 2025, and MCFP Springfield similarly has a low assault rate of 0.025%, with 28 assaults in 2025 and only one substantiated sexual assault in 2025. *Id.* at 2–3, 14–15. As to Plaintiffs' later theory of injury, the government obliquely suggests that an exacerbation of Plaintiffs' gender dysphoria is mitigated by the fact that these prisons are also "medical centers," meaning that they "are able to provide appropriate treatment to these inmates." *Id.* at 8 (quoting Stover Decl. ¶ 22).

The Court finds these responses wanting in several respects. Because the government's assault-rate evidence appears to be the backbone of its opposition on the objective prong, the Court begins with this argument. The Court then turns to the government's response to Plaintiffs' claim that their transfer will severely exacerbate their gender dysphoria symptoms.

*i. Risk of Violence*

As mentioned, the government asserts that the documented assault rates at FMC Rochester and MCFP Springfield demonstrate that Plaintiffs can be safely housed at these men's facilities without facing a substantial risk of violence. The statistics the government provides, however, are of limited value in this context precisely because, as the Circuit recognized, these Plaintiffs are outliers. The government's cited rates of assault are calculated across the entire population of each facility, but the relevant question under the objective prong is whether Plaintiffs face a substantial risk of violence *by virtue of their distinctive characteristics*. Plaintiffs represent less than one percent of the transgender population in the Bureau's custody (14 individuals out of approximately 1,500)—and transgender inmates as a group already account for only a small minority group among federal inmates (approximately 1,500 out of 154,000). Opp'n at 14–15; BUREAU OF PRISONS, Population Statistics, https://www.bop.gov/about/statistics/population_statistics.jsp [https://perma.cc/35J7-XXDG].

While it is reassuring that these prisons have notably low incidents of reported violence, there is evidence in the record indicating that these Plaintiffs stand a much higher likelihood of being one of the few who are victimized. Therefore, the relevant question is not the baseline rate of assault at the destination facility but the elevated risk that each Plaintiff—as a newly arrived, visibly feminized transgender woman coming from a women's prison—would face there. Moreover, the government relies only on "substantiated" sexual assault rates, reporting zero at

FMC Rochester and one at MCFP Springfield in 2025. *See* Opp'n at 8, 17. But Plaintiffs' expert explains that sexual assault in men's prisons is significantly underreported, and official substantiation rates do not capture the universe of abusive and violent conduct that actually occurs. *See* McLearen Decl. ¶¶ 29, 33.

It's important to note that an "unsubstantiated" allegation is one that the Bureau has determined to be inconclusive because there was "insufficient evidence to make a final determination." *See* BOP, Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, at 8–9 (Mar. 19, 2026) [https://perma.cc/2BAB-FD9T]. This is distinct from term "unfounded allegation," which "means an allegation that was investigated and determined not to have occurred." *Id.* Thus, the delta between the number of substantiated sexual assaults at these facilities and the total number of reported sexual assaults may be a relevant consideration if they have a significant number of unsubstantiated, but not unfounded, allegations.

The government next points to inmates with gender dysphoria already housed at FMC Rochester and MCFP Springfield as evidence that staff are experienced in protecting this population. Opp'n at 8. What the government does not draw attention to is the fact that the destination facilities house eight total inmates across both facilities combined, and only one of those eights is on hormones. Reply at 8 (citing Stover Decl. ¶¶ 25, 27). As Plaintiffs' evidence establishes, a diagnosis of gender dysphoria encompasses a wide range of presentations and the government makes no suggestion that any of these individuals present similarly to Plaintiffs, who have undergone years of hormone therapy and, in several cases, extensive feminizing surgeries.

The government also insists that, to the extent Plaintiffs face a risk of sexual violence because of their feminine features, this risk will be eliminated by the Bureau's new policy terminating hormone therapy, "under which Plaintiffs will receive an individualized hormone

tapering plan that will eventually lessen Plaintiffs' feminine characteristics." Opp'n at 15 (citing Program Statement 5260.01). That new policy has not yet been implemented because of an injunction this Court issued in *Kingdom v. Trump*, No. 1:25-cv-691-RCL (D.D.C.). Because the policy has not taken effect, the Bureau cannot rely on that position in these proceedings. What's more, the government make no effort to address the particular safety concerns faced by Plaintiffs who have undergone gender-affirming surgeries, whose feminine characteristics will not "largely resolve once they are tapered off cross-sex hormones." Opp'n at 15.

Despite the government's assurances that Plaintiffs will be transferred to low-risk facilities, Plaintiffs have established facts that suggest they will continue to face significant safety concerns if they are transferred. To establish facts relating to the unique vulnerabilities of transgender women in the Bureau of Prisons system, Plaintiffs rely heavily on the declaration of a former senior Bureau of Prisons executive, Dr. Alix McLearen, who has previously served both as the Bureau's National Administrator of the Women and Special Populations Branch and as its Acting Assistant Director. McLearen Decl. ¶ 1, ECF No. 117-27. Dr. McLearen asserts that the "severely elevated risks of sexual abuse" that transgender women face in men's prisons is "well understood within the field of corrections and is not meaningfully disputed among practitioners responsible for classification, housing, or PREA compliance." *Id.* at ¶¶ 11–13. The government provides no evidence to counter that assertion. Moreover, Dr. McLearen also asserts that distinct harms flow specifically from transferring transgender women from women's to men's prisons. The experience of such transfers is categorically different from the baseline experience of transgender women who have never left men's prisons because the transfer increases vulnerability to victimization by marking the transferee as a target and causes severe disorientation for transgender women accustomed to the norms of women's facilities. *Id.* ¶¶ 25–28, 37–42.

Dr. McLearen identifies the specific characteristics that would predictably make certain transgender women especially susceptible to violence if transferred to men's facilities. These include: "if she has had a vaginoplasty; if she has had other feminizing surgeries; or if she has breasts and a female physique as a result of consistent hormone therapy." *Id.* ¶ 19. More generally, "[w]ithin custodial environments, individuals who are perceived as female are more likely to be approached, pressured, exploited, and treated as potential targets." *Id.* Dr. McLearen also explains that the most vulnerable transgender women cannot be adequately protected in men's facilities. *See id.* ¶¶ 43–50; ¶ 49 ("The most vulnerable transgender women have historically been subjected to serious harms in male facilities, including physical and sexual violence; long-term or frequent placements in the SHU or protective custody, leading to deterioration in mental health or overall functioning; or both."). In Dr. McLearen's professional opinion, "the protective measures available in BOP facilities cannot adequately prevent harm to transgender women who are reassigned from female to male facilities based on a categorical housing policy unrelated to any individual circumstances." *Id.* ¶ 50.

Based on this evidence, the Court is inclined to agree with Plaintiffs that even if the statistical rate of reported violence at FMC Rochester and MCFP Springfield is low, individuals with a particular constellation of characteristics—such as Plaintiffs—stand a much higher chance of being one of the few who are victimized.

*ii. Severe Exacerbation of Gender Dysphoria*

Plaintiffs also claim they would face a substantial risk of harm from exacerbated gender dysphoria if they were transferred to men's prisons. According to Dr. McLearen, that harm could entail severe psychological distress and increased risk of self-harm or suicidality, especially for those who have been victims of sexual assault or who have no prior experience in men's facilities.

*Id.* ¶ 38 ("As a result of such a reassignment, a transgender woman would lose continuity in healthcare, mental health provider relationships, social supports and relationships, and programming—in addition to facing an unfamiliar and dangerous institutional and social environment that is dramatically different from the women's correctional environment."). Because Plaintiffs have lived as women in women's facilities (sometimes for many years), being moved to men's facilities would be predictably severely psychologically distressing. *See id.* ("In my professional judgment, such a change has a high and foreseeable likelihood of causing significant psychological distress.").

In response, the government says that FMC Rochester and MCFP Springfield are medical centers specializing in comprehensive medical care and therefore "are able to provide appropriate treatment to these inmates." Opp'n at 17 (citing Stover Decl. ¶ 22). But this retort does not meaningfully engage with the argument that because these particular Plaintiffs have lived in women's facilities for so long and have taken great lengths to accord their lives with their gender identities—such as by undergoing surgery, taking hormones, and wearing women's clothing—their circumstances are unique even among the broader transgender female population. The government does not seem to contest Plaintiffs' assertion that a transition from a women's prison to a men's prison *would* cause severe psychological distress; they offer only the consolation that if a transfer *does* cause psychological distress, "the selected facilities could adequately treat any worsening of symptoms, therapeutically and with psychotropic medications." *Id.* at 18. Moreover, the government fails to explain why therapy and psychotropic medication would alleviate the distress of living in a men's prison. Since the government does not actually argue that a transfer would *not* cause a substantial risk of exacerbated symptoms of gender dysphoria, the Court is inclined at this to agree with Plaintiffs that it would.

Because Plaintiffs have put forward specific expert evidence of two distinct intolerable risks—the risk of increased physical violence against them and the risk of severely exacerbated gender dysphoria—and because the government has not sufficiently rebutted those showings, the Court finds that Plaintiffs have the better argument as to their theories of injury under the objective prong of the Eighth Amendment analysis.

**2. Subjective Prong**

Turning to the subjective prong, Plaintiffs must demonstrate that Defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. A "sufficiently culpable state of mind" is one that shows "deliberate indifference" to either of the serious risks Plaintiffs presented under the objective prong. *Id.* When a plaintiff seeks prospective relief, as is the case here, deliberate indifference should be determined in light of prison officials' attitudes and conduct when the lawsuit was initiated and "persisting thereafter." *Id.* at 827.

Deliberate indifference means something more than negligence or lack of due care. *Id.* at 835. Indeed, the government must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. This means that they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* In other words, the government must "consciously disregard a substantial risk of serious harm." *Id.* at 839 (internal quotation marks omitted). And the question of "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" indicating "that the risk was obvious." *Id.* at 842.

That said, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm

ultimately was not averted." *Id.* at 844. This is so because prison officials' Eighth Amendment duty is "to ensure reasonable safety," which "incorporates due regard for prison officials' unenviable task of keeping dangerous [people] in safe custody under humane conditions." *Id.* at 844–45 (internal quotation marks omitted).

With the foregoing in mind, the Court considers the parties' arguments over whether the government knew of a serious risk to Plaintiffs and were deliberately indifferent to that risk. The crux of the parties' disagreement concerns whether, under the prior policy, the Bureau decided to house Plaintiffs in women's facilities out of concern for their health and safety, and whether the Bureau's subsequent decision to transfer Plaintiffs to male facilities exhibits conscious disregard for the same sorts of risks that resulted in Plaintiffs placement in women's facilities in the first place. To assess this disagreement, and to see that it ultimately misses the point, it is helpful to begin by describing the legal regime dictating the Bureau's placement decisions.

By statute, the Bureau may choose "any available penal or correctional facility" when deciding where to place an inmate and has discretion to "direct the transfer of a prisoner from one penal or correctional facility to another" so long as the placement "meets minimum standards of health and habitability established by" regulation. 18 U.S.C. § 3621(b). Along with the constitutional constraints on conditions of confinement, the Bureau must also take into account the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301 et seq., when making housing decisions. *Doe*, 172 F.4th at 907. The Bureau's regulations implementing PREA require that the Bureau screen inmates upon intake and transfer for "their risk of being sexually abused by other inmates or sexually abusive towards other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate

those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a)

Regarding the housing assignments of transgender inmates, the Bureau had for the past several years used a specialized decision-making body—the Transgender Executive Council—to make initial facility designations of transgender inmates, and to review and approve transfers of transgender inmates. Jan. 13, 2022, Transgender Offender Manual, at 4–6, ECF No. 11-3. From January 2022 until January 2025, when the Executive Order issued, the Council considered the inmate's "current gender expression" when deciding the facility assignment for a transgender inmate. *Id.* at 6. Pursuant to the Executive Order, however, the Bureau has rescinded this guidance and disbanded the Transgender Executive Council. BUREAU OF PRISONS, PROGRAM STATEMENT 5100.08, INMATE SEC. DESIGNATION AND CUSTODY CLASSIFICATION, ch. 1, at 1–3 (Mar. 6, 2025).

*i. Defendants Knew of the Serious Risk to Plaintiffs*

Plaintiffs argue that the evidence found in their BOP medical records demonstrates the Bureau's subjective awareness of the risks that Plaintiffs would face if transferred to men's prisons. Reply at 15. Specifically, Plaintiffs argue that the Bureau's own Chief of Psychiatry, Dr. Weidow, does not actually "dispute that transfer may worsen Plaintiffs' gender dysphoria, increase psychological distress, or trigger self-harm and suicidal ideation." *Id.* Moreover, the Bureau's Special Assistant to the Director, Rick Stover, admits in his declaration that the Bureau reviewed each of Plaintiffs' psychological records before selecting FMC Rochester and MCFP Springfield as the destination for their transfers. *Id.* (citing Stover Decl. ¶ 21).

The government argues that those facilities are equipped to manage the deterioration in mental and physical wellbeing that Plaintiffs argue will predictably occur. In Plaintiffs' words, "[t]hat argument concedes the critical point: BOP's response did not determine whether transfer

would expose Plaintiffs to a substantial risk of serious harm, but merely identified facilities purportedly capable of treating the foreseeable and avoidable consequences of that harm after it occurs." *Id.* The Court agrees: the government has evidenced a subjective awareness of the objectively serious risks to Plaintiffs by presenting specific (though inadequate) plans to mitigate them.

Plaintiffs also argue that the Bureau's previous determination—prior to the Executive Order—that Plaintiffs should be housed in women's prisons shows subjective awareness of the serious risks Plaintiffs would face in men's prisons. The D.C. Circuit itself noted that "[g]iven the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance." *Doe*, 172 F.4th at 918. That said, the Circuit ultimately concluded that "the record [did] not definitively establish whether safety concerns motivated each plaintiff's placement." *Id.*

The government insists on remand that safety concerns did *not* motivate Plaintiffs' original placements. Opp'n at 19–20 ("BOP's prior decisions to house Plaintiffs in female facilities were not made because Plaintiffs were uniquely vulnerable and incapable of being safely housed in any male facilities."). Instead, the government states that in granting requests to transfer transgender women to women's prisons, the Bureau considered "a number of factors, including: 'an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse.'" *Id.* at 19 (quoting Jan. 13, 2022, Transgender Offender Manual § 5). Defendants state that Plaintiffs were placed in a women's facilities for a variety of reasons. Those include: the Bureau's previous practice of placing individuals in facilities

consistent with their housing prior to coming into BOP custody, Stover Decl. ¶¶ 43, 58; the Bureau's previous policy of transferring transgender women to a women's facility for at least a year before they were eligible for cross sex surgery, *id.* ¶¶ 29, 33, 38, 46, 49, 55, 65, 69; and a prior Bureau policy to process post-vaginoplasty transgender women as women, *id.* ¶¶ 66, 67.

To begin, these policies do not dissuade the Court that safety and health concerns motivated the Bureau's placement of Plaintiffs in women's facilities because the Bureau offers no explanation as to what motivated these policies. For example, the government does not state *why* the Bureau chose to house pre- and post-surgery transgender women in women's facilities—leaving open the possibility that safety and mental health concerns underpinned this policy. And Plaintiffs put forward evidence in their declarations that make this possibility probable.

But the bigger issue is that the government's argument misses the point. The operative question is not whether the government was subjectively aware of the serious risks Plaintiffs would face in men's prisons at the time they were originally placed in women's prisons. It is whether the government was aware of the serious risk Plaintiffs faced when it made the categorical decision to transfer them to men's facilities, and whether the government is *still* aware of this risk, such that the Court may award preliminary prospective relief.

Of course, the government's subjective state of mind at the time of original placement might bear on whether it was aware in January 2025 of the serious risks Plaintiffs face. This Court believes Plaintiffs have submitted sufficient evidence to conclude that Plaintiffs' original placements in women's facilities *were* motivated by safety and mental health concerns, and that conclusion supports finding that the government has an ongoing awareness of the risks. Because the evidence the government's declarants put forward acknowledges the objectively serious risk faced by Plaintiffs, this Court concludes that the government was aware of that risk.

*ii. Mandated Transfer to Men's Prisons Was Not a Reasonable Response*

As noted above, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. This is so because prison officials' Eighth Amendment duty is "to ensure reasonable safety," which "incorporates due regard for prison officials' unenviable task of keeping dangerous [people] in safe custody under humane conditions." *Id.* at 844–45 (internal quotation marks omitted). Here, the government argues that it reacted reasonably to the serious risks Plaintiffs would face in men's prisons by assigning Plaintiffs to FMC Rochester and MCFP Springfield. Opp'n at 17. Though both facilities are men's prisons, the government argues that "the inmate population at these medical centers are largely non-violent and tend to have only minor infractions in their disciplinary history." Stover Decl. ¶ 22. The government notes that both facilities have experience housing some transgender female inmates and if Plaintiffs suffer from exacerbated gender dysphoria as a result of their transfers, these facilities "are able to provide appropriate treatment." *Id.*

This response fails for two reasons. First, because it is fundamentally unreasonable for prison officials to respond to serious risks such as mental health deterioration, self-harm, and suicidality by intentionally creating those risks and offering to treat them after they predictably occur. Second, because it is unreasonable, given the known risks, for the Bureau to adopt a categorical policy of transferring all transgender female inmates to men's prisons without first considering whether it would be safer to house Plaintiffs in women's facilities. The government does not make the argument that FMC Rochester and MCFP Springfield are safer housing options for Plaintiffs than any female facilities would be. Instead, the Bureau's categorical policy derives entirely from Executive Order 14168, notwithstanding its direct conflict with PREA's requirement

of individualized placement decisions, 28 C.F.R. § 115.42(c), and the Bureau's own prior policy. Failing to consider whether transferring Plaintiffs to *any* men's prison was safe despite Plaintiffs documented vulnerabilities is not a reasonable response to a serious risk.

Because Plaintiffs have established that the government knew of the serious risks of harm that Plaintiffs faced if they were transferred to men's prisons, and because the government did not respond reasonably to those known risks, Plaintiffs have satisfied the subjective prong of the Eighth Amendment.

**C. Individual Findings**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**D. Remaining Preliminary Injunction Factors**

Plaintiffs have demonstrated that irreparable harm will follow if their request for a preliminary injunction is denied. This is so because "a prospective violation of a constitutional right constitutes irreparable injury." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) ("[A] prospective violation of a constitutional right constitutes irreparable injury for purposes of seeking equitable relief." (cleaned up)). As detailed above, Plaintiffs have established a likelihood of success on their Eighth Amendment claims and have therefore established that they will face irreparable harm in the absence of preliminary relief.

Moreover, the balance of the equities and the public interest favor the plaintiffs. The government cites concerns about the safety, privacy, and dignity of cisgender women incarcerated with Plaintiffs. *See* Opp'n at 33–34. The government also claims that a preliminary injunction would "impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy." *Id.* at 34. But as detailed elsewhere in this opinion, nothing in this preliminary injunction prevents the government from separating Plaintiffs from cisgender female inmates within the women's facilities where they are currently housed if it is necessary to do so. This injunction only prevents the government from transferring Plaintiffs to

men's prisons. As such, any public interest in seeing Plaintiffs relocated immediately to male facilities is slight at best. The government's mitigable concerns are therefore outweighed by the specific harms Plaintiffs would face if transferred to men's prisons—including a heightened risk of sexual violence, as well as self-harm and suicide. The balance of the equities therefore favors a preliminary injunction so that the litigation may run its course.

### E. Narrow Tailoring Under the PLRA

Plaintiffs seek an order enjoining Defendants "from implementing Section[] 4(a) . . . of Executive Order 14168" against them and requiring Defendants to "maintain and continue [Plaintiffs'] housing status in women's facilities." Proposed Order ¶¶ 2–3, ECF No 117–29. The government argues this injunction violates the PLRA's command that "preliminary injunctive relief" "with respect to prison conditions" must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." Opp'n at 35 (quoting 18 U.S.C. § 3626(a)(2)). Specifically, the government asserts that there are less intrusive means of addressing the harms Plaintiffs would face in men's prisons than ordering the Bureau to keep Plaintiffs in female institutions. *Id.* The government suggests, for instance, that the Court could "order BOP to undertake additional safety measures to protect Plaintiffs in men's facilities, such as housing Plaintiffs 'in a dedicated facility, unit, or wing.'" *Id.* (quoting 28 C.F.R. § 115.42(g)).

Plaintiffs, by contrast, argue that the least intrusive relief "is to preserve the housing placements BOP itself established and has maintained for years." Reply at 17. The Court agrees with Plaintiffs. Maintaining Plaintiffs current housing status is obviously less intrusive than ordering Defendants to undertake additional safety measures or to establish and operationalize special facilities to house transgender female inmates in men's prisons while litigation proceeds.

Finally, the preliminary relief is narrowly tailored because, as stated elsewhere in this opinion, nothing in this injunction prevents the government from separating transgender female inmates from cisgender female inmates within women's prisons if it becomes necessary to do so.

## F. The *Fleming v. Rule* Preliminary Injunction

On June 2, 2026, a court in the Northern District of Texas issued a preliminary injunction in *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex.), a case brought by several cisgender female inmates at [redacted] against the United States, the Attorney General, and the Bureau of Prisons, challenging the Bureau's practice of housing transgender female inmates in women's prisons. The June 2 preliminary injunction was granted at the request of Plaintiff-Intervenors in that case—a group of cisgender female inmates at [redacted]—and ordered the government to house transgender female inmates at that facility "in a secure, segregated area," and to use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." Prelim. Inj., *Fleming* (N.D. Tex. June 2, 2026), ECF No. 133, at 3. The government in this case has since filed notice of the *Fleming* court's preliminary injunction and the *Fleming* Plaintiff-Intervenors have since moved to intervene in this matter, noting that [redacted] of the transgender female inmates housed at [redacted] that are subject to the *Fleming* preliminary injunction are also plaintiffs in this matter [redacted] Mot. to Intervene at 1, ECF No. 141.

Putative Plaintiff-Intervenors argue that their intervention is necessary because "the Government Defendants in this case have failed to document and present" the ways female inmates have been harmed by the presence of transgender females at [redacted] *Id.* The claimed harms include transgender female inmates' presence in women's bathrooms and other shared spaces, sexual propositions, and retaliation against cisgender female inmates who complain,

among other things. *Id.* at 1–2. Because these purported harms are temporarily addressed by the *Fleming* court's June 2 preliminary injunction—separating transgender female inmates from cisgender female inmates at [redacted]—this Court finds that it is not necessary to decide the motion to intervene before ruling on Plaintiffs' pending motion for a preliminary injunction.

Nothing in the preliminary injunction this Court issues today conflicts with the *Fleming* court's June 2 injunction. Today's injunction merely enjoins the government from transferring Plaintiffs to men's prisons. It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces.

## IV. CONCLUSION

For the forgoing reasons, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction. A separate Order consistent with this Memorandum Opinion shall issue.

Date: 6/7/26

Royce C. Lamberth
United States District Judge