**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
|         Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
|         Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
|         Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
|         Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
|         Plaintiffs, | |
| v. | |
| DONALD TRUMP, *in his official capacity* as President of the United States, et al., | |
|         Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO ENFORCE**
**PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES............................................................................................... ii

FACTS ............................................................................................................................3

    1.    This Action.....................................................................................................3

    2.    The Fleming Litigation. ..................................................................................4

    3.    Defendants' Response to the Fleming Preliminary Injunction. .............................5

    4.    Harm to the Plaintiffs at ███████ Who Have Been Housed in the Segregated Unit.................................................................................................7

    5.    Defendants' Decision to Transfer All Other Incarcerated Plaintiffs to the Segregated Unit at █████████. ...........................................................11

ARGUMENT ....................................................................................................................11

    1.    This Court Should Take Action to Enforce Its Own Orders and Protect Plaintiffs from Retaliation.............................................................................11

        a.    Defendants' Conduct Is Not Consistent with the Letter or Spirit of This Court's Prior Orders..........................................................................12

        b.    Defendants Are Routing Plaintiffs Into the █████ Segregated Unit in Retaliation for Their Participation in This Litigation. ...........................15

    2.    BOP's Categorical Segregation of Transgender Women Is Independently Unlawful and Requires Immediate Injunctive Relief. ..........................................18

        a.    Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates the Administrative Procedure Act .............18

        b.    Plaintiffs Are Likely To Succeed in Proving That the Mandatory Segregation Scheme Violates Their Constitutional Rights. .......................20

        c.    Plaintiffs Face Irreparable Harm Warranting Immediate Relief. ...............23

        d.    The Balance of Equities and Public Interest Weigh in Favor of Relief.........................................................................................................24

        e.    Granting Injunctive Relief Satisfies the Requirements of the PLRA. ......................................................................................................25

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) ........................................................................... 19

*Aref v. Holder,*
    774 F. Supp. 2d 147 (D.D.C. 2011) ................................................... 16

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ........................................................... 22

*Armstrong v. Newsom,*
    58 F.4th 1283 (9th Cir. 2023) ............................................................ 18

*Banks v. Booth,*
    459 F. Supp. 3d 143 (D.D.C. 2020) ................................................... 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................... 19

*D.A.M. v. Barr,*
    474 F. Supp. 3d 45 (D.D.C. 2020) ..................................................... 18

*Damus v. Nielsen,*
    313 F. Supp. 3d 317 (D.D.C. 2018) ................................................... 18

*Deering Milliken, Inc. v. Fed. Trade Comm'n.,*
    647 F.2d 1124 (D.C. Cir. 1978) ......................................................... 12

*Doe v. Blanche,*
    172 F.4th 901 (D.C. Cir. 2026) ...................................................... 4, 16

*Doe v. McHenry,*
    763 F. Supp. 3d 81 (D.D.C. 2025) ...................................................... 3

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ........................................................................... 20

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons,*
    954 F.3d 118 (2d Cir. 2020) .............................................................. 18

*Fleming v. Rule,*
    No. 4:25-cv-00157-D (N.D. Tex.) ................................................ *passim*

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................................ 19

*Frew ex rel. Frew v. Hawkins*,
    540 U.S. 431 (2004) ................................................................................................ 17

*Garcia v. Dist. of Columbia*,
    56 F. Supp. 2d 1 (D.D.C. 1998) ..................................................................... 12, 16

*Jones v. Bondi,*
    2025 WL 923117 (D.D.C. Feb. 24, 2025) .............................................................. 3

*Kingdom v. Trump*,
    No. 1:25-cv-691 (D.D.C. 2026) ............................................................................ 12

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ............................................................................. 16

*Moe v. Trump*,
    No. 1:25-cv-00653-RCL (D.D.C. 2025) .................................................................. 3

*Molina v. U.S. Dep't of Homeland Sec.,*
    2026 WL 1256234 (D.D.C. May 7, 2026) ............................................................. 11

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .............................................................................. 18

*Sandin v. Conner*,
    515 U.S. 472 (1995) ................................................................................................ 21

*Taylor v. Trump*,
    823 F. Supp. 3d 17 (D.D.C. 2026) ........................................................................ 22

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of the Univ. of D.C.*,
    56 F.3d 1469 (D.C. Cir. 1995) .............................................................................. 22

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ........................................................................................ 18, 20

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ........................................................................................ 12, 17

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................... 18

*Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*,
    93 F.3d 910 (D.C. Cir. 1996)....................................................................................... 17

**STATUTES**

5 U.S.C. § 553 ................................................................................................................... 20

5 U.S.C. § 704 ................................................................................................................... 19

5 U.S.C. § 706 ................................................................................................................... 18

18 U.S.C. § 3626 ............................................................................................................ 4, 25

28 U.S.C. § 1651 ..................................................................................................... 12, 13, 17

**REGULATIONS**

28 C.F.R. § 115.42 ..................................................................................................... *passim*

**FEDERAL RULES**

Fed. R. Civ. P. 62 .............................................................................................................. 12

**OTHER AUTHORITIES**

Executive Order 14168 ............................................................................................ 3, 5, 14, 17

77 Fed. Reg. 37152 ........................................................................................................... 20

Plaintiffs Emily Doe, Zoe Doe, Mary Doe, Carla Jones, Sara Doe, Maria Moe, Olivia Doe, and Amy Jones move to enforce this Court's June 7, 2026, preliminary injunction order, (ECF No. 160), which requires Defendants to maintain their housing in women's facilities.

In response to a separate injunction in *Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.), the Bureau of Prisons ("BOP") has placed all transgender women at ▬▬▬▬▬ in a restrictive, segregated unit that offers very little programming, education, or work and only minimal recreation, and it is now moving to transfer all other incarcerated Plaintiffs from other women's facilities to that segregated unit.

*Fleming* requires only that transgender women at ▬▬▬▬▬ be housed in a "secure, segregated area," with separate movement and scheduling to prevent contact with other incarcerated people in that facility. *Fleming*, ECF No. 199 at 3. It does not otherwise limit BOP's ability to move or transfer transgender women out of that prison and certainly does not require BOP to transfer additional Plaintiffs from across the country into the unit. Nor does it require BOP to place them on a twenty-three-hour per day lockdown in their unit or eliminate programming, education, recreation, and meaningful social contact. BOP added those deprivations itself, producing what it calls a "prison within a prison," *id.*, ECF No. 166 at 15–16, that has admittedly caused "difficulties . . . in managing" the entire facility, *id.*, ECF No. 129 at 41.

These conditions exceed what *Fleming* requires, and they are not "necessary" within the meaning of this Court's injunction, which permits Defendants to separate Plaintiffs from non-transgender women only "if it becomes necessary to do so." (ECF No. 161 at 52.) The BOP's actions here are neither narrowly tailored nor the least restrictive means of complying with *Fleming*, create additional Eighth Amendment violations, and independently violate 28 C.F.R. §

115.42(g), which bars placing transgender inmates in a separate unit based on their transgender status.

The four Plaintiffs already in the segregated unit have lost documented clinical progress: their gender dysphoria has returned, and their mental health has declined. Some report renewed suicidal ideation. The four Plaintiffs facing transfer to the segregated unit will suffer the same. Defendants could have housed Plaintiffs in general population at any of the Bureau's other women's facilities. They chose instead to concentrate Plaintiffs in this single unit—and did so only after Plaintiffs prevailed on their preliminary injunction. That timing, together with the general-population placements available at other facilities and the admitted burdens on day-to-day prison operations caused by maintaining a "prison within a prison," *Fleming*, ECF No. 166 at 15–16, supports the inference that the blanket segregation scheme is retaliation for Plaintiffs' exercise of their right to petition the courts.

Plaintiffs ask the Court to enforce its preliminary injunction or grant new injunctive relief requiring Defendants to: (1) transfer all Plaintiffs housed in the segregated unit at ███████████ to general population in other women's facilities according to BOP's ordinary individualized designation process and all applicable PREA regulations, or in the alternative, restore their access to programming, education, recreation, medical and mental health care, and out-of-unit time comparable to that offered to individuals in general population; (2) refrain from transferring additional Plaintiffs to the segregated unit at ███████████ and return any Plaintiffs already so transferred to an appropriate placement in general population of a women's facility consistent with BOP's ordinary individualized designation process and all applicable PREA regulations; (3) refrain from creating dedicated units or facilities for transgender women in violation of 28 C.F.R.

§ 115.42(g); and (4) comply with any other relief the court deems necessary and appropriate to enforce its orders and aid in its exercise of jurisdiction over this matter.

## FACTS

**1.    This Action.**

On January 20, 2025, Executive Order 14168 ("EO 14168") directed BOP to transfer transgender women in women's facilities to men's facilities without regard to individual health and safety, and to withhold "any medical procedure, treatment, or drug" used to treat gender dysphoria. EO 14168 § 4(a), (c). BOP began implementing the order at once. It removed several Plaintiffs from general population, placed them in segregated housing pending transfer, and told some that their hormone therapy would end.

Plaintiffs filed these consolidated actions (Nos. 25-cv-00401, 25-cv-00653, and 25-cv-00286) and sought injunctive relief. Along with challenging their transfers and the termination of hormone therapy, Plaintiffs detailed their removal from general population into segregated housing, and *Doe* Plaintiffs challenged their segregation as unlawful agency action taken to implement the Order. (*See* ECF No. 58-2 ¶¶ 77, 86, 90, 158.)

This Court granted preliminary relief, finding Plaintiffs likely to succeed on their Eighth Amendment claims as to both housing and medical care. *Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Bondi*, No. 1:25-cv-00401-RCL, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 1:25-cv-00653-RCL, ECF No. 62, at 1–2 (D.D.C. Mar. 10, 2025). The Court enjoined enforcement of Sections 4(a) and 4(c) and required Defendants to maintain Plaintiffs' housing in women's facilities and continue the gender dysphoria treatment they were receiving before January 20, 2025. (ECF Nos. 23, 44, 55, 68, 83, 89, 94, 101, 120, 125, 147, 160); *Jones*, ECF Nos. 28, 46, 69, 75, 81, 88; *Moe*, ECF Nos. 62, 84, 90, 96, 103.

The Government appealed as to Section 4(a) and Plaintiffs' housing. The D.C. Circuit vacated the injunction and remanded for individualized findings on the features of each Plaintiff that render transfer to a men's facility unconstitutional under the Eighth Amendment. *Doe v. Blanche*, 172 F.4th 901, 905–06, 910, 917 (D.C. Cir. 2026); (ECF No. 161 at 3). On remand, the Court made those findings and, on June 7, 2026, entered a new preliminary injunction barring implementation of Section 4(a) and requiring Defendants to maintain each Plaintiff's housing in women's facilities until release. (*See* ECF No. 160.) The Court found this relief "narrowly drawn," extending "no further than necessary," and "the least intrusive means necessary to correct that harm." (*Id.* at 2); 18 U.S.C. § 3626(a)(2).

**2.      The Fleming Litigation.**

In *Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.), two plaintiffs and five intervenors challenged BOP's placement of transgender women at ▮▮▮▮▮▮▮▮▮▮, a women's facility. The Government did not contest the merits; it stated repeatedly that it agreed with the plaintiffs' position. *See, e.g.*, *Fleming*, ECF No. 129, at 1–3.

On June 2, 2026, the *Fleming* court entered a preliminary injunction prohibiting BOP from housing transgender women in the general population of any unit at ▮▮▮▮▮▮▮ where other women are present, and from permitting any transgender woman to "enter or remain in any space . . . where biological female inmates are present, including, but not limited to, showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, the mailroom, and other shared prison spaces." *Fleming*, ECF No. 199 at 2. To comply, the court directed BOP to house transgender women "in a secure, segregated area" and to use "separate movement, routing,

scheduling, or other measures as necessary to prevent overlap" in housing and shared spaces. *Id.* at 3.[1]

This Court addressed *Fleming* in its June 7 opinion and held, at that time, that its own injunction did not conflict with it. (ECF No. 161 at 53.) This Court explained that its injunction does not, "at this juncture," require that Plaintiffs be housed with non-transgender women. (*Id.*) And it stated that nothing in its injunction "prevents the government from separating Plaintiffs from cisgender female inmates within the women's facilities where they are currently housed if it is necessary to do so." (*Id.* at 51.) That qualification—"if it is necessary"—is a limitation, not a blank check. (*Id.*) It necessarily implies that Defendants' response to the *Fleming* preliminary injunction must be narrowly tailored to achieve compliance while remaining consistent with the orders of this Court.

**3.      Defendants' Response to the *Fleming* Preliminary Injunction.**

BOP did not adopt narrowly-tailored measures to comply with *Fleming*. The preliminary injunction entered in that case is limited to a single women's facility. *Fleming* ECF No. 199 at 2. It left BOP free to house transgender women in general population at other women's facilities. BOP also retained authority to take measures in all women's facilities to address the alleged privacy, safety, and religious interests raised by the *Fleming* plaintiffs and intervenors, consistent with legitimate management and security needs.

Instead, BOP repeated the dangerous and harmful steps it took when initially implementing EO 14168 more than a year ago: it moved all transgender women at ▮▮▮▮▮ "to a separate, secure unit . . . so that they are no longer co-housed with any female inmates," and it kept them apart from

---

[1] The Government did not oppose the injunction on the merits, choosing instead to raise jurisdictional defenses about standing, procedural defenses about the scope of the proposed injunction compared to the operative complaint, and concerns that creating a segregated unit for transgender women would violate the orders of this Court. *See generally, Fleming*, ECF No. 166.

other incarcerated women "by clearing the compound and using escorted, secured moves" whenever they need to leave the unit. *Fleming* ECF No. 211 at 1.

BOP did not stop there. It also restricted their access to areas outside their unit and eliminated the programming, education, work, and recreation previously available to Plaintiffs in general population—producing what Emily Doe calls "SHU-lite," a reference to the Special Housing Unit that BOP uses for disciplinary segregation. (Emily Doe Decl. ¶ 10.) Indeed, Plaintiffs spend at least twenty-three hours per day restricted to their unit with only one hour of recreation outside the unit available to them. (Zoe Doe Decl. ¶¶ 6–7; Carla Jones Decl. ¶ 9.) Their only opportunity to be outside is the few minutes they spend walking between the medical building where they are housed and the enclosed recreation area outside their unit. (Carla Jones Decl. ¶ 10.)

The mental health care provided in the unit is also inadequate; Plaintiffs no longer have regular access to their psychologists, who now must visit them in the segregated unit. (Emily Doe Decl. ¶ 11.) It took "weeks" before a mental health staff member visited Emily Doe, and Mary Doe has seen a psychologist only twice since being housed in the unit a month and a half ago. (*Id.*; Mary Doe Decl. ¶ 12.) Zoe Doe recognized that her mental health was deteriorating as a result of her placement in the restrictive segregated unit and requested to see a mental health provider. It took approximately three weeks for someone to come to the unit to see her for a brief consult, and she was told she would thereafter be seen once every two weeks going forward. (Zoe Doe Decl. ¶ 17.)

Defendants have acknowledged to this Court that the unit has caused "difficulties . . . in managing" the facility. (ECF No. 129 at 35.) BOP officials shut down portions of the facility and have multiple guards escort Plaintiffs whenever they need to walk to their recreation area, medical appointments, or legal visits so that Plaintiffs will not be seen by any other incarcerated women in

the facility. This has caused hours-long waits and Plaintiffs missing medical appointments or having their legal visits cut short. (Zoe Doe Decl. ¶¶ 10–13; Carla Jones Decl. ¶ 10.) These conditions are highly restrictive and not consistent with Plaintiffs' preexisting housing status in women's facilities.

4.    **Harm to the Plaintiffs at** ▮▮▮▮▮▮▮ **Who Have Been Housed in the Segregated Unit.**

The Plaintiffs' declarations and the expert declaration of Dr. Randi Ettner document the harm the unit has caused each of them.

***Emily Doe.*** Emily Doe is ▮, has taken hormone medication for ▮▮▮▮▮▮▮, and has lived in women's facilities since ▮▮▮▮▮▮. (Ettner Decl. ¶ 15; ECF No. 116-25 ¶¶ 40, 44.) At ▮▮▮▮ she had improved: she was less depressed and less anxious and found it "much easier to manage thoughts of self-harm." (Emily Doe Decl. ¶ 2.) She was on the waitlist for the ▮▮▮▮▮▮ program (about 20th) and planned to apply to a ▮▮▮▮ program. (*Id.* ¶ 7.) In the segregated unit she is prohibited from accessing either program (or any general population programming for that matter). (*Id.*) Initially, indoor recreation lacked any of the exercise equipment and craft/hobby materials Ms. Doe had in general population. (*Id.* ¶ 8.) Just this week, the women were allowed to use their old space, but still without access to full equipment. (*Id.*) Outdoor recreation initially consisted of a small, empty patio without any exercise equipment but has not been offered at all in recent days. (*Id.* ¶ 9.) Ms. Doe's dysphoria symptoms are now "as severe as [she] can ever remember them being." (*Id.* ¶ 4.) When she asked to see a psychologist, weeks passed before anyone came. (*Id.* ¶ 11.) She reports rising anxiety, depression, fear, and paranoia (which her psychologist says is worsened by her ▮▮▮▮) and serious problems sleeping. (*Id.*) The BOP also cancelled ▮▮▮▮ she had scheduled this week, without any explanation, and

staff are no longer helping her transfer to another prison to participate in the ▮▮▮▮▮ program. (*Id.* ¶¶ 12–13.)

**Mary Doe.** Mary Doe has lived in women's facilities since ▮▮▮. BOP's records show that treatment for her gender dysphoria—through hormone therapy and placement in a women's facility—"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮." (Ettner Decl. ¶ 11.) Since moving to the segregated unit, she reports her gender dysphoria symptoms are "through the roof," she is unable to sleep, she has no access to the programming available in general population, and as of the date of her declaration, she had seen a psychologist only twice. (Mary Doe Decl. ¶¶ 5, 8, 12.) She feels isolated and trapped and perceives the placement as an effort to reverse her gender presentation. (*Id.* ¶¶ 14–15.) She has also stopped a formerly consistent daily grooming routine, which Dr. Ettner identifies as "a recognized correlate of increasing dysphoria-related distress, not merely a change in personal habit." (*Id.* ¶ 16; Ettner Decl. ¶ 11.)

**Zoe Doe.** Zoe Doe has taken hormone medication for nearly ▮▮▮▮, has ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and has lived in women's facilities since ▮▮▮. (Ettner Decl. ¶ 12; Zoe Doe Decl. ¶ 2.) BOP's own clinicians recorded that this placement "▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"—so much so that, as of ▮▮▮▮▮ she was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" for any condition. (Ettner Decl. ¶ 12.) In the segregated unit, Ms. Doe describes a "lock-down" situation that has severed her from a support network built over ▮▮▮▮. (*Id.* ¶ 13; Zoe Doe Decl. ¶¶ 6, 9.) She has no meaningful access to programming: before being placed in the unit, she was enrolled in a ▮▮▮▮▮▮▮ program that met five days a week and included ▮▮▮▮▮▮▮▮▮

██████████████████████████ but she can no longer attend the program or interact with its participants or mentors. (Zoe Doe Decl. ¶ 14.)

Whenever Zoe leaves the unit, the entire facility is shut down and guards surround and escort her. (*Id.* ¶ 10.) She also is forced to announce the purpose of any trip off the unit in front of staff and other residents—even when it is for ████████████ care or other confidential medical needs. (*Id.*) The process is humiliating and dehumanizing. (*Id.*) These lockdowns have also disrupted her access to counsel: on one occasion, it took BOP staff more than two hours to escort her approximately 50 feet to an attorney visit, leaving her lawyers only 30 minutes before they had to leave for the airport. (*Id.* ¶ 12.) On other occasions, her legal phone calls have been abruptly cancelled. (*Id.*) BOP staff also cancelled a medical appointment for ████████████ ██████ without her knowledge, apparently to avoid the logistical burden of moving her. (*Id.* ¶ 13.)

Ms. Doe's gender dysphoria is now "back in full force," with mounting "depression and agitat[ion]." (Ettner Decl. ¶ 13; Zoe Doe Decl. ¶¶ 16, 19.) Recognizing that her mental health was deteriorating, Ms. Doe requested to see a mental health provider, but it took approximately three weeks before anyone came to the unit for a brief consultation. (Zoe Doe Decl. ¶ 17.) She is experiencing difficulty sleeping, cognitive impairment, has thoughts of self-harm, reports questioning the value of her life, and states she has not felt this bad since she was housed in men's prisons ████████████ (*Id.* ¶¶ 18–19; Ettner Decl. ¶ 13.)

***Carla Jones.*** Carla Jones is ██, has taken hormone medication since ████, and has lived in women's facilities since ████████ (Ettner Decl. ¶ 13.) She is confined at least twenty-three hours a day in a small, overcrowded space with only limited indoor recreation, and no access to outdoor recreation. (Carla Jones Decl. ¶¶ 5, 9.) Before being placed in this unit, she spent much of her time outdoors and is severely distressed by this restrictive confinement. (*Id.* ¶ 11.) She has no

privacy and feels vulnerable and exposed to male officers in a way that never occurred in general population: on one occasion, a male guard opened her cell door while she was using the toilet and stood watching her. (*Id.* ¶¶ 6–7.) The shower area likewise provides no real privacy, as a window allows anyone passing by to observe her, and guards have moved the paper covering it aside. (*Id.* ¶ 7.) She reports feeling "locked down" and having no access to programming; she was told she may not join instructor-led classes and may do only "self-study." (*Id.* ¶¶ 9, 14.)

Ms. Jones's mental health has significantly declined since being placed in the unit. (*Id.* ¶ 12.) She feels that BOP is stripping her of her female identity and that the years she has spent fighting for treatment and recognition as a woman mean nothing. (*Id.* ¶¶ 4, 14.) Her confinement in the segregated unit is severely exacerbating her gender dysphoria; she feels she is never going to progress or obtain the ▇▇▇ she needs. (*Id.* ¶¶ 14–15.) Most concerning, Ms. Jones has had thoughts of self-harm, including of ▇▇▇▇▇▇ again—a method she has resorted to in the past—and has told her psychologist that while she has no immediate plans, at any minute she could give in and give up. (*Id.* ¶ 15.) Her appetite has declined, she gives much of her food away, and she spends most of her days sleeping as her only escape from the conditions. (*Id.* ¶ 16.)

***Dr. Ettner.*** Dr. Ettner explains that these serious outcomes and harms track the clinical literature. For transgender women, living as a woman—including through placement in women's prisons—is itself a recognized element of treatment for gender dysphoria. (Ettner Decl. ¶¶ 4–5.) Removing an environment in which a patient had improved creates a substantial risk that dysphoria symptoms will re-emerge even if hormone therapy continues unchanged. (*Id.* ¶ 6.) Segregated housing independently raises anxiety and depressive symptoms and diminishes coping capacity for anyone, regardless of gender identity. (*Id.* ¶ 7.) It also correlates closely with increased incidences of self-harming behaviors: in a study of more than 200,000 New York City jail

incarcerations, incarcerated individuals placed in solitary confinement faced a substantially higher risk of self-harm, and that risk grew with each additional episode. (*Id.* ¶ 18.) Prolonged isolation and an unaffirmed gender identity produce sustained physiological stress that compounds over time. *Id.* (¶¶ 16–17.) These effects are most acute for Plaintiffs with documented histories of self-harm or suicidality tied to gender dysphoria, including Mary Doe, Zoe Doe, and Carla Jones. (*Id.* ¶ 21.)

**5.     Defendants' Decision to Transfer All Other Incarcerated Plaintiffs to the Segregated Unit at ▮▮▮▮▮▮▮▮.**

On June 29, 2026, Plaintiffs' counsel notified Defendants that the unit was harming Emily Doe, Mary Doe, Zoe Doe, and Carla Jones, including by worsening their gender dysphoria. On July 14, counsel learned that four Plaintiffs housed elsewhere—Sara Doe, Maria Moe, Olivia Doe, and Amy Jones—were likely to be transferred to ▮▮▮▮ and placed in the same unit. Counsel again informed Defendants of the harm, stated Plaintiffs' intent to seek relief, and asked the Government to await this Court's ruling before moving four more Plaintiffs into those conditions.

Defendants have not agreed to wait. Despite being aware of the harm the segregated unit causes, they are moving to concentrate all eight incarcerated Plaintiffs there, removing them from general population at women's facilities across the country, disrupting their programming, and predictably destabilizing their health and well-being. In fact, on July 17—the date of this filing— Plaintiffs' counsel became aware that one Plaintiff had already been transferred.

**ARGUMENT**

**1.     This Court Should Take Action to Enforce Its Own Orders and Protect Plaintiffs from Retaliation.**

"When deciding a motion to enforce a preliminary injunction" pending appeal, "a district court has the authority to enforce the terms of its mandates absent a stay of the preliminary injunction order." *Molina v. U.S. Dep't of Homeland Sec.*, Civil Action No. 25-3417 (BAH), 2026

WL 1256234, at *8 (D.D.C. May 7, 2026); *see also Deering Milliken, Inc. v. Fed. Trade Comm'n.*, 647 F.2d 1124, 1128–29 (D.C. Cir. 1978); Fed. R. Civ. P. 62(d).

In addition, courts have authority under the All Writs Act to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.,* 434 U.S. 159, 172 (1977).

"This Court also has the inherent power to issue further enforcement orders to effectuate the purpose of an injunction or other prior orders." *Kingdom v. Trump*, No. 1:25-cv-691, ECF No. 124 at 2 (D.D.C. Feb. 19, 2026) (collecting authorities). "The fact that the parties in need of protection are incarcerated does not mean that the Court is powerless to issue further orders to protect them from retaliation and to protect the integrity of previously-issued orders." *Id.* (citing *Garcia v. Dist. of Columbia*, 56 F. Supp. 2d 1, 12 (D.D.C. 1998)).

### a.    Defendants' Conduct Is Not Consistent with the Letter or Spirit of This Court's Prior Orders.

This Court has repeatedly issued preliminary relief in this action to maintain the status quo pending final judgment, to protect Plaintiffs from serious harm (including worsening gender dysphoria), and to prevent Defendants from implementing Section 4(a) of the Executive Order. (*See, e.g.*, ECF No. 160 at 3 ("maintaining the status quo"); *id.* at 2 (enjoining implementation of the Executive Order); ECF No. 161 at 12–14, 16–20 (holding that injunctive relief was warranted in part because Defendants were aware of and disregarded an intolerable risk of exacerbated gender dysphoria).) Defendants defy all three aspects of this Court's orders.

First, far from maintaining the status quo, Defendants seek to remove all incarcerated Plaintiffs from general population at various facilities nationwide—facilities Defendants themselves chose as the most appropriate placements for each Plaintiff. Defendants now plan to house them all in a single, segregated, highly restrictive unit under conditions that are not comparable to a women's facility, without regard for their individual needs and circumstances. This plan is not consistent with this Court's injunction requiring Defendants to "maintain and continue the housing status in women's facilities." (ECF No. 160 at 2.)[2]

Second, the creation of the segregated unit and imposition of punitive conditions are predictably exacerbating the gender dysphoria of the Plaintiffs who are housed there. (*See* Emily Doe Decl. ¶ 4; Mary Doe Decl. ¶ 5; Zoe Doe Decl. ¶ 16; Carla Jones Decl. ¶ 14; Ettner Decl. ¶¶ 5–6.) It also undermines these Plaintiffs' gender dysphoria treatment by removing the combined benefit of medical treatment and social affirmation that BOP's own clinicians documented as producing "███████████████████████." (Ettner Decl. ¶¶ 5–6, 10, 11.) Defendants are on notice of these Plaintiffs' deteriorating mental health and yet seek to subject all other incarcerated Plaintiffs in this action to the same conditions. This will have a predictable destabilizing effect on the remaining Plaintiffs' mental health. (*Id.* ¶¶ 6–7; *see also* ECF No. 117-27 ¶ 37 ("McLearen Decl.")) ("Within BOP, mental health and suicide risk are core components of classification and

---

[2] The planned transfers may also be an attempt to manipulate the jurisdiction of the federal courts. Defendants' proposal will, for the first time, house all Plaintiffs in a single facility. That facility is currently subject to the jurisdiction of the *Fleming* court. And in the *Fleming* action, Defendants have represented that they agree with the substantive positions of the plaintiffs and intervenors in that case, have not meaningfully opposed injunctive relief on the merits, and have represented they will not appeal certain court orders. *See Fleming* ECF No. 72, 129, 133, 140, 147, 165, 166. Allowing Defendants to proceed will further entangle this first-filed litigation with the proceedings in *Fleming*, which could impede this Court's jurisdiction or delay Plaintiffs' ability to proceed with a motion for permanent relief in this Court. This provides an independent justification under the All Writs Act for enforcing this Court's prior orders by requiring Defendants to maintain the status quo. *See* 28 U.S.C. § 1651(a).

housing decisions, and changes in housing environment are recognized as clinically significant events. Under that framework, individuals who have been assessed, placed, and functioning appropriately in a given environment are not reassigned absent a safety, security, or clinical justification.").) This deliberate decision to inflict harm on Plaintiffs cannot be squared with this Court's orders.

Third, Defendants' conduct is an attempt to evade this Court's orders enjoining implementation of Section 4(a) of EO 14168. The decision to impose mandatory segregation on all transgender women in women's facilities is the very same action Defendants took in the days following January 20, 2025, to implement Section 4(a). The segregation regime is so restrictive that it renders Plaintiffs' continued presence in a women's facility punitive, rather than protective. This violates both the letter and spirit of this Court's orders enjoining Section 4(a) and requiring Defendants to maintain Plaintiffs' housing status in women's facilities.[3]

Defendants' conduct cannot be characterized merely as an attempt to comply with the *Fleming* court's order. The punitive environment Defendants have created in the segregated unit goes far beyond the terms of that order. The *Fleming* court said nothing about a twenty-three-hour lockdown, eliminating programming, stripping recreation access, barring education, or reducing mental health services to transgender women. In addition, the *Fleming* preliminary injunction was limited to a specific facility. *Fleming*, ECF No. 199 at 2. It did not prohibit Defendants from transferring transgender women to other women's facilities, consistent with their discretion to

---

[3] Indeed, after this Court initially enjoined Section 4(a) of the Executive Order, Defendants released Plaintiffs from segregation back to general population in their respective facilities. Defendants' conduct is contemporaneous evidence of their understanding that their reflexive, class-based segregation of all transgender women in women's facilities was an action taken to implement Section 4(a) that was prohibited by this Court's injunctions.

determine appropriate placements based on individualized assessments. And it certainly did not require Defendants to transfer other incarcerated Plaintiffs *into* the facility in question.

Defendants rely on this Court's statement that nothing in its June 7 preliminary injunction "prevents the government from separating Plaintiffs from cisgender female inmates within the women's facilities where they are currently housed *if it is necessary to do so.*" (ECF No. 161 at 50 (emphasis added).) But the blanket deprivation Defendants now seek to impose on all incarcerated Plaintiffs is not "necessary" and has not been sanctioned by this Court. To the contrary, it violates the narrow-tailoring limitation inherent in the text of this Court's order. (*Id.* at 51–52.)

At a minimum, this Court should enforce the PI's narrow-tailoring limitation and require Defendants to comply with *Fleming* through the least restrictive means, rather than through a blanket deprivation of programming, education, recreation, and out-of-unit time.

**b.    Defendants Are Routing Plaintiffs into the ▮▮▮▮▮▮ Segregated Unit in Retaliation For Their Participation in This Litigation.**

Defendants' conduct is not merely inconsistent with this Court's injunction; it is retaliatory. The Bureau operates numerous women's facilities across the country in which Plaintiffs could be held in general population. Yet Defendants have chosen to concentrate all eight incarcerated Plaintiffs in the single restrictive unit in the state where a standing court order will subject them to segregation and isolation—and they have moved to do so only after Plaintiffs secured individualized preliminary relief from this Court on June 7, 2026. (*See* ECF No. 160.) Where the Government, holding every alternative in hand, routes the very litigants who just prevailed against it to the one place guaranteed to inflict the harms this Court's injunction was designed to prevent, the natural inference is that Defendants are punishing Plaintiffs for coming to this Court.

Retaliation against Plaintiffs for pursuing this litigation is independently unlawful. The First Amendment protects the right of incarcerated people to petition the courts and to seek redress

-15-

of their grievances, and officials may not take adverse action to punish the exercise of that right. *See Garcia*, 56 F. Supp. 2d at 12 (a prisoner's right of access to the courts is protected by the First Amendment's guarantee of the right to petition for redress of grievances, and retaliatory action that would chill the exercise of those rights is actionable). An action is retaliatory when it would "deter a person of ordinary firmness" from engaging in the protected conduct, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025), and is causally connected to that conduct, *see Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011). That the transfer is nominally an exercise of the Bureau's housing discretion is no defense: a discretionary act taken to punish protected activity is retaliation all the same.

Each element is present here. Plaintiffs engaged in quintessential protected activity: they filed these actions and litigated them through preliminary-injunction proceedings, an appeal, a remand, and renewed proceedings, ultimately obtaining individualized findings and preliminary relief keeping them housed in women's facilities. (ECF No. 160, 161; *see also Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026).) Defendants' response has been severe. As the declarations of the four Plaintiffs already in the unit and the expert declaration of Dr. Ettner establish, placement in the segregated unit has stripped Plaintiffs of programming, education, recreation, and social contact and has caused resurgent gender dysphoria, the loss of years of clinical progress, and deteriorating mental health, including renewed suicidal ideation. (*See* Emily Doe Decl. ¶¶ 4, 6–11; Zoe Doe Decl. ¶¶ 6, 11, 14–19; Carla Jones Decl. ¶¶ 9–15, 17; Ettner Decl. ¶¶ 10–15, 21.) Consigning Plaintiffs to conditions that Emily Doe aptly describes as "SHU-lite," (Emily Doe Decl. ¶ 9), is far more than enough to deter a person of ordinary firmness from continuing to assert her rights.

-16-

The causal connection is evident from both the timing and the target of Defendants' conduct. Defendants moved to funnel Plaintiffs into the segregated unit in the aftermath of this Court's June 7 injunction, replicating the very steps BOP took to implement EO 14168 in the weeks following January 20, 2025. And of every placement available to them, Defendants selected the only one that would inflict these harms. No legitimate penological interest explains that choice. Defendants' stated justification for segregating transgender women—the protection of non-transgender women—cannot account for it, because no court has made any finding that any Plaintiff poses a danger to other women. (*See* ECF No. 161 at 50–51.) To address the asserted interests of a handful of individuals at ████ (out of more than ███ housed there), Defendants have built a unit that inflicts known, serious harm on eight Plaintiffs who did nothing but prevail in this Court—including four Plaintiffs who were not housed at ████████ in the first place. The most plausible explanation for singling them out is the impermissible one: to punish Plaintiffs for litigating, to make their continued confinement in women's facilities as painful as possible, and to deter them and others from asserting their rights.

This retaliation is itself a reason for the Court to act. Beyond violating the First Amendment, Defendants' effort to punish Plaintiffs for invoking this Court's protection—and to shift them into conditions supervised by another court—is an attempt to evade and frustrate this Court's injunction and to impede its management of litigation that was filed first. This Court has ample authority under the All Writs Act, 28 U.S.C. § 1651(a), and under its inherent power to prevent such interference and to protect those who come before it from retaliation. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004); *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977); *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 931

(D.C. Cir. 1996); *see also Armstrong v. Newsom*, 58 F.4th 1283, 1290–93 (9th Cir. 2023). It should exercise that authority here.

**2.     BOP's Categorical Segregation of Transgender Women Is Independently Unlawful and Requires Immediate Injunctive Relief.**

To obtain a temporary restraining order or preliminary injunction, a movant "must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (alterations added); *see also Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020) (explaining that an application for a temporary restraining order is analyzed using the same factors applicable to a preliminary injunction). "When the movant seeks to enjoin the government, the final two . . . factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). All four factors strongly support granting a temporary restraining order and preliminary injunction here.

**a.     Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates the Administrative Procedure Act**

Plaintiffs are likely to succeed on their claim that BOP's mandatory segregation scheme is contrary to 28 C.F.R. § 115.42(g)—a binding regulation—and thus violates the Administrative Procedure Act. *See* ECF No. 58-2 ¶ 158; 5 U.S.C. § 706(2)(A); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (establishing that agencies must follow their own regulations).[4]

---

[4] Accardi claims can be brought through an APA cause of action. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 335–36 (D.D.C. 2018); *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020).

First, the APA permits judicial review of final agency action. 5 U.S.C. § 704. Agency action is final where the action (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). The agency action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).

By Defendants' own admissions, BOP has "consummat[ed]" its decisionmaking process. *Bennett*, 520 U.S. at 177 –78. Defendants have affirmatively notified this Court that they "will be transferring" incarcerated Plaintiffs "from the female facilities where they are currently housed to the housing unit at ██████████." (ECF No. 168 at 2.) And there can be no question that the mandatory segregation of all incarcerated Plaintiffs has "direct and immediate" legal consequences affecting their conditions of confinement. *See Franklin*, 505 U.S. at 796–97.

Second, BOP's decision to create a single, segregated unit for all transgender women in women's facilities nationwide is arbitrary and capricious or "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because it directly violates binding Prison Rape Elimination Act regulations. Specifically, 28 C.F.R. § 115.42(g) provides that an agency "shall not place" transgender or intersex individuals "in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."

BOP's segregated unit does precisely what §115.42(g) forbids: it categorically segregates all transgender women at ██████████ based on their transgender status for reasons unrelated to

their own safety.[5]   And it comes with the consequences the PREA regulations sought to prevent. *See* 77 Fed. Reg 37106, 37153, *National Standards To Prevent, Detect, and Respond to Prison Rape* (June 20, 2012) (recognizing that separate units "may result in [LGBTI inmates] being unable to access the same privileges and programs as others in general population housing, effectively punishing [them] for their LGBTI status"). If Defendants wish to modify the PREA regulations, they are entitled to do so through notice-and-comment procedures. *See* 5 U.S.C. § 553. What they cannot do is ignore and violate their own regulations at will. *See generally Accardi*, 347 U.S. 260 (1954).

> **b.      Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates Their Constitutional Rights.**

Plaintiffs are also likely to succeed in establishing that the uniform segregation scheme violates their constitutional rights under the Eighth Amendment and the Due Process Clause.

**First,** the conditions of confinement in the segregated unit likely violate the Eighth Amendment, which prohibits cruel and unusual punishment. A prison official violates the Eighth Amendment when that official acts with deliberate indifference to a substantial risk of serious harm to an incarcerated person. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994). This court has already recognized "the risk of severely exacerbated gender dysphoria" and attendant mental health consequences to be a serious harm. (ECF No. 161 at 14.) And the evidence establishes that

---

[5] The regulatory exception allowing facilities to establish "dedicated facility, unit or wing . . . in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates" is not applicable here. The exception does not cover any legal judgment; it refers only to judgments entered "for the purpose of protecting" the individuals who are subject to segregation based on their transgender or intersex status. The *Fleming* injunction does not fall within the scope of that exception—the segregated unit established by that injunction was created for the benefit of non-transgender women who remain in general population, *not* "for the purpose of protecting" the impacted transgender women. And as already explained, the *Fleming* injunction did not prohibit BOP from transferring transgender women to other facilities or require BOP to transfer additional transgender women *into* the segregated unit from other facilities.

the removal of Plaintiffs from general population and the placement in the highly restrictive segregated unit are currently imposing that serious harm on the four Plaintiffs housed there. Their gender dysphoria is "through the roof," and they are experiencing thoughts of self-harm and suicide and other signs of severely deteriorating mental health. (Mary Doe Decl. ¶¶ 5, 8, 12; Carla Jones Decl. ¶¶ 12, 14–15; Emily Doe Decl. ¶¶ 4, 11; Zoe Doe Decl. ¶¶ 16, 18-19.) These harms were predictable. (Ettner Decl. ¶¶ 5-6, 10, 21.) And Defendants have had actual notice since at least June 29 (and likely sooner) that the conditions of confinement in the segregated unit were causing severe harm. Defendants have not taken action to rectify these harms and have failed to provide adequate mental health care in response. (*See* Emily Doe Decl. ¶ 11; Mary Doe Decl. ¶ 12; Zoe Doe Decl. ¶ 17.) And now, Defendants affirmatively seek to impose the same harms on additional Plaintiffs. That is textbook deliberate indifference. As this Court has recognized, "it is fundamentally unreasonable for prison officials to respond to serious risks such as mental health deterioration, self-harm, and suicidality by intentionally creating those risks." (ECF No. 161 at 19.)

**Second,** the decision to redesignate incarcerated Plaintiffs to the segregated unit likely violates the Due Process Clause. "Even within the prison setting, the Supreme Court has repeatedly held that conditions that 'impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life' encroach upon prisoners' liberty interests and are thereby subject to the requirements of due process." Taylor v. Trump, 823 F. Supp. 3d 17, 30 (D.D.C. 2026) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Restrictive conditions that are comparable to or worse than routine administrative segregation trigger due process review, especially if they are "'indefinite and could be permanent.'" *Id.* at 30 (quoting Aref v. Lynch, 833 F.3d 242, 257 (D.C. Cir. 2016)). "The duration of the condition imposed is a 'crucial element' of the analysis because

-21-

'especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.'" *Id.* (quoting *Aref*, 833 F.3d at 254). Conditions that "'necessarily increase in severity over time'" meet this standard, "'just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones.'" *Id.* (quoting *Aref*, 833 F.3d at 257). Here, the unjustified, indefinite segregation of incarcerated Plaintiffs under highly restrictive conditions satisfies this "atypical and significant hardship" standard and establishes a deprivation of a cognizable liberty interest. With every passing day, the severity of the deprivation increases. (Ettner Decl. ¶ 17.)

The remaining question is whether the government has provided constitutionally sufficient process. "[T]he 'general rule' is that 'individuals must receive notice and an opportunity to be heard before they are deprived of a constitutionally protected interest.'" *Taylor*, 823 F. Supp. 3d at 32 (quoting *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995)). Here, BOP has violated this general rule by failing to provide Plaintiffs *any* opportunity to be heard before they were placed in or redesignated to a highly restrictive segregated unit. *See id.* ("the government may run afoul the Due Process Clause when, for example, it fails to provide any opportunity to be heard").

To the extent BOP provided an opportunity to be heard, the outcome of that process would have been "predetermined—that is, fully decided at the beginning of the process rather than the end" and therefore constitutionally inadequate. *Id.* Defendants' own filing at ECF No. 168 makes clear that Plaintiffs would be sent to the segregated unit at ███████████ "no matter what result the ordinary BOP process might have yielded." *Id.* at 33; *compare id.* at 37 ("identical outcomes" and identical BOP transfer paperwork "suggests a cookie-cutter process that yielded the same predetermined result") *with* Notice of Anticipated Transfer of Additional Plaintiffs to ███

██████████████████████████████████ (ECF No. 168). The abruptness of this decision and Defendants' unwillingness to maintain the status quo until this Court could hear Plaintiffs' objections only reinforces the conclusion that BOP has not provided Plaintiffs the process they are due.

### c. Plaintiffs Face Irreparable Harm Warranting Immediate Relief.

The evidence before the Court establishes that each of the four Plaintiffs being held in the segregated unit is suffering severe and escalating harm. Emily Doe's gender dysphoria symptoms are "as severe as [she] can ever remember them being," she has lost access to programming that was central to her rehabilitation, and she is experiencing resurgent anxiety and paranoia. (Emily Doe Decl. ¶¶ 4, 7, 10–11.) Mary Doe's gender dysphoria is "through the roof," she has virtually no access to programming or mental health services, and she has abandoned a previously consistent grooming routine—a clinically recognized indicator of worsening distress. (Mary Doe Decl. ¶¶ 5, 8, 16; Ettner Decl. ¶ 11.) Zoe Doe, who had achieved such stability that ████████ ████████████████ while housed in general population of a women's facility, now reports her gender dysphoria is "back in full force" with escalating despair, fear, and anxiety after being severed from a ██████-long support network, and she is experiencing thoughts of self-harm. (Zoe Doe Decl. ¶¶ 16, 18–19; Ettner Decl. ¶ 13.) And Carla Jones, a ██-year-old woman, reports lockdown conditions, no programming access, deteriorating mental health, and thoughts of self-harm including of cutting herself.  (Carla Jones Decl. ¶¶ 12, 14–15; Ettner Decl. ¶ 14.)

Dr. Ettner's expert opinion confirms that these harms are not speculative but concrete and clinically predictable: segregated housing compounds two distinct injuries by simultaneously removing a treatment element that was necessary and effective for each Plaintiff and introducing independent psychiatric and physiological risk from isolation and restricted conditions. (Ettner Decl. ¶ 21.) For Plaintiffs with documented histories of self-harm or suicidality tied to gender

dysphoria—including Mary Doe, Zoe Doe, and Carla Jones—"the consequences are likely to be even more dire." (*Id.*) The risk of harm increases with each additional day of exposure to these conditions, following a dose-response pattern documented in the correctional mental health literature. (*Id.* ¶ 18.) Enforcement of this Court's injunction or separate injunctive relief is therefore urgently necessary to prevent irreversible harm to Plaintiffs' mental and physical health.

The four Plaintiffs facing imminent transfer to the segregated transgender unit at ███ ███ will suffer these same harmful conditions and increased risk of harms, as well as disruption of their current work, education, programming, and social supports in their current facilities. These harms cannot be remedied after the fact.

### d.       The Balance of Equities and Public Interest Weigh in Favor of Relief.

The balance of equities and the public interest strongly favor injunctive relief. Defendants have not presented any evidence to this Court that maintaining Plaintiffs' housing in women's facilities would be contrary to the public interest. Nor have they presented any evidence to this Court that maintaining the Plaintiffs' housing in general population within women's facilities would endanger other inmates. (*See* ECF No. 161 at 50.) The *Fleming* court has made no factual findings that any of these Plaintiffs would pose a danger to other incarcerated women in the general population.

Further, granting the requested relief would not create a conflict with any other court's orders. BOP retained full discretion under the *Fleming* order to determine the most appropriate housing assignments for transgender women after individualized assessment, including the option to transfer them to general population placements at other women's facilities not covered by the *Fleming* injunction based on their personal circumstances and needs. The public interest is served by ensuring that the federal government complies with this Court's orders and with its own regulations, that incarcerated persons are not subjected to unlawful and unjustified segregation,

and that the government officials do not punish individuals for pursuing their rights through litigation.

      e.      **Granting Injunctive Relief Satisfies the Requirements of the PLRA.**

Prohibiting Defendants from housing all transgender women in women's facilities in a single segregated unit under conditions that violate 28 C.F.R. § 115.42(g), the Fifth Amendment, and the Eighth Amendment, and requiring Defendants to house each Plaintiff consistent with applicable constitutional and regulatory requirements is a narrowly drawn remedy that extends no further than necessary to correct the harm to Plaintiffs, and is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. § 3626(a)(2). Plaintiffs have shown a likelihood of success on their claim that BOP's decision to place them into segregated housing is based on their transgender status and is contrary to BOP's own regulations and the Fifth and Eighth Amendments to the U.S. Constitution. Plaintiffs have also shown that such segregation has subjected or will subject them to immediate, irreparable harm, and that a TRO and preliminary injunction prohibiting this unlawful action is necessary to correct that harm. Such relief is the least intrusive action the Court could take to ensure that Defendants comply with 28 C.F.R. § 115.42(g) and applicable constitutional requirements. And, like the orders previously issued by this Court, the requested relief would simply preserve Defendants' own prior determinations regarding Plaintiffs' housing while this litigation proceeds. Maintaining that status quo for 90 days will have no adverse impact on public safety or on the operation of the criminal justice system.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue an order enforcing its preliminary injunction or grant new injunctive relief requiring Defendants to:

      1.      Transfer all Plaintiffs housed in the segregated unit at ▮▮▮▮▮▮ to general population in other women's facilities according to BOP's ordinary individualized

designation process and all applicable PREA regulations, or in the alternative, restore their access to programming, education, recreation, medical and mental health care, and out-of-unit time comparable to that offered in general population;

2. Refrain from transferring additional Plaintiffs to the segregated unit at ▆▆▆▆ ▆▆▆▆▆▆ and return any Plaintiffs already so transferred to an appropriate placement in general population of a women's facility consistent with BOP's ordinary individualized designation process and all applicable PREA regulations;

3. Refrain from creating dedicated units or facilities for transgender women in violation of 28 C.F.R. § 115.42(g); and

4. Comply with any other relief the court deems necessary and appropriate to enforce its orders and aid in its exercise of jurisdiction over this matter.

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES &
DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ
RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

*Pro Bono Counsel for Plaintiffs*

Respectfully submitted,

/s/ *Jennifer Fiorica Delgado*
Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com

Dated: July 17, 2026