## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, *in his official capacity* as President of the United States, et al., | |
| Defendants. | |

## <u>DECLARATION OF RANDI ETTNER, PH.D., IN SUPPORT OF PLAINTIFFS'</u>
## <u>MOTION TO ENFORCE PRELIMINARY INJUNCTION</u>

I, Randi Ettner, Ph.D., state as follows;

1.      I am a licensed clinical and forensic psychologist with a specialization in the diagnosis, treatment, and management of individuals with gender dysphoria. I have clinical experience evaluating and treating more than 3,000 transgender individuals, including extensive work in correctional settings. I have previously submitted two declarations in this case. ECF Nos. 116-26, 135-1. My initial declaration recounts my qualifications and attaches my *curriculum vitae.* For ease of reference, a copy of my *curriculum vitae* is attached as **Exhibit A**.

2.      I submit this declaration to address the serious harms arising from the segregated housing of transgender women at ███████████ based on sex assigned at birth. In preparing this declaration, I reviewed the June 2, 2026, preliminary injunction entered in *Fleming v. Rule* (N.D. Tex., No. 4:25-cv-00157-D, consolidated with No. 4:25-cv-00438-D), and Defendants' June 15, 2026, status report in that case. I also reviewed the declarations of Emily Doe, Zoe Doe, Mary Doe, and Carla Jones, the Plaintiffs in this case who are housed in the segregated unit described in the *Fleming* documents.

3.      My opinions are based on my education and training, the recognized standard of care for gender dysphoria, the general correctional mental health literature regarding restrictive housing, the physiological stress literature on chronic isolation and loss of control, my decades of experience treating transgender patients, and my communications and interactions with other clinicians and leading experts on transgender health and medical care.

4.      The World Professional Association for Transgender Health's Standards of Care, Version 8 (Coleman et al., 2022), and the Endocrine Society's clinical practice guideline (Hembree et al., 2017), both recognize that treatment for gender dysphoria is not limited to hormonal or surgical intervention. Living in a manner congruent with one's gender identity, including housing,

2

is itself a recognized element of clinically indicated treatment for many individuals with gender dysphoria.

5.    In correctional populations, clinical improvement and medical stability in transgender women is often attributable not to medical interventions alone, but to the combination of medical protocols and the ability to live as and be recognized as a woman. Residence in a female housing environment is one important example of the latter. Where records show that a transgender woman's psychiatric stability developed or improved after transfer to women's housing, that stability reflects the combined effect of medical treatment and social affirmation, not medication alone. Removing the housing component while continuing hormone therapy alone does not preserve that combined and necessary treatment effect.

6.    Where clinical improvement had previously been tied to living in general population among women, withdrawal of that environment creates a significant risk that the underlying gender dysphoria symptoms it had relieved will re-emerge, even if hormone therapy continues unchanged.

7.    Separate from its effect on gender dysphoria, segregated housing involves confinement to a single unit for meals, hygiene, and recreation, reduced programming and exercise access, and reduced contact with medical and mental health staff. It is well-known and documented in correctional mental health literature that these conditions are closely associated with elevated anxiety, depressive symptoms, and diminished coping capacity, regardless of gender identity (Haney, 2003; Grassian, 2006; Metzner & Fellner, 2010). This is true even where the housing arrangement is not formally classified as disciplinary segregation or solitary confinement.

8.    In addition, many incarcerated transgender women have histories of self-harm or suicidality clinically linked to environments where they are not treated as women or, even worse, where they are treated as men. Segregated housing that removes affirming social contact with other

3

women and staff, and introduces isolation, can reintroduce the conditions associated with that risk, even where the new arrangement is not itself a men's facility. If that segregated housing also removes an established social support network, additional harms occur. Loss of an established social support network is a risk factor for exacerbated symptoms in individuals with a psychiatric history and is especially significant where that network had specifically affirmed the individual's gender identity.

9.      Following treatment with hormone medications, transgender women are endocrinologically comparable to non-transgender women: their circulating sex steroid hormone levels fall within the same range as those of non-transgender women, and their secondary sex characteristics, including body composition, breast development, and facial and body hair patterns, reflect that hormonal profile. Clinically, these individuals are women, not men who have been permitted to present as women. For transgender women who have had vaginoplasty surgery, like ███████, their primary sex characteristics are also consistent with non-transgender women. A housing classification that designates these women as male, when their endocrine status and physical presentation are female, disregards the essential role hormones play in a person's sex and their physical characteristics. Hormones are sex steroids that affect every organ in the body and cross the blood-brain barrier. Hormones affect brain chemistry, bone metabolism, cardiovascular physiology body composition, the endocrine system, and metabolic systems including insulin sensitivity and lipid profiles. From a clinical perspective related to their gender dysphoria, such a placement can also exacerbate their symptoms as described above. As I explained in my prior declaration, a transgender woman is an individual whose birth sex was male but who cannot live and function in her birth sex. ECF No. 116-25 ¶ 11. An environment that focuses on and emphasizes her birth sex would foreseeably lead to serious mental health consequences.

10. The serious harms described above are consistent with Plaintiffs' experiences in this unit. For example, the Plaintiffs housed in ███ report that all six residents eat their meals, shower, and toilet entirely within the unit, and that programming and exercise equipment have been sharply curtailed relative to general population. They report that recreation is limited to a single small, enclosed patio with no exercise equipment which is available for only about an hour each day and that indoor activities are extremely limited as well.

11. As Dr. Gorton documented in his expert report, Mary Doe has lived in women's facilities since ███ and her "████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████.████████." ECF No. 116-19 ¶ 13. Since being moved to the segregated unit, Mary Doe reports that her health is suffering and that her gender dysphoria symptoms are "through the roof." Mary Doe Decl. ¶ 5. She has very little access to programming and as of the date of her declaration, she had only seen a psychologist twice since moving to the unit. *Id.* ¶¶ 8, 12. She feels trapped and isolated, with a subjective sense that the arrangement is intended to reverse her gender presentation and has markedly worsened her gender dysphoria symptoms. *Id.* ¶¶ 14–15. Notably, she reported having stopped a previously consistent daily grooming routine as her mental health has declined. *Id.* ¶ 16. That discontinuation is a meaningful behavioral indicator: the loss of a previously consistent grooming and gender-affirming routine is a recognized correlate of increasing dysphoria-related distress, not merely a change in personal habit.

12. Zoe Doe describes a similarly serious situation. According to Dr. Gorton's report, Zoe Doe has been prescribed hormone medication for nearly ██ years and ██████████████ ████████████████████████████████████████████. ECF. No. 116-19 ¶ 55. Zoe Doe has lived in women's facilities since ███ and "████████████████████

██████████████████████████████████████████████████

███████████████████████ " *Id.* ¶ 51. Zoe Doe's treatment was so effective that as of ███████████ ,

BOP clinicians noted she was " ██████████████████████████████████

████████████████████████████████████ ." *Id.* ¶ 56. Dr. Gorton concluded that her

medical treatment, " ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ ." *Id.* ¶ 64.

13.    Zoe Doe's situation has significantly deteriorated since the BOP moved her to the segregated unit. She no longer has meaningful access to programming and describes the unit as a "lock-down" situation. Zoe Doe Decl. ¶¶ 9, 14, 18. After living for ███████ in the facility, her displacement also means she is isolated from her support network with whom she formed very strong relationships. *Id.* ¶¶ 6, 14, 18. Importantly, her mental health has deteriorated significantly, with her gender dysphoria symptoms now "back in full force." *Id.* ¶ 16. She has become "depressed and agitated," has trouble sleeping, is experiencing cognitive impairment, and reports "questioning the value of my life" and "spiraling" since her placement in the unit roughly a month ago. *Id.* ¶¶ 16–17, 19.

14.    Carla Jones is ██ years old and, according to Dr. Karasic's review of her medical and psychological files, has been prescribed hormone medication since ██████ and housed in women's facilities since ███████████ . ECF No. 116-21 ¶¶ 77, 84. Since moving to the segregated unit, she reports "lock-down" like conditions. Carla Jones Decl. ¶¶ 9, 14. She does not have access to programming, cannot participate in "instructor-based" education classes and instead can only do "self-study." *Id.* ¶ 9. She feels that her mental health is deteriorating and that the BOP refuses to accept her as a woman and wants to deprive her of care; experiences that previously led to acute gender dysphoria and self-harming behaviors. *Id.* ¶¶ 4, 12–13, 17. Ms. Jones reports she has

recurring thoughts of self-harm again, including cutting—a method she has resorted to in the past. *Id.* ¶ 14. Her appetite has declined, and she spends most of her days sleeping as an escape from the harmful conditions. *Id.* ¶ 16.

15.     As I documented in my first report, Emily Doe is a ▮-year-old transgender woman who has been prescribed hormone medication for more than ▮▮▮▮ and has lived in women's facilities since ▮▮▮▮▮▮▮. ECF No. 116-26 ¶¶ 40, 44. Her "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* ¶ 41. Since moving to the segregated unit, Ms. Doe reports that her physical and mental health are suffering and that her gender dysphoria symptoms "are as severe as I can ever remember them being." Mary Doe Decl. ¶ 4. She describes that none of the women are allowed to leave the unit for programming, that officers do not want to take them out of the unit because of the staffing burden of doing so, and that she has no access to other incarcerated women outside the unit. *Id.* ¶ 5. Recreational opportunities are also severely restricted. *Id.* ¶¶ 8–9. As a result, she no longer has access to her prior support network that helped her feel like other women. *Id.* ¶¶ 6, 8. She feels "very anxious and depressed" living in the unit, which is exacerbated due to her ▮▮▮▮, and she feels she is being punished for being transgender. *Id.* ¶¶ 10–11.

16.     With respect to the segregation-like conditions the women describe, the mental and eventual physical consequences of a segregated environment are well known and documented. Chronic psychosocial stress, including social isolation, loss of perceived control, and unaffirmed gender identity, activates the hypothalamic-pituitary-adrenal axis and produces sustained elevation in cortisol output, distinct from the normal daily rise and fall of the hormone. Sustained rather than transient elevation is the clinically relevant marker, since it reflects a stress response that is not resolving (McEwen, 1998). Over time, sustained physiological stress activation produces allostatic

load: cumulative wear on cardiovascular, metabolic, and immune systems. This is the mechanism by which a housing or isolation stressor transitions into physical health effects (McEwen, 1998).

17.    The psychological harm associated with restrictive, isolating housing conditions also intensifies the longer the exposure continues. Early psychological effects, including anxiety, sleep disturbance, and depressive symptoms, can emerge within days of placement in such conditions, but where the environment persists without relief, these effects tend to become more severe, more resistant to treatment, and in some cases longer-lasting even after the person is removed from the restrictive setting (Haney, 2003; Grassian, 2006). This pattern is consistent with the allostatic load model described above: each additional period of unresolved physiological stress activation adds further cumulative wear rather than allowing the body to return to baseline, so the clinical and physiological risk compounds with time rather than remaining constant.

18.    These conditions are also closely associated with self-harm. In a study of over 200,000 incarcerations in New York City jails, Kaba et al. (2014) found that inmates placed in solitary confinement had a substantially increased risk of self-harm compared to those never placed in such conditions, and that this risk rose with each additional episode of solitary confinement, a dose-response relationship in which cumulative exposure, not merely the fact of restrictive housing, predicted the severity of harm. Applied here, this supports the clinical expectation that the Plaintiffs' risk of psychiatric and physiological harm will continue to increase for as long as the segregated housing arrangement continues, and that prompt relief from these conditions is clinically significant independent of any other remedy.

19.    The correctional segregation literature documents physical symptoms alongside psychiatric ones in restrictive housing, including sleep disruption, appetite change, cardiovascular symptoms such as palpitations and elevated blood pressure, and somatic complaints without other medical explanation (Grassian, 2006). The broader social isolation literature independently links

8

sustained loneliness and reduced social contact to elevated cortisol, disrupted sleep architecture, and increased cardiovascular risk (Cacioppo & Hawkley, 2003).

20.     These physiological effects can have compounding effects when gender dysphoria is active or worsening. Gender dysphoria itself is associated with elevated physiological stress markers when an individual's affirmed gender identity is not socially recognized, so removing an affirming housing environment can compound, rather than simply add to, the physiological stress already associated with gender dysphoria.

21.     The BOP's placement of Plaintiffs in segregated and lock-down like conditions compounds two distinct harms. First, it removes a treatment element that has been necessary and effective for each of the four Plaintiffs, and that has contributed to their psychiatric stabilization. Second, it introduces segregation conditions that create independent, recognized psychiatric and physiological risk, as described above. For women who have a documented history of self-harm or suicidality tied to gender dysphoria, such as Mary Doe, Zoe Doe, and Carla Jones, the consequences are likely to be even more dire.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of July, 2026.

Randi Ettner, PhD

9

## REFERENCES

Cacioppo, J. T., & Hawkley, L. C. (2003). Social isolation and health, with an emphasis on underlying mechanisms. *Perspectives in Biology and Medicine*, 46(3 Suppl), S39–S52.

Coleman, E., Radix, A. E., Bouman, W. P., et al. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health*, 23(sup1), S1–S259.

Grassian, S. (2006). Psychiatric effects of solitary confinement. *Washington University Journal of Law & Polic*y, 22, 325–383.

Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency,* 49(1), 124–156.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., et al. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism,* 102(11), 3869–3903.

Kaba, F., Lewis, A., Glowa-Kollisch, S., et al. (2014). Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *American Journal of Public Health*, 104(3), 442–447.

McEwen, B. S. (1998). Protective and damaging effects of stress mediators. *New England Journal of Medicine*, 338(3), 171–179.

Metzner, J. L., & Fellner, J. (2010). Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics. *Journal of the American Academy of Psychiatry and the Law*, 38(1), 104–108.