**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | Civ. A. No. 25-286 (RCL)<br><br>Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY
MOTION TO ENFORCE PRELIMINARY INJUNCTION, OR IN THE
ALTERNATIVE, MOTION FOR TEMPORARY RESTRAINING
<u>ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

ARGUMENT ....................................................................................................................7

I.      The Court Does Not Have Jurisdiction over Plaintiffs' Motion .......................................7

II.     BOP's Transfer of Plaintiffs to the ███████ Unit Does Not Contravene this Court's Preliminary Injunction ...................................................................................9

III.    Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction Fails ...... ...................................................................................................12

        A.     Plaintiffs Have Not Shown a Likelihood of Success on the Merits .............................13

              1.     *Plaintiffs Have Not Exhausted Their Administrative Remedies* ..................13

              2.     *Plaintiffs' Merits Arguments Also Fail at the Threshold, and BOP's Housing of Them in the* ███████ *Unit Does Not Violate the Constitution or PREA* .........15

                  a.    APA ................................................................................17

                  b.    Eighth Amendment ......................................................19

                  c.    Due Process .................................................................27

        B.     Plaintiffs Have Not Satisfied the Remaining Preliminary-Injunction Factors .............27

IV.    The Relief Sought by Plaintiffs Would Violate the PLRA. ..........................................30

CONCLUSION ...............................................................................................................31

## TABLE OF AUTHORITIES

**CASES**

*Abdullah v. Obama,*
  753 F.3d 193 (D.C. Cir. 2014) .................................................................................. 12, 13

*Alvin v. Suzuki,*
  227 F.3d 107 (3d Cir. 2000) ..............................................................................................27

*Armstrong v. Exec. Off. of the Pres.,*
1 F.3d 1274 (D.C. Cir. 1993) ................................................................................................9

*Beck v. U.S. Dep't of Justice,*
  Civ. A. No. 88-3433 (JHG), 1991 WL 519827 (D.D.C. Jan. 31, 1991)...............................18

*Benoit v. District of Columbia,*
  Civ. A. No. 18-1104 (RC), 2018 WL 5281908 (D.D.C. Oct. 24, 2018) .................................8

*Bernier v. Allen,*
  38 F.4th 1145 (D.C. Cir. 2022)...........................................................................................20

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ...........................................................................................28

*Chavis v. Garrett,*
  419 F. Supp. 3d 24 (D.D.C. 2019) ......................................................................................27

*Children's Health Def. v. U.S. Food & Drug Admin.,*
  Civ. A. No. 23-220 (RDM), 2024 WL 147851 (D.D.C. Jan. 12, 2024) ..............................18

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n,*
  904 F.3d 1014 (D.C. Cir. 2018) .........................................................................................28

*Clinkenbeard v. United States,*
  Civ. A. No. 24-252 (APM), 2024 WL 4650903 (D.D.C. Nov. 1, 2024)..............................27

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) .........................................................................................13

*De Beers Consol. Mines v. United States,*
  325 U.S. 212 (1945)...............................................................................................................7

*Doe v. Blanche,*
  172 F.4th 901 (D.C. Cir. 2026).....................................................................................*passsim*

*Doe v. Blanche*,
   Consol. Civ. A. No. 25-286, 2026 WL 1642068 (D.D.C. June 7, 2026),
   *appeal filed*, No. 26-5238 (D.C. Cir. June 24, 2026) ............................................................*passim*

*Does 1-26 v. Musk*,
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ....................................................28

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ....................................................................................................19, 20, 26

*Hanson v. Dist. of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ............................................................................................28

*Harrison v. Fed.Bureau of Prisons*,
   248 F. Supp. 3d 172 (D.D.C. 2017) ......................................................................................17

*Hatim v. Obama*,
   760 F.3d 54 (D.C. Cir. 2014) ................................................................................................29

*Heartland Reg'l Med. Ctr. v. Leavitt*,
   415 F.3d 24 (D.C. Cir. 2005) ..................................................................................................9

*Int'l Ladies' Garment Workers' Union v. Donovan*,
   733 F.2d 920 (D.C. Cir. 1984) ................................................................................................9

*Jones v. Bock*,
   549 U.S. 199 (2007) ..........................................................................................................13, 15

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) ..............................................................................................................13

*McKune v. Lile*,
   536 U.S. 24 (2002) .................................................................................. ........................... 29

*MediNatura, Inc. v. FDA*,
   998 F.3d 931 (D.C. Cir. 2021) ..............................................................................................27

*Molina v. U.S. Dep't of Homeland Sec.*,
   Civ. A. No. 25-3417, 2026 WL 1256234 (D.D.C. May 7, 2026) ...........................................9

*N.Y. State Nat'l Org. for Women v. Pataki*,
   261 F.3d 156 (2d Cir. 2001) .................................................................................................27

*NetworkIP, LLC v. FCC*,
   548 F.3d 116 (D.C. Cir. 2008) ................................................................................................7

*Olim v. Wakinekona*,
   461 U.S. 238 (1983) ..............................................................................................................27

*Perez v. Lappin*,
    672 F. Supp. 2d 35 (D.D.C. 2009) ..................................................................................27

*Ponce v. Billington*,
    679 F.3d 840 (D.C. Cir. 2012) .......................................................................................18

*Sai v. Transp. Sec. Admin.*,
    54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................................. 7, 8, 9

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .......................................................................................12

*Steele v. United States*,
    Civ. A. No. 14-1523 (RCL), 2020 WL 7123100 (D.D.C. Dec. 4, 2020)............................8

*Turner v. Safley*,
    482 U.S. 78 (1987)........................................................................... ............................ 29

*Wilson v. Seiter*,
    501 U.S. 294 (1991)......................................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................ 12

*Woodford v. Ngo*,
    548 U.S. 81 (2006)....................................................... ...................................... 13, 14

*Wrenn v. Dist. of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) .......................................................................................27

## STATUTES

18 U.S.C. § 3621 ................................................................................................. 15, 17

18 U.S.C. § 3625..................................................................................................17

18 U.S.C. § 3626.......................................................................................10, 11, 30

42 U.S.C. § 1997e................................................................................................13

## RULES

D.C. Rule of Prof. Conduct 1.7 ..................................................................................14

## REGULATIONS

28 C.F.R. § 115.41..................................................................................................15

28 C.F.R. § 115.42................................................................................................8, 15, 18, 19

28 C.F.R. § 542.13...........................................................................................................14

28 C.F.R. § 542.14...........................................................................................................14

28 C.F.R. § 542.15...........................................................................................................14

**EXECUTIVE ORDER**

EO 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) ................................................................ 3, 8, 14

**OTHER AUTHORITIES**

11A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure: Civil* § 2947 (3d ed.)................................................................................................................................ 7

**INTRODUCTION**

The overarching theme of Plaintiffs' Motion to Enforce Preliminary Injunction, or in the Alternative, Motion for Temporary Restraining Order and Preliminary Injunction ("Pls.' Mot."), ECF No. 183, is that the Federal Bureau of Prisons ("BOP" or the "Bureau") could have chosen other options to comply with the preliminary injunction in ███████████████████████ (N.D. Tex.), and that Plaintiffs would have preferred if BOP had chosen differently. Plaintiffs' preferences aside, they fall woefully short of establishing that BOP's conduct violated any order of this Court or any other law.

Plaintiffs make two central arguments. First, they contend that BOP's transfer of Plaintiffs to a segregated unit at ███████████████ ("████████ (the "████████ unit" or "SA-B Unit"), a *women's* facility, contravenes this Court's June 7 preliminary injunction that prohibits transfers to *men's* facilities. Second, in the alternative, they argue that the Court should issue additional preliminary injunctive relief directing BOP to transfer Plaintiffs from the ████████ unit to other female facilities because being housed in the ████████ unit exposes them to intolerable conditions and exacerbates their gender dysphoria.

The Court should deny Plaintiffs' motion because the Court does not have jurisdiction to order the preliminary relief they seek, which exceeds the scope of their complaints targeting placement in men's prisons. ████████ is not a men's prison and thus is not within the scope of their complaints. Even if this Court had jurisdiction, Plaintiffs' motion has no merit. First, BOP's transfer of Plaintiffs to the ████████ unit complies with this Court's preliminary injunction, which specifically states: "Today's injunction merely enjoins the government from transferring Plaintiffs to men's prisons. It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces." *Doe v. Blanche*, Consol. Civ. A. No. 25-286, 2026

WL 1642068, at *12 (D.D.C. June 7, 2026), *appeal filed*, No. 26-5238 (D.C. Cir. June 24, 2026); *see also* Prelim. Inj. Order at 4 ("PI Order"), ECF No. 147.

Second, and independent of BOP's facial compliance with the existing preliminary injunction, Plaintiffs have failed to show entitlement to further preliminary injunctive relief. Plaintiffs have not shown that they are likely to succeed on the merits of their Administrative Procedure Act ("APA"), Eighth Amendment, and Due Process arguments because they have not exhausted their administrative remedies as to their housing situation at ███████████ Even if they had exhausted, their claims otherwise fail on threshold grounds, and BOP's placement of them in the ███████████ unit was justified and does not violate the Constitution or the Prison Rape Elimination Act ("PREA"). Additionally, Plaintiffs are not being irreparably harmed by being housed in a women's facility, and the equitable factors favor the government.

Plaintiffs have twisted their case into a series of contradictions. On one hand, they argue that they are in all respects "women" and thus should not be transferred to a men's prison. *See, e.g.*, Emily Doe Decl. ¶ 32, ECF No. 117-7 ("I have known I was a woman my entire life."); Carla Jones Decl. ¶ 2, ECF No. 117-5 ("I knew since early childhood that I was a girl."), *id.* ¶ 15 ("the real me" is a woman); Zoe Doe Decl. ¶ 2, ECF No. 117-17 ("I am a woman. . . . [E]ver since I was little, I felt and knew that I was a girl."), *id.* ¶ 29 ("People I meet typically do not know that I was not born a woman[.]"), *id.* ¶ 34 ("After my surgeries, I finally felt complete and validated as a woman."), *id.* ¶ 48 ("After so many years of hormone therapy and having multiple surgeries, my body and my physical appearance are fully female[.]"); Sara Doe Decl. ¶ 3, ECF No. 117-15 ("I have known I was a woman since I was young."), *id.* ¶ 9 ("Because of my long-term hormone therapy and multiple surgeries, my body is completely female."). On the other hand, they now argue that the ███████████ unit is not suitable for them because they need to be housed with other women. Plaintiffs cannot have it both ways: if they are indeed women, they are currently housed with each other, which is exactly what they

2

have claimed to need. And if they are not women—the government's consistent position—then Plaintiffs' entire case is undermined, and they should be transferred to men's facilities.

At bottom, Plaintiffs' motion takes issue with the establishment and conditions of the ███ ███████ unit, which was established and operationalized pursuant to the ██████ preliminary injunction in the ████████████████████ To the extent Plaintiffs have concerns about the condition of the ███████████ unit or the scope of the ██████ preliminary injunction, the concerns should be aired in that court—not this one. The suits here relate to the housing of Plaintiffs in men's prisons, and indeed this Court's latest preliminary injunction made it clear that the two issues are distinct. *See Doe*, 2026 WL 1642068, at *12.

For these reasons, and for the reasons that follow, the Court should deny Plaintiffs' motion.

## BACKGROUND

The following background discussion is pertinent to this opposition. For further background of this case, *see* Defendants' Response to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, at 4–9, ECF No. 129.

On January 20, 2025, President Trump issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO 14,168). Among other things, EO 14,168 directs BOP to ensure that male inmates are not housed in women's prisons to protect female inmates' safety, privacy, and dignity. *Id.* § 4(a). Plaintiffs, male trans-identifying inmates housed in women's facilities, sued and sought preliminary injunctions to block their transfer to men's prisons. *See Doe* 2nd Am. Compl., ECF No. 58-2; *Jones* Am. Compl., ECF No. 35; *Moe* Compl., ECF No. 1. After the D.C. Circuit vacated the first preliminary injunctions that this Court entered, *Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026), this Court entered another preliminary injunction on June 7, 2026, that again enjoined Defendants from transferring Plaintiffs to

men's facilities. *Doe*, 2026 WL 1642068. The government appealed, and expedited briefing in the D.C. Circuit is underway. *See* No. 26-5238 (D.C. Cir. June 24, 2026).

Meanwhile, BOP was defending a competing lawsuit in the District Court for the ███████ ████████████ brought by biologically female inmates housed at ███████████ a women's facility. *See* ███████ *v. Rule*, Civ. A. No. ██████████████████). In ███████ the plaintiffs sought to have the biologically male inmates then housed with them at ██████████████which included some Plaintiffs here—moved elsewhere, on the basis that being housed with biological men violated their bodily integrity and subjected them to cruel and unusual punishment. *Id.* On June 2, 2026, the ████████ court granted a preliminary injunction and ordered that BOP "shall house male inmates in a secure, segregated area at ████████████ and shall use such separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." *See* Notice of ████████ PI (ECF No. 199).

BOP thereafter informed this Court that four of the biologically male inmates housed at ████ ███████ who are subject to the ███████ preliminary injunction are Plaintiffs in the instant case (Zoe Doe, Mary Doe, Emily Doe, and Carla Jones), and, on █████████████ in compliance with the ███████ injunction, these inmates along with a fifth inmate at ██████████████ were moved to their own housing unit. *Id.* BOP explains that "[t]his housing arrangement was also implemented to comply with both the ████████ and *Doe* injunctions and to protect the safety and bodily privacy concerns of both biologically female and biologically male inmates." Declaration of Rick Stover ("Stover Decl.") ¶ 14 (attached hereto as Ex. 1); *see also* Declaration of Warden Tyal Rule ("Rule Decl.") ¶ 6 (attached hereto as Ex. 2). The unit was selected because, *inter alia*, it is sufficiently spacious, includes an open area for socialization and programming, provides areas suitable for private medical examinations, and offers easy access to psychology and health services. Rule Decl. ¶ 7.

BOP took significant measures, and expended significant resources, to establish and operationalize the ▮▮▮▮▮▮ unit, including continuation of the inmates' medical care, mental health treatment, recreation, and programming. Among other things, the unit "has an assigned unit team, which continues to provide all required unit team functions for inmates on the unit, including determining inmate program needs, monitoring participation, encouraging prosocial behaviors, and conducting regularly scheduled program reviews for each inmate." *Id.* ¶ 10. "Most general population units at ▮▮▮▮▮▮ have at least 200 inmates with one officer assigned to the unit[,]" but the ▮▮▮ ▮▮▮▮▮ unit has "a dedicated unit officer" with a staffing ratio of nine inmates to one correctional officer. *Id.* ¶ 11. This new correctional officer post in the unit is staffed 24 hours per day, seven days per week, identical to the general population housing units. *Id.* ¶ 8. The inmates in the unit have access to programming that they previously participated in, including religious services and educational opportunities, and more is coming. *Id.* ¶¶ 17–19. The inmates in the ▮▮▮▮▮▮ unit are provided with a daily opportunity to engage in recreation for one hour (inside or outside, depending on the weather) and the same equipment that is available to the general population is also available to them. *Id.* ¶ 20. BOP also installed a law library station, phone station, three televisions, and two email stations for inmate usage—thereby "affording inmates more access to televisions, phones, and email than they had on their previous units." *Id.* ¶¶ 8, 24. The commissary is available, as are laundry services. *Id.* ¶¶ 21–22. Three meals—the same food that the rest of ▮▮▮▮▮▮ is served—is brought to the unit every day, and the inmates can eat in the common area or in their cells if they prefer. *Id.* ¶ 23. Social visiting has remained undisturbed at "the same total number of hours as biologically female inmates are afforded[,]" *id.* ¶ 25, and the common areas of the unit are open to the inmates "except during times when all inmates in the institution are required to be in their cells, such as during institution counts or after lights out[,]" *id.* ¶ 26. The cells themselves are bigger than the

general population housing cells, each cell is equipped with a toilet and a sink, and private showers are available. *Id.* ¶¶ 27–28.

BOP also "developed procedures to safeguard the impacted inmates' mental health" upon being moved to the ▇▇▇▇▇▇▇▇ unit and thereafter.  Declaration of Dr. Brittany Field ("Field Decl.") ¶ 6 (attached hereto as Ex. 3).  For example, a psychologist conducted a suicide risk assessment upon transfer to the unit, and BOP "out of an abundance of caution" elevated the inmates' care level so that they receive "routine outpatient mental health care or crisis-oriented mental health care." *Id.* ¶ 7.  Additionally, medical and psychological care is provided, clinics and outside specialists remain available, and medications remain accessible—all at the same level as before.  Rule Decl. ¶¶ 13–14.  A psychologist is "either available or on call at all hours to visit with inmates if an urgent need arises." Field Decl. ¶ 8.  Notably, "no inmate has requested protective custody, and suicide watch has not been clinically indicated for any impacted inmate[,]" *id.* ¶ 51, and "there have been no reported or substantiated occurrences of inmate harassment, sexual assault, sexual victimization, or assaultive behavior by another inmate[,]" Rule Decl. ¶ 44.

On June 7, this Court specifically addressed the ▇▇▇▇ injunction related to the ▇▇▇▇▇▇▇▇ unit in its preliminary injunction decision and emphasized that the two injunctions exist in harmony. Specifically, the Court stated: "Nothing in the preliminary injunction this Court issues today conflicts with the ▇▇▇▇ court's June 2 injunction.  Today's injunction merely enjoins the government from transferring Plaintiffs to men's prisons.  It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces." *Doe*, 2026 WL 1642068, at *12; *see also* PI Order at 4.

On July 15, 2026, BOP informed the Court that it would be transferring additional Plaintiffs from the female facilities where they were currently housed to the ▇▇▇▇▇▇▇▇ unit.  Notice of Anticipated Transfer, ECF No. 168.  Later that day, Plaintiffs moved on an emergency basis to

6

"preserve the status quo" by blocking the transfers, ECF No. 169, and Defendants opposed, ECF No. 170. The Court asked Plaintiffs to explain whether transferring them "to a segregated housing unit within a women's facility . . . is contemplated by the existing complaint[.]" July 17, 2026 Order, ECF No. 177. Before the Court resolved that jurisdictional question, Plaintiffs filed the instant emergency motion to enforce, or in the alternative, for preliminary relief.

In addition to the four Plaintiffs who were already housed at ███████████ Plaintiff Maria Moe was transferred to the ███████████ unit on ███████████ Amy Jones and Olivia Doe were transferred on ███████████ and Sara Doe on ███████████ Rule Decl. ¶¶ 40–43.

## ARGUMENT

### I.    The Court Does Not Have Jurisdiction over Plaintiffs' Motion.

Before adjudicating Plaintiffs' motion, the Court must assure itself that it has subject matter jurisdiction. *See NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008). It does not. The crux of Plaintiffs' lawsuits is that they should not be housed in a *men's* prison because of the alleged associated risk of physical and mental harm. *See Doe* 2nd Am. Compl. (ECF No. 58-2); *Jones* Am. Compl., ECF No. 35; *Moe* Compl., ECF No. 1. Their complaints contain no allegations about the conditions of the ███████████ unit or how being segregated with each other within a women's prison harms them. *See id.* The Court therefore does not have subject-matter jurisdiction over Plaintiffs' motion and should not permit Plaintiffs to proceed.

"As a general rule, 'a preliminary injunction may not issue when it is not of the same character as that which may be granted finally and when it deals with matter outside the issues in the underlying suit.'" *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 8–9 (D.D.C. 2014) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure: Civil* § 2947 (3d ed.)). In such circumstances, the district court has no jurisdiction to entertain the motion nor the power to preliminarily enjoin the defendants from engaging in the challenged conduct. *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220

7

(1945).  "This established rule is not based solely in equitable considerations of fairness to the non-movant, but instead cuts to the subject matter jurisdiction of the court.  Thus, just as a court lacks jurisdiction over a motion for a preliminary injunction in the absence of a complaint, the court also lacks jurisdiction over a motion when it raises issues different from those presented in the complaint." *Sai*, 54 F. Supp. 3d at 9 (citations omitted); *see also, e.g.*, *Steele v. United States*, Civ. A. No. 14-1523 (RCL), 2020 WL 7123100, at *7 (D.D.C. Dec. 4, 2020) (this Court denying preliminary injunction motion "because it cannot grant preliminary relief on claims not pleaded in the complaint"); *Benoit v. District of Columbia*, Civ. A. No. 18-1104 (RC), 2018 WL 5281908, at *5–6 (D.D.C. Oct. 24, 2018) (finding no subject matter jurisdiction over preliminary injunction motion where facts and legal basis underlying the motion are not alleged in complaint).

Here, as Plaintiffs acknowledge in their response to the Court's jurisdictional inquiry, they sued to block implementation of Executive Order 14,168, which directed BOP to end the housing of biological men in women's prisons.  Pls.' Resp. to July 17, 2026 Order at 2, ECF No. 181.  Plaintiffs sought to block their ensuing transfer to *men's* prisons because of the alleged risks of harm from being housed there as male trans-identifying inmates.  *See Doe* 2nd Am. Compl., ECF No. 58-2; *Jones* Am. Compl., ECF No. 35; *Moe* Compl. (ECF No. 1).  This Court preliminary enjoined those transfers. Now Plaintiffs are seeking to preliminary enjoin BOP from housing them in a certain unit in a *women's* facility because it allegedly does not suit them for other reasons, unrelated to the risk of harm of being housed in a male facility as trans-identifying inmates.  The relief that they now seek falls well outside the scope of the allegations of their complaints.  Their complaints contain no allegations about the conditions at ███████████ that they find objectionable, the alleged harm that they are experiencing from being in a segregated unit in a women's prison, relief directed at the segregated unit, or a procedural due process claim whatsoever.  Contrary to Plaintiffs' contention, the mere mention of temporary segregation pending placement in men's prison and reference to 28 C.F.R. § 115.42(g) does

8

not satisfy the jurisdictional rule or even fairly provide any notice to Defendants of the nature of these latest claims. Pls.' Resp. at 2–3. Because a court "lacks jurisdiction over a motion when it raises issues different from those presented in the complaint," *Sai*, 54 F. Supp. 3d at 9, the Court must deny Plaintiffs' motion on this basis alone.[1]

## II.    BOP's Transfer of Plaintiffs to the ▮▮▮▮▮▮▮ Unit Does Not Contravene this Court's Preliminary Injunction.

Even if the Court has jurisdiction over Plaintiff's motion (it does not, *see* Defs.' Reply to Pls.' Resp., ECF No. 184; *supra* § I), Plaintiffs fall far short of proving non-compliance with this Court's June 7 preliminary injunction. To prevail on their motion to enforce, it is Plaintiffs' burden to show that the government "blatantly disregarded" an "unambiguous mandate" from the Court. *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984); *see also Armstrong v. Exec. Off. of the Pres.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (per curiam) ("[C]ivil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous, and the violation [is] . . . proved by clear and convincing evidence.") (citation modified). "Success on a motion to enforce a judgment gets a plaintiff only the relief to which [the plaintiff] is entitled under [its] original action and the judgment entered therein." *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (citations omitted; alterations in original).

Here, Plaintiffs have not shown that their transfer to the ▮▮▮▮▮▮ unit violated this Court's "unambiguous" order. *Int'l Ladies' Garment Workers' Union*, 733 F.2d at 922. To the contrary, the Court's order was expressly confined to enjoining the transfer of Plaintiffs to men's prisons and

---

[1]    The Court should not exercise "its inherent authority" when it does not have jurisdiction over a motion. Pls.' Resp. at 3. *Molina v. U.S. Department of Homeland Security* is inapposite. The question in *Molina* was whether the district court had jurisdiction to take certain action while the preliminary injunction order was on appeal, *Molina*, Civ. A. No. 25-3417, 2026 WL 1256234, at *8–9 (D.D.C. May 7, 2026), not whether the court had jurisdiction to seek preliminary relief detached from the operative complaints.

did not require the housing of Plaintiffs with biological women.  The Court stated, "Today's injunction merely enjoins the government from transferring Plaintiffs to men's prisons.  *It does not, at this juncture, require that Plaintiffs be housed alongside cisgender female inmates or share common spaces*."  *Doe*, 2026 WL 1642068, at *12 (emphasis added); *see also* PI Order at 4.  On its face, the existing preliminary injunction is not violated by BOP's decision to house Plaintiffs in the ████████████ unit.

Plaintiffs argue that BOP could move Plaintiffs to the ████████████ unit only if "necessary," Pls.' Mot. at 15, but such a limitation is ambiguous at best, particularly given the Court's explicit acknowledgment that its order does not forbid separating Plaintiffs so long as they remain in a women's prison.  Regardless, it was "necessary" for BOP to establish the ████████████ unit to comply with the ██████ injunction (directing that BOP "shall house male inmates in a secure, segregated area at ████████████ ██████ PI Notice, ECF No. 199), and it was "necessary" to send the remaining Plaintiffs to the ████████████ unit to secure the safety, privacy, and dignity of the females being housed with male inmates at other female institutions.  In other words, "[t]his housing arrangement was [] implemented to comply with both the ██████ and *Doe* injunctions and to protect the safety and bodily privacy concerns of both biologically female and biologically male inmates."  Stover Decl. ¶ 14.  Specifically, "[b]y consolidating this population of biologically male inmates to one female institution, the Bureau can focus on privacy, safety, and security arrangements for both biologically male and biologically female inmates at one location, as opposed to numerous institutions throughout the country."  *Id.* ¶ 21.  Additionally, "[b]y centralizing all the Plaintiffs in one housing unit at a female medical center, the Bureau conserves resources and avoids duplication of services and prevents the creation of new infrastructure and alternative movement schedules at other institutions[,]" *id.*, while also proactively remediating complaints from women at other women's prisons about being housed with biological men, *id.* ¶¶ 16, 22.

In arguing to the contrary, Plaintiffs wrongly seek to conflate the Prison Litigation Reform Act's ("PLRA") narrow-necessary-intrusiveness standards with preliminary injunction compliance. Pls.' Mot. at 15; 18 U.S.C. § 3626(a)(2) (PLRA stating that preliminary injunctive relief with respect to prison conditions must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm"). Plaintiffs misread the PLRA. Section 3626 imposes restrictions on the *courts* when ordering relief, not on the *parties* in complying with that relief. BOP's obligation is to comply with the order of the Court, which it has plainly done.

Plaintiffs also invoke the preliminary injunction order, which states that "Defendants [shall] maintain and continue the housing status in women's facilities." Pls.' Mot. at 12–14 (citation omitted); *see also* PI Order at 2. But, consistent with the order, Defendants have "maintain[ed] and continue[d]" Plaintiffs' "housing status in women's facilities" as BOP continues to house them in a women's facility: ███████████ *Id.* Indeed, later in the Court's order, like in its memorandum opinion, the Court specifies that it was enjoining the transfer of Plaintiffs to men's prison only and was not requiring housing of them "alongside" biological females. *Id.* at 4. Thus, Plaintiffs' view that maintaining "housing status in women's facilities" specifically means requiring BOP to keep Plaintiffs in the general population of any such facilities is unfounded. *Id.* at 2. Moving Plaintiffs to the ███████████ unit is not inconsistent with any order of the Court.

Plaintiffs also ask the Court to infer unlawful retaliation from the transfer because BOP sought to move them to the ███████████ unit "after Plaintiffs secured individualized preliminary relief from this Court on June 7, 2026." Pls.' Mot. at 15. Plaintiffs' retaliation argument has no merit. BOP immediately established the ███████████ unit after the ██████ court, on June 2, 2026, ordered BOP to house the male inmates at ███████████ in a segregated area. Rule Decl. ¶ 12. On June 2, 2026, BOP moved Plaintiffs housed at ███████████ to the unit in compliance with the ██████ injunction.

11

*Id.* BOP did not immediately move other Plaintiffs to the unit because the D.C. Circuit mandate vacating this Court's earlier preliminary injunction was not to issue until June 8, 2026, and a preliminary injunction motion was pending before this Court, and if BOP prevailed, BOP could move Plaintiffs to male facilities. On June 7, 2026, this Court enjoined Defendants from transferring Plaintiffs to men's facilities but specifically did not prohibit segregation in a women's facility. *See Doe*, 2026 WL 1642068, at *12; PI Order at 4. Having already established and operationalized the ▮▮▮▮▮▮▮▮ unit and then having obtained explicit direction from this Court that segregated units in a women's facility were not encompassed by its order, BOP moved the other Plaintiffs because it made economical, operational, and legal sense to do so. *See* Stover Decl. ¶¶ 16–22. There is thus no causal connection between Plaintiffs' pursuit of their rights in seeking and prevailing on a preliminary injunction and the transfer of them to the ▮▮▮▮▮▮▮ unit, and thus, no unlawful retaliation. The only causal connection between this Court's preliminary injunction order and the transfers is that order expressly did not require the housing of Plaintiffs with biological women and thus BOP proceeded with the transfers.

In sum, BOP has complied with this Court's preliminary injunction and therefore Plaintiffs' motion to "enforce" it should be denied.

## III. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction Fails.

Even if the Court has jurisdiction over Plaintiff's motion (which it does not, *see* ECF No. 184; *supra* § I), Plaintiffs fail to make the requisite showing for obtaining the new preliminary injunctive relief they now seek. "A preliminary injunction [or temporary restraining order] is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction [or temporary restraining order] must

establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation modified). "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.* at 200 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

A.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

Plaintiffs cannot show a likelihood of success on the merits because they (1) have not exhausted their administrative remedies as required under the PLRA, and (2) in any event, their arguments otherwise fail at the threshold, and they have not shown a violation of PREA or the Constitution.

1.    *Plaintiffs Have Not Exhausted Their Administrative Remedies.*

Plaintiffs' motion fails at the threshold because they have not satisfied the PLRA's mandatory exhaustion requirement by challenging their housing at ████████████ through BOP's Administrative Remedy Program. The PLRA requires plaintiffs to exhaust their claims within prison remedial schemes before seeking judicial relief. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

Exhaustion of administrative remedies "serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "First, exhaustion protects 'administrative agency authority,' . . . giving an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled

13

into federal court[.]'" *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  "Second, exhaustion promotes efficiency."  *Id.*  That is because "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration."  *Id.*

BOP's Administrative Remedy Program has four levels: (i) aggrieved individuals must first attempt an informal resolution with unit staff, then (ii) submit an administrative remedy request to the Warden, then (iii) appeal to BOP's Regional Director, and then, (iv) if necessary, appeal to BOP's General Counsel.  *See* 28 C.F.R. §§ 542.13-.15.  An inmate must fully exhaust this multi-layer process.

Plaintiffs have not exhausted their administrative remedies.  *See* Rule Decl. ¶¶ 31–43.  Indeed, seven of the eight Plaintiffs who have been moved to the ▮▮▮▮▮▮▮ unit have not even *filed* a grievance about it.  *Id.*  The eighth Plaintiff, Zoe Doe, has filed four grievances related to the ▮▮▮ ▮▮▮▮ unit, but does not contest the establishment or conditions of the unit as Plaintiffs challenge in this motion.    Rather,  Doe,  who  has  undergone ▮▮▮▮▮▮▮▮ believes  that  it  is "discrimination" to include him in the unit because he is being housed with "repeat sex offenders who have intact penises."  *Id.* ¶¶ 36–39.[2]  Thus, Doe has not even begun to exhaust the claim Plaintiffs now bring, and in any event, the grievances that Doe has brought have not been fully exhausted.  *Id.*

Nor can Plaintiffs avoid their exhaustion obligation by reliance on *Doe v. Blanche*.  There, the D.C. Circuit determined that exhaustion was unnecessary because the remedy plaintiffs sought— halting their transfer to a men's prison—was not actually "available" insofar as EO 14,148 precluded

---

[2]    Zoe Doe complaining about other Plaintiffs crystallizes an issue of representation that has been lurking in this case from the outset:  It is questionable whether counsel can continue to adequately represent the interests of all Plaintiffs when their interests are so diverse, particularly those who are post-surgical in contrast to those who still have male genitalia.  Counsel is compelled to always take the most extreme position—that no Plaintiffs can be housed in male facilities—even though that position may not be in the best interests of their post-surgical clients.  *See* D.C. Rule of Prof. Conduct 1.7 (Conflict of Interest: General Rule).  To be sure, Zoe Doe has taken a position in his grievances akin to those of the ▮▮▮ plaintiffs.

that exact relief. *Doe*, 172 F.4th at 914. Here, by contrast, BOP is not precluded from transferring Plaintiffs to other female prisons or challenging the conditions of confinement in the ████████ unit. Plaintiffs need to pursue these available administrative remedies before seeking judicial relief and because exhaustion is "mandatory under the PLRA[,]" Plaintiffs' motion cannot proceed. *See Jones*, 549 U.S. at 211.

> 2. *Plaintiffs' Merits Arguments Also Fail at the Threshold, and BOP's Housing of Them in the ████████ Unit Does Not Violate the Constitution or PREA.*

Even if Plaintiffs had exhausted, they are not likely to succeed on the merits of their claims because their arguments fail at the threshold, and their housing in the ████████ unit is lawful.

Decisions on classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b). In making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau . . . that the Bureau determines to be appropriate and suitable[.]" *Id.* Additionally, "[t]he Bureau may at any time . . . direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

In designating inmates to a facility, BOP follows the applicable regulations under PREA. During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the assignment of trans-identifying inmates in particular, BOP "consider[s] on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c). BOP shall not place transgender inmates "in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in

15

connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates." *Id.* § 115.42(g).

BOP's placement of Plaintiffs in the ▮▮▮▮▮▮▮▮▮ unit complies with PREA and the Constitution. BOP initially formed the ▮▮▮▮▮▮▮▮▮ unit pursuant to the ▮▮▮▮▮ injunction (BOP "shall house male inmates in a secure, segregated area at ▮▮▮▮▮▮▮▮ ▮▮▮▮ PI Notice, ECF No. 199. BOP took significant measures and expended significant resources to establish and operationalize the ▮▮▮▮▮▮▮▮ unit, including continuation of the inmates' medical care, mental health treatment, recreation, and programming. *See supra* at 5–6. For example, FMC Carsell assigned a dedicated unit officer, established protocols and coverage for medical and psychological care, implemented a new correctional officer post for all three shifts each day, and provided programming, recreation, and entertainment. *Id.*

Upon expending significant resources to establish and operationalize the unit in accordance with the ▮▮▮▮▮ preliminary injunction, BOP made the rational decision to transfer the other similarly-situated male inmates housed in other female prisons to the unit as well. "The purpose of these transfers is to preserve Bureau resources, and to ensure compliance with court injunctions and prevent further litigation." Stover Decl. ¶ 16. "From a resource perspective, because Unit SA-B was set up operationally in response to the ▮▮▮▮▮ injunction, ▮▮▮▮▮▮▮▮ now has the requisite correctional unit staffing, bed space availability, controlled movement schedule, satellite feeding, programming, and privacy sensitivity controls to effectively manage this population of Plaintiffs at a female institution." *Id.* Plaintiffs are also safe at the ▮▮▮▮▮▮▮▮ unit, where the inmate staffing ratio is 9:1, as opposed to the general population where it is 200:1. *Id.* ¶ 17. Plaintiffs will also get specialized medical care and mental health treatment: "[B]eing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮ ▮▮▮▮▮▮ can successfully provide specialized medical and mental health services to this inmate population diagnosed with Gender Dysphoria, as well as appropriate correctional programs." *Id.* ¶ 18.

16

Concentrating inmates with similar needs at designated institutions or specialized units instead of having to provide specialized programs at various institutions is quite typical at BOP. *Id.* ¶ 19. In the end, the ▮▮▮▮▮▮▮▮ unit is "a non-punitive housing solution to resolve the complex housing challenge of safely and securely housing biologically male inmates at female institutions[,]" as this Court's preliminary injunction currently requires. *Id.* ¶ 21. "By consolidating this population of biologically male inmates to one female institution, the Bureau can focus on privacy, safety, and security arrangements for both biologically male and biologically female inmates at one location, as opposed to numerous institutions throughout the country." *Id.* And "[b]y centralizing all the Plaintiffs in one housing unit at a female medical center, the Bureau conserves resources and avoids duplication of services and prevents the creation of new infrastructure and alternative movement schedules at other institutions." *Id.*

Plaintiffs nevertheless challenge the transfer of Plaintiffs to the ▮▮▮▮▮▮▮▮ unit under the APA, the Eighth Amendment, and the Due Process Clause of the Fifth Amendment, Pls.' Mot. at 18–23–claims that do not appear in Plaintiffs' complaints as to the ▮▮▮▮▮▮▮ unit, *supra* § I. These claims are unlikely to succeed, even if the Court has jurisdiction (it does not) and even if Plaintiff had exhausted them (they did not).

a. APA

The APA argument is unlikely to succeed because, even if Plaintiffs had made such a claim in their complaints, it would not be subject to judicial review. Pls.' Mot. at 18–20. BOP's "designation of a place of imprisonment . . . is not reviewable by any court." 18 U.S.C. § 3621(b); *see also Doe*, 172 F.4th at 913 (deciding that § 3621(b) does not preclude review of *constitutional* claims but is otherwise preclusive). Moreover, 18 U.S.C. § 3625 specifically carves out imprisonment determinations and decisions, including designations of place of imprisonment, from APA review. *See, e.g., Harrison v. Fed.Bureau of Prisons*, 248 F. Supp. 3d 172, 182–83 (D.D.C. 2017) (dismissing inmate's APA claim

17

challenging transfer decision because, pursuant to § 3625, the government "has not waived its sovereign immunity" for these claims).

Even if reviewable (it is not), it is the ▮▮▮▮ court that issued the injunction ordering BOP to house Plaintiffs in a segregated unit at ▮▮▮▮▮▮ which Plaintiffs claim violates PREA. "[I]t is beyond the jurisdiction or proper role of this Court to review a decision rendered by another district court." *Children's Health Def. v. U.S. Food & Drug Admin.*, Civ. A. No. 23-220 (RDM), 2024 WL 147851, at *3 (D.D.C. Jan. 12, 2024). "Nor would it be in the interests of comity or respect for the law for this Court to enter an order that would, at least in practical effect, conflict with the order entered by another district court." *Id.*; *see also, e.g.*, *Beck v. U.S. Dep't of Justice*, Civ. A. No. 88-3433 (JHG), 1991 WL 519827, at *5 (D.D.C. Jan. 31, 1991).

In any event, the housing of Plaintiffs in the ▮▮▮▮▮▮ unit does not violate PREA, particularly 28 C.F.R. § 115.42(g). Pursuant to PREA, "The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings *solely* on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates." 28 C.F.R. § 115.42(g) (emphasis added).

The D.C. Circuit has explained that a "but-for" cause and something that's the "sole" basis, the latter of which appears in § 115.42(g), "are very different." *See Ponce v. Billington*, 679 F.3d 840, 845 (D.C. Cir. 2012). There can be multiple but-for causes for an action, but something that is the "sole" cause of an action means just that—it is the only reason. *Id.* at 845–46. For example, in the Title VII context, race would be a but-for cause in a non-selection case if an applicant were not selected because of lack of qualification and her race, but race would not be "sole" cause for the non-selection. *Id.* Title VII requires only but-for causation; the pertinent PREA regulation, on the other hand, would be

18

violated only if transgender status were the "sole[] . . . basis" for placement in the dedicated unit. 28 C.F.R. § 115.42(g).

Plaintiffs' transgender status was not the "sole[] . . . basis" for BOP placing them in the ███ ███ unit. BOP moved Plaintiffs already housed at ███████ to the unit because of the interrelationship ████ preliminary injunction. And upon establishing and operationalizing the unit in accordance with the ████ injunction, BOP transferred the remaining Plaintiffs being housed in women's facilities throughout the country because it made operational, economic, and legal sense to do so. *Supra* at 16–17. BOP thus did not place Plaintiffs in the unit "solely on the basis" of them being transgender. 28 C.F.R. § 115.42(g). To be sure, BOP has not sought to transfer other male trans-identifying inmates to the unit; only those who are male trans-identifying inmates *and* were being housed in women's facilities at the expense of the safety, privacy, and dignity of the females being housed with male inmates. *See* Stover Decl. ¶ 16. Thus, the ████████ unit does not violate PREA because reasons unrelated to Plaintiffs' transgender status underlie the placements.

Lastly, there is no PREA violation because the ████████ unit was established, in connection with a legal judgment, for the purpose of protecting Plaintiffs. *See* 28 C.F.R. § 115.42(g). To accommodate this Court's injunction that prevented the transfer of Plaintiffs to men's prisons because of safety concerns, the ████ injunction ordered segregated housing at FMC Carwell. The ████ injunction thus imported into it the purpose of protecting Plaintiffs and thus the ████████ unit falls outside the scope of § 115.42(g).

### b. Eighth Amendment

Plaintiffs' Eighth Amendment argument is also unlikely to succeed. Plaintiffs argue that the conditions in the segregated unit are causing them mental distress in violation of the Eighth Amendment, Pls.' Mot. at 20–21, but they fall far short of satisfying the deliberate indifference standard.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citation omitted). "To prove an Eighth Amendment violation based on deliberate indifference, a prisoner must establish that (1) the conditions in which the prisoner is incarcerated posed a substantial risk of serious harm; and (2) prison officials knew of and disregarded an excessive risk to the prisoner's health or safety." *Doe*, 172 F.4th at 906 (citation modified). Thus, deliberate indifference "includes subjective and objective components[,]" *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022); neither prong of that inquiry has been satisfied here.

*The Conditions at* ▆▆▆▆▆ *Do Not*
*Pose an Objectively Substantial Risk of Serious Harm.*

Plaintiffs have not demonstrated that being placed in a separate unit in a women's prison with other male trans-identifying inmates will subject them to an objectively substantial risk of serious harm, nor have they established that the conditions in that unit meet the Eighth Amendment threshold. For the level of risk to satisfy the first prong of this inquiry, it must be "sufficiently serious" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Plaintiffs fail to make this showing in their single paragraph of analysis. Pls.' Mot. at 20–21. They state that "the conditions of confinement in the segregated unit[,]" such as the lack of mental health care, is "causing severe harm." *Id.* at 21. But evidence shows that their medical care and mental health treatment (and their recreation and programming as well) are being provided at least at a similar level as others at ▆▆▆▆▆ albeit modified when necessary to comply with the ▆▆▆▆ injunction's requirement that BOP "shall use such separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces." ▆▆▆ PI Notice, ECF No. 199.

The unit housing Plaintiffs "has an assigned unit team, which continues to provide all required unit team functions for inmates on the unit, including determining inmate program needs, monitoring

20

participation, encouraging prosocial behaviors, and conducting regularly scheduled program reviews for each inmate." Rule Decl. ¶ 10. "Most general population units at ▆▆▆▆▆▆ have at least 200 inmates with one officer assigned to the unit[,]" but the ▆▆▆▆▆▆ unit is staffed nine inmates to one officer and is staffed 24 hours per day, seven days a week. *Id.* ¶¶ 8, 11. The inmates in the unit also have access to programming that they previously participated in, including religious services and educational opportunities, and more is coming. *Id.* ¶¶ 17–19. The inmates are provided with a daily opportunity to engage in recreation for one hour (inside or outside, depending on the weather) and the same equipment that is available to the general population is also available to them. *Id.* ¶ 20. BOP installed a law library station, phone station, three televisions, and two email stations for inmate usage—"affording inmates more access to televisions, phones, and email than they had on their previous units." *Id.* ¶ 24. The commissary is available, as are laundry services. *Id.* ¶¶ 21–22. Three meals—the same food that the rest of ▆▆▆▆▆▆ is served—is brought to the unit every day, and the inmates can eat in the common area or in their cells if they prefer. *Id.* ¶ 23. Social visiting has remained undisturbed at "the same total number of hours as biologically female inmates are afforded[,]" *id.* ¶ 25, and the common areas of the unit are open to the inmates "except during times when all inmates in the institution are required to be in their cells, such as during institution counts or after lights out[,]" *id.* ¶ 26. The cells themselves are bigger than the general population housing cells, each cell is equipped with a toilet and a sink, and private showers are available. *Id.* ¶¶ 27–28.

BOP also "developed procedures to safeguard the impacted inmates' mental health" upon being moved to the ▆▆▆▆▆▆ unit and thereafter. Field Decl. ¶ 6. For example, a psychologist conducted a suicide risk assessment upon transfer to the unit, and BOP "out of an abundance of caution" elevated their care level so that the inmates receive "routine outpatient mental health care or crisis-oriented mental health care." *Id.* ¶ 7. Additionally, medical and psychological care is provided, clinics and outside specialists remain available, and medications remain accessible—all at the same

21

level as before.  Rule Decl. ¶¶ 13–14.  A psychologist is "either available or on call at all hours to visit with inmates if an urgent need arises."  Field Decl. ¶ 8.  Notably, "no inmate has requested protective custody[,] suicide watch has not been clinically indicted for any impacted inmate," *id.* ¶ 51, and "there have been no reported or substantiated occurrences of inmate harassment, sexual assault, sexual victimization, or assaultive behavior by another inmate[,]" Rule Decl. ¶ 44.  Thus, the conditions do not objectively "pose[] a substantial risk of serious harm" to Plaintiffs.  *See Doe*, 172 F.4th at 906.

Additionally, the alleged severe mental harm that Plaintiffs allege in their self-serving declarations (*e.g.*, "through the roof" gender dysphoria and thoughts of self-harm and suicide), Pls.' Mot. at 21, are contradicted by the contemporaneous medical records.[3]

Emily Doe: On June 2, 2026, the date of the ▮▮▮▮ preliminary injunction, a BOP psychologist conducted a suicide risk assessment of Emily Doe.  Field Decl. ¶ 29.  "Doe did not express any thoughts of self-harm and did not articulate specific concerns with being transferred to the SA-B Unit."  *Id.*  On June 25, 2026, Doe reported that, since the move to the unit, it was "more difficult" to manage his gender dysphoria, but the mental status exam reflected no suicidal ideation or self-injurious behavior.  *Id.* ¶ 30. Emily Doe also stated that a component of his distress was that he was separated from his friends.  *Id.*  Emily Doe asserts in his declaration that his mental health is worsening, Pls.' Mot. at 23, yet Emily Doe has not sought any mental health services since June 25, 2026, despite having been encouraged to do so if problems were to arise.  *Id.*

Mary Doe: On June 2, 2026, a BOP psychologist conducted a suicide risk assessment, and no acute risk of suicide was identified.  *Id.* ¶ 31.  Mary Doe "did not articulate specific concerns with being transferred" to the unit.  *Id.*  On June 23, 2026, Mary Doe reported that he "hoped" to be transferred to a male federal medical center.  *Id.* ¶ 32.  His mood was "not the best, not the worst"

22

and he was not suicidal. *Id.* (citation omitted). On July 7, 2026, Doe stated that he was adjusting to the unit and had begun exercising more often. *Id.* ¶ 33. Mary Doe's mood "appeared [to be] irritated," but he was not emotionally distressed, and he continued to deny suicidal ideation and self-harm. *Id.* Mary Doe again expressed his desire to be transferred to a male facility and was "eager" to transfer to a male facility. *Id.*[4]

Zoe Doe: The June 2, 2026, suicide risk assessment of Zoe Doe, a ████████████ inmate, identified no suicide risk. *Id.* ¶ 19. Zoe Doe expressed "apprehension" about being placed in the unit, not because of gender dysphoria issues, but because he fears being placed in a locked unit with biological males with intact sex organs, particularly with those who have previously committed sexual offenses. *Id.* Zoe Doe declined interest in protective custody. *Id.* BOP addressed Zoe Doe's concerns by not celling him with an inmate identified as being a high risk of being a sexual predator, instead housing him with another inmate who is also at an "elevated risk of victimization[.]" *Id.* ¶ 21. On June 15, 2026, Zoe Doe did not reflect helpless or hopeless thinking and did not endorse any feelings of self-harm or suicide. *Id.* ¶ 20. On June 25, 2026, the psychologist described Zoe Doe's mood as "pleasant," and Zoe Doe again denied concerns of self-harm or mental health crisis, *Id.* ¶ 22—all contrary to the assertions he now makes in his declaration. On July 2, 2026, Zoe Doe self-reported "aggravated" gender dysphoria and other mental health symptoms because of concerns about being housed with biological males, *id.* ¶ 23, but he continued to deny seeking placement in protective custody, *id.* ¶ 24.

Indeed, based on the suicidal statements that Zoe Doe made in his declaration, a psychologist conducted a suicide risk assessment where Zoe Doe immediately stated that he was not going to hurt himself. *Id.* ¶¶ 26, 27. Doe expressed "general frustration" with his placement in the unit, but he did

---

[4]    In light of Mary Doe's insistence on being placed in a men's prison, Plaintiffs should voluntarily dismiss his claims so that BOP can effectuate an appropriate transfer.

not describe symptoms of increased gender dysphoria.  *Id.* ¶ 26.  "Doe is spending time completing Life Connections Program workbooks, ██████████████████████████████████ ████████, and on Doe's legal work.  Doe has regular video visits with Doe's sister and indicated this relationship discouraged self-harm."  *Id.* ¶ 27.  "Because Doe consistently and adamantly denied a desire or intention to engage in self-harm, and because Doe was future oriented and identified existing family support structures while also agreeing to work with Doe's assigned provider to reinforce coping skills, [the psychologist] concluded suicide watch placement was not indicated."  *Id.* ¶ 28.

Carla Jones: At the June 2, 2026, suicide risk assessment of Carla Jones, who has an extensive history of suicidal ideation, he "emphatically denied any intention to engage in self-harm."  *Id.* ¶ 9. Carla Jones "was not concerned" about being placed in the unit, "feeling it was a minor housing rearrangement."  *Id.*  The psychologist stated that Carla Jones "seemed to accept the current housing assignment without significant distress."  *Id.*  On June 8, 2026, Carla Jones continued to deny "acute distress" related to the move to the unit.  *Id.* ¶ 10.  Ten days later, he reported that the placement was becoming "less tolerable[,]" although he presented in a neutral mood, did not appear to be in any acute distress, and he did not articulate self-harm concerns.  *Id.* ¶ 11 (citation omitted).  On July 2, 2026, although "withdrawn," he presented in euthymic mood, described his recent mood as "fine," and denied having "any significant or actual mental health concerns[,]" *id.* ¶ 14 (citation omitted)—all contrary to what he now says in his declaration.  Carla Jones also acknowledged that he was declining recreation because of the heat, not because it was unavailable.  *Id.*  On July 17, 2026, Jones again denied "experiencing acute distress" and stated that he was now attending outside recreation and planned on continuing to do so.  *Id.* ¶ 15.

Based on the statement of self-harm that Jones made in his declaration, the psychologist conducted a suicide risk assessment on July 20, 2026, where Jones assured the provider that he "did not intend to engage in self-harm."  *Id.* ¶ 17.  "Jones denied having become more inclined to self-harm

24

since the previous [suicide risk assessment] on June 2, 2026." *Id.*  "Jones was future oriented and appeared thoroughly invested in the outcome of legal activities." *Id.*  "Based on this, along with Jones's general denial of interest in self-harm, and Jones's pleasant, honest, and open rapport with the provider, the provider concluded Jones did not warrant placement on suicide watch at that time." *Id.*

<u>Maria Moe.</u>  Maria Moe, who arrived at ██████████ on ██████████ "denied any suicidal ideation or imminent intention to engage in self-harm." *Id.* ¶ 35.  Moe stated that he was "adjusting well to the ██████████ and he "did not have significant concerns about the unit, though Moe did regret being separated from the biologically female population." *Id.* ¶ 36.

<u>Amy Jones.</u>  Amy Jones arrived at ██████████ on ██████████  Jones has an "extensive history of suicidality[,]" including a suicide risk assessment on ██████ that was prompted by his attorney telling him that, in the ██████████ unit, he "would be secured in a cell for twenty-three hours a day." *Id.* ¶¶ 39–40.  After the psychologist corrected this "incorrect impression" and informed Jones that the unit "included access to recreation equipment, a law library, video visits, and the ability to attend outside recreation, Jones was far more comfortable with the unit and reported feeling 'good.'" *Id.* ¶ 40 (citation omitted).  Jones denied any current suicidal ideation, intent, or plan. *Id.* The psychologist concluded that suicide watch was not warranted. *Id.*

<u>Olivia Doe.</u>  Olivia Doe arrived at ██████████ on ██████████  Doe "expressed unhappiness" about the transfer, but he was "future oriented" and denied any plan or intent to harm himself. *Id.* ¶ 45.  Doe revealed that he was under the misimpression that he would be "secured behind a locked door all day" but reported feeling "better" after being informed that the unit included access to recreation equipment, a law library, video visits, and the ability to attend outside recreation. *Id.* (citation omitted). The psychologist concluded that suicide watch was not warranted. *Id.*

<u>Sara Doe.</u>  Sara Doe arrived at ██████████ on ██████████ at which time BOP conducted a suicide risk assessment "out of an abundance of caution." *Id.* ¶ 47.  Doe expressed "general

frustration" with the transfer and "questioned whether programming would continue[.]"  *Id.* ¶ 48.  The provider advised Doe that programming would continue.  *Id.*  Doe denied suicidality,  was willing to engage in treatment, was future oriented, and identified various reasons to live.  *Id.*  The provider did not identify any acute distress and concluded that suicide watch was not warranted.  *Id.*

Therefore, Plaintiffs cannot show that they are likely to succeed under the objective prong of a deliberate indifference claim because the conditions of the ████████ unit did not expose them to an objectively substantial risk of risk of serious harm and the medical records show that they have not experienced such harm.

*Plaintiffs Cannot Establish that BOP Officials*
*Knew of and Disregarded an Excessive Risk to Their Health or Safety.*

As to the second prong of the deliberate indifference test, Plaintiffs have not shown that BOP officials subjectively believe Plaintiffs will face a substantial, intolerable risk of harm.  This prong of the inquiry requires that prison officials "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Here, BOP's medical records show that BOP did not know of serious harm being imposed, as those records show that there was no such harm.  *See supra* at 22–26.

Additionally, even if the evidence had shown such harm, BOP did not disregard that risk but instead took "reasonable measures to abate it."  *See Farmer*, 511 U.S. at 847.  For example, the unit "has an assigned unit team, which continues to provide all required unit team functions for inmates on the unit" and a 24/7 "dedicated unit officer."  Rule Decl. ¶¶ 10, 11.  BOP also "developed procedures to safeguard the impacted inmates' mental health" upon being moved to the ████ ████ unit and thereafter.  Field Decl. ¶ 6.  For example, a psychologist conducted a suicide risk assessment upon transfer to the unit, and BOP "out of an abundance of caution" elevated their care level so that the inmates receive "routine outpatient mental health care or crisis-oriented mental health care" and are seen at least once per month.  *Id.* ¶ 7.  Additionally, medical and psychological care is

26

provided, clinics and outside specialists remain available, and medications remain accessible—all at the same level as before. Rule Decl. ¶¶ 13–14. "A psychologist from ███████████ is either available or on call at all hours to visit with inmates if an urgent need arises." Field Decl. ¶ 8. Plaintiffs have not shown any basis on which to conclude that BOP has reason to believe these measures are insufficient to protect Plaintiffs' well-being. Therefore, Plaintiffs cannot satisfy the subjective prong either.

### c.   Due Process

Lastly, Plaintiffs are unlikely to succeed on their procedural due process argument that they are not being provided "constitutionally sufficient process." Pls.' Mot. at 21–23. First, Plaintiffs do not have a liberty interest in their place of confinement. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Clinkenbeard v. United States*, Civ. A. No. 24-252 (APM), 2024 WL 4650903, at *3 (D.D.C. Nov. 1, 2024); *Perez v. Lappin*, 672 F. Supp. 2d 35, 42 (D.D.C. 2009). Second, even if they did, due process to challenge their placement is available through BOP's Administrative Remedy Program. Plaintiffs, however, failed to avail themselves of that process and thus they cannot show that they have been deprived of due process. *See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001); *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) (plaintiff cannot "plausibly state" a due process claim where plaintiff "has not alleged that she availed herself of available procedures"). Here, as described above, *supra* at 13–15, Plaintiffs have not exhausted their administrative remedies and therefore they cannot plausibly state a due process claim, let alone show a likelihood of success on such a claim.

### B.   Plaintiffs Have Not Satisfied the Remaining Preliminary-Injunction Factors.

In seeking a preliminary injunction, Plaintiffs also have "the burden to show … that they are likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities, including the public interest, tips in their favor." *Wrenn v. Dist. of Columbia*, 864 F.3d 650, 667 (D.C.

Cir. 2017) (citation modified); *see MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) ("If the government is the party sought to be enjoined, the public interest and balance of equities factors merge."). Plaintiffs have failed to establish those factors here.

Plaintiffs have not demonstrated that they are likely to suffer irreparable harm by being moved to the ▮▮▮▮▮▮▮▮ unit. This Court has "set a high standard for irreparable injury": to qualify, an injury must be "both certain and great[,]" "actual and not theoretical[,]" "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) (emphasis omitted; citation omitted).

Here, the medical records of Plaintiffs Carla Jones, Maria Moe, Zoe Doe, Emily Doe, Mary Doe, Amy Jones, and Olivia Doe do not show irreparable harm that would support preliminary injunctive relief. *See supra* at 22–26. "[N]o inmate has requested protective custody, and suicide watch has not been clinically indicated for any impacted inmate." Field Decl. ¶ 51. "Specific concerns about the unit have been promptly addressed with follow up psychological services [and a]ll inmates continue to have access to individual therapy, psychotropic medication, and other services upon request or as indicated." *Id.* Moreover, "there have been no reported or substantiated occurrences of inmate harassment, sexual assault, sexual victimization, or assaultive behavior by another inmate . . . ." Rule Decl. ¶ 44. Plaintiffs might be dissatisfied with the placement for a variety of reasons, but their preferences fall far short of demonstrating irreparable harm.

As to any additional Plaintiffs or anticipation by the Plaintiffs currently housed in the unit about potential future harms of remaining in the unit, those assertions of irreparable harm "fail to rise beyond the speculative level." *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Hanson v. Dist. of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (per curiam) ("'[S]imply showing some *possibility* of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief." (citation omitted)). Although

28

Plaintiffs seem to suggest that experiencing fear of being housed in the unit or remaining in the unit is an irreparable injury, such intangible and subjective allegations of harm are insufficient. *See Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *5 (4th Cir. Mar. 28, 2025) ("[S]ubjective fear that is remote and speculative is insufficient to show the required actual and imminent harm to establish irreparability.").

As to the merged third and fourth factors, the Executive Branch interests at stake in ensuring the safety, privacy, and dignity of prisoners in federal custody outweigh Plaintiffs' speculative assertions regarding the possible risks of being housed in the unit at a women's facility. A preliminary injunction would impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy. "[P]rison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89 (1987) (citation modified). And "[i]t is well settled that the decision where to house inmates[,]" in particular, "is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). The D.C. Circuit has accordingly recognized the need to "accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (citation modified).

It is not the prerogative of this Court to dictate the management of federal prisons or countermand BOP's express judgment that the establishment of the ▮▮▮▮▮▮ unit serves as "a non-punitive housing solution to resolve the complex housing challenge of safely and securely housing biologically male inmates at female institutions[,]" as this Court's preliminary injunction currently requires. Stover Decl. ¶ 21. As BOP explained, "[b]y consolidating this population of biologically male inmates to one female institution, the Bureau can focus on privacy, safety, and security arrangements for both biologically male and biologically female inmates at one location, as opposed

to numerous institutions throughout the country." *Id.* And "[b]y centralizing all the Plaintiffs in one housing unit at a female medical center, the Bureau conserves resources and avoids duplication of services and prevents the creation of new infrastructure and alternative movement schedules at other institutions." *Id.* Such policy judgments and governmental interests merit particularly strong consideration under the PLRA, which requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would be caused by the requested preliminary-injunctive relief. 18 U.S.C. § 3626(a)(2).

The Executive Branch interests at stake thus clearly outweigh Plaintiffs' unproven and speculative assertions regarding the risks of being housed together in the ▓▓▓▓▓▓▓▓ unit.

## IV.     The Relief Sought by Plaintiffs Would Violate the PLRA.

At a minimum, this Court should alter the preliminary injunction requested by Plaintiffs to comply with the requirements of the PLRA. The PLRA contains specific restrictions on the grant of "preliminary injunctive relief" "with respect to prison conditions." 18 U.S.C. § 3626(a)(2). Any such relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.*

Here, Plaintiffs seek an order to transfer all Plaintiffs from the ▓▓▓▓▓▓▓▓ unit to the general population in other women's facilities. Pls.' Mot. at 25–26. To the extent the Court finds that Plaintiffs have demonstrated a sufficient threat of harm from being housed as the conditions currently exist in the ▓▓▓▓▓▓▓▓ unit, and that such harm requires preliminary relief, there are "le[ss] intrusive means" of addressing that harm than ordering BOP to disband the ▓▓▓▓▓▓▓▓ unit and transfer Plaintiffs to other female facilities. 18 U.S.C. § 3626(a)(2). For instance, the Court could order BOP to take additional measures relating to medical care, recreation, and programming. Where, as here, such less intrusive options are available, the PLRA requires the Court to narrow the scope of the relief requested.

30

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: July 24, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

MARIANNE F. KIES
Assistant Branch Director

/s/ *M. Jared Littman*
M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov