**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | Case No. 1:25-cv-00286-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| JANE JONES, et al., | Case No. 1:25-cv-00401-RCL |
| Plaintiffs, | |
| v. | |
| TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, et al., | |
| Defendants. | |
| MARIA MOE, et al., | Case No. 1:25-cv-00653-RCL |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION TO ENFORCE PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...............................................................................................................................2

    I.    Defendants' Jurisdictional and Procedural Arguments Fail. ...................................2

        A.    This Court Has Jurisdiction Over Plaintiffs' Motion................................2

        B.    The PLRA Does Not Impose an Independent Exhaustion Requirement on Plaintiffs' Motion. ...............................................................5

    II.    Defendants' Merits Arguments Fail...........................................................................6

        A.    Defendants' Response is Replete with Exaggeration, Half-Truths, and Misstatements..................................................................................6

        B.    Defendants Misunderstand the Legal Standard that Applies to this Enforcement Motion. ....................................................................10

        C.    Defendants' "Economical, Operational, and Legal" Rationale Is Pretextual. ...........................................................................................10

        D.    Defendants' Segregation Policy Independently Violates the PREA Regulations and, in Turn, the APA.............................................13

    III.    Immediate Enforcement or Injunctive Relief Is Warranted...................................17

        A.    Plaintiffs Have Established Irreparable Harm. ...........................................17

        B.    The Balance of Equities Favors Immediate Enforcement. ........................19

        C.    Plaintiffs' Requested Relief Satisfies the Requirements of the PLRA. ..................................................................................................19

CONCLUSION..........................................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

*CASES*

*Adams v. Fed. Bureau of Prisons*,
716 F. Supp. 2d 107 (D. Mass. 2010) ............................................................................ 18

*Aminjavaheri v. Biden*,
No. 1:21-cv-2246-RCL, 2021 WL 4399690 (D.D.C. Sep. 27, 2021) ................................. 4

*Armstrong v. Exec. Off. of the Pres., Off. of Admin.*,
1 F.3d 1274 (D.C. Cir. 1993) ......................................................................................... 10

*Ayyad v. Gonzales*,
No. 05-CV-02342-WYD-MJW, 2008 WL 2955964 (D. Colo. July 31, 2008) .................. 5

*Battista v. Clarke*,
645 F.3d 449 (1st Cir. 2011) .......................................................................................... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................................................................................... 18

*Clark v. California*,
739 F. Supp. 2d 1168 (N.D. Cal. 2010) ........................................................................... 5

*Crowe v. Fed. Bureau of Prisons*,
No. 24-cv-3582, 2025 WL 1635392 (D.D.C. June 9, 2025) ...................................... 16–17

*De Beers Consol. Mines v. United States*,
325 U.S. 212 (1945) ......................................................................................................... 4

*Democracy Forward Found. v. Off. of Mgmt. & Budget*,
780 F. Supp. 3d 61 (D.D.C. 2025) ................................................................................... 4

*Duvall v. Hogan*,
No. ELH-94-2541, 2020 WL 3402301 (D. Md. June 19, 2020) ....................................... 6

*EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*,
438 F. Supp. 876 (S.D.N.Y. 1977) .................................................................................. 5

*Fleming v. Fed. Bureau of Prisons*,
No. 4:21-cv-325 (N.D. Fla.) ........................................................................................... 11

*Fleming v. Rule*,
No. 4:25-cv-00157-D (N.D. Tex.) ......................................................................... 1, 12, 15

*Fleming v. United States*,
    No. 7:18-cv-00004-O (N.D. Tex.) ...................................................................... 11

*Garcia Ramirez v. United States Immigr. & Customs Enf't*,
    812 F. Supp. 3d 86 (D.D.C. 2025)................................................................... 3

*Gjoci v. Dep't of State*,
    No. 1:21-cv-00294-RCL, 2021 WL 2530651 (D.D.C. June 21, 2021) ............................. 4

*Holly Sugar Corp. v. Johanns*,
    No. 03-1739 (RBW), 2006 WL 8451547 (D.D.C. Aug. 1, 2006) ..................................... 5

*Int'l Ladies' Garment Workers' Union v. Donovan*,
    733 F.2d 920 (D.C. Cir. 1984)................................................................... 10

*Jones v. Berge*,
    172 F. Supp. 2d 1128 (W.D. Wis. 2001) ................................................................ 5

*Kifafi v. Hilton Hotels Ret. Plan*,
    No. 21-7025, 2022 WL 2280296 (D.C. Cir. June 24, 2022) ......................................... 2–3

*Love v. Bureau of Prisons*,
    No. 24- CV-2571 (APM), 2025 WL 105845 (D.D.C. Jan. 15, 2025) ............................... 17

*Marshall v. Loc. Union No. 639, Int'l Bhd. of Teamsters*,
    593 F.2d 1297 (D.C. Cir. 1979)................................................................... 2

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991)............................................................... 16–17

*Molina v. United States Dep't of Homeland Sec., Civ. Action*,
    2026 WL 1256234 (D.D.C. May 7, 2026)................................................... 3, 10

*Monroe v. Baldwin*,
    424 F. Supp. 3d 526 (S.D. Ill. 2019)............................................................... 18

*Nordstrom v. Ryan*,
    No. CV-15-02176-PHX-DGC, 2019 WL 530022 (D. Ariz. Feb. 11, 2019) ..................... 6

*Pennsylvania v. W. Virginia*,
    262 U.S. 553 (1923)................................................................... 18

*Sai v. Transp. Sec. Admin.*,
    54 F. Supp. 3d 5 (D.D.C. 2014)................................................................... 4

***STATUTES***

Title 18 U.S.C. § 3621(b)............................................................................................ 16–17

Title 18 U.S.C. § 3625 ............................................................................................... 16–17

Title 42 U.S.C. § 1997e(a) ................................................................................................ 5

***REGULATIONS***

Title 28 C.F.R. § 115.41 .................................................................................................. 15

Title 28 C.F.R. § 115.42 ........................................................................................... 4, 13–16

***FEDERAL RULES***

Fed. R. Civ. P. 3 ............................................................................................................... 5

***OTHER AUTHORITIES***

Executive Order 14168 ............................................................................................... 3, 16

## PRELIMINARY STATEMENT

Defendants do not dispute the critical facts: Defendants have rounded up all incarcerated Plaintiffs, removed them from the women's general population housing that BOP chose for them based on their individual circumstances, segregated them from their peers, and transferred them to a single unit that exclusively houses transgender women. Plaintiffs are confined in the segregated unit for twenty-three hours a day. They are not free to move about the facility or even be present in any place where they might be seen by a non-transgender woman. They can no longer shower or use the restroom without male officers watching; they cannot access or obtain the full benefits of programming with their peers; and they have been deprived of the social supports and relationships they built in general population, in some cases over years. Taken together, these conditions do not reflect continued housing in a women's facility—they reflect placement in a unit specifically designed to remove Plaintiffs from women's housing, which is precisely what this Court's order was meant to prevent.

There is no contradiction in Plaintiffs' argument. Wanting to continue living in women's facilities, rather than being confined together under adverse conditions designed to separate them from other women, does not undermine Plaintiffs' claims; it reinforces them. BOP's decision to categorically isolate them from women's general population is designed to convey a message—to them, everyone else in the facility, and the public—that they are "biological males," not women, and that they may not be housed as women. Indeed, in other court filings, BOP has characterized the segregated unit as "a new, all-male facility within ███████████." *Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.), ECF No. 166 at 14. It is obvious that the mandatory segregation scheme would therefore exacerbate Plaintiffs' gender dysphoria and frustrate a core purpose of this Court's preliminary injunction. Defendants do not meaningfully dispute this. Instead, they attempt to recast Plaintiffs' worsened gender dysphoria as insignificant because Plaintiffs are not presently on

suicide watch. Defendants also argue that the segregated unit contains larger cells than general population and provides certain standard amenities. Even if true, these contentions would not make the mandatory segregation policy lawful.

Defendants' asserted "legal" justification for categorical segregation collapses under scrutiny. They concede that their actions go far beyond what the *Fleming* injunction requires and that "BOP is not precluded from transferring Plaintiffs to other female prisons." (ECF No. 190, "Resp. Br.," at 15.) BOP's purported "economical" and "operational" rationales are similarly pretextual on their face. (*Id.* at 12.) The decision to voluntarily assume unnecessary costs and affirmatively create "difficulties" for the entire facility only serves to underscore the retaliatory purpose of the unit. (ECF No. 183, "Pls. Br.," at 11–12.) The equities favor enforcing the Court's preliminary injunction or issuing preliminary relief that allows Defendants to comply with the current *Fleming* injunction without causing Plaintiffs harm.

Finally, Defendants' threshold defenses are unpersuasive. This Court has jurisdiction to enforce its own preliminary injunction, to issue injunctive relief on claims raised in Plaintiffs' underlying complaints, and to protect Plaintiffs from retaliation in aid of the Court's jurisdiction. Plaintiffs' motion does not initiate a new action and thus does not trigger a new PLRA exhaustion requirement. The Court should enforce its order or issue other appropriate relief to restore Plaintiffs to the status quo the injunction was designed to preserve.

## ARGUMENT

I. **Defendants' Jurisdictional and Procedural Arguments Fail.**

A. **This Court Has Jurisdiction Over Plaintiffs' Motion.**

First, this Court has jurisdiction to consider Plaintiffs' enforcement motion. "The power of a federal court to protect and enforce its judgments is unquestioned." *Marshall v. Loc. Union No. 639, Int'l Bhd. of Teamsters*, 593 F.2d 1297, 1302 (D.C. Cir. 1979); *accord Kifafi v. Hilton Hotels*

*Ret. Plan*, No. 21-7025, 2022 WL 2280296, at \*1, \*2 (D.C. Cir. June 24, 2022). Defendants do not cite any cases to the contrary. [1] Defendants themselves invoked this Court's continuing supervision when they filed their Notice of Anticipated Transfer, (ECF No. 168), before moving any Plaintiff into the segregated unit. Defendants cannot now disclaim the Court's power to assess whether their conduct is in fact in compliance with its Order.

Second, this Court has jurisdiction to consider Plaintiffs' alternative request for a TRO and preliminary injunction, which seeks relief from a BOP policy and practice that is challenged in the operative complaints. Specifically, Plaintiffs' complaints challenge Defendants' implementation of Section 4(a) of Executive Order 14168, including their "sudden and unjustified removal from general population" in women's facilities. (*Doe*, ECF No. 58-2 at 15; *Jones*, ECF No. 35 at 7; *Moe*, ECF No. 1 at 4; *see also Doe*, ECF No. 58-2 ¶¶ 1, 53, 76–77, 80, 85–86, 90, 102, 153, 158; *Jones*, ECF No. 35 ¶¶ 1, 21, 40, 42, 67, 144; *Moe*, ECF No. 1 ¶¶ 1, 4, 7, 18–19, 22–23, 37, 40, 94.) In each complaint's prayer for relief, Plaintiffs sought broad injunctive and declaratory relief, along with "such other and further relief as the Court deems just and proper," to prevent Defendants from implementing Section 4(a) of Executive Order 14168. (*Doe*, ECF No. 58-2 at 34; *Jones*, ECF No. 35 at 33; *Moe*, ECF No. 1 at 23.)

Defendants' assertion that Plaintiffs' complaints contain "no allegations" about the harms of segregation is false. (Resp. Br. at 7–8.) All Plaintiffs specifically alleged that their "removal from general population" in women's facilities and "placement in segregated housing . . . caused

---

[1] It is common for enforcement motions to challenge agency actions taken after the complaint was filed. *See, e.g., Molina v. United States Dep't of Homeland Sec.*, Civ. Action No. 25-3417 (BAH), 2026 WL 1256234, at \*17 (D.D.C. May 7, 2026) (granting motion to enforce even though the plaintiffs had "not amended their complaint to challenge" the agency's recent conduct); *Garcia Ramirez v. United States Immigr. & Customs Enf't*, 812 F. Supp. 3d 86, 90 (D.D.C. 2025) (granting motion to enforce because Defendants' 2025 policy violated the terms of a 2021 injunction).

them significant distress and raise serious and imminent concerns regarding their safety and well-being." (*Doe*, ECF No. 58-2 ¶ 90; *Jones*, ECF No. 35 ¶ 42; *Moe*, ECF No. 1 ¶ 23.)

These allegations bring Plaintiffs' motion within the scope of their complaints and thus within this Court's jurisdiction. *See Democracy Forward Found. v. Off. of Mgmt. & Budget*, 780 F. Supp. 3d 61, 78–79 (D.D.C. 2025) (exercising jurisdiction over plaintiffs' request for preliminary injunction with respect to a "subset" of issues raised in the complaint); *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 9 (D.D.C. 2014) (exercising jurisdiction over preliminary injunction motion where the plaintiff referenced the challenged conduct in the complaint and sought broad relief); *contra De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (declining to grant relief where the requested injunction "deals with a matter wholly outside the issues in the suit"); *Aminjavaheri v. Biden*, No. 1:21-cv-2246-RCL, 2021 WL 4399690, at *7 (D.D.C. Sept. 27, 2021) (declining to exercise jurisdiction where the challenged policy was "utterly absent from plaintiffs' complaint").

In addition, the *Doe* Plaintiffs explicitly asserted a claim under the APA that Defendants' decision to segregate them "in separate housing with only transgender women is contrary to law as set forth in 28 C.F.R. § 115.42(g)." (*Doe*, ECF No. 58-2 ¶ 158.) This is not a "mere mention of temporary segregation" as Defendants contend. (Resp. Br. at 8.) To the contrary, it is an express assertion of a cause of action that "mirror[s]" Plaintiffs' request for preliminary injunctive relief under the APA. *Gjoci v. Dep't of State*, No. 1:21-cv-00294-RCL, 2021 WL 2530651, at *1 (D.D.C. June 21, 2021). This is sufficient to establish jurisdiction. *Id.*

Third, even if the Court were to find that Plaintiffs' complaints have not sufficiently raised the claims they now assert in connection with their motion for injunctive relief, the Court still "may entertain" the motion because the facts are "closely related" and "the relief sought is to

-4-

'prevent or remedy actions designed to or having the effect of deterring the use of the courts, or punishing one for such use.'" *Holly Sugar Corp. v. Johanns*, Civ. Action No. 03-1739 (RBW), 2006 WL 8451547, at *4 (D.D.C. Aug. 1, 2006) (quoting *EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*, 438 F. Supp. 876, 879 (S.D.N.Y. 1977)). As Plaintiffs have argued, Defendants' conduct seeks "to punish Plaintiffs for litigating, to make their continued confinement in women's facilities as painful as possible, and to deter them and others from asserting their rights" while ultimately attempting to "evade and frustrate this Court's injunction." (Pls. Br. at 17.)

    **B.**    **The PLRA Does Not Impose an Independent Exhaustion Requirement on Plaintiffs' Motion.**

The PLRA does not require Plaintiffs to exhaust new grievances before asking this Court to enforce an injunction already entered in this case or to issue relief on matters already pled. The statute provides that "no action shall be brought" until administrative remedies have been exhausted. 42 U.S.C. § 1997e(a). "An action is 'brought' when the complaint is filed." *Jones v. Berge*, 172 F. Supp. 2d 1128, 1134 (W.D. Wis. 2001) (citing Fed. R. Civ. P. 3). Once the PLRA's exhaustion requirement is satisfied—or remedies are deemed unavailable—"[a]ny claim for relief that is within the scope of the pleadings may be litigated without further exhaustion." *Id.*

That rule applies with particular force here. Plaintiffs do not bring a new action; they ask this Court to enforce its June 7 injunction, and they seek injunctive relief against a policy and practice that was challenged in the underlying complaints. Courts have repeatedly rejected efforts to impose an independent exhaustion requirement on enforcement or injunctive motions filed in already pending cases. *See, e.g.*, *Ayyad v. Gonzales*, No. 05-CV-02342-WYD-MJW, 2008 WL 2955964, at *2 (D. Colo. July 31, 2008) (rejecting freestanding exhaustion requirement for motion for a preliminary injunction in already filed case); *Clark v. California*, 739 F. Supp. 2d 1168, 1232 (N.D. Cal. 2010) (holding that motion for enforcement of consent decree does not trigger

-5-

exhaustion requirement); *Duvall v. Hogan*, No. ELH-94-2541, 2020 WL 3402301, at *8 (D. Md. June 19, 2020) (same, regarding claims brought under a settlement agreement); *Nordstrom v. Ryan*, No. CV-15-02176-PHX-DGC, 2019 WL 530022, at *2 (D. Ariz. Feb. 11, 2019) (same, noting that the PLRA "requires prisoners to exhaust administrative remedies before filing a § 1983 suit, but Plaintiff has not filed a new suit").

This action was brought a year and a half ago; the underlying complaints have already survived a full round of preliminary-injunction proceedings, an appeal, remand, and individualized findings resulting in the June 7 injunction. Defendants' insistence that each individual Plaintiff must first file grievances and complete multiple appeals before this Court may even consider whether its own order is being honored, (Resp. Br. at 13–15), inverts the PLRA's purpose and would allow Defendants to violate an injunction with impunity for as long as the multi-level grievance process takes to run its course. The PLRA does not require that result, and this Court should reject it.

## II.    Defendants' Merits Arguments Fail.

### A.    Defendants' Response is Replete with Exaggeration, Half-Truths, and Misstatements.

Defendants' opposition to enforcement of the preliminary injunction and to Plaintiffs' request for injunctive relief relies on a selective and misleading account of the medical and psychological records. Before filing their opposition, Defendants refused to produce those records to Plaintiffs, despite Plaintiffs' requests, Defendants' knowledge that this motion was forthcoming, and Plaintiffs' ongoing difficulties obtaining medical care. (*See* Shalom Decl. ¶¶ 2–6.)

Having withheld the records, Defendants now rely on isolated fragments to minimize documented distress, omit context that changes the meaning of providers' notes, and substitute counsel's gloss for what clinicians actually recorded. A few glaring examples follow:

- **Defendants' Assertion:** "On ███████████, [Emily] Doe reported that, since the move to the unit, it was "more difficult" to manage his [sic] gender dysphoria, but the mental status exam reflected no suicidal ideation or self-injurious behavior." (Resp. Br. at 22.)

- **Evidence:**
(ECF No. 190-3, Attachment 3 (Clinical Contact Report for Emily Doe).)

- **Assertion:** Mary Doe was "eager" to transfer to a male facility. (Resp. Br. at 23; ECF No. 190-3 ¶ 33.)

- **Evidence:** Mary Doe indicated that she ███████████████ and that she ███████████████████████████ but reiterated that she did not want ███████████████████████████ (ECF No. 190-3, Attachment 4 (therapy notes); *see also* Mary Doe Supp. Decl. ¶ 7 (affirming that she never expressed interest in being in a men's facility));

- **Assertion:** "[M]edical and psychological care is provided, clinics and outside specialists remain available, and medications remain accessible—all at the same level as before." (Resp. Br. at 6; ECF No. 190-2, ███ Decl. ¶¶ 13–14.)

- **Evidence:** ███████████████████████████ (ECF No. 190-3, Attachment 6 (███████ transfer intake screening); *see also* Shalom Decl. ¶¶ 7–10 (describing failure to provide medication).)

- **Assertion:** Sara Doe's provider "did not identify any acute distress." (Resp. Br. at 26.)

- **Evidence:** "███████████████████████████████████████████████ (ECF No. 190-3, Attachment 8 (medical records of Sara Doe).)

Defendants' factual presentation suffers from the same defect throughout: it focuses on facts that make the segregated unit appear tolerable while ignoring evidence of harm to Plaintiffs.

The record—including Plaintiffs' declarations, the ███ Declaration and attachments, and Dr. Ettner's unrebutted declaration—confirms that removal from women's housing placements and imposition of mandatory segregation has predictably caused significant distress, worsened gender dysphoria, increased isolation, and undermined protective supports. Defendants' contrary narrative cannot be credited.

A few more systemic misrepresentations bear mentioning: First, throughout their Response, Defendants rely heavily on the *Fleming* preliminary injunction as the justification for their categorical segregation policy. But Senior Deputy Assistant Director Stover admits that the "decision to establish a separate housing unit at ███████████" for transgender women was made "[p]rior to the order in *Fleming*" and was unrelated to any legal obligation; rather, it was purportedly "for the specialized care of this inmate population." (ECF No. 190-1 ¶ 13.) Defendants provide no evidence to suggest that Plaintiffs were receiving inadequate care in their general population placements or that segregation is necessary or appropriate to meet their individual medical or mental health needs (and Dr. Ettner made clear that segregation predictably causes significant medical and mental health harm (*See* Ettner Decl. ¶¶ 4–21)). Rather, membership in "this inmate population" was the sole criterion supporting the "decision to establish a separate housing unit" for transgender women. (ECF No. 190-1 ¶ 13.)

Even if Defendants relied on the *Fleming* order in deciding to impose mandatory segregation on all Plaintiffs, Defendants' actions went far beyond that order. The *Fleming* injunction requires only that BOP house transgender women at ███████████ "in a secure, segregated area" and use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap" with other incarcerated people. (ECF No. 133-1, Exhibit to Notice of *Fleming* PI, at 3.) It does not require twenty-three-hour confinement, loss of programming, denial of

meaningful recreation, or transfer of Plaintiffs from other women's facilities to ███████. Those restrictions are BOP's choices, not the Texas court's commands.

Second, Defendants suggest mandatory segregation is not likely to harm Plaintiffs because they have conducted suicide-risk assessments and increased Plaintiffs' care levels. (Resp. Br. at 6.) But the more natural conclusion is that BOP's own clinicians recognized increased psychological risk after Defendants imposed a blanket segregation policy. As this Court has recognized, "the government has evidenced a subjective awareness of the objectively serious risks to Plaintiffs by presenting specific (though inadequate) plans to mitigate them." (ECF No. 161 at 17.)

Third, Defendants' selective discussion of programming and recreation do not accurately reflect the deprivations Plaintiffs are experiencing due to segregation. They highlight limited programming available to some Plaintiffs while ignoring that all Plaintiffs are unable to access Female Integrated Treatment ("FIT"), ███████ programming, and the opportunities available to women in general population at the facilities from which they were transferred. Similarly, Defendants emphasize nominal access to exercise equipment while overlooking the loss of classes, group activities, meaningful recreation, and documented instances in which Plaintiffs were denied recreation altogether. (*See e.g.*, Mary Doe Supp. Decl. ¶ 8.)

Fourth, Defendants focus on irrelevant metrics—cell size, laundry, commissary, and television access—while avoiding the harms Plaintiffs actually raise, all of which flow from one critical fact: they have been removed from women's housing and placed in an isolated transgender-only unit precisely to separate them from other women and to indicate to them and others that they are not being housed as women but rather as transgender individuals—that is, precisely to demarcate them and house them as "biological males," not women.

### B.  Defendants Misunderstand the Legal Standard that Applies to this Enforcement Motion.

Defendants invoke the civil-contempt standard in response to Plaintiffs' motion. (Resp. Br. at 9 (citing *Armstrong v. Exec. Off. of the Pres., Off. of Admin.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)).) But Plaintiffs seek enforcement of the preliminary injunction, not contempt of court or related sanctions. To prevail on such an enforcement motion, a plaintiff need only show the defendant has not complied with the court's injunction. *See Molina,* 2026 WL 1256234 at *8, *17(explaining that the "only question" is whether defendants have complied with the court's injunction); *id.* at *10 (evaluating whether agency action "comports with the preliminary injunction order or instead, when judged in relation to that order, sweeps more broadly than authorized"); *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 923 (D.C. Cir. 1984) (directing the district court to "determine whether" certain agency action "violate[d] the terms of [the] previous mandate"). Plaintiffs have made the requisite showing here. (*See* Pls. Br. At 12–15; ECF No. 181 at 2–3.)

### C.  Defendants' "Economical, Operational, and Legal" Rationale Is Pretextual.

Defendants' asserted "economical, operational, and legal" rationale rests on a false premise: that due to the preliminary injunction entered in *Fleming*, BOP had to choose between segregating Plaintiffs at ▮▮▮▮▮ or segregating them elsewhere. (*See* Resp. Br. at 17 (stating that, by "centralizing all the Plaintiffs in one housing unit at a female medical center, the Bureau conserves resources and avoids duplication of services and prevents the creation of new infrastructure and alternative movement schedules at other institutions" (quoting ECF No. 190-1, Stover Decl. ¶ 21)); *id.* at 16 (stating that Defendants transferred additional Plaintiffs into the segregated unit "to ensure compliance with court injunctions" (quoting ECF No. 190-1, Stover Decl. ¶ 16)); ECF No. 190-3, ▮▮▮ Decl. ¶ 5 (stating that "[a]ll Plaintiffs" were segregated "to

-10-

comply with the *Fleming* preliminary injunction").) BOP did not have to make that choice. The *Fleming* preliminary injunction applies only to ███████████ and says nothing about Plaintiffs housed in other women's facilities. As Defendants later admit, (*see* Resp. Br. at 15), they retained the option to maintain Plaintiffs in general population at other women's facilities, consistent with this Court's injunction. They made a choice to implement the terms of the *Fleming* order against all incarcerated Plaintiffs across the country, knowing it would cause them harm. And they made that choice even before the *Fleming* order issued, allegedly "for the specialized care" of Plaintiffs. (*See* ECF No. 190-1, Stover Decl. ¶ 13.) The facial implausibility and logical inconsistencies in Defendants' arguments are textbook indicators of pretext.

Defendants' suggestion that the legal rationale supporting the *Fleming* preliminary injunction could or even should bind the agency nationwide is also surprising given the procedural irregularities in the *Fleming* litigation. The preliminary injunction issued without any opposition from BOP on the merits of the underlying legal claims, (*see generally Fleming*, ECF No. 166; Pls. Br. at 5 n.1), and it is not supported by any findings of fact or conclusions of law that might be adopted as precedent in other jurisdictions.[2] Further, multiple courts have rejected near-identical claims challenging the placement of transgender women in women's facilities. *See, e.g., Fleming v. Fed. Bureau of Prisons*, No. 4:21-cv-325, ECF Nos. 14, 17, 88, 90, 176 (N.D. Fla.) (dismissing claims that the presence of transgender women in women's facilities violated her constitutional right to bodily privacy and her religious exercise rights under RFRA); *Fleming v. United States*, No. 7:18-cv-00004-O, ECF No. 46 at 9 (N.D. Tex. 2021) ("Plaintiff's subjective belief that her safety was at risk because of the transgender inmates" and "generalized fear of transgender

---

[2] BOP subsequently denied many of the plaintiffs' factual allegations. *See generally Fleming*, ECF 208, 213.

inmates" did not establish a failure to protect, and Plaintiff failed to state a plausible claim that she had been forced to expose herself to transgender women in prison in violation of her rights under the Free Exercise Clause or RFRA), *appeal dismissed*, No. 21-10585 (5th Cir. July 7, 2021). As a defendant in those cases, BOP is aware of these precedents. Indeed, on June 5, 2026, Defendants filed a brief in the currently pending *Fleming* action highlighting them. *Fleming v. Rule*, No. 4:25-cv-00157-D, ECF No. 203 at 9–11 (N.D. Tex. June 5, 2026) (noting that other lawsuits making similar claims have been unsuccessful).

Defendants' own conduct also forecloses their reliance on this argument. When this Court previously enjoined enforcement of Section 4(a), Defendants maintained their position that BOP must not house transgender women with other women due to alleged safety, dignity, and privacy concerns—the same position taken by the parties in the *Fleming* litigation. Yet in the aftermath of this Court's initial preliminary injunctions, Defendants released Plaintiffs from segregation and returned them to general population in women's facilities—conduct flatly inconsistent with any genuine belief that segregation was legally necessary.

Defendants' argument regarding conserving resources does not hold water for another reason. Defendants could have complied with the *Fleming* order by transferring Plaintiffs to other women's facilities where they would not have had to bear *any* additional costs or the resources they cite to create the segregated unit. They chose not to and instead created a disruptive and resource-intensive unit. Warden ███ explains that "[s]ecuring the biologically female population disrupts the regular flow of institution operations," so "services are generally brought to the inmates on the SA-B Unit rather than permitting the biologically male inmates to move about the institution to obtain services"—again, an operational choice, not a *Fleming* mandate. (ECF No. 190-2 at ¶ 12.) As detailed in Plaintiffs' declarations, Defendants have to shut down portions of

the facility whenever any Plaintiff needs to go off the unit for their one-hour recreation time, to attend a medical appointment or legal visit, or for any other reason, and they need to provide multiple guards to personally escort Plaintiffs and ensure that they do not come in contact with any of the more than ▆▆▆ women housed at the facility—operational difficulties that have led to Plaintiffs waiting hours for and even missing medical and legal appointments. (Emily Doe Decl. ¶¶ 11–12; Mary Doe Decl. ¶ 12; Zoe Doe Decl. ¶¶ 12–13, 17). Defendants do not deny these accounts and have also separately admitted that the arrangement they built causes "difficulties . . . in managing" the facility, underscoring that the restrictiveness of the unit is a product of BOP's own design choices. (ECF No. 129 at 35.) Critically, despite the disruption that was being caused by keeping six individuals in the segregated unit, Defendants chose to unnecessarily take Sara Doe, Olivia Doe, Amy Jones, and Maria Moe out of non-restrictive environments and subject them to segregation—requiring additional resources and disruption to the facility every time any of those four newly-transferred Plaintiffs needs to leave the unit.

At bottom, Defendants' mischaracterization of their legal obligations after the preliminary injunction in *Fleming*—and corresponding institutional costs and operational concerns—is a smokescreen for their true objectives: to implement the Executive Order and violate this Court's preliminary injunction by removing Plaintiffs from women's facilities, or to punish them for asserting their right to remain there.

### D. Defendants' Segregation Policy Independently Violates the PREA Regulations and, in Turn, the APA.

Defendants' decision to subject all transgender women in women's facilities to status-based segregation also violates 28 C.F.R. § 115.42(g), which bars placing transgender inmates in a dedicated unit "solely on the basis of such identification or status" unless the unit was established in connection with a judgment "*for the purpose of protecting such inmates*." (emphasis added).

-13-

Defendants argue that Plaintiffs' transgender status was not the sole basis for their segregation because BOP purportedly relied on three independent justifications: the *Fleming* injunction; "operational, economic, and legal" concerns; and the supposed threat Plaintiffs pose to women's "safety, privacy, and dignity." (Resp. Br. at 19.) But none of these rationales offers another basis for Defendants' action. The *Fleming* injunction contemplated segregation of transgender women solely because they are transgender. Defendants' purported operational, economic, and legal rationales—in addition to being pretextual for the reasons explained above— all depend on the assumption that Plaintiffs must be segregated from other women because of their transgender status (even if the terms of the *Fleming* injunction did not apply to them). And Defendants cite nothing other than Plaintiffs' transgender status to support their claim that Plaintiffs pose a supposed threat to other women.

Defendants note that they have not moved transgender women from men's facilities into the segregated unit at ███████. (*Id.*) But § 115.42(g) does not ask whether BOP placed *all* transgender individuals from *all* facilities in segregation. It asks whether BOP "place[d] . . . transgender . . . inmates" in a "dedicated . . . unit[] . . . solely on the basis of" their transgender status. 28 C.F.R. § 115.42(g). The answer to that question is yes. Plaintiffs are "transgender inmates." They were placed in a "dedicated unit." And the only characteristic BOP relied on in moving Plaintiffs from general population to that unit is the fact that they are transgender. Defendants have not identified any other basis for categorically treating Plaintiffs differently from every other woman with whom they were housed. As such, their segregation is forbidden by § 115.42(g).

Taken to its logical conclusion, Defendants' sole-causation argument would mean that § 115.42(g) is not violated if one BOP facility subjects all transgender women to automatic segregation, as long as some other BOP facility houses even one transgender woman in general population. If BOP can point to any operational or management difference between the two facilities, then according to Defendants, there could be no objection under § 115.42(g). By the same token, under Defendants' argument, the regulations would permit one facility to subject 99 transgender individuals to automatic segregation if the 100th is housed in general population. As long as BOP could identify some distinguishing factor between the first 99 individuals and the 100th, it could establish that the segregation decision depended on multiple but-for causes and thus did not violate § 115.42(g). That outcome defies logic and could not be what the Department of Justice intended when it promulgated the PREA regulations. Indeed, Defendants' approach is patently inconsistent with the individualized-assessment framework that is the bedrock of PREA's risk screening and housing placement protocols. *See* 28 C.F.R. §§ 115.41, 115.42(a)–(c).

Defendants next argue that the segregated unit complies with § 115.42(g) because it "was established, in connection with a legal judgment, for the purpose of protecting Plaintiffs." (Resp. Br. at 19.) Yet nothing in the *Fleming* court's order indicates a purpose to protect Plaintiffs in this action or any other transgender person. That order issued solely to protect the *Fleming* plaintiffs from alleged harms posed by transgender women. *See Fleming*, No. 4:25-cv-00157-D, ECF No. 199 (Preliminary Injunction) (N.D. Tex. June 2, 2026). Defendants' argument that the *Fleming* injunction somehow "imported into it the purpose of protecting Plaintiffs" from this Court's prohibition on transferring Plaintiffs to men's prisons, (Resp. Br. at 19), is pure fiction and nowhere to be found, explicitly or implicitly, in the *Fleming* injunction's text or purpose. Plaintiffs did not seek this unit for protection; they seek relief from it because it is harming them. Moreover,

accepting Defendants' post-hoc "imported purpose" theory would gut the PREA regulation's protective-purpose exception entirely.[3]

Finally, Defendants are incorrect in arguing that their blatant violation of § 115.42(g) is unreviewable under 18 U.S.C. §§ 3621(b) and 3625. To start, § 3621(b) only prohibits judicial review of "*a designation* of a place of imprisonment *under this subsection*." Plaintiffs do not challenge any such individualized "designation." Rather, they challenge a categorical segregation policy that BOP has adopted and applied to them in furtherance of § 4(a) of Executive Order 14168. *See Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *14 (D.D.C. June 9, 2025) (holding that under § 3621(b), courts retain jurisdiction to determine whether BOP policies are "contrary to established federal law," even if they "might implicate individual designation decisions"); *cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991).

Even if the Court were to find that Plaintiffs challenge their individual housing designations rather than a general policy, the jurisdictional bar still does not apply because Plaintiffs do not challenge their designations "under" § 3621(b). That subsection requires BOP to determine individual housing placements only after considering a number of factors, including "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons,"

---

[3] 28 C.F.R. § 115.42(g) requires that the underlying judgment itself be established for the purpose of protecting the segregated inmates—not that an agency may retroactively assert a secondary protective rationale after the fact to justify a segregation scheme created for other reasons. Under Defendants' theory, any BOP-initiated segregation scheme could bootstrap itself into the exception simply by declaring, after the fact, that it also serves to protect the inmates it confines. That is precisely the evasion that the regulation's requirement—that the judgment be entered "for the purpose of protecting such inmates"—is designed to foreclose.

and proximity to "the prisoner's primary residence." *Id.* For transfer designations, § 3621(b) also requires BOP to consider "the prisoner's preference for staying at his or her current facility or being transferred." *Id.* Here, there is no indication that BOP considered any of these factors; they simply transferred Plaintiffs to the segregated unit because they are transgender. As such, Defendants are not entitled to the protection from judicial review that § 3621(b) affords.

Defendants' invocation of 18 U.S.C. § 3625 fails for the same reasons. That statute "bars review of individualized housing determinations, not . . . a challenge to a broad policy that informs the designation decision." *Love v. Bureau of Prisons*, No. 24- CV-2571 (APM), 2025 WL 105845, at *11–12 (D.D.C. Jan. 15, 2025) (holding § 3625 is "no bar to review" because "[p]laintiffs are not challenging their individual housing placements. They contest the BOP's alleged discriminatory treatment of [a subset of prisoners] in the decision-making process"); *see also Crowe*, 2025 WL 1635392, at *14.

## III.    Immediate Enforcement or Injunctive Relief Is Warranted.

### A.    Plaintiffs Have Established Irreparable Harm.

Defendants' contention that Plaintiffs suffer no harm rests on selectively characterized medical records, *see supra* Section II, and ignores unrebutted expert evidence. Dr. Ettner's declaration explains that "[l]iving in a manner congruent with one's gender identity, including housing, is itself a recognized element of clinically indicated treatment," and that clinical stability in transgender women is often attributable to "the combination of medical protocols and the ability to live as and be recognized as a woman." (Ettner Decl. ¶¶ 4–5.) Her declaration documents the ways in which being housed in an environment that focuses on and emphasizes Plaintiffs' birth sex would foreseeably lead to significant worsening of gender dysphoria. (*Id.* ¶¶ 8–9.) Removing Plaintiffs from that environment and confining them to a restrictive unit therefore inflicts precisely

the harm this Court has already recognized as serious and irreparable: "severely exacerbated gender dysphoria" and its attendant mental-health consequences. (ECF No. 161 at 14.)

Courts have found that denying medical treatment for gender dysphoria can produce grave irreparable harms, including suicidal ideation, attempts, and self-harm. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (explaining that gender identity disorder, now known as gender dysphoria, is "a disorder that can be extremely dangerous," including leading to "self-mutilation"); *Adams v. Fed. Bureau of Prisons,* 716 F. Supp. 2d 107, 109 (D. Mass. 2010) (discussing the "risk of serious harm including depression, anxiety, self-mutilation, and suicide"); *see also, e.g.*, *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) ("there is no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages" where deprivation of treatment for gender dysphoria resulted in depression, suicidal ideation, and self-harm), *vacated and remanded on other grounds*, 122 F.4th 688 (7th Cir. 2024).

That no Plaintiff has yet requested protective custody nor has suicide watch been clinically indicated, (Resp. Br. at 28), does not make the harms associated with gender dysphoria any less certain or great, does not convert them from actual to theoretical, and does not make them anything other than imminent. For over a century, courts have recognized that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. W. Virginia*, 262 U.S. 553, 593 (1923), *aff'd*, 263 U.S. 350 (1923); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). The harm here is ongoing, escalating, and imposed on Plaintiffs by Defendants' own operational choices rather than by any court order. (*See generally* Emily Doe Decl.; Mary Doe Decl.; Zoe Doe Decl.; Carla Jones Decl; and Exhibit C to Shalom Decl.)

**B.    The Balance of Equities Favors Immediate Enforcement.**

The balance of equities favors immediate relief. Defendants repeat the same high-level policy concerns they raised in opposing Plaintiffs' most recent motion for preliminary injunction, asserting without any evidence that mandatory segregation of all Plaintiffs promotes the "safety, privacy, and dignity of prisoners in federal custody." (ECF No. 180 at 11; *see also* ECF No. 129 at 33–35 (making the same broad and unsupported argument in opposition to Plaintiffs' motion for preliminary injunction).) The Court has already rejected these arguments. (ECF No. 161 at 50.) Compliance with the Constitution, the APA, and this Court's injunction is not an improper intrusion on prison administration.

Defendants' operational argument also fails on its own terms. As explained *supra* at Point II.C, to the extent Defendants contend that cost or operational concerns impact the balance of the equities, the argument collapses upon inspection. Indeed, the ▮▮▮ Declaration's own admission that BOP had to "secure[] the biologically female population" and deploy multiple guards whenever any Plaintiff needs to leave the unit demonstrates the cost to institutional order and other incarcerated people, not just to Plaintiffs, imposed by the segregated unit—which favors granting Plaintiffs the relief they seek here. (ECF No. 190-2 ¶ 12.)

Granting relief would not require BOP to violate the *Fleming* injunction. Plaintiffs seek restoration of general-population placement in women's facilities other than ▮▮▮▮▮. The public interest therefore favors enforcing this Court's injunction, restoring the status quo it was designed to preserve, and ending a regime that harms Plaintiffs and that Defendants themselves describe as difficult to manage.

**C.    Plaintiffs' Requested Relief Satisfies the Requirements of the PLRA.**

Defendants close by arguing that the PLRA requires the Court to issue, at most, an order requiring "BOP to take additional measures relating to medical care, recreation, and

programming." (Resp. Br. at 30.) But such relief would not resolve Plaintiffs' legal or actual injuries, which flow from the fact that they have been unlawfully placed in segregated housing because of their transgender status. In other words, Plaintiffs have requested the narrowest and least intrusive relief possible that is still capable of addressing the harms they are suffering.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to enforce the June 7, 2026, preliminary injunction, or, in the alternative, grant a temporary restraining order and preliminary injunction, and enter the relief requested in Plaintiffs' proposed order.

Dated: July 27, 2026

Respectfully submitted,

/s/ *Jennifer Fiorica Delgado*

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES &
DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ
RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com

*Pro Bono Counsel for Plaintiffs*

-21-