**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANE DOE, *et al.*,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Attorney General of the United States, *et al.*,

Defendants.

Civ. A. No. 25-286 (RCL)

Consolidated with *Jones v. Blanche*, Civ. A. No. 25-401 (RCL); *Moe v. Trump*, Civ. A. No. 25-653 (RCL)

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT THEREOF

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Executive Order 14168 ..... 3

B. BOP's Management of Trans-Identifying Inmates ..... 3

C. Factual Background ..... 6

D. Prior Proceedings ..... 8

LEGAL STANDARDS ..... 10

ARGUMENT ..... 11

I. Plaintiffs' Eighth Amendment Housing Claims (Counts Two) Fail as a Matter of Law. ..... 11

A. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities. ..... 12

B. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate. ..... 18

II. Plaintiffs' Equal Protection Claims (Counts One) Fail as a Matter of Law. ..... 22

III. Plaintiffs' Rehabilitation Act Claims (Counts Four) Fail as a Matter of Law. ..... 27

A. Plaintiffs Lack a Private Right of Action under the Rehabilitation Act. ..... 27

B. Plaintiffs' Rehabilitation Act Claims Fail on the Merits. ..... 30

IV. Plaintiffs' APA Claims (Count VI) Fail as a Matter of Law. ..... 33

V. The Could Should Dismiss Plaintiffs' Gender Dysphoria Medical Treatment Claims (Counts Three, Five, Six, and Seven). ..... 36

CONCLUSION ..... 37

# TABLE OF AUTHORITIES

## Cases

*Aka v. Wash. Hosp. Ctr.*,
156 F.3d 1284 (D.C. Cir. 1998) .......... 32

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 10, 11

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 1, 13, 33

*Bennett v. Blanchard*,
802 F.2d 456 (6th Cir. 1986) .......... 36

*Calhoun v. DeTella*,
319 F.3d 936 (7th Cir. 2003) .......... 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 10, 11

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) .......... 13, 14

*Clark v. Skinner*,
937 F.2d 123 (4th Cir. 1991) .......... 29

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 34

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) .......... 29

*Curtis v. Citibank, N.A.*,
226 F.3d 133 (2d Cir. 2000) .......... 36

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 34, 35

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) .......... 8, 9, 32

*Doe v. Spahn,*
Civ. A. No. 23-2859 (CJN), 2025 WL 1305360 (D.D.C. May 6, 2025) .......... 29

*Dothard v. Rawlinson*,
433 U.S. 321 (1977) ........ 14, 24

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........ *passim*

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ........ 27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 11, 33, 35

*FDA v. Wages & White Lion Investments, L.L.C.*,
604 U.S. 542 (2025) ........ 33, 36

*Florence v. Bd. of Chosen Freeholders*,
566 U.S. 318 (2012) ........ 25

*Forest Cnty. Potawatomi Cmty. v. United States*,
330 F. Supp. 3d 269 (D.D.C. 2018) ........ 11

*Goff v. Menke*,
672 F.2d 702 (8th Cir. 1982) ........ 36

*Harrison v. Fed. Bureau of Prisons*,
248 F. Supp. 3d 172 (D.D.C. 2017) ........ 33

*Harrison v. Kernan*,
971 F.3d 1069 (9th Cir. 2020) ........ 26

*Heller v. Doe by Doe*,
509 U.S. 312 (1993) ........ 27

*Helling v. McKinney*,
509 U.S. 25 (1993) ........ 20, 21

*Hudson v. Palmer*,
468 U.S. 517 (1984) ........ 13

*Irving v. Dormire*,
519 F.3d 441 (8th Cir. 2008) ........ 16

*J.L. v. Soc. Sec. Admin.*,
971 F.2d 260 (9th Cir. 1992) ........ 30

*Jagers v. Federal Crop Ins. Corp.*,
758 F.3d 1179 (10th Cir. 2014) ........ 35

*Johnson v. California*,
543 U.S. 499 (2005) ........................................................................................................ 26

*Kapche v. Holder*,
677 F.3d 454 (D.C. Cir. 2012) ........................................................................................ 30

*Kincaid v. Williams*,
600 U.S. ---, 143 S. Ct. 2414 (2023) ................................................................................ 32

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ........................................................................................... 26

*Lane v. Pena*,
518 U.S. 187 (1996) ........................................................................................................ 29

*Lopez v. Ferguson*,
361 F. App'x 225 (2d Cir. 2010) ..................................................................................... 36

*Mathis v. U.S. Parole Comm'n*,
749 F. Supp. 3d 8 (D.D.C. 2024) .................................................................................... 29

*McKune v. Lile*,
536 U.S. 24 (2002) ................................................................................................ 13, 18

*McNeil v. Guthrie*,
945 F.2d 1163 (10th Cir. 1991) ....................................................................................... 36

*Morris v. Jackson*,
994 F. Supp. 2d 38 (D.D.C. 2013) .................................................................................. 32

*Moya v. U.S. Dep't of Homeland Sec.*,
975 F.3d 120 (2d Cir. 2020) ............................................................................................ 29

*Murphy v. United States*,
653 F.2d 637 (D.C. Cir. 1981) ........................................................................................ 19

*Oceana, Inc. v. Locke*,
831 F. Supp. 2d 95 (D.D.C. 2011) .................................................................................. 11

*Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017) ........................................................................................................ 27

*Porfiri v. Eraso*,
121 F. Supp. 3d 188 (D.D.C. 2015) ................................................................................ 31

*Public Safety Spectrum All. v. FCC*,
184 F.4th 640 (D.C. Cir. 2026) ....................................................................................... 22

*Rhodes v. Chapman*,
452 U.S. 337 (1981) ........................................ 13

*Roubideaux v. N.D. Dep't of Corr. & Rehab.*,
570 F.3d 966 (8th Cir. 2009) ........................................ 26

*SAI v. Dep't of Homeland Sec.*,
149 F. Supp. 3d 99 (D.D.C. 2015) ........................................ 29

*Silvious v. Ungar's Food Prods. Inc.*,
Civ. A. No. 10-0639 (JDB), 2010 WL 3324747 (D.D.C. Aug. 24, 2010) ........................................ 36

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) ........................................ 29

*Trump v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) ........................................ 35

*Turner v. Safley*,
482 U.S. 78 (1987) ........................................ 25, 26

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........................................ *passim*

*Washington v. Harper*,
494 U.S. 210 (1990) ........................................ 25, 26

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026) ........................................ *passim*

*Wilson v. Seiter*,
501 U.S. 294 (1991) ........................................ 13

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ........................................ 31

*Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) ........................................ 14, 26, 34

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ........................................ 28

**Constitutional Provisions**

U.S. Const. amend. VIII ........................................ 11

**Statutes**

5 U.S.C. § 706 .......... 33
18 U.S.C. § 3621 .......... 3, 14, 18, 33
18 U.S.C. § 3625 .......... 33
18 U.S.C. § 3626 .......... 8
20 U.S.C. § 1681 .......... 13
20 U.S.C. § 1686 .......... 13
29 U.S.C. § 705 .......... 30, 2
29 U.S.C. § 791 .......... 28
29 U.S.C. § 794 .......... 28, 30
29 U.S.C. § 794a .......... 28, 30
42 U.S.C. § 12211 .......... 30

**Rules**

Fed. R. Civ. P. 1 .......... 10
Fed. R. Civ. P. 56 .......... 10

**Regulations**

28 C.F.R. § 115.41 .......... 4
28 C.F.R. § 115.42 .......... 4
28 C.F.R. § 542.13 .......... 5
28 C.F.R. § 542.14 .......... 5
28 C.F.R. § 542.15 .......... 5

**Executive Orders**

Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......... 3, 35

**Other Authorities**

Am. Psychiatric Ass'n, DSM (2d ed. 1968) .......... 31

Am. Psychiatric Ass'n, DSM (3rd ed. rev. 1987) .......... 31

BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, (Mar. 6, 2025), https://perma.cc/G43K-8BD8 .......... 4

U.S. Dep't of Justice, Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12, (May 2013), https://perma.cc/RLB3-CY8Q ................. 16

## INTRODUCTION

The Court should grant summary judgment in Defendants' favor as to Plaintiffs' housing claims (Counts I, II, IV, and VI) because they fail as a matter of law. The Court should also dismiss Plaintiffs' stayed medical treatment claims (Counts I, III, V, and VII) because Plaintiffs are part of the *Kingdom* class and their medical treatment claims are being litigated in that case. *See Kingdom v. Trump*, Civ. A. No. 25-691 (D.D.C.).

The central question in this case is whether the Eighth Amendment's prohibition on cruel and unusual punishments bars the Federal Bureau of Prisons (BOP) from implementing the usual and longstanding practice of segregating based on sex in prison housing. As a matter of law, the Eighth Amendment does not require the federal government to place a male inmate in a women's prison, endangering female inmates' safety, privacy, and dignity. Even outside the prison context, society routinely separates based on sex, especially where there are real biological differences between the sexes that raise safety, privacy, or fairness concerns, and the lawfulness of those practices has repeatedly been upheld. *See, e.g.*, *West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026) (sports teams divided by sex). It is also well established that individuals have more circumscribed rights in the prison environment than they would in society at large. Inmates are not guaranteed a comfortable experience in prison, nor are they guaranteed perfect safety; the Constitution requires only that prison administrators employ reasonable measures to keep inmates safe. And deference to government officials is at its apex in the correctional environment. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

Plaintiffs, male trans-identifying inmates, most certainly do not have *more* rights than they would if they were not incarcerated in a federal prison. It follows, then, that the Eighth

Amendment does not forbid BOP from placing male inmates in men's prisons any more than it requires BOP to endanger female inmates' safety, privacy, and dignity by placing male inmates alongside them. Rather, the Constitution affords BOP officials discretion to exercise their experience and expertise in determining how to keep *all* inmates reasonably safe. Many characteristics can render certain men especially vulnerable to violence in men's prisons—whether they be trans-identifying, government informants, or pedophiles—and the Constitution does not require giving male trans-identifying inmates any different or stronger constitutional rights to be placed in women's prisons instead. *See B.P.J.*, 146 S. Ct. at 2377 n.4. Moreover, the Eighth Amendment does not contemplate injunctions that—like those Plaintiffs pursue here—are based upon hypothetical, future placements and conditions of confinement to which inmates have not been subjected, because there is no way for courts to properly assess the severity of those hypothetical placements and conditions or the adequacy of prison officials' future response to them. Plaintiffs' Eighth Amendment claims are premature and meritless and therefore fail as a matter of law.

Plaintiffs' other claims are also unavailing. Their Equal Protection claim fails as a matter of law because the Constitution does not require classifications based on gender identity (as opposed to biological sex); nor does the Constitution require exceptions to sex classifications for trans-identifying people. *Id.* at 2376–77 & n.4. Moreover, rational basis review applies to Plaintiffs' Equal Protection claims. BOP's housing policy, which was established to protect female inmates' safety, privacy, and dignity, easily clears that deferential standard. Plaintiffs' Rehabilitation Act claims also fail as a matter of law because Plaintiffs' lack a private right of action, because gender dysphoria is not a protected disability, and

because BOP is not required to provide Plaintiffs with the accommodation that they prefer, particularly the unreasonable accommodation of housing them—as biological males—in a women's prison. Lastly, Plaintiffs' Administrative Procedures Act (APA) claims fail as a matter of law because BOP's housing determinations are not subject to judicial review, and in any event, housing males in men's prisons is not arbitrary or capricious.

All of these claims can be decided as a matter of law, without regard to any factual disputes. The Court should therefore grant judgment in Defendants' favor on Plaintiffs' housing claims, dismiss Plaintiffs' medical treatment claims because they are being litigated in the *Kingdom* class action, and close this case.

## BACKGROUND

### A. Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO). This order aims to "defend women's rights" and promote women's "dignity, safety, and well-being" through "policies that recognize women are biologically female, and men are biologically male." EO § 1. As relevant here, Section 4(a) requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers." EO § 4(a).

### B. BOP's Management of Trans-Identifying Inmates

Decisions on classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b). When making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that

meets minimum standards of health and habitability established by [BOP] … that [BOP] determines to be appropriate and suitable." *Id.* Additionally, "[BOP] may at any time … direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

Previously, BOP used a specialized decision-making body to handle placements of trans-identifying inmates. *See* Stover Decl. ¶ 6, ECF No. 130. Now, the Designation and Sentence Computation Center (DSCC) makes the initial placement and transfer decisions for all trans-identifying inmates, just as it does for the rest of BOP's inmate population. BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 1, at 1–3 (Mar. 6, 2025), https://perma.cc/G43K-8BD8. Consistent with the EO, BOP has determined that it is the agency's "correctional judgment that housing inmates according to their biological sex ensures bodily privacy and safety for all inmates and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships." Stover Decl. ¶ 23.

When designating inmates to a facility, BOP follows the applicable regulations under the Prison Rape Elimination Act. During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates." 28 C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). BOP thus makes "individualized determinations when making placement decisions to reduce the risk of assaults," taking into consideration various factors including "an inmate's vulnerability to sexual victimization, prior victimization history, physical stature

or presentation, and other factors that make an inmate a target for abuse." Roman Decl. ¶ 3, ECF No. 130-2.

Like all other inmates, when trans-identifying inmates wish to raise concerns about their treatment in BOP custody, they can invoke BOP's Administrative Remedy Program. *See* 28 C.F.R. §§ 542.13–.15. Importantly, however, BOP does not merely wait to react to any such complaints. Rather, under its "zero tolerance policy toward sexual abuse and sexual harassment," BOP "provides routine training to all staff to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior," and instructs staff "on how to properly and timely intervene." Roman Decl. ¶ 8. Staff "regularly review the files of certain inmates … for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses to keep the institution safe and secure." *Id.* ¶ 13.

In response to concerns from male trans-identifying inmates regarding their safety, BOP has "many options available to provide relief to reduce their risk of harm in the men's prison." *Id.* ¶ 4. For instance, BOP can "transfer the inmate to a different facility," "change the inmate's cell assignment," or "plac[e] an inmate in a separate housing unit to keep potential threats away from the potential victim." *Id.* ¶ 5. Additionally, when staff become aware of a threat to a particular inmate, "they can begin monitoring predatory inmates and issuing separation orders that notify staff to keep certain inmates away from one another, including not placing them in the same programs." *Id.* ¶ 9. And, in circumstances where a "credible threat" has been identified, BOP can use "both protective custody and restrictive housing" in a non-punitive manner to keep the potential victim safe. *Id.* ¶ 11.

### C. Factual Background

As of May 2026, there are "approximately 1,022 inmates in BOP custody that have a diagnosis of gender dysphoria." Stover Decl. ¶ 5. Approximately 600 of those inmates are on sex-rejecting hormones. *Id.* The vast majority of male trans-identifying inmates are currently housed in men's facilities. *See* ECF No. 52-1, at 2 ("Feb. 21, 2025 Stover Decl.") (explaining that, as of February 2025, there were "1,488 biological male inmates who identify as female" in BOP custody and only 22 were "living in female institutions").[1] The original decisions to house male trans-identifying-inmates in women's facilities were made "for several reasons," including as a step towards eligibility for cross-sex surgery intervention under the old policy and as a result of lawsuits, but those decisions were not based on any finding that BOP "could not successfully keep the inmates safe if housed with male inmates." Stover Decl. ¶ 5; *see also id.* ¶¶ 29, 33, 38, 43, 46, 49, 55, 58, 61, 65-67, 69.

Plaintiffs are 14 male trans-identifying inmates in BOP custody who were housed in women's facilities at the time the EO was issued. They include the 13 male inmates currently housed in women's facilities, as well as one inmate who is on home confinement. *See* Stover Decl. ¶ 18. Plaintiffs allege that, although their "birth sex" is male, they identify as female, take sex-rejecting hormones, and have been housed in women's prison facilities, and that several have had sex-rejecting surgeries. *See* Doe 2d Am. Compl., ECF No. 58-2; *Jones v. Trump*,

---

[1] Currently, 15 known biological males are housed in women's facilities, 13 of whom are plaintiffs. Six additional individuals were originally plaintiffs in this action but are no longer part of the case because they were released from custody, passed away, or voluntarily chose to be transferred to a men's facility.

25-cv-401, ("Jones") Am. Compl., ECF No. 35; *Moe v. Trump*, 25-cv-653, ("Moe") Compl., ECF No. 1.

Following the issuance of the EO, BOP officials informed Plaintiffs that they would be transferred to men's facilities. BOP individually reviewed the housing placements for each plaintiff at the time and determined that they should be assigned to low-security men's facilities with nonviolent offenders—which BOP determined, based on its experience and expertise, "would minimize the likelihood that they would be victimized." ECF No. 11-1, at 2-3. As a result of the earlier preliminary injunctions in this case, *see infra* at 8–10, these 2025 housing assignments were never effectuated.

In 2026, the DSCC again undertook individualized assessments of the male inmates currently in opposite-sex facilities to determine their appropriate housing. Stover Decl. ¶ 21. "The assessments included an evaluation of each inmate's unique medical record, psychology record, disciplinary record, and security level," and "BOP consider[ed] on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.*

Based on these assessments, BOP determined that the four plaintiffs who were housed in halfway houses would be switched to the men's side of those facilities. *Id.* ¶¶ 64–68. In making this determination, BOP noted that those facilities experience very few substantiated sexual assault allegations and guilty findings for assaults on inmates. *Id.* ¶¶ 64, 66–68.

For the nine plaintiffs then housed in women's BOP institutions, BOP determined that placement was appropriate at Federal Medical Center (FMC) Rochester or Medical Center for Federal Prisoners (MCFP) Springfield. *Id.* ¶ 22. BOP determined that those locations were

appropriate "because the inmate population at these medical centers are largely nonviolent and tend to have only minor infractions in their disciplinary history." *Id.* Additionally, BOP medical centers house inmates requiring "specialized," "long-term," or "comprehensive medical or mental health care," and thus "are able to provide appropriate treatment to these inmates." *Id.* In making this determination, BOP noted that both FMC Rochester and MCFP Springfield currently house other inmates with gender dysphoria. *Id.* ¶¶ 25, 27. And both have extremely low rates of assault and sexual assault. *Id.* ¶¶ 24, 26.

**D. Prior Proceedings**

Following the issuance of the EO, Plaintiffs brought three lawsuits against the Attorney General and the Director of BOP, challenging the transfer of them to men's facilities on statutory and constitutional grounds. *See* Doe 2d Am. Compl.(ECF No. 58-2); Jones Am. Compl. (ECF No. 35); Moe Compl. (ECF No. 1). In February 2025, this Court granted Plaintiffs' first motions for preliminary injunctions and barred BOP from effectuating the transfers, concluding that plaintiffs were likely to succeed on their Eighth Amendment claims that they would face an unconstitutional risk of harm if they were to be housed in men's prisons. *See* ECF Nos. 23, 44, 55, 68, 83, 89, 94, 101 (*Doe*); ECF Nos. 62, 84, 90, 96, 103 (*Moe*); ECF Nos. 28, 46, 69, 75, 81, 88 (*Jones*).[2]

The government appealed, and the D.C. Circuit vacated the February 2025 preliminary injunctions because, the court of appeals held, Plaintiffs had not demonstrated a likelihood of success on their Eighth Amendment claims or irreparable harm. *See Doe v. Blanche*, 172 F.4th

[2] Pursuant to the Prison Litigation Reform Act (PLRA), these preliminary injunctions expired 90 days after their entry. *See* 18 U.S.C. § 3626(a)(2). The district court repeatedly issued renewed injunctions for additional 90-day periods based on the same analysis.

901, 918–19 (D.C. Cir. 2026). The D.C. Circuit held that it could not "sustain the district court's preliminary injunctions on the ground that every transgender woman … in BOP custody has an Eighth Amendment entitlement to not be housed in men's facilities." *Id.* at 916. The mandate was set to issue on June 8, 2026. *See* Order, *Doe v. Blanche*, No. 25-5099 (Apr. 17, 2026).

Following the D.C. Circuit's decision, Plaintiffs moved for a new preliminary injunction based on their Eighth Amendment claims. Mot. for TRO, ECF No. 117. Given that the parties would not have sufficient time to fully brief the new motion before the existing preliminary injunction expired on May 20, 2026, this Court issued an order purporting to "renew the existing preliminary injunction through the time that it is formally vacated by the Circuit's mandate issuing on June 8, 2026." Order for Prelim. Inj., ECF No. 125 at 3.

On June 7, 2026, the day before the D.C. Circuit's mandate issued in the prior appeal, this Court granted Plaintiffs' motion for a new preliminary injunction based on their Eighth Amendment claims. Mem. Op., ECF No. 148. This Court again concluded that all Plaintiffs were likely to succeed in showing that they would face objectively intolerable risks of harm in men's facilities and that BOP's transfer of them to men's facilities would reflect deliberate indifference to those risks. *Id.* This Court thus barred the government from transferring Plaintiffs to men's facilities, enjoined the government "from implementing Section 4(a) of Executive Order 14168 against" Plaintiffs, and ordered the government to "maintain and continue [Plaintiffs'] housing status in … women's prisons and women's halfway houses."

Order, ECF No. 147.[3] The government again appealed and briefing is proceeding on an expedited basis, to conclude on October 9, 2026. *See Doe v. Blanche*, No. 26-5238 (D.C. Cir. appeal filed June 24, 2026).

**LEGAL STANDARDS**

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one whose existence affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

[3] The Court also expressly clarified that its "injunction merely enjoins Defendants from transferring Plaintiffs to men's prisons" but "does not, at this juncture, require that Plaintiffs be housed alongside . . . female inmates or share common spaces." ECF No. 147. That caveat regarding the scope of relief was required in light of a potentially conflicting preliminary injunction that had been issued in a separate case, *Fleming v. Rule*, No. 4:25-cv-0157-D (N.D. Tex. filed Feb. 19, 2025), brought by female inmates at FMC Carswell who objected to being housed alongside male trans-identifying inmates (who are some of the plaintiffs in this action). ECF No. 148, at 52; *see* Preliminary Injunction at 3, *Fleming*, No. 4:25-cv-0157-D (June 2, 2026), ECF No. 199. Given this Court's June 7, 2026, explanation of the scope of its order, BOP filed a notice on July 15, 2026, alerting the Court that it would be transferring other plaintiffs in this action from the facilities they were then housed into the unit in FMC Carswell that was created pursuant to and in compliance with the *Fleming* injunction. ECF No. 168. Plaintiffs here then filed a motion to enforce the preliminary injunction or, in the alternative, for a new preliminary injunction seeking to block the housing of any plaintiffs in this segregated unit at FMC Carswell. ECF No. 183. This Court denied that motion on August 12 for lack of jurisdiction. ECF No. 212. Three weeks later, on September 3, 2026, Plaintiffs sought leave to file a supplemental complaint that challenges their FMC Carswell placements, ECF No. 221, and have indicated their intention to file another preliminary injunction about the FMC Carswell unit, Joint Status Report at 3, ECF No. 219.

242, 248 (1986). A "genuine" dispute of material fact exists when the non-movant produces sufficient evidence of a material fact so that a fact finder is required to resolve the parties' differing versions at trial. *Id.* "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Celotex Corp*, 477 U.S. at 327.

Further, in actions under the APA, summary judgment is the mechanism for "deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). In such cases, the standard set forth in Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 278 (D.D.C. 2018) (citation omitted). Rather, under the arbitrary and capricious standard, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## ARGUMENT

### I. Plaintiffs' Eighth Amendment Housing Claims (Counts Two) Fail as a Matter of Law.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Plaintiffs contend that transferring them to men's prison facilities and housing them alongside other male inmates would be cruel and unusual because it would subject them to unacceptable risks of harm from their fellow inmates and increase their

symptoms of gender dysphoria. *E.g.*, *Doe* 2d Am. Compl. ¶¶ 5, 8. This challenge fails as matter of law because, as a threshold matter, Plaintiffs are not currently housed in men's facilities and the Eighth Amendment does not exist to prevent speculative, hypothetical, future harms. In any event, there is no Eighth Amendment right prohibiting BOP from adopting a policy of placing male inmates in men's prisons to protect the safety, privacy, and dignity of female inmates in BOP custody. For all male inmates who may face heightened risks of harm in prison—whether they be trans-identifying, government informants, or pedophiles—BOP can and does take reasonable measures to ensure their safety within men's facilities. The Eighth Amendment does not require BOP to take the extraordinary step of housing inmates in any of these groups in opposite-sex facilities. No triable material fact can change that outcome.

Because Plaintiffs cannot satisfy either the objective or subjective elements of a non-speculative Eighth Amendment claim, Defendants are entitled to judgment as a matter of law on Counts Two in the operative complaints.

### A. The Eighth Amendment Does Not Require Prison Officials to House Male Inmates in Women's Facilities.

Plaintiffs' Eighth Amendment claims are premised on a fundamental misunderstanding of the Constitution: that the Eighth Amendment prohibits prison officials from adopting a "categorical policy" of housing male inmates in men's facilities. *See* Mem. Op., ECF No. 161 at 19. But binding law disproves that theory. *Cf. B.P.J.*, 146 S. Ct. at 2376–77 (the government "is not *constitutionally* required to grant individualized exemptions" from categorical policy of sex-segregated sports teams). It is axiomatic that the Eighth Amendment bars the imposition only of "cruel and unusual punishments." Punishments are "cruel" if they are "calculated to superadd terror, pain, or disgrace," and they are "unusual" if they have "long fallen out of

use." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified). Plaintiffs' Eighth Amendment claims fail for the simple reason that there is nothing cruel or unusual about prisons housing inmates exclusively with members of the same biological sex.

BOP's decision to house members of one sex with other members of the same sex is hardly unique. Even outside the prison context, society routinely (and lawfully) separates based on sex when, as here, there are real biological differences—even for those who partake in sex-rejecting hormones and surgeries—between the sexes that present safety, privacy, and dignity concerns. *See, e.g.*, *B.P.J.*, 146 S. Ct. 2356 (sports teams); 20 U.S.C. § 1686 (school living facilities); 20 U.S.C. § 1681(a)(5)-(7), (9) (undergraduate admissions policies, fraternities, youth organizations, conferences, pageants). No different rule applies to the correctional environment.

To the contrary, individuals' rights are *more* circumscribed in the prison environment than in society at large. *See Hudson v. Palmer*, 468 U.S. 517, 524 (1984). Inmates are guaranteed "'the minimal civilized measure of life's necessities,'" not a "'comfortable'" experience. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Conditions in prison may thus permissibly be "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Inmates can hardly be considered to have *more* rights against sex separation in prison than they would if they were not incarcerated.

Moreover, deference to government officials is at its apex in the correctional environment. *See Bell*, 441 U.S. at 547–48. And "the decision where to house inmates," in particular, "is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Prison administrators have long exercised that expertise to adopt policies of housing

inmates exclusively in prison facilities that correspond with their sex. Far from "unusual," such policies are well established, nearly universal, and hardly controversial. *See Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) ("the segregation of inmates by sex is unquestionably constitutional"); *Dothard v. Rawlinson*, 433 U.S. 321, 326 (1977) (observing that "most correctional facilities in the United States … are segregated on the basis of sex").

Against this backdrop, BOP's policy of housing inmates exclusively with inmates of the same sex is reasonable both as a general matter and with respect to Plaintiffs. BOP has broad (and exclusive) statutory discretion to designate inmates' places of imprisonment. 18 U.S.C. § 3621(b). And it has made the expert "correctional judgment" that "housing inmates according to their biological sex" is necessary to "ensure[] bodily privacy and safety for all inmates and limit[] the risk of sexual abuse, disciplinary problems, and illicit intimate relationships." Stover Decl. ¶ 23. The resulting housing policy has not "long fallen out of use," nor is it "calculated to superadd terror, pain, or disgrace." *Grants Pass*, 603 U.S. at 542 (citation modified). Therefore, as a matter of law, it does not give rise to an Eighth Amendment violation.

The notion that men who identify as women are entitled to a special exemption from the general rule that sex-segregated prisons are permissible is plainly wrong. Where, as here, a policy reasonably classifies based on sex, the Supreme Court has made clear that the government "is not *constitutionally* required to grant individualized exemptions" to specific plaintiffs who object to that policy. *B.P.J.*, 146 S. Ct. at 2376–77. Although the Court made that observation in rejecting an Equal Protection challenge to state laws maintaining women's

and girls' sports teams exclusively for female athletes, its reasoning applies equally to Plaintiffs' argument that the Eighth Amendment entitles them to exemptions from BOP's facially reasonable policy of placing inmates exclusively in prison facilities that correspond to their biological sex. As in the sports context, in the prison context the government "may treat all biological males the same and treat all biological females the same, given the inherent physical differences between biological males and biological females." *See B.P.J.*, 146 S. Ct. at 2377. Indeed, it is even clearer that Plaintiffs are not entitled to special treatment under the Eighth Amendment, given its limited application to cruel and unusual punishments, not the mere refusal to provide preferential accommodations. The Eighth Amendment protects inmates from exposure to objectively intolerable risks of harm; it does not require prison officials to house male inmates in women's facilities. *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Plaintiffs' view that the Eighth Amendment entitles them to an exemption from BOP's reasonable policy of housing inmates based on their sex thus cannot be squared with the substance of the Eighth Amendment's prohibition, the circumscribed nature of inmates' rights, or the deference owed to prison officials. The Eighth Amendment does not require prison officials to disregard obvious and serious safety risks to female inmates to serve the interests of a specific group of male inmates. Rather, it only requires officials to make reasonable efforts to keep male inmates reasonably safe, *id.*, and BOP has reasonably determined that it can satisfy this important obligation by housing Plaintiffs in men's facilities. *Supra* at 7–8 (discussing Stover declarations).

In overriding BOP's expert judgments on this score, based on little more than speculation about the risks Plaintiffs would face in men's facilities and prejudgments about the

adequacy of measures BOP might take in response, Plaintiffs rely on logic that leads to absurd results. Even if Plaintiffs may face some elevated risks of sexual or other assault in men's facilities, that is equally true for many *non*-trans-identifying males who face similarly heightened risks based on other identifiable characteristics, such as, for example, their offense of conviction, their sexual orientation, their status as government informants, or their mental health. *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, at 18, 19–20, 24–26 (May 2013), https://perma.cc/RLB3-CY8Q (non-heterosexual inmates, violent sex offenders, and inmates with severe psychological distress); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (informants).

The risks to such inmates would likely decrease if they were transferred to women's prisons. But even if there were no other way to eliminate those risks, no one could plausibly argue that BOP would violate the Eighth Amendment by declining to house such inmates in women's prisons. The same is true for Plaintiffs here: the Constitution does not force BOP to privilege their interests above other inmates' by exempting them from a general policy of housing inmates based on their sex, particularly where such special treatment (as both BOP and the district court in *Fleming* determined) compromises the safety and privacy of female inmates in BOP's custody. Put differently, the Constitution does not require treating Plaintiffs *better* than other male inmates, simply because Plaintiffs identify as female. *See B.P.J.*, 146 S. Ct. at 2377 n.4.

Of course, this is not to say that the Eighth Amendment has no bearing on BOP's housing determinations. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" which requires that the official "respond[] reasonably" to known risks.

*Farmer*, 511 U.S. at 844 (citation omitted). That obligation is equally true in the housing context. Here, though, it has been met: BOP has taken great care to identify facilities that are safe and appropriate for each Plaintiff. BOP considered each Plaintiff's "unique medical record, psychology record, disciplinary record, and security level" and identified placements that "would ensure the [Plaintiff]'s health and safety" and that would not "present management or security problems." Stover Decl. ¶ 21. Based on those individualized assessments, BOP determined that FMC Rochester or MCFP Springfield would be appropriate placements, both "because the inmate population[s] at these medical centers are largely nonviolent and tend to have only minor infractions in their disciplinary history," and "because [the medical centers] are able to provide appropriate treatment" to plaintiffs. *Id.* ¶ 22. Those facilities, which already house trans-identifying inmates, further have extremely low rates of assault. *Id.* ¶¶ 24–27. BOP also reasonably decided to move the Plaintiffs residing in halfway houses to the men's side of the same houses, all of which had extremely rare instances of violence. *Id.* ¶¶ 64, 66, 67, 68.

When Plaintiffs are transferred to these facilities in the future, BOP will regularly reassess Plaintiffs' safety in those facilities and respond to any specific threats that may arise. *See* Roman Decl. ¶¶ 4–13. In such circumstances, "BOP would have many options available to provide relief to reduce their risk of harm in the men's prison," including transfer to a new facility, changing cell assignments or housing units, "monitoring predatory inmates and issuing separation orders," or, where necessary, using protective custody or restrictive housing. *Id.* ¶¶ 4-11. And if Plaintiffs' gender-dysphoria symptoms worsened following the transfer,

Plaintiffs would be evaluated to determine whether additional treatment would be necessary to address any such changes. *E.g.*, Weidow Decl. ¶ 14, ECF No. 130-3; *see* Roman Decl. ¶ 12.

Additionally, under Plaintiffs' view of the Eighth Amendment, BOP is barred from revisiting their past assignments to female facilities—which were not made for safety reasons—and determining that different housing designations are appropriate. Plaintiffs' argument boils down to the extraordinary assertion that once BOP decides to house a male inmate in a female facility (for however long or for whatever reasons), it can never move that person to a male facility. But housing placements are not a one-way ratchet; BOP has substantial discretion over such determinations. *See* 18 U.S.C. § 3621(b). "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune*, 536 U.S. at 39. In making such decisions, the Constitution does not require prison administrators to prioritize the safety of an individual prisoner over all other considerations. *See, e.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (no Eighth Amendment violation where the action challenged was taken for "a legitimate penological purpose"). BOP has a legitimate penological interest in the privacy, well-being, and security of female inmates. *Supra* at 6. That BOP is now placing more weight on those interests when making housing assignments than it did in the recent past does not violate the Constitution.

In sum, the Eighth Amendment never requires a male inmate to be housed in a women's prison, and for this reason, Plaintiffs' Eighth Amendment claims fail as a matter of law.

### B. Plaintiffs Cannot Obtain an Injunction Based on Speculation About Hypothetical Future Prison Conditions That BOP Could Mitigate.

Even apart from the fundamental error—Plaintiff's assumption that the Eighth Amendment can ever compel BOP to house male inmates in women's facilities—Plaintiffs' Eighth Amendment claim independently fails as a matter of law because it is based exclusively on speculation about hypothetical prison conditions that Plaintiffs might experience in their new facilities, and improper prejudgments about the adequacy of mitigation measures BOP could take to address any risks that could hypothetically materialize. The Eighth Amendment does not permit Plaintiffs' broad intrusion on the Executive Branch's management of the federal prison system based on nothing more than conjecture about future placements and prison conditions.

As noted above, the Eighth Amendment's protections are limited in crucial ways to "incorporate[] due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 845 (citation omitted). Accordingly, "[a] prison official's duty under the Eighth Amendment is to ensure 'reasonable safety.'" *Id.* at 844 (citation omitted). As the D.C. Circuit has recognized, "a prisoner has no right to demand the level of protection necessary to render an institution assault-free." *Murphy v. United States*, 653 F.2d 637, 644 (D.C. Cir. 1981). And prison officials have not acted with "deliberate indifference to a substantial risk of serious harm" "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 836, 844.

It is particularly important for those limits to be respected where inmates seek prospective relief, as Plaintiffs do here. The Supreme Court has warned that courts must

"approach issuance of injunctive orders with the usual caution" in the failure-to-protect context, noting the danger of "becoming 'enmeshed in the minutiae of prison operations.'" *Id.* at 846–47 (citation omitted). Plaintiffs seeking injunctive relief must thus demonstrate that officials are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Id.* at 846. And crucially, an inmate seeking injunctive relief "must show that he *is incarcerated* under conditions posing a substantial risk of serious harm." *Id.* at 834 (emphasis added). The Supreme Court's use of the present tense in this context is critical; it is consistent with the Court's discussion elsewhere about the availability of injunctive relief for "inmates who plainly proved an unsafe, life-threatening condition in their prison." *Id.* at 845 (quotation marks omitted).

To be clear, an inmate who has not yet "suffer[ed] physical injury" can in some circumstances "seek[] injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer*, 511 U.S. at 845; *see Helling v. McKinney*, 509 U.S. 25, 32–33 (1993). But the Supreme Court contemplated that such a "substantial risk" could exist only where the inmate was in fact currently subject to "objectively inhumane prison conditions," *Farmer*, 511 U.S. at 845, not merely subject to the speculative possibility of experiencing such conditions in the future. In other words, the harm on which inmates base their claim to standing can be a sufficiently imminent future injury, but they must have already experienced conditions that violate the Eighth Amendment to obtain an injunction on the merits of their constitutional claims.

Under *Farmer*, then, the Eighth Amendment permits injunctive relief for failure-to-protect claims only where inmates have already been subjected to allegedly inhumane

challenged conditions and can thus demonstrate a *current* violation of the Eighth Amendment—not where inmates merely hypothesize a future violation. This limitation is necessary to the proper application of both prongs of the analysis. On the objective prong, an inmate must "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. If an inmate has not been subjected to the challenged conditions, he has suffered no Eighth Amendment violation; his lawsuit is premature, and allegations would be improperly based on speculation rather than evidence about existing conditions. *See id.* at 845–47; *Helling*, 509 U.S. at 35–36.

As to the subjective prong, an inmate cannot show that prison officials have been or are deliberately indifferent where the inmate has not been subjected to an objectively intolerable risk. In *Farmer*, the Supreme Court explained that deliberate indifference for purposes of a claim for injunctive relief "should be determined in light of the prison authorities' … attitudes and conduct at the time suit is brought and persisting thereafter." 511 U.S. at 845 (citation modified). And "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id.* at 846. But when inmates have not yet experienced the allegedly inhumane conditions, it is impossible to assess whether prison officials "knowingly and unreasonably disregard[] an objectively intolerable risk of harm" caused by prison conditions or took "reasonable measures to abate" it. *Id.* at 846, 847. Where a risk does not yet exist, officials have had no opportunity to reasonably react to it. Inmates thus have no ability to furnish concrete factual evidence that could satisfy the deliberate-indifference prong.

Because Plaintiffs seek injunctive relief premised on hypothetical conditions in men's prisons for which the placements have yet to be effectuated, they cannot satisfy either prong of the Eighth Amendment analysis. Their allegations about the severity of conditions in men's facilities are based solely on speculation about what they expect those conditions to be, rather than facts about the specific facilities to which they would be transferred. Plaintiffs similarly can only speculate that BOP's response to any risks that do arise will be inadequate, much less rise to the level of deliberate indifference. Plaintiffs have not identified any plausible basis for denying BOP the "presumption of regularity" that the agency would take appropriate measures to identify and mitigate any risks that might arise. *See Public Safety Spectrum All. v. FCC*, 184 F.4th 640, 654 (D.C. Cir. 2026).

To find a likely Eighth Amendment violation and enjoin BOP from implementing important policy decisions governing the housing of federal inmates based on such prejudgment and speculation flies in the face of the careful approach that the Supreme Court mandates in this context. For this independent reason, Plaintiffs' Eighth Amendment claims fail as a matter of law.

## II. Plaintiffs' Equal Protection Claims (Counts One) Fail as a Matter of Law.

Plaintiffs' Equal Protection claims fail as a matter of law because the Constitution does not require classifications based on gender identity, nor does the Constitution require exceptions to sex classifications for trans-identifying people. *B.P.J.*, 146 S. Ct. at 2376–77 & n.4.

In *B.P.J.*, the Supreme Court held that States "may determine eligibility for women's and girls' sports based on biological sex" consistent with the Equal Protection Clause. *Id.* at

2375. The Court noted that, in "the sports context, . . . everyone agrees that the States may maintain separate women's and men's teams—in other words, that the States may make distinctions based on sex—because of the inherent physical differences between women and men" that give rise to "safety" and other concerns. *Id.* at 2375–76. And the Court rejected the plaintiffs' contention that those interests, "while sufficient reasons to exclude most biological males, do not justify excluding a relatively small *subclass* of biological males—namely, those biological males who identify as female and have taken puberty blockers or hormones." *Id.* at 2375. Rather, "when a sex-based classification is justified as a constitutional matter"—"for example," in "women's and girls' sports"—then a State "may treat all biological males the same and treat all biological females the same"; it "is not *constitutionally* required to grant individualized exemptions to specific [persons] or subclasses." *Id.* at 2377, 2380. In other words, "the Constitution does not require that schools determine eligibility for women's and girls' sports based on gender identity rather than biological sex." *Id.* at 2377 n.4. The challenged state laws thus "readily satisfie[d] rational basis review or intermediate scrutiny." *Id.* at 2379.

*B.P.J.* expounded on *United States v. Skrmetti*, which rejected another constitutional claim seeking relief for "only transgender individuals." 605 U.S. 495, 519 (2025). The Court in *Skrmetti* approved a state law banning certain medical care for trans-identifying minors, relying in part on the inevitability of "reference to sex . . . in the medical context," where "biological differences" affect medical safety and efficacy—for example, the Food and Drug Administration "frequently approves drugs for use by only one sex." *Id.* at 512; *see id.* at 501–02. The Court also rejected as "misplaced" the plaintiffs' "allegations of sex stereotyping" in

the challenged state law. *Id.* at 516. More generally, the Court "decline[d] the plaintiffs' invitation to second-guess the lines that [the state law] draws," emphasizing "the need for legislative flexibility in this area." *Id.* at 524. The Court "repeat[ed]" that cautionary note in *B.P.J.*, which again underscored that courts lack "license" to redraw legislative lines or carve out exemptions for trans-identifying plaintiffs "as [courts] see best." 146 S. Ct. at 2380.

These precedents are fatal to Plaintiffs' Equal Protection claims. Like sports and medicine, prisons are another "context" where "everyone agrees" that some "sex-based classifications are permitted"—indeed, "amply justif[ied]" by "the inherent physical differences between women and men"—"and the only question is whether the States may limit women's [facilities] to biological females." *B.P.J.*, 146 S. Ct. at 2376, 2378–79; *see Skrmetti*, 605 U.S. at 512. The prison context also resembles athletics in that the "forced" inclusion of biological males in women's spaces "can create significant safety risks" and privacy concerns for women, whose interests courts "must also account for," among other "enormous practical and administrability problem[s]." *B.P.J.*, 146 S. Ct. at 2367, 2378, 2381; *cf. Dothard*, 433 U.S. at 335 ("There is a basis in fact" for male inmates' risks to female guards). Those parallels with *B.P.J.* underscore that "[t]he Constitution . . . do[es] not require an overhaul of women's [prisons] throughout America," any more than "women's and girls' sports." 146 S. Ct. at 2381.

Similar to the plaintiffs in *B.P.J.*, Plaintiffs here do not challenge *that* BOP separates people based on sex, but merely *how* it does so—specifically, they challenge the fact that BOP treats them (as male inmates who identify as women) differently than biological women, for housing purposes. But *B.P.J.* has foreclosed that claim by holding that "the Constitution does not require" policymakers to rewrite longstanding and indisputably permissible sex

classifications either to make them turn on "gender identity rather than biological sex," or by making "case-by-case exceptions" for males who identify as female. 146 S. Ct. at 2377 n.4, 2380. And *Skrmetti* rejected as "misplaced" the kind of "sex stereotyping" allegations that Plaintiffs make, while underscoring the "wide discretion" that the Constitution affords to policymakers in this area. 605 U.S. at 516, 524. Thus, the male housing assignment that Plaintiffs challenge "readily" withstand either "rational basis review or intermediate scrutiny" under newly clarified precedent. *B.P.J.*, 146 S. Ct. at 2379.

Although the Court need not decide the issue, rational basis review applies here—another reason these claims fail. Because "[r]unning a prison is an inordinately difficult undertaking" that is "peculiarly within the province of the legislative and executive branches of government" under the "separation of powers," the Supreme Court in *Turner v. Safley* "h[e]ld that a lesser standard of scrutiny is appropriate in determining the constitutionality of . . . prison rules." 482 U.S. 78, 81, 84–85 (1987). When a prisoner challenges a prison policy on the basis of generally applicable constitutional rights (not including the Eighth Amendment, which has its own prison-specific jurisprudence, *see supra* at 12–17), courts must eschew "heightened scrutiny" and uphold the policy so long as it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 87, 89. And the Supreme Court has "made quite clear that the standard of review [it] adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights" that apply both in and outside the penal context, including rights secured by "the Fourteenth Amendment." *Washington* v. *Harper*, 494 U.S. 210, 221–22, 224 (1990); *see Florence* v. *Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012).

The Supreme Court has narrowed *Turner* only once, and that exception does not apply to Plaintiffs' sex-discrimination claim. In *Johnson v. California*, the Supreme Court held that heightened scrutiny applied to an Equal Protection claim challenging a "policy of *racially* segregating prisoners." 543 U.S. 499, 502 (2005) (emphasis added); *see id.* at 515. It did so in part in reliance on pre-*Turner* precedent that had "applied heightened standard of review in evaluating racial segregation in prisons," *id.* at 506, *see id.* at 507, 510, 512; and in part because the right to be free from racial discrimination "is not a right that need necessarily be compromised for the sake of proper prison administration"—indeed, "public respect for our system of justice is undermined when the system discriminates based on race," *id.* at 510–11. But neither of those points is true for sex: there is no pre-*Turner* precedent applying heightened scrutiny to sex segregation in prison, and it is undisputed that prisons generally *must* separate men and women to protect important safety and privacy interests, *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 482–83 (6th Cir. 2023), aff'd, 605 U.S. 495 (2025); *Women Prisoners of D.C. Dep't of Corrs.*, 93 F.3d at 926. "In *Turner* itself [the Court] applied the reasonableness standard to a prison regulation that imposed severe restrictions on the inmate's right to marry," *Washington*, 494 U.S. at 224, while considering potential concerns with "housing both male and female prisoners," *Turner*, 482 U.S. at 98. In the 21 years since *Johnson*, only two courts of appeals have issued published decisions deciding whether *Turner* applies to sex-discrimination claims; both held that it does not. *See Harrison* v. *Kernan*, 971 F.3d 1069, 1076–78 (9th Cir. 2020); *Roubideaux* v. *N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009). There is thus no basis to extend *Johnson*'s race-discrimination exception to sex-based prison policies, which do not share race

discrimination's "unique historical, constitutional, and institutional concerns." *Cf. Pena-Rodriguez* v. *Colorado*, 580 U.S. 206, 208 (2017).

The housing-by-sex policy easily satisfies rational basis review, which "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). The Court must "uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Skrmetti*, 605 U.S. at 522 (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 313). The policy "is presumed constitutional," and the burden is on the challengers "'to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, at 320–21 (1993) (citation omitted). "Where there exist 'plausible reasons' for the relevant government action, '[the Court's] inquiry is at an end.'" *Skrmetti*, 605 U.S. at 522 (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 313–14).

Here, BOP's concerns about female inmates' safety, privacy, and dignity if a male inmate is place in a women's prison is a legitimate reason for their policy and is sufficient to establish a rational basis. Because BOP has provided a "plausible reason[]" that is rationally related to its housing policy, the Court's "inquiry is at an end." *Id.* (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 313–14). The Court thus should enter judgment in Defendants' favor on Plaintiffs' Equal Protection claims.

## III. Plaintiffs' Rehabilitation Act Claims (Counts Four) Fail as a Matter of Law.

Plaintiffs' claims under the Rehabilitation Act fail for myriad reasons, each of which is an independent basis for dismissal.

**A. Plaintiffs Lack a Private Right of Action under the Rehabilitation Act.**

The Rehabilitation Act does not provide for a private right of action for Plaintiffs to sue BOP under the Act in these circumstances. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). It is well-established that if Congress intends to create a private right of action, it must expressly do so in the statute. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017); *Alexander*, 532 U.S. at 286–87. "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar*, 582 U.S. at 133.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791 (§ 501 of the Rehabilitation Act); (2) by recipients of federal funds and federal agencies in their capacity as funders, 29 U.S.C. § 794(a) (§ 504 of the Rehabilitation Act); and (3) by federal agencies in their capacity as the "conduct[ors]" of their own "program[s] or activit[ies]," *id.* Congress provided express remedies, including private rights of action, to enforce the first two prohibitions, but not the third. 29 U.S.C. § 794a (Remedies and attorney fees). Specifically, § 794a(a)(1) provides for a private right of action to disabled federal employees and applicants seeking federal employment who are aggrieved by an agency's affirmative action plan in violation of § 791. Likewise, § 794a(a)(2) provides for a private right of action "to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794." By contrast, § 794a does not provide a private right of action against federal agencies in their capacity as the operators of their own "program[s] or activit[ies]" under § 794. Congress knows how to create a private right of action, and the fact that it did not do so in the circumstances here

forecloses Plaintiffs' claims. It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979).

Although the D.C. Circuit has not directly addressed the question, the overwhelming weight of authority among the other circuits and this District supports Defendants' position that there is no private cause of action under § 504 for federal programs or activities. *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc); *Doe v. Spahn*, Civ. A. No. 23-2859 (CJN), 2025 WL 1305360, at *4 (D.D.C. May 6, 2025) ("the Rehabilitation Act does not create a private right of action" to challenge agencies "acting as conductors of federal programs"); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 19 (D.D.C. 2024) ("Congress only created private rights of action for the first two categories, not the last."); *SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015) (holding that the Rehabilitation Act provides no "cause of action for a substantive claim of disability discrimination in a federal program or activity").

When the Supreme Court was confronted with the Rehabilitation Act's statutory language in a related context of sovereign immunity for money damages, it found it "telling[]" that in amending the Rehabilitation Act to cover federal programs and activities, Congress did not amend the § 794a remedies provision to include federal programs and activities. *Lane v. Pena*, 518 U.S. 187, 192–93 (1996) (holding that Congress did not intend to waive sovereign immunity for suits for money damages for Rehabilitation Act programs and activities claims); *id.* at 193 ("Congress did not intend to treat all § 504(a) defendants alike with regard to

remedies."). The only Circuit to hold otherwise is the Ninth Circuit. *See J.L. v. Soc. Sec. Admin.*, 971 F.2d 260 (9th Cir. 1992). But the Ninth Circuit reached its holding based on the premise—subsequently refuted by the Supreme Court's 1996 decision in *Lane*—that a private right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages," *id.* at 268, which are not at issue here.

Plaintiffs, who are not federal employees or recipients of federal funds, are suing BOP under the Rehabilitation Act in BOP's capacity as the "conduct[or]" of its programs or activities. *See* 29 U.S.C. § 794(a); *e.g.*, 2d Am. Compl. ¶¶ 143–146 (alleging Rehabilitation Act disability discrimination in the housing accommodations that BOP provides). Given the express causes of action otherwise outlined in 29 U.S.C. § 794a, the Court should follow the weight of authority and related Supreme Court precedent by holding that Plaintiffs lack a private right of action to sue BOP under the Rehabilitation Act in these circumstances.

### B. Plaintiffs' Rehabilitation Act Claims Fail on the Merits.

Even if a private right of action existed, Plaintiffs' Rehabilitation Act claims fail because gender dysphoria is not a protected disability under the statute. The Rehabilitation Act excludes from its definition of "individual with a disability" an individual with "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders* not resulting from physical impairments, or other sexual behavior disorders." 29 U.S.C. § 705(20)(F)(i) (emphasis added). The Americans with Disabilities Act ("ADA"), passed in 1990, contains the same exclusion. *See* 42 U.S.C. § 12211(b)(1). Because of the textual similarities between the Rehabilitation Act and the ADA, the same standards govern claims under both, *e.g.*, *Kapche v. Holder*, 677 F.3d 454, 460 (D.C. Cir. 2012), and courts rely on cases construing these provisions

"interchangeabl[y]," *e.g.*, *Porfiri v. Eraso*, 121 F. Supp. 3d 188, 194 (D.D.C. 2015) (citation omitted).

When the Rehabilitation Act was passed in 1973, and when the ADA was passed in 1990, Congress's use of the term "gender identity disorders" would have been commonly understood to include gender dysphoria. *See* Am. Psychiatric Ass'n, *DSM* 71 (3rd ed. rev. 1987); Am. Psychiatric Ass'n, *DSM* 44 (2d ed. 1968). Because neither the Rehabilitation Act nor the ADA defines "gender identity disorders," the phrase must be given its ordinary public meaning at the time of the statute's enactment. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 276–77 (2018). When the Rehabilitation Act was passed, the DSM edition then in use (DSM-II) did not define gender identity disorders. Am. Psychiatric Ass'n, *DSM* 44 (2d ed. 1968). When the ADA was passed, the DSM edition then in use (DSM-III-R) identified "the essential feature" of all gender identity disorders as "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psychiatric Ass'n, *DSM* 71 (3rd ed. rev. 1987). The DSM-III-R also explained that while "some forms of gender identity disturbance are on a continuum," even "mild" cases involve feeling "discomfort and a sense of inappropriateness about the assigned sex." *Id.* Indeed, the DSM-III-R's first "diagnostic criteria" for gender identity disorder is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Id.* at 77. What is now called "gender dysphoria," therefore, is simply a subset of gender identity disorders. In other words, gender dysphoria is a gender identity disorder with clinically significant distress or impairment—*i.e.*, a particularly intense form of a gender identity disorder. Gender dysphoria is thus subject to the statutory exclusion and is not a protected disability under the Rehabilitation Act.

If any doubt remains that gender dysphoria is excluded by the Rehabilitation Act, the statute's catchall phase "other sexual behavior disorders" extinguishes it. 29 U.S.C. § 705. "This final catch-all category suggests that Congress sought to prohibit the [statute]'s application to conditions that are sufficiently similar to the more specific categories of conditions that precede." *Kincaid v. Williams*, 600 U.S. ---, 143 S. Ct. 2414, 2417 (2023) (Mem.) (Alito, J., dissenting from denial of certiorari).

In any event, even if gender dysphoria were a qualifying disability, housing a male inmate in a female facility, at the expense of female inmates' safety, privacy, and dignity, is not a "reasonable" accommodation, and BOP is not required to provide Plaintiffs the accommodation they "request[]" or "prefer[.]" *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998). BOP "need only provide some reasonable accommodation," *id.*, *i.e.*, "the sort of accommodation that normally occurs," *Morris v. Jackson*, 994 F. Supp. 2d 38, 47 (D.D.C. 2013). Here, the housing of a male inmate in a female facility to treat gender dysphoria is an anomaly rather than a "normal[] occur[rence]." *Id.* The vast majority of male trans-identifying inmates are currently housed in men's facilities. *See* ECF No. 52-1, at 2 (explaining that, as of February 2025, there were "1,488 biological male inmates who identify as female" in BOP custody and only 22 were "living in female institutions"). That number is down to 15. *Supra* at n.1. Thus, housing a man in a woman's facility is not "the sort of accommodation that normally occurs" such that BOP is required to provide this accommodation under the governing statute. *Morris*, 994 F. Supp. 2d at 47.

## IV. Plaintiffs' APA Claims (Counts VI) Fail as a Matter of Law.

Finally, Plaintiffs' APA claims fail as a matter of law because BOP's housing designations are not subject to judicial review. BOP's "designation of a place of imprisonment . . . is not reviewable by any court." 18 U.S.C. § 3621(b); *see also Doe*, 172 F.4th at 913 (deciding that § 3621(b) does not preclude review of *constitutional* claims but is otherwise preclusive). Moreover, 18 U.S.C. § 3625 specifically carves out imprisonment determinations and decisions, including designations of place of imprisonment, from APA review. *See, e.g.*, *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 184 (D.D.C. 2017) (dismissing inmate's APA claim challenging transfer decision because, pursuant to § 3625, the government "has not waived its sovereign immunity" for these claims). There is no question that Plaintiffs are challenging their housing designations here—*i.e.*, BOP's decision to house each of them, for individualized reasons, in a men's facility.

Even if Plaintiffs' APA claims were subject to judicial review, and statutory authority provides that they are not, housing males in men's prisons is not arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. "The scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA* v. *Wages & White Lion Investments, L.L.C.*, 604 U.S. 542, 567 (2025) (citation omitted).

Deference is particularly warranted on matters "within the province and professional expertise of corrections officials." *Bell*, 441 U.S. at 548 n.23 (citation omitted). As the Supreme Court has recognized, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. Such deference is warranted "not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548.

Prison administrators have long exercised that expertise to adopt policies of housing inmates exclusively in prison facilities that correspond with their sex. For the reasons discussed above, *supra* at 12–17, far from being "arbitrary or capricious," such policies are well established, nearly universal, and hardly controversial. *See Women Prisoners of D.C. Dep't of Corrs.*, 93 F.3d at 926 ("the segregation of inmates by sex is unquestionably constitutional").

Moreover, under the APA, courts "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" *Id.* (citation omitted). To the contrary, the proper functioning of the Executive Branch depends on agencies following presidential policy directions. The Constitution grants the President authority to ensure that agencies act "in accordance with the policies that the people presumably elected the President to promote."

*Collins* v. *Yellen*, 594 U.S. 220, 252 (2021). And the President may exercise that authority by issuing directions to agencies concerning actions within their authority. *See, e.g.*, *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025); *id.* (Sotomayor, J., concurring). It is thus entirely proper for political officials to "come into office with policy preferences" and "work with staff attorneys to substantiate the legal basis for a preferred policy," *Dep't of Com.*, 588 U.S. at 783, provided that the final agency action is "reasonable and reasonably explained," *Prometheus Radio Project*, 592 U.S. at 423; *see Jagers* v. *Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185–86 (10th Cir. 2014) (explaining that any "internal political pressure" or "desire to reach a particular result" does not render the result invalid under the APA where "objective evidence [adequately] support[s] the agency's conclusion").

Here, on January 20, 2025, President Trump issued EO 14168, which aims to "defend women's rights" and promote women's "dignity, safety, and well-being" through "policies that recognize women are biologically female, and men are biologically male." EO § 1. As relevant here, Section 4(a) requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers." EO § 4(a). Following the issuance of the EO, BOP officials informed Plaintiffs that they would be transferred to men's facilities with low assault rates and otherwise appropriate for the medical care they needed. *Supra* at 6–8.

In sum, BOP did not act arbitrarily or capriciously by following EO 14183, which set forth a reasonable policy that, to protect female inmates' safety, privacy, and dignity, men cannot be housed in women's prisons. BOP "acted within a zone of reasonableness" by thoughtfully implementing the EO in a manner that took great precaution in minimizing the

likelihood of victimization and maximizing the medical or mental health care that those inmates might need. *See Prometheus Radio Project*, 592 U.S. at 423. Under the APA, the Court is prohibited from "substitut[ing]" its "own judgment for that of the agency" as to BOP's housing of male trans-identifying inmates in men's prisons, *Wages & White Lion Investments*, 604 U.S. at 567 (citation omitted), as Plaintiffs urge the Court to do. Plaintiffs' APA claims thus fail as a matter of law.

## V. The Court Should Dismiss Plaintiffs' Gender Dysphoria Medical Treatment Claims (Counts Three, Five, Six, and Seven).

In addition to housing transfer claims, Plaintiffs also bring claims related to their gender dysphoria medical treatment (Counts I, III, V, and VII). The Court previously stayed those claims because Plaintiffs are part of the *Kingdom* class, which is the subject of ongoing litigation as to those same claims. ECF No. 127; *see Kingdom*, Civ. A. No. 25-691 (D.D.C.). Because Plaintiffs are seeking to "maintain two actions on the same subject in the same court, against the same defendant at the same time," *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000), Plaintiffs' duplicative individual claims medical treatment claims in this case should be dismissed. *See, e.g.*, *Lopez v. Ferguson*, 361 F. App'x 225, 226 (2d Cir. 2010) (affirming dismissal of suit when plaintiffs are part of class action with duplicative claims); *McNeil v. Guthrie*, 945 F.2d 1163, 1165–66 (10th Cir. 1991) (finding that individual suits cannot be brought where a class action with the same claims exists); *Bennett v. Blanchard*, 802 F.2d 456, 456 (6th Cir. 1986) (holding that the lower court was correct in dismissing a case when plaintiff was a member in a parallel class action); *Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982) (holding that a class member "should not be able to prosecute a separate equitable action once his or her class has been certified"); *Silvious v. Ungar's Food Prods. Inc.*, Civ. A. No. 10-0639 (JDB), 2010 WL

3324747, at *1–2 (D.D.C. Aug. 24, 2010) (dismissing case where substantially similar claims were proceeding in a class action lawsuit).

## CONCLUSION

For the foregoing reasons, the Court should grant judgment in Defendants' favor as to Plaintiffs' housing claims, dismiss Plaintiffs' medical treatment claims, and close this case.

Dated: September 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

MARIANNE F. KIES
Assistant Branch Director

/s/ *M. Jared Littman*
M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Jared.littman2@usdoj.gov