**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al.,<br>Plaintiffs,<br>v.<br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00286-RCL |
| JANE JONES, et al.,<br>Plaintiffs,<br>v.<br>TODD BLANCHE, *in his official capacity* as Acting Attorney General of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00401-RCL |
| MARIA MOE, et al.,<br>Plaintiffs,<br>v.<br>DONALD TRUMP, *in his official capacity* as President of the United States, et al.,<br>Defendants. | Case No. 1:25-cv-00653-RCL |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ..... ii

Introduction ..... 1

Statement of Facts and Procedural History ..... 3

I. This Action. ..... 3

II. The *Fleming* Injunction and Defendants' Retaliatory Response. ..... 5

III. Defendants' Disregard of Relevant Statutes, Regulations, and BOP Policies. ..... 7

IV. Defendants Subject Plaintiffs to Conditions in the Segregated Unit. ..... 9

V. Harm to the Plaintiffs Housed in the Segregated Unit. ..... 13

ARGUMENT ..... 21

I. Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates the Administrative Procedure Act. ..... 22

A. The Segregation Decision Is Contrary to Law and Arbitrary and Capricious. ..... 22

B. The Segregation Decision Is Reviewable under the APA. ..... 26

II. Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates Their Eighth Amendment Rights ..... 28

III. Plaintiffs Face Irreparable Harm Warranting Immediate Relief. ..... 34

IV. The Balance of Equities and Public Interest Weigh in Favor of Relief. ..... 36

V. Granting Injunctive Relief Satisfies the Requirements of the PLRA. ..... 37

CONCLUSION ..... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................22

*Brown v. Holder*,
770 F. Supp. 2d 363 (D.D.C. 2011) ....................27

*Campaign Legal Center v. FEC*,
466 F. Supp. 3d 141 (D.D.C. 2020) ....................24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................35

*Comstock v. McCrary*,
273 F.3d 693 (6th Cir. 2001) ....................28

*Cope v. Cogdill*,
3 F.4th 198 (5th Cir. 2021) ....................28–29

*Costa v. Bazron*,
464 F. Supp. 3d 132 (D.D.C. 2020) ....................35

*Crowe v. Fed. Bureau of Prisons*,
No. 24-cv-3582 (APM), 2025 WL 1635392 (D.D.C. June 9, 2025) ....................26

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) ....................21

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ....................22–23

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ....................35

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................24

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ....................24

*Disability Rts. Mont., Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) ....................28

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026)....................................................................................4

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025)...............................................................................3

*Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*,
30 F.4th 1181 (10th Cir. 2022) ...................................................................................28

*Est. of Miller ex rel. Bertram v. Tobiasz*,
680 F.3d 984 (7th Cir. 2012) ......................................................................................28

*Farmer v. Brennan*,
511 U.S. 825 (1994).......................................................................................28–29, 32

*Fleming v. Rule*,
No. 4:25-cv-00157-D (N.D. Tex.) ........................................................................ *passim*

*Franklin v. Massachusetts*,
505 U.S. 788 (1992).....................................................................................................22

*Helling v. McKinney*,
509 U.S. 25 (1993).......................................................................................................28

*Jones v. Bondi*,
No. 1:25-cv-00401-RCL, 2025 WL 923117 (D.D.C. Feb. 24, 2025).......................................3

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)......................................................................................36

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).........................................................................................36

*Lemoyne-Owen College v. NLRB*,
357 F.3d 55 (D.C. Cir. 2004)...................................................................................23–24

*Love v. Bureau of Prisons*,
No. 24-CV-2571 (APM), 2025 WL 105845 (D.D.C. Jan. 15, 2025) ...............................26–27

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995) ............................................................................29

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991).....................................................................................................27

*Mirabelli v. Bonta*,
607 U.S. 492 (2026)...............................................................................................35–36

*Moe v. Trump*,
No. 1:25-cv-00653-RCL, ECF No. 62 (D.D.C. Mar. 10, 2025) ....................3

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................23–25

*Nken v. Holder*,
556 U.S. 418 (2009) ....................36

*Pennsylvania v. West Virginia*,
262 U.S. 553 (1923), *aff'd*, 263 U.S. 350 (1923) ....................35

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ....................35

*Royer v. Fed. Bureau of Prisons*,
933 F. Supp. 2d 170 (D.D.C. 2013) ....................27

*Sorenson Commc'ns Inc. v. F.C.C.*,
755 F.3d 702 (D.C. Cir. 2014) ....................24

*United States v. D.W.*,
198 F. Supp. 3d 18 (E.D.N.Y. 2016) ....................29

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ....................22–23

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....................21

**Statutes**

5 U.S.C. § 704 ....................22

5 U.S.C. § 706(2)(A) ....................22–23

18 U.S.C. § 3621 .................... *passim*

18 U.S.C. § 3626(a)(2) ....................4, 37

**Other Authorities**

28 C.F.R. § 115.15(d) ....................13

28 C.F.R. § 115.42(g) .................... *passim*

28 C.F.R. §§ 541.20–33 ....................9

77 Fed. Reg 37106 ....................23

BOP Program Statement 5100.08-CN-3 ........ 8, 9, 25

BOP Program Statement 5200.09-CN-1 ........ 9, 25

BOP Program Statement 5270.12 ........ 9, 25

BOP Program Statement 5333.01 ........ 7

Executive Order 14168 ........ *passim*

## INTRODUCTION

Without warning, individualized assessment, or any lawful justification, Defendants removed eight Plaintiffs from general population in women's federal prisons across the country and confined them indefinitely in a single, restrictive unit (the "Segregated Unit") that Defendants created specifically to separate transgender women in BOP facilities from non-transgender women (the "Segregation Decision"). They took this action solely because of Plaintiffs' transgender status and to implement the January 20, 2025, Executive Order challenged in this litigation. Plaintiffs now seek a preliminary injunction to end this unlawful segregation and restore the status quo that prevailed before January 20, 2025—when BOP made individualized housing decisions consistent with federal law and their own policies.

Defendants' actions violate both the Administrative Procedure Act and the Eighth Amendment. BOP's own PREA regulations expressly prohibit placing transgender individuals in a dedicated unit "solely on the basis of such identification or status." 28 C.F.R. § 115.42(g). Defendants did precisely that. They also abandoned BOP's own individualized determinations—which consistently found Plaintiffs appropriately housed in general population—without explanation, without considering the statutory factors Congress required, and without following BOP's own policies governing housing, transfer, and segregation decisions. Although Defendants invoke the preliminary injunction in *Fleming v. Rule*, No. 4:25-cv-00157-D (N.D. Tex.) ("*Fleming*"), that order is limited to [redacted] and did not require Defendants to house even a single Plaintiff at that facility, much less to transfer Plaintiffs from other facilities into [redacted] Nor did the *Fleming* order displace BOP's obligations to Plaintiffs under the Eighth Amendment and under the laws and policies governing BOP housing designations.

Defendants also violate the Eighth Amendment by disregarding the known and substantial risks of serious harm to Plaintiffs caused by the Segregation Decision. Defendants have actual

notice that conditions in the Segregated Unit are causing Plaintiffs' gender dysphoria to return or intensify, their mental health to deteriorate, and some to report renewed and worsening thoughts of suicide and self-harm. Indeed, BOP's own clinicians have documented that the Segregated Unit is subjecting Plaintiffs to "social isolation" that increases their risk of suicide. Yet Defendants have taken no action to rectify these harms.

The harms are immediate and escalating. The Segregation Decision labels and treats Plaintiffs as "biological males," not women, deliberately undermining their gender dysphoria treatment and exacerbating their gender dysphoria symptoms. The restrictive and punitive conditions in the Segregated Unit compound the risks. Plaintiffs are confined in the unit at least twenty-three hours per day in lockdown-like conditions, severed from the support networks they built over years, stripped of meaningful programming and recreation, denied adequate access to medical and mental health care, and forced to expose their intimate body parts to male officers who watch while they are showering and using the toilet. These conditions independently cause physical and psychiatric harm—and they compound the harm from withdrawing a critical component of Plaintiffs' gender dysphoria treatment. Dr. Randi Ettner, an expert in treating gender dysphoria, confirms that the harms Plaintiffs are experiencing are clinically predictable, and that the risk of serious harm increases with each additional day of exposure.

All four preliminary injunction factors favor Plaintiffs. They are likely to succeed on the merits. They face irreparable harm that worsens by the day. The balance of equities favors relief because Defendants have identified no legitimate penological justification for maintaining Plaintiffs in indefinite, segregation-like conditions—and the *Fleming* preliminary injunction does not require it. And the public interest is served by requiring the federal government to follow its own policies, regulations, and the Constitution.

The eight Plaintiffs currently confined in the Segregated Unit seek narrow relief: an order prohibiting Defendants from maintaining a Segregated Unit for transgender women based solely on their transgender status and requiring Defendants to restore, maintain, and continue each Plaintiff's housing in general population in women's facilities, subject to generally applicable disciplinary or administrative rules in those facilities, consistent with the status quo before January 20, 2025.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I. This Action.

On January 20, 2025, Executive Order 14168 ("EO 14168") directed BOP to transfer transgender women in women's facilities to men's facilities without regard to individual health and safety, and to withhold "any medical procedure, treatment, or drug" used to treat gender dysphoria. EO 14168 § 4(a), (c). BOP began implementing the order at once. It removed several Plaintiffs from general population, placed them in segregated or Secure Housing Units ("SHUs") pending transfer, and told some that their hormone therapy and medical treatment would end.

Plaintiffs filed these now-consolidated actions (Nos. 1:25-cv-00401, 1:25-cv-00653, and 1:25-cv-00286) and sought injunctive relief. This Court granted preliminary relief, finding Plaintiffs likely to succeed on their Eighth Amendment claims as to both housing and medical care. *Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025); *Jones v. Bondi*, No. 1:25-cv-00401-RCL, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe v. Trump*, No. 1:25-cv-00653-RCL, ECF No. 62, at 1–2 (D.D.C. Mar. 10, 2025). The Court enjoined enforcement of Sections 4(a) and 4(c) and required Defendants to maintain Plaintiffs' housing in women's facilities and continue the gender dysphoria treatment they were receiving before January 20, 2025. (*Doe*, ECF Nos. 23, 44, 55, 68, 83, 89, 94, 101, 120, 125, 147, 160, 216; *Jones*, ECF Nos. 28, 46, 69, 75, 81, 88; *Moe*, ECF Nos. 62, 84, 90, 96, 103.)

In response to this Court's initial preliminary injunctions, BOP returned Plaintiffs to the general population of the women's facilities where they were housed. Although one or more Plaintiffs were transferred to different women's facilities after the initial preliminary injunctions, BOP continued to house Plaintiffs with non-transgender women in general population.

The Government appealed the preliminary injunction orders only as to Section 4(a) and Plaintiffs' housing. The D.C. Circuit vacated the injunction and remanded for further proceedings. *Doe v. Blanche*, 172 F.4th 901, 905–06, 910, 917 (D.C. Cir. 2026). In May 2026, on remand, Plaintiffs moved for a new preliminary injunction. The Court made individualized findings on the features of each Plaintiff that render transfer to a men's facility unconstitutional under the Eighth Amendment and, on June 7, 2026, entered a preliminary injunction barring implementation of Section 4(a) for 90 days and requiring Defendants to maintain each Plaintiff's housing in women's facilities for 90 days or until release from BOP custody. (ECF No. 160.) The Court found this relief "narrowly drawn," extending "no further than necessary," and "the least intrusive means necessary to correct that harm." (*Id.* at 2); 18 U.S.C. § 3626(a)(2). On August 26, 2026, the Court issued a new preliminary injunction granting the same relief for another 90 days. (ECF No. 216 at 1 ("There are no newly discovered factual circumstances that necessitate a reassessment of this Court's prior holding that Plaintiffs have met their burden for preliminary injunctive relief or that require a reevaluation of the scope of that relief.").) Defendants have appealed the Court's June 7 and August 26 preliminary injunctions.

As more fully set forth below, in June and July 2026, Defendants removed all incarcerated Plaintiffs from general population at women's facilities across the country and moved them into a Segregated Unit at [redacted] that Defendants created specifically to separate transgender women in BOP facilities from non-transgender women. On July 17, 2026, Plaintiffs moved for

enforcement of the existing preliminary injunction or, in the alternative, for a preliminary injunction blocking the Segregation Decision. (ECF No. 183.) On August 12, 2026, the Court denied Plaintiffs motion on jurisdictional grounds but indicated that the Court would expeditiously consider a new motion for preliminary injunction if Plaintiffs filed a complaint that expressly set forth the relevant facts and claims for relief arising from the Segregation Decision. (ECF No. 212.) On September 3, 2026, Plaintiffs filed a motion for leave to file a supplemental complaint that pleads facts related to the Segregation Decision and asserts several claims challenging the Segregation Decision. (ECF No. 221.) Because the Plaintiffs face imminent, ongoing, and irreparable harm from the Segregation Decision, Plaintiffs now file this motion seeking immediate relief from the Court in the event that leave to file is granted. Plaintiffs respectfully request that this Court consider this motion simultaneously with the motion for leave to file a supplement complaint so that the irreparable harms Plaintiffs are experiencing can be redressed as expeditiously as possible.

## II. The *Fleming* Injunction and Defendants' Retaliatory Response.

In *Fleming*, two plaintiffs and five intervenors challenged BOP's placement of transgender women at [redacted], a women's facility. The Government did not contest the merits; it stated repeatedly that it agreed with the plaintiffs' positions on their substantive legal claim. *See, e.g.*, *Fleming*, ECF No. 129. On June 2, 2026, in the absence of any opposition from Defendants on the merits,[1] the *Fleming* court entered a preliminary injunction prohibiting BOP from housing

[1] The Government raised only jurisdictional defenses about standing, procedural defenses about the scope of the proposed injunction compared to the operative complaint, and concerns that creating a Segregated Unit for transgender women would violate the orders of this Court. *See generally Fleming*, ECF No. 166. The Court expressly found that the Government did "not contend that intervenor-plaintiffs have failed to show that they are likely to succeed on the substantive merits of their claims." *Fleming*, ECF No. 197 at 2.

transgender women in the general population of any unit at [redacted] where other women are present, and from permitting any transgender woman to "enter or remain in any space . . . where biological female inmates are present, including, but not limited to, showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, the mailroom, and other shared prison spaces." *Fleming*, ECF No. 199 at 2. To comply, the court directed BOP to house transgender women at [redacted] "in a secure, segregated area" and to use "separate movement, routing, scheduling, or other measures as necessary to prevent overlap" in housing and shared spaces. *Id.* at 3. The Court issued a new injunction with the same restrictions on August 28, 2026, that will be in effect until November 26, 2026. *Fleming*, ECF No. 236.

BOP was not required to house Plaintiffs in the Segregated Unit to comply with *Fleming*. The preliminary injunction entered in that case is limited to a single women's facility. *Fleming*, ECF No. 199 at 2. It left BOP free to house transgender women in general population at other women's facilities. BOP also retained authority to take measures in all women's facilities to address the alleged privacy, safety, and religious interests raised by the *Fleming* plaintiffs and intervenors, consistent with legitimate management and security needs.

Not only did BOP move the four Plaintiffs already housed at [redacted] into a restrictive, Segregated Unit, but it also transferred four other Plaintiffs from general population at women's facilities across the country not subject to the *Fleming* preliminary injunction to FMC [redacted] for the purpose of placing them in the Segregated Unit because of their transgender status. BOP has made it clear that the Segregated Unit—which it refers to as "a new, all-male facility within [redacted]"—is designed to mark Plaintiffs as "biologically male." *Fleming*, ECF No. 166 at 14; (*Doe*, ECF No. 168 at 1.) Indeed, after moving Plaintiffs into the Segregated Unit, BOP changed their sex designations from "female" to "male" on the BOP Inmate Locator. (*See, e.g.*,

Ex. C, Declaration of Olivia Doe ("Olivia Doe Decl.") ¶ 7; Ex. H, Declaration of Maria Moe ("Maria Moe Decl.") ¶ 15; Ex. D, Declaration of Sara Doe ("Sara Doe Decl.") ¶ 17.) These actions go far beyond what the *Fleming* court required and demonstrate that Defendants' Segregation Decision was not based on any court order but on the Executive Order challenged in this action. While it appears that the designations have been returned to "female" as of September 3, 2026, nothing prevents the BOP from once again making this change in its various and ongoing actions to implement the challenged Executive Order.

Plaintiffs' confinement in the Segregated Unit is indefinite and could be permanent for the remainder of Plaintiffs' sentences. Defendants have not identified any end date for Plaintiffs' segregation and have refused to move Plaintiffs to other women's prisons where they can live in the general population.

## III. Defendants' Disregard of Relevant Statutes, Regulations, and BOP Policies.

The Prison Rape Elimination Act ("PREA") provides in relevant part that an agency "shall not place" transgender or intersex individuals "in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates." 28 C.F.R. § 115.42(g). The Segregation Decision violates the plain terms of this regulation.[2]

[2] Defendants have adopted policies ignoring and willfully disregarding 28 C.F.R. § 115.42(g) and other PREA regulations regarding transgender people. In December 2025, the Department of Justice issued a memorandum implementing EO 14168 and stating that BOP should disregard all PREA regulations that refer to transgender people, including § 115.42(g). (*See* ECF No. 221-2, Ex. 1.) BOP subsequently removed references to § 115.42(g) and other identified regulations from its policy statement implementing the PREA regulations—even though the identified regulations remain in effect and have not been formally amended or rescinded. *See* BOP Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Manual, 33–34 (Mar. 19, 2026).

18 U.S.C. § 3621(b) requires BOP to place a person within 500 miles of their primary residence, "subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons." 18 U.S.C. § 3621(b). These criteria require individualized determinations. Defendants did not consider these statutory factors or conduct any individualized assessment before moving Plaintiffs into the Segregated Unit.

BOP also has its own policy in place to address how individual housing designations are made. *See* BOP Program Statement 5100.08-CN-3, Inmate Security Designation and Custody Classification (May 6, 2026). That policy requires BOP to consider the statutory factors set forth in 18 U.S.C. § 3621(b). *Id.* ch. 1, p. 2. That policy further requires BOP to select facilities for individuals based on (a) the level of security and supervision they require, and (b) their "program needs," including "substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment." *Id.* at ch. 1, p. 1. Individual designation and transfer decisions depend on a host of variables, including but not limited to an individual's age, educational level, criminal history, history of violence, prior escapes and/or attempts, outstanding detainers from other jurisdictions, sentence length, time to release, severity of their current offense, type of offense, whether they voluntarily surrendered, recommendations by the sentencing judge, drug/alcohol abuse history, percentage of time served, program participation, living skills and behavior in custody, the most serious and recent disciplinary incident reports (if any) for which the person was found guilty, the number of incident reports (if any), efforts to build or maintain family/community ties, the person's legal residence or release destination, institutional adjustment, medical and mental health needs, and programming needs. *See generally id.* chs. 4–7. Defendants

did not follow this policy when they decided to move Plaintiffs into the Segregated Unit. In fact, they overrode the determinations BOP had previously made under that policy—which consistently found Plaintiffs were appropriately housed in general population in women's facilities—and adopted a categorical approach under which transgender status trumps all the usual factors BOP officials must consider in making housing decisions.[3]

## IV. Defendants Subject Plaintiffs to Conditions in the Segregated Unit.

Plaintiffs are confined to the Segregated Unit for at least twenty-three hours per day and are generally granted only one hour of recreation outside the unit. (Ex. E, Declaration of Zoe Doe ("Zoe Doe Decl.") ¶ 6; Ex. G, Declaration of Carla Jones ("Carla Jones Decl.") ¶ 9; Ex. A, Declaration of Emily Doe ("Emily Doe Decl.") ¶¶ 5, 10; Ex. B, Declaration of Mary Doe ("Mary Doe Decl.") ¶¶ 6–7; Sara Doe Decl. ¶¶ 5–7; Maria Moe Decl. ¶¶ 5–7; Olivia Doe Decl. ¶ 6; Ex. F, Declaration of Amy Jones ("Amy Jones Decl.") ¶ 6.) Often, their only opportunity to be outside the unit is during the few minutes they spend walking between the medical building where they are housed and the enclosed recreation area. (*E.g.*, Carla Jones Decl. ¶ 10.) Even during the allotted recreation hour, outdoor time is not consistently available. (Mary Doe Decl. ¶¶ 10–11; Ex. I, Supplemental Declaration of Mary Doe ("Mary Doe Suppl. Decl.") ¶ 8; Emily Doe Decl. ¶ 9; Zoe Doe Decl. ¶ 11.)

Defendants have acknowledged to this Court that the unit has caused "difficulties . . . in managing" the facility. (ECF No. 129 at 35.) Plaintiffs are not permitted to be present in any part of the facility where they might be seen by other incarcerated women. Whenever a Plaintiff must

---

[3] Defendants also did not comply with BOP regulations or policies governing disciplinary segregation or administrative segregation in deciding to segregate all incarcerated Plaintiffs indefinitely. *See* 28 C.F.R. §§ 541.20–33; BOP Program Statement 5200.09-CN-1, Female Offender Manual (July 31, 2025), p. 7; BOP Program Statement 5100.08-CN-3, ch. 7, p. 19; BOP Program Statement 5270.12, Special Housing Units (Mar. 6, 2024).

walk through the facility for recreation, a medical appointment, or a legal visit, BOP officials shut down portions of the facility and assign multiple guards to escort her, surrounding her so that she cannot be seen or heard by women outside the Segregated Unit. (ECF No. 189-3 ¶ 12.) These movement restrictions are humiliating and harmful to Plaintiffs, and they have resulted in hours-long delays that interfere with Plaintiffs' access to medical care and legal visits. (Zoe Doe Decl. ¶¶ 10–13; Carla Jones Decl. ¶ 10; Emily Doe Decl. ¶¶ 11–12; Maria Moe Decl. ¶ 13.)

Because Plaintiffs cannot be seen by or interact with other women at the facility, they can no longer enroll or meaningfully participate in the programming—including vocational and educational opportunities—available to women in the general population. BOP has made only haphazard and unsuccessful attempts at bringing limited programming to the Segregated Unit. (*See, e.g.*, Mary Doe Decl. ¶ 8; Zoe Doe Decl. ¶¶ 14–15; Emily Doe Decl. ¶ 7; Sara Doe Decl. ¶ 12; Maria Moe Decl. ¶ 11.) Plaintiffs remain excluded from nearly all programming opportunities that are provided in general population, and they are denied the benefits of the live interaction and communication with peers, mentors, and educators that general-population programming provides. (*See, e.g.*, Zoe Doe Decl. ¶¶ 14–15; Emily Doe Decl. ¶ 7; Olivia Doe Decl. ¶ 4.) Several Plaintiffs are also unable to enroll in programs responsive to their specific needs and backgrounds; for example, Plaintiffs are excluded from participation in certain mental-health programs available at many women's facilities but not in the Segregated Unit. (*See, e.g.*, Mary Doe Decl. ¶¶ 8, 17 (noting she lost access to the [redacted] waitlist and mental health classes); Emily Doe Decl. ¶ 7 (noting she lost access to the [redacted] and [redacted] programs in which she planned to enroll).)

Recreation in the Segregated Unit is also extremely restricted. Within the Segregated Unit, Plaintiffs are offered access to a single stationary exercise bicycle and a few games. (*See, e.g.*,

Carla Jones Decl. ¶ 5.) By contrast, women in general population have access to an indoor recreation area that includes multiple types of exercise equipment such as treadmills and kettlebells, and multiple types of hobby and craft activities such as knitting equipment and musical instruments. (Mary Doe Decl. ¶ 9; Emily Doe Decl. ¶ 8; Sara Doe Decl. ¶ 14.) Since mid-July, Plaintiffs have had limited access to that recreation area but are not permitted full access to all the equipment, do not have access to classes or other programming, and are limited to one hour's use of the area per day. (ECF No. 189-3 ¶ 20; Zoe Doe Decl. ¶ 11; Emily Doe Decl. ¶¶ 8–9.) Outdoor recreation provided for Plaintiffs in the Segregated Unit has alternated between an empty, ten-foot-by-fifteen-foot concrete patio and no outdoor recreation at all. (*See, e.g.*, Emily Doe Decl. ¶ 9; Mary Doe Decl. ¶¶ 10–11; Zoe Doe Decl. ¶ 11.) When Plaintiffs have access to the patio, they are prohibited from using the entire space because other incarcerated women might see them if they walk to the corners. (Mary Doe Decl. ¶ 10.) This is in stark contrast to the outdoor recreation opportunities they were offered in general population, which included a running track, equipment for various games and activities, and opportunities to observe nature. (*See, e.g.*, Mary Doe Decl. ¶ 10; Emily Doe Decl. ¶ 9; Carla Jones Decl. ¶ 11.)

The Segregated Unit dramatically reduces Plaintiffs' access to meaningful social contact and cuts off Plaintiffs from the social support and peer relationships they built in general population. (*See, e.g.*, ECF No. 189-4, Attachment 2 at 3; *id.*, Attachment 3 at 2; *id.*, Attachment 6 at 4.) Plaintiffs used to have contact with hundreds of other women in their facilities; now they have contact with fewer than ten. (*See, e.g.*, Sara Doe Decl. ¶ 6; Maria Moe Decl. ¶ 3.) Plaintiffs are required to eat all meals in the Segregated Unit and are excluded from the dining hall. (*See, e.g.*, Emily Doe Decl. ¶ 5; Sara Doe Decl. ¶ 6.) By contrast, women in general population at [redacted]

[redacted] and other women's prisons leave their housing units to get meals in the dining hall. (Zoe Doe Decl. ¶ 9.)

The conditions in the Segregated Unit also impair Plaintiffs' access to appropriate medical and mental health care. Because of the burdensome movement restrictions, Plaintiffs cannot seek medical and mental health services as needed and must instead wait for providers to visit the unit. (*See, e.g.*, Zoe Doe Decl. ¶¶ 10–13; Emily Doe Decl. ¶¶ 11–12; Sara Doe Decl. ¶ 1; Maria Moe Decl. ¶ 13.) Plaintiffs no longer have adequate access to their psychologists, who must now come to the Segregated Unit to see them. (*See, e.g.*, Emily Doe Decl. ¶ 11; Mary Doe Decl. ¶ 12; Sara Doe Decl. ¶ 15; Maria Moe Decl. ¶ 13.) For example, it took "weeks" for a mental health staff member to visit Emily Doe, and Mary Doe saw a psychologist only twice during her first month and a half in the unit. (Emily Doe Decl. ¶ 11; Mary Doe Decl. ¶ 12.) Zoe Doe similarly recognized that her mental health was deteriorating because of her placement in the restrictive Segregated Unit and requested to see a mental health provider. (Zoe Doe Decl. ¶ 17.) Approximately three weeks passed before someone came to the unit for a brief consultation, after which she was told that she would be seen only once every two weeks. (*Id.*) Maria Moe likewise reports that she has not been to medical since her transfer and has waited months for an [redacted] (Maria Moe Decl. ¶ 12.) Plaintiffs also lack privacy during provider visits, and many have faced barriers and delays in receiving medical care and medications prescribed by BOP providers, including medications for medical and mental health conditions other than gender dysphoria. (Zoe Doe Decl. ¶¶ 13, 17; Mary Doe Decl. ¶ 12; Sara Doe Decl. ¶ 15; Maria Moe Decl. ¶ 10; ECF No. 189-4, Attachment 6 at 1.)

Finally, the Segregated Unit has deprived Plaintiffs of the ability to protect their bodily privacy and compels them to expose their breasts, buttocks, and genitalia to male officers while

showering and performing bodily functions. In their prior housing placements at women's facilities, Plaintiffs could shower and use the toilet privately, and male officers were generally prohibited from entering restrooms or showers.[4] (Carla Jones Decl. ¶¶ 6–7; Mary Doe Decl. ¶ 7; Zoe Doe Decl. ¶ 8; Sara Doe Decl. ¶ 8; Maria Moe ¶ 8.) The showers and toilets in the Segregated Unit do not provide that basic privacy. Plaintiffs must expose themselves to their cellmates and to officers, including male officers, when using the toilets in their cells. (*See, e.g.*, Carla Jones Decl. ¶ 6; Emily Doe Decl. ¶ 5; Maria Moe ¶ 8.) Although the unit contains one additional toilet, its door has a large window through which others, including male officers, can see into the room. (*See, e.g.*, Carla Jones Decl. ¶ 6; Zoe Doe Decl. ¶ 8.) The door to the shower area likewise has a window that exposes Plaintiffs to anyone who passes by. (*See, e.g.*, Carla Jones Decl. ¶ 7; Zoe Doe Decl. ¶ 8.) A small piece of paper sometimes covers part of the shower window, but officers have moved the paper and stated that they must be able to see Plaintiffs at all times. (Carla Jones Decl. ¶ 7; Maria Moe ¶ 8.)

## V. Harm to the Plaintiffs Housed in the Segregated Unit.

The Plaintiffs' declarations and the expert declaration of Dr. Randi Ettner, along with the Plaintiffs' medical records,[5] document the harm the unit has caused each of them.

---

[4] *See* 28 C.F.R. § 115.15(d) (requiring facilities to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks"). As explained above, Defendants have unlawfully revoked every PREA regulation intended to protect transgender prisoners.

[5] Defendants have refused Plaintiffs' requests to produce updated medical records. The last production of documents from Defendants was in connection with the briefing on the motion for a preliminary injunction that led to the June 7 Order. Defendants provided some medical records in their opposition to Plaintiffs' Motion to Enforce the June 7 Preliminary Injunction. *See* ECF No. 189-4. However, Plaintiffs cannot verify whether this was a complete production of the records, and Defendants have not produced any updated records since that filing. Nevertheless, even the limited records that were provided demonstrate the harms that the Plaintiffs experienced while in the Segregated Unit.

***Emily Doe.*** Emily Doe is [redacted] years old, has taken hormone medication for over [redacted] and has lived in women's facilities since [redacted]. (Ex. J, Declaration of Randi Ettner, Ph.D. ("Ettner Decl.") ¶ 15; ECF No. 116-25 ¶¶ 40, 44.) She has experienced suicidal ideation and attempted suicide while in BOP custody. (ECF No. 117-7, ¶¶ 7, 9, 10, 27.) In general population at [redacted] she had improved: she was less [redacted] and less [redacted] and found it "much easier to manage thoughts of self-harm." (Emily Doe Decl. ¶ 2.) She was on the waitlist for the [redacted] program (about 20th) and planned to apply to a [redacted] program. (*Id.* ¶ 7.) In the Segregated Unit, she is prohibited from accessing either program, or any other general population programming. (*Id.*) Emily's gender dysphoria symptoms are now "as severe as [she] can ever remember them being." (*Id.* ¶ 4.) When she asked to see a psychologist, weeks passed before anyone came. (*Id.* ¶ 11.) She reports rising [redacted] fear, paranoia (which her psychologist says is worsened by her [redacted]), and serious problems sleeping. (*Id.*) The BOP also cancelled [redacted] she had scheduled, and staff are no longer helping her transfer to another prison to participate in the [redacted] program. (*Id.* ¶¶ 12–13.)

***Mary Doe.*** Mary Doe has lived in women's facilities since [redacted]. (Mary Doe Decl. ¶ 2.) Mary has a serious history of self-harm and suicidality: she has attempted [redacted] and suicide multiple times, undergone at least [redacted] suicide-risk assessments in BOP custody due to suicidal ideation, and been placed on suicide watch at least [redacted] times while in BOP custody. (ECF No. 117-11, ¶¶ 15, 17, 21; ECF No. 189-4, Attachment 4 at 8, 10.) BOP's records show that treatment for her gender dysphoria—through hormone therapy and placement in a women's facility—"[redacted]" (Ettner Decl. ¶ 11.) Since moving to the Segregated Unit, she reports that her gender dysphoria symptoms are "through the roof," she is unable to sleep, she has no access to the

programming available in general population, and as of the date of her declaration, she had seen a psychologist only twice. (Mary Doe Decl. ¶¶ 5, 8, 12.) She feels isolated and trapped and perceives the placement as an effort to reverse her gender transition. (*Id.* ¶¶ 14–15.) She has also stopped a formerly consistent daily grooming routine, which Dr. Ettner identifies as "a recognized correlate of increasing dysphoria-related distress, not merely a change in personal habit." (*Id.* ¶ 16; Ettner Decl. ¶ 11.)

***Zoe Doe.*** Zoe Doe has taken hormone medication for nearly [redacted], has [redacted], and has lived in women's facilities since [redacted] (Ettner Decl. ¶ 12; Zoe Doe Decl. ¶ 2.) BOP's own clinicians recorded that this placement "[redacted]"—so much so that, as of [redacted] she was "[redacted]" for any condition. (Ettner Decl. ¶ 12.) In the Segregated Unit, Ms. Doe describes a "lock-down" situation that has severed her from a support network built over [redacted]. (*Id.* ¶ 13; Zoe Doe Decl. ¶¶ 6, 9.) She has no meaningful access to programming: before being placed in the unit, she was enrolled in a [redacted] program that met five days a week and included [redacted] but she can no longer attend the program or interact with its participants or mentors. (Zoe Doe Decl. ¶ 14.)

Whenever Zoe leaves the unit, the entire facility is shut down, and guards surround and escort her. (*Id.* ¶ 10.) She also is forced to announce the purpose of any trip off the unit in front of staff and other residents—even when it is for [redacted] care or other confidential medical needs. (*Id.*) The process is humiliating and dehumanizing. (*Id.*) These lockdowns have also disrupted her access to counsel: on one occasion, it took BOP staff more than two hours to escort her approximately 50 feet to an attorney visit, leaving her lawyers only 30 minutes before

they had to leave for the airport. (*Id.* ¶ 12.) On other occasions, her legal phone calls have been abruptly cancelled. (*Id.*) BOP staff also cancelled a medical appointment for [redacted] without her knowledge. (*Id.* ¶ 13.)

Zoe's gender dysphoria is now "back in full force," with mounting "[redacted] and agitat[ion]." (*Id.* ¶¶ 16, 19; Ettner Decl. ¶ 13.) Recognizing that her mental health was deteriorating, Zoe requested to see a mental health provider, but it took approximately three weeks before anyone came to the unit for a brief consultation. (Zoe Doe Decl. ¶ 17.) She is experiencing difficulty sleeping, cognitive impairment, has thoughts of self-harm, reports questioning the value of her life, and states she has not felt this bad since she was housed in men's prisons [redacted] (*Id.* ¶¶ 18–19; Ettner Decl. ¶ 13.)

***Carla Jones.*** Carla Jones is [redacted], has taken hormone medication since [redacted] and has lived in women's facilities since [redacted] (Ettner Decl. ¶ 14.) BOP records classify Carla as [redacted]. (ECF No. 189-4, Attachment 1 at 1.) She is confined at least twenty-three hours a day in a small, overcrowded space with only limited indoor recreation, and no access to outdoor recreation. (Carla Jones Decl. ¶¶ 5, 9.) Before being placed in this unit, she spent much of her time outdoors and is severely distressed by this restrictive confinement. (*Id.* ¶ 11.) She has no privacy and feels vulnerable and exposed to male officers in a way that never occurred in general population: on one occasion, a male guard opened her cell door while she was using the toilet and stood watching her as she pulled her pants up. (*Id.* ¶¶ 6–7.) The shower area likewise provides no real privacy, as a window allows anyone passing by to observe her, and guards have moved the paper covering it aside. (*Id.* ¶ 7.) She reports feeling "locked down" and having no access to programming; she was told she may not join instructor-led classes and may do only "self-study." (*Id.* ¶¶ 9, 14.)

Carla's mental health has significantly declined since being placed in the unit. (*Id.* ¶ 12.) She feels that BOP is trying to strip her of her female identity and that the years she has spent fighting for treatment and recognition as a woman mean nothing. (*Id.* ¶¶ 4, 14.) Her confinement in the Segregated Unit is severely exacerbating her gender dysphoria; she feels she is never going to progress or obtain the surgery she needs. (*Id.* ¶¶ 14–15.) Most concerning, Carla has had thoughts of self-harm, including of [redacted] again—a method she has resorted to in the past—and has told her psychologist that while she has no immediate plans, at any minute she could give in and give up. (*Id.* ¶ 15.) Her appetite has declined, she gives much of her food away, and she spends most of her days sleeping as her only escape from the conditions. (*Id.* ¶ 16.)

***Olivia Doe.*** Olivia Doe describes the Segregated Unit as having "deeply restrictive" conditions in which her movements are tightly regulated, she cannot interact with anyone outside the unit, and she lacks meaningful access to programming. (Olivia Doe Decl. ¶ 4.) Whenever Olivia needs to leave the unit, she is surrounded by guards and treated as if she were dangerous, even though she has given BOP no reason to do so. (*Id.* ¶ 8.) That treatment sends the "unmistakable" and "devastating" message that she is "not [a] real wom[a]n." (*Id.*) Her time in the Segregated Unit has been "unbearable," and although her [redacted] is approaching, Olivia now spends most of her days crying and fears that she may not make it to that date. (*Id.* ¶¶ 3–4.) BOP also changed her sex designation from "female" to "male" on the BOP Inmate Locator. (*Id.* ¶ 7.) The effects have been devastating: she has experienced worsening gender dysphoria, worsening [redacted] (requiring an increase in [redacted]), and sleep disturbance. (*Id.* ¶¶ 5, 9).

***Maria Moe.*** Maria spends nearly all her time in the Segregated Unit, including eating, showering, and ordering commissary; whenever she must leave for a legal visit or another appointment, BOP shuts down movement throughout the facility. (Maria Moe Decl. ¶ 6.) She

reports that officers have been particularly cruel, treating her and other transgender women in the Segregated Unit as if they were men and telling them that they are confined in the Segregated Unit because they are "not real women," which is severely exacerbating Maria's gender dysphoria. (*Id.* ¶¶ 9–10.) Maria—who had not been referred to as male since before [redacted]—feels crushed every time this occurs. (*Id.* ¶ 9) She feels as if the Segregated Unit is "operated like a male unit inside a women's prison" based on how it operates and how Plaintiffs are treated. (*Id.* ¶ 5.) BOP also changed her sex designation from "female" to "male" on the BOP Inmate Locator, which feels "demeaning" to her and reflects a further attempt to undermine her gender transition and her gender dysphoria treatment. (*Id.* ¶ 15.)

As a result of these conditions, Maria's mental health has deteriorated: she is more [redacted] than she has been in a long time, is sleeping poorly, has lost her usual appetite, and is experiencing intensified symptoms of gender dysphoria. (*Id.* ¶ 10.) Her gender dysphoria has reached "an all-time high, and it worsens by the day" and has gotten so bad that she has requested to be put back on [redacted]. (*Id.*) She wakes up in tears multiple times throughout the night and has little motivation. (*Id.*) She also has not received a long-delayed [redacted] follow-up after undergoing [redacted] and has generally struggled to get responses from departments such as [redacted]. (*Id.* ¶ 13–14.) Maria has no access to the programming available to women in general population and has been deprived of the programming opportunities that are specific to her individual needs, and she has less access to recreation equipment and no exercise or crafting classes. (*Id.* ¶¶ 11–12.) The conditions in the Segregated Unit are "taking a toll on" Maria and her "health is suffering" as a result of the Segregation Decision. (*Id.* ¶ 10.)

***Sara Doe.*** Sara Doe has been housed in women's facilities throughout her incarceration. (Sara Doe Decl. ¶ 2.) Prior to being transferred to the Segregated Unit in [redacted] Sara lived in general population at another facility where she had a strong support system, her gender dysphoria was well managed, and she was deeply engaged in programming. (*Id.* ¶¶ 3–4.) Since being placed in the Segregated Unit, Sara's mental health has declined: she is experiencing tremendous [redacted] debilitating [redacted], and self-doubt, she sleeps poorly, she has lost her usual appetite, and she is experiencing intensified gender-dysphoria symptoms. (*Id.* ¶¶ 11, 15.) These symptoms are triggered and made worse by the isolating and restrictive conditions in the Segregated Unit. Whenever Sara must leave the Segregated Unit, BOP halts movement throughout the facility and surrounds her with guards who shield her from view. (*Id.* ¶ 6.) This treatment makes her feel as though her "existence is somehow harmful or dangerous." (*Id.*) BOP staff have also subjected her to harassment based on her transgender status, further exacerbating her gender dysphoria and distress. (*Id.* ¶ 9).

Sara has no access to the programming available in general population, and her confinement will substantially interfere with her ability to practice her [redacted] (*Id.* ¶¶ 12–13.) Although women in [redacted] general population may eat all their meals in the [redacted], officials told Sara that logistical difficulties in transporting her will limit her to one meal there each day. (*Id.* ¶ 13.) She also has less access to recreation equipment than before her transfer and none of the exercise opportunities that are important to her physical and mental health. (*Id.* ¶ 14.) BOP also changed her sex designation from "female" to "male" on the BOP Inmate Locator. (*Id.* ¶ 17.) Since being placed in the Segregated Unit she is experiencing renewed suicidal thoughts and ideation. (*Id.* ¶ 15.)

***Amy Jones.*** Since [redacted] Amy Jones has been exclusively housed in women's facilities. (Amy Jones Decl. ¶ 2.) BOP recently removed Amy from general population at another facility and transferred her to [redacted] for placement in the Segregated Unit, even though she had previously reported a [redacted] and had warned BOP that returning her there would put her at risk of self-harm. (*Id.* ¶ 3.) She understands that at least some of [redacted] and does not know whether BOP has [redacted] (*Id.*) Amy describes the Segregated Unit as a "severely restricted" unit where her movement and interactions are tightly controlled, she has little to no privacy, and she lacks meaningful access to programming. (*Id.* ¶ 5.) Whenever she must leave the unit, BOP stops movement throughout the facility and surrounds her with guards, making her feel as though "just being near [her] is unsafe" and keeping her in constant fear of encountering the [redacted]. (*Id.* ¶ 6–7.)

Because of the Segregation Decision, Amy's mental health has deteriorated: she is more [redacted], sleeps poorly, has lost her usual appetite, and is experiencing intensified symptoms of gender dysphoria and [redacted] (*Id.* ¶ 8.) She has a long history of self-harm and has been placed on suicide watch several times while in BOP custody. (*Id.* ¶¶ 8, 11.) Amy explains that suicide watch "is not treatment": she loses what little she has and is watched constantly, making her reluctant to speak candidly with clinicians and rendering it harder to obtain help when she needs it most. (*Id.* ¶ 11.) Even so, on [redacted]. (*Id.*) The Segregation Decision puts her at renewed and increased risk of self-harm and suicidal ideation. Amy also fears that the lack of programming and repeated transfers will affect her [redacted] (*Id.* ¶ 9.)

***Dr. Ettner.*** Dr. Ettner explains that these serious outcomes and harms track the clinical literature. For transgender women, living as a woman—including through placement in women's prisons—is itself a recognized element of treatment for gender dysphoria. (Ettner Decl. ¶¶ 4–5.) Removing an environment in which a patient had improved creates a substantial risk that dysphoria symptoms will re-emerge or worsen even if hormone therapy continues unchanged. (*Id.* ¶ 6.) Segregated housing independently raises anxiety and depressive symptoms and diminishes coping capacity for anyone, regardless of gender identity. (*Id.* ¶ 7.) It also correlates closely with increased incidences of self-harming behaviors. (*Id.* ¶ 18.) Prolonged isolation and removal of the housing component of an incarcerated person's gender dysphoria treatment together produce sustained physiological stress that compounds over time. (*Id.* ¶¶ 16–17.) These effects are most acute for Plaintiffs with documented histories of self-harm or suicidality tied to gender dysphoria, including, for example, Mary Doe, Zoe Doe, and Carla Jones. (*Id.* ¶ 21.)

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the movant seeks to enjoin the government, the final two . . . factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). All four factors strongly support granting a preliminary injunction here.

## I. Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates the Administrative Procedure Act.

### A. The Segregation Decision Is Contrary to Law and Arbitrary and Capricious.

The APA permits judicial review of final agency action. 5 U.S.C. § 704. Agency action is final where the action (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). The agency action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).

As confirmed in Defendants' previous filings in this action (*see* ECF Nos. 168; 189-2), they consummated their decisionmaking process with regard to Plaintiffs' housing when they made the decision to establish a separate housing unit at [redacted] for all transgender women housed in women's prisons and transferred all incarcerated Plaintiffs into that single unit. And there can be no question that the mandatory segregation of all incarcerated Plaintiffs has "direct and immediate" legal consequences affecting their conditions of confinement. *See Franklin*, 505 U.S. at 796–97.

A court must set aside agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Segregation Decision fails both tests: it directly violates binding PREA regulations and constitutes arbitrary and capricious agency action in multiple distinct ways.

As an initial matter, the decision to create a single, Segregated Unit for all transgender women in women's facilities nationwide is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it directly violates binding PREA regulations. *See United States ex rel. Accardi v.*

*Shaughnessy*, 347 U.S. 260, 266–68 (1954) (establishing that agencies must follow their own regulations); *accord Damus v. Nielsen*, 313 F. Supp. 3d 317, 335–36 (D.D.C. 2018) (plaintiffs may challenge an agency's violation of its own regulations under § 706(2)(A)). Specifically, 28 C.F.R. § 115.42(g) prohibits placing transgender individuals in a dedicated facility, unit, or wing solely on the basis of their identification or status. BOP's Segregated Unit does precisely what § 115.42(g) forbids: it categorically segregates all incarcerated Plaintiffs in a dedicated unit solely because of their transgender status, for reasons unrelated to their own safety.[6] *See also* National Standards To Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg 37106, 37153 (June 20, 2012) (recognizing that separate units "may result in [LGBTI inmates] being unable to access the same privileges and programs as others in general population housing, effectively punishing [them] for their LGBTI status"). If Defendants wish to modify the PREA regulations, they are entitled to do so through notice-and-comment procedures. What they cannot do is ignore and violate their own regulations at will.

Separately, the Segregation Decision is arbitrary and capricious. Agency action fails this standard where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

---

[6] Section 115.42(g)'s exception allowing facilities to establish a "dedicated facility, unit or wing . . . in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates" is not applicable here. The exception does not cover any legal judgment; it refers only to judgments entered "for the purpose of protecting" the individuals who are subject to segregation based on their transgender or intersex status. The *Fleming* injunction does not fall within the scope of that exception—the Segregated Unit established by that injunction was created at the request of non-transgender women who remain in general population, *not* "for the purpose of protecting" the impacted transgender women. And as already explained, the *Fleming* injunction did not prohibit BOP from transferring transgender women to other facilities or require BOP to transfer additional transgender women *into* the Segregated Unit from other facilities.

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Lemoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 60–61 (D.C. Cir. 2004) (failure to follow agency precedent without any explanation is grounds for finding arbitrary and capricious action). Courts have found agency action to be arbitrary and capricious when it relies on mere speculation, false or unsupported factual findings, an erroneous view of the law, or pretextual or contrived reasons. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23–24 (2020); *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141, 155–56 (D.D.C. 2020); *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 708–09 (D.C. Cir. 2014). The Segregation Decision exhibits all of these hallmarks of arbitrary and capricious action.

First, Defendants have failed to articulate a rational, non-pretextual connection between the facts before BOP and its categorical decision to confine every incarcerated Plaintiff in the Segregated Unit. In prior briefing, Defendants invoked the "safety, privacy, and dignity" of non-transgender women, yet they failed to identify any individualized facts showing that any Plaintiff poses a threat to another incarcerated person. Instead, their reasoning treated transgender status itself as proof of dangerousness—a rationale that "runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, given BOP's own years of individualized determinations finding Plaintiffs appropriately housed in general population.

*Second*, Defendants "entirely failed to consider" the factors Congress directed BOP to weigh when making placement decisions. Defendants disregarded the statutory factors in 18 U.S.C. § 3621(b)—including bed availability, security classification, programmatic, medical, mental-health, and faith-based needs, sentencing-court recommendations, other security concerns, and proximity to the prisoner's primary residence—and conducted no individualized assessment

before transferring Plaintiffs. They likewise failed to follow BOP Program Statement 5100.08-CN-3, which incorporates those statutory factors, requires consideration of numerous additional individual circumstances, and prescribes procedures for designation and transfer decisions. Defendants also disregarded the standards and required procedures governing administrative and disciplinary segregation within BOP facilities by placing Plaintiffs in segregated confinement without individualized determinations, notice, periodic review, mental-health screening, or related safeguards. *See* BOP Program Statement 5200.09-CN-1, Female Offender Manual (July 31, 2025); BOP Program Statement 5270.12, Special Housing Units (Mar. 6, 2025).

*Third*, Defendants failed to consider "an important aspect of the problem" before them: the severe risks of indefinite segregation and isolation, including exacerbated gender dysphoria, loss of clinical progress, deteriorating mental health, self-harm, and suicidality. Nor did they meaningfully consider reasonable alternatives, such as maintaining individualized placements at women's facilities other than [redacted]. An agency's failure to consider obvious alternatives renders its action arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 34 (agency action arbitrary where agency "failed to present an adequate basis and explanation" for its action).

*Fourth*, Defendants' remaining justifications rest on unsupported premises, legal error, and pretext. Defendants have incorrectly argued that the Segregation Decision was necessary to comply with the *Fleming* preliminary injunction. That is not true. The *Fleming* injunction was limited to [redacted]. It did not dictate the facility in which any Plaintiff must be housed. It did not require BOP to transfer Plaintiffs to [redacted] from other institutions. It did not direct Defendants to ignore Plaintiffs' constitutional rights. Nor did it displace Defendants' obligation to make individualized placement decisions for each Plaintiff under § 3621(b) and BOP's own policies. This same legal error infects Defendants' alternative argument that the Segregation

Decision "made economical, operational and legal sense" because that argument falsely presumes categorical segregation of all incarcerated Plaintiffs was required by the *Fleming* preliminary injunction. (ECF No. 189-1 at 12.)

Even if taken at face value, Defendants' economical and operational arguments are arbitrary and unsupported by the record. Defendants' own filings show that the Segregated Unit has imposed extraordinary staffing, movement, cost, and management difficulties. (*See id.* at 5 (describing the "significant resources" BOP expended to establish and operate the Segregated Unit, including a dedicated unit team and a new correctional-officer post staffed at all times); ECF No. 189-3 ¶ 12 (acknowledging that BOP must secure the rest of the population whenever Plaintiffs move through the facility and that doing so "disrupts the regular flow of institution operations"); ECF No. 129 at 35 (noting the "difficulties . . . in managing" the facility associated with the Segregated Unit).) An agency explanation that is "so implausible that it could not be ascribed to a difference in view" is the hallmark of arbitrary and capricious action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

**B. The Segregation Decision Is Reviewable under the APA.**

Neither 18 U.S.C. § 3621(b) nor § 3625 bars judicial review of Plaintiffs' APA claim. Section 3621(b) only prohibits judicial review of "*a designation* of a place of imprisonment *under this subsection*" (emphasis added). Plaintiffs do not challenge any such individualized "designation." Rather, they challenge a categorical segregation policy that BOP has adopted and applied to them in furtherance of § 4(a) of EO 14168 and that specifically disregards statutory and regulatory housing requirements. *See Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *14 (D.D.C. June 9, 2025) (holding that under § 3621(b), courts retain jurisdiction to determine whether BOP policies are "contrary to established federal law," even if they "might implicate individual designation decisions"); *Love v. Bureau of Prisons*, No. 24-CV-

2571 (APM), 2025 WL 105845, at *11–12 (D.D.C. Jan. 15, 2025) (holding § 3625 "is no bar to review" because plaintiffs did not challenge "their individual housing placements" but contested "BOP's alleged discriminatory treatment of [a subset of prisoners] in the decision-making process"); *cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (limitation on judicial review of immigrants' individual amnesty applications did not bar pattern-and-practice challenges to the INS's processing of such applications). These decisions are consistent with the analysis in *Brown v. Holder*, which recognized that judicial review was precluded only as to "individual determinations" made "under those statutes governing inmate placement, transfer, release and early release." 770 F. Supp. 2d 363, 366 (D.D.C. 2011) (quoting *Fox v. Lappin*, 409 F. Supp. 2d 79, 89 (D. Mass. 2006)).

Even if the Court were to find that Plaintiffs challenge their individual housing designations rather than a general policy, the jurisdictional bar still does not apply because Plaintiffs do not challenge their designations "under" § 3621(b). That subsection requires BOP to determine individual housing placements only after considering a number of factors, including "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons," and proximity to "the prisoner's primary residence." *Id.* Here, BOP failed to consider any of these factors; they simply sent Plaintiffs to the segregated unit because they are transgender and as part of their implementation of the challenged Executive Order in this case. Because the categorical Segregation Decision was not "made pursuant to 18 U.S.C. § 3621," *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181 (D.D.C. 2013), Defendants are not entitled to the protection from judicial review that § 3621(b) affords.

For all these reasons, Plaintiffs are likely to succeed in establishing an APA violation.

## II. Plaintiffs Are Likely to Succeed in Proving That the Mandatory Segregation Scheme Violates Their Eighth Amendment Rights.

The conditions of confinement in the Segregated Unit likely violate the Eighth Amendment, which prohibits cruel and unusual punishment. A prison official violates the Eighth Amendment when that official acts with deliberate indifference to a substantial risk of serious harm to an incarcerated person. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("whether one characterizes the treatment received by [the prisoner] as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard").

The deliberate indifference standard has two components: objective and subjective. *First*, the objective prong is satisfied where an individual is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. This protection extends beyond physical violence to encompass known risks of serious psychological harm and known risks of suicide and self-harm. This Court has already recognized "the risk of severely exacerbated gender dysphoria" and attendant mental-health consequences to be serious harms that form the basis for an Eighth Amendment violation. (ECF No. 161 at 14.) Federal courts of appeals have likewise repeatedly recognized that the risk of suicide and self-harm, and the failure to prevent it, constitutes a sufficiently serious harm to implicate the Eighth Amendment. *See, e.g.*, *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021); *Comstock v. McCrary*, 273 F.3d 693, 703–04 (6th Cir. 2001); *Est. of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012); *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019); *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs for Jefferson Cnty., Colo.*, 30 F.4th 1181, 1186 (10th Cir. 2022).

*Second*, the subjective prong is met where prison officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Deliberate indifference exists when officials are aware of an incarcerated person's particular vulnerability to harm yet fail to take reasonable measures to protect her. *Id.* at 842–44. This includes circumstances in which officials knowingly place an incarcerated person in conditions that expose her to a substantial risk of serious psychological harm, self-harm, or suicide. *See, e.g.* Cope, 3 F.4th at 207 (deliberate indifference is established where officers "were aware of a substantial and significant risk that the [detainee] might kill [him]self, but effectively disregarded it." (citation omitted) (alterations in original)). Courts also consistently recognize that placing individuals with known mental-health vulnerabilities in segregated housing can constitute deliberate indifference. See, *e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146, 1264, 1266 (N.D. Cal. 1995) (subjecting individuals to conditions that are "very likely" to "seriously exacerbate an existing mental illness can not be squared with evolving standards of humanity or decency," particularly where those "conditions appear to bear little relation to security concerns"); *United States v. D.W.*, 198 F. Supp. 3d 18, 91, 93 (E.D.N.Y. 2016) (noting that segregation can "significantly exacerbate[] the condition of those already suffering from emotional instabilities" and that "[r]eliable studies show that inmates with pre-existing mental illnesses are likely to suffer the most severe consequences from isolation").

Plaintiffs satisfy both prongs. As to the objective prong, BOP's placement of Plaintiffs in segregated and lockdown-like conditions compounds multiple distinct harms. First, the Segregation Decision deliberately undermines Plaintiffs' gender dysphoria treatment by withdrawing a treatment element that has been necessary and effective for each Plaintiff. (*See* Ettner Decl. ¶¶ 11–15.) The clinical improvement of Plaintiffs' gender dysphoria is attributable to the combination of medical treatment and the ability to live as and be recognized as a woman in

women's housing—not medical interventions alone. Defendants have deliberately removed the housing component of Plaintiffs' gender dysphoria treatment without any medical justification, and they have subjected Plaintiffs to status-based segregation that is designed to mark them as "biological males" and separate them from women, further undermining Plaintiffs' gender dysphoria treatment. Second, the Segregation Decision has predictably exacerbated Plaintiffs' gender dysphoria and puts Plaintiffs at substantial risk of serious psychological and physiological harm, including self-harm and suicidality. Third, the conditions in the Segregated Unit—confinement to a single, small unit for meals, hygiene, and recreation; reduced programming and exercise access; reduced contact with medical and mental health staff; and isolation from established social networks and supports—are closely associated with elevated anxiety, depressive symptoms, and diminished coping capacity, which are known to increase the risk of serious physical and psychiatric symptoms including suicidality. (*See* Ettner Decl. ¶ 7.) These serious harms mutually reinforce and compound each other, and they are the natural and obvious consequence of segregation and removal from women's housing.

The Plaintiffs housed in the Segregated Unit have experienced these predictable harms. Their gender dysphoria treatment has been undermined, their gender dysphoria is "through the roof," and they are experiencing increased thoughts of self-harm and suicide and other signs of severely deteriorating mental health.

1. Emily Doe's mental health has suffered, her gender dysphoria symptoms are "as severe as [she] can ever remember them being," she has lost access to programming that was central to her rehabilitation, and she is experiencing resurgent [redacted], extreme fear, and paranoia. (Emily Doe Decl. ¶¶ 4, 7, 11.)

2. Mary Doe's gender dysphoria is "through the roof," she is "extremely [redacted]," she is "so [redacted] that [she] is unable to sleep," she has virtually no access to programming and scant access to mental health services, and she has abandoned a previously consistent grooming routine—a clinically recognized indicator of worsening distress. (Mary Doe Decl. ¶¶ 5, 8, 16; Ettner Decl. ¶ 11.)

3. Zoe Doe reports her gender dysphoria is "back in full force" with escalating despair, fear, and [redacted] after being severed from a [redacted]-long support network, her mental health has "significantly deteriorated," and she is experiencing thoughts of self-harm. (Zoe Doe Decl. ¶¶ 6, 16, 18–19; Ettner Decl. ¶ 13.) In the past, when Zoe has been placed in segregation, her "mental health declined and suicidal thoughts became more acute." (Zoe Doe Decl. ¶ 18.) Zoe's mental health vulnerabilities in restricted units are well-documented. After spending just four days in a segregated unit because of EO 14168 in 2025, a provider recommended that Zoe be taken out of the restricted housing and returned to the general population because [redacted] (*Id.* ¶ 5.)

4. Carla Jones, a [redacted]-year-old woman with a substantial history of self-harm relating to her gender dysphoria, reports lockdown conditions, no programming access, deteriorating mental health, and thoughts of self-harm including of [redacted] again. (Carla Jones Decl. ¶¶ 9, 12, 14–15; Ettner Decl. ¶ 14.) Since being in the Segregated Unit, Carla's "mental state has become as bad or worse than it has ever been." (Carla Jones Decl. ¶ 15.)

5. Sara Doe reports that, after leaving a general-population placement where her gender dysphoria was well-managed and she was deeply engaged in programming, she is now experiencing increased [redacted] poor sleep, loss of appetite, and intensified gender-dysphoria symptoms. (Sara Doe Decl. ¶¶ 3–5, 11.) Sara's mental health has suffered so significantly in the Segregated Unit that for the "first time since the Court protected [her] from transfer to a men's facility, [her] suicidal thoughts have returned." (*Id.* ¶ 15.)

6. Maria Moe is experiencing increased [redacted], poor sleep and appetite, intensified gender-dysphoria symptoms to the point that her "gender dysphoria has reached an all-time high," and a months-long delay in receiving [redacted] (Maria Moe Decl. ¶¶ 10, 13.) Maria's [redacted] is so severe in the Segregated Unit that BOP clinicians had to [redacted] *Id.* ¶ 10.)

7. Olivia Doe describes the last six weeks in the Segregated Unit as "unbearable," reports spending most of her days crying, and fears that she [redacted]. (Olivia Doe Decl. ¶¶ 4, 9.) In fact, Olivia's "mental health and gender dysphoria have not been this bad

since before [she] was transferred to a women's facility." (*Id.* ¶ 5.) Olivia's [redacted] by BOP clinicians because of her "severe and worsening symptoms of [redacted]" (*Id.*)

8. Amy Jones, who has a long history of self-harm, reports increased [redacted] and [redacted] poor sleep and appetite, and intensified gender-dysphoria and [redacted] symptoms. (Amy Jones Decl. ¶ 8.) Amy's mental health has deteriorated so significantly that her BOP psychology provider [redacted] (*Id.* ¶11.)

Plaintiffs' individual mental health diagnoses, histories of self-harm and suicidality, and deteriorating mental health since being placed in the Segregated Unit confirm the seriousness of the risks to their individual health and safety, which increase with every day they are confined in the Segregated Unit.

These harms were predictable. (Ettner Decl. ¶¶ 5–6, 10, 21.) Indeed, as Dr. Ettner explains, "[w]here clinical improvement has been tied to living in general population among women, withdrawal of that environment creates a significant risk that the underlying gender dysphoria symptoms it had relieved will re-emerge[.]" (*Id.* ¶ 6.) In addition to exacerbated gender dysphoria symptoms, Dr. Ettner notes the well-known and documented risks of elevated anxiety, depressive symptoms, and increased risk of self-harm that are associated with segregated housing. (*Id.* ¶¶ 7-8.) And as Dr. Ettner notes, the serious harms she describes associated with segregated housing are "consistent with Plaintiffs' experiences" in the Segregation Unit. (*Id.* ¶ 10.)

As to the subjective prong, the risks and harms Plaintiffs are experiencing in the Segregated Unit are so obvious that they must be known to Defendants—indeed, Defendants have affirmatively indicated their awareness of the risks by increasing multiple Plaintiffs' mental health care levels and conducting suicide risk assessments immediately upon moving Plaintiffs into the Segregated Unit. *See Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). In addition, Defendants have had actual notice of the unacceptably high risks to Plaintiffs' health and safety since at least

June 29, 2026, when Plaintiffs' counsel contacted Defendants' counsel to inform them that the conditions of confinement in the Segregated Unit were causing severe harm to the Plaintiffs housed there. Further, BOP's own clinicians have repeatedly found that the Segregated Unit is subjecting multiple Plaintiffs to "social isolation" that increases their risk of suicide, and multiple Plaintiffs' BOP medical records demonstrate increased reports of suicidal ideation since being placed in the Segregated Unit. (*See, e.g.*, ECF No. 189-4, Attachment 2 at 3; *id.*, Attachment 3 at 2; *id.*, Attachment 6 at 3–4.) BOP clinicians have also increased multiple Plaintiffs' psychiatric medications and placed one Plaintiff, [redacted], demonstrating BOP's ongoing knowledge of these Plaintiffs' deteriorating mental states and the grave risks to their health and safety. ([redacted])

Despite their actual knowledge of serious risk, Defendants have not taken action to rectify the harms to Plaintiffs and have failed to provide adequate mental-health care in response. (*See* Emily Doe Decl. ¶ 11; Mary Doe Decl. ¶ 12; Zoe Doe Decl. ¶ 17; Sara Doe Decl. ¶ 13; Maria Moe Decl. ¶ 12; Amy Jones Decl. ¶ 11.) In fact, Defendants subsequently chose to affirmatively subject four more Plaintiffs to the same known risks and harms caused by confinement in the Segregated Unit. Defendants refuse to even consider removing Plaintiffs from the conditions that are causing the serious risks to their health and safety, even as the risk levels increase and Plaintiffs show signs of serious mental distress. Some BOP officials have further undermined Plaintiffs' gender dysphoria treatment and increased the health and safety risks they are facing in the Segregated Unit by refusing to treat them as women and subjecting them to harassment based on their transgender status. (Sara Doe Decl. ¶¶ 9–10; Maria Moe Decl. ¶9.) That is textbook deliberate indifference. As this Court has recognized, "it is fundamentally unreasonable for prison officials

to respond to serious risks such as mental health deterioration, self-harm, and suicidality by intentionally creating those risks." (ECF No. 161 at 19.)

## III. Plaintiffs Face Irreparable Harm Warranting Immediate Relief.

Plaintiffs face irreparable harm from being removed from general population in women's facilities across the country and placed into a single, restrictive unit that isolates and segregates them from other women. As explained above, BOP's indefinite placement of Plaintiffs in segregated and lockdown-like conditions compounds multiple distinct harms: it deliberately undermines their gender dysphoria treatment by withdrawing a treatment element that has been necessary and effective for each Plaintiff, it exposes Plaintiffs to a substantial risk of serious harm associated with exacerbated gender dysphoria, and it introduces segregation conditions that create distinct psychiatric and physiological risks. The Segregation Decision, if allowed to stand, inflicts precisely the harm this Court has already recognized as serious and irreparable: "severely exacerbated gender dysphoria" and its attendant mental-health consequences. (ECF No. 161 at 14.) And the conditions in the Segregated Unit compound the risks and harms to Plaintiffs. (Ettner Decl. ¶¶ 7, 8, 16–20.) Such conditions are closely associated with elevated anxiety, depressive symptoms, and diminished coping capacity, which are known to increase the risk of serious psychiatric symptoms including suicidality. (*Id.* ¶¶ 7–8, 17.)

The evidence before the Court, including Plaintiffs' declarations, communications, and medical records, demonstrate that each of the Plaintiffs being held in the Segregated Unit is suffering severe and escalating harm as a result of the Segregation Decision based on their individual circumstances, mental health diagnoses, and personal histories including past self-harm and suicidal ideation and attempts. As set forth in Section II *supra,* since being placed in the Segregated Unit, Plaintiffs have reported skyrocketing gender dysphoria, extreme anxiety,

depression, fear, paranoia, difficulty sleeping, worsening PTSD symptoms, loss of appetite, increased thoughts of suicide and self-harm, and other signs of deteriorating mental health.

Dr. Ettner's expert opinion confirms that these harms are not speculative but concrete and clinically predictable: segregated housing compounds two distinct injuries by simultaneously removing a treatment element that was necessary and effective for each Plaintiff and introducing independent psychiatric and physiological risk from isolation and restricted conditions. (Ettner Decl. ¶ 21.) For Plaintiffs with documented histories of self-harm or suicidality tied to gender dysphoria—including but not limited to Mary Doe, Zoe Doe, and Carla Jones—"the consequences are likely to be even more dire." (*Id.*) The risk of harm increases with each additional day of exposure to these conditions, following a dose-response pattern documented in the correctional mental health literature. (*Id.* ¶ 18.) "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923), *aff'd*, 263 U.S. 350 (1923); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Injunctive relief is therefore urgently necessary to prevent irreversible harm to Plaintiffs' mental and physical health.

Finally, constitutional violations, such as the Eighth Amendment violation here, constitute irreparable harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[A] prospective violation of a constitutional right constitutes irreparable injury."); *Costa v. Bazron*, 464 F. Supp. 3d 132, 156 (D.D.C. 2020) (finding that harm imposed by alleged Fifth Amendment violation was "itself irreparable" and granting preliminary injunction); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (finding that harm imposed by alleged First Amendment violation was "irreparable" and remanding district court's

denial of a preliminary injunction); *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (recognizing "denial of plaintiffs' constitutional rights" as irreparable harm).

**IV. The Balance of Equities and Public Interest Weigh in Favor of Relief.**

The balance of equities and the public interest strongly favor injunctive relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining when the party opposing a preliminary injunction is the federal government, the final two factors merge). As an initial matter, enforcement of an unconstitutional policy is never in the public interest, and the public interest is served by ensuring that the federal government complies with its own regulations. *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

In previous briefing, Defendants asserted without any evidence that mandatory segregation of all Plaintiffs promotes the "safety, privacy, and dignity of prisoners in federal custody." (ECF No. 197 at 29; *see also* ECF No. 129 at 33–35 (making the same broad and unsupported argument in opposition to Plaintiffs' motion for preliminary injunction).) The Court has already rejected these arguments. (ECF No. 161 at 50–51.) The *Fleming* court has made no factual findings that any of these Plaintiffs would pose a danger to other incarcerated women in the general population. And a person's transgender status, on its own, does not threaten the rights or safety of women in general population.

Further, granting the requested relief would not create a conflict with any other court's orders. BOP retained full discretion under the *Fleming* order to determine the most appropriate housing assignments for transgender women after individualized assessment, including the option to transfer them to general population placements at other women's facilities not covered by the *Fleming* injunction based on their personal circumstances and needs. The public interest is served by ensuring that incarcerated persons are not subjected to unlawful and unjustified segregation,

ending a regime that harms Plaintiffs and that Defendants themselves describe as difficult to manage, and ensuring BOP's compliance with mandatory statutory and regulatory housing practices.

**V. Granting Injunctive Relief Satisfies the Requirements of the PLRA.**

Enjoining Defendants from placing Plaintiffs in a dedicated unit or facility at [redacted], and requiring them, consistent with the *status quo* immediately before January 20, 2025, to restore, maintain, and continue the housing status of Emily Doe, Zoe Doe, Mary Doe, Carla Jones, Sara Doe, Maria Moe, Olivia Doe, and Amy Jones in general population in women's facilities, subject to generally applicable disciplinary or administrative rules in those facilities, is a narrowly drawn remedy that extends no further than necessary to correct the harm to Plaintiffs, and is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. § 3626(a)(2).

Plaintiffs have shown a likelihood of success on their claims that BOP's decision to place them into segregated housing is based on their transgender status and is contrary to BOP's own policies and regulations and the Eighth Amendment to the U.S. Constitution. Plaintiffs have also shown that such segregation has subjected or will subject them to immediate, irreparable harm, and that a preliminary injunction prohibiting this unlawful action is necessary to correct that harm. Such relief is the least intrusive action the Court could take to ensure that Defendants comply with 28 C.F.R. § 115.42(g) and applicable constitutional requirements. And, like the orders previously issued by this Court, the requested relief would simply preserve Defendants' own prior determinations regarding Plaintiffs' housing while this litigation proceeds. Maintaining that *status quo* for 90 days will have no adverse impact on public safety or on the operation of the criminal justice system.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an Order that: (1) enjoins Defendants from placing Plaintiffs in a dedicated unit or facility at [redacted], and (2) consistent with the *status quo* before January 20, 2025, requires Defendants to restore, maintain, and continue the housing status of Emily Doe, Zoe Doe, Mary Doe, Carla Jones, Sara Doe, Maria Moe, Olivia Doe, and Amy Jones in general population in women's facilities, subject to generally applicable disciplinary or administrative rules in those facilities.

Dated: September 4, 2026

Respectfully submitted,

Jennifer L. Levi (Bar. No. MA0056)
Sarah Austin (admitted *pro hac vice*)
**GLBTQ LEGAL ADVOCATES & DEFENDERS**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

Christopher F. Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
**NATIONAL CENTER FOR LGBTQ RIGHTS**
1401 21st Street #11548
Sacramento, CA 95811
(415) 365-1320
cstoll@nclrights.org
awhelan@nclrights.org

*Pro Bono Counsel for Plaintiffs*

*/s/ Natalie Kraner*
Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Natalie J. Kraner (Bar No. 66202)
Wayne Fang (admitted *pro hac vice*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Eve L. Hill (Bar No. 424896)
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
(410) 385-0869
ehill@browngold.com