**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| EMILY DOE, MARY DOE, OLIVIA DOE, SARA DOE, ZOE DOE, LOIS DOE, SALLY DOE, and WENDY DOE,<br><br>JANE JONES, AMY JONES, BARBARA JONES, and CARLA JONES,<br><br>MARIA MOE,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity* as Attorney General of the United States, and WILLIAM K. MARSHALL III, *in his official capacity as* Director of the Bureau of Prisons,<br><br>Defendants. | Case No. 1:25-cv-00286-RCL<br><br>Case No. 1:25-cv-00401-RCL<br><br>Case No. 1:25-cv-00653-RCL |

## CONSOLIDATED AMENDED COMPLAINT

1. Hours after his inauguration on January 20, 2025, President Donald Trump issued Executive Order 14168 (the "Gender Ideology Order," "Executive Order," or "Order"), declaring it the "policy of the United States to recognize two sexes, male and female." The purpose and effect of the Gender Ideology Order is to deny transgender people legal recognition, strip them of existing legal protections, and deprive them of equal opportunity to participate in American public life.

2. This Action is a federal statutory and constitutional challenge to Defendants' decisions to implement two provisions of the Gender Ideology Order related to federal prison administration: Section 4(a), which categorically bars the Bureau of Prisons ("BOP") from housing transgender women in women's prisons, regardless of individual health and safety needs; and

Section 4(c), which prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," regardless of individual medical need.

3. Plaintiffs are thirteen transgender women in BOP custody who are diagnosed with gender dysphoria, a rare but serious medical condition and disability.[1] All Plaintiffs have lived as women for years or even decades. Several have legally changed their names and changed their sex markers on identifying documents to female. All Plaintiffs have also undergone extensive, medically necessary treatment to facilitate gender transition. Years of continuous hormone therapy have caused them to develop female sex characteristics and physical traits, including female breasts, fuller hips and thighs, decreased muscle mass, softened skin, and reduced body hair. Multiple Plaintiffs have also received transition-related surgeries to treat their gender dysphoria, including vaginoplasty, breast augmentation, and facial feminization surgery.

4. Prior to January 20, 2025, BOP determined that Plaintiffs are among the less than 1% of transgender women in BOP custody who should not be housed in men's facilities, considering each Plaintiff's individual characteristics including health and safety needs. Plaintiffs have been housed in women's BOP facilities for years, and BOP assessments have repeatedly confirmed those placements. BOP clinicians also repeatedly confirmed each Plaintiff's diagnosis of gender dysphoria, prescribed continuous hormone therapy for each Plaintiff, and assessed and recommended some Plaintiffs for medically necessary surgery.

5. Sections 4(a) and 4(c) of the Gender Ideology Order overrode BOP's expert correctional and clinical judgments regarding each individual Plaintiff's housing and medical care

---

[1] The previously filed complaints in *Jones* and *Doe* also named Donna Jones, Susan Doe, Ellen Doe, Sophia Doe, Jane Doe, Rachel Doe, and Tori Doe as Plaintiffs. Each of these former Plaintiffs are either deceased, no longer in BOP custody, or were dismissed from the lawsuit.

and directed Defendants to categorically ban transgender women from women's BOP facilities and categorically ban all medical treatment for gender dysphoria. Defendants swiftly began implementing these directives and notified Plaintiffs that they would immediately be transferred to men's facilities and cut off from hormone therapy and other medically necessary gender dysphoria treatment.

6. If Plaintiffs are transferred to men's facilities under Section 4(a), they will not be safe. Plaintiffs' individual characteristics—including their significant physical feminization, histories of sexual victimization, and years of living in women's facilities—make them acutely vulnerable to physical violence and sexual assault in a men's prison environment. In addition, transfer to men's facilities would inevitably and severely exacerbate Plaintiffs' gender dysphoria symptoms and cause their overall mental health to worsen, exposing them to serious health and safety risks including an increased risk of self-harm and suicide. Plaintiffs' individual medical and mental health histories confirm the seriousness of this grave physical and psychological risk.

7. Termination of all medical treatment for Plaintiffs' gender dysphoria under Section 4(c) would also inevitably cause severe harm. Each individual Plaintiff has an ongoing and serious medical need for gender dysphoria treatment, including hormone therapy. Medical professionals experienced in the treatment of gender dysphoria and in the prolonged use of hormone medications recognize that the abrupt termination and ongoing denial of hormone therapy can have disastrous consequences, including a serious risk of permanent physical and emotional harm, severe danger of self-mutilation, and suicidal ideation and attempts. In addition, Plaintiffs who have had genital surgery to treat their gender dysphoria can no longer produce hormones on their own. Without continuous hormone therapy, these Plaintiffs would not have sufficient hormones of any kind in their systems, which would lead to serious medical difficulties.

8. Defendants are aware of the serious risks each individual Plaintiff would face if transferred to men's facilities and cut off from medically necessary gender dysphoria treatment. But Sections 4(a) and 4(c) give BOP no discretion to protect Plaintiffs by maintaining their housing placements in women's facilities or continuing their medically-necessary care; they are categorical mandates rooted in animus against transgender people. By seeking to implement those provisions of the Gender Ideology Order as to Plaintiffs, Defendants are knowingly exposing each Plaintiff to unacceptably high risks of sexual assault, physical violence, profound psychological harm, physical harm, self-harm, suicide, and other serious harm to health and safety.

9. Plaintiffs bring claims for violations of their individual rights under the Fifth Amendment to the United States Constitution; the Eighth Amendment to the United States Constitution; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*. Plaintiffs seek declaratory and injunctive relief to enjoin enforcement of Sections 4(a) and 4(c) of the Gender Ideology Order as applied to each of them. Without the relief sought, Plaintiffs will experience irreparable injury.

10. Plaintiffs also bring claims for violations of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and seek a judgment holding unlawful and setting aside BOP's policy implementing Section 4(a) of the Gender Ideology Order.

## JURISDICTION AND VENUE

11. This action arises under the Constitution and statutes of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

12. This Court has jurisdiction to review agency actions under 5 U.S.C. § 702.

13. This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and this Court's inherent equitable powers.

14. This Court has authority to hold unlawful and set aside agency action, findings, and conclusions under 5 U.S.C. § 706(2).

15. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because the Defendants are officers of the United States sued in their official capacity and are domiciled in this district, and a substantial part of the events giving rise to this action occurred in this district.

**PARTIES**

16. Plaintiff Mary Doe is a transgender woman who is incarcerated at [redacted] She was previously housed in the women's facilities [redacted]. Mary Doe is a pseudonym.

17. Plaintiff Sara Doe is a transgender woman. She is incarcerated at [redacted] She was previously housed at [redacted]. Sara Doe is a pseudonym.

18. Plaintiff Emily Doe is a transgender woman. She is incarcerated at [redacted] Emily Doe is a pseudonym.

19. Plaintiff Zoe Doe is a [redacted] transgender woman incarcerated [redacted] Zoe Doe is a pseudonym.

20. Plaintiff Olivia Doe is a transgender woman. She is incarcerated [redacted] She was previously incarcerated at [redacted]. Olivia Doe is a pseudonym.

21. Lois Doe is a transgender woman. She is in BOP custody at a [redacted]. If she is [redacted], under the Gender Ideology Order she will be sent to a men's prison. Lois Doe is a pseudonym.

22. Plaintiff Sally Doe is a transgender woman. She is in BOP custody at [redacted]. If she is [redacted], under the Gender Ideology Order she will be sent to a men's prison. Sally Doe is a pseudonym.

23. Wendy Doe is a transgender woman. She is in BOP custody at [redacted]. If she is [redacted] under the Gender Ideology Order she will be sent to a men's prison. Wendy Doe is a pseudonym.

24. Jane Jones is a transgender woman. She is in BOP custody at [redacted]. If she is [redacted] under the Gender Ideology Order she will be sent to a men's prison. Jane Jones is a pseudonym.

25. Amy Jones is a transgender woman. She is incarcerated at [redacted] She was previously housed in women's facilities at [redacted] Amy Jones is a pseudonym.

26. Barbara Jones is a transgender woman. She is in BOP custody at [redacted]. If she is [redacted], under the Gender Ideology Order she will be sent to a men's prison. Barbara Jones is a pseudonym.

27. Carla Jones is a transgender woman. She is incarcerated at [redacted] She was previously incarcerated at [redacted]. Carla Jones is a pseudonym.

28. Maria Moe is a transgender woman. She is incarcerated at [redacted]. She was previously incarcerated in women's facilities at [redacted].

## DEFENDANTS

29. Defendant Todd Blanche is sued in his official capacity as Attorney General of the United States. The Attorney General oversees the Department of Justice, including the Federal Bureau of Prisons (BOP), and has responsibility for overseeing the enforcement and implementation of Executive Order 14168 with respect to the Bureau of Prisons.

30. Defendant William K. Marshall III is sued in his official capacity as Director of the Federal Bureau of Prisons. The Director of BOP has responsibility for overseeing enforcement and implementation of Executive Order 14168 by all BOP staff.

## FACTS

### BOP's Decision To Transfer Plaintiffs to Men's Facilities and Cut off Their Medical Treatment for Gender Dysphoria

31. BOP maintains separate housing facilities for men and women. Before January 20, 2025, BOP applied an individualized assessment process to determine appropriate housing for transgender women, consistent with the safety and security of all individuals and pursuant to the federal Prison Rape Elimination Act ("PREA") and its implementing regulations. Based on this assessment, transgender women could be housed in women's facilities if doing so promoted safety and security.

32. On January 20, 2025, President Trump issued an Executive Order directing the Attorney General to ensure that BOP categorically bar transgender women from women's facilities and categorically deny medically necessary gender dysphoria treatment to all transgender people in BOP custody, without regard for BOP's established policy and any associated safety and

security risks concerning the housing and care of transgender women. Defendants immediately began to implement these directives.

33. Pursuant to the Executive Order, BOP removed Maria Moe from the general population of the women's facility where she had been housed.

34. Maria Moe was subsequently placed in the Special Housing Unit ("SHU"). She was told that the reason she was removed from general population was because of the Executive Order. She was also informed that she would be imminently transferred to a men's facility because of the Executive Order. On January 23, 2025, Maria Moe's publicly accessible BOP classification of her sex was "female." On January 25, that classification indicated "male." Maria Moe had no ability to contest her placement in the SHU, and BOP officials told her she could not challenge the transfer because it was required by the Executive Order.

35. On January 24, 2025, pursuant to the Executive Order, BOP removed all Plaintiffs incarcerated at [redacted] from the general population of [redacted]. BOP officials placed these Plaintiffs, including Carla Jones, Zoe Doe, Emily Doe, Sally Doe, and Mary Doe, in separate housing with all other transgender women at the facility. All of these women, including Plaintiffs, were told they were removed from general population because of the Executive Order.

36. These Plaintiffs were also informed that they would be imminently transferred to men's facilities because of the Executive Order. When they were placed into the segregated unit, BOP officials told them they would be transferred no later than Thursday, January 30, 2025. BOP officials told several of the Plaintiffs that the transfer paperwork had already been processed.

37. On January 28, 2025, after transgender women at [redacted] began contacting counsel, the Plaintiffs at [redacted] were returned to general population housing but continued to be told that they would be imminently transferred to men's facilities.

38. Similarly, on or about January 25, 2025, Wendy Doe was removed from general population at [redacted] and transferred to a [redacted], where she was held in isolation pending transfer to a men's facility. Wendy Doe remained in isolation for five days before BOP officials transferred her back to a women's facility.

39. BOP also removed Barbara Jones from the general population of the [redacted] women's facility where she had been housed and moved her to the SHU. She was told by staff to prepare to be transferred to a men's prison. She remained in the SHU for about a week, before she was returned to general population.

40. Similarly, on or about January 25, 2025, the BOP removed Sara Doe from the general population at [redacted]. BOP officials allowed Sara to make a phone call to her family and then placed her in the SHU.

41. BOP officials told Sara Doe that she was being transferred to a men's facility, and that her cell was being cleaned out and she would not be permitted to return.

42. Sara Doe's mother and sister emailed [redacted] on January 25, 2025, to request that they reconsider the decision to transfer Sara to a men's prison. They wrote: "Sending her to an all-male prison will be the end of her. No one deserves this. There needs to be another way, we beg for your sympathy. She will get sexually assaulted and even possibly killed for being who she is. She is a citizen designated as a female and deserves protection like any other human. . . . This could mean life or death and she has not received a death penalty as her sentence."

43. In response to the email from Sara Doe's family, the BOP stated that they could not house Sara at [redacted] or any other women's facility because of the Executive Order.

44. On or about January 28, 2025, Sara Doe was returned to the women's general population at [redacted]. Absent a court injunction, Sara still faces imminent transfer to a men's facility.

45. Similarly, on or about January 24, 2025, pursuant to the Executive Order, the BOP removed Lois Doe, Olivia Doe, and all other transgender women at [redacted] from the general population of that facility.

46. BOP officials placed these women in separate housing and told them that because of the Executive Order, they had to place all transgender female inmates into special housing pending transfer to a male facility.

47. On or about January 31, 2025, the Plaintiffs at [redacted] were returned to general population housing. BOP officials continued to state that they will be imminently transferred to men's facilities.

48. On January 24, 2025, BOP officials removed Jane Jones from the general population of the [redacted] and transferred her to the men's unit of the [redacted]. BOP officials provided her no prior notice of the transfer and did not allow her to bring the vast majority of her belongings. They placed her in the SHU within the men's prison. In SHU, she was under twenty-four-hour video surveillance, and corrections officers came by to look at her through the small cell window. Male guards were able to watch her use the restroom. She felt like a "zoo animal" everyone came to stare at.

49. Jane Jones feared that she would be imminently transferred to a men's general population unit because a high-ranking prison official came to her cell on January 27, 2025; the same day, a BOP psychologist asked her what men's unit she would like to be sent to. BOP officials also informed her that she would no longer be given medical treatment for gender dysphoria after

her existing thirty-day prescription ran out. On January 28, 2025, Jane Jones was transferred back to the women's [redacted].

50. On February 20, 2025, BOP officials at [redacted] called the transgender women incarcerated at [redacted], including many of the Plaintiffs at that facility, into the warden's office. They were told that the Department of Justice had called the warden that morning and directed the warden to transfer all of them to men's facilities. The women were told that the transfers could happen as early as Monday, February 24, 2025, and that their medical treatment would be cut off in the men's facilities. Each of the women met with psychology staff for suicide risk assessments before being sent back to their units.

51. Although the initial transfers of Plaintiffs from women's to men's facilities were blocked by preliminary injunctions, Defendants still intend to implement Section 4(a) and transfer all Plaintiffs to men's facilities at the first possible opportunity.

52. Plaintiffs' removal from general population, placement in segregated housing, and anticipated transfer to men's facilities caused them significant distress and raise serious and imminent concerns regarding their safety and well-being.

53. Evidence, research, case law, and practical experience show that transgender women housed in men's prisons face near-constant sexual harassment and extremely high levels of violence and sexual assault. Federal regulations recognize transgender status as a risk factor for sexual assault. *See* 28 C.F.R. §§ 115.41(d)(7), 115.42(c)–(g). A 2013 study by the Department of Justice estimated that nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2012. U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, NCJ No. 241399, Supplemental

Table 1 (2013).[2] From 2011 to 2012, transgender people were sexually assaulted at nearly ten times the rate for the general incarcerated population.[3]

54. Further, Plaintiffs will predictably experience worsening gender dysphoria in men's facilities. They may be forced to wear men's clothing and undergarments, prevented from styling their hair as female, referred to as men, and addressed by their stereotypically male former names. Treating transgender women with gender dysphoria as men is known to intensify dysphoria, undermine medical treatment, and increase emotional distress, and it can precipitate self-harm.

**Each Plaintiff Faces a Substantial Risk of Serious Harm from Transfer to Men's Facilities and Withdrawal of Medically Necessary Treatment for Gender Dysphoria**

**Mary Doe**

55. Mary Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Mary has lived as a woman and has taken hormones for more than [redacted]. If her medical treatment is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

56. Mary has been housed in a women's facility for about [redacted]. If Mary is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. When she was previously housed in BOP men's facilities, she was raped and sexually assaulted multiple times, including while housed in a Restrictive Housing Unit in a men's facility, where BOP had placed her specifically for her protection given threats made against her based on her transgender status. Now, the risk would be

[2] Available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

[3] *Compare id.* (noting a 39.9% sexual victimization rate for transgender people from 2011 to 2012), *with* the full report at 6 (reflecting a 4.0% rate of sexual victimization in the general prison population from 2011 to 2012), available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf.

even greater because her physical appearance is even more feminine, and she would be identifiable as one of very few transgender women who had been housed in women's BOP facilities.

57. If transferred to a men's facility, Mary will face grave risks to her mental health, which could lead to self-harm or suicide. She will predictably experience worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression. Mary is also [redacted] related to the rapes and sexual assaults she experienced in men's facilities. She has attempted suicide five times, all related to untreated symptoms of gender dysphoria.

58. Mary's gender dysphoria and [redacted] symptoms have improved with the combination of continuous hormone therapy and housing in women's facilities, and she has not experienced any sexual abuse in women's facilities. If she is transferred back to men's facilities and denied medically necessary treatment for gender dysphoria, she will face unacceptably high risks to her safety and her physical and mental health.

**<u>Sara Doe</u>**

59. Sara Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care for the treatment of gender dysphoria, Sara has lived as a woman and has taken hormones for [redacted] including the entire duration of her incarceration. Prior to her incarceration, she [redacted]. As a result of her long-term hormone therapy [redacted].

60. If Sara's medical treatment is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria. In addition, because Sara [redacted]. Without prescription hormone medications, she [redacted].

61. Since her arrest in [redacted], Sara has always been housed in women's facilities. If Sara is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. Her [redacted] and her lack of familiarity with men's facilities make her an obvious and easy target for sexual violence. BOP staff have acknowledged this danger in her presence, telling her she [redacted] a men's prison.

62. Transfer to a men's facility would be devastating for Sara's mental health as well as her physical safety. Her gender dysphoria would be seriously exacerbated, which can lead to serious harm, including worsening anxiety and dramatically increased risks of suicidality and depression. In addition, transfer to a men's facility would predictably trigger Sara's [redacted] and worsen her other psychiatric symptoms. She has a long history of severe and repeated abuse, and the thought of being subjected to further abuse in men's facilities makes her extremely fearful. Transfer into that environment will subject Sara to unacceptably high risks of profound physical and psychological harm, self-harm, and suicide.

**Emily Doe**

63. Emily Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, she has lived as a woman, been treated as a woman, and taken hormones for almost [redacted] all while in BOP custody. If her medical treatment is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

64. Emily was transferred to [redacted] by BOP's Transgender Executive Council in [redacted]. Since being housed at a female facility, she has started programming, [redacted] have dramatically diminished.

65. If Emily is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. Nearly [redacted] of hormone

therapy has given her female breasts, body fat redistribution to hips and buttocks, decreased muscle mass, and a markedly feminine overall appearance. When she was previously housed in men's facilities, she was sexually assaulted multiple times and sexually harassed on a weekly basis, sometimes multiple times per week. The risk to her now is even greater given her years of additional hormone therapy and years of being housed in a women's facility.

66. If transferred to a men's facility, Emily's mental health will also seriously decline and put her in danger of self-harm or suicide. Emily is diagnosed with gender dysphoria and [redacted] She has attempted suicide twice, both times driven by the unbearable distress of being prevented from living as a woman. Being housed in women's facilities has brought Emily significant relief from gender dysphoria symptoms and thoughts of self-harm. Removing Emily from women's housing and forcing her back into an environment where she has been traumatized will predictably exacerbate her gender dysphoria [redacted] and severely increase the risk that she will attempt suicide or harm herself again.

**<u>Zoe Doe</u>**

67. Zoe Doe is a [redacted] year-old transgender woman diagnosed with gender dysphoria. She was first diagnosed with "gender identity disorder" in [redacted] by a psychiatrist. She has repeatedly been diagnosed with gender dysphoria by BOP medical personnel as well. Zoe has lived as a woman since [redacted] and has taken hormones since [redacted] [redacted] she [redacted] that BOP's own medical and psychological staff deemed medically necessary. [redacted]

68. If Zoe's medical treatment is terminated, she will experience severely exacerbated gender dysphoria, which can lead to dramatically increased rates of suicidality and depression. In addition, [redacted]. Without [redacted], which will lead to serious medical difficulties.

69. Zoe has been housed in a federal women's facility for [redacted]. If Zoe is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. When she was previously housed in men's facilities, she was raped, sexually assaulted, sexually harassed, and stalked because of her transgender status and [redacted] She told a BOP mental health provider that [redacted]. She was repeatedly transferred between men's facilities for her own safety and placed in protective custody, but no matter what BOP did, she remained a target. The risks of physical and sexual violence that Zoe faces in a men's facility are even higher today, after an additional [redacted] of hormone therapy, [redacted] of living as a woman in a women's facility, and [redacted].

70. Zoe has a history of suicidality and thoughts of self-harm related to untreated gender dysphoria, and [redacted] Living among women and receiving hormone therapy and surgical treatment for gender dysphoria effectively treated Zoe's gender dysphoria symptoms, [redacted], and eliminated her thoughts of self-harm. Being in a women's facility also allowed Zoe to process the sexual trauma she had experienced in men's facilities. Being forced back into a men's prison environment and cut off from medically necessary hormone therapy will inevitably reactivate Zoe's psychiatric symptoms,

again putting her at a foreseeable and high risk of physical and psychological harm, including self-harm and suicide.

**Olivia Doe**

71. Olivia Doe is a transgender woman diagnosed with gender dysphoria. Olivia began living as a woman and taking hormones since [redacted] when she was [redacted] years old. When Olivia entered BOP custody, her hormone treatment abruptly ended. But her treatment was eventually restored, and she has been consistently receiving hormones again since about [redacted] If her medical treatment is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

72. Olivia has been housed at a women's facility since [redacted]. If Olivia is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. When previously housed in BOP men's facilities, Olivia was brutally raped and continues to suffer ongoing medical complications. She was isolated in the SHU for several months following the rape, causing her mental health to deteriorate. She has been [redacted]. If she is transferred to a men's facility now, she will be even more vulnerable than before. Additional years of hormone therapy have increased the physical feminization of her body, and years of living as a woman in a women's facility will make her an easy target.

73. Olivia's other medical conditions and vulnerabilities—[redacted]—only compound the risk that she will be physically and sexually assaulted in a men's facility.

74. Olivia is [redacted]. The constant fear of sexual violence and the harassment she experienced in men's facilities [redacted]. She has a history of suicidality and previously attempted suicide while housed in a men's facility.

75. Being housed in women's facilities while receiving continuous hormone therapy has significantly improved Olivia's mental health, including her gender dysphoria symptoms, and she has not experienced further sexual abuse or harassment while housed with women. Forcing Olivia back into a men's facility will return her to the environment where she was raped and harassed, [redacted] and eventually to attempt suicide. In addition to putting her in danger of sexual violence, transferring Olivia to a men's facility will predictably and severely exacerbate her [redacted] and gender dysphoria and put her at grave risk of physical and psychological harm, including self-harm and suicide.

**Lois Doe**

76. Lois Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Lois has lived as a woman and been taking hormones since [redacted], when she was in her [redacted] If her medical treatment is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

77. Lois has lived in women's facilities for over [redacted]. If she is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. When she was previously housed with men in a state prison, Lois was raped twice, and [redacted]. In men's BOP facilities, she was sexually harassed and threatened with violence because of her transgender status. If Lois is transferred back to a men's facility, she will face these risks again, but they will be even more elevated given her additional

years of hormone therapy and the years she has spent adjusting to life in women's facilities, which will mark her as an especially vulnerable target.

78. The persistent fear of revictimization in men's facilities caused Lois's [redacted] to worsen and led her to contemplate harming herself. Being in a women's facility improved Lois's mental health and allowed her to finally live without fear of sexual abuse in custody. Returning her to a men's facility would plunge her back into an environment that threatened her safety and exacerbated her gender dysphoria, [redacted] to the point that she considered harming herself. Simultaneously withdrawing her medical treatment for gender dysphoria will compound the risk of self-harm and suicide and could put her life in danger.

79. Being transferred to [redacted] will have a similar impact on Lois's mental health by inevitably exacerbating her gender dysphoria, [redacted] especially if combined with denials of medical treatment for gender dysphoria. In [redacted], Lois would also face increased risks of sexual victimization due to the [redacted]. The fear of sexual violence she would experience in that environment would further exacerbate her risks of serious physical and psychological harm, including self-injury and suicide.

**Sally Doe**

80. Sally Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Sally has received hormone treatment for [redacted]. Sally was first formally diagnosed with gender dysphoria in [redacted] while in BOP custody. She has suffered through significant childhood trauma and has a history of suicidality, [redacted]. Treatment for her gender dysphoria, combined with placement in a women's facility, has been the only effective way of alleviating those symptoms. If Sally's medical treatment is terminated, she will

be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

81. Sally was transferred to a women's facility, [redacted], in [redacted]. If Sally is transferred to a men's facility, she will not be safe. She will be at a high risk of harassment, abuse, violence, and sexual assault. She has a history of being physically and sexually abused by men, and she feared for her safety when previously housed in men's facilities. The risks are greater today given the additional years of hormone therapy, which resulted in further physical feminization of her body, and the years of living in a women's facility.

82. Sally also has a documented history of suicidality, including a previous suicide attempt, [redacted] stemming from previously untreated gender dysphoria. These symptoms improved significantly once Sally began receiving treatment for gender dysphoria and was transferred to a women's facility. Transferring her to a men's facility would destabilize her mental health and put her in danger of self-harm and suicide again. [redacted]

83. Being transferred to [redacted] will have a similar impact on Sally's mental health by inevitably exacerbating her gender dysphoria, [redacted], especially if combined with denials of medical treatment for gender dysphoria. In [redacted] Sally would also face increased risks of sexual victimization due to [redacted]. The fear and anxiety she would experience in that environment would further exacerbate her risks of serious physical and psychological harm, including self-injury and suicide.

**Wendy Doe**

84. Wendy Doe is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Wendy has been living as a woman since [redacted] and taking hormones since about [redacted]. In [redacted], she legally changed her name and sex marker to female on her driver's license, birth certificate, social security card, and passport. In [redacted], before entering BOP custody, Wendy received [redacted]. [redacted]

85. If Wendy's hormone therapy is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression. In addition, because Wendy [redacted], which will lead to serious physical and medical difficulties.

86. From the time she entered BOP custody [redacted] Wendy was housed exclusively in women's facilities. On or about January 25, 2025, Wendy was transferred to [redacted], and held in isolation pending transfer to a men's facility for five days before being transferred back to a women's facility.

87. If Wendy is transferred to a men's facility, she will not be safe. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. [redacted] will immediately make her a target for sexual violence. Her history of housing in women's facilities and her lack of familiarity with the men's prison environment will make her even more vulnerable. Wendy also has a long history of being physically, sexually, and emotionally abused throughout childhood, which further increases her risk of victimization.

88. Wendy will also face serious health and safety risks from the psychological impact of transfer to a men's facility, which will predictably exacerbate her gender dysphoria [redacted]. The increased risk of self-harm and suicide is confirmed by her BOP medical records, which indicate [redacted].

89. Being transferred to [redacted] would have a similar impact on Wendy's mental health by inevitably exacerbating her gender dysphoria, [redacted] especially if combined with denials of medical treatment for gender dysphoria. In [redacted] Wendy would also face increased risks of sexual victimization due to the [redacted] The fear and anxiety she would experience in that environment would further exacerbate her risks of serious physical and psychological harm, including self-injury and suicide.

**Jane Jones**

90. Jane Jones is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Jane has been living as a woman and taking hormones for [redacted]. This course of treatment has produced profound and irreversible physical feminization: she has developed female breasts, lost significant muscle mass, experienced a redistribution of body fat to a feminine shape, and her skin and body hair have transformed. In [redacted], before entering BOP custody, Jane Jones [redacted] In [redacted] Jane legally changed her name and changed her sex marker to female on her driver's license, her [redacted] with [redacted], and with the social security office.

91. If Jane's hormone therapy is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression. [redacted] If she stops taking hormones, the physical and psychological impact will be devastating.

92. Transferring Jane to a men's prison will inevitably exacerbate her gender dysphoria, destabilize her mental health, and put her in danger of severe psychological and physical harm. From the time she entered BOP custody until January 2025, Jane was housed exclusively in women's facilities. When she was transferred to a men's facility under Section 4(a) of the Gender Ideology Order, she was housed in SHU for her own protection. The time in solitary confinement, under twenty-four-hour video observation by male officers, caused her mental health to deteriorate rapidly. She experienced hopelessness, fear, severe anxiety, exacerbated gender dysphoria, and a profound sense of dehumanization. Although she was eventually returned to general population at [redacted], the trauma of her isolation in a men's facility continues to cause ongoing psychological harm, including severe anxiety.

93. If transferred to a men's facility, Jane Jones will also be at an extremely high risk of harassment, abuse, violence, and sexual assault. [redacted] will immediately make her a target for sexual violence. Her history of housing in women's facilities and her lack of familiarity with the men's prison environment will make her even more vulnerable to these extraordinary risks.

94. Being transferred to a [redacted] will have a similar impact on Jane's mental health and physical safety. Such a transfer would inevitably exacerbate her gender

dysphoria [redacted], especially if combined with denials of medical treatment for gender dysphoria. In [redacted], Jane would also face increased risks of sexual victimization due [redacted]. The fear and anxiety she would experience in that environment would put her at additional risk of serious physical and psychological harm, including self-injury and suicide.

**Amy Jones**

95. Amy Jones is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Amy has been living as a woman and taking hormones for [redacted]. That therapy has produced significant physical feminization: she has developed breasts, her hips and thighs have become fuller, and she has lost muscle mass. In [redacted] she legally changed her name and the sex marker on her birth certificate, and in [redacted] she [redacted]

96. If Amy's hormone therapy is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression. Hormone therapy has been effective in treating Amy's gender dysphoria. Removing that medically necessary treatment would present a substantial risk of significant psychiatric deterioration and could lead to self-harm or suicide.

97. If transferred to a men's facility, Amy will not be safe. She has been housed in women's BOP facilities since [redacted] Prior to that, she was housed in men's facilities, and she was sexually assaulted in every single one. [redacted]. She was transferred to another men's BOP facility, and then another, and continued to be sexually harassed, assaulted, and targeted for being transgender. If Amy is

transferred to a men's facility today, she will face even higher safety risks than she did previously, given her additional years of hormone therapy, [redacted], and her years of being housed in a women's facility.

98. Transferring Amy to a men's facility would also destabilize her mental health and put her in serious danger of self-harm and suicide. Amy is diagnosed with [redacted] which is related to the violent physical and sexual victimization she experienced while housed in men's facilities. She also has a history of suicidality and self-harm in men's facilities, including one suicide attempt and three incidents of serious self-harm. After she was transferred to a women's facility, Amy did not experience any more incidents of sexual abuse or assault. Her mental health improved, her gender dysphoria symptoms diminished substantially, and she experienced fewer thoughts of self-harm. Returning her to an environment where she experienced repeated sexual abuse, multiple episodes of self-harm, and a suicide attempt would jeopardize her years of clinical progress and put her at extremely high risk of severe psychological and physical harm.

**Barbara Jones**

99. Barbara Jones is a transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, she has been living as a woman since about [redacted] and has been continuously taking hormones since [redacted] Hormone therapy has been effective in treating Barbara's gender dysphoria and has produced significant feminization of her body, including breast development, reduced facial and body hair, softened skin, and feminine fat redistribution around her hips and thighs. Terminating this medically necessary treatment would put Barbara at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression.

100. Barbara has a history of suicidality and self-harm stemming from severe gender dysphoria, including during her incarceration in men's facilities. The combination of continuous

hormone therapy and housing in women's facilities has significantly alleviated Barbara's symptoms of gender dysphoria and reduced her thoughts of self-harm. Terminating her hormone therapy or transferring her to a men's facility would inevitably exacerbate her gender dysphoria and put her mental health and physical safety in serious danger; the combination would put her at extraordinary risk.

101. If transferred to a men's facility, Barbara would also face a high risk of harassment, abuse, violence, and sexual assault based on her transgender status, her female sex characteristics, and her history of being housed in women's facilities.

102. Being transferred to [redacted] will have a similar impact on Barbara's mental health and physical safety. Such a transfer would inevitably exacerbate her gender dysphoria and severe anxiety symptoms, especially if combined with denials of medical treatment for gender dysphoria. In [redacted], Barbara would also face increased risks of sexual victimization due to [redacted] The fear and anxiety she would experience in that environment would put her at additional risk of serious physical and psychological harm, including self-injury and suicide.

**Carla Jones**

103. Carla Jones is a [redacted] transgender woman diagnosed with gender dysphoria. She has lived as a woman for much of her life and has received continuous hormone therapy since [redacted] That treatment has produced substantial and irreversible physical changes: her breasts have developed fully, her figure has become more feminine, her body hair has decreased significantly, and her muscle mass has declined.

104. Ongoing hormone therapy is part of the medically necessary course of treatment for Carla's gender dysphoria. Terminating this medically necessary treatment would put her at substantial risk of serious harm from worsening gender dysphoria, including severe depression,

self-harm, and suicidality. This risk is especially high in Carla's case because she has a documented history of self-harm and suicidality associated with severe gender dysphoria symptoms and denials of medically necessary care for gender dysphoria.

105. Carla also has an ongoing medical need for surgical transition care. Prior to January 20, 2025, BOP was in the process of evaluating Carla for surgery to treat her gender dysphoria, but all appointments related to that surgery were canceled because of Section 4(c) of the Gender Ideology Order. This denial of medical care has caused Carla significant distress, despair, and increased symptoms of gender dysphoria and [redacted], and puts her at an ongoing and substantial risk of serious harm.

106. Carla also faces a substantial risk of serious harm from Defendants' decision to transfer her to a men's facility. Carla will not be safe in a men's prison. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. When Carla was previously housed in men's prisons, she was repeatedly sexually harassed, physically assaulted, and sexually assaulted by men because of her feminine appearance. Today, she would be even more vulnerable given her years of additional hormone therapy and years of being housed exclusively in women's facilities.

107. Transfer to a men's facility would also put Carla at severe risk of psychological harm, self-harm, and suicide. Such a transfer would exacerbate Carla's gender dysphoria, would return her to an environment where she was previously sexually victimized, and would force her to live in fear of physical and sexual violence again. This combination of conditions previously contributed to the despair and depression that drove Carla to harm herself and contemplate suicide.

108. Carla's [redacted] and gender dysphoria symptoms have improved with the combination of continuous hormone therapy and housing in women's facilities, and she has not

experienced any sexual abuse in women's facilities. After being transferred to general population in [redacted], she was able to live as a woman without fear of sexual victimization for the first time in [redacted] If she is transferred back to men's facilities and denied medically necessary treatment for gender dysphoria, her mental health will predictably deteriorate, and she will face an extremely high risk of mental decompensation, self-harm, and suicide.

**Maria Moe**

109. Maria Moe is a [redacted] transgender woman diagnosed with gender dysphoria. Consistent with the standard of care, Maria Moe has lived as a woman and has taken hormones continuously since she [redacted]. She [redacted] and has been accepted as a woman by her peers, her friends, and her close family. During her term of incarceration, she has been housed exclusively in women's facilities and treated as a woman. She has never been housed in a men's facility.

110. If Maria's hormone therapy is terminated, she will be at substantial risk of serious harm from worsening gender dysphoria, which can lead to serious harm, including dramatically increased rates of suicidality and depression. [redacted]

111. Maria also has an ongoing medical need for surgical transition care. Prior to January 20, 2025, BOP was in the process of evaluating Maria for surgery to treat her gender dysphoria, but she has not been able to obtain this treatment because of Section 4(c) of the Gender Ideology Order and Defendants' deliberate indifference to her serious medical need.

112. Maria also faces a substantial risk of serious harm from Defendants' decision to transfer her to a men's facility. Maria will not be safe in a men's prison. She will be at an extremely high risk of harassment, abuse, violence, and sexual assault. The long-term hormone therapy [redacted]

[redacted] has produced significant and lasting physical feminization: breast growth, decreased muscle mass and strength, softer skin, and voice changes. [redacted] Maria's experience living as a woman since [redacted] her lack of experience living in men's facilities, and her history of being housed in women's facilities will make her vulnerability even more acute.

113. Maria's history of trauma and her mental health conditions also make her vulnerable to self-harm and suicide risks if she is transferred to men's facilities. She has a history of [redacted] a history of suicidal ideation stemming from her gender dysphoria, and three past episodes of self-harm or suicide attempts related to acute gender dysphoria distress. Transferring Maria to an environment that will exacerbate her gender dysphoria and put her at risk of sexual violence will predictably exacerbate her gender dysphoria and depression symptoms, creating the same psychiatric conditions that led her to harm herself in the past. This grave risk would be further compounded by a withdrawal of medically necessary treatment that Maria has relied on for close to half her life.

**Each Plaintiff Has a Serious Medical Need for Gender Dysphoria Treatment**

114. Gender dysphoria is a serious medical condition marked by the significant distress or impairment that occurs when a transgender individual is made to live in their birth sex. The condition is highly treatable. When left untreated, however, it causes serious physical and emotional harms.

115. Scientific and medical research shows that gender dysphoria has a physiological and biological etiology.

116. The only current, medically accepted treatment for gender dysphoria is to enable a transgender person to live in a sex different than their birth sex.

117. The medical and scientific community recognize well-established protocols for supporting a person to go through gender transition, the treatment that allows a transgender person to live in their target sex. These protocols are endorsed by the major medical and mental health associations in the United States, including but not limited to the American Medical Association, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

118. Under these accepted protocols, treatment for gender dysphoria can involve any combination of social transition, medications (including hormones), and a range of surgeries. The treatment prescribed for a particular patient depends on an individualized assessment of the patient's health and needs. Gender transition care, including hormone therapy, is a highly effective treatment for gender dysphoria.

119. The BOP is aware that each of the Plaintiffs has a diagnosis of gender dysphoria, that gender dysphoria is a serious medical condition requiring treatment, and that Plaintiffs have a serious medical need for such treatment.

120. Before January 20, 2025, BOP recognized that the medically appropriate treatment for gender dysphoria is gender transition and that a women's housing placement could be one component of that course of treatment for a transgender woman. Consistent with that policy, BOP granted women's housing placements to each Plaintiff, causing Plaintiffs' gender dysphoria symptoms to either remain stable (for those who transitioned before incarceration) or significantly improve (for those previously housed in men's facilities).

121. Before January 20, 2025, the BOP's Transgender Offender Manual expressly allowed hormone medication as a treatment for gender dysphoria based on an "individualized

assessment" by medical staff.[4] If providers determined that hormone medications are appropriate for an individual, that policy stated that hormones "will be provided."[5] Consistent with that policy, BOP has consistently provided hormone medications to Plaintiffs for years pursuant to treatment plans determined by BOP medical and mental health staff.

122. Prior to January 20, 2025, the Transgender Offender Manual also established a process for transgender individuals to be evaluated for surgical transition. Consistent with that policy, several Plaintiffs were in the process of being evaluated and/or referred for surgery to treat their gender dysphoria before January 20, 2025.

123. If Plaintiffs' medically necessary treatment for gender dysphoria is terminated or restricted, they will be at a well-known and substantial risk of serious harm.

124. Medical professionals experienced in the treatment of gender dysphoria and in the prolonged use of hormone medications recognize that the abrupt termination and ongoing denial of hormone therapy can have disastrous consequences, including serious risk of permanent physical and emotional harm, severe danger of self-harm, and suicidal ideation and attempts. Some of the Plaintiffs who have had surgery to treat their gender dysphoria can no longer produce hormones on their own. Without prescription hormone medication, these Plaintiffs will not have sufficient hormones of any kind in their systems, which will lead to serious medical difficulties.

125. Medical professionals experienced in the treatment of gender dysphoria recognize that categorically denying surgical transition care to a transgender woman, regardless of individual medical necessity, can cause serious physical and emotional harm, severe danger of self-harm, and suicidal ideation and attempts.

---

[4] *See* ECF No. 11-3 at 8.

[5] *See id.*

**Executive Order 14168 and BOP's Implementing Policies**

126. The Gender Ideology Order began causing harm to Plaintiffs almost immediately. As a result of the Order, they have already suffered significant distress. The Order also raises serious concerns for their safety and well-being going forward.

127. Section 2 of the Order adopts a federal definition of "sex" that is intentionally designed to target and discriminate against transgender people. Specifically, Section 2 of the Order defines "sex" as "an individual's immutable biological classification as either male or female." In turn, it defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell," and "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." It includes these definitions to preclude transgender people from being able to live in a sex different than their birth sex and to target them for harm and suffering.

128. Section 2(f) goes on to define "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa." By characterizing the existence of transgender people as a "false claim," Section 2(f) is explicitly disparaging and demeaning to transgender people.

129. Section 4(a) requires the Attorney General to categorically bar all transgender women from ever being housed in women's prisons with no individualized consideration of their safety and security. That section acknowledges that the requirement contradicts federal regulations found at 28 C.F.R. § 115.41.

130. Section 4(c) requires the Attorney General to "ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." Section 4(c) eliminates Plaintiffs' ability to continue taking hormone medications and to receive other medical treatment for their gender dysphoria.

131. BOP immediately began taking action to implement the Order, including by transferring or attempting to transfer Plaintiffs to men's facilities. BOP also swiftly began issuing guidance documents to implement the Order.

132. On February 21, 2025, BOP issued a memorandum requiring staff to treat transgender women as men.[6] That policy requires BOP staff to "refer to individuals by their legal name or pronouns corresponding to their biological sex"; to deny "any items that align with transgender ideology"; to deny "issuance of smocks for male inmates and undergarments that do not align with an inmate's biological sex"; and to deny "pat search accommodations" that protected transgender women from invasive pat searches by male officers. The February 21 memorandum also suspended the Transgender Executive Council and stated that "individuals will not be referred for gender affirming surgeries."

133. On or about February 25, 2025, BOP removed guidelines related to surgical transition care from its patient care program statement.

134. On February 28, 2025, BOP adopted a policy entitled "Executive Order 14168 Compliance," which states, "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex. This policy is to be implemented in a manner consistent with applicable law including the Eighth Amendment."[7]

**Executive Order 14168 Was Motivated by Discriminatory Animus**

135. Executive Order 14168 was motivated by a sex-based discriminatory purpose and animus against transgender people.

---

[6] *See Kingdom v. Trump*, No. 1:25-cv-00691 (D.D.C. 2025), ECF No. 1-1.

[7] *See Kingdom v. Trump*, No. 1:25-cv-00691 (D.D.C. 2025), ECF No. 1-2.

136. President Trump has been transparent about his hostility toward transgender people and openly stated his intentions to eliminate legal protections for transgender people and to deter them from obtaining medical care or being able to live in a sex other than their birth sex. On November 15, 2022, when he announced his candidacy for President, he explicitly promised to target transgender Americans through executive action.[8] He pledged a "day one" executive order to "cease all programs that promote the concept of sex and gender transition at any age."[9]

137. Throughout his campaign, President Trump repeatedly characterized transgender Americans in dehumanizing terms, referring to them as "deranged"[10] and as victims of madness"[11]

[8] ABC Tampa Bay 28, *(Full Speech) Former President Trump Announces 2024 Presidential Bid* at 48:40-49:13, YouTube (Nov. 15, 2022), https://www.youtube.com/watch?v=8tSYwJ1_htE; *id.* at 50:39-53 (suggesting he would attempt to ban transgender people from military service).

[9] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, Trump Vance: Make America Great Again! 2025 (Feb. 1, 2023), https://web.archive.org/web/20230520140252/https://www.donaldjtrump.com/agenda47/president-trumps-plan-to-protect-children-from-left-wing-gender-insanity ("President Trump's Plan").

[10] Gabriel Bertrand, *Trump's Shocking Admission Exposes GOP's Bigoted Agenda*, Medium (June 17, 2023), https://medium.com/illumination/trumps-shocking-admission-exposes-gop-s-bigoted-agenda-e981becb2c5f.

[11] *President Trump's Plan*, *supra* note 9.

and "insanity."[12] He falsely claimed transgender identity was "never heard of in all of human history" and described transgender healthcare as "mutilation."[13]

138. President Trump's campaign devoted substantial resources to promoting anti-transgender policies, spending approximately $215 million on advertisements vilifying transgender Americans.[14] These advertisements comprised over 40 percent of all pro-Trump campaign messaging in the weeks before the 2024 election.[15]

139. President Trump's official campaign platform included a "Plan to Protect Children from Left-Wing Gender Insanity," which promised to deny legal recognition to transgender Americans and restrict access to medically necessary healthcare.[16]

140. On December 23, 2024, after winning the election, President Trump reaffirmed his intent to implement discriminatory policies through executive action, stating "with a stroke of [his]

---

[12] Jackson Walker, *Trump vows to remove 'transgender insanity' and critical race theory from US schools*, IdahoNews (Dec. 23, 2024), https://idahonews.com/news/nation-world/trump-vows-to-remove-transgender-insanity-and-critical-race-theory-from-us-schools-phoeniz-arizona-woke-speech-usa-donald-president-white-house-education-department-crt-trans-gender-lgbt; *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, NBC News (Nov. 1, 2024), https://www.nbcnews.com/nbc-out/out-politics-and-policy/donald-trump-jd-vance-transgender-2024-election-rcna178390; Donald J. Trump, Truth Social (Dec. 18, 2023), https://truthsocial.com/@realDonaldTrump/posts/111599880929254153; Gabriel Bertrand, *supra* note 8; Joe Middleton, *Trump attacks transgender rights at Waco rally saying he will ban 'disfigurement of our youth'*, The Independent (Mar. 26, 2023), https://www.independent.co.uk/news/world/americas/donald-trump-transgender-waco-rally-b2308177.html.

[13] *President Trump's Plan*, *supra* note 9.

[14] Audrey Kemp, *What Trump's win – and $215m worth of anti-trans ads – mean for the future of campaigning*, The Drum (Nov. 6, 2024), https://www.thedrum.com/news/2024/11/06/after-donald-trump-s-victory-marketers-weigh-their-role-countering-divisive.

[15] Lauren Barrón-López et al., *Why anti-transgender political ads are dominating the airwaves this election*, PBS News (Nov. 2, 2024), https://www.pbs.org/newshour/show/why-anti-transgender-political-ads-are-dominating-the-airwaves-this-election.

[16] *President Trump's Plan*, *supra* note 9.

pen on day one," he would "stop the transgender lunacy" and "get transgender out of the military and out of our elementary schools and middle schools and high schools."[17]

141. Executive Order 14168, issued on President Trump's first day in office, implements these campaign promises, demonstrating that the discriminatory animus expressed throughout his campaign was the driving force behind the Order's restrictions on medical care and housing for incarcerated transgender people.

142. The timing, content, and context of Executive Order 14168 demonstrate it was motivated by and implements the same discriminatory animus President Trump repeatedly expressed during his campaign, rather than any legitimate government purpose.

143. The Gender Ideology Order is also part of a broader pattern of targeted discrimination. From its first days, this administration has moved to strip protections from transgender people across multiple domains—including housing, social services, schools, sports, healthcare, employment, international travel, military service, and family life. *See* Executive Orders 14168, 14183 (military), 14187 (healthcare), 14190 (schools), 14201 (sports).

144. Immediately after January 20, 2025, the federal government also began a sustained effort to erase any mention of transgender people from federal government websites and other materials. For example, the State Department's website that formerly provided advice for "LGBTQI+ Travelers" was revised to provide advice only for "LGB Travelers."[18] A State

---

[17] Azcentral.com and The Arizona Republic, *Turning Point USA Donald Trump full speech: The 'golden age of America' begins now, says Trump* at 57:02-24, YouTube (Dec. 23, 2024), https://www.youtube.com/watch?v=XuIeXJw6BA8.

[18] Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025, 6:22 PM), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-p-rcna190519; *see also* Dep't of State, *Gay and Lesbian Travelers*, Travel.State.Gov, https://travel.state.gov/en/international-travel/planning/personal-needs/gay-lesbian.html.

Department web page providing "Resources for LGBTQI+ Prospective Adoptive Parents" was revised to provide resources only for "LGB Prospective Adoptive Parents."[19] Similarly, stopbullying.gov, a website hosted by the Department of Health and Human Services, removed articles on "LGBT Youth" and "Transgender" bullying.[20] Information related to health and healthcare for transgender people was also wiped from federal government websites.[21]

145. The statements by President Trump before January 20, and the actions taken by his administration—including Defendants—on and after January 20, 2025, demonstrate that Executive Order 14168 is part of a coordinated and sweeping attack on transgender people.

## CLAIMS FOR RELIEF

## COUNT I

**Challenge to Housing and Medical Care Policies**
**Fifth Amendment to the United States Constitution**
**Due Process Clause - Deprivation of Equal Protection of the Laws**
**Against All Defendants in Their Official Capacities**

146. Plaintiffs incorporate all preceding paragraphs of the Complaint as though fully set forth herein.

---

[19] Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-p-rcna190519; *see also* Dep't of State, *Resources for LGB Prospective Adoptive Parents*, Travel.State.Gov, https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/before-you-adopt/LGB-adoption-resources.html.

[20] Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far*, Them (Feb. 7, 2025), https://www.them.us/story/trump-administration-federal-websites-lgbtq-content-deleted-cdc-doe-usaid.

[21] Carla K. Johnson, *Health data, entire pages wiped from federal websites as Trump officials target 'gender ideology,'* Associated Press (Jan. 31, 2025), https://apnews.com/article/trump-gender-ideology-sex-pronouns-order-transgender-2d7e54837f5d0651ed0cefa5ea0d6301.

147. Like the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment prohibits unwarranted discrimination by the federal government.

148. Government action violates the constitutional guarantee of Equal Protection when it is based on "animus," including "negative attitudes," "fear," "irrational prejudice," or "a bare . . . desire to harm a politically unpopular group." *Trump v. Hawaii*, 585 U.S. 667, 705–06 (2018); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Likewise, if a policy's "avowed purpose and practical effect" is "to impose a disadvantage, a separate status, and so a stigma" on a particular group, it cannot survive rational basis review. *United States v. Windsor*, 570 U.S. 744, 770 (2013).

149. There is no rational justification underlying the Gender Ideology Order, which effectively declares a federal policy of denying the existence of transgender people and targeting them based on transgender status and sex. The text of the Order is disparaging on its face, and its apparent purpose and necessary effect is to demean transgender people. The policies announced in the Gender Ideology Order are driven by negative attitudes, fear, and irrational prejudice toward transgender people.

150. The Gender Ideology Order's avowed purposes—promoting women's "dignity, safety, and well-being"; advancing "scientific inquiry, public safety, morale, and trust in government"; and "protect[ing] freedom of conscience"—cannot be reconciled with the "sheer breadth" of the Order. As such, the scope of the Gender Ideology Order "is so discontinuous" with the reasons offered for that it is "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

151. Defendants' immediate and wholesale adoption of the Gender Ideology Order in matters relating to federal prison administration is infected by the same animus. There is no

legitimate penological purpose or other legitimate basis for BOP's decision to adopt the categorical housing and medical policies set forth in Sections 4(a) and 4(c) of the Gender Ideology Order, without regard for the dire health and safety consequences for Plaintiffs and other affected transgender people. These policies are the product of discriminatory animus and are unconstitutional under any level of scrutiny.

152. Defendants have violated the Fifth Amendment's Equal Protection guarantee. Plaintiffs will suffer irreparable injury, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT II

**Challenge to Housing Policy**
**Eighth Amendment to the United States Constitution**
**Cruel and Unusual Punishment**
**Against All Defendants in Their Official Capacities**

153. Plaintiff incorporates all preceding paragraphs of the Complaint as though fully set forth herein.

154. The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court has held that the Eighth Amendment thus prohibits the unnecessary and wanton infliction of pain, including those punishments that are without a legitimate penological justification. A prison official violates the Eighth Amendment when that official acts with deliberate indifference to a substantial risk of serious harm to an incarcerated person. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Helling v. McKinney*, 509 U.S. 25 (1993).

155. Transferring Plaintiffs to men's facilities puts them at a known and substantial risk of serious harm, including an extremely high risk of violence and sexual assault from other incarcerated people and BOP staff. In men's facilities, Plaintiffs will also be at high risk of serious

physical and psychological harms, including worsening gender dysphoria exacerbated by a lack of medical care, and an increased risk of self-harm and suicide.

156. Defendants are aware of the grave risks Plaintiffs face if transferred to men's facilities. The risks to each Plaintiff are obvious, well documented, known to BOP officials, and incorporated into BOP's prior determinations that Plaintiffs should not be housed in men's facilities.

157. Defendants disregarded these known risks when they reversed their own prior individualized determinations for all Plaintiffs to implement a categorical policy requiring all transgender women to be housed in men's facilities. The policy contains no waivers, exemptions, or mechanisms for considering the individual health and safety risks associated with transfer from women's to men's facilities.

158. Defendants' deliberate indifference to known and substantial risks of serious harm to Plaintiffs violates Plaintiffs' rights under the Eighth Amendment. Plaintiffs have suffered and will suffer irreparable injury from these violations, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT III

**Challenge to Medical Care Policy**
**Eighth Amendment to the United States Constitution**
**Cruel and Unusual Punishment**
**Against All Defendants in Their Official Capacities**

159. Plaintiffs incorporate all preceding paragraphs of the Complaint as though fully set forth herein.

160. A prison official who has knowledge of an individual's serious need for medical care and intentionally refuses to provide that care acts with deliberate indifference and therefore violates the Eighth Amendment's prohibition on cruel and unusual punishment.

161. Defendants have adopted a policy implementing Section 4(c) of the Gender Ideology Order, which requires them to terminate and withhold medical treatment for Plaintiffs' gender dysphoria, without consideration of any Plaintiff's individual medical needs or their healthcare providers' independent medical judgment.

162. Each Plaintiffs has a serious medical need for ongoing hormone therapy for their gender dysphoria, which is a rare and serious health condition, and some Plaintiffs have serious medical needs for additional forms of medical treatment. Abruptly terminating hormone therapy treatment and denying other forms of medically necessary treatment violates the applicable standard of care and subjects Plaintiffs to known and substantial risks of serious harm.

163. Denying Plaintiffs medically necessary healthcare for gender dysphoria constitutes deliberate indifference to their serious medical needs and violates the Eighth Amendment's prohibition on cruel and unusual punishment. Plaintiffs have suffered and will suffer irreparable injury from these violations, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT IV

**Challenge to Housing Policy**
**Rehabilitation Act of 1973, Section 504**
**Disability Discrimination – Failure to Accommodate**
**Against All Defendants in Their Official Capacities**

164. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

165. Section 504 of the Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Section 504 prohibits both intentional

disability discrimination and failure to make reasonable accommodations that are necessary to provide qualified individuals with equal access to federal programs and activities.

166. DOJ regulations implementing Section 504 provide that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the agency." 28 CFR § 39.130(a); *see also id.* § 39.130(b) (specifically prohibiting various forms of discriminatory conduct).

167. Violations of the Section 504 statute and regulations by the federal government are subject to judicial review directly under the statute, under federal courts' inherent equitable authority, and under 5 U.S.C. § 706(2)(A), which requires courts to set aside and vacate final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

168. Each Plaintiff is a qualified individual with a disability. Each Plaintiff has a current diagnosis of gender dysphoria as well as a record of gender dysphoria that is known to BOP officials. Gender dysphoria is a serious medical condition that qualifies as a disability. It is a physical impairment that substantially limits the major life activities of interacting with others, reproduction, social and occupational functioning, and caring for oneself, among others.

169. Housing Plaintiffs in women's facilities is a reasonable accommodation for their gender dysphoria. Women's housing is part of the gender dysphoria treatment that BOP has provided to each Plaintiff, and it is part of the recommended treatment protocol set forth by the applicable standards of care and clinical practice guidelines.

170. Involuntarily transferring Plaintiffs to men's facilities would be a cruel and unnecessary revocation of this reasonable accommodation and would deny them equal benefits of correctional and rehabilitative programs and services, including but not limited to safe housing, showers, and healthcare consistent with accepted medical standards.

171. Defendants' policy requiring all Plaintiffs to be transferred from women's to men's facilities under Section 4(a) of the Gender Ideology Order violates Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973 and applicable DOJ regulations. Plaintiffs have suffered and will suffer irreparable injury from these violations, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT V

### Challenge Medical Care Policy
### Rehabilitation Act of 1973, Section 504
### Disability Discrimination
### Against All Defendants in Their Official Capacities

172. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

173. Each Plaintiff is a qualified individual with a disability. Each Plaintiff has a current diagnosis of gender dysphoria as well as a record of gender dysphoria that is known to BOP officials. Gender dysphoria is a serious medical condition that qualifies as a disability. It is a physical impairment that substantially limits the major life activities of interacting with others, reproduction, social and occupational functioning, and caring for oneself, among others.

174. Section 4(c) of the Gender Ideology Order categorically bans medical treatments, regardless of medical need, if they are prescribed to "conform[] an inmate's appearance to that of the opposite sex"—meaning treatments are banned only if they are prescribed to treat gender dysphoria. Section 4(c) does not restrict the medical treatments available for any other condition.

175. Defendants' medical care policy implementing Section 4(c) violates Plaintiffs' rights under Section 504 of the Rehabilitation Act and corresponding DOJ regulations by subjecting Plaintiffs to discrimination and excluding them from participation in or denying them the benefits of correctional and rehabilitative programs and activities provided by BOP—including but not limited to medically necessary healthcare services—because of their gender dysphoria. The actions and omissions which violate Plaintiffs' rights under Section 504 and applicable DOJ regulations include the following:

a. Denying Plaintiffs the opportunity to participate in or benefit from aids, benefits, and services for which they are qualified because they have gender dysphoria;

b. Affording Plaintiffs opportunities to participate in or benefit from aids, benefits, and services that are not equal to the opportunities afforded to others who do not have gender dysphoria;

c. Providing Plaintiffs with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as those benefits and services provided to others who do not have gender dysphoria;

d. Providing Plaintiffs with different or separate aids, benefits, and services than is provided to others who do not have gender dysphoria;

e. Applying eligibility criteria and methods of administration that have the purpose or effect of discriminating against Plaintiffs on the basis of their gender dysphoria;

f. Applying eligibility criteria and methods of administration that have the purpose or effect of defeating or substantially impairing the objectives of BOP programs and activities with respect to Plaintiffs;

g. Failing to make reasonable accommodations in policies, practices, and procedures that are necessary to provide Plaintiffs equal access to BOP programs and activities; and

h. Otherwise limiting Plaintiffs in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others who do not have gender dysphoria.

176. Plaintiffs have suffered and will suffer irreparable injury from these violations, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT VI

**Challenge to Housing Policy**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law**
**Against All Defendants in Their Official Capacities**

177. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

178. The Administrative Procedure Act ("APA") permits judicial review of final agency actions and requires courts to set aside and vacate agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

179. Defendants' housing policy constitutes final agency action. Defendants consummated their decisionmaking process with regard to that policy when they made the decision to transfer all transgender women housed in women's BOP facilities out of those facilities and into

men's facilities. The housing policy determines Plaintiffs' legal rights and had direct and immediate legal consequences affecting their conditions of confinement.

180. Under the *Accardi* doctrine, an agency must follow its own rules and regulations. *See Accardi*, 347 U.S. at 268. Agency action that does not follow agency rules and regulations is arbitrary and capricious and not in accordance with law.

181. A binding Department of Justice regulation promulgated pursuant to the Prison Rape Elimination Act provides that, "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates," BOP "shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c).

182. In deciding to categorically reassign all Plaintiffs to men's facilities, Defendants failed to conduct the "case-by-case assessment" required by the § 115.42(c) to guide the decision "whether to assign a transgender . . . inmate to a facility for male or female inmates." *Id.* The plain text of § 115.42(c) requires BOP to consider both men's and women's facilities as potential placements for transgender individuals and to make the ultimate decision based on a case-by-case consideration of relevant health, safety, management, and security factors. Defendants' housing policy directly violates § 115.42(c) by categorically barring the assignment of transgender women to women's facilities regardless of individual circumstances or the results of prior case-by-case assessments.

183. Defendants' housing policy implementing Section 4(a) of the Gender Ideology Order is arbitrary, capricious, and not in accordance with law and must be set aside under the APA. Plaintiffs have suffered and will suffer irreparable injury from this violation, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT VII

**Challenge to Housing Policy**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Agency Action Taken Without Observance of Procedure Required by Law**
**Against All Defendants in Their Official Capacities**

184. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

185. The APA permits judicial review of final agency actions and requires courts to set aside and vacate agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

186. The APA requires that substantive rules be promulgated through notice-and-comment rulemaking, with general notice published in the Federal Register to allow interested parties an opportunity to participate in the rulemaking process. 5 U.S.C. § 553. Agencies must use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance. Accordingly, binding regulations that were promulgated through notice-and-comment rulemaking cannot be amended or repealed through executive orders or internal agency policies.

187. In adopting the housing policy set forth in Section 4(a) of the Gender Ideology Order, Defendants effectively rescinded or amended § 115.42(c) to make it inapplicable to BOP facilities. That regulation was promulgated through notice-and-comment rulemaking. As such, it can only be properly amended or rescinded through the same procedures. Defendants have not completed such a rulemaking and thus failed to observe procedures required by law.

188. Because Defendants' housing policy implementing Section 4(a) of the Gender Ideology Order was taken without observance the rulemaking procedures required by law and must be set aside under the APA. Plaintiffs have suffered and will suffer irreparable injury from this

violation, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## COUNT VIII

**Challenge to Housing and Medical Care Policies**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**
**Against All Defendants in Their Official Capacities**

189. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

190. The APA requires courts to set aside and vacate agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

191. Agency action is arbitrary and capricious if the agency fails to articulate a rational connection between the facts found and the conclusions made, fails to adequately explain a change in position, or fails to consider applicable statutory factors, reasonable alternatives, or other important aspects of the problem the action is intended to address. Agency action is also arbitrary and capricious if it relies on mere speculation, false or unsupported factual findings, or an erroneous view of the law.

192. The housing and medical policies constitute final agency action. They represent the consummation of the agency's decision-making process: they were issued by agency leadership and do not contemplate any further consideration by the agency prior to implementation and enforcement. Rather than merely clarifying its existing duties, the policies determine the rights of Plaintiffs and BOP's obligations to Plaintiffs, both of which have direct and immediate legal consequences for the Plaintiffs.

193. Defendants acted arbitrarily and capriciously when they adopted a housing policy implementing Section 4(a), which departed dramatically from years of agency policy as set forth

in the Transgender Offender Manual, and which remained in effect and had not been rescinded at the time Defendants adopted the challenged policy.

194. The housing policy rests on inaccurate factual premises and unsupported assumptions. Defendants have not articulated any factual basis for their claim that transgender status or birth sex alone renders transgender women a threat to non-transgender women.

195. Defendants' housing policy contravenes the language and purpose of the federal Constitution, the Rehabilitation Act, and 28 C.F.R. § 115.42(c), which requires BOP to decide whether to place an individual transgender woman in a men's facility or in a women's facility based on a case-by-case assessment of her individual circumstances, including her health and safety as well as BOP's management and security concerns.

196. Defendants failed to consider the consequences of their housing policy on Plaintiffs and other affected transgender women, including but not limited to increased risk of physical and sexual violence, exacerbation of gender dysphoria, loss of clinical progress, increased risk of self-harm or suicide, deteriorating mental health and overall well-being, and dignitary harm.

197. Defendants failed to consider the impacts that their housing policy would have on the management, operation, and security of men's BOP facilities.

198. Defendants failed to consider reasonable alternative measures to their housing policy implementing Section 4(a) of the Executive Order.

199. Defendants also acted arbitrarily and capriciously when they adopted a medical policy implementing Section 4(c), which departed dramatically from years of agency policy as set forth in, for instance, the BOP's June 2023 Clinical Guidance for "Gender-Affirming Care of Transgender and Gender Nonbinary Persons" and the BOP's 2016 Clinical Guidance for "Medical Management of Transgender Inmates."

200. The medical policy rests on inaccurate factual premises and unsupported assumptions. Defendants have provided no meaningful explanation for its prohibition and denial of access to medically indicated treatment for gender dysphoria or for treating people with gender dysphoria differently from any other person with another medically recognized diagnosis.

201. Defendants' medical policy contravenes the language and purpose of the federal Constitution and the Rehabilitation Act,

202. Defendants failed to consider the consequences of their medical policy on Plaintiffs and other affected transgender people in BOP custody, including but not limited to exacerbation of gender dysphoria, loss of clinical progress, increased risk of self-harm or suicide, deteriorating mental health and overall well-being, and dignitary harm.

203. Defendants failed to consider the impacts that their medical policy would have on the management, operation, and security of BOP facilities.

204. Defendants failed to consider reasonable alternative measures to their medical policy implementing Section 4(c) of the Executive Order.

205. Because Defendants' housing and medical care policies are arbitrary and capricious, they must be set aside under the APA. Plaintiffs have suffered and will suffer irreparable injury from this violation, including serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(1) Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that Defendants' implementation of Sections 4(a) and 4(c) of Executive Order 14168 violates Plaintiffs' rights under the Fifth and Eighth Amendments to the United States

Constitution and the Rehabilitation Act of 1973, and violates the Administrative Procedure Act, for the reasons and on the Counts set forth above;

(2) Enter a preliminary and permanent injunction prohibiting Defendants and their officers, employees, servants, agents, appointees, and successors from implementing Sections 4(a) and 4(c) of Executive Order 14168 as to Plaintiffs, and requiring Defendants to maintain Plaintiffs' housing status in women's facilities consistent with the status quo before January 20, 2025, and provide Plaintiffs' medical treatment consistent with the status quo before January 20, 2025;

(3) Hold unlawful and set aside Defendants' policies implementing Sections 4(a) and 4(c) of the Gender Ideology Order under the Administrative Procedure Act;

(4) Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, 42 U.S.C. § 12205, and other applicable laws; and

(5) Grant such other and further relief as the Court deems just and proper.

Dated: September 3, 2026

s/ *Natalie J. Kraner*
Natalie J. Kraner (Bar No. 66202)
Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom (Bar No. 66195)
Wayne Fang (admitted pro hac vice)
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
(973) 422-6722
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com

Eve L. Hill (Bar No. 424896)
ehill@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

Christopher Stoll (admitted *pro hac vice*)
Amy Whelan (admitted *pro hac vice*)
CStoll@nclrights.org
AWhelan@nclrights.org
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel: (415) 365-1338
Fax: (415) 392-8442

Jennifer L. Levi (admitted *pro hac vice*)
Sarah Austin (admitted *pro hac vice*)
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

*Attorneys for Plaintiffs*